Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for all Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, BOLD ALLIANCE, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, CENTER FOR BIOLOGICAL DIVERSITY, and FRIENDS OF THE EARTH,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS and LIEUTENANT GENERAL TODD T. SEMONITE (in his official capacity as U.S. Army Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers),<br><br>Defendants. | CV<br><br>**Complaint for Declaratory and Injunctive Relief** |

**INTRODUCTION**

1.      This case involves the U.S. Army Corps of Engineers' improper issuance of Nationwide Permit 12, a general permit issued for pipelines and other utility projects pursuant to section 404(e) of the Clean Water Act, and improper approval of the Keystone XL pipeline using Nationwide Permit 12. The Corps violated the National Environmental Policy Act, the Clean Water Act, and the Administrative Procedure Act by issuing Nationwide Permit 12 without assessing its significant direct, indirect, and cumulative environmental effects and by using the Permit to approve most of Keystone XL's water crossings without analyzing its project-specific impacts.

2.      In previous litigation over federal approvals of the Keystone XL pipeline, this Court ruled that the U.S. State Department violated the National Environmental Policy Act (NEPA) by failing to supplement its 2014 environmental impact statement (EIS) in light of a new pipeline route through Nebraska and new information about the project's impacts, including new information about the risks and impacts of climate change, oil markets, and oil spills into waterways. The Court enjoined project construction and remanded to the State Department for further environmental analysis. After President Trump issued a new permit for the project on March 29, 2019, the Ninth Circuit dismissed the

suit as moot. Nonetheless, the State Department has stated that it intends to continue revising the EIS to address the Court's order. That process is ongoing.

3. Meanwhile, the U.S. Army Corps of Engineers (Corps) has *already* used its streamlined process under Nationwide Permit 12 (NWP 12) to permit and/or approve Keystone XL to be constructed through the vast majority of rivers, streams, wetlands, and other waterways along the route in Montana, South Dakota, and Nebraska, without adequately evaluating the project's environmental impacts. For example, the Corps has never evaluated the risks or impacts of pipeline oil spills at all, either upon issuance of NWP 12 or upon NWP 12's application to Keystone XL.

4. Section 404(e) of the Clean Water Act (CWA) allows the Corps to issue general nationwide permits (NWPs) for activities that will cause only "minimal adverse environmental effects" and have only "minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). Projects using NWPs may proceed without undergoing the comprehensive and transparent project-level environmental review ordinarily required by CWA section 404(a). There is no public notice or opportunity for public involvement when projects are approved under NWPs.

5. NWP 12 is a final permit authorizing the construction of pipelines and other utility projects nationwide, usually without any further Corps review process.

The Corps estimates that NWP 12 will be used for an estimated 11,500 projects per year over its five-year duration. NWP 12 Decision Document at 70. The Corps does not prepare any project-level NEPA analysis for NWP 12 projects because it purports to have discharged all of its NEPA obligations upon issuance of an environmental assessment (EA) / Finding of No Significant Impact (FONSI) for NWP 12 as a whole (collectively, the "NWP 12 EA"). Thus, the NWP 12 EA constitutes the Corps' only NEPA analysis for projects permitted by NWP 12.

6.      The Corps' NWP 12 EA violates NEPA by failing to adequately evaluate the environmental impacts of pipelines and other utility projects permitted by NWP 12. Incredibly, the EA does not evaluate the risks or impacts of oil spills into waterways at all. Nor does the EA adequately evaluate the direct, indirect, and cumulative impacts associated with approving major oil pipelines like Keystone XL under NWP 12, such as the effects of numerous water crossings, impacts from the creation of pipeline rights of way such as the removal of high-quality forested wetlands, or the pipelines' climate change impacts.

7.      The Corps' issuance of NWP 12 also violates CWA section 404(e) by authorizing activities that will cause more than minimal adverse environmental effects, either individually or cumulatively. NWP 12 authorizes the construction of pipelines and other utility lines that would result in no more than half an acre of loss of waters of the United States; however, it allows linear utility lines such as

pipelines to use NWP 12 repeatedly for each water crossing along a project's length. There is no limit to the number of times a utility line can use NWP 12, nor is there a limit to the total number of acres of wetlands that a utility can impact. This repeated use of NWP 12 causes more than minimal adverse environmental effects.

8.     NWP 12 thereby allows the Corps to artificially treat large interstate pipeline projects as hundreds or even thousands of "single and complete projects" so as to avoid the more transparent and thorough individual permit process required by section 404, which includes public notice and comment and an analysis of the project's overall impacts and alternatives pursuant to NEPA and the CWA. *See* 82 Fed. Reg. 1860, 1985, 1999, 2007 (Jan. 6, 2017).

9.     The Corps attempts to justify this approach by relying on Corps district engineers to conduct project-level reviews to ensure that projects would have no more than minimal adverse effects. However, most projects permitted by NWP 12 can proceed without notification to the Corps at all, so the district engineers have no opportunity to conduct any project-level review in those cases. Even when applicants do notify the Corps, the Corps' failure to conduct project-level review for Keystone XL demonstrates that a project-level minimal adverse effects analysis does not always occur.

10.     TC Energy is the project proponent for the proposed Keystone XL
pipeline, a massive tar sands pipeline that would travel nearly 1,200 miles from
Canada to Nebraska. In 2017, TC Energy submitted three preconstruction
notifications to the Corps for Keystone XL, which listed all of the waterways the
project would cross in Montana, South Dakota, and Nebraska, respectively. But in
response, the Corps issued two verifications—one for Montana and one for South
Dakota—that were limited to one river crossing each and failed to evaluate the
adverse effects of the hundreds of other water crossings, as NWP 12 requires. As
for Nebraska, the Corps notified TC Energy that no Corps review or approval was
necessary for the state, even though the pipeline would cross hundreds of
waterbodies there. As such, the Corps' verifications and approvals of Keystone XL
violated section 404(e) and the terms and conditions of NWP 12 because the Corps
failed to analyze whether the impacts would be more than minimal, either
individually or cumulatively.

11.     Plaintiffs therefore seek a declaration that the Corps' issuance of
NWP 12 violated NEPA and the CWA, and that its use of NWP 12 to approve
Keystone XL violated the CWA and NWP 12 itself. Plaintiffs seek vacatur of the
Corps' approval of Keystone XL using NWP 12, and an injunction against any
construction of Keystone XL or further approvals of the project under NWP 12.

## JURISDICTION AND VENUE

12.     This case arises under the Clean Water Act, 33 U.S.C. §§ 1251 et seq., including § 1344(b) (application of Corps guidelines in permit determinations), § 1344(c) (prohibition of discharge of dredged or fill material that will have an unacceptable adverse effect), and § 1344(e) (setting forth circumstances in which the Corps can issue nationwide permits); the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.; and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. Jurisdiction exists under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (mandamus), and 28 U.S.C. §§ 2201-02 ("creation of remedy" and "further relief" provisions establishing power to issue declaratory judgments in cases of actual controversy).

13.     Venue is appropriate in this Court under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here. The proposed route for the Keystone XL pipeline enters the United States in Montana and crosses approximately 221 waterways under the jurisdiction of the Corps in Montana. The Corps has permitted most of those waterways through its issuance of NWP 12 and/or its verification of Keystone XL to proceed under NWP 12 in Montana.

14.     Assignment to the Great Falls division of this Court is appropriate because Keystone XL would cross the U.S.-Canada border near Morgan, Montana,

in Phillips County. Upon information and belief, the Corps' issuance of NWP 12 and/or its verification of Keystone XL to proceed under NWP 12 will allow Keystone XL to be constructed through approximately 170 jurisdictional waterways in Phillips and Valley Counties in Montana. Phillips and Valley Counties are both within the Great Falls Division. L.R. 1.2(c)(3).

## PARTIES

### Plaintiffs

15.    Plaintiff Northern Plains Resource Council (Northern Plains), based in Billings, Montana, organizes citizens to protect Montana's water, land, air, and working landscapes and pass them on unimpaired to future generations. Northern Plains was founded in the 1970s to protect Eastern Montana's people and agricultural economy from becoming a sacrifice zone for energy development. Northern Plains has over 3,000 members, many of whom live directly on the path of the Keystone XL pipeline and/or close to the pipeline route. Since the federal and state permitting processes for Keystone XL began in 2009, Northern Plains and its members have participated at every step. That includes working to improve reclamation and liability protections for member families whose land the pipeline would cross.

