Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for all Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, BOLD ALLIANCE, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, CENTER FOR BIOLOGICAL DIVERSITY, and FRIENDS OF THE EARTH, | CV 19-44-GF-BMM |
| Plaintiffs, | **First Amended Complaint for Declaratory and Injunctive Relief** |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS and LIEUTENANT GENERAL TODD T. SEMONITE (in his official capacity as U.S. Army Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers), | |
| Defendants, | |
| TC ENERGY CORPORATION and TRANSCANADA KEYSTONE PIPELINE LP, | |
| Intervenor-Defendants. | |

**INTRODUCTION**

1.      This case involves the U.S. Army Corps of Engineers' improper
issuance of Nationwide Permit 12, a general permit issued for pipelines and other
utility projects pursuant to Section 404(e) of the Clean Water Act, and improper
approval of the Keystone XL pipeline using Nationwide Permit 12. The Corps
violated the National Environmental Policy Act, the Clean Water Act, the
Endangered Species Act, and the Administrative Procedure Act by issuing
Nationwide Permit 12 without assessing its significant direct, indirect, and
cumulative environmental effects and by using the Permit to approve most of
Keystone XL's water crossings without analyzing its project-specific impacts.

2.      In previous litigation over federal approvals of the Keystone XL
pipeline, this Court ruled that the U.S. State Department violated the National
Environmental Policy Act (NEPA) by failing to supplement its 2014
environmental impact statement (EIS) in light of a new pipeline route through
Nebraska and new information about the project's impacts, including new
information about the risks and impacts of climate change, oil markets, and oil
spills into waterways. The Court further found that the State Department violated
the Endangered Species Act (ESA) by failing to properly analyze the impacts of oil
spills on listed species. The Court enjoined project construction and remanded to
the State Department for further environmental analysis. On appeal, and after

2

President Trump issued a new permit for the project on March 29, 2019, the Ninth

Circuit dismissed the suit as moot. Nonetheless, the State Department has stated

that it intends to continue revising the EIS to address the Court's order, and that

further analysis is being undertaken pursuant to Section 7 of the ESA. Those

processes are ongoing.

3.     Meanwhile, the U.S. Army Corps of Engineers (Corps) has *already*

used its streamlined process under Nationwide Permit 12 (NWP 12) to permit

and/or approve Keystone XL to be constructed through the vast majority of rivers,

streams, wetlands, and other waterways along the route in Montana, South Dakota,

and Nebraska, without adequately evaluating the project's environmental impacts.

For example, the Corps has never evaluated the risks or impacts of pipeline oil

spills at all, either upon issuance of NWP 12 or upon NWP 12's application to

Keystone XL.

4.     Section 404(e) of the Clean Water Act (CWA) allows the Corps to

issue general nationwide permits (NWPs) for activities that will cause only

"minimal adverse environmental effects" and have only "minimal cumulative

adverse effect on the environment." 33 U.S.C. § 1344(e)(1). Projects using NWPs

may proceed without undergoing the comprehensive and transparent project-level

environmental review ordinarily required by CWA Section 404(a). There is no

public notice or opportunity for public involvement when projects are approved under NWPs.

5.      NWP 12 is a final permit authorizing the construction of pipelines and other utility projects nationwide, usually without any further Corps review process. The Corps estimates that NWP 12 will be used for an estimated 11,500 projects per year over its five-year duration. NWP 12 Decision Document at 70. The Corps does not prepare any project-level NEPA analysis for NWP 12 projects because it purports to have discharged all of its NEPA obligations upon issuance of an environmental assessment (EA) / Finding of No Significant Impact (FONSI) for NWP 12 as a whole (collectively, the "NWP 12 EA"). Thus, the NWP 12 EA constitutes the Corps' only NEPA analysis for projects permitted by NWP 12.

6.      The Corps' NWP 12 EA violates NEPA by failing to adequately evaluate the environmental impacts of pipelines and other utility projects permitted by NWP 12. Incredibly, the EA does not evaluate the risks or impacts of oil spills into waterways at all. Nor does the EA adequately evaluate the direct, indirect, and cumulative impacts associated with approving major oil pipelines like Keystone XL under NWP 12, such as the effects of numerous water crossings, impacts from the creation of pipeline rights of way such as the removal of high-quality forested wetlands, or the pipelines' climate change impacts.

4

7.     The Corps' issuance of NWP 12 also violates CWA Section 404(e) by authorizing activities that will cause more than minimal adverse environmental effects, either individually or cumulatively. NWP 12 authorizes the construction of pipelines and other utility lines that would result in no more than half an acre of loss of waters of the United States; however, it allows linear utility lines such as pipelines to use NWP 12 repeatedly for each water crossing along a project's length. There is no limit to the number of times a utility line can use NWP 12, nor is there a limit to the total number of acres of wetlands that a utility can impact. This repeated use of NWP 12 causes more than minimal adverse environmental effects.

8.     NWP 12 thereby allows the Corps to artificially treat large interstate pipeline projects as hundreds or even thousands of "single and complete projects" so as to avoid the more transparent and thorough individual permit process required by Section 404, which includes public notice and comment and an analysis of the project's overall impacts and alternatives pursuant to NEPA and the CWA. *See* 82 Fed. Reg. 1860, 1985, 1999, 2007 (Jan. 6, 2017).

9.     The Corps attempts to justify this approach by relying on Corps district engineers to conduct project-level reviews to ensure that projects would have no more than minimal adverse effects. However, most projects permitted by NWP 12 can proceed without notification to the Corps at all, so the district

5

engineers have no opportunity to conduct any project-level review in those cases. Even when applicants do notify the Corps, the Corps' failure to conduct project-level review for Keystone XL demonstrates that a project-level minimal adverse effects analysis does not always occur.

10.     The Corps' issuance of NWP 12 also violates the ESA. The Corps failed to initiate formal programmatic consultation with the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (together, the "Services") to consider the cumulative, adverse environmental effects of discharges under NWP 12 on protected species or their critical habitat. Programmatic consultation is necessary under Section 7 of the ESA to ensure that NWP 12-authorized activities are not likely to jeopardize the continued existence of listed species.

11.     TC Energy is the project proponent for the proposed Keystone XL pipeline, a massive tar sands pipeline that would travel nearly 1,200 miles from Canada to Nebraska. In 2017, TC Energy submitted three preconstruction notifications to the Corps for Keystone XL, which listed all of the waterways the project would cross in Montana, South Dakota, and Nebraska, respectively. But in response, the Corps issued two verifications—one for the Yellowstone River in Montana and one for the Cheyenne River in South Dakota—that failed to evaluate the adverse effects of the hundreds of other water crossings, as NWP 12 requires.

As for Nebraska, the Corps notified TC Energy that no Corps review or approval was necessary for the state, even though the pipeline would cross hundreds of waterbodies there. As such, the Corps' verifications and approvals of Keystone XL violated Section 404(e) and the terms and conditions of NWP 12 because the Corps failed to analyze whether the impacts would be more than minimal, either individually or cumulatively. The Corps also failed to conduct the required project-specific ESA Section 7 consultation when it verified the use of NWP 12 for water crossings in Montana and South Dakota, and never considered the impacts to listed species for the hundreds of water crossings in Nebraska.

12.    The Corps has since "suspended" the NWP verifications for the Yellowstone River and Cheyenne River crossings; however, those verifications could be reinstated at any time. Additionally, there is no indication that the Corps has altered its actual or tacit approval of TC Energy's use of NWP 12 for the hundreds of other water crossings in Montana, South Dakota, and Nebraska.

13.    Plaintiffs therefore seek a declaration that the Corps' issuance of NWP 12 violated NEPA, the CWA, and the ESA, and that its use of NWP 12 to approve Keystone XL violated the CWA, NWP 12 itself, and the ESA. Plaintiffs seek vacatur of the Corps' approval of Keystone XL using NWP 12, and an injunction against any construction of Keystone XL or further approvals of the project under NWP 12.

## JURISDICTION AND VENUE

14.    This case arises under the Clean Water Act, 33 U.S.C. §§ 1251 et seq.,

including § 1344(b) (application of Corps guidelines in permit determinations),

§ 1344(c) (prohibition of discharge of dredged or fill material that will have an

unacceptable adverse effect), and § 1344(e) (setting forth circumstances in which

the Corps can issue nationwide permits); the National Environmental Policy Act,

42 U.S.C. §§ 4321 et seq.; the Endangered Species Act, 16 U.S.C. §§ 1531-1544;

and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. Jurisdiction

exists under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (mandamus),

and 28 U.S.C. §§ 2201-02 ("creation of remedy" and "further relief" provisions

establishing power to issue declaratory judgments in cases of actual controversy).

15.    Venue is appropriate in this Court under 28 U.S.C. § 1391(e)(1)

because a substantial part of the events or omissions giving rise to Plaintiffs'

claims occurred here. The proposed route for the Keystone XL pipeline enters the

United States in Montana and crosses approximately 221 waterways under the

jurisdiction of the Corps in Montana. The Corps has permitted most of those

waterway crossings through its issuance of NWP 12 and/or its verification of

Keystone XL to proceed under NWP 12 in Montana.

16.    Assignment to the Great Falls division of this Court is appropriate

because Keystone XL would cross the U.S.-Canada border near Morgan, Montana,

in Phillips County. Upon information and belief, the Corps' issuance of NWP 12 and/or its verification of Keystone XL to proceed under NWP 12 will allow Keystone XL to be constructed through approximately 170 jurisdictional waterways in Phillips and Valley Counties in Montana. Phillips and Valley Counties are both within the Great Falls Division. L.R. 1.2(c)(3).

## PARTIES

### Plaintiffs

17.    Plaintiff Northern Plains Resource Council (Northern Plains), based in Billings, Montana, organizes citizens to protect Montana's water, land, air, and working landscapes and pass them on unimpaired to future generations. Northern Plains was founded in the 1970s to protect Eastern Montana's people and agricultural economy from becoming a sacrifice zone for energy development. Northern Plains has over 3,000 members, many of whom live directly on the path of the Keystone XL pipeline and/or close to the pipeline route. Since the federal and state permitting processes for Keystone XL began in 2009, Northern Plains and its members have participated at every step. That includes working to improve reclamation and liability protections for member families whose land the pipeline would cross.

18.    Plaintiff Bold Alliance (Bold) is a network of individuals and not-for-profit environmental- and landowner-rights groups based in Nebraska and other

rural states in the Midwest and South. It has more than 92,000 supporters across the country. Bold advocates for clean energy, fights fossil fuel projects, and works to protect rural landowners and landscapes, in cooperation with Tribal nations, farmers, ranchers, hunters, anglers, and environmentalists. Bold and its allies have spent years working to raise awareness of Keystone XL's threats to the people, land, wildlife, and water of Nebraska and other states, and to persuade our national and state officials to reject it.

19.    Plaintiff Natural Resources Defense Council (NRDC) is a national, not-for-profit public-health and environmental advocacy organization whose purpose is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends. NRDC has hundreds of thousands of members, including members who own land and live in states Keystone XL would cross. Since its founding in 1970, NRDC has worked to enforce environmental laws and to reduce air and water pollution from, threats to wildlife and habitat from, and destruction of natural lands by industrial activity. NRDC has fought to curb greenhouse gas emissions that contribute to climate change, including by working to educate people about, and combat the threats posed by, Canadian tar sands crude oil. NRDC has also litigated to protect endangered wildlife and wild lands, advocated for the addition of at-risk animals and plants to the lists of endangered and threatened species under the Endangered Species Act (ESA), and educated

lawmakers and the public about the value of protecting and conserving these resources.

20.    Plaintiff Sierra Club is the nation's oldest grassroots organization dedicated to the protection and preservation of the environment. The Sierra Club has over one million members and supporters dedicated to exploring, enjoying, and protecting the wild places of the Earth; practicing and promoting the responsible use of the Earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives. The Sierra Club has chapters and members in each of the states through which Keystone XL would pass. The Sierra Club's concerns encompass the protection of wildlands, wildlife and habitat, water resources, air, climate, public health, and the health of its members, all of which stand to be affected by Keystone XL.

21.    Plaintiff Center for Biological Diversity (the Center) is a national nonprofit organization that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center has over 70,000 members and more than 1.4 million online supporters worldwide. The Center has worked for decades to safeguard fresh water for people, plants, and animals. One of the Center's main goals is to protect the habitats and communities that may be adversely affected by fossil fuel infrastructure projects,

11

such as Keystone XL. The Center's members and staff value and benefit from rare species' continued existence in the wild, and are concerned about new industrial development and associated trends like global climate change and water degradation that threaten wild species' survival and recovery. The Center has worked for years to protect several imperiled species that would be harmed by Keystone XL, including the critically endangered whooping crane, endangered interior least tern, endangered American burying beetle, endangered pallid sturgeon, and threatened piping plover.

