William W. Mercer
Brianne McClafferty
HOLLAND & HART LLP
401 North 31st Street, Suite 1500
Billings, MT 59101
Phone: (406) 252-2166
wwmercer@hollandhart.com
bcmcclafferty@hollandhart.com

Deidre G. Duncan (D.C. Bar No. 461548) *(pro hac vice pending)*
Karma B. Brown (D.C. Bar No. 479774) *(pro hac vice pending)*
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037-1701
Phone: (202) 955-1500
dduncan@huntonAK.com
kbbrown@huntonAK.com

*Counsel for Defendant-Intervenors American Gas
Association, American Petroleum Institute,
Association of Oil Pipe Lines, Interstate Natural
Gas Association of America, and National Rural
Electric Cooperative Association*

FILED

OCT 15 2019

Clerk, U.S. Courts
District Of Montana
Billings Division

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, et al., | Case No. 4:19-cv-00044-GF-BMM |
| Plaintiffs, | **MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE BY AMERICAN GAS ASSOCIATION, AMERICAN PETROLEUM INSTITUTE, ASSOCIATION OF OIL PIPE LINES, INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA, AND NATIONAL** |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, et al., | |

Defendants,

RURAL ELECTRIC
COOPERATIVE ASSOCIATION

TRANSCANADA KEYSTONE
PIPELINE, LP, et al.,

Defendant-Intervenors.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...................................................................... ii

EXHIBIT INDEX.................................................................................. vi

I.    INTRODUCTION............................................................................ 1

II.   STATEMENT OF INTERESTS ...................................................... 4

    A.    American Gas Association. ................................................... 6

    B.    American Petroleum Institute. ............................................... 8

    C.    Association of Oil Pipe Lines. ............................................... 9

    D.    Interstate Natural Gas Association of America. ................... 10

    E.    National Rural Electric Cooperative Association................ 12

    F.    Plaintiffs' Claims. ............................................................... 14

III.  ARGUMENT ................................................................................ 15

    A.    The NWP 12 Coalition Is Entitled to Intervene as of Right.............. 15

        1.    The Motion to Intervene is Timely. ......................... 15

        2.    The Coalition Has a Direct and Recognized Interest in NWP 12—the Subject of this Action. ...................................... 17

        3.    The NWP 12 Coalition's Interests May be Impaired or Impeded by the Disposition of this Litigation.......................... 21

        4.    The Current Parties Do Not Adequately Represent the NWP 12 Coalition's Interests.................................................... 23

    B.    Alternatively, the NWP 12 Coalition Should Be Granted Permissive Intervention. ................................................................. 27

    C.    Rule 24(c) Is Satisfied. ......................................................... 29

IV.   CONCLUSION............................................................................. 29

CERTIFCATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Cabinet Mountains Wilderness v. Peterson*, 510 F. Supp. 1186
(D.D.C. 1981) ................................................................... 19

*Californians for Safe & Competitive Dump Truck Transp. v.
Mendonca*, 152 F.3d 1184 (9th Cir. 1998) .................... 25

*Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d
893 (9th Cir. 2011)........................................ 17, 21, 23, 24

*Conservation Law Found. of New England, Inc. v. Mosbacher*, 966
F.2d 39 (1st Cir. 1992)..................................................... 25

*Daggett v. Comm'n on Governmental Ethics & Election Practices*,
172 F.3d 104 (1st Cir. 1999)............................................ 27

*Ga. River Network v. U.S. Army Corps of Eng'rs*, 334 F. Supp. 2d
1329 (N.D. Ga. 2003) ...................................................... 19

*Georgia v. U.S. Army Corp of Eng'rs*, 302 F.3d 1242 (11th Cir. 2002) ................ 24

*Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995) ..................... 16

*Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094 (9th Cir. 2002),
*abrogated on other grounds by Wilderness Soc'y v. U.S. Forest
Serv.*, 630 F.3d 1173 (9th Cir. 2011) ............................. 27

*NAACP v. New York*, 413 U.S. 345 (1973)............................................. 15

*Nat'l Farm Lines v. Interstate Commerce Comm'n*, 564 F.2d 381
(10th Cir. 1977)......................................................... 19, 24

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, 243 F.R.D.
253 (S.D.W.Va. 2007) ..................................................... 19

*Perry v. Schwarzenegger*, 630 F.3d 898 (9th Cir. 2011) .................... 21, 26

*Rapanos v. United States*, 547 U.S. 715 (2006)................................................. 5

*Sierra Club v. Bostick*, No. CIV-12-742-R, 2013 WL 6858685 (W.D. Okla. Dec. 30, 2013), *aff'd*, 787 F.3d 1043 (10th Cir. 2015).............. 2, 3, 20

*Sierra Club v. EPA*, 995 F.2d 1478 (9th Cir. 1993), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) ........................................................................ 18, 20

*Sierra Club v. Espy*, 18 F.3d 1202 (5th Cir. 1994) .................................... 18

*South Dakota v. Ubbelohde*, 330 F.3d 1014 (8th Cir. 2003) ................................... 24

*Spangler v. Pasadena City Bd. Of Educ.*, 552 F.2d 1326 (9th Cir. 1977) ........................................................................................................ 27

*Sw. Ctr. For Biological Diversity v. Berg*, 268 F.3d 810 (9th Cir. 2001) .................................................................................................. 21, 23

*Trbovich v. United Mine Workers*, 404 U.S. 528 (1972)......................................... 23

*United States v. Aerojet Gen. Corp.*, 606 F.3d 1142 (9th Cir. 2010) .................... 15

*United States v. Albert Inv. Co.*, 585 F.3d 1386 (10th Cir. 2009) .......................... 20

*United States v. Alisal Water Corp.*, 370 F.3d 915 (9th Cir. 2004)........................ 15

*United States v. City of Los Angeles*, 288 F.3d 391 (9th Cir. 2002)................. 16, 17

## FEDERAL STATUTES

33 U.S.C. § 1344(e)............................................................................... 5, 6

## FEDERAL RULES

Fed. R. Civ. P. 24(a)(2) ................................................ 14, 15, 17, 23, 26, 28

Fed. R. Civ. P. 24(b)(1)(B)............................................... 26, 27, 28, 29

Fed. R. Civ. P. 24(c)........................................................................... 28

## FEDERAL REGULATIONS

33 C.F.R. § 330.2(i) (2011) ...................................................... 3

## FEDERAL REGISTER

81 Fed. Reg. 35,186 (June 1, 2016) ........................................ 19

82 Fed. Reg. 1860 (Jan. 6, 2017) ..................................... 1, 5, 6

## DOCKETED MATERIAL

Order, *Sierra Club, Inc. v. Bostick*, No. 5:12-cv-00742-R (W.D. Okla.
        Aug. 1, 2012), ECF No. 50 ............................................ 2

## MISCELLANEOUS

API, Comments on Department of the Army, Corps of Engineers,
        Proposal to Reissue and Modify Nationwide Permits, 76 Fed.
        Reg. 9174 (Feb. 16, 2011) (Apr. 18, 2011), COE-2010-0035-
        0234, https://www.regulations.gov/document?D=COE-2010-
        0035-0234 ................................................................ 9

API, Comments on Department of the Army, Corps of Engineers,
        Proposal to Reissue and Modify Nationwide Permits, 81 Fed.
        Reg. 35,186 (June 1, 2016) (Aug. 1, 2016), COE-2015-0017-
        0441, https://www.regulations.gov/document?D=COE-2015-
        0017-0441 ................................................................ 9

INGAA, Comments on Department of the Army, Corps of Engineers,
        Proposal to Reissue and Modify Nationwide Permits, 81 Fed.
        Reg. 35,186 (June 1, 2016) (Aug. 1, 2016), COE-2015-0017-
        0457, https://www.regulations.gov/document?D=COE-2015-
        0017-0457 ............................................................... 11

INGAA Foundation, Inc., The, *North America Midstream
        Infrastructure through 2035; Significant Development
        Continues* (June 18, 2018),
        https://www.ingaa.org/File.aspx?id=34703 ..................... 10

Nystrom, Scott, et al., *The Economic Impact of America's Electric Cooperatives* (Mar. 2019), https://www.electric.coop/wp-content/uploads/2019/03/Economic_Impact_of_Americas_Electric_Cooperatives-3-2019.pdf ...................................................................... 12

Parfomak, Paul W., Cong. Research Serv., IN11060, *Pipeline Security: Homeland Security Issues in the 116th Congress* (Mar. 1, 2019), https://crsreports.congress.gov/product/pdf/IN/IN11060 .............................. 4

Parfomak, Paul W., Cong. Research Serv., RL33347, *Pipeline Safety and Security: Federal Programs* (Feb. 18, 2010), https://www.everycrsreport.com/reports/RL33347.html ......................... 4, 22

U.S. Dep't of Homeland Sec., *National Infrastructure Protection Plan (NIPP) 2013: Partnering for Critical Infrastructure Security and Resilience* (undated), https://www.dhs.gov/sites/default/files/publications/national-infrastructure-protection-plan-2013-508.pdf ................................................. 22

## <u>EXHIBIT INDEX</u>

Exhibit 1      Affidavit of Michael L. Murray for the American Gas Association (Oct. 10, 2019)

Exhibit 2      Affidavit of Robin Rorick for the American Petroleum Institute (Oct. 9, 2019)

Exhibit 3      Affidavit of Andrew Black for the Association of Oil Pipe Lines (Oct. 7, 2019)

Exhibit 4      Affidavit of Joan Dreskin for the Interstate Natural Gas Association of America (Oct. 10, 2019)

Exhibit 5      Affidavit of Dorothy Kellogg for the National Rural Electric Cooperative Association (Oct. 9, 2019)

## I.    INTRODUCTION

Plaintiffs ask this Court to find unlawful U.S. Army Corps of Engineers

("Corps") Clean Water Act ("CWA") Nationwide Permit 12, Utility Line

Activities ("NWP 12").[1] Five national energy organizations (the "NWP 12

Coalition" or "Coalition") move to intervene to defend against Plaintiffs'

wholesale challenge to NWP 12:  American Gas Association ("AGA"), American

Petroleum Institute ("API"), Association of Oil Pipe Lines ("AOPL"), Interstate

Natural Gas Association of America ("INGAA"), and National Rural Electric

Cooperative Association ("NRECA").[2]

The NWP 12 Coalition has been involved in the development and defense of

NWP 12 since its inception over four decades ago.  Coalition members routinely

rely upon NWP 12 for the timely authorization of activities that have minimal

environmental effects, but that are essential to the reliable, safe, and affordable

delivery of energy to U.S. consumers, including rural customers, schools,

hospitals, and businesses nationwide.  Indeed, many Coalition members have

---

[1] NWP 12, "Utility Line Activities," authorizes minor, and typically temporary, discharges associated with "the construction, maintenance, or repair of utility lines." *See* 82 Fed. Reg. 1860, 1985 (Jan. 6, 2017).

[2] The NWP 12 Coalition does not intend to address Plaintiffs' specific claims concerning the Keystone XL Pipeline Project ("Project") and will defer to the Federal Defendants and Defendant-Intervenor TransCanada Keystone Pipeline, LP and TC Energy Corporation (collectively "TC Energy") with respect to those claims.

public service obligations to deliver energy to their customers, and this demand could not be met without the streamlined authorization provided by NWP 12.

