Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, Montana 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for all Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, et al., | |
| Plaintiffs, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, et al., | CV 19-44-GF-BMM |
| Defendants, | **Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment** |
| TC ENERGY CORPORATION, et al., | |
| Intervenor-Defendants, | |
| STATE OF MONTANA, | |
| Intervenor-Defendant, | |
| AMERICAN GAS ASSOCIATION, et al., | |
| Intervenor-Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ............................................................................................................1

BACKGROUND ...............................................................................................................3

I.     The Nationwide Permit Program.......................................................................3

II.    Nationwide Permit 12 ..........................................................................................5

III.   The Keystone XL Pipeline ..................................................................................7

STANDARD OF REVIEW ...........................................................................................10

ARGUMENT ..................................................................................................................10

I.     The Corps' Environmental Assessment for NWP 12 violated NEPA ..........10

     A.    The Environmental Assessment fails to evaluate oil spills.................11

     B.    The Environmental Assessment fails to evaluate frac-outs ...............15

     C.    The Environmental Assessment fails to evaluate climate change
             impacts.....................................................................................................17

     D.    The Environmental Assessment fails to adequately evaluate
             cumulative effects by impermissibly deferring analysis to the
             project level ............................................................................................20

II.    The Corps' failure to complete formal programmatic consultation on
       the reissuance of NWP 12 violates the ESA ..................................................27

     A.    The Corps was required to undertake programmatic consultation
             on NWP 12 ..............................................................................................27

     B.    The Corps' obligation to consult on the NWPs cannot be absolved
             by its reliance on project-level review .................................................33

III.  The Corps' reissuance of NWP 12 violated Section 404(e) of the CWA
      by permitting activities with more than minimal impacts ............................38

      A.   The Corps cannot rely on project-level review to ensure that
           NWP 12 will have only minimal adverse environmental effects .......39

      B.   The Corps cannot claim that a pipeline's water crossings will be
           sufficiently "separate and distant" so as to satisfy Section 404(e) .....42

CONCLUSION ..................................................................................................43

# TABLE OF AUTHORITIES

## Cases

*Am. Rivers v. U.S. Army Corps of Eng'rs,*
    271 F. Supp. 2d 230 (D.D.C. 2003) ............................................................. 30

*Barnes v. U.S. Dep't of Transp.,*
    655 F.3d 1124 (9th Cir. 2011) ........................................................... 10, 11

*Calvert Cliffs Coordinating Comm. v. Atomic Energy Comm'n,*
    449 F.2d 1109 (D.C. Cir. 1971) ...................................................... 13

*Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs,*
    No. 16-cv-950, 2019 WL 5103309
    (W.D. Wash. Oct. 10, 2019) .............................................. 13-14, 16, 24, 40

*Conner v. Burford,*
    848 F.2d 1441 (9th Cir. 1988) ........................................................ 35

*Defs. of Wildlife v. Ballard,*
    73 F. Supp. 2d 1094 (D. Ariz. 1999) ............................................ 21, 24

*Defs. of Wildlife v. Zinke,*
    856 F.3d 1248 (9th Cir. 2017) ........................................................ 29

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004) ........................................................................ 15

*Friends of the Earth v. Hintz,*
    800 F.2d 822 (9th Cir. 1986) ......................................................... 10

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) .......................................................................... 9

*Gerber v. Norton,*
    294 F.3d 173 (D.C. Cir. 2002) ..................................................... 36

*Indigenous Envtl. Network v. U.S. Dep't of State*,
　　No. 17-cv-29-GF-BMM, 2017 WL 5632435
　　(D. Mont. Nov. 22, 2017) ............................................................7, 8

*Indigenous Envtl. Network v. U.S. Dep't of State*,
　　347 F. Supp. 3d 561 (D. Mont. 2018) .....................................8, 23

*Indigenous Envtl. Network v. U.S. Dep't of State*,
　　No. 18-36068, 2019 WL 2542756 (9th Cir. June 6, 2019) ............8

*Ky. Riverkeeper, Inc. v. Rowlette*,
　　714 F.3d 402 (6th Cir. 2013) ........................................................21

*Lands Council v. Powell*,
　　395 F.3d 1019 (9th Cir. 2005) .............................................13, 17

*Lane Cty. Audubon Soc'y v. Jamison*,
　　958 F.2d 290 (9th Cir. 1992) ........................................................34

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
　　463 U.S. 29 (1983)........................................................................13

*Nat'l Wildlife Fed'n v. Brownlee*,
　　402 F. Supp. 2d 1 (D.D.C. 2005).........................................28, 34

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
　　668 F.3d 1067 (9th Cir. 2011) .....................................................24

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
　　402 F.3d 846 (9th Cir. 2005) .................................11-12, 14-15, 16

*Ohio Valley Envtl. Coal. v. Bulen*,
　　429 F.3d 493 (4th Cir. 2005) .......................................................40

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*,
　　482 F. Supp. 2d 1248 (W.D. Wash. 2007) ..................................35

*Save Our Sonoran, Inc. v. Flowers*,
　　408 F.3d 1113 (9th Cir. 2004) .....................................................26

*Selkirk Conservation All. v. Forsgren,*
    336 F.3d 944 (9th Cir. 2003) ........................................................36

*S. Fork Band Council of W. Shoshone v. U.S. Dep't of Interior,*
    588 F.3d 718 (9th Cir. 2009) ........................................................13

*Sierra Club, Inc. v. Bostick,*
    787 F.3d 1043 (10th Cir. 2015) .............................................22, 41

*Sierra Club v. FERC,*
    867 F.3d 1357 (D.C. Cir. 2017)......................................... 17-18, 19

*Sierra Club v. U.S. Army Corps of Eng'rs,*
    803 F.3d 31 (D.C. Cir. 2015)................................................22, 26

*Sierra Club v. Sigler,*
    695 F.2d 957 (5th Cir. 1983) ..............................................12, 14

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
    255 F. Supp. 3d 101 (D.D.C. 2017)..............................................14

*Stop the Pipeline v. White,*
    233 F. Supp. 2d 957 (S.D. Ohio 2002).........................................12

*Wild Fish Conservancy v. Salazar,*
    628 F.3d 513 (9th Cir. 2010) ........................................................30

*W. Watersheds Project v. Kraayenbrink,*
    632 F.3d 472 (9th Cir. 2011) ...............................................10, 29

*Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs,*
    351 F. Supp. 2d 1232 (D. Wyo. 2005) ...................................21, 26

## Statutes

5 U.S.C. § 706 ..............................................................................10

16 U.S.C. § 1536 .................................................................4, 27, 35

33 U.S.C. § 1311 .............................................................................3

33 U.S.C. § 1342 ...................................................................................3

33 U.S.C. § 1344 ..........................................................................3, 4, 38

42 U.S.C. § 4332 ...................................................................................4

## Regulations

33 C.F.R. § 330.1 ........................................................................3, 4, 5, 39

33 C.F.R. § 330.2 .............................................................................4, 5

33 C.F.R. § 330.4 ...................................................................................4

33 C.F.R. § 330.6 .............................................................................4, 5

40 C.F.R. § 230.1 ...................................................................................3

40 C.F.R. § 230.10 .................................................................................3

40 C.F.R. § 1502.16 ...............................................................................11

40 C.F.R. § 1508.7 ..........................................................................20, 26

40 C.F.R. § 1508.8 ....................................................................10, 11, 17

40 C.F.R. § 1508.27 ........................................................................20, 26

50 C.F.R. § 402.02 ..........................................................................27, 28

50 C.F.R. § 402.14 ..........................................................................28, 34

80 Fed. Reg. 26,832 (May 11, 2015) ...............................................28, 30, 31

84 Fed. Reg. 53,215 (Oct. 4, 2019) .......................................................8

# INTRODUCTION

Plaintiffs challenge the U.S. Army Corps of Engineers' 2017 reissuance of Nationwide Permit 12, a general permit that will be used an estimated 69,700 times over five years to approve pipelines and other utility projects under the Clean Water Act. The agency violated several bedrock environmental laws when it took this action without adequately evaluating Nationwide Permit 12's significant environmental impacts. Plaintiffs also challenge the use of Nationwide Permit 12 to authorize the construction of the proposed Keystone XL pipeline across hundreds of rivers and wetlands.