16.    Plaintiff Bold Alliance (Bold) is a network of individuals and not-for-profit environmental- and landowner-rights groups based in Nebraska and other

rural states in the Midwest and South. It has more than 92,000 supporters across the country. Bold advocates for clean energy, fights fossil fuel projects, and works to protect rural landowners and landscapes, in cooperation with Tribal nations, farmers, ranchers, hunters, anglers, and environmentalists. Bold and its allies have spent years working to raise awareness of Keystone XL's threats to the people, land, wildlife, and water of Nebraska and other states, and to persuade our national and state officials to reject it.

17. Plaintiff Natural Resources Defense Council (NRDC) is a national, not-for-profit public-health and environmental advocacy organization whose purpose is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends. NRDC has hundreds of thousands of members, including members who own land and live in states Keystone XL would cross. Since its founding in 1970, NRDC has worked to enforce environmental laws and to reduce air and water pollution from, threats to wildlife and habitat from, and destruction of natural lands by industrial activity. NRDC has fought to curb greenhouse gas emissions that contribute to climate change, including by working to educate people about, and combat the threats posed by, Canadian tar sands crude oil. NRDC has also litigated to protect endangered wildlife and wild lands, advocated for the addition of at-risk animals and plants to the lists of endangered and threatened species under the Endangered Species Act (ESA), and educated

lawmakers and the public about the value of protecting and conserving these resources.

18. Plaintiff Sierra Club is the nation's oldest grassroots organization dedicated to the protection and preservation of the environment. The Sierra Club has over one million members and supporters dedicated to exploring, enjoying, and protecting the wild places of the Earth; practicing and promoting the responsible use of the Earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives. The Sierra Club has chapters and members in each of the states through which Keystone XL would pass. The Sierra Club's concerns encompass the protection of wildlands, wildlife and habitat, water resources, air, climate, public health, and the health of its members, all of which stand to be affected by Keystone XL.

19. Plaintiff Center for Biological Diversity (the Center) is a national nonprofit organization that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center has over 70,000 members and more than 1.4 million online supporters worldwide. The Center has worked for decades to safeguard fresh water for people, plants, and animals. One of the Center's main goals is to protect the habitats and communities that may be adversely affected by fossil fuel infrastructure projects,

such as Keystone XL. The Center's members and staff value and benefit from rare species' continued existence in the wild, and are concerned about new industrial development and associated trends like global climate change and water degradation that threaten wild species' survival and recovery. The Center has worked for years to protect several imperiled species that would be harmed by Keystone XL, including the critically endangered whooping crane, endangered interior least tern, endangered American burying beetle, endangered pallid sturgeon, and threatened piping plover.

20.     Plaintiff Friends of the Earth (FoE) is a non-profit advocacy organization founded in 1969. FoE has more than 380,000 members and almost 1.9 million activists across the United States. It is a member of Friends of the Earth International, which is the world's largest grassroots environmental network with 75 affiliates worldwide. FoE's mission is to defend the environment and champion a healthy and just world. FoE speaks truth to power and exposes those who endanger people and the planet. Its campaigns work to hold politicians and corporations accountable, transform our economic systems, protect our forests and oceans, halt climate chaos, and revolutionize our food and agriculture systems. Ending destructive tar sands development is one of FoE's top priorities.

21.     In bringing this lawsuit, Plaintiffs stand in the shoes of members, staff, and other supporters who live, work, and recreate in places threatened by

Keystone XL and who use, study, and cherish the land, water, wildlife, and other resources that may be irrevocably damaged by the project. Plaintiffs have numerous members and other supporters who live in Montana, South Dakota, and Nebraska—the states that Keystone XL would cross. Plaintiffs' members, other supporters, and staff include individuals who study and advocate for better protection of wildlife and other resources threatened by Keystone XL.

22.     For example, some of Plaintiffs' members own property on and/or near the proposed pipeline route, and some of those properties are located downstream of and/or near waterways that the pipeline would cross. The project threatens these individuals' use and enjoyment, and the economic value, of their property, as well as the waters that members use and enjoy both as a resource and for the habitat they provide for plants and animals. Some of Plaintiffs' members also enjoy hiking, picnicking, fishing, and observing wildlife in parks and along rivers and streams near and on the proposed pipeline route, and plan to return to those areas to pursue such activities in the future. In addition, some of Plaintiffs' members study and enjoy observing wild species whose survival and recovery are threatened by Keystone XL, including the critically endangered whooping crane and other federally protected Great Plains migratory birds, such as the interior least tern and piping plover.

23.     The Corps' unlawful issuance of NWP 12 and approval of Keystone XL using NWP 12 threaten the health, recreational, economic, professional, scientific, and aesthetic interests of Plaintiffs' members, staff, and other supporters.

24.     For example, the Corps' NWP 12 EA did not adequately address the risk of oil spills from pipelines such as Keystone XL. A spill on a member's land would interfere with their use and enjoyment of the property, threaten their water supply, and decrease property values. Similarly, the negative ecological effects of pipeline construction through streams and rivers—such as increased sedimentation and harm to species—would interfere with members' use and enjoyment of those waterways.

25.     By refusing to prepare and publish an adequate and complete environmental review for NWP 12 or Keystone XL, the Corps failed to analyze and address the project's negative impacts on and threats to the interests of Plaintiffs' members, other supporters, and staff. The Corps also deprived these individuals of their right to participate in the approval process in order to protect the interests described above.

26.     The declaratory and injunctive relief Plaintiffs seek in this lawsuit will redress their injuries by setting aside the Corps' approvals and requiring the Corps to comply with NEPA, the CWA, and the APA. This relief will give Plaintiffs, their members, other supporters, staff, and the general public more comprehensive

and complete information regarding Keystone XL's threats to waterways and other valued resources. It will allow Plaintiffs, their members and supporters, and others who are concerned about Keystone XL to advocate more effectively for denial of the project or changes to its design and operation that would help mitigate its adverse impacts (including but not limited to measures designed to protect wetlands and waterways and reduce the impacts of oil spills). And it will give federal, state, and local decision-makers the chance to make better-informed decisions about whether and on what terms to approve the project.

### Defendants

27.    Defendant U.S. Army Corps of Engineers (Corps) is the federal agency charged with administering permits under section 404 of the CWA for discharge of dredged or fill material into the waters of the United States. The Corps is headquartered in Washington, D.C. The Corps has three regulatory offices in Montana, and its Omaha, Nebraska district office oversees the regulatory program in Montana.

28.    Defendant Todd T. Semonite is Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers headquartered in Washington, D.C., and is designated to act for the Secretary of the Army. Plaintiffs bring this action against Lieutenant General Semonite in his official capacity only. Lieutenant

General Semonite is the federal officer personally responsible for compliance with any injunction that this Court issues.

## LEGAL BACKGROUND

### The Clean Water Act

29.     The CWA was enacted by Congress in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, section 404 of the CWA prohibits the discharge of any pollutant, including dredged soil or other fill material, into navigable waters unless authorized by a permit. *Id.* §§ 1311, 1344.

30.     Section 404 of the CWA gives the Corps primary responsibility for permitting construction activities that involve dredge and fill of U.S. waters. *Id.* § 1344(a), (d). The Corps oversees the 404 permit process and must comply with guidelines promulgated by the U.S. Environmental Protection Agency (EPA), which are incorporated into the Corps' own regulations. *Id.* § 1344(b)(1); 33 C.F.R. §§ 320.4(b)(4), 325.2(a)(6). The objective of these "404(b)(1) guidelines," set forth at 40 C.F.R. Part 230, is to prevent unacceptable adverse impacts to the nation's aquatic ecosystems from the discharge of dredged or fill material. 40 C.F.R. § 230.1(c).

31.     The guidelines provide that no discharge of dredged or fill material shall be permitted for an individual project: (1) if there is a practicable alternative

to the proposed discharge; (2) if the discharge causes or contributes to violations of applicable state water quality standards; (3) if the discharge causes or contributes to significant degradation of the environment; and (4) unless all appropriate and practicable steps have been taken to minimize potential adverse impacts. *Id*. § 230.10. "Practicable alternatives" include "not discharging into the waters of the U.S. or discharging into an alternative aquatic site with potentially less damaging consequences." *Id*. § 230.5(c); *see id.* § 230.10(a). The Corps' regulations also require that destruction of wetlands be avoided to the extent practicable. 33 C.F.R. § 320.4(b), (r).