22.    Plaintiff Friends of the Earth (FoE) is a non-profit advocacy organization founded in 1969. FoE has more than 380,000 members and almost 1.9 million activists across the United States. It is a member of Friends of the Earth International, which is the world's largest grassroots environmental network with 75 affiliates worldwide. FoE's mission is to defend the environment and champion a healthy and just world. FoE speaks truth to power and exposes those who endanger people and the planet. Its campaigns work to hold politicians and corporations accountable, transform our economic systems, protect our forests and oceans, halt climate chaos, and revolutionize our food and agriculture systems. Ending destructive tar sands development is one of FoE's top priorities.

23.    In bringing this lawsuit, Plaintiffs stand in the shoes of members, staff, and other supporters who live, work, and recreate in places threatened by

12

Keystone XL and who use, study, and cherish the land, water, wildlife, and other resources that may be irrevocably damaged by the project. Plaintiffs have numerous members and other supporters who live in Montana, South Dakota, and Nebraska—the states that Keystone XL would cross. Plaintiffs' members, other supporters, and staff include individuals who study and advocate for better protection of wildlife and other resources threatened by Keystone XL.

24.    For example, some of Plaintiffs' members own property on and/or near the proposed pipeline route, and some of those properties are located downstream of and/or near waterways that the pipeline would cross. The project threatens these individuals' use and enjoyment, and the economic value, of their property, as well as the waters that members use and enjoy both as a resource and for the habitat they provide for plants and animals. Some of Plaintiffs' members also enjoy hiking, picnicking, fishing, and observing wildlife in parks and along rivers and streams near and on the proposed pipeline route, and plan to return to those areas to pursue such activities in the future.

25.    In addition, some of Plaintiffs' members study and enjoy observing protected species, including the pallid sturgeon, American burying beetle, whooping crane, and other federally protected Great Plains migratory birds, such as the interior least tern and piping plover, whose survival and recovery are threatened by activities authorized under NWP 12. Plaintiffs' staff and members

include scientists and naturalists who have researched, studied, observed, and

sought protection for endangered species that are adversely affected by NWP 12-

authorized activities, including Keystone XL. Plaintiffs' members and staff derive

scientific, recreational, conservation, and aesthetic benefits from rare species'

existence in the wild, and intend to continue to visit and observe, or attempt to visit

and observe, these species in the near future.

26.     The Corps' unlawful issuance of NWP 12 and approval of Keystone

XL using NWP 12 threaten the health, recreational, economic, professional,

scientific, and aesthetic interests of Plaintiffs' members, staff, and other supporters.

27.     For example, the Corps' NWP 12 EA did not adequately address the

risk of oil spills from pipelines such as Keystone XL. A spill on a member's land

would interfere with their use and enjoyment of the property, threaten their water

supply, and decrease property values. Similarly, the negative ecological effects of

pipeline construction through streams and rivers—such as increased sedimentation,

oil spills, and other harm to protected species—would interfere with members' use

and enjoyment of those waterways and the wildlife they support.

28.     By refusing to prepare and publish an adequate and complete

environmental review for NWP 12 or Keystone XL, the Corps failed to analyze

and address the project's negative impacts on and threats to the interests of

Plaintiffs' members, other supporters, and staff. The Corps also deprived these

14

individuals of their right to participate in the approval process in order to protect the interests described above.

29.     The declaratory and injunctive relief Plaintiffs seek in this lawsuit will redress their injuries by setting aside the Corps' approvals and requiring the Corps to comply with NEPA, the CWA, the ESA, and the APA. This relief will give Plaintiffs, their members, other supporters, staff, and the general public more comprehensive and complete information regarding Keystone XL's threats to waterways, protected species, and other valued resources. It will allow Plaintiffs, their members and supporters, and others who are concerned about Keystone XL to advocate more effectively for denial of the project or changes to its design and operation that would help mitigate its adverse impacts (including but not limited to measures designed to protect wetlands and waterways and reduce the impacts of oil spills). And it will give federal, state, and local decision-makers the chance to make better-informed decisions about whether and on what terms to approve the project.

## **Defendants**

30.     Defendant U.S. Army Corps of Engineers (Corps) is the federal agency charged with administering permits under Section 404 of the CWA for discharge of dredged or fill material into the waters of the United States. The Corps is headquartered in Washington, D.C. The Corps has three regulatory offices in

15

Montana, and its Omaha, Nebraska district office oversees the regulatory program in Montana.

31.     Defendant Todd T. Semonite is Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers headquartered in Washington, D.C., and is designated to act for the Secretary of the Army. Plaintiffs bring this action against Lieutenant General Semonite in his official capacity only. Lieutenant General Semonite is the federal officer personally responsible for compliance with any injunction that this Court issues.

## LEGAL BACKGROUND

### The Clean Water Act

32.     The CWA was enacted by Congress in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, Section 404 of the CWA prohibits the discharge of any pollutant, including dredged soil or other fill material, into navigable waters unless authorized by a permit. *Id.* §§ 1311, 1344.

33.     Section 404 of the CWA gives the Corps primary responsibility for permitting construction activities that involve dredge and fill of U.S. waters. *Id.* § 1344(a), (d). The Corps oversees the 404 permit process and must comply with guidelines promulgated by the U.S. Environmental Protection Agency (EPA), which are incorporated into the Corps' own regulations. *Id.* § 1344(b)(1); 33

16

C.F.R. §§ 320.4(b)(4), 325.2(a)(6). The objective of these "404(b)(1) guidelines," set forth at 40 C.F.R. Part 230, is to prevent unacceptable adverse impacts to the nation's aquatic ecosystems from the discharge of dredged or fill material. 40 C.F.R. § 230.1(c).

34.    The guidelines provide that no discharge of dredged or fill material shall be permitted for an individual project: (1) if there is a practicable alternative to the proposed discharge; (2) if the discharge causes or contributes to violations of applicable state water quality standards; (3) if the discharge causes or contributes to significant degradation of the environment; and (4) unless all appropriate and practicable steps have been taken to minimize potential adverse impacts. *Id*. § 230.10. "Practicable alternatives" include "not discharging into the waters of the U.S. or discharging into an alternative aquatic site with potentially less damaging consequences." *Id*. § 230.5(c); *see id.* § 230.10(a). The Corps' regulations also require that destruction of wetlands be avoided to the extent practicable. 33 C.F.R. § 320.4(b), (r).

35.    Public participation plays an important role in CWA permitting decisions. The CWA provides in its general policy section that "[p]ublic participation in the development . . . of any . . . program established by the Administrator . . . under this chapter shall be provided for, encouraged, and assisted by the Administrator. . . ." 33 U.S.C. § 1251(e). *See also id.* § 1344(a)

17

("The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites."); 33 C.F.R. § 327.4(b) ("[A]ny person may request, in writing, . . . that a public hearing be held . . . . Requests for a public hearing under this paragraph shall be granted, unless the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing.").

36.     When issuing an individual Section 404 permit for a specific project, the Corps must comply with the requirements of NEPA, which are set forth below.

37.     An alternative to this comprehensive, transparent individual permit process is the nationwide permit program. "Nationwide permits (NWPs) are a type of general permit issued by the Chief of Engineers and are designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts." *Id.* § 330.1(b).

38.     Section 404(e) allows the Corps to, "after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the [Corps] determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C.

18

§ 1344(e)(1). NWPs can last up to five years, at which point they must be reissued or left to expire. *Id.* § 1344(e)(2); 33 C.F.R. §§ 330.5, 330.6(b).

39.    Once an NWP is issued, specific projects that meet the terms and conditions of that NWP may proceed without obtaining an individual Section 404 permit. Projects permitted via an NWP are not subject to public participation, and do not go through the more comprehensive, site-specific environmental- and public-interest review individual Section 404 permits require. *See* 33 C.F.R. § 323.3(a).

40.    In most cases, permittees may proceed with activities authorized by NWPs without notifying the Corps at all. *Id.* § 330.1(e)(1).

41.    In some cases, however, permittees must notify Corps district engineers of their projects through submission of a preconstruction notification (PCN) and await verification before the project may proceed under the NWP. *Id.* §§ 330.1(e)(1), 330.6(a).

42.    If, upon receiving a PCN, the district engineer decides that an activity does not comply with the terms or conditions of an NWP, the district engineer must deny verification and require an individual Section 404 permit. *Id.* § 330.6(a)(2).

43.    If the district engineer determines that an activity does comply with the terms and conditions of an NWP, the district engineer will notify the applicant

19

that the project is verified under the NWP. *Id.* § 330.6(a)(3). The district engineer may add conditions on a case-by-case basis to ensure the activity will have only minimal individual and cumulative adverse effects on the environment and will not be contrary to the public interest. *Id.* § 330.6(a)(3)(i).

44.    Ordinarily, once a permittee has submitted a PCN for a project under an NWP, it may presume that the project qualifies for the NWP unless otherwise notified by the district engineer within a 45-day period. *Id.* § 330.1(e)(1).

45.    The Corps does not issue any public notice or allow any opportunity for public involvement when a PCN is submitted or when a project is verified under an NWP. *See id.* § 330.1(e).

46.    Corps regulations provide that two or more different NWPs can be combined to authorize a project, but that "the same NWP cannot be used more than once for a single and complete project." *Id.* § 330.6(c).

47.    Corps division engineers may prepare supplemental documentation for NWPs, make modifications, and add regional conditions. *Id.* § 330.5(c).

### The National Environmental Policy Act

48.    NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Congress enacted it in 1969 "to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

20

49.     NEPA seeks to ensure "that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b), (c). When the federal government acts before fulfilling its NEPA obligations, courts may set the action aside until the government complies with NEPA.

50.     The Council on Environmental Quality (CEQ) is an agency created by NEPA and housed within the Executive Office of the President. 42 U.S.C. § 4342. CEQ has promulgated general regulations implementing NEPA. 40 C.F.R. §§ 1500-1508.

51.     To achieve these objectives, NEPA requires all federal agencies to prepare a "detailed statement" for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement—the EIS—must describe the environmental impacts of the proposed action. *Id.* § 4332(2)(C)(i), (ii). The EIS is an "action-forcing device" that ensures NEPA's goals "are infused into the ongoing programs and actions" of the federal government. 40 C.F.R. § 1502.1.

52.     To determine whether a proposed action significantly affects the environment, and whether an EIS is required, the lead federal agency first prepares an EA. *Id*. §§ 1501.4(b), 1508.9.

53.     An EA must provide sufficient evidence and analysis to determine whether to prepare an EIS. *Id.* § 1508.9. The lead agency must take a hard look at the relevant environmental concerns and alternatives to the proposed action. The agency must consider both the context and intensity of the proposed action, including whether the project will take place in wetlands or other "ecologically critical areas," whether the project will affect endangered species, and "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." *Id*. § 1508.27 (a), (b).

54.     If the agency concludes in an EA that a project may have significant environmental impacts, then it must prepare an EIS. *Id*. § 1501.4. If an EA concludes that there are no potentially significant impacts to the environment, the federal agency must describe why the project's impacts are insignificant and issue a FONSI. *Id*. § 1508.13. If the agency issues an EA/FONSI, it must make a convincing case for a finding of no significant impact on the environment, since the FONSI is crucial to a court's evaluation of whether the agency took the requisite hard look at the potential impacts of a project.

55.     An EIS or EA must include a "full and fair discussion" of the "direct,"
"indirect," and "cumulative" effects of the action, as well as a discussion of
"[m]eans to mitigate adverse environmental impacts." *Id*. §§ 1502.1, 1502.16(a),
(b), (h), 1508.25(c). Direct impacts are "caused by the action and occur at the same
time and place." *Id.* § 1508.8(a). Indirect impacts are "caused by the action and are
later in time or farther removed in distance, but are still reasonably foreseeable."
*Id*. § 1508.8(b). Cumulative impacts are the "incremental impact[s] of the action
when added to other past, present, and reasonably foreseeable future actions
regardless of what agency (Federal or non-Federal) or person undertakes such
other actions." *Id.* § 1508.7. "Cumulative impacts can result from individually
minor but collectively significant actions taking place over a period of time." *Id.*

56.     Agencies must include analysis of any "[c]onnected" actions in the
same EIS or EA. *Id.* § 1508.25(a)(1). Connected actions are those that
"[a]utomatically trigger other actions which may require environmental impact
statements," "[c]annot or will not proceed unless other actions are taken previously
or simultaneously," or "[a]re interdependent parts of a larger action and depend on
the larger action for their justification." *Id.*

57.     The EIS or EA must also inform federal agency decision-makers and
the public of the "reasonable alternatives" that would "avoid or minimize adverse
impacts or enhance the quality of the human environment." *Id.* § 1502.1. This

23

analysis of alternatives is the "heart" of the document—i.e., where the agency should "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options." *Id.* § 1502.14. The EIS or EA must "[r]igorously explore and objectively evaluate all reasonable alternatives," including the alternative of "no action." *Id.* § 1502.14(a), (d).