The Coalition's members are the energy companies primarily responsible, on a national scale, for utility line activities that rely on NWP 12, and, thus, there is a direct and substantial relationship between NWP 12 and the Coalition's members' activities. Due to their significant interests in NWP 12, when Plaintiff Sierra Club brought a similar challenge in the Western District of Oklahoma, asserting that NWP 12 was unlawful under the CWA, Administrative Procedure Act ("APA"), and National Environmental Policy Act ("NEPA"), the Coalition intervened in defense of NWP 12. Order, *Sierra Club, Inc. v. Bostick*, No. 5:12-cv-00742-R (W.D. Okla. Aug. 1, 2012), ECF No. 50 (granting intervention). The Coalition's participation in *Bostick* provided the district and appellate courts with the perspective of the nationwide holders of the permit, and the courts expressly relied on many of the Coalition's arguments in upholding NWP 12. *Sierra Club v. Bostick*, No. CIV-12-742-R, 2013 WL 6858685, at *9 & n.11, 10, 12 n.16, 13-14, 21 (W.D. Okla. Dec. 30, 2013) (upholding NWP 12 and granting the Federal Defendants' and Defendant-Intervenors' motions for summary judgment), *aff'd*, 787 F.3d 1043 (10th Cir. 2015) ("*Bostick*").

The Coalition maintains the same interests here as it did in *Bostick*— ensuring the continued availability of NWP 12. Plaintiffs, having failed to make

their case in *Bostick*, once again challenge NWP 12 on many of the same grounds.[3] If NWP 12 is found unlawful, the Coalition's members may be forced to engage in lengthy and expensive individual CWA permit processes to undertake time-sensitive construction, maintenance, and repair activities on utility lines and intrastate and interstate natural gas pipelines across the country. The delay and expense resulting from those permitting processes would harm, not only the Coalition's members, but more importantly, the public—including residences, businesses, schools, hospitals, and government entities— and impede our nation's economy, energy security, and energy diversity.

Accordingly, the NWP 12 Coalition moves to intervene in this action, pursuant to Federal Rule of Civil Procedure 24(a) and (b), to defend against Plaintiffs' challenge to NWP 12, including their request to have NWP 12 declared unlawful pursuant to the APA, CWA, NEPA, and Endangered Species Act ("ESA"). The Coalition is entitled to intervene as a matter of right pursuant to Federal Rule of Civil Procedure 24(a)(2) because: (1) the motion to intervene is timely; (2) the Coalition has a direct interest in NWP 12, the subject of this case;

---

[3] For example, in *Bostick* as well as here, Plaintiffs challenge the definition of "'single and complete project,'" which, for linear projects, authorizes use of NWP 12 for crossings of separate water bodies or for crossings of a single water body at separate and distant locations. 33 C.F.R. § 330.2(i) (2011). The "'single and complete project'" definition was upheld in *Bostick*. *Bostick*, 2013 WL 6858685, at *20.

(3) this interest may be impaired or impeded by the disposition of this case; and (4) the other parties do not adequately represent the Coalition's interests.

Intervention will allow the NWP 12 Coalition to defend its unique and critical interests in NWP 12 and will aid the Court in understanding the history, development, and purpose of NWP 12, as well as the merits and implications of Plaintiffs' claims and requested relief on a nationwide scale.[4]

## II.    STATEMENT OF INTERESTS

The safe and reliable supply of energy at an affordable cost requires the construction and maintenance of thousands of miles of linear pipelines and electrical transmission and distribution lines.[5]  The need to supply electricity, natural gas, and other energy sources over long distances to all areas of the country means that pipelines, electric transmission lines, and other linear structures must at times unavoidably cross wetlands and other waters of the U.S.

---

[4] Plaintiffs oppose the NWP 12 Coalition's Motion to Intervene.  The Federal Defendants consent to the Coalition's Motion for Permissive Intervention, and Defendant-Intervenors TC Energy and the State of Montana consent to this Motion.

[5] Steady and reliable energy is essential to our national security.  *See* Paul W. Parfomak, Cong. Research Serv., RL33347, *Pipeline Safety and Security: Federal Programs* 1 (Feb. 18, 2010), https://www.everycrsreport.com/reports/RL33347.html ("CRS Report"). *See also* Paul W. Parfomak, Cong. Research Serv., IN11060, *Pipeline Security:  Homeland Security Issues in the 116th Congress* at 1 (Mar. 1, 2019), https://crsreports.congress.gov/product/pdf/IN/IN11060.

NWP 12 authorizes small discharges of dredged or fill material into waters of the U.S. that have "only minimal adverse environmental effects," as provided by Congress in CWA section 404(e), 33 U.S.C. § 1344(e).[6] The NWP 12 Coalition's members routinely rely on NWP 12 for the timely authorization of specific utility line activities, including critical maintenance and servicing, which the Corps has determined have only minimal impacts on the aquatic environment. Many of the utility line activities covered by NWP 12 are either overhead lines, which cross above water bodies, or lines placed underground with only minor, temporary impacts, after which the affected areas are returned to pre-construction elevations and revegetated, as appropriate. 82 Fed. Reg. at 1986.

Nationwide permits authorize these minor discharges without the need for lengthy and expensive individual CWA section 404 permit proceedings.[7] Significantly, the Corps' requirements to qualify for NWP 12 limit its application to covered utility line activities that cause no more than minimal impacts to the

---

[6] In establishing the NWP program, Congress recognized the importance of the NWP streamlined permitting approach to protect the efficiency and usefulness of the CWA section 404 program, fearing that detailed regulation of such relatively minor activities would undermine overall environmental protection by impairing the Corps' ability to focus on more significant activities.

[7] "The average applicant for an individual permit spends 788 days and $271,596 in completing the process, and the average applicant for a nationwide permit spends 313 days and $28,915—not counting costs of mitigation or design changes." *Rapanos v. United States*, 547 U.S. 715, 721 (2006).

environment.[8] Moreover, review and re-issuance of the nationwide permits through notice and comment rulemaking every five years ensures an ongoing review of the sufficiency of these protections.[9]

The NWP 12 Coalition's members are the companies primarily responsible, on a national scale, for the activities authorized by NWP 12.

## A.    American Gas Association.

AGA, founded in 1918, is a national trade association that represents more than 200 local energy companies that deliver and distribute clean natural gas to local residential, commercial, institutional, and industrial customers throughout the country.  There are more than 74 million residential, commercial, and industrial natural gas customers in the U.S., of which 95%—more than 71 million

---

[8] NWP 12 imposes a 1/2 acre limit on the "loss of ... waters" for each distinct water body and each separate and distant crossing, requires compliance with 32 general conditions, regional conditions, and any project-specific conditions.  82 Fed. Reg. at 1985-86.  Use of NWP 12 further requires pre-construction notification to the Corps District in at least seven distinct circumstances, including information about all water body crossings along the entire line, thereby allowing the District to further evaluate individual and cumulative effects and add project-specific conditions or require an individual permit.  *Id.* at 1986.  The numerous terms governing NWP 12 ensure compliance with the statutory standard.  33 U.S.C. § 1344(e).

[9] NWP 12 was reissued in 2017.  *See* 82 Fed. Reg. 1860 (Jan. 6, 2017).

customers—receive their gas from AGA members.[10] Today, natural gas meets about ¼ of the country's energy needs.[11]

AGA members rely on NWP 12 to obtain streamlined approvals for gas pipe installation and maintenance projects, which are essential to provide safe, reliable transportation of cleaner burning natural gas to businesses and residences. AGA members must install new natural gas utility lines on a regular basis, both to extend service to new customers and to replace older lines and improve system integrity and pipeline safety. Gas distribution lines and utility-operated intrastate natural gas transmission pipelines can cover many miles and often cross streams, wetlands, or other waters of the U.S. Many of these minor crossing projects could require individual section 404 permits if NWP 12 was not available.

The Department of Transportation Pipeline and Hazardous Materials Safety Administration, state laws, and public utility commission regulations and decisions require AGA member utilities to provide safe, reliable natural gas service to customers at just and reasonable rates, which requires maintaining, improving and expanding natural gas distribution and transmission systems in a cost-effective manner. In light of the federal and state regulatory requirements to maintain this extensive network of existing distribution mains and transmission pipelines and to

---

[10] *See* Affidavit of Michael L. Murray ¶ 3 ("Murray Aff.") (Ex. 1).
[11] *Id.*

construct new mains and pipelines, AGA members routinely rely on and will continue to rely on NWP 12.[12]

## B. American Petroleum Institute.

API is a nationwide, non-profit trade association that represents all facets of the natural gas and oil industry, which supports 10.3 million U.S. jobs and nearly 8% of the U.S. economy.[13] API's more than 600 member companies include large integrated companies, as well as exploration and production, refining, marketing, pipeline, and marine businesses, and service and supply firms.[14] API was formed in 1919 as a standards-setting organization, and API has developed more than 700 standards to enhance operational and environmental safety, efficiency, and sustainability.[15]

API members engage in exploration, production, and construction projects that routinely involve both state and federal water permitting.[16] API's members rely on an efficient and reasonable permitting process, as provided by the NWPs, including NWP 12, to obtain required CWA approvals for the construction, inspection, maintenance, and repair of oil, gas, natural gas liquids, and refined

---

[12] *See id.* ¶ 10.

[13] *See* Affidavit of Robin Rorick ¶ 3 ("Rorick Aff.") (Ex. 2).

[14] *Id.*

[15] *Id.*

[16] *Id.* ¶ 4.

product pipelines.[17] To protect these significant interests, API filed comments in response to the Corps' February 16, 2011 and June 1, 2016 proposals to reissue and modify the nationwide permits.[18]

## C. Association of Oil Pipe Lines.

AOPL is a national trade association that represents owners and operators of oil pipelines across North America and educates the public about the vital role oil pipelines serve in the daily lives of Americans. AOPL members transport approximately 96% of the crude oil and refined petroleum products shipped through pipelines in the U.S. AOPL members bring crude oil to the nation's refineries, natural gas liquids to manufacturers and industrial users, jet fuel to airports, and petroleum products to our communities.[19]

AOPL members routinely rely on NWP 12 authorizations for the construction, maintenance, and repair of their liquid pipelines.[20] AOPL members

---

[17] *Id.* ¶¶ 5, 7, 8, 9.

[18] API, Comments on Department of the Army, Corps of Engineers, Proposal to Reissue and Modify Nationwide Permits, 76 Fed. Reg. 9174 (Feb. 16, 2011) (Apr. 18, 2011), COE-2010-0035-0234, https://www.regulations.gov/document?D=COE-2010-0035-0234; API, Comments on Department of the Army, Corps of Engineers, Proposal to Reissue and Modify Nationwide Permits, 81 Fed. Reg. 35,186 (June 1, 2016) (Aug. 1, 2016), COE-2015-0017-0441, https://www.regulations.gov/document?D=COE-2015-0017-0441.

[19] *See* Affidavit of Andrew Black ¶ 4 ("Black Aff.") (Ex. 3).