The National Environmental Policy Act, 42 U.S.C. § 4321 et seq., requires agencies to take a hard look at an action's environmental effects. The U.S. Army Corps of Engineers (the "Corps") flouted this requirement when it reissued Nationwide Permit 12—which is used to authorize numerous oil pipelines, like Keystone XL—before first examining the direct, indirect, and cumulative impacts of such projects, including the risks that they will spill oil, release drilling fluids, and exacerbate the climate crisis.

The Corps also violated the Endangered Species Act, 16 U.S.C. § 1531 et seq., by failing to undertake programmatic consultation with the National Marine Fisheries Service and U.S. Fish and Wildlife Service on the reissuance of Nationwide Permit 12. The Corps instead deferred that analysis to the project level.

That contravenes the Corps' duty to ensure that the projects authorized by Nationwide Permit 12, taken together, will not jeopardize threatened or endangered species or their critical habitat.

Finally, the Corps' reissuance of Nationwide Permit 12 ran afoul of the Clean Water Act, 33 U.S.C. § 1251 et seq. Section 404(e) of this statute requires that projects authorized by Nationwide Permits cause only minimal adverse effects on the environment. To effectuate this requirement, Nationwide Permit 12 provides that "any single and complete project" using the permit cannot result in the loss of more than half an acre of U.S. waters. But Nationwide Permit 12 allows each individual water crossing of a linear project, such as Keystone XL, to count as a "single and complete project." That means Nationwide Permit 12 can be used numerous times along the line so long as each crossing is under the half-acre threshold, no matter how many cumulative acres of waters are affected or how much cumulative environmental harm results. And although the Corps points to project-level review as a backstop to ensure that the minimal effects threshold will nonetheless be met, in many cases project-level review never occurs at all. Nor is there any guarantee that crossings for a particular project will be far enough apart to prevent significant cumulative impacts. The Corps' determination that Nationwide Permit 12 satisfied Section 404(e)'s requirements was therefore arbitrary and capricious.

In sum, the Corps' reissuance of Nationwide Permit 12 authorizes countless utility projects, including the Keystone XL pipeline, to cross the nation's waterways without a full and proper analysis of those projects' environmental effects, as mandated by law. Accordingly, the Court should grant Plaintiffs' motion for partial summary judgment.

## BACKGROUND

### I.     The Nationwide Permit Program

Section 404 of the Clean Water Act ("CWA") prohibits the discharge of any pollutant into navigable waters of the United States without a permit. 33 U.S.C. §§ 1311(a), 1342, 1344. The discharge of dredged soil or other fill material must be approved by the Corps. *Id.* § 1344. Before issuing a permit for such activity, and consistent with the CWA's goal of protecting the integrity of the nation's waters, the Corps must ensure that the activity will not cause significant degradation of the waters, taking into account, e.g., effects on aquatic life and ecosystems and recreational, aesthetic, and economic values. 40 C.F.R. §§ 230.1(a), 230.10(c). The Corps must also evaluate all "practicable alternative[s]" and take, or direct applicants to take, "appropriate and practicable steps" to minimize potential adverse impacts. *See id.* § 230.10(a), (d).

Nationwide Permits ("NWPs") offer a streamlined alternative to this individual permitting process. *See* 33 C.F.R. § 330.1(b). When the Corps

determines that a category of "similar" activities "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment," it may issue a NWP for those activities. 33 U.S.C. § 1344(e)(1); *see also* 33 C.F.R. § 330.2(b) (defining "nationwide permit"). NWPs are issued for up to five years, at which point they are either reissued or left to expire. 33 U.S.C. § 1344(e)(2); 33 C.F.R. § 330.6(b). As with the individual permitting process, the Corps must comply with the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA") when it issues a NWP. *See* 33 C.F.R. § 330.4(b)(2), (f); *see also* 42 U.S.C. § 4332(2)(C); 16 U.S.C. § 1536(a)(2).

"In most cases," projects meeting the specific terms and conditions of a NWP may be constructed without even notifying the Corps. *See* 33 C.F.R. § 330.1(c), (e)(1). In some cases, however, applicants must submit a preconstruction notification ("PCN") to the Corps' district engineer and hold off on construction until the district engineer verifies that the project meets the NWP's terms and conditions. *See id.* §§ 330.1(e)(1), 330.6(a)(1). If the district engineer determines that the project does not comply with the NWP's terms and conditions, verification must be denied; the applicant may then seek an individual permit instead. *See id.* § 330.6(a)(2). If the district engineer simply fails to respond to the

PCN within 45 days, then generally "[t]he permittee may presume that his project qualifies for the NWP." *Id.* § 330.1(e)(1).

On June 1, 2016, the Corps published a proposal to reauthorize 50 existing NWPs, including Nationwide Permit 12, and to add two new ones. NWP018361, NWP018372-73.[1] The Corps then held a public comment period, finalizing its decision on January 6, 2017. NWP000002. The issued and reissued NWPs took effect on March 19, 2017, and will expire on March 18, 2022. NWP000002.

## II. Nationwide Permit 12

Nationwide Permit 12 ("NWP 12") authorizes the construction of pipelines and other linear utility projects so long as each "single and complete project" will not result in the loss of more than half an acre of U.S. waters. *See* NWP000127. In the Decision Document for NWP 12, the Corps estimated that NWP 12 will be used for approximately 69,700 projects over its five-year lifespan and impact 8,900 acres of U.S. waters. NWP005331.

Generally, NWPs cannot be used more than once for any "single and complete project." 33 C.F.R. § 330.6(c). However, for linear projects like those authorized by NWP 12, the Corps defines "single and complete project" so as to

---

[1] These citations are to the Corps' administrative record, lodged with the Court on November 1, 2019. ECF No. 54. Plaintiffs also cite to several extra-record documents, and are moving to supplement the record with those documents. *See* Mot. to Suppl. the Administrative Record ("Mot. to Suppl.") (filed herewith).

apply to each individual water crossing. *Id.* § 330.2(i); NWP000149. Thus, for a single pipeline, NWP 12 can be used for multiple—indeed, an unlimited number of—water crossings without exceeding the half-acre threshold. *See* NWP005268, NWP005272.

NWP 12's terms and conditions include a requirement that an applicant submit a PCN if a project meets certain criteria—for example, if a project "might affect" federally listed endangered or threatened species or designated critical habitat. NWP000141-42; *see also* NWP000030, NWP000128. The PCN must name the potentially affected species or habitat, *see* NWP000141, and also list all "other separate and distant water crossings" that require Corps authorization, even if those crossings do not themselves require a PCN, *see* NWP000128. The district engineer must then evaluate the PCN to determine whether the project "may affect" the species or habitat, such that consultation under the ESA is required; whether the project's water crossings—individually and cumulatively—comply with the NWP; and whether any mitigation is necessary. *See* NWP000128, NWP000141-42, NWP000146-47. In practice, however, and as detailed below, the Corps generally limits any project-level review to those water crossings requiring a PCN, which are often a small subset of the project's total crossings. *See infra* pp. 22-23, 40-41.

In purporting to address its NEPA obligations for NWP 12, the Corps'
Decision Document included an Environmental Assessment "with a mitigated
finding of no significant impact" ("EA"). NWP000032; *see also* NWP005267,
NWP005303. This document constituted the Corps' only NEPA analysis for
projects authorized or verified under NWP 12. *See* NWP000003 (asserting that
Environmental Assessments for NWPs fulfill NEPA's requirements and that
project verifications do not require separate NEPA documentation).

In purporting to address its ESA obligations for NWP 12, the Corps relied
on the condition requiring applicants to submit a PCN whenever a project "might
affect" listed species or critical habitat. *See* NWP000141. The Corps concluded
that the reissuance of NWP 12 would have "no effect" on listed species and that
any such effects from individual projects would be analyzed on a project-specific
basis. *See* NWP000015-16. The Corps therefore did not conduct any programmatic
consultation with the U.S. Fish and Wildlife Service ("FWS") or National Marine
Fisheries Service ("NMFS") (collectively, the "Services") before it reauthorized
NWP 12. *See* NWP000016.