32.     Public participation plays an important role in CWA permitting decisions. The CWA provides in its general policy section that "[p]ublic participation in the development . . . of any . . . program established by the Administrator . . . under this chapter shall be provided for, encouraged, and assisted by the Administrator . . . ." 33 U.S.C. § 1251(e). *See also id.* § 1344(a) ("The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites."); 33 C.F.R. § 327.4(b) ("[A]ny person may request, in writing, . . . that a public hearing be held . . . . Requests for a public hearing under this paragraph shall be granted, unless the district engineer determines that the issues

raised are insubstantial or there is otherwise no valid interest to be served by a hearing.").

33.     When issuing an individual section 404 permit for a specific project, the Corps must comply with the requirements of NEPA, which are set forth below.

34.     An alternative to this comprehensive, transparent individual permit process is the nationwide permit program. "Nationwide permits (NWPs) are a type of general permit issued by the Chief of Engineers and are designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts." *Id.* § 330.1(b).

35.     Section 404(e) allows the Corps to, "after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the [Corps] determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). NWPs can last up to five years, at which point they must be reissued or left to expire. *Id.* § 1344(e)(2); 33 C.F.R. §§ 330.5, 330.6(b).

36.     Once an NWP is issued, specific projects that meet the terms and conditions of that NWP may proceed without obtaining an individual section 404 permit. Projects permitted via an NWP are not subject to public participation, and

do not go through the more comprehensive, site-specific environmental and public interest review individual section 404 permits require. *See* 33 C.F.R. § 323.3(a).

37.    In most cases, permittees may proceed with activities authorized by NWPs without notifying the Corps at all. *Id.* § 330.1(e)(1).

38.    In some cases, however, permittees must notify Corps district engineers of their projects through submission of a preconstruction notification (PCN) and await verification before the project may proceed under the NWP. *Id.* §§ 330.1(e)(1), 330.6(a).

39.    If, upon receiving a PCN, the district engineer decides that an activity does not comply with the terms or conditions of an NWP, the district engineer must deny verification and require an individual section 404 permit. *Id.* § 330.6(a)(2).

40.    If the district engineer determines that an activity does comply with the terms and conditions of an NWP, the district engineer will notify the applicant that the project is verified under the NWP. *Id.* § 330.6(a)(3). The district engineer may add conditions on a case-by-case basis to ensure the activity will have only minimal individual and cumulative adverse effects on the environment and will not be contrary to the public interest. *Id.* § 330.6(a)(3)(i).

41.     Ordinarily, once a permittee has submitted a PCN for a project under an NWP, it may presume that the project qualifies for the NWP unless otherwise notified by the district engineer within a 45-day period. *Id*. § 330.1(e)(1).

42.     The Corps does not issue any public notice or allow any opportunity for public involvement when a PCN is submitted or when a project is verified under an NWP. *See id*. § 330.1(e).

43.     Corps regulations provide that two or more different NWPs can be combined to authorize a project, but that "the same NWP cannot be used more than once for a single and complete project." *Id*. § 330.6(c).

44.     Corps division engineers may prepare supplemental documentation for NWPs, make modifications, and add regional conditions. *Id*. § 330.5(c).

## The National Environmental Policy Act

45.     NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Congress enacted it in 1969 "to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

46.     NEPA seeks to ensure "that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance

the environment." 40 C.F.R. § 1500.1(b), (c). When the federal government acts before fulfilling its NEPA obligations, courts may set the action aside until the government complies with NEPA.

47. The Council on Environmental Quality (CEQ) is an agency created by NEPA and housed within the Executive Office of the President. 42 U.S.C. § 4342. CEQ has promulgated general regulations implementing NEPA. 40 C.F.R. §§ 1500-1508.

48. To achieve these objectives, NEPA requires all federal agencies to prepare a "detailed statement" for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement—the EIS—must describe the environmental impacts of the proposed action. *Id.* § 4332(2)(C)(i), (ii). The EIS is an "action-forcing device" that ensures NEPA's goals "are infused into the ongoing programs and actions" of the federal government. 40 C.F.R. § 1502.1.

49. To determine whether a proposed action significantly affects the environment, and whether an EIS is required, the lead federal agency first prepares an EA. *Id.* §§ 1501.4(b), 1508.9.

50. An EA must provide sufficient evidence and analysis to determine whether to prepare an EIS. *Id.* § 1508.9. The lead agency must take a hard look at the relevant environmental concerns and alternatives to the proposed action. The

agency must consider both the context and intensity of the proposed action, including whether the project will take place in wetlands or other "ecologically critical areas," whether the project will affect endangered species, and "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." *Id*. § 1508.27 (a), (b).

51. If the agency concludes in an EA that a project may have significant environmental impacts, then it must prepare an EIS. *Id*. § 1501.4. If an EA concludes that there are no potentially significant impacts to the environment, the federal agency must describe why the project's impacts are insignificant and issue a FONSI. *Id*. § 1508.13. If the agency issues an EA/FONSI, it must make a convincing case for a finding of no significant impact on the environment, since the FONSI is crucial to a court's evaluation of whether the agency took the requisite hard look at the potential impacts of a project.

52. An EIS or EA must include a "full and fair discussion" of the "direct," "indirect," and "cumulative" effects of the action, as well as a discussion of "[m]eans to mitigate adverse environmental impacts." *Id*. §§ 1502.1, 1502.16(a), (b) & (h), 1508.25(c). Direct impacts are "caused by the action and occur at the same time and place." *Id.* § 1508.8(a). Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8(b). Cumulative impacts are the "incremental impact[s]

of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

53. Agencies must include analysis of any "[c]onnected" actions in the same EIS or EA. *Id.* § 1508.25(a)(1). Connected actions are those that "[a]utomatically trigger other actions which may require environmental impact statements," "[c]annot or will not proceed unless other actions are taken previously or simultaneously," or "[a]re interdependent parts of a larger action and depend on the larger action for their justification." *Id.*

54. The EIS or EA must also inform federal agency decision-makers and the public of the "reasonable alternatives" that would "avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.* § 1502.1. This analysis of alternatives is the "heart" of the document—i.e., where the agency should "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options." *Id.* § 1502.14. The EIS or EA must "[r]igorously explore and objectively evaluate all reasonable alternatives," including the alternative of "no action." *Id.* § 1502.14(a), (d).

55. The CEQ regulations require the federal agency to provide an opportunity for public participation. *See id*. § 1500.1(b) ("public scrutiny [is] essential"), § 1500.2(d) (the agency must "[e]ncourage and facilitate public involvement"), § 1506.6 (the agency must "[m]ake diligent efforts to involve the public" in preparing environmental documents, give "public notice of . . . the availability of environmental documents so as to inform those persons . . . who may be interested or affected," and "[s]olicit appropriate information from the public."). CEQ regulations require federal agencies to give the public as much information as is practicable, so that the public has a sufficient basis to assess those areas that the agency must consider in conducting the environmental review. *See id*. § 1501.4.

## The Administrative Procedure Act

56. The APA provides for judicial review of agency actions such as those at issue here. A reviewing court shall "hold unlawful and set aside" any Corps actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## FACTS

## The Corps' Reissuance of NWP 12

57. On June 1, 2016, the Corps published a proposal to reauthorize 50 existing NWPs and add two new NWPs. 81 Fed. Reg. 35,186, 35,188 (Jun. 1,

2016). The Corps also proposed to reissue the general conditions and definitions for all NWPs, with some modifications, and to add one new general condition. *Id*. at 35,186. The Corps invited public comment for a period of 60 days, ending on August 1, 2016. *Id.*

58.     On August 1, 2016, the Sierra Club, the Center, Bold Alliance, and NRDC, among many others, submitted comments to the Corps that focused on NWP 12 and outlined violations of the CWA, NEPA, and ESA.

59.     On January 6, 2017, the Corps published a final decision ("Final Decision") reissuing 50 NWPs, general conditions, and definitions (with some modifications), and issuing two new NWPs and one new general condition. 82 Fed. Reg. at 1860. The NWPs took effect on March 19, 2017, and expire on March 18, 2022. *Id*.

60.     The Final Decision included the reissuance of NWP 12 for utility projects with up to a half-acre loss of waters of the United States. *Id*. at 1985. The general conditions, *id.* at 1998-2008, and definitions, *id.* at 2005-06, discussed herein apply to all NWPs, including NWP 12.

61.     NWP 12 authorizes "discharges of dredged or fill material into waters of the United States . . . associated with the construction, maintenance, or repair of utility lines," "provided the activity does not result in the loss of greater than ½-acre of waters of the United States for each single and complete project." *Id*. at

1985. The definition of "utility line" includes "any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance," which includes oil pipelines. *Id*.

62.     NWP 12 also authorizes discharges into waters of the United States for the construction of related substation facilities, access roads, and overhead utility lines. *Id*.