58.    The CEQ regulations require the federal agency to provide an opportunity for public participation. *See id*. § 1500.1(b) ("public scrutiny [is] essential"), § 1500.2(d) (the agency must "[e]ncourage and facilitate public involvement"), § 1506.6 (the agency must "[m]ake diligent efforts to involve the public" in preparing environmental documents, give "public notice of . . . the availability of environmental documents so as to inform those persons . . . who may be interested or affected," and "[s]olicit appropriate information from the public."). CEQ regulations require federal agencies to give the public as much information as is practicable, so that the public has a sufficient basis to assess those areas that the agency must consider in conducting the environmental review. *See id*. § 1501.4.

### The Endangered Species Act

59.    With the ESA, Congress intended endangered species to be afforded the highest of priorities. The ESA's purpose is "to provide a means whereby the

24

ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

60.    The ESA assigns responsibility to implement the statute to the Secretaries of Commerce and Interior, which in turn have delegated responsibility to the National Marine Fisheries Service and the U.S. Fish and Wildlife Service ("the Services"), respectively. 50 C.F.R. § 402.01.

61.    To fulfill the substantive purposes of the ESA, federal agencies are required to engage in Section 7 consultation with the Services to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical." 16 U.S.C. § 1536(a)(2). To "jeopardize" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of . . . the survival [or] recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

62.    The ESA's regulatory definition of "action" is broad and includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas," such as the

promulgation of regulations, the granting of permits, or actions directly or indirectly causing modifications to the land, water, or air. *Id*.

63.     Section 7(a)(2) and its implementing regulations set forth a detailed process that must be followed before agencies take or approve actions that may affect threatened or endangered species or critical habitat. In fulfilling the requirements of Section 7(a)(2) and the procedural requirements set forth in 50 C.F.R. Part 402, agencies must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

64.     Each federal agency must "review its actions at the earliest possible time to determine whether any action may affect listed species or [their] critical habitat" in the action area. 50 C.F.R. § 402.14(a). The term "may affect" is broadly construed to include "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character," and thus is easily triggered. 51 Fed. Reg. 19,926, 19,949 (June 3, 1986). The "action area" includes all areas that would be "affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02.

65.     If the Services determine that listed species may be present in the action area, the action agency must prepare a "biological assessment" that "evaluate[s] the potential effects of the action" on listed species and their habitat. *Id*. §§ 402.12(a), 402.02.

26

66.     If the action is "likely to adversely affect" listed species or critical habitat, the agency must engage in "formal consultation" with the Services to meet the ESA's substantive "no jeopardy" mandate. *Id.* § 402.14; *see* 16 U.S.C. § 1536(a)(2). The threshold for triggering this formal consultation requirement is very low. *See* 51 Fed. Reg. at 19,949-50.

67.     Formal ESA consultation commences with the action agency's written request for consultation and concludes with the Services' issuance of a "biological opinion." 50 C.F.R. § 402.02; *see id.* § 402.14(c), (g)(4). During formal consultation, the Services and the action agency must evaluate the "[e]ffects of the action," including all direct and indirect effects of the proposed action, plus the effects of actions that are interrelated or interdependent, added to all existing environmental conditions—that is, the "environmental baseline." *Id.* §§ 402.02, 402.14(g)(3). "The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area . . . ." *Id.* § 402.02. The effects of the action must be considered together with "cumulative effects," which are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id*.

68.     The biological opinion is the heart of the formal consultation process, and states the Services' opinion as to whether the effects of the action are "likely to

27

jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(g)(4), (h)(3); *see* 16 U.S.C. § 1536(a)(2), (b)(3)(A).

69.     If the Services determine that the action is likely to jeopardize a species, the biological opinion must outline "reasonable and prudent alternatives" to the action, if any exist, that will avoid jeopardy and "which [the agency] believes would not violate [Section 7(a)(2)]." 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). The Services may also "suggest modifications" to the action during the course of consultation "to avoid the likelihood of adverse effects" to the listed species even when not necessary to avoid jeopardy. 50 C.F.R. § 402.13(b).

70.     If the Services conclude that an action is not likely to jeopardize listed species, they ordinarily provide the action agency with a written statement, commonly known as an "incidental take statement" (ITS). *See* 16 U.S.C. § 1536(a)(2), (b)(4); 50 C.F.R. § 402.14(i). The ITS must set forth "reasonable and prudent measures" that are "necessary or appropriate to minimize" take, and "terms and conditions" that the action agency must comply with to implement the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4)(ii), (iv); 50 C.F.R. § 402.14(i)(1)(ii), (iv).

71.     The Services may also engage in "programmatic consultation" to guide the implementation of Federal programs by establishing standards,

28

guidelines, or governing criteria to avoid, minimize, or offset the effects of the program on listed species and critical habitat. *See* 50 C.F.R. § 402.02. However, pursuant to the Services' revised regulations defining "framework programmatic action," programmatic consultations, such as for the NWP program, should not result in the issuance of an ITS. Rather, any incidental take must be subsequently authorized under a project-specific Section 7 consultation. *See* 80 Fed. Reg. 26,832, 26,832, 26,837 (May 11, 2015) (adding definition of "framework programmatic action" to 50 C.F.R. § 402.02 and adding 50 C.F.R. § 402.14(i)(6) to clarify that incidental take statements generally will not be issued at the programmatic level). When the Services issued the 2015 regulations defining framework programmatic consultations, they used the Corps' NWP program as a specific example of a federal program where programmatic consultation would be required. 80 Fed. Reg. at 26,835.

72.    After the issuance of a biological opinion and "where discretionary Federal involvement or control over the action has been retained or is authorized by law," the action agency and the Services must reinitiate formal consultation if "the amount or extent of taking specified in the incidental take statement is exceeded;" if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;" if "the identified action is subsequently modified in a manner that causes an effect to

the listed species . . . that was not considered in the biological opinion;" or if "a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16.

## The Administrative Procedure Act

73.     The APA provides for judicial review of agency actions such as those at issue here, and provides the standard of review for ESA citizen suit claims. A reviewing court shall "hold unlawful and set aside" any Corps actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## FACTS

## The Corps' Reissuance of NWP 12

74.     On June 1, 2016, the Corps published a proposal to reauthorize 50 existing NWPs and add two new NWPs. 81 Fed. Reg. 35,186, 35,188 (Jun. 1, 2016). The Corps also proposed to reissue the general conditions and definitions for all NWPs, with some modifications, and to add one new general condition. *Id.* at 35,186. The Corps invited public comment for a period of 60 days, ending on August 1, 2016. *Id.*

75.     On August 1, 2016, the Sierra Club, the Center, Bold, and NRDC, among many others, submitted comments to the Corps that focused on NWP 12 and outlined violations of the CWA, NEPA, and ESA.

76.    On January 6, 2017, the Corps published a final decision ("Final

Decision") reissuing 50 NWPs, general conditions, and definitions (with some

modifications), and issuing two new NWPs and one new general condition. 82 Fed.

Reg. at 1860. The NWPs took effect on March 19, 2017, and expire on March 18,

2022. *Id*. The general conditions, *id*. at 1998-2008, and definitions, *id*. at 2005-06,

discussed herein apply to all NWPs, including NWP 12.

77.    The Final Decision included the reissuance of NWP 12, which

authorizes "discharges of dredged or fill material into waters of the United States

. . . associated with the construction, maintenance, or repair of utility lines,"

"provided the activity does not result in the loss of greater than ½-acre of waters of

the United States for each single and complete project." *Id*. at 1985. The definition

of "utility line" includes "any pipe or pipeline for the transportation of any

gaseous, liquid, liquescent, or slurry substance," which includes oil pipelines. *Id*.

NWP 12 also authorizes discharges into waters of the United States for the

construction of related substation facilities, access roads, and overhead utility lines.

*Id*.

78.    Although NWP 12 is limited to utility projects with up to a half acre

of loss of U.S. waters for each "single and complete project," for linear projects the

Corps defines that term as "that portion of the total linear project . . . that includes

*all crossings of a single water of the United States (i.e., a single waterbody) at a*

31

*specific location.*" *Id.* at 2007 (emphasis added). In other words, NWP 12 allows

pipelines and other linear utility projects to use NWP 12 separately at each location

where the project crosses a river, stream, or wetland. By contrast, non-linear

projects can invoke NWP 12 only once for the overall project, unless the separate

components of the project would have "independent utility" (i.e., if the

components could function as stand-alone projects). *Id.* at 2006.

79.     NWP 12 thus allows the Corps to treat numerous water crossings

along a proposed linear utility project—which often number in the hundreds or

thousands—as "single and complete projects" that each qualify separately under

NWP 12. There is no limit to the number of times that a single linear utility project

can use NWP 12, nor is there a maximum number of acres of water that a linear

project can impact while still being authorized under NWP 12. Because the Corps

treats each crossing separately, it does not use the total amount of loss attributable

to a project to determine whether the half-acre threshold has been met.

80.     The Corps rationalizes this practice by claiming that water crossings

on a linear pipeline are usually at "separate and distant" locations and/or separate

watersheds along a pipeline route such that cumulative effects are dissipated. For

example, the Final Decision states:

> We do not agree that the [½-acre] limit should apply to the entire utility
> line because the separate and distant crossings of waters of the United
> States are usually at separate waterbodies scattered along the length of
> the utility line, and are often in different watersheds . . . . For utility

32

lines that cross the same waterbody (e.g., a river or stream) at separate and distant locations, the distance between those crossings will usually dissipate the direct and indirect adverse environmental effects so that the cumulative adverse environmental effects are no more than minimal.

*Id.* at 1885.

81.     However, NWP 12 does not actually require that multiple crossings along a linear project be "separate and distant" or in separate watersheds: it does not define the phrase "separate and distant" or impose any spacing requirements, and it does not require district engineers to make a "separate and distant" finding. In fact, linear projects permitted by NWP 12, including but not limited to Keystone XL, often have ten or more water crossings within a mile.

82.     The Corps further claims that district engineers, upon receipt of a PCN for an NWP 12 project, will conduct a project-level review to ensure that all of its water crossings "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment," as required by 33 U.S.C. § 1344(e)(1). 82 Fed. Reg. at 1870; *see also id.* at 1885 ("If the district engineer determines after reviewing the PCN that the cumulative adverse environmental effects are more than minimal . . . he or she will exercise discretionary authority and require an individual permit.")

83.     However, NWP 12 requires a permittee to submit a PCN *only if* the proposed project meets certain criteria. *See, e.g.*, *id.* at 1986, 1999, 2000, 2003-04.

If none of these criteria is met, a project proponent may commence with the activity under NWP 12 without notifying the Corps or the public at all.

84.    In fact, many project applicants proceed under NWP 12 without ever submitting a PCN or notifying the Corps, and thus the Corps district engineers lack the opportunity to evaluate the environmental effects of those projects at all.

85.    When an applicant does submit a PCN, the PCN must include a listing of not only the water crossings that triggered the PCN requirement, but also all water crossings along the project. *Id.* at 1986 (Note 8) (stating that the PCN must include "*other separate and distant crossings that require Department of the Army authorization but do not require pre-construction notification*" (emphasis added)). The district engineer must then "evaluate the PCN in accordance with Section D, 'District Engineer's Decision,'" and "may require mitigation to ensure that the authorized activity results in no more than minimal individual and cumulative adverse environmental effects." *Id.* In turn, Section D, "District Engineer's Decision," states that "the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest." *Id.* at 2004. "For a linear project, this determination will include an evaluation of the individual crossings of waters of the United States to determine whether they individually satisfy the terms and conditions of the NWP(s), *as well as the*

34

*cumulative effects caused by all of the crossings authorized by NWP*."[1] *Id.* at 2004-05 (emphasis added).

86.     In the Final Decision, the Corps explains that the purpose of the PCN requirements included in Note 8 "is to remind users of the NWPs that if a utility line includes crossings of waters of the United States that are authorized by NWP but do not require PCNs, and one or more crossings of waters of the United States requires pre-construction notification, then the PCN must include those Non-PCN crossings, in accordance with the requirements of paragraph (b)(4) of general condition 32." *Id.* at 1889.

---

[1] The same section provides additional detail about what that analysis should look like:

> When making minimal adverse environmental effects determinations the district engineer will consider the direct and indirect effects caused by the NWP activity. He or she will also consider the cumulative adverse environmental effects caused by activities authorized by NWP and whether those cumulative adverse environmental effects are no more than minimal. The district engineer will also consider site specific factors, such as the environmental setting in the vicinity of the NWP activity, the type of resource that will be affected by the NWP activity, the functions provided by the aquatic resources that will be affected by the NWP activity, the degree or magnitude to which the aquatic resources perform those functions, the extent that aquatic resource functions will be lost as a result of the NWP activity (*e.g.*, partial or complete loss), the duration of the adverse effects (temporary or permanent), the importance of the aquatic resource functions to the region (*e.g.*, watershed or ecoregion), and mitigation required by the district engineer.