[20] *See id.* ¶¶ 9-10.

seeking to ensure the integrity and safety of their pipelines through maintenance and repair projects would face significant delays and costs if NWP 12 is found unlawful, which, in turn, could affect their customers' supply and costs of obtaining crude oil and refined petroleum products.

### D.     Interstate Natural Gas Association of America.

INGAA is a non-profit trade association representing virtually all of the interstate natural gas transmission pipeline companies operating in the U.S. INGAA's members, which constitute approximately two-thirds of the interstate pipeline industry, operate a network of approximately 200,000 miles of pipelines.[21]

Natural gas plays a prominent role in the nation's energy mix, and interstate natural gas pipelines are an integral part of the energy infrastructure.[22] U.S. natural gas production is expected to increase to 130 billion cubic feet per day by 2035, spurred by growing markets, if available supplies are developed, and it is estimated that investment in new oil and gas infrastructure will total $791 billion from 2018 through 2035, averaging $44 billion per year.[23] Natural gas also will serve as a backstop to help firm up variable renewables, like wind and solar, which are

---

[21] *See* Affidavit of Joan Dreskin ¶ 3 ("Dreskin Aff.") (Ex. 4).

[22] *Id.* ¶ 12.

[23] The INGAA Foundation, Inc., *North America Midstream Infrastructure through 2035; Significant Development Continues* at 3 (June 18, 2018), https://www.ingaa.org/File.aspx?id=34703.

expected to grow. This translates to the need for thousands of miles of new and replacement pipe to meet market demand or to modernize existing pipeline facilities.[24]

Interstate natural gas pipeline construction and maintenance activities are typically conducted on tight schedules designed to ensure the safety, security, and reliability of the natural gas pipeline network, and to meet the growing demands of natural gas consumers.[25] Pipeline construction and maintenance operations often unavoidably cross wetlands and streams due to their linear nature, and require permitting and mitigation under CWA section 404 and/or section 10 of the Rivers and Harbors Act. INGAA members regularly rely on NWPs to streamline permitting for their construction and maintenance projects.[26]

To protect its interests in the NWP program, INGAA filed comments on August 1, 2016 in response to the Corps' proposal to reissue and modify the nationwide permits.[27] Based on the extent to which INGAA members rely on

_____

[24] *See id.* at 65; Dreskin Aff. ¶ 5.

[25] Dreskin Aff. ¶ 8.

[26] *Id.* ¶ 11.

[27] *Id.* ¶ 13; INGAA, Comments on Department of the Army, Corps of Engineers, Proposal to Reissue and Modify Nationwide Permits, 81 Fed. Reg. 35,186 (June 1, 2016) (Aug. 1, 2016), COE-2015-0017-0457, https://www.regulations.gov/document?D=COE-2015-0017-0457.

NWP 12 and the pipeline construction outlook ahead, INGAA's members have significant interests at stake in this challenge.

### E. National Rural Electric Cooperative Association.

NRECA, formed in 1942, is a national trade association that represents the national interests of nearly 900 not-for-profit rural electric cooperatives and the communities they serve. NRECA is dedicated to bringing electrical service to vast unserved regions of the country, and to provide safe, reliable, and affordable electric power through electric cooperative entities. Electric cooperatives have legal public service obligations to provide reliable electric service to their customer members.[28]

Electric cooperatives provide power to one in eight people in this country, and NRECA members serve more than 20 million businesses, homes, schools, hospitals, farms, irrigation systems, and other establishments.[29] Cooperatives own 42% of the nation's electrical distribution lines and cover over 56% of the U.S. land mass.[30] In 2017, electric cooperatives supported 611,600 jobs and contributed

---

[28] *See* Affidavit of Dorothy Kellogg ¶ 4 ("Kellogg Aff.") (Ex. 5).
[29] *Id.* ¶ 3.
[30] *Id.* ¶¶ 3, 5.

$88.4 billion to the U.S. GDP annually, including investing $12 billion annually in local economies.[31]

To provide electricity to communities across the U.S., NRECA's members engage in construction, operation, and maintenance of thousands of miles of transmission and distribution lines, as well as other utility operations that periodically take place in wetlands and other waters of the U.S. NRECA's members depend on NWP 12 to conduct these utility line activities, to ensure timely and reliable installation of electric transmission and distribution lines to deliver essential power to homes, public institutions, and businesses, and to perform maintenance on existing lines, which is critical to reliability.[32]

NRECA's members have a longstanding interest in nationwide permits, particularly NWP 12, and NRECA has participated in the nationwide permit rulemaking process during each reissuance.[33] If NRECA's members could not rely on NWP 12 for utility line construction and maintenance, they would be required to engage in the often lengthy and expensive individual CWA permitting process, with potentially significant adverse impacts to their customers' accessibility to

---

[31] *Id.* ¶ 5; *see also* Scott Nystrom et al., *The Economic Impact of America's Electric Cooperatives* 10 (Mar. 2019), https://www.electric.coop/wp-content/uploads/2019/03/Economic_Impact_of_Americas_Electric_Cooperatives-3-2019.pdf.

[32] Kellogg Aff. ¶¶ 8-9.

[33] *Id.* ¶ 11.

reliable and secure energy services at a reasonable cost. These costs and delays could impede cooperatives' ability to fulfill their public service obligations to ensure a reliable supply of electricity to rural consumers.

### F. Plaintiffs' Claims.

Plaintiffs' First Amended Complaint includes five claims: three challenges to NWP 12 and two challenges to the Project's verifications.[34] Plaintiffs ask the Court to declare that the reissuance of NWP 12 violates the CWA, APA, NEPA, and the ESA, and to remand NWP 12 to the Corps to remedy these alleged deficiencies. (Doc. 26 at 87-88).

The NWP 12 Coalition seeks to defend against Plaintiffs' facial claims to NWP 12, which allege, *inter alia*, that the Corps' reissuance of NWP 12 violates the: (1) NEPA and APA because the Corps' Environmental Assessment / Finding of No Significant Impact was arbitrary and capricious (Doc. 26 at ¶¶ 191-197); (2) CWA section 404(e) and APA because the Corps failed to ensure that projects authorized by NWP 12 will have only minimal adverse environmental effects (Doc. 26 at ¶¶ 198-205); and (3) ESA and APA because the Corps did not undertake programmatic formal ESA section 7 consultation (Doc. 26 at ¶¶ 218-227).

---

[34] The Coalition intends to defer to the Federal Defendants and Defendant-Intervenor TC Energy to address Project-specific claims.

## III. ARGUMENT

### A. The NWP 12 Coalition Is Entitled to Intervene as of Right.

Federal Rule of Civil Procedure 24(a)(2) provides that, "[o]n timely motion, the court *must permit* anyone to intervene" who:

> claims an interest relating to the property or transaction
> that is the subject of the action, and is so situated that
> disposing of the action may as a practical matter impair
> or impede the movant's ability to protect its interest,
> unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2) (emphasis added); *see also United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1148 (9th Cir. 2010). In determining whether intervention is appropriate, the Ninth Circuit is "guided primarily by practical and equitable considerations, and the requirements for intervention are broadly interpreted in favor of intervention." *Aerojet Gen. Corp.*, 606 F.3d at 1148 (internal quotations and citation omitted). The NWP 12 Coalition satisfies each of the requirements under Rule 24(a)(2). Accordingly, the Coalition respectfully requests the Court grant intervention as of right.

### 1. The Motion to Intervene is Timely.

The timeliness of a motion to intervene "is to be determined from all the circumstances" of the case. *NAACP v. New York*, 413 U.S. 345, 366 (1973). In evaluating the timeliness of a motion to intervene, courts consider "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other

parties; and (3) the reason for and length of the delay." *United States v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004) (internal quotations and citation omitted). The Coalition's motion to intervene is timely, and the Coalition plans to work collaboratively and efficiently with the other parties.

Plaintiffs filed their original complaint on July 1, 2019 (Doc. 1), and their First Amended Complaint on September 10, 2019 (Doc. 36). Upon filing of the complaint, the five separate and diverse trade associations that comprise the NWP 12 Coalition promptly joined together, as they did in *Bostick*, for purposes of intervening to provide a unified industry perspective on the national-level issues involved in this litigation and to defend their members' interests.

The Ninth Circuit has found intervention to be timely when proposed intervenors filed under similar circumstances. *See, e.g., United States v. City of Los Angeles*, 288 F.3d 391, 398 (9th Cir. 2002) (noting that intervention motion was timely when filed "only approximately one and [a] half months after the suit was filed"); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995) (permitting intervention when the "very early" motion was submitted four months after filing of the action, two months after defendants filed an answer and submitted the administrative record, and "before any hearings or rulings on substantive matters").

The Coalition has proceeded expeditiously. The litigation is at a very early stage. The Federal Defendants filed an answer on October 1, 2019 (Doc. 39), and TC Energy filed an answer on October 8, 2019 (Doc. 45). The Court has not ruled on any dispositive matter, and the merits of Plaintiffs' wholesale challenge to NWP 12 only may be decided based on the administrative record, which has not yet been lodged with the Court.

If granted intervention, the NWP 12 Coalition is prepared to comply with any established scheduling deadlines negotiated by the parties or imposed by the Court. Under these circumstances, the Coalition's motion is timely and allowing intervention at this early stage in the proceedings will not delay this action or unfairly prejudice the parties.

## 2. The Coalition Has a Direct and Recognized Interest in NWP 12—the Subject of this Action.

To intervene as of right, a movant must have an "interest relating to the property or transaction that is the subject of the action." Fed. R. Civ. P. 24(a)(2). Whether a movant has "a significant protectable interest in the action" "is a 'practical, threshold inquiry,' and '[n]o specific legal or equitable interest need be established.'" *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (citation omitted). The movant need only "establish that the interest is protectable under some law and that there is a relationship between the legally protected interest and the claims at issue." *Id.* "The relationship

17

requirement is met 'if the resolution of the plaintiff's claims actually will affect the [movant].'" *City of Los Angeles*, 288 F.3d at 398 (citation omitted).

Here, the NWP 12 Coalition's members are the entities that primarily rely upon NWP 12. These diverse energy companies historically have relied, currently rely, and in the future intend to rely, on NWP 12 authorizations to, among other things, support their obligations to provide reliable transportation and delivery of power, natural gas, oil, and other hydrocarbons to their customers at a reasonable cost and conduct maintenance, inspection and emergency work under short timeframes set by federal regulation.[35] If repairs cannot be accomplished within required timeframes, the affected portions of the system may be required to shut down, or operate at reduced pressure, with potentially severe environmental and economic consequences as customers must use alternative supplies, if available, or even curtail their operations.[36] An inability to complete these time sensitive maintenance and repair activities could have wide-ranging and serious consequences.

Entities relying on federal permits, such as the Coalition's members' reliance on NWP 12 authorizations, are routinely granted intervention in actions challenging those permits. *See, e.g.*, *Sierra Club v. EPA*, 995 F.2d 1478, 1482 (9th

---

[35] *See* Kellogg Aff. ¶¶ 14-15; Black Aff. ¶¶ 12-14.
[36] Dreskin Aff. ¶ 12; Black Aff. ¶ 14.