## III.    The Keystone XL Pipeline

TransCanada (now TC Energy) first applied for a cross-border permit for
Keystone XL in 2008, and ultimately received one in 2017. *Indigenous Envtl.
Network v. U.S. Dep't of State*, No. 17-cv-29-GF-BMM, 2017 WL 5632435, at *1-

2 (D. Mont. Nov. 22, 2017). Plaintiffs subsequently sued the U.S. Department of State and FWS for their roles in allowing construction of that pipeline to move forward based on a faulty environmental review. *Id.* at *2. Plaintiffs prevailed, obtaining an injunction against the project until the State Department and FWS completed a legally compliant environmental analysis. *Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 590-91 (D. Mont. 2018). Although President Trump's issuance of a new cross-border permit for Keystone XL on March 29, 2019 rendered that decision moot, *see Indigenous Envtl. Network v. U.S. Dep't of State*, No. 18-36068, 2019 WL 2542756, at *1 (9th Cir. June 6, 2019), these agencies are apparently continuing their review of Keystone XL. The State Department recently released a draft Supplemental Environmental Impact Statement and sent FWS a Biological Assessment, *see* 84 Fed. Reg. 53,215, 53,215 (Oct. 4, 2019); to Plaintiffs' knowledge, the FWS has yet to issue a Biological Opinion or concurrence statement.

Because Keystone XL crosses hundreds of waters of the United States, TC Energy must also obtain the Corps' approval under Section 404 of the CWA. The Corps maintains, however, that the vast majority of these water crossings (approximately 685 of them) are "already authorized" under NWP 12—"without the need for any Corps verification or other-project level approval" and despite the ongoing environmental review mentioned above—because they meet the terms and

conditions of NWP 12 and do not require a PCN (hence, they are called "non-PCN" waters). *See* Stipulation to Stay Claims ("Stipulation") at 2, ECF No. 53.[2] Thus, according to the Corps, TC Energy is authorized to begin constructing Keystone XL through these waterways.

Plaintiffs now challenge the Corps' issuance of NWP 12, and the use of NWP 12 for Keystone XL, as violating NEPA, the CWA, and the ESA. Plaintiffs—a coalition of non-profit conservation groups—bring this lawsuit on behalf of their members, who are harmed by the Corps' inadequate environmental review of NWP 12 and whose harms would be redressed if Plaintiffs' suit is successful. *See generally* Decl. of Jon C. Bedick; Decl. of Martin J. Hamel, Ph.D.; Decl. of Brett Hartl; Decl. of Dena Hoff; Decl. of Kenneth R. Midkiff; Decl. of Gail E. Miller-Richardson; Decl. of Wade Sikorski; Decl. of Byron "Stix" Steskal;

---

[2] TC Energy previously filed PCNs for Keystone XL's crossing of U.S. waters in Montana, South Dakota, and Nebraska. *See* Mot. to Suppl., Exs. A-C (collectively listing 688 jurisdictional waterways). In 2017, the Corps issued verifications for the Yellowstone River in Montana and the Cheyenne River in South Dakota, and informed TC Energy that the water crossings in Nebraska did not require Section 404 approval. *Id.*, Exs. D-H. At TC Energy's request, the Corps has since suspended the Yellowstone River and Cheyenne River verifications; accordingly, the parties jointly agreed to stay Claims Three and Five of Plaintiffs' First Amended Complaint. Stipulation at 1-2. TC Energy is also awaiting the Corps' approval of Keystone XL's crossing of the Missouri River in Montana under Section 404 as well as Section 14 of the Rivers and Harbors Act. First Am. Compl. ¶¶ 150, 167, ECF No. 36; Defs.' Answer to First Am. Compl. ¶¶ 150, 167, ECF No. 39.

Decl. of Arthur Tanderup; Decl. of Thomas E. Towe; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

## STANDARD OF REVIEW

Plaintiffs' claims are governed by the standard of review set forth under the Administrative Procedure Act ("APA"). *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481, 496 (9th Cir. 2011) (holding that the APA's standard of review applies to NEPA claims and ESA citizen suit claims against a federal agency); *Friends of the Earth v. Hintz*, 800 F.2d 822, 830-31 (9th Cir. 1986) (same as to claims challenging the Corps' issuance of a Section 404 permit under the CWA). Pursuant to that standard, the Court must "set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Kraayenbrink*, 632 F.3d at 481 (quoting 5 U.S.C. § 706(2)(A)). "Critical to that inquiry is whether there is 'a rational connection between the facts found and the conclusions made' in support of the agency's action." *Id.* (citation omitted).

## ARGUMENT

## I.     The Corps' Environmental Assessment for NWP 12 violated NEPA

NEPA requires the Corps to take a "hard look" at the direct, indirect, and cumulative effects of its reissuance of NWP 12. *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1131 (9th Cir. 2011); 40 C.F.R. § 1508.8 (defining "effects"). The

Corps' Environmental Assessment included in the NWP 12 Decision Document falls well short of this obligation. It ignores significant foreseeable impacts of NWP 12 projects, including the impacts of oil spills into waterways, the risks of frac-outs during construction, and climate change impacts. The Corps' flawed reasoning for each omission is the same: that these impacts are outside the Corps' regulatory authority. The Environmental Assessment's cumulative effects analysis is also insufficient because it defers all meaningful analysis of NWP 12 activities to the project level, where no further NEPA analysis occurs. For these reasons, the Corps' Environmental Assessment and accompanying finding of no significant impact for NWP 12 are arbitrary and capricious. *See Barnes*, 665 F.3d. at 1143 (holding Environmental Assessment and finding of no significant impact inadequate and remanding to the agency for further analysis).

### A.     The Environmental Assessment fails to evaluate oil spills

The Environmental Assessment violates NEPA because it contains absolutely no analysis of the risk of oil spills from pipelines permitted by NWP 12 or the attendant direct, indirect, or cumulative impacts of such spills.

The Corps plainly has an obligation under NEPA to analyze oil spills when issuing Section 404 permits. *See* 40 C.F.R. §§ 1502.16(a), (b), 1508.8(b) (requiring agencies to evaluate effects that are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable"). In *Ocean*

*Advocates v. U.S. Army Corps of Engineers*, the court held that the Corps was required to analyze the effects of increased tanker traffic, and the attendant risks of oil spills, before issuing a Section 404 permit for a dock extension. 402 F.3d 846, 867-68 (9th Cir. 2005). Similarly, in *Sierra Club v. Sigler*, the court struck down the Corps' Environmental Impact Statement for a dredging project that would allow increased oil tanker access in a port because the agency's oil spill analysis did not analyze the worst-case scenario of an oil tanker spill. 695 F.2d 957, 968-75 (5th Cir. 1983). *See also Stop the Pipeline v. White*, 233 F. Supp. 2d 957, 967-70 (S.D. Ohio 2002) (discussing the sufficiency of the Corps' oil spill analysis in an Environmental Assessment prepared for a Section 404 permit for a crude oil pipeline). Although these cases involved the Corps' issuance of individual permits under Section 404, its NEPA obligation applies equally to NWPs.

Despite this clear obligation—and despite the propensity of oil pipelines to spill, *see, e.g.*, NWP044139-47— the Environmental Assessment fails to analyze oil spill frequency, potential spill amounts, how different types of waterways and habitats will be impacted, the causes of pipeline spills, the various impacts of spills of different types of oil, or potential mitigation measures that may protect waterways from spills. These omissions are striking considering that the Corps expects NWP 12 to be used about 69,700 times over its five-year lifespan and authorizes crude oil pipelines to be built through tens of thousands of streams,

rivers, and wetlands nationwide, usually with no further involvement by the Corps or additional review under NEPA. *See supra* pp. 5-7. That the Environmental Assessment—the *only* NEPA document for the majority of these projects—ignores oil spills altogether is a clear violation of NEPA's hard look requirement. *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action that "entirely failed to consider an important aspect of the problem" is arbitrary and capricious).

The Corps, conscious of its failure to evaluate oil spills from NWP 12 activities, attempted to justify this glaring omission by claiming that it "do[es] not have the authority to regulate the operation of oil and gas pipelines," and so "do[es] not have the authority to address spills or leaks from oil and gas pipelines." NWP005268. The Corps also pointed out that other federal agencies regulate certain aspects of oil pipelines. NWP005268-69.