63.     Although NWP 12 is limited to utility projects with up to a half acre of loss of U.S. waters for each "single and complete project," for linear projects the Corps defines that term as "that portion of the total linear project . . . that includes *all crossings of a single water of the United States (i.e., a single waterbody) at a specific location*." *Id.* at 2007 (emphasis added). In other words, NWP 12 allows pipelines and other linear utility projects to use NWP 12 separately at each location where the project crosses a river, stream, or wetland. By contrast, non-linear projects can invoke NWP 12 only once for the overall project, unless the separate components of the project would have "independent utility" (i.e., if the components could function as stand-alone projects). *Id.* at 2006.

64.     NWP 12 thus allows the Corps to treat numerous water crossings along a proposed linear utility project—which often number in the hundreds or thousands—as "single and complete projects" that each qualify separately under NWP 12. There is no limit to the number of times that a single linear utility project

can use NWP 12, nor is there a maximum number of acres of water that a linear project can impact while still being authorized under NWP 12. Because the Corps treats each crossing separately, it does not use the total amount of loss attributable to a project to determine whether the half-acre threshold has been met.

65.    The Corps rationalizes this practice by claiming that water crossings on a linear pipeline are usually at "separate and distant" locations and/or separate watersheds along a pipeline route such that cumulative effects are dissipated. For example, the Final Decision states:

> We do not agree that the [½-acre] limit should apply to the entire utility line because the separate and distant crossings of waters of the United States are usually at separate waterbodies scattered along the length of the utility line, and are often in different watersheds . . . . For utility lines that cross the same waterbody (e.g., a river or stream) at separate and distant locations, the distance between those crossings will usually dissipate the direct and indirect adverse environmental effects so that the cumulative adverse environmental effects are no more than minimal.

*Id.* at 1885.

66.    However, NWP 12 does not actually require that multiple crossings along a linear project be "separate and distant" or in separate watersheds: it does not define the phrase "separate and distant" or impose any spacing requirements, and it does not require district engineers to make a "separate and distant" finding. In fact, linear projects permitted by NWP 12, including but not limited to Keystone XL, often have ten or more water crossings within a mile.

67.     The Corps further claims that district engineers, upon receipt of a PCN for an NWP 12 project, will conduct a project-level review to ensure that all of its water crossings "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment," as required by 33 U.S.C. § 1344(e)(1). 82 Fed. Reg. at 1870; *see also id.* at 1885 ("If the district engineer determines after reviewing the PCN that the cumulative adverse environmental effects are more than minimal . . . he or she will exercise discretionary authority and require an individual permit.")

68.     However, NWP 12 requires a permittee to submit a PCN *only if* the proposed project meets certain criteria. *See, e.g.*, *id*. at 1986, 1999, 2000, 2003-04. If none of these criteria is met, a project proponent may commence with the activity under NWP 12 without notifying the Corps or the public at all.

69.     In fact, many project applicants proceed under NWP 12 without ever submitting a PCN or notifying the Corps, and thus the Corps district engineers lack the opportunity to evaluate the environmental effects of those projects at all.

70.     When an applicant does submit a PCN, the PCN must include a listing of not only the water crossings that triggered the PCN requirement, but also all water crossings along the project. *Id.* at 1986 (Note 8) (stating that the PCN must include "*other separate and distant crossings that require Department of the Army authorization but do not require pre-construction notification*" (emphasis added)).

The district engineer must then "evaluate the PCN in accordance with Section D, 'District Engineer's Decision,'" and "may require mitigation to ensure that the authorized activity results in no more than minimal individual and cumulative adverse environmental effects." *Id.* In turn, Section D, "District Engineer's Decision," states that "the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest." *Id.* at 2004. "For a linear project, this determination will include an evaluation of the individual crossings of waters of the United States to determine whether they individually satisfy the terms and conditions of the NWP(s), *as well as the cumulative effects caused by all of the crossings authorized by NWP.*"[1] *Id.* at 2004-05 (emphasis added).

---

[1] The same section provides additional detail about what that analysis should look like: "When making minimal adverse environmental effects determinations the district engineer will consider the direct and indirect effects caused by the NWP activity. He or she will also consider the cumulative adverse environmental effects caused by activities authorized by NWP and whether those cumulative adverse environmental effects are no more than minimal. The district engineer will also consider site specific factors, such as the environmental setting in the vicinity of the NWP activity, the type of resource that will be affected by the NWP activity, the functions provided by the aquatic resources that will be affected by the NWP activity, the degree or magnitude to which the aquatic resources perform those functions, the extent that aquatic resource functions will be lost as a result of the NWP activity (*e.g.*, partial or complete loss), the duration of the adverse effects (temporary or permanent), the importance of the aquatic resource functions to the region (*e.g.*, watershed or ecoregion), and mitigation required by the district engineer." *Id*. at 2005.

71.     In the Final Decision, the Corps explains that the purpose of the PCN requirements included in Note 8 "is to remind users of the NWPs that if a utility line includes crossings of waters of the United States that are authorized by NWP but do not require PCNs, and one or more crossings of waters of the United States requires pre-construction notification, then the PCN must include those non-PCN crossings, in accordance with the requirements of paragraph (b)(4) of general condition 32." *Id.* at 1889.

72.     Likewise, general condition 32(b)(4) states that the PCN must include "any other NWP(s), regional general permit(s), or individual permit(s) used or intended to be used to authorize any part of the proposed project or any related activity, including other separate and distant crossings for linear projects that require Department of the Army authorization but do not require pre-construction notification." *Id.* at 2003.

73.     The requirement that a PCN include all water crossings using NWP 12 (not only those that triggered the PCN requirement) is necessary to allow the district engineer to evaluate the adverse effects of an overall project and ensure that they would be no more than minimal, either individually or cumulatively, and to ensure that the project complies with all general and regional conditions for use of NWP 12 before it can proceed. *See id.* at 2004.

## The Corps' NEPA Documents for NWP 12

74.     The Corps' reissuance of NWP 12 is a major federal action that requires compliance with NEPA. *See* 42 U.S.C. § 4332(2)(C). The Corps issued an EA and FONSI for its reissuance of NWP 12 on December 21, 2016.

75.     The NWP 12 EA is the Corps' only NEPA document for an estimated 11,500 uses of NWP 12 per year nationwide. The Corps will not prepare any further NEPA analysis for individual projects that are permitted, verified, or authorized by NWP 12. *See, e.g.*, 82 Fed. Reg. at 1861 ("Corps Headquarters fulfills the requirements of NEPA when it finalizes the environmental assessment in its national decision document for the issuance or reissuance of an NWP. An NWP verification issued by a district engineer does not require separate NEPA documentation."). In fact, for oil pipelines, there is no guarantee that any other federal agency will conduct any project-level NEPA review because there is no federal statute governing oil pipeline permitting.

76.     The NWP 12 EA is narrowly limited to discussing the impacts of discharges of fill material into waterways. It does not discuss the full range of direct, indirect, and cumulative impacts associated with oil pipelines or other utility projects permitted by NWP 12.

77.     For example, the NWP 12 EA does not evaluate the risks or impacts of pipeline oil spills into waterways, nor does it discuss the various types of crude

oil transported by pipelines permitted by NWP 12 or their respective characteristics, impacts, or spill response requirements. Instead, the Corps' NWP 12 EA simply states: "We do not have the authority to regulate the operation of oil and gas pipelines, and we do not have the authority to address spills or leaks from oil and gas pipelines." NWP 12 Decision Document at 7.

78. The NWP 12 EA does not evaluate the climate change impacts associated with NWP 12, including the potential for increased greenhouse gas emissions caused by pipeline construction and/or the lifecycle emissions associated with the oil transported by NWP 12 projects. Instead, the NWP 12 EA states: "The Corps does not have the legal authority to regulate the burning of fossil fuels that are transported by pipelines where the Corps authorized crossings of waters of the United States by NWP 12, other general permits, or individual permits. Therefore, in its environmental documentation the Corps is not required to fully evaluate the burning of fossil fuels . . . ." NWP 12 Decision Document at 9.

79. The NWP 12 EA also does not evaluate the impacts associated with the permanent conversion of forested wetlands to lesser quality wetlands associated with pipeline rights of way. However, the EA does acknowledge that forested wetland will be permanently converted. *See, e.g.*, NWP 12 Decision Document at 11 ("There is often conversion of wetland types within utility line

rights-of-way and those conversions often need to be permanently maintained while the utility line is operational.").