*Id.* at 2005.

87.     Likewise, general condition 32(b)(4) states that the PCN must include "any other NWP(s), regional general permit(s), or individual permit(s) used or intended to be used to authorize any part of the proposed project or any related activity, including other separate and distant crossings for linear projects that require Department of the Army authorization but do not require pre-construction notification." *Id.* at 2003.

88.     The requirement that a PCN include all water crossings using NWP 12 (not only those that triggered the PCN requirement) is necessary to allow the district engineer to evaluate the adverse effects of an overall project and ensure that they would be no more than minimal, either individually or cumulatively, and to ensure that the project complies with all general and regional conditions for use of NWP 12 before it can proceed. *See id.* at 2004.

89.     In order to comply with the ESA for NWP 12-authorized activities, the Corps has relied on NWP General Condition 18(a), which states that "[n]o activity is authorized under any NWP which 'may affect' a listed species or critical habitat, unless ESA section 7 consultation addressing the effects of the proposed activity has been completed." 82 Fed. Reg. at 1999. Similarly, General Condition 32 provides that "the permittee cannot begin the activity until receiving written notification from the Corps that there is '*no effect' on listed species*." *Id.* at 2003 (emphasis added).

36

90.     Under General Condition 18(c), non-federal permittees must submit a PCN to the district engineer if the activity "might affect" any listed species or designated critical habitat, and "shall not begin work" on the activity until notified by the district engineer that the requirements of the ESA have been satisfied. *Id.* at 1999-2000. The PCN "must include the name(s) of the endangered or threatened species that might be affected by the proposed activity or that utilize the designated critical habitat that might be affected," and the district engineer will then "determine whether the proposed activity 'may affect' or will have 'no effect' [on] listed species and designated critical habitat." *Id.* at 1999. If a "may effect" determination is made, the Corps will undertake Section 7 consultation with the FWS and/or NMFS as appropriate.

91.     However, the PCN requirement set forth in General Condition 18 is insufficient to ensure that the Corps will engage in Section 7 consultation for all projects utilizing NWP 12 that may affect listed species because there is no guarantee that a project applicant will properly apply the "might affect" standard and submit a PCN for every water crossing that may impact a listed species. There is, therefore, no guarantee that district engineers will ensure ESA compliance for

all NWP 12-authorized activities.

## The Corps' NEPA Documents for NWP 12

92.    The Corps' reissuance of NWP 12 is a major federal action that requires compliance with NEPA. *See* 42 U.S.C. § 4332(2)(C). The Corps issued an EA and FONSI for its reissuance of NWP 12 on December 21, 2016.

93.    The NWP 12 EA is the Corps' only NEPA document for an estimated 11,500 uses of NWP 12 per year nationwide. The Corps will not prepare any further NEPA analysis for individual projects that are permitted, verified, or authorized by NWP 12. *See, e.g.*, 82 Fed. Reg. at 1861 ("Corps Headquarters fulfills the requirements of NEPA when it finalizes the environmental assessment in its national decision document for the issuance or reissuance of an NWP. An NWP verification issued by a district engineer does not require separate NEPA documentation."). In fact, for oil pipelines, there is no guarantee that any other federal agency will conduct any project-level NEPA review because there is no federal statute governing oil pipeline permitting.

94.    The NWP 12 EA is narrowly limited to discussing the impacts of discharges of fill material into waterways. It does not discuss the full range of direct, indirect, and cumulative impacts associated with oil pipelines or other utility projects permitted by NWP 12.

38

95.     For example, the NWP 12 EA does not evaluate the risks or impacts of pipeline oil spills into waterways, nor does it discuss the various types of crude oil transported by pipelines permitted by NWP 12 or their respective characteristics, impacts, or spill response requirements. Instead, the Corps' NWP 12 EA simply states: "We do not have the authority to regulate the operation of oil and gas pipelines, and we do not have the authority to address spills or leaks from oil and gas pipelines." NWP 12 Decision Document at 7.

96.     The NWP 12 EA does not evaluate the climate change impacts associated with NWP 12, including the potential for increased greenhouse gas emissions caused by pipeline construction and/or the lifecycle emissions associated with the oil transported by NWP 12 projects. Instead, the NWP 12 EA states:

> The Corps does not have the legal authority to regulate the burning of fossil fuels that are transported by pipelines where the Corps authorized crossings of waters of the United States by NWP 12, other general permits, or individual permits. Therefore, in its environmental documentation the Corps is not required to fully evaluate the burning of fossil fuels . . . .

NWP 12 Decision Document at 9.

97.     The NWP 12 EA also does not evaluate the impacts associated with the permanent conversion of forested wetlands to lesser quality wetlands associated with pipeline rights of way. However, the EA does acknowledge that forested wetland will be permanently converted. *See, e.g.*, NWP 12 Decision Document at 11 ("There is often conversion of wetland types within utility line

39

rights-of-way and those conversions often need to be permanently maintained while the utility line is operational.").

98.     The NWP 12 EA purports to contain a cumulative effects analysis, but that analysis fails to comply with NEPA. It includes only a summary of historic and current causes of wetlands depletion in the United States; discusses U.S. waters and species or habitat loss generally; and estimates the total acreage and condition of wetlands in the United States. The NWP 12 EA does not discuss any cumulative impacts specifically associated with the construction, maintenance, operation, or repair of utility projects such as crude oil or natural gas pipelines; the cumulative effects associated with the creation and permanent maintenance of pipeline rights of way such as forest fragmentation, habitat loss, erosion and sedimentation, soil nutrient loss, aesthetic impairment, etc.; or the cumulative effects from using NWP 12 hundreds of times, often in close proximity, to approve a massive pipeline project like Keystone XL. In fact, the cumulative effects analysis in the NWP 12 EA is the same boilerplate language contained verbatim in the decision documents for each of the 52 NWPs.

99.     Rather than evaluate the full host of direct, indirect, and cumulative impacts associated with pipelines and other activities permitted by NWP 12, the NWP 12 EA appears to defer much of its analysis to the project level. For example, the EA states:

40

Although the terms and conditions for this NWP have been established at the national level to authorize most activities that have no more than minimal individual and cumulative adverse environmental effects, division and district engineers have the authority to impose case-specific conditions on an NWP authorization to ensure that the authorized activities will result in only minimal individual and cumulative adverse environmental effects. . . . If the proposed activity will result in more than minimal adverse environmental effects, then the district engineer will exercise discretionary authority and require an individual permit.

NWP 12 Decision Document at 27-28. However, the Corps division or district engineer performs no further NEPA analysis when projects proceed under NWP 12, even upon issuance of verifications for specific projects.

100.   On March 17, 2017, the Corps' Omaha district office issued a Supplemental Decision Document ("Regional Decision") approving the NWPs and adding NWP regional conditions for Montana, South Dakota, and Nebraska.

101.   The Regional Decision contains only a general discussion of regional cumulative impacts (e.g., it estimates the number of yearly uses of NWP 12 and acreage affected in the region), but continues to rely on district engineers' review at the project level to ensure specific projects would have no more than minimal cumulative effects. Indeed, the Regional Decision uses the same phrase nearly verbatim in addressing eight separate categories of impacts: "The Omaha District *reviews each proposed activity and carefully considers the cumulative effects to watersheds and the aquatic resources*. By closely adhering to the requirements of the NWP and pertinent regional conditions, every effort is made to ensure that

41

project activities have minimal effects . . . ." Regional Decision § 7.2(a) (emphasis added); *see also id.* § 7.2(b)(e), (g), (i)-(j)(1) (including nearly identical language).

102. The Regional Decision does not purport to contain any NEPA analysis, nor does it discuss the risks or impacts of oil spills into waterways.

### The Corps' Failure to Undertake Programmatic ESA Consultation for the Reissuance of NWP 12

103. Pipelines constructed in U.S. waters pursuant to NWP 12, including the Keystone XL pipeline, "may affect" and are "likely to adversely affect" species listed under the ESA and/or destroy or adversely modify designated critical habitat, including through leaks and spills into the Corps' jurisdictional waterways, with disastrous impacts on aquatic resources.

104. In its Decision Document for NWP 12, the Corps acknowledged the potential for harm to the environment and the species that rely on areas affected by NWP 12-authorized activities, including from inadvertent returns of drilling fluids; fragmentation of terrestrial and aquatic ecosystems; leaks and spills of transformer fluids or petroleum products; conversion of wetlands resulting in loss of wetland functions as well as permanent loss of wetland habitat and alteration of natural drainage patterns; and adverse effects on water quality from increases in sediments and pollutants in the water that impair the quality of fish and wildlife habitat by modifying or eliminating areas used for nesting, foraging, resting, and reproduction.

105.   Pipelines and power lines also cause immediate and irreparable impacts to ecosystem functions of streams and adjacent wetlands through several means, including by: spreading invasive species; damaging soils; degrading water quality and harming fish; causing cumulative impacts to bank stability and floodplain vegetation leading to erosion, sedimentation, release of toxic substances, and reduced biodiversity and productivity; converting forested wetlands to scrub wetlands; and causing cumulative adverse impacts from forest fragmentation, habitat loss, erosion and sedimentation, and soil nutrient loss. These impacts adversely affect hundreds of listed species that rely on rivers, streams, and wetland habitats and other aquatic resources across the country.

106.   The Corps did not undertake any ESA Section 7 consultation with the Services regarding its reissuance of the NWPs to determine whether the NWP program, including NWP 12, may jeopardize listed species or adversely modify critical habitat.

107.   Instead, the Corps wrongly concluded that the issuance of the NWPs, including NWP 12, would have "no effect" on species protected under the ESA. 82 Fed. Reg. at 1,873-74; *see also* 81 Fed. Reg. 35,186, 35,193 (June 1, 2016). Upon information and belief, the Services did not formally concur with the Corps' "no effect" determination for the NWP program.

108.   The Corps' "no effect" determination was premised on the assumption that project-specific consultations will occur pursuant to NWP General Condition 18, which requires a PCN for all NWP-authorized activities that might affect listed species, and provides that "[n]o activity is authorized under any NWP which 'may affect' a listed species or critical habitat, unless ESA section 7 consultation addressing the effects of the proposed activity has been completed." 82 Fed. Reg. at 1873, 1999.

109.   However, the PCN requirement set forth in General Condition 18 is insufficient to ensure that NWP-authorized activities, collectively, will not result in jeopardy to listed species or adverse modification of critical habitat, as the ESA requires. The project-specific consultations required under NWP General Condition 18 will not account for the cumulative impacts to species resulting from the NWP program as a whole. The Corps has failed to undertake any analysis of the impacts to ESA-listed species from NWP 12-authorized activities at the programmatic level, even though the ESA requires that the Corps consider the cumulative, national-scale programmatic impacts of discharges under NWP 12 on listed species and their critical habitat. In fact, the Services specifically stated that the NWP program required programmatic review when they issued the 2015 regulations defining framework programmatic consultations.

44

## TC Energy's Keystone XL Pipeline Project

110.   If built, the Keystone XL pipeline would be approximately 1,200 miles long and made of three-foot-wide steel pipe. It would stretch from Canada's tar sands mining region through Montana and South Dakota to southern Nebraska. The applicant, TC Energy (formerly TransCanada) would build the pipeline in an approximately 110-foot-wide construction right of way; the permanent right of way for most stretches of the pipeline route would be 50 feet. The project would cross approximately 47 miles of federal lands administered by the Bureau of Land Management, including at the U.S.-Canada border crossing.

111.   Keystone XL would import Canadian tar sands and other crude oil from Hardisty in Alberta, Canada to Steele City, Nebraska. In Steele City, Keystone XL would connect to TC Energy's existing pipeline network, which serves refineries and export terminals on the Gulf Coast. Connecting Keystone XL to the existing network would allow TC Energy to move as many as 830,000 additional barrels (about 35 million gallons) of crude oil from Canada to the Gulf Coast every day. If TC Energy receives a waiver to operate the pipeline at higher pressure, capacity could increase to 900,000 barrels per day. Keystone XL would be one of the largest oil pipelines ever built in the United States.

112.   There is no requirement that gasoline and other finished products made from Keystone XL's oil be sold on U.S. markets, and most of the refined product would likely be exported to other countries.

113.   Keystone XL would increase the extraction, transport, refining, and burning of oil derived from tar sands, one of the dirtiest and most destructive fuels on our planet. Tar sands crude oil—also known as oil sands crude oil, bitumen, or Western Canadian Sedimentary Basin crude oil—is an unconventional petroleum source that is mined from a mixture of sand and clay underlying the boreal forests and wetlands of Alberta, Canada.