Cir. 1993) (CWA permit holder entitled to intervene as a matter of right),

*abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d

1173 (9th Cir. 2011) (en banc); *see also Sierra Club v. Espy*, 18 F.3d 1202 (5th

Cir. 1994) (timber purchasers' association whose members had timber contracts

that provided sufficient interest to intervene of right in suit seeking ban on timber

management); *Nat'l Farm Lines v. Interstate Commerce Comm'n*, 564 F.2d 381,

382 (10th Cir. 1977) (reversing denial of intervention to motor vehicle common

carriers based on risk that suit would set aside regulatory scheme that "directly

protects their economic interests"); *Ohio Valley Envtl. Coal. v. U.S. Army Corps of*

*Eng'rs*, 243 F.R.D. 253 (S.D.W.Va. 2007) (mining companies holding Corps

permits permitted to intervene as a matter of right); *Ga. River Network v. U.S.*

*Army Corps of Eng'rs*, 334 F. Supp. 2d 1329 (N.D. Ga. 2003) (holder of Corps

permit allowed to intervene in NEPA suit challenging permit); *Cabinet Mountains*

*Wilderness v. Peterson,* 510 F. Supp. 1186 (D.D.C. 1981) (holder of drilling permit

allowed to intervene in challenge to Forest Service approval of exploratory plan).

Moreover, the Coalition's substantial interests in NWP 12 are evidenced by

their active participation in the development of the NWPs throughout their history,

including by filing detailed comments during each re-issuance of the NWPs. Most

recently, members of the NWP Coalition submitted comments in response to the

Corps' 2016 proposal to reissue and modify the NWPs,[37] which were part of the administrative record before the Corps when it prepared the NWP 12 decision document. And the court in *Bostick* plainly recognized the significant interests of the NWP 12 Coalition when it granted the Coalition's motion to intervene and expressly relied on the Coalition's defense of NWP 12 and expertise on these issues in deciding the merits of the case. *See Bostick*, 2013 WL 6858685, at *9 n.11, 12 n.16.

Lastly, in the context of the CWA, a non-speculative economic interest in the outcome of the litigation is sufficient to warrant intervention. *Sierra Club*, 995 F.2d at 1483; *see also United States v. Albert Inv. Co.*, 585 F.3d 1386, 1393 (10th Cir. 2009) ("threat of economic injury from the outcome of litigation undoubtedly gives a petitioner the requisite interest" to warrant intervention (internal quotation marks and citation omitted)). If Plaintiffs' request for a judgment declaring NWP 12 unlawful is granted, the NWP 12 Coalition's members may be required to obtain individual CWA permits for utility line construction or maintenance. The Coalition's members and consumers nationwide would be impacted negatively by any requirement to obtain an individual permit for activities the Corps has

---

[37] 81 Fed. Reg. 35,186 (June 1, 2016).

determined have only minimal impacts on the aquatic environment.[38]  Thus, NWP

12 Coalition's members—and ultimately their customers—face a real and present

threat of economic injury should Plaintiffs prevail in this lawsuit.

In sum, the NWP 12 Coalition has substantial interests that are directly

implicated by Plaintiffs' lawsuit.[39]

### 3. The NWP 12 Coalition's Interests May be Impaired or Impeded by the Disposition of this Litigation.

Courts in this circuit adhere to "the guidance of Rule 24 advisory committee

notes that state that '[i]f an absentee would be substantially affected in a practical

sense by the determination made in an action, he should, as a general rule, be

entitled to intervene.'"  *Sw. Ctr. for Biological Diversity*, 268 F.3d at 822 (citation

omitted).  Impairment is routinely found when the movant has "a significant

protectable interest"—in those circumstances, courts have "little difficulty

concluding that the disposition of th[e] case *may*, as a practical matter affect" the

---

[38] *See* Black Aff. ¶¶ 12-13; Murray Aff. ¶ 14; Rorick Aff. ¶¶ 6, 12; Dreskin Aff. ¶ 15; Kellogg Aff. ¶ 15.

[39] Although the NWP 12 Coalition is not required to separately demonstrate standing to participate as defendant-intervenors, *see Perry v. Schwarzenegger*, 630 F.3d 898, 906 (9th Cir. 2011) (per curiam), the Coalition's interests in NWP 12, and the impairment the Coalition and its members would suffer if the plaintiffs prevail, easily satisfy any standing requirement.  *See Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 821 n.3 (9th Cir. 2001).

movant. *Citizens for Balanced Use*, 647 F.3d at 898 (emphasis added) (internal quotations and citation omitted).

Here, it is readily apparent that, if NWP 12 is found unlawful, the Coalition's members' interests could be substantially impaired or impeded. A court order declaring NWP 12 to be unlawful and remanding the permit to the Corps may not only require the Coalition's members to obtain individual section 404 permits for routine construction and maintenance activities, but also may significantly impair or impede their broader interests.[40] Collectively, the member companies of the NWP 12 Coalition control a significant segment of the nation's critical infrastructure that transports fuel and energy. Some of these companies are obligated by federal and/or state regulatory requirements to provide safe and reliable service at a reasonable price, and they are under increasing pressure from the federal government to undertake projects to ensure their plants, pipes, facilities, and assets provide timely, secure, and reliable service to their public and private sector customers.[41] Regulators, Congress, and customers understand that safe and reliable energy service is essential to our nation's security, public health and

---

[40] Murray Aff. ¶ 14; Rorick Aff. ¶ 12; Black Aff. ¶ 12; Dreskin Aff. ¶ 15; Kellogg Aff. ¶¶ 14, 15.

[41] *See* CRS Report at 1.

safety, economic viability, and way of life.[42] The inability to proceed with new

construction, upgrades, and maintenance activities through a timely, efficient, and

cost-effective permitting process would hinder the Coalition's members' ability to

accomplish these important missions and directives.[43]

### 4. The Current Parties Do Not Adequately Represent the NWP 12 Coalition's Interests.

The Coalition has significant protectable interests that may be impaired by

the disposition of this litigation, and thus, the right to intervene as long as its

interests *may* not be adequately represented by the existing parties. Fed. R. Civ. P.

24(a)(2). Adequacy of representation is determined by "examin[ing] three factors:

'(1) whether the interest of a present party is such that it will undoubtedly make all

of a proposed intervenor's arguments; (2) whether the present party is capable and

willing to make such arguments; and (3) whether a proposed intervenor would

offer any necessary elements to the proceeding that other parties would neglect.'"

*Citizens for Balanced Use*, 647 F.3d at 898 (citation omitted). Only a "'minimal'"

showing is required to establish this element of the legal standard for intervention

---

[42] *See* U.S. Dep't of Homeland Sec., *National Infrastructure Protection Plan (NIPP) 2013: Partnering for Critical Infrastructure Security and Resilience* (undated), https://www.dhs.gov/sites/default/files/publications/national-infrastructure-protection-plan-2013-508.pdf.

[43] Murray Aff. ¶¶ 8, 10; Rorick Aff. ¶¶ 8, 12; Black Aff. ¶ 14; Dreskin Aff. ¶ 15; Kellogg Aff. ¶ 15.

by right under Rule 24(a)(2). *Id.*; *see also Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n.10 (1972).

In cases like this —where the NWP 12 Coalition seeks to intervene on the same side as the government—the Ninth Circuit permits a private party to intervene even when the government and private party desire the same outcome. *Sw. Ctr. for Biological Diversity,* 268 F.3d at 823. This is so because "the government's representation of the public interest may not be identical to the individual parochial interest of a particular group" notwithstanding that "both entities occupy the same posture in the litigation." *Citizens for Balanced Use,* 647 F.3d at 899 (internal quotations and citations omitted).

The existing parties do not adequately represent the Coalition's interests. Although the Federal Defendants generally may share the NWP 12 Coalition's desire to defend NWP 12, the broad balance of environmental, administrative, public, and other interests the government must consider in addressing the claims differs markedly from the Coalition's specific interests in protecting the rights and expectations of their members and other entities that rely on NWP 12.[44] As a result, the positions the Federal Defendants may take during the litigation (or any

---

[44] *See Nat'l Farm Lines,* 564 F.2d at 383 (recognizing the inadequacy of government representation of the interests of private trade associations whose members had a direct economic interest in preserving a statute that government did not have).

settlement discussions) will neither necessarily align with the positions that the NWP 12 Coalition would take, nor adequately represent the Coalition's interests. *See, e.g., South Dakota v. Ubbelohde*, 330 F.3d 1014, 1025-26 (8th Cir. 2003) (in suit challenging Corps policy to lower reservoir water level, Corps could not adequately represent interests of proposed intervenors—downstream users— because Corps was required to balance the interests of the upstream and downstream users); *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1259 (11th Cir. 2002) ("a federal defendant with a primary interest in the management of a resource" does not have an "interest[] identical to those of an entity with an economic interest[] in the use of that resource") (citation omitted); *Conservation Law Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 44-45 (1st Cir. 1992) ("governmental entity charged by law with representing the public interest of its citizens might shirk its duty were it to advance the narrower interest of a private entity").

Put simply, the Federal Defendants' primary interests in this case are to defend the Corps' permitting policies and procedures and its administrative resources. The Federal Defendants do not have any particular stake in protecting the Coalition's rights and expectations in NWP 12, and may be constrained by federal policy or litigation strategy from making certain arguments in defense of NWP 12. *See Californians for Safe & Competitive Dump Truck Transp. v.*

25

*Mendonca*, 152 F.3d 1184, 1190 (9th Cir. 1998) (recognizing the different, narrower interests of a private intervenor and the more general interests of the public at large). Moreover, the Corps would not face the same consequences the NWP 12 Coalition's members would face if NWP 12 is declared unlawful.

Intervenor TC Energy also will not adequately represent the NWP 12 Coalition because its interests are primarily focused on constructing and operating the Project. *See* (Doc. 19 at 1, 10-11). By contrast, the NWP 12 Coalition will not focus on Plaintiffs' Project-specific allegations, but rather solely on defense of Plaintiffs' facial challenges to NWP 12. Similarly, Intervenor State of Montana will not adequately represent the NWP 12 Coalition, because its interests are focused on protecting its citizens, public safety, promoting economic development, and the State's role in siting oil pipelines. (Doc. 43).

Lastly, the NWP 12 Coalition has a direct, substantial, and focused interest in any settlement negotiations that may result from this litigation because the Coalition's members have an independent interest in supporting and upholding NWP 12 the other parties do not share, and the Coalition may have an interest in appealing an adverse decision that the existing parties may not share. Given the genuine potential for divergence of interests, it is clear that representation by existing parties *may* be inadequate and, as a result, the Coalition is entitled to intervene as of right.

**B. Alternatively, the NWP 12 Coalition Should Be Granted Permissive Intervention.**

Although the Coalition is entitled to intervene as of right under Rule 24(a)(2), in the alternative, the Court should permit the NWP 12 Coalition to intervene under Rule 24(b)(1)(B). Under Rule 24(b)(1)(B), the Court may exercise its discretion to permit intervention by anyone who "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B); *see also Perry*, 630 F.3d at 905. This Court has broad discretion to grant permissive intervention. *See Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1110 (9th Cir. 2002), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) (en banc).