This reasoning, however, is in direct conflict with both the plain language of NEPA and caselaw holding that an agency is not relieved of its obligation to evaluate the environmental impacts of its actions simply because the impacts are regulated by another agency. *See Calvert Cliffs Coordinating Comm. v. Atomic Energy Comm'n*, 449 F.2d 1109, 1123 (D.C. Cir. 1971) (certifications under other laws do not satisfy NEPA); *S. Fork Band Council of W. Shoshone v. U.S. Dep't of*

*Interior*, 588 F.3d 718, 726 (9th Cir. 2009) (impacts analysis is required even where facility operates pursuant to a separate Clean Air Act permit); *Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, No. 16-cv-950, 2019 WL 5103309, at *6 (W.D. Wash. Oct. 10, 2019) (Corps must evaluate impacts of pesticides even though they are regulated by other agencies and the Corps lacks jurisdiction to permit or prohibit their use). Likewise here, NEPA requires consideration of the reasonably foreseeable effects—like oil spills—that would occur as a result of using NWP 12 to authorize oil pipelines. This is particularly true because none of the other federal agencies charged with regulating oil pipelines is required to conduct NEPA analyses for them, meaning that, in many cases, the Corps is the *only* agency to complete such a review.

Indeed, several courts have applied this principle to this exact issue, recognizing the Corps' obligation to evaluate potential impacts from oil spills— even where the Corps does not directly "regulate" the underlying activity. *See, e.g.*, *Sigler*, 695 F.2d at 962 (requiring the Corps to conduct a worst-case oil spill analysis before permitting a crude oil distribution system); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 134 (D.D.C. 2017) (holding that the Corps' Environmental Assessment for the Dakota Access oil pipeline violated NEPA by failing to evaluate the potential impacts of oil spills). In requiring an oil spill analysis for the dock extension at issue in *Ocean Advocates*,

the court explained that "a 'reasonably close causal relationship' exists between the Corps' issuance of the permit, the environmental effect of increased vessel traffic, and the attendant increased risk of oil spills." 402 F.3d at 868 (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004)).

That causal connection exists equally here. NWP 12 authorizes the construction of oil pipelines across waterways; the increased risk of oil spills is a logical and foreseeable consequence of that authorization, and therefore the Corps was required to consider oil spills in its review of NWP 12. Its failure to do so violates NEPA.

### B.      The Environmental Assessment fails to evaluate frac-outs

The Environmental Assessment also violates NEPA by failing to evaluate the impacts associated with "frac-outs," which can occur when pipelines are tunneled under waterways using horizontal directional drilling ("HDD") and drilling fluids are released through fractures in the bedrock and flow to the surface into waterways. NWP005274.[3]

The Environmental Assessment acknowledges that frac-outs can occur as a result of NWP 12 activities, NWP005274, that the adverse impacts of frac-outs are significant enough that they may require immediate remediation measures to

---

[3] The Corps changed the term "frac-out" to "inadvertent return of drilling mud" in the final rule. NWP005274-75.

restore the waterbodies, NWP005275, NWP005263, and that the water-bentonite slurry used in most drilling fluids "can adversely affect aquatic organisms if released into bodies of water," NWP005274. Many commenters, including the White House Center for Environmental Quality, also registered their concern about the impacts of frac-outs on waterways. *See, e.g.*, NWP043886-87, NWP006778-79, NWP006805, NWP006816, NWP006820, NWP006848, NWP006853.

Nonetheless, the Corps refused to analyze frac-outs (e.g., their impacts, frequency, size, or mitigation measures) in the Environmental Assessment, invoking the same argument it used to avoid evaluating oil spills: "Because these drilling fluids are not fill material, inadvertent returns of these drilling fluids are not regulated under section 404 of the Clean Water Act." NWP005274; *see also* NWP006848. As set forth above, *supra* pp. 13-15, this argument is misplaced. NEPA requires the Corps to evaluate the foreseeable impacts associated with its permitting action regardless of whether the Corps has regulatory authority over the underlying activity or pollutants at issue—in this case, drilling fluid. *See, e.g.*, *Ocean Advocates*, 402 F.3d at 867; *Coal. to Protect Puget Sound Habitat*, 2019 WL 5103309, at *6.

The Corps also avoided addressing the impacts of frac-outs in the Environmental Assessment by relying on district engineers to protect waters at the individual project level. *See, e.g.*, NWP005274 ("For NWP 12 activities where

there is the possibility of such inadvertent returns, district engineers may add

conditions to the NWP 12 verification requiring activity-specific remediation plans

to address these situations . . . ."); *see also* NWP005263, NWP005275-76. But

allowing district engineers the option to add unspecified conditions or create a

remediation plan does nothing to satisfy the Corps' NEPA obligations. *See Lands*

*Council*, 395 F.3d at 1027 (purpose of NEPA is to disclose environmental impacts

and alternatives to enable informed decision making). And, as detailed throughout,

many NWP 12-permitted activities do not require PCNs so, for these projects,

there is no project-level Corps review at all.

The Corps cannot avoid its obligations under NEPA to evaluate the full host

of direct, indirect, and cumulative impacts associated with NWP 12 activities by

invoking the authority of other agencies or hoping a district engineer might

consider such impacts at the project level. The Corps' failure to evaluate the risk of

frac-outs in the Environmental Assessment violates NEPA.

### C.  The Environmental Assessment fails to evaluate climate change impacts

The Environmental Assessment further violates NEPA by failing to evaluate

the indirect and/or cumulative effects of the lifecycle greenhouse gas emissions

caused by projects authorized under NWP 12. As explained above, NEPA

commands federal agencies to analyze indirect effects, which are "caused by the

action and are later in time or farther removed in distance, but are still reasonably

foreseeable." 40 C.F.R § 1508.8(b). It is "reasonably foreseeable" that oil

transported by pipelines like Keystone XL "will be burned," and that such burning

will "contribute to climate change." *Sierra Club v. FERC*, 867 F.3d 1357, 1372

(D.C. Cir. 2017). Indeed, the significant climate impacts of Keystone XL alone are

well recognized. *See, e.g.*, First Am. Compl. ¶¶ 143, 147. The Corps must

therefore, "at a minimum," estimate the "amount of . . . carbon emissions that the

pipelines will make possible." *See Sierra Club v. FERC*, 867 F.3d at 1371.

The Environmental Assessment concedes that "[f]or utility lines that carry

oil or natural gas, reasonably foreseeable future actions also include the burning of

fossil fuels, which produce carbon dioxide that contribute[s] to greenhouse gas

emissions." NWP005308. The Environmental Assessment also recognizes that

"[c]limate change represents one of the greatest challenges our country faces with

profound and wide-ranging implications for the health and welfare of Americans,

economic growth, the environment, and international security." NWP005316-17.

The Environmental Assessment, however, never quantifies these emissions or

analyzes the resulting environmental harm.

Neither of the Corps' excuses for not doing so has merit. First, the Corps

claimed, as it did with oil spills and frac-outs, that it lacked the "legal authority to

regulate the burning of fossil fuels that are transported by [NWP 12] pipelines."

NWP005270. Again, the Corps cannot absolve itself of its NEPA responsibilities

by simply declaring that it does not have the authority to regulate an underlying project or ensuing impact. *See supra* pp. 13-15; *see also Sierra Club v. FERC*, 867 F.3d at 1371 (holding that NEPA required the Federal Energy Regulatory Commission ("FERC") to analyze the climate impacts of the natural gas carried by the Sabal Trail pipeline, even though FERC does not authorize natural gas combustion).

Second, the Corps claimed that NWP 12 would authorize various clean energy projects and so, on balance, NWP 12 could *reduce* greenhouse gas emissions. NWP005270. This claim, too, fails. In *Sierra Club v. FERC*, the D.C. Circuit rejected FERC's attempt to avoid quantifying greenhouse gas emissions from a pipeline based on its unfounded assertions that those emissions "might be partially offset by reductions elsewhere." *Id.* at 1375. The D.C. Circuit explained that an "agency decisionmaker reviewing this [Environmental Impact Statement] would thus have no way of knowing whether total emissions, on net, will be reduced or increased by this project, or what the degree of reduction or increase will be," meaning that the Statement "fails to fulfill its primary purpose." *Id.* Similarly here, the Corps has provided no quantitative data to support its claim that NWP 12 activities might help reduce greenhouse gas emissions, or to allow decisionmakers to know whether emissions would increase or decrease overall, or

by how much in either direction, as a result of projects authorized under NWP 12.