80.     The NWP 12 EA purports to contain a cumulative effects analysis, but that analysis fails to comply with NEPA. It includes only a summary of historic and current causes of wetlands depletion in the United States; discusses U.S. waters and species or habitat loss generally; and estimates the total acreage and condition of wetlands in the United States. The NWP 12 EA does not discuss any cumulative impacts specifically associated with the construction, maintenance, operation, or repair of utility projects such as crude oil or natural gas pipelines; the cumulative effects associated with the creation and permanent maintenance of pipeline rights of way such as forest fragmentation, habitat loss, erosion and sedimentation, soil nutrient loss, aesthetic impairment, etc.; or the cumulative effects from using NWP 12 hundreds of times, often in close proximity, to approve a massive pipeline project like Keystone XL. In fact, the cumulative effects analysis in the NWP 12 EA is the same boilerplate language contained verbatim in the decision documents for each of the 52 NWPs.

81.     Rather than evaluate the full host of direct, indirect, and cumulative impacts associated with pipelines and other activities permitted by NWP 12, the NWP 12 EA appears to defer much of its analysis to the project level. For example, the EA states: "Although the terms and conditions for this NWP have been

31

established at the national level to authorize most activities that have no more than

minimal individual and cumulative adverse environmental effects, division and

district engineers have the authority to impose case-specific conditions on an NWP

authorization to ensure that the authorized activities will result in only minimal

individual and cumulative adverse environmental effects. . . . If the proposed

activity will result in more than minimal adverse environmental effects, then the

district engineer will exercise discretionary authority and require an individual

permit." NWP 12 Decision Document at 27-28. However, the Corps division or

district engineer performs no further NEPA analysis when projects proceed under

NWP 12, even upon issuance of verifications for specific projects.

82.     On March 17, 2017, the Corps' Omaha district office issued a

Supplemental Decision Document ("Regional Decision") approving the NWPs and

adding NWP regional conditions for Montana, South Dakota, and Nebraska.

83.     The Regional Decision contains only a general discussion of regional

cumulative impacts (e.g., it estimates the number of yearly uses of NWP 12 and

acreage affected in the region), but continues to rely on district engineers' review

at the project level to ensure specific projects would have no more than minimal

cumulative effects. Indeed, the Regional Decision uses the same phrase nearly

verbatim in addressing eight separate categories of impacts: "The Omaha District

*reviews each proposed activity and carefully considers the cumulative effects to*

*watersheds and the aquatic resources*. By closely adhering to the requirements of the NWP and pertinent regional conditions, every effort is made to ensure that project activities have minimal effects . . . ." Regional Decision § 7.2(a) (emphasis added); *see also id.* § 7.2(b)(e), (g), (i)-(j)(1) (including nearly identical language).

84.     The Regional Decision does not purport to contain any NEPA analysis, nor does it discuss the risks or impacts of oil spills into waterways.

## TC Energy's Keystone XL Pipeline Project

85.     If built, the Keystone XL pipeline would be approximately 1,200 miles long and made of three-foot-wide steel pipe. It would stretch from Canada's tar sands mining region through Montana and South Dakota to southern Nebraska. The applicant, TC Energy (formerly TransCanada) would build the pipeline in an approximately 110-foot-wide construction right of way; the permanent right of way for most stretches of the pipeline route would be 50 feet. The project would cross approximately 47 miles of federal lands administered by the Bureau of Land Management, including at the U.S.-Canada border crossing.

86.     Keystone XL would import Canadian tar sands and other crude oil from Hardisty in Alberta, Canada to Steele City, Nebraska. In Steele City, Keystone XL would connect to TC Energy's existing pipeline network, which serves refineries and export terminals on the Gulf Coast. Connecting Keystone XL to the existing network would allow TC Energy to move as many as 830,000

additional barrels (about 35 million gallons) of crude oil from Canada to the Gulf Coast every day. If TC Energy receives a waiver to operate the pipeline at higher pressure, capacity could increase to 900,000 barrels per day. Keystone XL would be one of the largest oil pipelines ever built in the United States.

87.    There is no requirement that gasoline and other finished products made from Keystone XL's oil be sold on U.S. markets, and most of the refined product would likely be exported to other countries.

88.    Keystone XL would increase the extraction, transport, refining, and burning of oil derived from tar sands, one of the dirtiest and most destructive fuels on our planet. Tar sands crude oil—also known as oil sands crude oil, bitumen, or Western Canadian Sedimentary Basin crude oil—is an unconventional petroleum source that is mined from a mixture of sand and clay underlying the boreal forests and wetlands of Alberta, Canada.

89.    Tar sands crude oil is not extracted from the ground like other types of oil. Instead, it is mined using either open pit mining or in-situ drilling, two methods that are energy intensive and cause significant air and water pollution and deforestation.

90.    The mining, processing, refining, and end-use burning of tar sands also generates large amounts of carbon dioxide and other greenhouse gases that contribute to climate change. During the NEPA process for Keystone XL, the State

Department and the EPA both concluded that lifecycle greenhouse gas pollution from tar sands is much higher—about 17%—than that from other forms of crude oil.

91.     The significant greenhouse gas emissions enabled by Keystone XL would exacerbate climate change, one of the predominant environmental crises of our age. The extraction and burning of fossil fuels, changes in land use (such as deforestation), and other processes associated with population growth and industrialization are causing the Earth's temperature to rise and its climate to change.

92.     According to the National Oceanic and Atmospheric Administration, the last five years were the hottest on record. Higher surface temperatures cause a wide range of human and ecological harms, including sea-level rise, coastal flooding, heat waves, increased risk of stronger hurricanes and extreme weather, increased risk of wildfires, water shortages, species extinction, habitat destruction, and shifting disease pathways.

93.     The transportation of tar sands crude oil through the Keystone XL pipeline also poses other serious threats to human health and the environment, particularly waterways. Oil pipelines routinely leak and spill oil, and diluted bitumen, or "dilbit," is extremely difficult to clean up after a spill—much more so than conventional crude oils. The chemicals used to dilute the bitumen can

vaporize into air or dissolve into water, leaving behind the heavy bitumen. Because it does not readily biodegrade and is incredibly viscous and sticky, bitumen is nearly impossible to remove from the natural environment, where it persistently lingers as a source of oil pollution.

94.    Two dilbit spills from pipelines have highlighted how costly and damaging such spills can be. A 2010 tar sands crude oil spill in Michigan's Kalamazoo River led to a more than $1.2 billion cleanup effort, the most expensive oil pipeline cleanup in U.S. history. A 2013 spill in Mayflower, Arkansas contaminated an entire neighborhood and caused extensive health problems for residents, including headaches, nausea, fatigue, nosebleeds, bowel issues, and breathing problems.

95.    Problems with a Keystone XL predecessor also owned and operated by TC Energy, the Keystone I pipeline, underscore the significant spill risks associated with crude oil pipelines. When it began shipping oil through Keystone I in June 2010, TC Energy claimed that "[c]onstruction and operation of the Keystone Pipeline system will continue to meet or exceed world class safety and environmental standards." But in its first year of operation alone, Keystone I leaked at least 14 times and was temporarily shut down by U.S. authorities. Canadian authorities recorded more than 20 spills and other accidents between June 2010 and July 2011. In April 2016, Keystone I spilled 16,800 gallons; and in

November 2017, spilled another 210,000 gallons. Both of these major spills occurred in South Dakota.

96.     Spills from Keystone XL could be particularly harmful because they threaten aquifers that serve as the main or sole source of drinking and irrigation water for many people. The proposed route described in the State Department's 2014 analysis would cross parts of the Northern High Plains Aquifer in South Dakota and Nebraska, including the Northern Great Plains Aquifer System that supplies communities in eastern Montana and the Ogallala Aquifer that supplies most of Nebraska's drinking and irrigation water. The Ogallala is the United States' largest freshwater aquifer. As development and climate change increase competition for and stress on water supplies, protecting our freshwater aquifers will become ever more important. Keystone XL would threaten these aquifers directly and threaten surface waters that are hydrologically connected to the aquifers.

97.     Keystone XL's construction would also harm rivers and wetlands and threaten human health and welfare. The State Department's 2014 EIS found that the proposed route would cross more than one thousand rivers and streams and more than three hundred acres of wetlands. Using horizontal directional drilling, TC Energy would drill tunnels under the largest rivers, which include the Yellowstone, Missouri, Milk, Frenchman, Cheyenne, Bad, White, Elkhorn, and

Platte Rivers. With horizontal directional drilling crossings, the project would use drilling mud, or fracking fluid, to drill underneath the waterways.