114.   Tar sands crude oil is not extracted from the ground like other types of oil. Instead, it is mined using either open pit mining or in-situ drilling, two methods that are energy intensive and cause significant air and water pollution and deforestation.

115.   The mining, processing, refining, and end-use burning of tar sands also generates large amounts of carbon dioxide and other greenhouse gases that contribute to climate change. During the NEPA process for Keystone XL, the State Department and the EPA both concluded that lifecycle greenhouse gas pollution from tar sands is much higher—about 17%—than that from other forms of crude oil.

116.    The significant greenhouse gas emissions enabled by Keystone XL would exacerbate climate change, one of the predominant environmental crises of our age. The extraction and burning of fossil fuels, changes in land use (such as deforestation), and other processes associated with population growth and industrialization are causing the Earth's temperature to rise and its climate to change.

117.    According to the National Oceanic and Atmospheric Administration, the last five years were the hottest on record. Higher surface temperatures cause a wide range of human and ecological harms, including sea-level rise, coastal flooding, heat waves, increased risk of stronger hurricanes and extreme weather, increased risk of wildfires, water shortages, species extinction, habitat destruction, and shifting disease pathways.

118.    The transportation of tar sands crude oil through the Keystone XL pipeline also poses other serious threats to human health and the environment, particularly waterways. Oil pipelines routinely leak and spill oil, and diluted bitumen, or "dilbit," is extremely difficult to clean up after a spill—much more so than conventional crude oils. The chemicals used to dilute the bitumen can vaporize into air or dissolve into water, leaving behind the heavy bitumen. Because it does not readily biodegrade and is incredibly viscous and sticky, bitumen is

nearly impossible to remove from the natural environment, where it persistently

lingers as a source of oil pollution.

119.   Two dilbit spills from pipelines have highlighted how costly and

damaging such spills can be. A 2010 tar sands crude oil spill in Michigan's

Kalamazoo River led to a more than $1.2 billion cleanup effort, the most expensive

oil pipeline cleanup in U.S. history. A 2013 spill in Mayflower, Arkansas

contaminated an entire neighborhood and caused extensive health problems for

residents, including headaches, nausea, fatigue, nosebleeds, bowel issues, and

breathing problems.

120.   Problems with a Keystone XL predecessor also owned and operated

by TC Energy, the Keystone I pipeline, underscore the significant spill risks

associated with crude oil pipelines. When it began shipping oil through Keystone I

in June 2010, TC Energy claimed that "[c]onstruction and operation of the

Keystone Pipeline system will continue to meet or exceed world class safety and

environmental standards." But in its first year of operation alone, Keystone I

leaked at least 14 times and was temporarily shut down by U.S. authorities.

Canadian authorities recorded more than 20 spills and other accidents between

June 2010 and July 2011. In April 2016, Keystone I spilled 16,800 gallons; and in

November 2017, spilled another 210,000 gallons. Both of these major spills

occurred in South Dakota.

121.   Spills from Keystone XL could be particularly harmful because they threaten aquifers that serve as the main or sole source of drinking and irrigation water for many people. The proposed route described in the State Department's 2014 analysis would cross parts of the Northern High Plains Aquifer in South Dakota and Nebraska, including the Northern Great Plains Aquifer System that supplies communities in eastern Montana and the Ogallala Aquifer that supplies most of Nebraska's drinking and irrigation water. The Ogallala is the United States' largest freshwater aquifer. As development and climate change increase competition for and stress on water supplies, protecting our freshwater aquifers will become ever more important. Keystone XL would threaten these aquifers directly and threaten surface waters that are hydrologically connected to the aquifers.

122.   Keystone XL's construction would also harm the more than 1,000 waterbodies and more than 300 acres of wetlands it would cross. Using horizontal directional drilling, TC Energy would drill tunnels under the largest rivers, which include the Yellowstone, Missouri, Milk, Frenchman, Cheyenne, Bad, White, Elkhorn, and Platte Rivers. With horizontal directional drilling crossings, the project would use drilling mud, or fracking fluid, to drill underneath the waterways.

123.   Horizontal directional drilling presents a threat of "frac-out," which occurs when pressurized fluids and drilling lubricants escape the active bore, migrate up through the soils, and come to the surface at or near the construction site or in the waterbody.

124.   TC Energy would use an "open cut" method—excavating a trench in the streambed while water is flowing—to cross most other streams and rivers. In larger waterways, TC Energy would place construction equipment in the channel. These activities will increase sediment pollution and the risk of oil spills in waters that support fish and other wildlife and that people along the proposed route use for drinking, recreation, and agriculture.

125.   Construction in wetlands would be particularly damaging. Keystone XL would cut a 75- to 110-foot-wide path through wetlands along the proposed route. For comparison, Interstate 15 in central Great Falls is approximately 115 feet wide. Construction in wetlands can damage and destroy precious wildlife habitat, including foraging, nesting, spawning, rearing, and resting sites for migratory birds. It can also damage and destroy the wetland plants that influence water chemistry and trap sediments and other pollutants, harming water quality.

126.   According to the State Department's 2014 analysis, the construction of the project would impact a total of 11,599 acres, including approximately 128 acres of herbaceous wetlands, 53 acres of scrub-shrub wetlands, 7 acres of forested

wetlands, and 74 acres of riverine and open water wetlands; and the operation of the pipeline would *permanently* affect an estimated 55 acres of herbaceous wetlands, 23 acres of scrub-shrub wetlands, 5 acres of forested wetlands, and 38 acres of riverine and open-water wetlands.

127.   The project will require the construction of approximately 21 new pump stations, 55 new mainline valves, and hundreds of miles of new power lines, as well as permanent and temporary access roads.

128.   Keystone XL provides an instructive example of the adverse impacts of NWP 12-authorized activities on listed species. The pipeline and its related power line infrastructure pose significant threats to several species protected under the ESA. Construction and operation of the project will cause take of American burying beetles, pallid sturgeon, whooping cranes, interior least terns, and piping plovers through habitat loss and fragmentation, power line collisions, increased predation, construction activities, and inevitable oil spills during operation that will adversely affect these listed species and the habitats they depend on.

129.   FWS and the State Department have previously acknowledged that the project will negatively impact whooping cranes, interior least terns, and piping plovers due to collisions with the hundreds of miles of new electrical power transmission lines and distribution lines that would serve pump stations along the route. This increased collision risk is especially dangerous for the survival and

recovery of the whooping crane. The primary cause of mortality for this critically imperiled bird is collisions with power lines, and power lines associated with Keystone XL would present new collision hazards to migrant whooping cranes, as well as to interior least terns and piping plovers. Given the low numbers, genetic bottleneck, and slow reproduction of the whooping crane in particular, many whooping crane experts believe that the loss of a few, and even one, breeding adult could jeopardize the continued existence of this iconic species.

130.   The FWS has issued guidance entitled "Region 6 Guidance for Minimizing Effects from Power Line Projects within the Whooping Crane Migration Corridor" (the "Region 6 Guidance"). The Region 6 Guidance requires a five-mile buffer for documented high-use whooping crane areas, that lines within one mile of potentially suitable habitat be buried where feasible, and that existing lines as well as any proposed new lines be marked. However, none of the power companies that will erect the power lines to service Keystone XL has agreed to implement the conservation measures set forth in the Region 6 Guidance. Rather, the power companies have consented only to marking the proposed new lines with bird flight diverters, which are less than 50% effective at reducing crane collisions. Therefore, while the proposed conservation measures may reduce the threat of collisions, they cannot eliminate the likelihood of take or the possibility of

jeopardy. Take of whooping cranes, terns, and plovers is therefore reasonably certain to occur as a result of construction and operation of the project.

131.   Keystone XL will inevitably result in oil spills over the 50-year life of the project, presenting another threat to listed species, including whooping cranes, interior least terns, piping plovers, and pallid sturgeon. These listed species rely on waterbodies that Keystone XL would cross, as well as waterbodies downstream of many of the project's water crossings (including Non-PCN waters), and thus would be adversely affected by leaks or spills, including those in the vicinity of the crossings and upstream in tributaries. Yet the Corps has not considered whether oil spills or frac-outs may jeopardize these listed species, and FWS never provided incidental take coverage for listed species that may be harmed from oil spills, leaks, or frac-outs caused by Keystone XL.

132.   For example, oil spills from Keystone XL into or near the Platte River in Nebraska or the Missouri or Milk Rivers in Montana, and/or connected waterways, would be devastating to the endangered pallid sturgeon, which is very sensitive to harm from spills or other contamination that smothers the benthic habitat that it relies on for feeding and breeding.

133.   Keystone XL would drill under the Milk River (milepost 83.41) and the Missouri River (milepost 89.66) in Montana, two locations where endangered pallid sturgeon are present. However, in the span of ten miles on either side of

these two crossings (i.e., between milepost 73 and 100), the pipeline would cross 41 other waterways using conventional trenching methods. Discharges and/or oil spills into those 41 waterways during construction or operation could flow into the Missouri and Milk Rivers and adversely affect pallid sturgeon. Similar concerns exist with respect to crossings of Non-PCN waters in South Dakota and Nebraska.

134.   The State Department's analysis of the Keystone XL project acknowledged that oil spills and leaks could travel at least 40 miles downstream and adversely impact connected waterways. Plaintiffs' comments on the 2017 reissuance of NWP 12 and on the Keystone XL draft EIS provided evidence that oil spills can in fact travel up to 70 miles downstream.

135.   However, the Corps issued NWP 12 verifications (and/or found such verifications were unecessary) for the Keystone XL river crossings without considering the direct, indirect and cumulative impacts on protected sturgeon through ESA Section 7 consultation.

136.   The State Department and the FWS have also already admitted that Keystone XL will adversely affect remaining occupied habitat of the American burying beetle in Nebraska and South Dakota. Take of beetles will occur from direct harm associated with construction activities (i.e., habitat loss and crushing of beetles) and mortality if beetles are trapped and moved, as well as from heat emanating from the pipeline during operation. As described below, in 2013, the

FWS issued an ITS for Keystone XL finding that the project would result in take of over 350 American burying beetles, mostly through construction-related impacts in South Dakota and Nebraska. Now, that consultation has been withdrawn, and the Corps has not completed any independent analysis to ensure that its approval of Keystone XL will not jeopardize the continued existence of the American burying beetle.

## The State Department's Approval of Keystone XL

137.   In September 2008, TC Energy submitted an application to the State Department pursuant to Executive Order 13,337 for approval of a cross-border permit for the proposed Keystone XL pipeline.

138.   Because Executive Order 13,337 requires the State Department to determine whether the project "would serve the national interest," the State Department acted as the lead agency in the Keystone XL NEPA process—as it had done for most, if not all, cross-border projects since 1968. The Corps elected to participate as a cooperating agency in preparation of the EIS because the project requires authorization under Section 404 of the CWA to cross many of the approximately 1,073 waterways along its path. In January 2012, the State Department denied the first permit application. TC Energy subsequently reapplied for a cross-border permit on May 4, 2012, but constructed the southern segment of

Keystone XL as a separate project called the Gulf Coast Pipeline, which is now
operational.

139.   On December 21, 2012, the U.S. Department of State issued a
biological assessment ("BA") for the Keystone XL project and requested formal
Section 7 consultation with FWS. According to the BA, the Department was acting
as the "lead agency" for the agencies involved in the consultation, including the
Bureau of Land Management (BLM) and the Corps. Thus, the federal agency
actions covered by this consultation included not only the State Department's
cross-border permit, but also the Corps' actions pertaining to Keystone XL, such as
any Clean Water Act Section 404 permits, NWP 12 verifications, or other Corps
approvals concerning wetlands and jurisdictional waters. The "action area" or
"project area" covered by the 2012 BA was the entire length of the pipeline in
Montana, South Dakota, and Nebraska, which includes BLM lands and more than
1,000 water crossings under the jurisdiction of the Corps.

140.   The 2012 BA identified 13 federally listed threatened or endangered
species in the project area. The State Department made a "no effect" determination
on four species (gray wolf, Eskimo curlew, Topeka shiner and blow-out
penstemon); a "not likely to adversely affect" determination for nine species
(black-footed ferret, greater sage-grouse, interior least tern, piping plover,
Sprague's pipit, whooping crane, pallid sturgeon, and western prairie fringed

orchid); and a "may affect, likely to adversely affect" determination for the American burying beetle.

141.   The FWS issued a biological opinion (BiOp) for Keystone XL on May 15, 2013. Consistent with the BA, the action area defined by FWS stretched from the border of the United States with Canada to Steele City, Nebraska. The BiOp addressed 11 of the 13 species the State Department included in the BA. The FWS concurred with the "no effect" and "not likely to adversely affect" findings. The FWS found the project may adversely affect but would not jeopardize the American burying beetle, and issued an ITS pursuant to ESA Section 7(b) for the beetle.