In deciding whether to allow intervention under Rule 24(b)(1)(B), the Court may consider any number of factors, *see Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977), but intervention should generally be permitted when the movant (1) asserts an interest related to the agency rule in dispute, and (2) defenses that respond directly to the plaintiff's claim for relief. *Kootenai Tribe*, 313 F.3d at 1110. "The fact that the applicants may be helpful in fully developing the case is a reasonable consideration in deciding on permissive intervention." *Daggett v. Comm'n on Governmental Ethics & Election Practices*, 172 F.3d 104, 113 (1st Cir. 1999).

Permissive intervention is warranted here. Plaintiffs seek to have NWP 12 declared unlawful. The defenses the NWP 12 Coalition would assert would be based on the administrative record to be filed by the Federal Defendants, present questions of law and fact in common with the underlying suit and respond directly to Plaintiffs' claims. Moreover, given the unique perspective of the NWP 12 Coalition in light of their nationwide reliance on NWP 12 (a perspective not shared by any other party to the suit), and their longstanding involvement in the nationwide permit program and defense of NWP 12, in particular, the Coalition's participation would likely aid or enhance the Court's understanding of the history, development, purpose, and use of NWP 12. As with *Bostick*, the NWP 12 Coalition is uniquely positioned to assist the Court in considering the merits and implications of Plaintiffs' claims and requested relief, and thereby assist in the equitable resolution of this action.

Finally, the NWP 12 Coalition's motion to intervene is timely. If granted intervention, the NWP 12 Coalition expects to participate on the same schedule established for the existing parties. As a result, the Coalition's intervention will not delay the litigation.

Taken together, these considerations clearly support the NWP 12 Coalition's alternative request for permission to intervene under Rule 24(b)(1)(B).

## C.    Rule 24(c) Is Satisfied.

A motion to intervene "must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). The NWP 12 Coalition has filed a proposed Answer along with its Motion to Intervene satisfying this requirement.

## IV.    CONCLUSION

The NWP 12 Coalition respectfully requests that this Court grant its Motion to Intervene as of Right under Federal Rule of Civil Procedure 24(a)(2). In the alternative, the NWP 12 Coalition respectfully requests that this Court grant permissive intervention under Federal Rule of Civil Procedure 24(b)(1)(B).

Date: October 15, 2019.

Respectfully submitted,

Brianne C. McClafferty
William W. Mercer
Holland & Hart LLP
401 North 31st Street, Suite 1500
Billings, MT 59101
Phone: (406) 252-2166
Email: wwmercer@hollandhart.com
        bcmcclafferty@hollandhart.com

Deidre G. Duncan (D.C. Bar No. 461548)
Karma B. Brown (D.C. Bar No. 479774)
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037-1701
(202) 955-1500
dduncan@huntonAK.com
kbbrown@huntonAK.com

*Pro Hac Vice* Applications Pending

*Counsel for Defendant-Intervenors
American Gas Association, American
Petroleum Institute, Association of Oil Pipe
Lines, Interstate Natural Gas Association of
America, and National Rural Electric
Cooperative Association*

## CERTIFICATE OF COMPLIANCE

I certify that this Memorandum in Support of Motion to Intervene by American Gas Association, American Petroleum Institute, Association of Oil Pipe Lines, Interstate Natural Gas Association of America, and National Rural Electric Cooperative Association complies with the requirements of Local Rule 7.1(d)(2) and contains 6,353 words, excluding the parts exempted by Local Rule 7.1(d)(2)(E), according to the word count calculated by Microsoft Word 2016.

_____
William W. Mercer

# CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing to be mailed, first class postage paid, on this 15th day of October, 2019, to the following:

Timothy M. Bechtold
Bechtold Law Firm
P.O. Box 7051
Missoula, MT 59807-7051

Cecilia D. Segal
Natural Resources Defense Council
San Francisco
111 Sutter Street, Floor 21
San Francisco, CA 94104

Amy R. Atwood
Center for Biological Diversity
Portland
P.O. Box 11374
Portland, OR 97211-0374

Douglas P. Hayes
Sierra Club
1650 38th Street, Suite 102W
Boulder, CO 80301

Eric E. Huber
Sierra Club
Environmental Law Program
1650 38th Street, Suite 102W
Boulder, CO 80301

Jaclyn H. Prange
Natural Resources Defense Council
San Francisco
111 Sutter Street, Floor 21
San Francisco, CA 94104

Jared Michael Margolis
Center for Biological Diversity
2852 Willamette Street, Suite 171
Eugene, OR 97405

Benjamin James Grillot
U.S. Department of Justice
Environmental & Natural Resources
Division-NRS
P.O. Box 7611
Washington, DC 20044-7611

Kristofor R. Swanson
U.S. Department of Justice
Environmental Enforcement
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044-7611

Bridget K. McNeil
U.S. Department of Justice
999 18th Street, Suite 370
Denver, CO 80202

Mark Steger Smith
U.S. Attorney's Office
Billings
2601 Second Avenue North
Suite 3200
Billings, MT 59101

Jeffrey M. Roth
Crowley Fleck PLLP
Missoula
305 South 4th Street East, Suite 100
P.O. Box 7099
Missoula, MT 59807

Peter R. Steenland
Sidley Austin LLP
Washington, DC
1501 K Street, NW
Washington, DC 20005

Robert Thomas Cameron
Montana Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401

Jeremiah R. Langston
Montana Public Service Commission
1701 Prospect
P.O. Box 202601
Helena, MT 59601

Jeffery J. Oven
Crowley Fleck PLLP
Billings
490 North 31st Street, Suite 500
P.O. Box 2529
Billings, MT 59103-2529

Mark L. Stermitz
Crowley Fleck PLLP
Billings
490 North 31st Street, Suite 500
P.O. Box 2529
Billings, MT 59103-2529

Peter Christopher Whitfield
Sidley Austin LLP
Washington, DC
1501 K Street, NW
Washington, DC 20005

Timothy C. Fox
Montana Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401

_____
William W. Mercer

13690223_v1

**EXHIBIT 1**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

NORTHERN PLAINS RESOURCE
COUNCIL, et al.,

                    Plaintiffs,

          v.

U.S. ARMY CORPS OF ENGINEERS,
et al.,

                    Defendants,


TRANSCANADA KEYSTONE
PIPELINE, LP, et al.,

                    Intervenor-
                    Defendants.

Case No. 4:19-cv-00044-GF-BMM

## AFFIDAVIT OF MICHAEL L. MURRAY, FOR THE
## AMERICAN GAS ASSOCIATION, IN SUPPORT OF MOTION OF NWP 12
## COALITION TO INTERVENE IN SUPPORT OF DEFENDANTS

    1.    My name is Michael L. Murray.  I am the General Counsel of the

American Gas Association ("AGA").  My business address is 400 North Capitol

Street, NW, Washington, DC  20001.

    2.    I am offering this affidavit in support of the "Motion by American

Gas Association, American Petroleum Institute, Association of Oil Pipe Lines,

Interstate Natural Gas Association of America, and National Rural Electric

Cooperative Association to Intervene as Defendants" (the "NWP 12 Coalition"), in the above captioned case.

3.      The AGA, founded in 1918, is a national trade association that represents more than 200 local energy companies that deliver clean natural gas throughout the United States. There are more than 74 million residential, commercial and industrial natural gas customers in the U.S., of which 95 percent — more than 71 million customers — receive their gas from AGA members. AGA is an advocate for natural gas utility companies and their customers and provides a broad range of programs and services for member natural gas pipelines, marketers, gatherers, international natural gas companies and industry associates. Today, natural gas meets more than one-fourth of the United States' energy needs.

4.      AGA members across the country rely on the U.S. Army Corps of Engineers' ("Corps") nationwide permit ("NWP") program under Clean Water Act ("CWA") section 404 to obtain streamlined approvals for gas pipe installation and maintenance projects. Natural gas utilities construct and maintain natural gas distribution lines and intra-state pipelines in communities across the United States. Such projects are essential for providing safe, reliable transportation of cleaner burning natural gas to businesses and residences. Gas distribution lines can cover many miles and often must cross streams, wetlands, or other waters of the United States. Utilities take steps to avoid such stream and wetland crossings where

feasible. However, it is not always feasible. When a new pipe must be laid to serve a community or power plant or commercial customer, there may be limited routes available to reach that community or customer. Projects to replace existing pipelines with new pipe must follow the existing route and utility right-of-way.

5.    NWP 12 recognizes that AGA members' natural gas transmission and distribution line projects usually have limited, temporary impacts on aquatic resources. When the projects must cross a stream or wetland, the impact is typically limited because these long, narrow projects affect an area only a few yards wide, and each stream or wetland crossing is usually completed within a short time.

6.    Natural gas utilities are allowed to use NWP 12 only if certain terms and conditions are met, including conditions designed to minimize sedimentation and other impacts of the activity. NWP 12 requires that natural, pre-construction contours be restored after crossings are completed and the revegetation of areas affected by temporary fills. Additionally, potential impacts to waters of the United States associated with natural gas construction projects disturbing one acre or more are also regulated by EPA and/or delegated States under CWA section 402 through construction storm water permits that require best management practices to control sediment from leaving the site of construction. Local governments often also

impose additional requirements through their own construction storm water permitting ordinances.

7.    AGA members have relied on NWP 12 authorizations for many years, back to the inception of the NWP program, to install natural gas transmission and distribution pipelines. AGA members are diligent in designing and implementing their natural gas transmission and distribution pipeline projects to conform to the requirements of NWP 12.

8.    AGA's over 200 member local utility companies would be significantly impacted if NWP 12 were found unlawful as a result of Plaintiffs' challenge. Our members must install new natural gas utility lines on a regular basis, both to extend service to new customers and to replace older lines and improve system integrity and pipeline safety. Recent energy trends and a focus on developing cleaner sources of energy are driving a need to expand and expedite the installation of natural gas transmission and distribution lines. The abundant supply of natural gas from domestic shale gas supplies in the United States has resulted in stable, affordable market prices for this energy source. National demand for affordable supplies may require new gathering, transmission and distribution pipelines to transport domestic natural gas to customers. NWP 12 is essential for our members' ability to complete their infrastructure projects in a timely manner.

9. The Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA") drafted an Administration legislative initiative for pipeline safety, which led to the Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011, Pub. Law No. 112-90, 125 Stat. 1904 (2012), which was signed into law by President Obama on January 3, 2012, and provides a number of strong pipeline safety measures. AGA and its members are committed to pipeline safety.

10. Based on statistics available from PHMSA, for the decade from 2000-2009, there were 18,056 miles of natural gas customer distribution service lines, 2,621 miles of natural gas local distribution mains, and 2,965 miles of natural gas transmission pipelines installed on average each year. Given that AGA members deliver natural gas to 95 percent of the residential, commercial and industrial customers in the United States, nearly all of these distribution lines and much of the intra-state transmission lines were installed by AGA member companies. State laws and public utility commission regulations and decisions require our member utilities to provide safe, reliable natural gas service to customers at just and reasonable rates, and this requires maintaining, improving and expanding natural gas distribution and transmission systems in a cost-effective manner. PHMSA requires our member utilities to conduct this work in order to comply with applicable federal pipeline safety regulations. In light of the federal and state

regulatory requirements to maintain this extensive network of existing distribution mains and transmission pipelines and construct new mains and pipelines, and the broad expanse of areas deemed by the Corps to be waters of the United States subject to CWA jurisdiction, AGA members routinely rely on and will continue to rely on NWP 12. Many, if not all, of these projects would require CWA jurisdictional determinations and/or individual crossing-specific permits if NWP 12 were not available, and the resulting delays could impede our members' ability to provide safe, affordable and reliable natural gas service to the public.