Accordingly, the Environmental Assessment violates NEPA.

### D. The Environmental Assessment fails to adequately evaluate cumulative effects by impermissibly deferring analysis to the project level

NEPA requires that the Corps consider the direct, indirect, and cumulative

impacts of "past, present, and reasonably foreseeable future actions regardless of

what agency (Federal or non-Federal) or person undertakes such other actions." 40

C.F.R. § 1508.7; *see also id.* § 1508.27 (stating that significant cumulative impacts

"cannot be avoided by terming an action temporary or by breaking it down into

small component parts").

Upon reissuance of NWP 12, the Corps should have prepared an extensive

analysis of the cumulative effects of oil pipelines at the regional or watershed level

combined with other past, present, and reasonably foreseeable projects; the

potential local and site-specific impacts of multiple pipeline crossings in close

proximity to each other, on the same waterways or in the same watershed; and the

cumulative impacts to non-aquatic areas crossed by pipelines. But instead, the

Corps deferred most of that analysis to the project level. *See* NWP005282 (stating

that NWP 12 "requires district engineers to consider the cumulative effects of all

crossings of waters of the United States for a single and complete linear project

that is authorized by NWP"); NWP005272 ("If the district engineer determines

after reviewing the PCN that the cumulative adverse environmental effects are more than minimal . . . he or she will exercise discretionary authority and require an individual permit."); *see also* NWP005276, NWP005285, NWP005288, NWP005303-04. That is unlawful.

Several courts have held that the cumulative effects analysis for NWPs must occur at the national, not project, level. *See Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 413 (6th Cir. 2013) (explaining that the Corps must satisfy NEPA *upon issuance of a NWP* and cannot rely primarily on additional reviews or conditions that may come later); *Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1243 (D. Wyo. 2005) ("By their very nature, the 'cumulative impacts' of a general permit cannot be evaluated in the context of approval of a single project."); *Defs. of Wildlife v. Ballard*, 73 F. Supp. 2d 1094, 1112-13 (D. Ariz. 1999) (holding site-specific NEPA analysis "inadequate to measure the impact of implementing the NWP program under which thousands of projects will be authorized").

It was particularly important for the Corps to have conducted a complete cumulative effects analysis here, since the Environmental Assessment for NWP 12 is the only NEPA document for *tens of thousands* of uses, authorizing oil pipelines to be installed in streams, rivers, and wetlands nationwide. *See Ballard*, 73 F. Supp. 2d at 1112-13. As Judge McHugh stated in reviewing the 2012 version of

NWP 12, "[i]t is impossible for an agency to have taken the 'hard look' required by NEPA—and thereby have made a fully informed decision to undertake an action—if it knowingly defers portions of its analysis to a later date," especially because, "in the context of nationwide permits, it is often the case that *no* further environmental analysis is ever contemplated." *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1067 (10th Cir. 2015) (McHugh, J., concurring).[4]

Importantly, the Corps has acknowledged that it does not typically prepare any NEPA analysis at the project level, even when verifying projects pursuant to a PCN. NWP000003 (the Corps "fulfills the requirements of NEPA when it finalizes the environmental assessment" for the NWP, and "[a]n NWP verification issued by a district engineer does not require separate NEPA documentation"); *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 39 (D.C. Cir. 2015) (the Corps' practice is "not to conduct additional NEPA analysis when it verifies specific activities under the general permits"). Because there is no project-level NEPA review for NWP 12 activities, the Corps should have evaluated the full host of cumulative effects upon reissuance of NWP 12.

The Keystone XL pipeline demonstrates the problem with the Corps' existing approach. As explained above, *see supra* pp. 8-9, the Corps' only project-

---

[4] The majority found that plaintiffs had waived their claim and so did not address the adequacy of the Corps' cumulative effects analysis. *Bostick*, 787 F.3d at 1051.

level review will focus on two or three individual river crossings. The Corps'
previous verifications for the Yellowstone and Cheyenne Rivers did not entail *any*
cumulative effects analysis. *See generally* Mot. to Suppl., Exs. D & F
(verifications); *see also id.*, Ex. E at 10 & Ex. G at 10 (memorandums for record).
Even though the Corps must still issue new verifications, the other approximately
685 water crossings are "already authorized" by NWP 12, "without the need for
any Corps verification or other project-level approval." Stipulation at 2. According
to the Corps, then, TC Energy is currently authorized to begin construction through
the vast majority of waterways along Keystone XL's route despite the fact that the
agency has prepared no project-level NEPA analysis that evaluates the cumulative
effects of the project, much less NWP 12 generally.[5]

The Environmental Assessment nonetheless insists that it "does not defer the
NEPA cumulative effects analysis" to the project level, NWP005283, apparently
referring to its "general" or "national-scale cumulative effects analysis,"
NWP005283, NWP005313. That analysis, however, merely consists of a general
overview of historical wetland losses in the United States over the last 200 years,

---

[5] Although the State Department prepared a Supplemental Environmental
Impact Statement for Keystone XL in 2014, that document was legally inadequate
and so could not have been used to inform the Corps' evaluation of Keystone XL.
*See Indigenous Envtl. Network*, 347 F. Supp. 3d at 590-91. And there is no dispute
that the revised analysis is not yet final, as the State Department recently released
another draft. *See* 84 Fed. Reg. at 53,215.

NWP005305-16, NWP005330-39, and does not evaluate the cumulative effects of NWP 12 projects.

To be sure, the Corps' cumulative effects analysis for a NWP is unlikely to be as detailed as a cumulative effects analysis completed for a specific project. But the Environmental Assessment's cumulative effects analysis is *so* generalized that it uses almost verbatim language as the other 52 NWP Decision Documents, even though the NWPs authorize vastly different types of activities. *See, e.g.*, NWP005424-35 (NWP 10 for mooring buoys); NWP003912-22 (NWP 34 for cranberry production activities); NWP033074-003085 (NWP 48 for shellfish activities). NEPA demands more, particularly because this is the only NEPA analysis for most NWP 12 projects. *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078-79 (9th Cir. 2011) (agencies' cumulative effects analysis must be specific enough so as to "rationally explain its decision in the context of project-specific effects"); *Coal. to Protect Puget Sound Habitat*, 2019 WL 5103309, at *3 (Corps' issuance of Environmental Assessment for NWP 48 violated NEPA by "focusing solely on a cumulative, landscape-scale analysis"); *Ballard*, 73 F. Supp. 2d at 1113 (Corps' NEPA analysis for NWPs must include sufficient analysis "to measure the impact of implementing the NWP program under which thousands of projects will be authorized").

Here, the record is replete with evidence of cumulative effects from pipelines that the Environmental Assessment ignores. *See, e.g.*, NWP043863, NWP045071-80 (discussing cumulative effects such as introduction of invasive species, soil damage, water quality degradation and harm to fish, impacts to bank stability and floodplain vegetation, erosion, sedimentation, release of toxic substances, and reduced biodiversity and productivity); NWP045134 (discussing cumulative impacts from pipelines, including loss of habitat, changes in thermal conditions, increased erosion, increased stream instability, and turbidity); *see also* NWP045068-202; NWP045137-65.