98. Horizontal directional drilling presents a threat of "frac-out," which occurs when pressurized fluids and drilling lubricants escape the active bore, migrate up through the soils, and come to the surface at or near the construction site or in the waterbody.

99. TC Energy would use an "open cut" method—excavating a trench in the streambed while water is flowing—to cross most other streams and rivers. In larger waterways, TC Energy would place construction equipment in the channel. These activities will increase sediment pollution and the risk of oil spills in waters that support fish and other wildlife and that people along the proposed route use for drinking, recreation, and agriculture.

100. Construction in wetlands would be particularly damaging. Keystone XL would cut a 75-to-110-foot-wide path through wetlands along the proposed route. For comparison, Interstate 15 in central Great Falls is approximately 115 feet wide. Construction in wetlands can damage and destroy precious wildlife habitat, including foraging, nesting, spawning, rearing, and resting sites for migratory birds. It can also damage and destroy the wetland plants that influence water chemistry and trap sediments and other pollutants, harming water quality.

101.    According to the State Department's 2014 analysis, the construction

of the project would impact a total of 11,599 acres, including approximately 128

acres of herbaceous wetlands, 53 acres of scrub-shrub wetlands, 7 acres of forested

wetlands, and 74 acres of riverine and open water wetlands; and the operation of

the pipeline would *permanently* affect an estimated 55 acres of herbaceous

wetlands, 23 acres of scrub-shrub wetlands, 5 acres of forested wetlands, and 38

acres of riverine and open-water wetlands.

102.    The project will require the construction of approximately 21 new

pump stations, 55 new mainline valves, and hundreds of miles of new power lines,

as well as permanent and temporary access roads.

## The State Department's Approval of Keystone XL

103.    In September 2008, TC Energy submitted an application to the State

Department pursuant to Executive Order 13,337 for approval of a cross-border

permit for the proposed Keystone XL pipeline.

104.    Because Executive Order 13,337 requires the State Department to

determine whether the project "would serve the national interest," the State

Department acted as the lead agency in the Keystone XL NEPA process—as it had

done for most, if not all, cross-border projects since 1968. The Corps elected to

participate as a cooperating agency in preparation of the EIS because the project

requires authorization under section 404 of the CWA to cross many of the approximately 1,073 waterways along its path.

105.　In January 2012, the State Department denied the first permit application. TC Energy subsequently reapplied for a cross-border permit on May 4, 2012, but constructed the southern segment of Keystone XL as a separate project called the Gulf Coast Pipeline, which is now operational.

106.　In January 2014, the State Department published a Final Supplemental Environmental Impact Statement for Keystone XL ("2014 EIS").

107.　In November 2015, citing the project's climate impacts and other significant threats to human health and the environment, the State Department found that Keystone XL was contrary to the national interest and denied TC Energy's application for a cross-border permit.

108.　On January 24, 2017, President Trump issued a presidential memorandum inviting TC Energy to reapply for a cross-border permit and directing the State Department to make a permitting decision within 60 days of TC Energy's submission. TC Energy subsequently submitted a new application.

109.　On March 23, 2017, the State Department found that Keystone XL "would serve the national interest" and issued TC Energy a cross-border permit. In issuing the permit, the State Department relied on the 2014 EIS to comply with NEPA.

110.    On March 30, 2017, Plaintiffs in the instant case challenged the State

Department's approval of Keystone XL as violating NEPA, the ESA, and the APA.

*See* Complaint, *N. Plains Res. Council v. Shannon*, 17-cv-31-GF-BMM (D.

Mont.), ECF No. 1. In orders dated August 15 and November 8, 2018, this Court

held that the State Department violated NEPA and the APA by failing to evaluate

new information regarding the impacts of Keystone XL, including the newly

approved route in Nebraska, changes in oil markets, Keystone XL's climate change

impacts, and the impacts of tar sands oil spills into waterways, and by discarding

its prior factual findings on climate change to support its change in course on the

cross-border permit. Partial Summ. J. Order Regarding NEPA Compliance, ECF

No. 202; Order, ECF No. 211. The Court also found that the State Department and

the U.S. Fish and Wildlife Service violated the ESA by failing to adequately

evaluate oil spills. Order, ECF No. 211. The Court vacated the State Department's

Record of Decision, remanded to the State Department for preparation of a

supplemental EIS, and enjoined project construction. *Id.*

111.    On March 29, 2019, while the Court's decisions were on appeal to the

Ninth Circuit Court of Appeals, President Trump issued a new cross-border permit

for Keystone XL in an effort to circumvent this Court's ruling. On June 7, 2019,

the Ninth Circuit dismissed the case as moot, vacated the Court's opinions, and

dissolved the injunction.

112. Upon information and belief, the State Department is continuing to prepare a supplemental EIS that will address the deficiencies identified by this Court and that will be used to support the Bureau of Land Management's pending decision on the project's right-of-way permits needed under the Mineral Leasing Act, 30 U.S.C. § 185, and the Corps' pending decision on the project's crossing of the Missouri River pursuant to section 14 of the Rivers and Harbors Act, 33 U.S.C. § 408 ("section 408 Permit").

## The Corps' Approval of Keystone XL

113. Although the supplemental EIS process is ongoing, the Corps has already approved (or determined that no approval is necessary for) the majority, if not all, of Keystone XL's water crossings, except the Missouri River crossing, using NWP 12.

114. On May 25, 2017, TC Energy submitted three PCNs to the Corps' Omaha district office requesting verification for the use of NWP 12 to construct and operate the Keystone XL pipeline in U.S. waters in Montana, South Dakota, and Nebraska, each discussed further below. The PCNs indicate that Keystone XL would cross 212 waterbodies and 32 wetlands in Nebraska, 182 waterbodies and 41 wetlands in South Dakota, and 194 waterbodies and 27 wetlands in Montana,

for a total of *at least* 688 jurisdictional waterways (588 waterbodies and 100 wetlands).[2]

115.    Upon information and belief, the Corps has already permitted the majority of these Keystone XL water crossings—possibly all of them except the Missouri River crossing in Montana—through its issuance of NWP 12 and/or project verifications or other approvals.

116.    The Corps took these actions without *ever* analyzing Keystone XL's direct, indirect, or cumulative effects under NEPA (e.g., the risks or impacts of pipeline oil spills into waterways), either upon issuance of NWP 12 or upon verification of the PCNs. As set forth above, the only NEPA document the Corps relies on for its approval of all NWP 12 activities nationwide is the NWP 12 EA.

117.    Although the Corps was a cooperating agency in the State Department's preparation of the 2014 EIS for Keystone XL, the Corps' verifications do not purport to rely on that document. *See, e.g.*, 82 Fed. Reg. at 1861 (explaining that project verifications do not require any NEPA documentation because the Corps fulfills its NEPA obligations upon issuance of the NWP). Indeed, the Corps did not rescind its NWP 12 verifications for Keystone XL following this Court's order finding the State Department EIS inadequate. In

---

[2] The 2014 EIS estimates that the project would cross approximately 1,073 waterways in Montana, South Dakota, and Nebraska. The reason for the discrepancy between these two numbers is unclear.

any case, to the extent the verifications did rely on the 2014 EIS, the 2014 EIS failed to adequately address the adverse individual and cumulative effects of hundreds of water crossings for the project, and instead stated that such review would happen as part of the NWP 12 process.

118. The Corps also failed to evaluate the adverse effects of approving many hundreds of water crossings along the Keystone XL route, as required by section 404(e) of the CWA and NWP 12 itself.

119. The PCNs demonstrate that numerous parts of Keystone XL have multiple water crossings very close to each other in the same watersheds, often on the same waterbodies or in various tributaries of the same waterbody. For example, in approximately one mile, from milepost 111.44 to milepost 112.64 of the proposed pipeline in Montana, there are six pipeline crossings of "Unnamed Tributary to Shade Creek." There are countless other examples of areas with high densities of water crossings. *See, e.g.*, milepost 425 (8 crossings of Narcelle Creek within one mile in South Dakota); milepost 775 (13 crossings within a mile in Nebraska). Nowhere does the Corps *ever* perform a project-level analysis to determine whether the pipeline's numerous water crossings would have more than a minimal adverse effect on the environment at any scale (e.g., either at the stream, watershed, state-wide, or regional scale).

120.    Because Keystone XL is proceeding under NWP 12, there was no public notice or opportunity for involvement upon TC Energy's submission of the PCNs or the Corps' evaluation or verification of the PCNs, nor were the PCNs made available to the public. Plaintiffs learned of these PCNs by submitting requests to the Corps under the Freedom of Information Act.