142.   In January 2014, the State Department published a Final Supplemental Environmental Impact Statement for Keystone XL ("2014 EIS").

143.   In November 2015, citing the project's climate impacts and other significant threats to human health and the environment, the State Department found that Keystone XL was contrary to the national interest and denied TC Energy's application for a cross-border permit.

144.   On January 24, 2017, President Trump issued a presidential memorandum inviting TC Energy to reapply for a cross-border permit and directing the State Department to make a permitting decision within 60 days of TC Energy's submission. TC Energy subsequently submitted a new application.

145.   On March 23, 2017, the State Department found that Keystone XL "would serve the national interest" and issued TC Energy a cross-border permit. In issuing the permit, the State Department relied on the 2014 EIS to comply with NEPA.

146.   On November 20, 2017, the Nebraska Public Service Commission denied TC's application for its preferred route and instead approved the "Mainline Alternative" route. The Mainline Alternative route crosses several different water bodies and would be longer than the original preferred route, requiring an additional pump station and accompanying power line infrastructure. The 2014 EIS, the 2012 BA, and FWS's 2013 BiOp did not evaluate this route.

147.   On March 30, 2017, Plaintiffs in the instant case challenged the State Department's approval of Keystone XL as violating NEPA, the ESA, and the APA. *See* Complaint, *N. Plains Res. Council v. Shannon*, 17-cv-31-GF-BMM (D. Mont.), ECF No. 1. In orders dated August 15 and November 8, 2018, this Court held that the State Department violated NEPA and the APA by failing to evaluate new information regarding the impacts of Keystone XL, including the newly approved route in Nebraska, changes in oil markets, Keystone XL's climate change impacts, and the impacts of tar sands oil spills into waterways, and by discarding its prior factual findings on climate change to support its change in course on the cross-border permit. Partial Summ. J. Order Regarding NEPA Compliance, ECF

58

No. 202; Order, ECF No. 211. The Court also found that the State Department and the FWS violated the ESA by failing to adequately evaluate oil spills. Order, ECF No. 211. The Court vacated the State Department's Record of Decision, remanded to the State Department for preparation of a supplemental EIS, and enjoined project construction. *Id.*

148. On March 29, 2019, while the Court's decisions were on appeal to the Ninth Circuit Court of Appeals, President Trump issued a new cross-border permit for Keystone XL in an effort to circumvent this Court's ruling. On June 7, 2019, the Ninth Circuit dismissed the case as moot, vacated the Court's opinions, and dissolved the injunction.

149. In response to President Trump's issuance of a permit for Keystone XL, the State Department withdrew its 2012 BA on May 2, 2019 and requested that the FWS withdraw the 2013 BiOp. On the same day, the FWS withdrew the 2013 BiOp and ITS.

150. Upon information and belief, the State Department is continuing to prepare a supplemental EIS that will address the deficiencies identified by this Court and that will be used to support the Bureau of Land Management's pending decision on the project's right-of-way permits needed under the Mineral Leasing Act, 30 U.S.C. § 185, and the Corps' pending decision on the project's crossing of

the Missouri River pursuant to section 14 of the Rivers and Harbors Act, 33 U.S.C. § 408 ("Section 408 Permit").

151.   Upon information and belief, some further analysis on the project's impacts to protected species is being conducted pursuant to Section 7 of the ESA; however, Plaintiffs have not been provided with basic information, such as what the scope of the consultation will be, which federal agency is undertaking this process, or a date by which it will be completed.

## The Corps' Approval of Keystone XL

152.   Although the State Department's NEPA process and ESA consultation were never adequately completed and are purportedly ongoing, in 2017 the Corps approved (or determined that no approval is necessary for) the majority, if not all, of Keystone XL's water crossings, except the Missouri River crossing, using NWP 12.

153.   On May 25, 2017, TC Energy submitted three PCNs to the Corps' Omaha district office requesting verification for the use of NWP 12 to construct and operate the Keystone XL pipeline in U.S. waters in Montana, South Dakota, and Nebraska, each discussed further below. The PCNs indicate that Keystone XL would cross 212 waterbodies and 32 wetlands in Nebraska, 182 waterbodies and 41 wetlands in South Dakota, and 194 waterbodies and 27 wetlands in Montana, for a total of *at least* 688 jurisdictional waterways (588 waterbodies and 100

wetlands).[2] The PCNs further indicate that the project "might affect" listed species pursuant to NWP General Condition 18.

154.   Upon information and belief, the Corps has already permitted the majority of these Keystone XL water crossings—possibly all of them except the Missouri River crossing in Montana—through its issuance of NWP 12 and/or project verifications or other approvals.

155.   The Corps took these actions without *ever* analyzing Keystone XL's direct, indirect, or cumulative effects under NEPA or the ESA (e.g., the risks or impacts of pipeline oil spills into waterways), either upon issuance of NWP 12 or upon verification of the PCNs. As set forth above, the only NEPA document the Corps relies on for its approval of all NWP 12 activities nationwide is the NWP 12 EA. The Corps has not provided a project-specific NEPA analysis or completed ESA consultation regarding the permitting of water crossings for Keystone XL.

156.   Although the Corps was a cooperating agency in the State Department's preparation of the 2014 EIS for Keystone XL, the Corps' verifications do not purport to rely on that document. *See, e.g.*, 82 Fed. Reg. at 1861 (explaining that project verifications do not require any NEPA documentation because the Corps fulfills its NEPA obligations upon issuance of

---

[2] The 2014 EIS estimates that the project would cross approximately 1,073 waterways in Montana, South Dakota, and Nebraska. The reason for the discrepancy between these two numbers is unclear.

the NWP). Indeed, the Corps did not rescind its NWP 12 verifications for Keystone

XL following this Court's order finding the State Department EIS inadequate. In

any case, to the extent the verifications did rely on the 2014 EIS, the 2014 EIS

failed to adequately address the adverse individual and cumulative effects of

hundreds of water crossings for the project, and instead stated that such review

would happen as part of the NWP 12 process.

157.   The Corps also failed to evaluate the adverse effects of approving

many hundreds of water crossings along the Keystone XL route, as required by

Section 404(e) of the CWA and NWP 12 itself.

158.   The PCNs demonstrate that numerous parts of Keystone XL have

multiple water crossings very close to each other in the same watersheds, often on

the same waterbodies or in various tributaries of the same waterbody. For example,

in approximately one mile, from milepost 111.44 to milepost 112.64 of the

proposed pipeline in Montana, there are six pipeline crossings of "Unnamed

Tributary to Shade Creek." There are countless other examples of areas with high

densities of water crossings. *See, e.g.*, milepost 425 (8 crossings of Narcelle Creek

within one mile in South Dakota); milepost 775 (13 crossings within a mile in

Nebraska). Nowhere does the Corps *ever* perform a project-level analysis to

determine whether the pipeline's numerous water crossings would have more than

a minimal adverse effect on the environment at any scale (e.g., either at the stream, watershed, state-wide, or regional scale).

159.   Because Keystone XL is proceeding under NWP 12, there was no public notice or opportunity for involvement upon TC Energy's submission of the PCNs or the Corps' evaluation or verification of the PCNs, nor were the PCNs made available to the public. Plaintiffs learned of these PCNs by submitting requests to the Corps under the Freedom of Information Act.

160.   Although there was no public notice or comment period associated with these PCNs, Plaintiffs submitted a letter in August 2017 arguing that it is unlawful to approve Keystone XL under NWP 12 because the project will have more than minimal adverse environmental effects, urging the Corps to initiate an individual Section 404 process for Keystone XL, and requesting a public hearing.

161.   The Corps responded on September 14, 2017, confirming that it was processing Keystone XL under NWP 12 and that no public hearing was planned. The Corps had previously denied requests for public hearing upon issuance of NWP 12, so there was no public hearing at either stage of review.

<u>Montana</u>

162.   According to TC Energy, a PCN was required in Montana for three reasons: (1) the pipeline would cross the Yellowstone River; (2) the pipeline would

63

cross the Missouri River; and (3) species listed under the ESA "might be affected" by the project.

163.   The Montana PCN indicates that Keystone XL would cross 27 wetlands (25 palustrine emergent wetlands and 2 palustrine scrub shrub wetlands) and 194 waterbodies (19 perennial waterbodies, 55 intermittent waterbodies, 110 ephemeral waterbodies, and 10 seasonal waterbodies) in Montana.

164.   The Montana PCN also includes an "Appendix B" that consisted of "Non-PCN Datasheet Tables," which identified all of the water crossings in Montana. *See* 82 Fed. Reg. at 1986 (requiring this identification, citing NWP 12 Note 8 and paragraph (b) of general condition 32) (hereinafter, these are referred to as the "Non-PCN waters"). TC identified 192 Non-PCN waters in Montana.

165.   On September 8, 2017, the Corps issued a verification for Keystone XL's crossing of the Yellowstone River only. Although the PCN and "Memorandum for the Record" accompanying the verification acknowledge that the project would affect 221 aquatic resource crossings in the state, the verification is limited to the Yellowstone River crossing. Thus, the verification failed to evaluate the individual or cumulative effects of any water crossings in Montana other than the Yellowstone River, including how far apart the other crossings are from each other, or whether they are "separate and distant." Instead, the verification states that cumulative effects were already evaluated in the 2014 EIS,

64

the Corps' NWP 12 EA, and the Omaha Supplemental Decision Document for NWP 12.

166.   Upon information and belief, the Corps' position appears to be that the Non-PCN water crossings are tacitly permitted by NWP 12 without needing to be included in the verification, as the verification and Memorandum for the Record are limited to the Yellowstone River crossing.

167.   Upon information and belief, the Corps has not yet issued a verification for the Missouri River crossing because the Corps must wait until it makes a decision on the Section 408 Permit, which has not yet occurred; however, the Corps has apparently approved all other water crossings in Montana.

<u>South Dakota</u>

168.   According to TC Energy, a PCN was required in South Dakota for two reasons: (1) the pipeline would cross the Cheyenne River; and (2) species listed under the ESA "might be affected" by the project.

169.   The South Dakota PCN indicates that Keystone XL would cross 41 wetlands (40 palustrine emergent wetlands and 1 palustrine scrub shrub wetland) and 182 waterbodies (24 perennial waterbodies, 69 intermittent waterbodies, 86 ephemeral waterbodies, and 3 seasonal waterbodies) in South Dakota.

170.   The South Dakota PCN also includes an "Appendix B" that identifies 181 Non-PCN waters in South Dakota.

171.   On August 4, 2017, the Corps issued a verification for the Cheyenne River crossing only, which authorizes construction of a bridge in Meade County. Although the PCN and "Memorandum for the Record" accompanying the verification acknowledge that the project would affect 223 aquatic resource crossings in the state, the verification is limited to the Cheyenne River crossing. That verification failed to evaluate the individual or cumulative effects of any water crossings in South Dakota other than the Cheyenne River, including how far apart they are from each other, or whether they are "separate and distant." Instead, the verification states that cumulative effects were already evaluated in the 2014 EIS, the Corps' NWP 12 EA, and the Omaha Supplemental Decision Document for NWP 12.

172.   Upon information and belief, the Corps' position appears to be that the Non-PCN water crossings are tacitly permitted by NWP 12 without the need to be included in the verification, as the verification and Memorandum for the Record are limited to the Cheyenne River crossing.

<u>Nebraska</u>

173.   According to TC Energy, a PCN was required in Nebraska for three reasons: (1) the pipeline would cross the Niobrara River; (2) the pipeline would cross the Platte River; and (3) species listed under the ESA "might be affected" by the project.

174.   The Nebraska PCN states that TC Energy's preferred route in Nebraska would cross 32 wetlands (27 emergent palustrine wetlands and 5 palustrine forested wetlands) and 212 waterbodies (38 perennial waterbodies, 59 intermittent waterbodies, 110 ephemeral waterbodies, 1 open waterbody, 1 man-made open water, and 3 man-made ditches).

175.   The Nebraska PCN also includes an "Appendix B" that identifies 242 Non-PCN waters in Nebraska.

176.   On June 22, 2017, the Corps sent TC Energy a letter stating that because the project would use horizontal directional drilling to cross under the Niobrara and Platte Rivers in Nebraska, "the project will not involve a regulated discharge of dredged or fill material under Section 404 of the Clean Water Act . . . [and therefore] the activity is not subject to Department of the Army (DA) regulatory authorities and no permit pursuant to Section 404 is required from the U.S. Army Corps of Engineers."

177.   The letter implies that TC Energy could begin constructing Keystone XL through all waterways in Nebraska pursuant to NWP 12 without awaiting Corps verification or undergoing any project-level minimal adverse effects review from the district engineers, or ESA Section 7 consultation with the FWS.

178.   In November 2017, the Nebraska Public Service Commission approved the Keystone XL Mainline Alternative Route, which differs from TC Energy's preferred route—the route described by the 2017 Nebraska PCN.