11.     As a result of the importance of NWP 12 for AGA member activities, AGA has participated in the Corps' NWP program (including NWP 12 for utility lines) since its inception. AGA filed comments on proposals to revise the NWPs including the last four rounds of reissuance in 2001, 2006, 2012, and 2016. AGA, Comments on Department of the Army, Corps of Engineers, Proposal to Reissue and Modify Nationwide Permits, 81 Fed. Reg. 35,186 (June 1, 2016) (Aug. 1, 2016), COE-2015-0017-0476.[1] AGA's 2016 comments are part of the administrative record that was before the Corps when it prepared the decision document for the 2017 NWP 12 and decided to reissue the permit in accordance with the CWA and National Environmental Policy Act ("NEPA").

---

[1] https://www.regulations.gov/document?D=COE-2015-0017-0476.

12.     AGA holds regular meetings and conference calls with members to discuss issues our members face with respect to the NWP program, and we have held frequent webinars and conference sessions over the past decade to assist our members share innovative ideas for improving their environmental performance and best practices to conform to the requirements of the NWPs, including NWP 12. In addition, AGA staff research and respond to member inquiries regarding CWA and NWP issues for members.

13.     To ensure the continued availability of NWP 12 for AGA member activities, AGA joined the NWP 12 Coalition to intervene as Defendant-Intervenors in *Sierra Club v. Bostick. See Sierra Club, Inc. v. Bostick*, No. CIV-12-742-R, 2013 WL 6858685 (W.D. Okla. Dec. 30, 2013), *aff'd*, 787 F.3d 1043 (10th Cir. 2015) ("*Bostick*"). *Bostick* involved similar wholesale challenges to NWP 12 under the Administrative Procedure Act ("APA"), CWA, and NEPA. AGA, and the NWP 12 Coalition intervened in *Bostick* to provide the critical perspective of nationwide holders of NWP 12 and to defend their interests in NWP 12.

14.     If Plaintiffs were to obtain the relief they request of a judgment declaring NWP 12 unlawful, AGA's more than 200 members would no longer be able to rely on NWP 12 authorizations to undertake natural gas transmission and distribution line testing, replacement, maintenance, and expansion projects.  If

AGA's members are instead forced to apply for individual CWA permits for those activities, AGA's members could face years of additional delays and substantial additional costs in projects needed to help ensure pipeline safety and integrity throughout the nation. The process of applying for and obtaining a CWA individual permit is time consuming, expensive, and subject to regulatory uncertainty. Accordingly, many important natural gas utility activities may be delayed or otherwise encumbered if NWP 12 is declared unlawful. This will significantly harm AGA's members as well as impede their ability to provide safe and reliable natural gas services to 71 million customers across the United States. The cost of these natural gas delivery services to customers may increase if AGA's members can no longer rely on the streamlined permitting approach of NWP 12.

15. Based on AGA's experience throughout the U.S. in relying on NWP 12, and its long involvement in the NWP program, AGA's participation in this litigation would likely enhance the Court's understanding of the history, purpose and use of NWP 12 to facilitate the nationwide installation and maintenance of a safe and reliable natural gas distribution and intra-state transmission system by AGA member utilities across all 50 states.

# CERTIFICATION

I certify that the foregoing statements made by me are true. I am aware that, if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Executed this _10_ day of _October_ _____, 2019.

_Michael L. Murray_ (signature)

Michael L. Murray

Washington, D.C.

Subscribed and sworn to before me this _10_ day of _October_, 2019.

_Cynthia E. Maimone_ (signature)

Notary Public

My Commission Expires: _May 14, 2021_

CYNTHIA E. MAIMONE
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires May 14, 2021

CYNTHIA E. MAIMONE
NOTARY PUBLIC
EXP.
5-14-21
DISTRICT OF COLUMBIA

9

# EXHIBIT 2

NORTHERN PLAINS RESOURCE
COUNCIL, et al.,

                Plaintiffs,

    v.

U.S. ARMY CORPS OF ENGINEERS,
et al.,

                Defendants,


TRANSCANADA KEYSTONE
PIPELINE, LP, et al.,

                Intervenor-
                Defendants.

Case No. 4:19-cv-00044-GF-BMM


## AFFIDAVIT OF ROBIN RORICK, FOR THE AMERICAN PETROLEUM INSTITUTE, IN SUPPORT OF MOTION OF NWP 12 COALITION TO INTERVENE IN SUPPORT OF DEFENDANTS

1.     My name is Robin Rorick. I am Vice President of Midstream and Industry Operations for the American Petroleum Institute ("API"). My business address is 200 Massachusetts Ave., NW, Suite 1100, Washington, DC 20001.

2.     I am offering this affidavit in support of the "Motion by American Gas Association, American Petroleum Institute, Association of Oil Pipe Lines,

Interstate Natural Gas Association of America, and National Rural Electric Cooperative Association to Intervene as Defendants" (the "NWP 12 Coalition") in the above captioned case.

3. API is a nationwide, non-profit trade association that represents all facets of the natural gas and oil industry, which supports 10.3 million U.S. jobs and nearly 8 percent of the U.S. economy. API's more than 600 member companies include large integrated companies, as well as exploration and production, refining, marketing, pipeline, and marine businesses, and service and supply firms. API's members provide most of the nation's energy. API was formed in 1919 as a standards-setting organization, and API has developed more than 700 standards to enhance operational and environmental safety, efficiency, and sustainability.

4. API's members engage in exploration, production, construction, and maintenance projects that routinely involve both state and federal water permitting and are, and will be, affected by Clean Water Act ("CWA") section 404 permits, including Nationwide Permit ("NWP") 12.

5. The safe and reliable supply of energy to consumers, at an affordable cost, requires the construction and maintenance of thousands of lines of linear pipelines. The need to deliver energy over long distances to neighborhoods and communities across the country often means that pipelines and linear structures must, at times, unavoidably cross wetlands and other waters of the United States as

2

they extend from supply to market areas. API's members rely on an efficient and reasonable permitting process, as provided by the NWPs, including NWP 12, to obtain required CWA approvals for the construction and maintenance of these critical elements of our nation's energy supply infrastructure.

6.     NWPs are an important tool for authorizing critical and time-sensitive activities that the Corps has determined have only minimal impacts on the aquatic environment. NWP 12, for example, contains certain limits, thresholds, and other conditions to ensure compliance with the "minimal adverse environmental effects" statutory standard.

7.     API's members conform their projects to meet the terms and conditions of the NWPs, including NWP 12. In particular, just within the past five years, several of API's members have relied on NWP 12 authorizations to construct hundreds of miles of oil pipelines, natural gas pipelines, refined product pipelines, and natural gas liquids pipelines, which traverse the States of Montana, Oklahoma, Texas, Colorado, Louisiana, Missouri, Mississippi, Kansas, Wisconsin, Illinois, Utah, North Dakota, Arkansas and Minnesota.

8.     API members also rely on NWP 12 authorizations to inspect, maintain, and repair existing pipelines to ensure the continued safety and reliability of the projects.

3

9.     Several of API's members have specific plans to rely on NWP 12 for authorization to build oil, gas, natural gas liquids, and refined product pipelines in Montana, Oklahoma, Colorado, Illinois, Indiana, Iowa, Kansas, Louisiana, Missouri, New Mexico, Ohio, Pennsylvania, South Dakota, Texas, Utah, West Virginia, and Wyoming. These API members plan to rely on NWP 12 authorizations for the specific water crossings involved for the pipelines.

10.     To protect these significant interests, API has filed comments and participated in numerous administrative rulemakings involving the NWPs generally, and NWP 12 in particular. Most recently, on August 1, 2016, API submitted comments in response to the Corps' proposal to reissue and modify the NWPs. API, Comments on Department of the Army, Corps of Engineers, Proposal to Reissue and Modify Nationwide Permits, 81 Fed. Reg. 35,186 (June 1, 2016) (Aug. 1, 2016), COE-2015-0017-0441.[1] These comments are part of the administrative record that was before the Corps when it prepared the decision document for NWP 12 and decided to reissue the permit in accordance with the CWA and National Environmental Policy Act ("NEPA"). API has a long-standing history of participation in NWP rulemakings. *See, e.g.,* API, Comments on Department of the Army, Corps of Engineers, Proposal to Reissue and Modify

---

[1] https://www.regulations.gov/document?D=COE-2015-0017-0441.

Nationwide Permits, 76 Fed. Reg. 9174 (Feb. 16, 2011) (Apr. 18, 2011), COE-2010-0035-0234.[2]

11.     Due to the importance of NWP 12 for API members nationwide, API invested significant time and resources to join with the members of the NWP 12 Coalition as Defendant-Intervenors in *Sierra Club v. Bostick*.  *See Sierra Club, Inc. v. Bostick*, No. CIV-12-742-R, 2013 WL 6858685 (W.D. Okla. Dec. 30, 2013), *aff'd*, 787 F.3d 1043 (10th Cir. 2015) (*"Bostick"*).  *Bostick* involved similar wholesale challenges to NWP 12 under the Administrative Procedure Act ("APA"), CWA, and NEPA.  API and the NWP 12 Coalition intervened in *Bostick* to provide the critical perspective of nationwide holders of NWP 12 and to defend their interests in NWP 12.

12.     If Plaintiffs were to obtain the relief that they request here, a judgment declaring NWP 12 to violate the APA, CWA, NEPA, and/or the Endangered Species Act, and applicable regulations, API members may no longer be able to rely on NWP 12 authorizations to undertake the activities necessary to construct pipelines in a cost-effective and timely manner.  If API's members are instead forced to apply for individual CWA permits for those activities that the Corps has deemed to have only minimal environmental effects, API's members could face years of additional delays and substantial additional costs, without any

---

[2] https://www.regulations.gov/document?D=COE-2010-0035-0234.

commensurate benefit to the aquatic environment. The process of applying for and obtaining an individual permit is time consuming, expensive, and subject to regulatory uncertainty. Accordingly, many important activities associated with oil pipelines, natural gas pipelines, refined product pipelines, and natural gas liquids pipelines may be delayed or otherwise encumbered if NWP 12 is declared to be unlawful. This will significantly harm API's members as well as impede their ability to safely deliver natural gas, oil, and related products through pipelines. The cost of these services to customers may increase if API's members can no longer rely on the efficient and reasonable permitting approach of NWP 12.

13. API's participation in litigation would likely aid the Court in understanding the ramifications of this litigation on the natural gas and oil industry as a whole. In this capacity, API, as part of a coalition with other industry interests, will make legal arguments that will aid the Court's understanding and disposition of the issues, and which may not be made by other parties to the litigation.

## CERTIFICATION

I certify that the foregoing statements made by me are true. I am aware that, if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Executed this **9** th day of October, 2019.

*[signature]*

DISTRICT OF COLUMBIA

Subscribed and sworn to before me this 9th day of October, 2019.