Of particular note is the Environmental Assessment's failure to analyze the cumulative impacts associated with the permanent "conversion" of high-quality forested wetlands to scrub shrub wetlands for pipeline rights of way. A study of forested wetland conversion on the PennEast pipeline documented functional losses such as decreased structural and species diversity, decreased soil and streambank stabilization, decreased erosion and sedimentation control, loss of forest interior habitat and species, and decreased nutrient storage, and cast doubt on the ability of wetland mitigation to compensate for these losses. NWP043864-65, NWP044441-85. Because the Corps does not consider the conversion of forested wetlands a "loss" for purposes of the half-acre threshold, NWP000119, there is no limit to the amount of conversion that can occur within specific

watersheds or *even at individual crossings* while still allowing a project to be authorized under NWP 12. For example, the Galveston, Texas district office verified TC Energy's use of NWP 12 for the Gulf Coast pipeline even though there were over 10 acres of forested conversion at several individual water crossings, and over 60 acres of conversion in the Pine Island Bayou alone. *See* NWP043791, NWP044378.[6]

The Environmental Assessment similarly ignores the impacts of pipeline construction and infrastructure (e.g., pump stations, access roads, and transmission lines) in "uplands," again concluding that the Corps does "not have the legal authority to regulate . . . upland segments of pipelines." NWP005268. NEPA prohibits the Corps from limiting its analysis in this way. *See, e.g.*, 40 C.F.R. §§ 1508.7, 1508.27; *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124 (9th Cir. 2004) (requiring Corps to evaluate impacts to uplands); *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d at 40 n.3 (rejecting Corps' argument that its NEPA obligations are "confined to considering environmental effects on CWA jurisdictional waters"); *Wyo. Outdoor Council*, 351 F. Supp. 2d at 1242, 1245

---

[6] While the Environmental Assessment acknowledges that forested wetlands may be permanently converted to build pipeline rights of way, resulting in the loss of certain wetland functions, NWP005285, NWP005318, it fails to analyze which wetlands functions may be lost, at what levels, and in which regions or ecosystems. Instead, the Corps simply relies on district engineers to address and mitigate impacts through compensatory mitigation. NWP005282; *see also* NWP005338. That hardly satisfies NEPA.

(holding that Corps' cumulative effects analysis for a general permit must include impacts to private lands).

In short, the Corps' Environmental Assessment for NWP 12 violates NEPA. It fails to analyze oil spills, frac-outs, and climate change—all on the legally flawed notion that the Corps need not analyze impacts it does not directly regulate. And it fails to adequately analyze NWP 12's cumulative impacts, instead improperly deferring that analysis to district engineers.

## II. The Corps' failure to complete formal programmatic consultation on the reissuance of NWP 12 violates the ESA

Despite the Corps' estimate that NWP 12 will be used 69,700 times and impact 8,900 acres of waters, the Corps reauthorized NWP 12 without undertaking formal programmatic consultation with the Services—on the NWP program generally or NWP 12 specifically—to consider the impacts of NWP-authorized activities on protected species or their critical habitat. This violates the ESA.

### A. The Corps was required to undertake programmatic consultation on NWP 12

The Corps has an ongoing duty under ESA Section 7(a)(2) to ensure that any action it authorizes is not likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). The ESA's implementing regulations broadly define the kind of "action[s]" subject to this mandate to include "all activities *or programs* of any

kind authorized, funded, or carried out, in whole or in part, by Federal agencies."

50 C.F.R. § 402.02 (emphasis added).

Section 7(a)(2) and its implementing regulations set forth a detailed

consultation process that must be followed before agencies take or approve actions

that "may affect" threatened or endangered species. Formal consultation is required

at the "earliest possible time" whenever an agency action is "likely to adversely

affect" such species. *Id.* § 402.14(a), (b). For broad federal programs, action

agencies and the Services must engage in "programmatic consultation" to consider

the cumulative impacts of the program and to guide implementation by

establishing criteria to avoid, minimize, or offset adverse effects on listed species

and critical habitat. *See id.* §§ 402.02, 402.14(i)(6); *see also* 80 Fed. Reg. 26,832,

26,832, 26,837 (May 11, 2015).

There can be no doubt that the Corps' reissuance of NWP 12 was an agency

"action" within the meaning of the ESA, 50 C.F.R. § 402.02, and that it was an

action that both "may affect" and is "likely to adversely affect" listed species and

critical habitat, *id.* § 402.14; *see Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d

1, 7-8 (D.D.C. 2005) (finding the Corps' previous reissuance of the NWPs to be

final agency action requiring ESA consultation). NWP 12 authorizes activities that

cause impacts to listed species from habitat loss and fragmentation, avian power

line collisions, and sedimentation and contamination of waters from spills, as well

as indirect impacts associated with climate change. NWP005319, NWP005322, NWP041623-24, NWP041650, NWP043837, NWP043842-45, NWP043862-65, NWP043871-73. For example, pipelines authorized by NWP 12, including the proposed Keystone XL pipeline, have the potential to leak and spill oil into the Corps' jurisdictional waterways, with disastrous impacts on aquatic resources. *See, e.g.*, NWP044962-63, NWP044966-67, NWP044969 (discussing impacts of several pipeline spills); *see also* NWP044139-47 (discussing oil spill impacts in the context of Keystone XL).

Indeed, in the NWP 12 Environmental Assessment, the Corps acknowledged the potential for harm to species from NWP 12-authorized activities, including from frac-outs, fragmentation and loss of habitat, oil spills, conversion and loss of wetland habitat, and adverse effects on water quality from increases in sediments and pollutants. *See, e.g.*, NWP005274, NWP005308, NWP005310, NWP005315, NWP005318. Clearly, then, listed species are likely to be adversely affected by NWP 12-authorized activities and the Corps was required to undertake formal programmatic consultation—on the full NWP program and/or NWP 12 specifically—to consider the cumulative, national-scale impacts of NWP 12. *See Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1252 (9th Cir. 2017) (if the proposed action "may affect" an endangered species or its critical habitat, "the action agency must initiate formal consultation"); *Kraayenbrink*, 632 F.3d at 496 (holding agency

had duty to consult with FWS before amending nationally applicable regulations due to "[t]he sheer number of acres affected . . . and number of special status species who reside on those lands").

In fact, when the Services issued regulations in 2015 defining framework programmatic consultations, they specifically used the Corps' NWP program as an example of a federal program requiring programmatic consultation. 80 Fed. Reg. at 26,835 ("Examples of Federal programs that provide such a framework include . . . the U.S. Army Corps of Engineers' Nationwide Permit Program."). The Services have therefore already explicitly directed the Corps to complete programmatic consultation for the NWP program, including NWP 12, yet the Corps unlawfully ignored that directive.

The reason for the programmatic consultation requirement is clear: it is the only way to ensure that the piecemeal destruction of habitat from the thousands of construction activities authorized by NWP 12 each year will not cumulatively jeopardize listed species. *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 522 (9th Cir. 2010) (noting the obligation "to analyze the effect of the *entire* agency action"); *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 255 (D.D.C. 2003) (requiring a comprehensive assessment of the overall impacts of agency activities on protected species). Programmatic consultation is also necessary to allow the Services to establish broad conservation measures to prevent

jeopardy to species, such as ongoing monitoring to ensure that incidental take does not occur at unsustainable levels and restrictions to limit impacts at the programmatic level. *See* 80 Fed. Reg. at 26,833 (describing the purpose of programmatic consultation).

The Corps is well aware that its reauthorization of the NWPs required programmatic consultation. The Corps initiated formal programmatic consultation on the 2012 reissuance of the NWPs with NMFS, and on February 15, 2012, NMFS released a Biological Opinion concluding that the Corps' implementation of the NWP program, including NWP 12, was jeopardizing the continued existence of listed species under NMFS's jurisdiction. *See* Mot. to Suppl., Ex. I at 223.

The Corps reinitiated consultation to address NMFS's concerns, and NMFS issued a new Biological Opinion in 2014. *See* NWP030590. Although that Biological Opinion did not make a jeopardy determination, it reiterated many of the agency's concerns about the NWP program—specifically NWP 12—and required modifications to the NWPs, including data collection, monitoring, and corrective action, with semi-annual reporting requirements. NWP030655-57. It was only on the basis of these measures that NMFS was able to conclude that the 2012 issuance of the NWPs would not jeopardize listed species within its jurisdiction. NWP030655-57. However, it is not clear that the Corps complied with

these measures, as no semi-annual reports appear in the record.[7]

The Corps' prior consultation with NMFS thus underscores the need for programmatic consultation on the NWP program, including NWP 12. And, though the Corps claims that this consultation was merely "voluntary," NWP031043, that claim is belied by the record. David Olson, the Corps' Regulatory Program Manager, stated in an email that "for the 2017 NWPs, *we would have to do a new consultation* . . . . " NWP036481 (emphasis added). However, Mr. Olson went on to recommend that rather than engage in such consultation, the Corps should simply make a "no effect" determination—regardless of the Corps' prior consultation with NMFS, which identified many adverse impacts to listed species from NWP-authorized activities—and rely on Corps districts to implement regional conditions, which "might make a national 'no effect' determination more legally defensible." NWP036481. He noted further:

> We could continue to make the national "no effect" determination for each NWP reissuance until it is challenged in federal court and a judge rules against the Corps. If we lose in federal court, then we would start doing the national programmatic consultations again.