121.    Although there was no public notice or comment period associated with these PCNs, Plaintiffs submitted a letter in August 2017 arguing that it is unlawful to approve Keystone XL under NWP 12 because the project will have more than minimal adverse environmental effects, urging the Corps to initiate an individual section 404 process for Keystone XL, and requesting a public hearing.

122.    The Corps responded on September 14, 2017, confirming that it was processing Keystone XL under NWP 12 and that no public hearing was planned. The Corps had previously denied requests for public hearing upon issuance of NWP 12, so there was no public hearing at either stage of review.

<u>Montana</u>

123.    According to TC Energy, a PCN was required in Montana for three reasons: (1) the pipeline would cross the Yellowstone River; (2) the pipeline would cross the Missouri River; and (3) species listed under the ESA "might be affected" by the project.

124.    The Montana PCN indicates that Keystone XL would cross 27 wetlands (25 palustrine emergent wetlands and 2 palustrine scrub shrub wetlands) and 194 waterbodies (19 perennial waterbodies, 55 intermittent waterbodies, 110 ephemeral waterbodies, and 10 seasonal waterbodies) in Montana.

125.    On September 8, 2017, the Corps issued a verification for Keystone XL's crossing of the Yellowstone River. Although the PCN and "Memorandum for the Record" accompanying the verification acknowledge that the project would affect 221 aquatic resource crossings in the state, the verification is limited to the Yellowstone River crossing. Thus, the verification failed to evaluate the individual or cumulative effects of any water crossings in Montana other than the Yellowstone River, including how far apart the other crossings are from each other, or whether they are "separate and distant." Instead, the verification states that cumulative effects were already evaluated in the 2014 EIS, the Corps' NWP 12 EA, and the Omaha Supplemental Decision Document for NWP 12.

126.    Upon information and belief, the Corps' position appears to be that the "non-PCN" water crossings are tacitly permitted by NWP 12 without needing to be included in the verification, as the verification and Memorandum for the Record are limited to the Yellowstone River crossing.

127.    Upon information and belief, the Corps has not yet issued a verification for the Missouri River crossing because the Corps must wait until it

makes a decision on the section 408 permit, which has not yet occurred; however, the Corps has apparently approved all other water crossings in Montana.

South Dakota

128.   According to TC Energy, a PCN was required in South Dakota for two reasons: (1) the pipeline would cross the Cheyenne River; and (2) species listed under the ESA "might be affected" by the project.

129.   The South Dakota PCN indicates that Keystone XL would cross 41 wetlands (40 palustrine emergent wetlands and 1 palustrine scrub shrub wetland) and 182 waterbodies (24 perennial waterbodies, 69 intermittent waterbodies, 86 ephemeral waterbodies, and 3 seasonal waterbodies) in South Dakota.

130.   On August 4, 2017, the Army Corps issued a verification for the Cheyenne River crossing, which authorizes construction of a bridge in Meade County. Although the PCN and "Memorandum for the Record" accompanying the verification acknowledge that the project would affect 223 aquatic resource crossings in the state, the verification is limited to the Cheyenne River crossing. That verification failed to evaluate the individual or cumulative effects of any water crossings in South Dakota other than the Cheyenne River, including how far apart they are from each other, or whether they are "separate and distant." Instead, the verification states that cumulative effects were already evaluated in the 2014

EIS, the Corps' NWP 12 EA, and the Omaha Supplemental Decision Document for NWP 12.

131. Upon information and belief, the Corps' position appears to be that the "non-PCN" water crossings are tacitly permitted by NWP 12 without the need to be included in the verification, as the verification and Memorandum for the Record are limited to the Cheyenne River crossing.

Nebraska

132. According to TC Energy, a PCN was required in Nebraska for three reasons: (1) the pipeline would cross the Niobrara River; (2) the pipeline would cross the Platte River; and (3) species listed under the ESA "might be affected" by the project.

133. The Nebraska PCN states that TC Energy's preferred route in Nebraska would cross 32 wetlands (27 emergent palustrine wetlands and 5 palustrine forested wetlands) and 212 waterbodies (38 perennial waterbodies, 59 intermittent waterbodies, 110 ephemeral waterbodies, 1 open waterbody, 1 man-made open water, and 3 man-made ditches).

134. On June 22, 2017, the Corps sent TC Energy a letter stating that because the project would use horizontal directional drilling to cross under the Niobrara and Platte Rivers in Nebraska, "the project will not involve a regulated discharge of dredged or fill material under Section 404 of the Clean Water Act . . .

[and therefore] the activity is not subject to Department of the Army (DA) regulatory authorities and no permit pursuant to Section 404 is required from the U.S. Army Corps of Engineers."

135.   The letter implies that TC Energy could begin constructing Keystone XL through all waterways in Nebraska pursuant to NWP 12 without awaiting Corps verification or undergoing any project-level minimal adverse effects review from the district engineers.

136.   In November 2017, the Nebraska Public Service Commission approved the Keystone XL Mainline Alternative Route, which differs from TC Energy's preferred route—the route described by the 2017 Nebraska PCN.

137.   On November 22, 2017, the Corps sent TC Energy a letter recognizing that the Mainline Alternative Route "follows the same path into Nebraska and across the Niobrara River, but deviates east, crossing the Platte River in a new location." Thus, the Corps concluded that the "deviations from the original plans and specifications of this project could require additional authorizations from this office." Upon information and belief, this letter pertains only to the section of the route where the Mainline Alternative Route deviates from the preferred route, but did not change the Corps' position of June 22, 2017 (i.e., that no permit or verification is required) with respect to the portion of the preferred route in Nebraska.

138.    Upon information and belief, TC Energy has not submitted a revised PCN for the Mainline Alternative Route in Nebraska, nor has the Corps requested any additional information from TC Energy.

## FIRST CLAIM FOR RELIEF

**The Corps' reissuance of NWP 12 violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706**

139.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

140.    The Corps' reissuance of NWP 12 was a major federal action that requires compliance with NEPA. *See* 42 U.S.C. § 4332(2)(C).

141.    The Corps issued an EA/FONSI for its reissuance of NWP 12, which constitutes the Corps' only NEPA document for an estimated 11,500 projects per year using NWP 12 nationwide. The Corps will not prepare any further NEPA analysis for individual projects that are permitted or authorized by NWP 12.

142.    The Corps' EA violated NEPA by failing to take the requisite hard look at the significant direct, indirect, and cumulative environmental effects of reissuing NWP 12 (i.e., the impacts of projects permitted or authorized by NWP 12). *See* 40 C.F.R. §§ 1502.1, 1502.16(a), (b), 1508.25(c). Among other things, the NWP 12 EA failed to adequately analyze:

a. The risks and impacts of crude oil spills and leaks from pipelines approved by NWP 12, including but not limited to spills into Corps jurisdictional waterways and an examination of the various types of crude oil products transported by NWP 12 projects and their respective properties, characteristics, environmental impacts, or spill response requirements;

b. The environmental impacts associated with the construction and maintenance of pipeline rights of way, both within and outside of Corps jurisdictional waterways, including but not limited to the permanent conversion of forested wetlands to lower quality wetlands, forest fragmentation, habitat loss, erosion and sedimentation, soil nutrient loss, and aesthetic impairment;

c. The climate change impacts of NWP 12, including but not limited to the potential for increased lifecycle greenhouse gas emissions resulting from oil and gas pipelines approved by NWP 12; and

d. The cumulative impacts of NWP 12, including the effects of multiple uses of NWP 12 for the same pipeline within particular watersheds, regions, or other sensitive areas; and the impacts of other past, future, and reasonably foreseeable projects.

143.   The Corps' FONSI for NWP 12 was arbitrary and capricious, and fails to make a convincing case that the impacts of issuing NWP 12 are not significant. The environmental impacts associated with the Corps' reissuance of NWP 12 are "significant," 40 C.F.R. § 1508.27, and thus the Corps should have prepared an EIS.

144.   By preparing an EA/FONSI rather than an EIS for its NWP 12 reissuance, the Corps violated NEPA, 42 U.S.C. § 4332(2)(C), and its implementing regulations, including but not limited to 40 C.F.R. §§ 1501.3, 1501.4, 1502.4, 1508.8, 1508.9, 1508.11, 1508.18, and 1508.27.

145.   For the reasons set forth above, the Corps' reissuance of NWP 12 was inconsistent with NEPA and CEQ regulations. It was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, and contrary to the APA. *See* 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

**The Corps' reissuance of NWP 12 violated the Clean Water Act, 33 U.S.C. § 1344(e), applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706**

146.   Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

147.   Section 404(e) of the CWA allows the Corps to issue NWPs only for categories of projects that the agency determines "are similar in nature, will cause

only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).