179.   On November 22, 2017, the Corps sent TC Energy a letter recognizing that the Mainline Alternative Route "follows the same path into Nebraska and across the Niobrara River, but deviates east, crossing the Platte River in a new location." Thus, the Corps concluded that the "deviations from the original plans and specifications of this project could require additional authorizations from this office." Upon information and belief, this letter pertains only to the section of the route where the Mainline Alternative Route deviates from the preferred route, but did not change the Corps' position of June 22, 2017 (i.e., that no permit or verification is required) with respect to the portion of the preferred route in Nebraska.

180.   Upon information and belief, TC Energy has not submitted a revised PCN for the Mainline Alternative Route in Nebraska, nor has the Corps requested any additional information from TC Energy.

**The Corps' Failure to Undertake Project-Specific ESA Consultation for Keystone XL**

181.   In each of the three PCNs submitted for Keystone XL on May 25, 2017, TC Energy, as required by General Condition 18, stated that listed species

68

"might be affected or [are] in the vicinity" of the Keystone XL project. *See* 82 Fed.

Reg. at 1999.

182.   The Montana PCN states: "Within the jurisdiction of the USACE

Omaha District in Montana, potential habitat exists for the following federally

listed threatened or endangered species: the whooping crane (*Grus americana*),

piping plover (*Charadrius melodus*), interior least tern (*Sternula antillarum*), pallid

sturgeon (*Scaphirhynchus albus*), northern long-eared bat (*Myotis septentrionalis*),

and rufa red knot (*Calidris canutus rufa*)." As the PCN makes clear, these species

and their habitat may be adversely affected by the construction and operation of the

overall pipeline and water crossings, including crossings of Non-PCN waters.

183.   The South Dakota PCN states: "Within the jurisdiction of the USACE

Omaha District in South Dakota, potential habitat exists for the following federally

listed threatened or endangered species: the whooping crane (*Grus americana*),

piping plover (*Charadrius melodus*), interior least tern (*Sternula antillarum*),

American burying beetle (*Nicrophorus americanus*), and western prairie fringed

orchid (*Platanthere praeclara*)." As the PCN makes clear, these species and their

habitat may be adversely affected by the construction and operation of the overall

pipeline and water crossings, including crossings of Non-PCN waters.

184.   The Nebraska PCN states: "Within the jurisdiction of the USACE

Omaha District in Nebraska, potential habitat exists for the following federally

listed threatened or endangered species: the whooping crane (*Grus americana*),

piping plover (*Charadrius melodus*), interior least tern (*Sternula antillarum*), pallid

sturgeon (*Scaphirhynchus albus*), American burying beetle (*Nicrophorus*

*americanus*), Northern long-eared bat (*Myotis septentrionalis*), rufa red knot

(*Calidris canutus rufa*), and Western fringed prairie orchid (*Platanthera*

*praeclara*)." As the PCN makes clear, these species and their habitat may be

adversely affected by the construction and operation of the overall pipeline and

water crossings, including crossings of Non-PCN waters.

185.   General Condition 18 requires the Corps to undertake a project-

specific analysis of the direct and indirect effects on listed species to determine

whether the proposed activity "may affect" or will have "no effect" to listed

species and designated critical habitat. 82 Fed. Reg. at 1999. No project that "may

affect" a listed species or critical habitat may proceed under an NWP until the

Corps complies with Section 7 of the ESA. 82 Fed. Reg. at 1873; 33 C.F.R.

§ 330.4(f).

186.   "If the [district engineer] determines that the activity may affect any

Federally listed species or critical habitat, the [district engineer] must initiate

section 7 consultation in accordance with the ESA. In such cases, the [district

engineer] may: (i) Initiate section 7 consultation and then, upon completion,

authorize the activity under the NWP by adding, if appropriate, activity-specific

conditions; or (ii) Prior to or concurrent with section 7 consultation, assert

discretionary authority (see 33 CFR 330.4(e)) and require an individual permit (see

33 CFR 330.5(d)).” 33 C.F.R. § 330.4(f)(2)(i) & (ii).

187.  Upon receipt of the three Keystone XL PCNs, the Corps issued two

verifications that were limited to the Yellowstone River (MT) and Cheyenne River

(SD) crossings. The Corps verified these water crossings without conducting any

project-specific ESA Section 7 consultation. Rather, the verifications were

accompanied by a Memorandum for the Record that indicated the Corps relied on

the State Department’s 2012 BA and FWS’s 2013 BiOp for ESA compliance.

However, the 2013 BiOp was vacated by this Court in 2018 because it did not

adequately consider the impacts of oil spills on listed species, and was withdrawn

by FWS in 2019.

188.  In addition, while the Corps’ Montana and South Dakota verifications

referenced only the Cheyenne River and Yellowstone River crossings, the PCNs

listed all of the water crossings in each state, and therefore the Corps’ verifications

constituted an actual or tacit approval of TC’s intent to use NWP 12 as

authorization for construction and maintenance of the Keystone XL pipeline

through those Non-PCN waters. The Corps approved these water crossings without

making any determinations or findings as to whether listed species may be affected

by the crossings of Non-PCN waters. Similarly, the Corps’ June 22, 2017 letter

stating that no Corps authorization was required for any water crossings in Nebraska constituted an actual or tacit approval of TC's intent to use NWP 12 as authorization for construction and maintenance of the Keystone XL pipeline through the Non-PCN waterbodies in Nebraska, absent any analysis of impacts to listed species.

## The Corps' Recent Suspension of the KXL Verifications

189.   On June 20, 2019, TC Energy submitted a letter to the Corps requesting withdrawal of its PCNs for the use of NWP 12 for the Keystone XL pipeline's crossings of the Yellowstone River and Cheyenne River. In response, on August 2, 2019, the Corps used its discretion to suspend—not withdraw—the authorizations for the Yellowstone River and Cheyenne River crossings pursuant to 33 C.F.R. § 330.5(d) based on the need for further ESA compliance. The Corps did not specify the scope of this ESA compliance, what agency is undertaking further ESA analysis, or when this Section 7 process might be completed. The Corps may reinstate, modify, or revoke the authorizations at any time. Upon information and belief, at the time of this filing the Corps has not revoked or otherwise withdrawn the NWP 12 authorizations, and TC Energy has not refiled PCNs for the project.

190.   Although the Corps has suspended the Yellowstone River and Cheyenne River verifications, there is no indication that the Corps has altered its

actual or tacit approval of TC Energy's use of NWP 12 for all Non-PCN waters in

Montana, South Dakota, and Nebraska.

## FIRST CLAIM FOR RELIEF

**The Corps' reissuance of NWP 12 violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706**

191.   Plaintiffs reallege, as if fully set forth herein, each and every

allegation contained in the preceding paragraphs.

192.   The Corps' reissuance of NWP 12 was a major federal action that

requires compliance with NEPA. *See* 42 U.S.C. § 4332(2)(C).

193.   The Corps issued an EA/FONSI for its reissuance of NWP 12, which

constitutes the Corps' only NEPA document for an estimated 11,500 projects per

year using NWP 12 nationwide. The Corps will not prepare any further NEPA

analysis for individual projects that are permitted or authorized by NWP 12.

194.   The Corps' EA violated NEPA by failing to take the requisite hard

look at the significant direct, indirect, and cumulative environmental effects of

reissuing NWP 12 (i.e., the impacts of projects permitted or authorized by NWP

12). *See* 40 C.F.R. §§ 1502.1, 1502.16(a), (b), 1508.25(c). Among other things, the

NWP 12 EA failed to adequately analyze:

a.   The risks and impacts of crude oil spills and leaks from pipelines

approved by NWP 12, including but not limited to spills into Corps

73

jurisdictional waterways and an examination of the various types of

crude oil products transported by NWP 12 projects and their

respective properties, characteristics, environmental impacts, or spill

response requirements;

b.      The environmental impacts associated with the construction and

maintenance of pipeline rights of way, both within and outside of

Corps jurisdictional waterways, including but not limited to the

permanent conversion of forested wetlands to lower quality wetlands,

forest fragmentation, habitat loss, erosion and sedimentation, soil

nutrient loss, and aesthetic impairment;

c.      The climate change impacts of NWP 12, including but not limited to

the potential for increased lifecycle greenhouse gas emissions

resulting from oil and gas pipelines approved by NWP 12; and

d.      The cumulative impacts of NWP 12, including the effects of multiple

uses of NWP 12 for the same pipeline within particular watersheds,

regions, or other sensitive areas; and the impacts of other past, future,

and reasonably foreseeable projects.

195.   The Corps' FONSI for NWP 12 was arbitrary and capricious, and fails

to make a convincing case that the impacts of issuing NWP 12 are not significant.

The environmental impacts associated with the Corps' reissuance of NWP 12 are

"significant," 40 C.F.R. § 1508.27, and thus the Corps should have prepared an EIS.

196.   By preparing an EA/FONSI rather than an EIS for its NWP 12 reissuance, the Corps violated NEPA, 42 U.S.C. § 4332(2)(C), and its implementing regulations, including but not limited to 40 C.F.R. §§ 1501.3, 1501.4, 1502.4, 1508.8, 1508.9, 1508.11, 1508.18, and 1508.27.

197.   For the reasons set forth above, the Corps' reissuance of NWP 12 was inconsistent with NEPA and CEQ regulations. It was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, and contrary to the APA. *See* 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

**The Corps' reissuance of NWP 12 violated the Clean Water Act, 33 U.S.C.
§ 1344(e), applicable regulations, and the Administrative Procedure Act,
5 U.S.C. §§ 701-706**

198.   Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

199.   Section 404(e) of the CWA allows the Corps to issue NWPs only for categories of projects that the agency determines "are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).

200.   NWP 12 permits or authorizes the construction and operation of utility lines and associated facilities that do not result in the loss of greater than a half-acre of waters of the United States "for each single and complete project." 82 Fed. Reg. at 1985. However, NWP 12 defines "[s]ingle and complete linear project" as "that portion of the total linear project . . . that includes all crossings of a single water of the United States *(i.e., a single waterbody) at a specific location*." *Id.* at 2007 (emphasis added). The effect of this definition is to artificially treat each water crossing along a proposed linear utility project, which often number in the hundreds or thousands, as a "single and complete project" that qualifies separately under NWP 12.

201.   There is no limit to the number of times that a single linear utility project can use NWP 12, nor is there a total maximum number of acres of waters of the United States that a linear project can impact while still being authorized under NWP 12.

202.   NWP 12 relies on the discretion of division and district engineers to ensure, on a project-by-project basis, that the activities will have no more than minimal effects. *See id.* at 1885-86; *see also id.* at 2004.

203.   However, this project-level review by Corps district or division engineers fails to ensure projects permitted by NWP 12 will have only minimal adverse environmental effects because for many or most projects that proceed

under NWP 12, an applicant is not required to submit a PCN or notify the Corps at all, and thus the Corps does not have an opportunity to evaluate the adverse environmental effects of those projects.

204.   For those projects where a PCN is required, project-level review by Corps district or division engineers still fails to ensure that the multiple water crossings for projects permitted by NWP 12 will have only minimal adverse environmental effects, either individually or cumulatively, because the Corps never considers the effects of multiple water crossings for individual linear projects.

205.   In short, NWP 12 permits linear projects to use the NWP numerous times along a pipeline or utility route—even if there are high concentrations of water crossings in specific areas—with no mechanism to ensure impacts would be minimal. Thus, NWP 12 fails to ensure that projects it permits "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment" as required by 33 U.S.C. § 1344(e)(1).

## THIRD CLAIM FOR RELIEF

**The Corps' issuance of NWP 12 verifications and other approvals for Keystone XL violated the Clean Water Act, 33 U.S.C. § 1344(e), applicable regulations, the terms and conditions of NWP 12, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706**

206.   Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

207.   On September 8, 2017, the Corps issued a verification for the Keystone XL's crossing of the Yellowstone River in Montana, which notified TC Energy that construction of the project in U.S. waters meets the terms and conditions of NWP 12 and that the project is authorized to proceed under NWP 12. Although the Montana PCN and Memorandum for the Record accompanying the verification acknowledge that the project would affect 221 aquatic resource crossings in Montana, the verification is limited to the Yellowstone River crossing.

208.   On August 4, 2017, the Corps issued a verification for the Keystone XL Cheyenne River crossing, which authorizes construction of a bridge in Meade County, South Dakota, notifying TC Energy that construction of the project in U.S. waters meets the terms and conditions of NWP 12 and that the project is authorized to proceed under NWP 12. Although the South Dakota PCN and Memorandum for the Record accompanying the verification letter acknowledge that the project would affect 223 aquatic resource crossings in South Dakota, the verification is limited to the Cheyenne River crossing.