_____
Notary Public

Yvette M Cordone
Notary Public, District of Columbia
My Commission Expires 5/31/2020

My Commission Expires: _____

DISTRICT OF COLUMBIA
COMMISSION
EXPIRES
5/31/2020
MY
NOTARY PUBLIC
YVETTE M. CORDONE

# EXHIBIT 3

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS, et al.,<br><br>Defendants,<br><br><br>TRANSCANADA KEYSTONE PIPELINE, LP, et al.,<br><br>Intervenor-<br>Defendants. | Case No. 4:19-cv-00044-GF-BMM |

**AFFIDAVIT OF ANDREW BLACK,
FOR THE ASSOCIATION OF OIL PIPE LINES, IN SUPPORT OF
MOTION OF NWP 12 COALITION TO INTERVENE
IN SUPPORT OF DEFENDANTS**

      1.     My name is Andrew Black. I am the President and Chief Executive Officer of the Association of Oil Pipe Lines ("AOPL"). My business address is 900 17th Street, NW, Suite 600, Washington, DC 20006.

      2.     I am offering this affidavit in support of the "Motion by American Gas Association, American Petroleum Institute, Association of Oil Pipe Lines, Interstate Natural Gas Association of America, and National Rural Electric

Cooperative Association to Intervene as Defendants" (the "NWP 12 Coalition"), in the above captioned case.

3.     AOPL is a national trade association that represents the interests of owners and operators of America's liquid pipelines. Liquid pipelines play a vital transportation role in the economy of the United States, its commerce, and its national defense. AOPL helps educates the public, policymakers, and the press about the vital role oil pipelines serve in the daily lives of Americans.

4.     AOPL members transport approximately 96% of the crude oil and refined petroleum products shipped through pipelines in the United States. AOPL members bring crude oil to the nation's refineries, natural gas liquids such as ethane, butane, propane and carbon dioxide to manufacturers and industrial users, jet fuel to airports, and petroleum products to our communities, including all grades of gasoline, diesel, home heating oil, kerosene, propane and biofuels.

5.     As of 2018, there were over 218,000 miles of liquid pipelines in the United States, including over 62,000 miles of refined petroleum product pipelines, 70,000 miles of highly volatile liquid pipelines and 80,000 miles of crude oil pipelines.[1]

---

[1] https://www.phmsa.dot.gov/data-and-statistics/pipeline/annual-report-mileage-hazardous-liquid-or-carbon-dioxide-systems

6.    While the existing United States liquid pipeline network is extensive, new construction is required to transport energy liquids from new production areas across North America, including Montana, Oklahoma, Texas, North Dakota, Colorado, Pennsylvania and Ohio to existing refining and processing locations.

7.    During the past five years, approximately 26,000 miles of liquid pipelines have been added, an increase of approximately 13.5 percent in overall mileage.  In addition, AOPL members have publicly announced over $2 billion in new construction projects with a completion date in 2017 or later.  This new construction would add over 1,000 miles of pipeline into service.

8.    Pipelines constructed by AOPL members almost invariably cross waters of the United States at some point.  New pipeline construction projects can range from tens to hundreds of miles long, sometimes over 1,000 miles long, and often must cross areas deemed by the U.S. Army Corps of Engineers ("Corps") to be waters of the United States subject to Clean Water Act ("CWA") jurisdiction.

9.    AOPL members routinely rely on nationwide permit ("NWP") 12 to construct those portions of pipelines that cross waters of the United States when construction activity will have only minimal impacts on the environment.  Activities may include temporary impacts associated with excavation, backfill or bedding for pipelines, with the areas then returned to normal pre-disturbance conditions (i.e., pre-construction contours).  Pipeline activities undertaken in

conformance with NWP 12 must meet the terms and conditions of NWP 12, including the ½ acre limit on loss of waters for each separate water body and each separate and distant crossing, among numerous other requirements.

10.     AOPL members also rely on NWP 12 authorizations to maintain the integrity and safety of their pipelines through maintenance and repair projects.  The need for pipelines to cross waters of the United States means that maintenance and repair of pipelines must sometimes also occur at locations considered to be waters of the United States.

11.     Due to the importance of NWP 12 for AOPL members nationwide, AOPL invested significant time and resources to join with the NWP 12 Coalition as Defendant-Intervenors in *Sierra Club v. Bostick.  See Sierra Club, Inc. v. Bostick*, No. CIV-12-742-R, 2013 WL 6858685 (W.D. Okla. Dec. 30, 2013), *aff'd*, 787 F.3d 1043 (10th Cir. 2015) (*"Bostick"*).  *Bostick* involved similar wholesale challenges to NWP 12 under the Administrative Procedure Act ("APA"), CWA, and National Environmental Policy Act ("NEPA").  AOPL and the NWP 12 Coalition intervened in *Bostick* to provide the critical perspective of nationwide holders of NWP 12 and to defend their interests in NWP 12.

12.     If Plaintiffs were to obtain the relief they request in this suit, a judgment declaring NWP 12 to violate the APA, the CWA, NEPA, the Endangered Species Act, and applicable regulations, AOPL members may no longer be able to

rely on NWP 12 authorizations to undertake the construction, maintenance or repair of existing pipelines. AOPL members would instead need to obtain individual CWA section 404 permits for those activities.

13.     The process of applying for and obtaining an individual CWA section 404 permit is time consuming, expensive, and subject to regulatory uncertainty. The time necessary to obtain an individual CWA section 404 permit can stretch into years, in comparison to an NWP 12 authorization, which by design typically requires only a matter of months. An individual CWA permit process stretching multiple years would be significantly more expensive to AOPL members than the existing NWP 12 authorization process.

14.     AOPL members seeking to construct new pipelines would face significant delays and additional costs if NWP 12 is declared to violate one or more of the statutes, which could also affect their customers' supply and costs of obtaining crude oil and refined petroleum products. Moreover, AOPL members seeking to ensure the integrity and safety of their pipelines through maintenance and repair projects would face significant delays and additional costs if NWP 12 is declared unlawful, which could also affect their customers' supply and costs of obtaining crude oil and refined petroleum products.

15.     Accordingly, the outcome of this litigation could significantly harm AOPL's members.

# CERTIFICATION

I certify that the foregoing statements made by me are true. I am aware that, if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Executed this _7th_ day of _October_ , 2019.

_Andrew Black_

Washington, D.C.

Subscribed and sworn to before me this _7_ day of _October_ , 2019.

Notary Public

My Commission Expires
April 30, 2023

My Commission Expires: _____

6

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**GREAT FALLS DIVISION**

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, et al.,<br><br>     Plaintiffs,<br><br> v.<br><br>U.S. ARMY CORPS OF ENGINEERS, et al.,<br><br>     Defendants,<br><br><br>TRANSCANADA KEYSTONE PIPELINE, LP, et al.,<br><br>     Intervenor-<br>     Defendants. | Case No. 4:19-cv-00044-GF-BMM |

<u>**AFFIDAVIT OF JOAN DRESKIN, FOR THE INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA, IN SUPPORT OF MOTION OF NWP 12 COALITION TO INTERVENE IN SUPPORT OF DEFENDANTS**</u>

  1.  My name is Joan Dreskin. I am Senior Vice President and General Counsel of the Interstate Natural Gas Association of America ("INGAA"). My business address is 20 F Street, NW, Suite 450, Washington, DC 20001.

  2.  I am offering this affidavit in support of the "Motion by American Gas Association, American Petroleum Institute, Association of Oil Pipe Lines, Interstate Natural Gas Association of America, and National Rural Electric

1

Cooperative Association to Intervene as Defendants" (the "NWP 12 Coalition"), in the above captioned case.

3.    INGAA is a non-profit trade association representing interstate natural gas transmission pipelines ("interstate pipelines") operating in the United States. INGAA is comprised of 28 members, representing the vast majority of the interstate natural gas transmission pipeline companies in the U.S. INGAA members operate approximately 200,000 miles of pipelines. Ensuring the safety, security, and reliability of this natural gas pipeline network is crucial to meeting the energy needs of the U.S. and contributes directly to the U.S. economy by powering domestic industry and providing jobs.

4.    INGAA advocates regulatory and legislative positions of importance to the interstate pipeline industry in the U.S. As part of its regulatory advocacy, INGAA speaks for its members on a broad array of environmental issues. Within the environmental sphere, INGAA represents its members on matters affecting interstate pipeline siting and permitting under the Clean Water Act ("CWA"), the Clean Air Act, the Natural Gas Act, and other federal and state programs. Maintaining members' reasonable access to CWA nationwide permits ("NWPs") falls within this area of INGAA's responsibilities.

5.    As documented by statistics compiled by the Federal Energy Regulatory Commission ("FERC"), which is responsible for regulating INGAA

2

members' rates, services and facilities, INGAA members construct hundreds of miles of new interstate pipelines each year. Maintenance activities require uncovering additional hundreds, if not thousands, of miles of interstate pipelines annually.

6.      Interstate natural gas pipeline projects must comply with FERC certification requirements, which are designed to ensure that pipeline crossings cause only temporary construction impacts, do not result in permanent fill of jurisdictional waters, are restored to pre-construction contours and elevations immediately after construction, and are mitigated to the greatest extent possible.

7.      Many of INGAA members' construction, maintenance, and safety activities involve "utility line crossings," as defined under NWP 12. INGAA members rely on, and make regular use of NWPs, including NWP 12 for the timely authorization of activities that have only minimal environmental effects, but that are essential to the reliable, safe and affordable supply of energy to U.S. consumers.

8.      NWPs provide an efficient permitting mechanism that helps streamline the review and approval process for pipeline projects without precluding or compromising the consideration of any necessary project-specific conditions. Construction and maintenance of natural gas pipelines typically occur on tight schedules designed to ensure the safety, security, and reliability of the

3

natural gas pipeline network and to meet the growing demands of natural gas customers. Obtaining coverage under an NWP takes considerably less time than an individual CWA section 404 permit, while still ensuring appropriate consideration of all applicable avoidance, minimization and mitigation measures.

9.    The conditions associated with the NWPs are designed to ensure that authorized crossings have only minimal environmental effects. NWPs are subject to a set of 32 general conditions that protect a range of different environmental resources, including spawning areas, migratory bird breeding areas, shellfish beds, water supply intakes, wild and scenic rivers, endangered species, migratory birds, bald and golden eagles, historic properties, and designated critical resource waters. In each case, these conditions prohibit activities that would have more than minimal impacts on these resources.

10.    When the Corps reissued the NWPs in 2017, it imposed a number of enhanced and additional conditions relevant to NWP 12. In addition to these general conditions, each Corps District has the authority to impose regional conditions. And, in addition to the general and regional conditions, the Corps District Engineer is obligated to impose any project-specific conditions necessary to ensure that project-related impacts are minimal. These conditions work together to ensure that activities authorized under NWP 12 have "only minimal adverse environmental effects."

4

11.    Information I have obtained to date indicates that INGAA members use NWP 12 thousands of times annually for their construction, maintenance, and repair activities.  Use of NWP 12 for INGAA members is particularly important to allow critical pipeline safety and reliability activities to proceed in a timely manner.