NWP036481.

The Corps has apparently adopted Mr. Olson's scheme to avoid programmatic consultation. It failed to undertake a new programmatic consultation

---

[7] The 2014 Biological Opinion does not apply to the 2017 issuance of the NWPs. NWP030606.

on the current version of the NWPs (or NWP 12 specifically) with NMFS, and has *never* completed any programmatic consultation with FWS. The Corps has also continued to oppose recommendations made by NMFS regarding measures to protect species. *See* NWP025564 (email stating the Corps "strongly opposes" NMFS's expert recommendations and rejecting a letter NMFS had asked the Corps to sign regarding ESA consultation).

In short, the record demonstrates that the Corps is not only aware that it is legally obligated to undertake programmatic consultation under the ESA for the NWP program—including NWP 12—but that it is purposefully avoiding doing so until forced by a court. This blatant disregard for the law is clearly arbitrary and capricious.

**B.    The Corps' obligation to consult on the NWPs cannot be absolved by its reliance on project-level review**

As described above, the Corps contends that it can bypass programmatic consultation by instead relying on regional conditions and consultation at the project level. Accordingly, the Corps asserted that the reissuance of the NWPs, including NWP 12, will have "no effect" on protected species. NWP000016, NWP018368. This argument, however, has been rejected by NMFS as well as several courts.

NMFS was unequivocal in its objection to the Corps' "no effect" determination, stating that it "cannot support [the determination's] inclusion in the

preamble of this rule," and that "such a conclusion is not supportable under the ESA." NWP027751. NMFS further stated that it is "concerned that the [Corps'] failure to consult on the effects of this rule pursuant to Section 7(a)(2) of the ESA is not consistent with the [Corps'] legal obligations." NWP027751.[8]

The Corps' reliance on project-specific consultation to avoid programmatic review was also squarely rejected by the court in *Brownlee*. There, the Corps refused to consult with FWS on four NWPs on the basis that project-specific analyses would avoid any harm to species. 402 F. Supp. 2d at 10. The court disagreed, reasoning that the ESA regulations are clear that "[a]ny request for formal consultation may encompass . . . a number of similar individual actions within a given geographical area or a segment of a comprehensive plan. This does not relieve the Federal agency of the requirements for considering the effects of the action as a whole." *Id.* (quoting 50 C.F.R. § 402.14(c)). The court concluded that "overall consultation for the NWPs is necessary to avoid piece-meal destruction of . . . habitat through failure to make a cumulative analysis of the program as a whole." *Id.*

---

[8] *See also* NWP030589, NWP027490. Because the Corps never initiated consultation with FWS, that agency had no need to concur with the Corps' assessment and so declined to take a legal position on the "no effect" determination. NWP031041.

Other courts have come to similar conclusions. *See, e.g.*, *Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 294 (9th Cir. 1992) (a broad "strategy" for actions that may affect listed species must undergo Section 7 consultation, even if individual actions will be subject to project-specific consultation); *Conner v. Burford*, 848 F.2d 1441, 1453-58 (9th Cir. 1988) (rejecting the Services' deferral of impacts analysis to a second, project-specific stage); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 482 F. Supp. 2d 1248, 1266-67 (W.D. Wash. 2007) (holding that deferral of analysis to the project level "improperly curtails the discussion of cumulative effects"). Project-specific consultation therefore cannot relieve the Corps of its duty to consult on the issuance of the NWPs at the programmatic level, and cannot justify a "no effect" determination for NWP 12.

Even putting aside the legal requirement, there are practical reasons why regional conditions and project-level consultations are inadequate substitutes for programmatic consultation. For example, such analyses fail to adequately analyze NWP 12's cumulative impacts to listed species, like migratory birds, that cross regions. Keystone XL is illustrative. Whooping cranes, interior least terns, and piping plovers traversing the length of the migratory corridor suffer significant *cumulative* effects from wetland loss associated with Keystone XL and other NWP 12 projects, and yet under the approach adopted by the Corps, these cumulative

effects will never be analyzed in a Biological Opinion in the manner that Section 7 requires. Project-specific consultation on Keystone XL will not remedy this error because it will not take into account the loss or contamination of habitat outside the project area, and so will not consider the cumulative effects of NWP 12-authorized activities across the full migration route.

There is also no assurance that project-specific consultation will even occur for listed species that may be adversely affected by NWP 12-authorized activities. NWP 12 requires applicants to submit PCNs if listed species "might be" affected by the project. NWP000015. This, however, unlawfully delegates the initial effects determination to the applicant, whereas ESA Section 7(a)(2) requires federal agencies to make that determination. 16 U.S.C. § 1536(a)(2); *cf. Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 955 (9th Cir. 2003) ("[F]ederal agencies cannot delegate the protection of the environment to public-private accords."); *Gerber v. Norton*, 294 F.3d 173, 184-86 (D.C. Cir. 2002) (FWS may not delegate species protection obligations to a private permit applicant).

As a result, applicants may proceed with NWP 12-authorized activities without submitting a PCN to the Corps if they unilaterally—and incorrectly— decide the projects would not impact listed species, in which case no consultation will occur. *See* NWP044263 ("For the vast majority of actions permitted by NWP 12, the action can proceed with no further review or verification by the

Corps . . . ."). And, even when PCNs are submitted, the Corps does not undertake

consultation on the water crossings that do not trigger the PCN requirement, since

it is the Corps' position that these are "already authorized without the need for any

Corps verification or other project-level approval." Stipulation at 2. NMFS has also

found that "evidence suggests that the Corps has historically not reviewed

significant percentages of PCNs to insure they are complete and the information is

correct." NWP030857. For most projects, then, a project-level consultation may

never occur.

Keystone XL again exemplifies this concern. As discussed above, *supra* pp.

22-23, the Corps has acknowledged that several hundred non-PCN water crossings

for the project are authorized under NWP 12 without requiring any project-level

review by the Corps, and so construction in these waters may proceed prior to the

completion of any ESA consultation. In other words, the vast majority of Keystone

XL's water crossings can be constructed without the Corps conducting *any*

analysis under the ESA—even though it is well documented that an oil spill or

other contamination in these waters could result in harm to listed species. *See*

NWP044138-47, NWP044159, NWP044164-68 (noting that even small spills from

Keystone XL into wetlands or natural areas could result in habitat contamination

and harm to wildlife, including listed species).

In sum, the Corps' failure to undertake formal programmatic consultation with the Services regarding the reauthorization of NWP 12, and its reliance on applicants to initiate project-specific consultations, violates Section 7 of the ESA, the ESA's implementing regulations, and the APA.

## III. The Corps' reissuance of NWP 12 violated Section 404(e) of the CWA by permitting activities with more than minimal impacts

Section 404(e) of the CWA allows the Corps to issue NWPs for categories of activities that have only minimal adverse effects on the environment, both individually and cumulatively. 33 U.S.C. § 1344(e)(1). NWP 12 activities exceed that threshold.

As detailed above, *supra* pp. 5-6, NWP 12 allows the Corps to treat numerous water crossings along a proposed linear utility project—which often number in the hundreds or thousands—as many "single and complete projects" that each qualify separately under NWP 12, regardless of the supposed half-acre limit. There is no cap on the total number of times a single pipeline can use NWP 12, nor is there a maximum number of acres a pipeline can impact while still qualifying for NWP 12. The result is that NWP 12 can authorize projects with an unlimited level of impacts, rather than limiting its applicability to activities with only "minimal" impacts.

In fact, the U.S. Environmental Protection Agency commented in 2016 that it had "become increasingly concerned" with the impacts resulting from dozens of

uses of NWP 12 to approve large utility lines because that practice "raises the likelihood that projects will result in greater than minimal cumulative effects." NWP032639. The agency explained that major pipelines should instead "be reviewed through the individual permit process." NWP032643.