148.   NWP 12 permits or authorizes the construction and operation of utility lines and associated facilities that do not result in the loss of greater than a half-acre of waters of the United States "for each single and complete project." 82 Fed. Reg. at 1985. However, NWP 12 defines "[s]ingle and complete linear project" as "that portion of the total linear project . . . that includes all crossings of a single water of the United States *(i.e., a single waterbody) at a specific location*." *Id*. at 2007 (emphasis added). The effect of this definition is to artificially treat each water crossing along a proposed linear utility project, which often number in the hundreds or thousands, as a "single and complete project" that qualifies separately under NWP 12.

149.   There is no limit to the number of times that a single linear utility project can use NWP 12, nor is there a total maximum number of acres of waters of the United States that a linear project can impact while still being authorized under NWP 12.

150.   NWP 12 relies on the discretion of division and district engineers to ensure, on a project-by-project basis, that the activities will have no more than minimal effects. *See id.* at 1885-86; *see also id.* at 2004.

151.    However, this project-level review by Corps district or division engineers fails to ensure projects permitted by NWP 12 will have only minimal adverse environmental effects because for many or most projects that proceed under NWP 12, an applicant is not required to submit a PCN or notify the Corps at all, and thus the Corps does not have an opportunity to evaluate the adverse environmental effects of those projects.

152.    For those projects where a PCN is required, project-level review by Corps district or division engineers still fails to ensure that the multiple water crossings for projects permitted by NWP 12 will have only minimal adverse environmental effects, either individually or cumulatively, because the Corps never considers the effects of multiple water crossings for individual linear projects.

153.    In short, NWP 12 permits linear projects to use the NWP numerous times along a pipeline or utility route—even if there are high concentrations of water crossings in specific areas—with no mechanism to ensure impacts would be minimal. Thus, NWP 12 fails to ensure that projects it permits "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment" as required by 33 U.S.C. § 1344(e)(1).

## THIRD CLAIM FOR RELIEF

**The Corps' issuance of NWP 12 verifications and other approvals for Keystone XL violated the Clean Water Act, 33 U.S.C. § 1344(e), applicable regulations, the terms and conditions of NWP 12, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706**

154.   Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

155.   On September 8, 2017, the Corps issued a verification for the Keystone XL's crossing of the Yellowstone River in Montana, which notified TC Energy that construction of the project in U.S. waters meets the terms and conditions of NWP 12 and that the project is authorized to proceed under NWP 12. Although the Montana PCN and Memorandum for the Record accompanying the verification acknowledge that the project would affect 221 aquatic resource crossings in Montana, the verification is limited to the Yellowstone River crossing.

156.   On August 4, 2017 the Army Corps issued a verification for the Keystone XL Cheyenne River crossing, which authorizes construction of a bridge in Meade County, South Dakota, notifying TC Energy that construction of the project in U.S. waters meets the terms and conditions of NWP 12 and that the project is authorized to proceed under NWP 12. Although the South Dakota PCN and Memorandum for the Record accompanying the verification letter acknowledge that the project would affect 223 aquatic resource crossings in South Dakota, the verification is limited to the Cheyenne River crossing.

157.   On June 22, 2017, the Corps sent a letter to TC Energy stating that because the project would use horizontal directional drilling to cross under the Niobrara and Platte Rivers in Nebraska, "the project will not involve a regulated discharge of dredged or fill material under Section 404 of the Clean Water Act . . . [and therefore] the activity is not subject to Department of the Army (DA) regulatory authorities and no permit pursuant to Section 404 is required from the U.S. Army Corps of Engineers." The Corps failed to address the other 242 aquatic resource crossings identified in the Nebraska PCN.

158.   The Yellowstone River verification, the Cheyenne River verification, and the June 22, 2017 letter approving Nebraska crossings are each final agency action reviewable under the APA, 5 U.S.C. §§ 704, 706(2). In the alternative, the verifications/letters constitute agency action unlawfully withheld or unreasonably delayed pursuant to 5 U.S.C. § 706(1), insofar as they failed to evaluate the adverse effects of crossings for "non-PCN" waterways.

159.   Furthermore, the June 22, 2017 Nebraska letter is arbitrary and capricious insofar as it states the project in Nebraska does not involve fill in Corps jurisdictional waters.

160.   The Corps' issuance of the verifications/letters violates section 404(e) of the CWA, because the Corps approved a project (or projects) that have more than minimal environmental effects.

161. The Corps' issuance of the verifications/letters violates NWP 12 and/or its terms and conditions by failing to evaluate the project's individual and cumulative adverse effects, and failing to include in the respective "District Engineers' Decision(s)" a determination that the cumulative effects caused by all of the crossings authorized by NWP would be no more than minimal, either when measured project-, state-, region-, or watershed-wide. 82 Fed. Reg. at 2004-05. This omission includes a consideration of both direct and indirect effects (including but not limited to the risks and impacts of oil spills into waterways), and site-specific factors. *Id*. at 2005.

162. The Corps' issuance of the verifications/letters constitutes de facto or implicit approvals of all non-PCN waterways listed in the PCNs, and violates NWP 12 and section 404(e) of the Clean Water Act for approving those waterways without evaluating their adverse environmental effects.

163. Because the adverse environmental effects caused by all of the project's water crossings would be more than minimal, Keystone XL is ineligible for authorization under NWP 12 and the Corps' verification of the project under NWP 12 was unlawful. Instead, the Corps must evaluate the project under the individual section 404 permit process pursuant to 33 U.S.C. § 1344(a) before the project can proceed.

164. For these reasons, the Corps' verifications/approvals of the project under NWP 12 are arbitrary and capricious and not in accordance with law and must be set aside under the APA, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a) Declare the Corps' issuance of NWP 12 in violation of the Administrative Procedure Act, the Clean Water Act, the National Environmental Policy Act, and applicable regulations;

b) Remand NWP 12 to the Corps for compliance with the National Environmental Policy Act and the Clean Water Act;

c) Declare the Corps' verifications and/or other approvals of Keystone XL pursuant to NWP 12 in violation of the Administrative Procedure Act, the Clean Water Act, and NWP 12 and its terms and conditions;

d) Vacate all Corps verifications or other approvals of Keystone XL under NWP 12;

e) Issue a preliminary and permanent injunction enjoining the Corps from using NWP 12 to authorize the construction of the Keystone XL pipeline in waterbodies or wetlands, or otherwise verifying or approving the Keystone XL pipeline under NWP 12, and enjoin any activities in furtherance of pipeline construction;

f) Award Plaintiffs their costs, expenses, and attorneys' fees under

   applicable law; and

g) Provide for such other relief as the Court deems just and appropriate.


Dated: July 1, 2019                    Respectfully submitted,

                                       /s/ Timothy M. Bechtold
                                       Timothy M. Bechtold
                                       Bechtold Law Firm, PLLC
                                       P.O. Box 7051
                                       Missoula, MT 59807
                                       (406) 721-1435
                                       tim@bechtoldlaw.net
                                       *Attorney for all Plaintiffs*

                                       /s/ Doug Hayes
                                       Doug Hayes (*pro hac vice* applicant)
                                       /s/ Eric Huber
                                       Eric Huber (*pro hac vice* applicant)
                                       Sierra Club Environmental Law Program
                                       1650 38th Street, Suite 102W
                                       Boulder, CO 80301
                                       (303) 449-5595
                                       doug.hayes@sierraclub.org
                                       eric.huber@sierraclub.org
                                       *Attorneys for Sierra Club and Northern*
                                       *Plains Resource Council*

                                       /s/ Jaclyn H. Prange
                                       Jaclyn H. Prange (*pro hac vice* applicant)
                                       /s/ Cecilia D. Segal
                                       Cecilia D. Segal (*pro hac vice* applicant)
                                       Natural Resources Defense Council
                                       111 Sutter Street, Floor 21
                                       San Francisco, CA 94104
                                       (415) 875-6100
                                       jprange@nrdc.org

csegal@nrdc.org
*Attorneys for Bold Alliance and Natural Resources Defense Council*

/s/ Jared Margolis
Jared Margolis (*pro hac vice* applicant)
/s/ Amy R. Atwood
Amy R. Atwood (*pro hac vice* applicant)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
(503) 283-5474
jmargolis@biologicaldiversity.org
atwood@biologicaldiversity.org
*Attorneys for Center for Biological Diversity and Friends of the Earth*