78

209.   On June 22, 2017, the Corps sent a letter to TC Energy stating that because the project would use horizontal directional drilling to cross under the Niobrara and Platte Rivers in Nebraska, "the project will not involve a regulated discharge of dredged or fill material under Section 404 of the Clean Water Act . . . [and therefore] the activity is not subject to Department of the Army (DA) regulatory authorities and no permit pursuant to Section 404 is required from the U.S. Army Corps of Engineers." The Corps failed to address the other 242 aquatic resource crossings identified in the Nebraska PCN.

210.   The Yellowstone River verification, the Cheyenne River verification, and the June 22, 2017 letter approving Nebraska crossings are each final agency actions reviewable under the APA, 5 U.S.C. §§ 704, 706(2). In the alternative, the verifications/letter constitute agency action unlawfully withheld or unreasonably delayed pursuant to 5 U.S.C. § 706(1), insofar as they failed to evaluate the adverse effects of crossings for Non-PCN waterways.

211.   Furthermore, the June 22, 2017 Nebraska letter is arbitrary and capricious insofar as it states the project in Nebraska does not involve fill in Corps jurisdictional waters.

212.   The Corps' issuance of the verifications/letter violates Section 404(e) of the CWA, because the Corps approved a project (or projects) that have more than minimal environmental effects.

79

213.   The Corps' issuance of the verifications/letter violates NWP 12 and/or its terms and conditions by failing to evaluate the project's individual and cumulative adverse effects, and failing to include in the respective "District Engineers' Decision(s)" a determination that the cumulative effects caused by all of the crossings authorized by NWP would be no more than minimal, either when measured project-, state-, region-, or watershed-wide. 82 Fed. Reg. at 2004-05. This omission includes a consideration of both direct and indirect effects (including but not limited to the risks and impacts of oil spills into waterways), and site-specific factors. *Id.* at 2005.

214.   The Corps' issuance of the verifications/letter constitutes de facto or implicit approvals of all Non-PCN waterways listed in the PCNs, and/or constitutes an acknowledgment that no additional or separate PCN is required for these water crossings, and violates NWP 12 and Section 404(e) of the Clean Water Act for approving those waterways without evaluating their adverse environmental effects.

215.   Although the Corps has suspended (but not revoked) the Cheyenne River and Yellowstone River verifications, there is no indication that the Corps has modified, suspended, or revoked its actual or tacit approval of TC Energy's use of NWP 12 for Non-PCN waters in Montana, South Dakota, or Nebraska. Furthermore, the Corps may reinstate the verifications at any time.

80

216.   Because the adverse environmental effects caused by all of the project's water crossings would be more than minimal, Keystone XL is ineligible for authorization under NWP 12 and the Corps' verification of the project under NWP 12 was unlawful. Instead, the Corps must evaluate the project under the individual Section 404 permit process pursuant to 33 U.S.C. § 1344(a) before the project can proceed.

217.   For these reasons, the Corps' verifications/approvals of the project under NWP 12 are arbitrary and capricious and not in accordance with law and must be set aside under the APA, 5 U.S.C. § 706(2)(A).

## FOURTH CLAIM FOR RELIEF

**The Corps' reissuance of NWP 12 violated the Endangered Species Act, 16 U.S.C. §§ 1531-1544, and applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706**

218.   Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

219.   The Corps has an ongoing duty pursuant to ESA Section 7(a)(2) to ensure that its actions are not likely to jeopardize the continued existence of endangered and threatened species or result in the destruction or adverse modification of such species critical habitat. 16 U.S.C. § 1536(a)(2).

220.   The Corps' reissuance of NWP 12 was an agency action that "may affect" listed species, and therefore the Corps was required to undertake

programmatic ESA Section 7 consultation to ensure that activities authorized and undertaken pursuant to NWP 12 will not result in cumulative adverse impacts that would jeopardize the continued existence of listed species or result in adverse modification of designated critical habitat. *Id*. The sheer number of waterways affected by NWP 12-authorized activities, and the number of listed species in those waters or in their vicinity that are adversely affected by such activities, indicates NWP 12 "may affect" listed species and/or critical habitat.

221.   NWP 12 allows activities that result in direct harm to listed species from habitat loss and fragmentation, power line collisions, sedimentation and contamination of waters relied on by listed species, as well as indirect impacts associated with climate change. The ESA requires that the Corps consider the cumulative, national-scale programmatic impacts of NWP 12 on listed species.

222.   The primary way to ensure that the issuance of NWP 12 will not jeopardize listed species is to consult at a programmatic level; otherwise the Services are not provided the opportunity to identify where NWP 12 may be problematic for listed species or critical habitat, and to provide reasonable and prudent measures to minimize take, such as measures to ensure that the Corps gathers and analyzes sufficient data to prevent jeopardy to listed species, and to ensure that incidental take does not occur at unsustainable levels. Programmatic consultation is also necessary to analyze the cumulative effects of NWP 12-

authorized activities on listed species, in order to avoid piecemeal destruction of habitat that may jeopardize species in violation of ESA Section 7.

223.   When the Services issued the 2015 regulations defining framework programmatic consultations, *see* 50 C.F.R. § 402.02, they specifically used the Corps' Nationwide Permit Program as an example of a federal program where programmatic consultation would be required. 80 Fed. Reg. at 26,835.

224.   NWP 12 authorizes activities that can impact listed species and their critical habitat, but it does not contain sufficient protections to ensure that the Corps will fulfill its obligations pursuant to ESA Section 7. For instance, project proponents may proceed with some NWP 12-authorized activities without submitting a PCN to the Corps if the applicant believes the project would have no impact on a listed species. This means that the Corps turns the initial effect determination over to non-federal applicants, whereas ESA Section 7(a)(2) requires federal agencies to make that determination.

225.   The project-specific consultation contemplated by the NWPs does not satisfy the Corps' ESA Section 7 duty to consult on the cumulative effects of projects approved under the NWP program. Project-specific consultations cannot ensure that the cumulative impacts from the program will not jeopardize listed species or adversely modify critical habitat, and the Corps' NWP 12 scheme therefore improperly curtails consultation on the NWP's cumulative effects in

violation of the ESA. 50 C.F.R. § 402.14(c)(4) & (g)(3),(4). For example, the Corps' finding that NWP 12 would have "no effect" on threatened and endangered species was arbitrary and capricious because it did not consider the cumulative impacts of oil leaks or spills on threatened and endangered species.

226.   Likewise, regional conditions by district engineers do not ensure there will be no effect on listed species and cannot relieve the Corps of its duty to consult on NWP 12. There is no Section 7 consultation on the regional conditions, and the district engineers are not required by NWP 12 to institute measures to protect listed species at the regional level.

227.   The Corps' failure to undertake and complete programmatic formal ESA Section 7 consultation with the Services regarding the effects of NWP 12-authorized activities on listed species and their critical habitats constitutes a failure to ensure that NWP 12 activities are not likely to jeopardize the existence of listed species or result in destruction or adverse modification of critical habitat, in violation of Section 7 of the ESA, 16 U.S.C. § 1536, and the ESA's implementing regulations. Such action is also arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law within the meaning of the APA. 5 U.S.C. § 706(2).

## FIFTH CLAIM FOR RELIEF

**The Corps' issuance of NWP 12 verifications and other approvals for Keystone XL violated the Endangered Species Act, 16 U.S.C. §§ 1531-1544, and applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706**

228.   Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

229.   The Corps has an ongoing duty pursuant to ESA Section 7(a)(2) to ensure that activities authorized pursuant to NWP 12 are not likely to jeopardize the continued existence of endangered and threatened species or result in the destruction or adverse modification of such species critical habitat. 16 U.S.C. § 1536(a)(2).

230.   The ESA requires federal agencies to consider the effects of their actions on listed species at the earliest possible time. 50 C.F.R. § 402.14(a). The only way to satisfy the duties in Section 7(a)(2) of the ESA is to complete the procedural requirements set forth in the ESA's implementing regulations, found in 50 C.F.R. Part 402, and rely on the best scientific information available in doing so. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).

231.   Keystone XL and related power line infrastructure pose significant threats to species protected under the ESA. Construction and operation of the project will cause take of American burying beetles, pallid sturgeon, whooping cranes, interior least terns, and piping plovers through habitat loss and

85

fragmentation, power line collisions, increased predation, oil spills, and construction activities.

232.   Upon information and belief, the Corps has not ensured, using the best available science, that Keystone XL and related power line infrastructure will not jeopardize listed species or that sufficient measures have been included to mitigate the adverse impacts of the project on such species, including the measures set forth in the FWS's Region 6 Guidance.

233.   Despite TC Energy's submission of PCNs indicating that listed species "might be affected or [are] in the vicinity of the project," as well as the 2013 BiOp's conclusion that Keystone XL "may affect" nine listed species, the Corps failed to conduct any project-specific Section 7 consultation for the project, in violation of the ESA, NWP 12, General Condition 18, and 33 C.F.R. § 330.4(f). Specifically, the Corps issued NWP 12 verifications, approvals, and/or tacit approvals for Keystone XL water crossings (including Non-PCN waters) without completing a valid Section 7 consultation, even though the project "may affect" listed species.

234.   The NWP program contemplates project-specific analysis where listed species are likely to be adversely affected. Likewise, the FWS's regulations specifically provide that incidental take must be authorized under a project-specific Section 7 consultation, even if the agency completes programmatic consultation,

which the Corps failed to do for NWP 12. *See* 80 Fed. Reg. at 26,835; 50 C.F.R. § 402.14(i)(6).

235.   Although the Corps has suspended (but not revoked) the Cheyenne River and Yellowstone River verifications, there is no indication that the Corps has modified, suspended, or revoked its actual or tacit approval of TC Energy's use of NWP 12 for Non-PCN waters in Montana, South Dakota, or Nebraska. Furthermore, the Corps may reinstate the verifications at any time.

236.   The Corps has therefore failed to independently analyze the impacts of Keystone XL through formal project-specific ESA consultation in violation of Section 7 of the ESA, 16 U.S.C. § 1536, and the ESA's implementing regulations. Such action is also arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law within the meaning of the APA. 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a) Declare the Corps' issuance of NWP 12 in violation of the Administrative Procedure Act, the Clean Water Act, the National Environmental Policy Act, the Endangered Species Act, and applicable regulations;

b)  Remand NWP 12 to the Corps for compliance with the National Environmental Policy Act, the Clean Water Act, and the Endangered Species Act;

c)  Declare the Corps' verifications and/or other approvals of Keystone XL pursuant to NWP 12 in violation of the Administrative Procedure Act, the Clean Water Act, the Endangered Species Act, and NWP 12 and its terms and conditions;

d)  Vacate all Corps verifications or other approvals of Keystone XL under NWP 12;

e)  Issue a preliminary and permanent injunction enjoining the Corps from using NWP 12 to authorize the construction of the Keystone XL pipeline in waterbodies or wetlands, or otherwise verifying or approving the Keystone XL pipeline under NWP 12, and enjoin any activities in furtherance of pipeline construction;

f)  Award Plaintiffs their costs, expenses, and attorneys' fees under applicable law; and

g)  Provide for such other relief as the Court deems just and appropriate.

Dated: September 10, 2019                 Respectfully submitted,

                                          /s/ Timothy M. Bechtold
                                          Timothy M. Bechtold
                                          Bechtold Law Firm, PLLC
                                          P.O. Box 7051
                                          Missoula, MT 59807
                                          (406) 721-1435
                                          tim@bechtoldlaw.net
                                          *Attorney for all Plaintiffs*

                                          /s/ Doug Hayes
                                          Doug Hayes (*pro hac vice*)
                                          /s/ Eric Huber
                                          Eric Huber (*pro hac vice*)
                                          Sierra Club Environmental Law Program
                                          1650 38th Street, Suite 102W
                                          Boulder, CO 80301
                                          (303) 449-5595
                                          doug.hayes@sierraclub.org
                                          eric.huber@sierraclub.org
                                          *Attorneys for Sierra Club and Northern*
                                          *Plains Resource Council*

                                          /s/ Jaclyn H. Prange
                                          Jaclyn H. Prange (*pro hac vice*)
                                          /s/ Cecilia D. Segal
                                          Cecilia D. Segal (*pro hac vice*)
                                          Natural Resources Defense Council
                                          111 Sutter Street, Floor 21
                                          San Francisco, CA 94104
                                          (415) 875-6100
                                          jprange@nrdc.org
                                          csegal@nrdc.org
                                          *Attorneys for Bold Alliance and Natural*
                                          *Resources Defense Council*

/s/ Jared Margolis
Jared Margolis (*pro hac vice*)
/s/ Amy R. Atwood
Amy R. Atwood (*pro hac vice*)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
(503) 283-5474
jmargolis@biologicaldiversity.org
atwood@biologicaldiversity.org
*Attorneys for Center for Biological Diversity*
*and Friends of the Earth*