12.    The extent of interstate pipeline construction and maintenance, and INGAA members' corresponding reliance on NWP 12, are likely to increase based on current trends.  The abundant supply of natural gas from domestic shale gas supplies in the U.S. has resulted in stable, affordable natural gas prices.  This has increased demand for affordable natural gas and for new gathering, transmission and distribution pipelines to bring the domestic natural gas to customers.

13.    The protectiveness and continued availability of NWP 12 is critically important to INGAA and its members.  Consistent with its members' reliance on NWP 12, INGAA has filed comments and participated in numerous administrative rulemakings involving NWPs generally and NWP 12 in particular.  Most recently, on August 1, 2016, I submitted comments on INGAA's behalf addressing the Corps' proposal to reissue and modify various NWPs.  INGAA, Comments on Department of the Army, Corps of Engineers, Proposal to Reissue and Modify Nationwide Permits, 81 Fed. Reg. 35,186 (June 1, 2016) (Aug. 1, 2016), COE-

2015-0017-0457.[1] INGAA's August 2016 comment letter discussed NWP 12

extensively and is part of the administrative record that was before the Corps when

it prepared the decision document for NWP 12 and decided to reissue the permit in

accordance with the CWA and National Environmental Policy Act ("NEPA").

INGAA has a long-standing history of participation in NWP rulemakings. *See,*

*e.g.,* INGAA, Comments on the Department of the Army, Corps of Engineers,

Proposal to Reissue and Modify Nationwide Permits, 76 Fed. Reg. 9174 (Feb. 16,

2011), (Apr. 18, 2011), COE-2010-0035-0124.[2]

    14.    Due to the importance of NWP 12 for INGAA members nationwide,

INGAA invested significant time and resources to join with the NWP 12 Coalition

as Defendant-Intervenors in *Sierra Club v. Bostick. See Sierra Club, Inc. v.*

*Bostick,* No. CIV-12-742-R, 2013 WL 6858685 (W.D. Okla. Dec. 30, 2013), *aff'd,*

787 F.3d 1043 (10th Cir. 2015) (*"Bostick"*). *Bostick* involved similar wholesale

challenges to NWP 12 under the Administrative Procedure Act ("APA"), CWA,

and NEPA. INGAA and the NWP 12 Coalition intervened in *Bostick* to provide

the critical perspective of nationwide holders of NWP 12 and to defend their

interests in NWP 12.

---

[1] https://www.regulations.gov/document?D=COE-2015-0017-0457.

[2] https://www.regulations.gov/document?D=COE-2010-0035-0124.

15.     If Plaintiffs were to obtain the relief that they request, a judgment declaring NWP 12 to violate the APA, CWA, NEPA, and/or the Endangered Species Act, and applicable regulations, INGAA members may no longer be able to rely on NWP 12 authorizations to undertake critical and time-sensitive construction and maintenance activities necessary to ensure the safety, security, and reliability of the natural gas pipeline network. If INGAA members are instead forced to apply for individual CWA permits for those activities, the additional time required to obtain individual permits could create unnecessary safety risks by delaying critical maintenance work, threatening the reliability of our nation's natural gas pipeline network, and restricting consumers' access to natural gas, while potentially raising costs for consumers. Moreover, the delay and expense associated with requiring individual CWA permits for these activities will significantly harm INGAA's members and impede their ability to continue serving as an indispensable link between natural gas producers and consumers.

16.     Based on INGAA's experience throughout the U.S. in relying on NWP 12, and its long involvement in the NWP program, including prior litigation over NWP 12, INGAA's participation in litigation would likely enhance the Court's understanding of the history, purpose, development, and use of NWP 12. In addition, INGAA's participation in this litigation will aid the Court in understanding the ramifications of this litigation on the oil and gas industry as a

7

whole, and, by extension, on the national economy. As part of a coalition with other industry interests, INGAA will make legal arguments that will aid the Court's understanding and disposition of the issues.

## CERTIFICATION

I certify that the foregoing statements made by me are true. I am aware that, if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Executed this 10th day of October , 2019.

_Joan Dreskin_
Joan Dreskin

Washington, D.C.

Subscribed and sworn to before me this 10th day of October , 2019.

_Mundah Carpenter._
Notary Public

My Commission Expires: 5|31|23



8

# EXHIBIT 5

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, et al.,<br><br>               Plaintiffs,<br><br>      v.<br><br>U.S. ARMY CORPS OF ENGINEERS, et al.,<br><br>               Defendants,<br><br><br>TRANSCANADA KEYSTONE PIPELINE, LP, et al.,<br><br>               Intervenor-<br>               Defendants. | Case No. 4:19-cv-00044-GF-BMM |

## <u>AFFIDAVIT OF DOROTHY KELLOGG, FOR THE NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION, IN SUPPORT OF MOTION OF NWP 12 COALITION TO INTERVENE IN SUPPORT OF DEFENDANTS</u>

1.      My name is Dorothy Kellogg.  I am Environmental Regulatory Director for the National Rural Electric Cooperative Association ("NRECA").  My business address is 4301 Wilson Boulevard, Arlington, VA  22203.

2.      I am offering this affidavit in support of the "Motion by American Gas Association, American Petroleum Institute, Association of Oil Pipe Lines, Interstate Natural Gas Association of America, and National Rural Electric

Cooperative Association to Intervene as Defendants" (the "NWP 12 Coalition"), in the above captioned case.

3.     NRECA is the national trade association representing the national interests of cooperative electric utilities and the consumers they serve.  NRECA represents nearly 900 not-for-profit rural electric utilities that provide electric energy.  America's electric cooperatives belong to the communities they serve and comprise a unique sector of the electric industry.  From growing suburbs to remote farming communities, electric cooperatives power one in eight Americans and serve as engines of economic development for 42 million people across 56 percent of the nation's landscape.  NRECA members power over 20 million businesses, homes, schools, churches, hospitals, farms, irrigation systems and other establishments throughout the U.S.

4.     NRECA was formed in 1942 by the nation's rural electric cooperative leaders, who were dedicated to bringing electrical service to vast unserved regions of the country and providing safe, reliable, and affordable electric power through electric cooperative entities.  NRECA was organized specifically to mitigate wholesale electric power shortages in rural areas.  Electric cooperatives are incorporated as private entities in states in which they reside and have legal public service obligations to provide reliable electric service to their customer members.

5.     The number of customers served and the revenue received by rural electric cooperatives per mile of electric distribution line is modest, relative to the electric industry as a whole. Cooperatives own and maintain 2.6 million miles or 42 percent of the nation's electric distribution lines. They serve an average of 8 consumers per mile of line. In 2017, electric cooperatives supported 611,600 jobs and contributed $88.4 billion to the U.S. GDP annually, including an investment of $12 billion annually in local economies.

6.     NRECA's members include 62 generation and transmission ("G&T") and 831 distribution cooperatives. The G&Ts generate, purchase, and transmit power to distribution cooperatives that provide it to the end of the line co-op consumer-members. Collectively, cooperative G&Ts provide power to nearly 80 percent of the distribution cooperatives in the nation. The remaining distribution cooperatives receive power directly from other generation sources within the electric utility sector. Both distribution and G&T cooperatives share an obligation to serve their members by providing safe, reliable, and affordable electric service.

7.     NRECA serves its members as a nationwide advocate for legislative and regulatory policies that are scientifically sound, cost-effective and balance consumer interest and environmental protection. NRECA advocates for policies that protect health and the environment, while ensuring safe, reliable, and affordable power.

8.    In the course of providing electricity over long distances and to all areas of the country, NRECA's members engage in construction, operation and maintenance of transmission and distribution lines and other utility operations that sometimes take place in wetlands and other waters of the United States and that require authorization under Clean Water Act ("CWA") section 404 permits.

9.    NRECA's members depend on CWA section 404 permits, including in particular nationwide permit ("NWP") 12, to conduct many of these utility line activities.  Many cooperatives rely on NWP 12 to provide timely and reliable installation of transmission and distribution lines to deliver essential electric supplies to homes, public institutions, and businesses, and to perform maintenance on those lines, which is critical to their reliability.  Throughout the country, many electric utilities attempt to conform their construction and maintenance activities, whenever practicable, to fall within the terms of NWP 12, the general conditions applicable to all NWPs, the regional conditions imposed by Corps Division Engineers (including those required by the State under Section 401 of the CWA or the Coastal Zone Management Act), and any project-specific conditions imposed by Corps District Engineers.

10.    The laws and rules governing CWA section 404 permits are, therefore, important to NRECA's members as well as to the rural consumers they

4

serve, whose health, safety, and general welfare depend on a reliable and cost-effective supply of electricity.

11.     NRECA members have identified the NWPs, and NWP 12 in particular, as a critical environmental issue for the organization. As a result, NRECA has participated in the NWP rulemaking process during each reissuance of the NWPs.

12.     NRECA has a significant interest in ensuring that our member electric cooperatives have certainty in meeting the CWA's requirements, including whether they are able to avail themselves of the streamlined NWP permitting process, or must instead, apply for an individual CWA § 404 permit.

13.     For most cooperatives, defending their significant regulatory interests and positions in federal court is prohibitively expensive. Therefore, electric cooperatives join NRECA so that we, as an organization, can represent their interests before the regulatory agencies, Congress, and the courts, and ensure that they are able to continue providing safe, reliable, and affordable electric power, which is important to the Nation's economy and a key service to rural America.

14.     If Plaintiffs were to obtain the relief that they request here, a judgment declaring NWP 12 to violate the Administrative Procedure Act, CWA, National Environmental Policy Act, and/or the Endangered Species Act, and applicable regulations, NRECA members may no longer be able to rely on NWP 12

authorizations to undertake the activities necessary to provide electricity to the rural communities they serve in a cost-effective and timely manner.

15. If NRECA's members are instead forced to apply for individual CWA permits for those activities, NRECA's members could face years of additional delays and substantial additional costs. The process of applying for and obtaining an individual permit is time consuming, expensive, and subject to regulatory uncertainty. The increased costs and burdens that result from the individual permitting process can affect not only the members, but the amount of costs that are passed on to consumers and indirectly borne by the rural public. In addition, CWA-related burdens, costs, and delays can impede NRECA members' ability to fulfill their public service obligations to ensure a reliable supply of electricity to rural consumers. Accordingly, many important utility line activities may be delayed or otherwise encumbered if NWP 12 is declared unlawful. NRECA members would be significantly impacted by any decision that NWP 12 is unlawful.

16. Intervention in this suit is intended to implement NRECA's organizational policies, as determined by the members. NRECA's participation in litigation would likely aid the Court by providing the perspective of one of the primary industries that utilizes, and will continue to utilize, NWP12. NRECA, as part of the NWP 12 Coalition with other industry interests, will make legal

arguments that may aid the Court's understanding and disposition of the issues, by providing the electric utility sector perspective on the merits and implications of Plaintiffs' claims and requested relief, which may not be made by other parties to the litigation.

## CERTIFICATION

I certify that the foregoing statements made by me are true. I am aware that, if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Executed this 9th day of October, 2019.

Dorothy Kellogg

STATE

COUNTY OF

Subscribed and sworn to before me this 9 day of October, 2019.

Notary Public

My Commission Expires: _____

RHONDA M. MCDONALD
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires July 31, 2022



7