The Corps itself estimated that NWP 12 will be used a total of 69,700 times over its five year duration, resulting in impacts to 8,900 acres of U.S. waters. NWP005331. It nonetheless determined that this level of impacts satisfied Section 404(e)'s minimal impacts requirement on the bases that additional review takes place at the project level and that water crossings on a linear pipeline usually occur at "separate and distant" locations. *See* NWP005272. Neither justification holds water.

## A.    The Corps cannot rely on project-level review to ensure that NWP 12 will have only minimal adverse environmental effects

The Corps justified the unlimited use of NWP 12 by claiming that district engineers, upon receipt of a PCN, will conduct a project-level review to ensure that all of the project's water crossings will comply with Section 404(e)'s minimal effects threshold. *See, e.g.*, NWP000012, NWP000027.

However, project-level review fails to accomplish this for one simple reason—in most cases, the review never occurs. As the Corps has admitted, "[f]or the *vast majority of actions permitted by NWP 12*, the action can proceed with no further review or verification by the Corps . . . ." NWP044263 (emphasis added);

*see also* 33 C.F.R. § 330.1 ("In most cases, permittees may proceed with activities authorized by NWPs without notifying the [Corps]."). Because the Corps is not notified about most projects, it does not have the opportunity to ensure that the project's environmental effects are actually minimal.

Even in cases where PCNs are required, it is far from certain that district engineers will conduct any further analysis at the project level to ensure projects do not exceed the minimal effects threshold. This precise concern led the court in *Coalition to Protect Puget Sound Habitat* to hold that the Corps' issuance of NWP 48 for shellfish farming activities violated the CWA. 2019 WL 5103309, at *8. There, the Corps based its minimal effects determination for NWP 48 on its imposition of general conditions and "the hope that regional Corps districts will impose additional conditions and/or require applicants to obtain individual permits if necessary to ensure that the adverse impacts will be minimal." *Id.* at *3. The court rejected that approach, finding that it would render the Corps' determinations "little more than its own promise to obey the law" and consisted of an "abdication of responsibility [that] is not authorized under the CWA." *Id.* at *8 (quoting *Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493, 502 (4th Cir. 2005)). So too here. By relying "on post-issuance procedures to make its pre-issuance minimal impact determinations," *id.*, the Corps' issuance of NWP 12 violated the CWA.

The Corps' review of Keystone XL bears this out. Although the 2017 PCNs indicated that Keystone XL would cross approximately 688 jurisdictional waterways, the Corps issued two verifications that were limited to the Yellowstone and Cheyenne Rivers and failed to evaluate the cumulative effects of the roughly 685 non-PCN waters. *See supra* pp. 22-23. That narrow scope of review was based on the Corps' interpretation of NWP 12 that these non-PCN water crossings were "*already authorized [by NWP 12] without the need for any Corps verification or other project-level approval*." Stipulation at 2 (emphasis added). The result is that the cumulative effects of the vast majority of Keystone XL's water crossings completely escape review at any stage of the Corps' approval.

The lack of any project-level review for most of the water crossings authorized under NWP 12 distinguishes this case from *Sierra Club, Inc. v. Bostick*. There, the court upheld the 2012 version of NWP 12 on the basis of safeguards that *required* project-level personnel to evaluate the cumulative impacts of the overall project. 787 F.3d at 1056-58. The court then examined the administrative record for the pipeline at issue, found that the district engineers *had* conducted that project-wide cumulative effects analysis, and found no evidence that the crossings were not far enough apart to prevent aquatic impacts. *Id.* at 1056, 1060-62. As demonstrated by Keystone XL, the Corps has abandoned those safeguards.

In short, the Corps' reliance on project-level review to satisfy the minimum effects threshold violates the CWA. In most instances, applicants do not submit PCNs and so that review never occurs. Even when applicants do submit PCNs, the Corps does not include non-PCN water crossings in its analyses, as the Corps' 2017 verifications for Keystone XL make clear. Thus, NWP 12, as implemented, offers no guarantee of a meaningful minimum effects analysis.

**B.      The Corps cannot claim that a pipeline's water crossings will be sufficiently "separate and distant" so as to satisfy Section 404(e)**

The Corps further rationalized the unlimited use of NWP 12 on the basis that multiple water crossings on a linear pipeline are usually at "separate and distant locations" and/or separate waterbodies or watersheds along a pipeline route, such that their cumulative effects are usually dissipated. NWP000027.

But NWP 12 does not define the phrase "separate and distant" or impose any spacing requirements, nor does it require district engineers to make any "separate and distant" findings. Thus, there is nothing to prevent a pipeline with numerous water crossings in close proximity to each other and/or on the same waterbody from relying on NWP 12 and causing more than minimal cumulative effects.

Keystone XL is again illustrative. Across its route, the pipeline has high densities of water crossings in specific watersheds and even in the same waterways. For example, the pipeline would be constructed through "Unnamed Tributary to Shade Creek" six times in the span of a single mile in Montana;

42

Narcelle Creek eight times within one mile in South Dakota; and thirteen waterways within a single mile in Nebraska. First Am. Compl. ¶ 158.[9] While these crossings may have individually minor effects, the potential for cumulative effects are heightened where numerous crossings occur in such close proximity. A meaningful minimal effects analysis of Keystone XL is therefore critical to safeguard these waterways from adverse effects. Yet the Corps has acknowledged that it will never conduct such an analysis, since the approximately 685 non-PCN waters have already been authorized by NWP 12 and will not be addressed in any future Corps review. Stipulation at 2; *supra* pp. 22-23.

In sum, NWP 12 can be used numerous times along a pipeline or utility route—even if there are high concentrations of water crossings in specific areas—with no mechanism to ensure impacts would be minimal. Thus, the Corps failed to ensure that projects authorized by NWP 12, like Keystone XL, comply with Section 404(e).

## CONCLUSION

For the foregoing reasons, the Court should hold that NWP 12, as well as its specific application to Keystone XL, is arbitrary and capricious and otherwise not in accordance with law. Accordingly, the Court should grant Plaintiffs' motion for

---

[9] For many other examples, see the Non-PCN Datasheet Tables included in Exhibit A, Exhibit B, and Exhibit C to the Motion to Supplement (starting at pages 52, 52, and 57, respectively).

partial summary judgment; declare that NWP 12—and its specific application to Keystone XL—violated the CWA, NEPA, and ESA; remand NWP 12 to the Corps for compliance with these statutes; and enjoin the use of NWP 12 to authorize the construction of Keystone XL.

Dated: November 22, 2019                 Respectfully submitted,

/s/ Doug Hayes
Doug Hayes (*pro hac vice*)
/s/ Eric Huber
Eric Huber (*pro hac vice*)
Sierra Club Environmental Law Program
1650 38th Street, Suite 102W
Boulder, CO 80301
(303) 449-5595
doug.hayes@sierraclub.org
eric.huber@sierraclub.org
*Attorneys for Sierra Club and Northern Plains Resource Council*

/s/ Jaclyn H. Prange
Jaclyn H. Prange (*pro hac vice*)
/s/ Cecilia D. Segal
Cecilia D. Segal (*pro hac vice*)
Natural Resources Defense Council
111 Sutter Street, Floor 21
San Francisco, CA 94104
(415) 875-6100
jprange@nrdc.org
csegal@nrdc.org
*Attorneys for Bold Alliance and Natural Resources Defense Council*

/s/ Jared Margolis
Jared Margolis (*pro hac vice*)
/s/ Amy R. Atwood
Amy R. Atwood (*pro hac vice*)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
(503) 283-5474
jmargolis@biologicaldiversity.org
atwood@biologicaldiversity.org
*Attorneys for Center for Biological Diversity*
*and Friends of the Earth*

/s/ Timothy M. Bechtold
Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for all Plaintiffs*

**WORD COUNT CERTIFICATION**

I certify that the foregoing response contains 9,996 words, as counted with Microsoft Word's "word count" tool, and excluding material Local Civil Rule 7.1(d)(2)(E) omits from the word-count requirement.

/s/ Cecilia D. Segal

**CERTIFICATE OF SERVICE**

I certify that I served the foregoing brief on all counsel of record via the

Court's CM/ECF system.

/s/ Cecilia D. Segal