JONATHAN D. BRIGHTBILL
JEAN E. WILLIAMS
Deputy Assistant Attorneys General

BENJAMIN J. GRILLOT
BRIDGET KENNEDY MCNEIL
KRISTOFOR R. SWANSON
Environment & Natural Resources Division
U.S. Department of Justice

[contact information in signature block]
*Attorneys for Federal Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| **Northern Plains Resource Council**, **et al.**, | Case No. 4:19-cv-44-BMM |
| Plaintiffs, | **Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment (ECF No. 72) and in Support of Cross-Motion** |
| v. | |
| **U.S. Army Corps of Engineers**, **et al.**, | |
| Defendants, | |
| and | |
| **TransCanada Keystone Pipeline, LP**, **et al.**, | |
| Defendant-Intervenors. | |

# TABLE OF CONTENTS

Table of Authorities ..................................................................................... iv

Table of Acronyms .................................................................................... xi

Introduction ................................................................................................ 1

Background ................................................................................................. 2

    I.     Section 404(e) General Permits ................................................... 2

    II.    Nationwide Permits ...................................................................... 3

    III.   Nationwide Permit 12 .................................................................. 7

    IV.   Procedural Posture ....................................................................... 9

Standard of Review ................................................................................... 10

Argument .................................................................................................. 11

    I.     Nationwide Permit 12 Does Not "Authorize"
          or "Approve" Oil Pipelines ...................................................... 11

    II.    The Corps' "Minimal Effects" Determination in
          Nationwide Permit 12 Complies with CWA Section 404(e) .... 13

        A.    The Corps Did Not Improperly Defer Analysis of Impacts ............... 13

        B.    The Corps' Long-Standing Construction of Section 404(e)
              to Allow Separate Evaluation of "Separate and Distinct
              Crossings" Is Permissible Under *Chevron* ......................... 17

    III.   The Corps Complied with NEPA ....................................... 20

        A.    The Corps Properly Assessed the Potential Effects
              From Nationwide Permit 12. ............................................. 21

        B.    Plaintiffs' Arguments for a Broader NEPA
              Analysis of Oil Pipeline Impacts are Contrary to *Public Citizen*. ...... 23

      C.     The Corps Properly Assessed Effects
             from the Inadvertent Return of Drilling Fluid....................................29

      D.     The Corps Did Not "Defer" Its Cumulative Impacts Analysis ..........30

   IV.    The Corps Complied with the ESA.........................................................32

    A.    The Corps' "No Effect" Determination is Well-Considered................32

    B.    Plaintiffs' Arguments Do Not Undermine
        the Corps' Determination ...................................................................36

Conclusion ..................................................................................................................43

Certificate of Compliance ..........................................................................................45

Certificate of Service ..................................................................................................46

**T**ABLE OF **A**UTHORITIES

**Cases**

*Alaska Ctr. for the Env't v. West*,
   157 F.3d 680 (9th Cir. 1998) ............................................................15

*All. for the Wild Rockies v. Krueger*,
   664 F. App'x 674 (9th Cir. 2016) ....................................................10

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
   271 F. Supp. 2d 230 (D.D.C. 2003) .................................................40

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, *Inc.*,
   462 U.S. 87 (1983) ...........................................................................13

*Black Warrior Riverkeeper, Inc. v U.S. Army Corps of Eng'rs,*
   833 F.3d 1274 (11th Cir. 2016) .......................................................15

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*,
   467 U.S. 837 (1984) ................................................................. 10, 18

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971), *abrogated on other grounds by*
   *Califono v. Sanders,* 430 U.S. 99 (1977) ........................................10

*Coal. to Protect Pugent Sound Habitat v. U.S. Army Corps of Eng'rs,*
   No. 16-cv-0950-RSL, 2019 WL 5103309 (W.D. Wash. Oct. 10, 2019).............23

*Conner v. Burford,*
   848 F.2d 1441 (9th Cir. 1988) .........................................................41

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs,*
   941 F.3d 1288 (11th Cir. 2019) .......................................................27

*Defs. of Wildlife v. Ballard,*
   73 F. Supp. 2d 1094 (D. Ariz. 1999) ...............................................27

*Defs. of Wildlife v. Flowers*,
  414 F.3d 1066 (9th Cir. 2005) .................................................................38

*Defs. of Wildlife v. Kempthorne*,
  No. 04-1230-GK, 2006 WL 2844232 (D.D.C. Sept. 29, 2006)..........................38

*Dep't of Transp. v. Public Citizen*,
  541 U.S. 752 (2004)......................................................... 21, 24, 25, 27, 28, 29

*Greater Yellowstone Coal. v. Flowers*,
  359 F.3d 1257 (10th Cir. 2004) ...............................................................20

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019) ......................................................................11, 18

*Lane Cty. Audubon Soc'y v. Jamison*,
  958 F.2d 290 (9th Cir. 1992) ..................................................................41

*League of Wilderness Defs. v. U.S. Forest Serv.*,
  689 F.3d 1060 (9th Cir. 2012) ........................................................... 22, 23

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989)..............................................................................20

*Morongo Band of Mission Indians v. FAA*,
  161 F.3d 569 (9th Cir. 1998) ..................................................................21

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007)..............................................................................39

*Nat'l Wildlife Found. v. Brownlee*,
  402 F. Supp. 2d 1 (D.D.C. 2005) ............................................................42

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
  668 F.3d 1067 (9th Cir. 2011) ................................................................22

*Ocean Advocates v. U.S. Army Corps Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) ..................................................................26

*Ohio Valley Envtl. Coal. v. Bulen*,
  429 F.3d 493 (4th Cir. 2005) .............................................................. 4, 14, 16, 22

*Pit River Tribe v. U.S. Forest Serv.*,
  615 F.3d 1069 (9th Cir. 2010) ............................................................15

*Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*,
  898 F.2d 1410 (9th Cir. 1990) ............................................................35

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) .................................................................... 20, 26

*Sierra Club v. Bostick*,
  787 F.3d 1043 (10th Cir. 2015) ....................................... 7, 13, 14, 16, 20, 23, 31

*Sierra Club v. Bostick*,
  No. 12-cv-742-R, 2013 WL 6858685 (W.D. Okla. Dec. 30, 2013)....................23

*Sierra Club v. FERC*,
  867 F.3d 1357 (D.C. Cir. 2017) ................................................... 25, 26

*Sierra Club v. Sigler*,
  695 F.2d 957 (5th Cir. 1983) ............................................................26

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  508 F.3d 1332 (11th Cir. 2007) ............................................................14

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  803 F.3d 31 (D.C. Cir. 2015) .....................................................11, 26

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  64 F. Supp. 3d 128 (D.C. Cir. 2014) ....................................................30

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  990 F. Supp. 2d 9 (D.D.C. 2013) .........................................................4

*Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs*,
  683 F.3d 1155 (9th Cir. 2012) ............................................................30

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
205 F. Supp. 3d 4 (D.D.C. 2016) ........................................................11

*Sw. Ctr. for Biological Diversity v. Glickman*,
932 F. Supp. 1189, *aff'd*, 100 F.3d 1443 (9th Cir. 1996) ....................38

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978).............................................................................20

*W. Watersheds Project v. Kraayenbrink*,
632 F.3d 472 (9th Cir. 2011) .................................................. 36, 40, 41

*Walter O. Boswell Mem'l Hosp. v. Heckler*,
749 F.2d 788 (D.C. Cir. 1984)............................................................19

*Wetlands Action Network v. U.S. Army Corps of Eng'rs*,
222 F.3d 1105 (9th Cir. 2000), *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.,* 603 F.3d 1173 (9th Cir. 2011) .................................................27

*Wild Fish Conservancy v. Salazar*,
628 F.3d 513 (9th Cir. 2010).................................................................40

*WildEarth Guardians v. Conner*,
920 F.3d 1245 (10th Cir. 2019).............................................................15

*Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*,
351 F. Supp. 2d 1232 (D. Wyo. 2005) .................................................27

**Statutes**

5 U.S.C. § 704.......................................................................................40

5 U.S.C. § 706.......................................................................................10

5 U.S.C. § 706(2)(A)..............................................................................10

15 U.S.C. § 717f....................................................................................25

15 U.S.C. § 717f(c)(1)(A).......................................................................25

15 U.S.C. § 717f(e) ...............................................26

16 U.S.C. § 1531(b) ...............................................32

16 U.S.C. § 1532(3) ...............................................32

16 U.S.C. § 1536(a)(1) ...........................................35

16 U.S.C. § 1536(a)(2) ...........................................32

33 U.S.C. § 403 .......................................................8

33 U.S.C. § 1251(a) .................................................2

33 U.S.C. § 1344(a) .................................................2

33 U.S.C. § 1344(e) ............................. 2, 4, 17, 18, 24

33 U.S.C. § 1344(e)(1) .........................................3, 14

33 U.S.C. § 1344(e)(2) ...........................................3

42 U.S.C. § 4332(2)(C) ...........................................20

**Code of Federal Regulations**

33 C.F.R. pt. 323 .....................................................2

33 C.F.R. pt. 325 ..................................................2, 3

33 C.F.R. pt. 330 .....................................................3

33 C.F.R. § 320.1(a)(2) ...........................................4

33 C.F.R. § 330.1(b) .................................................3

33 C.F.R. § 330.1(c) .................................................4

33 C.F.R. § 330.1(d)............................................ 3, 5, 6

33 C.F.R. § 330.1(e)(1) ...................................................................6

33 C.F.R. § 330.1(e)(2) ...................................................................6

33 C.F.R. § 330.1(e)(3) ..............................................................6, 31

33 C.F.R. § 330.2(b) .......................................................................3

33 C.F.R. § 330.2(c) ....................................................................3, 6

33 C.F.R. § 330.2(i) ......................................................................18

33 C.F.R. § 330.4(e)(1) ...................................................................5

33 C.F.R. § 330.4(f) ..................................................................8, 32

33 C.F.R. § 330.4(f)(2) ...................................................................9

33 C.F.R. § 330.5 ...........................................................................4

33 C.F.R. § 330.5(b)(2) ...................................................................4

33 C.F.R. § 330.5(b)(2)(ii) ..............................................................5

33 C.F.R. § 330.5(b)(3) .............................................................4, 30

33 C.F.R. § 330.5(c)(1) ...................................................................5

33 C.F.R. § 330.5(c)(1)(i) ...............................................................5

33 C.F.R. § 330.6(a) ...................................................................6, 7

33 C.F.R. § 330.6(a)(3)(1) ...............................................................6

40 C.F.R. § 230.7(b) .......................................................................4

40 C.F.R. §§ 1500–1508 ..............................................................20

40 C.F.R. § 1501.4(b)....................................................................21

40 C.F.R. § 1501.4(c) ........................................................................21

40 C.F.R. § 1501.4(d) ........................................................................21

40 C.F.R. § 1502.22 ...........................................................................23

40 C.F.R. § 1508.7 ..................................................................... 20, 28

40 C.F.R. § 1508.8 ............................................................................20

40 C.F.R. § 1508.9 ............................................................................21

40 C.F.R. § 1508.18 ..........................................................................20

50 C.F.R. § 402.03 ............................................................................32

**Federal Registers**

51 Fed. Reg. 19,926 (June 3, 1986) ..................................................32

56 Fed. Reg. 59,110 (Nov. 22, 1991) ................................................18

80 Fed. Reg. 26,832 (May 11, 2015) .................................................37

81 Fed. Reg. 35,186 (June 1, 2016) ....................................................5

82 Fed. Reg. 1,860 (Jan. 6, 2017) ........................... 6, 7, 8, 9, 12, 13, 15, 16, 18, 19

82 Fed. Reg. 8,663 (Jan. 24, 2017) ...................................................12

**Legislative History**

H.R. Rep. No. 95-830 (1977),
    *reprinted in* 1977 U.S.C.C.A.N. 4424 ...............................................2

| | |
|---|---|
| CWA | Clean Water Act |
| ESA | Endangered Species Act |
| FWS | U.S. Fish & Wildlife Service |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NWP 12 | Nationwide Permit 12 |
| PCN | Pre-Construction Notice |

Counts One, Two, and Four in this case are facial challenges to a U.S. Army

Corps of Engineers regulation known as "Nationwide Permit 12," which has

existed in various forms for more than forty years.  The Permit (or "NWP 12") is a

Clean Water Act Section 404(e) general permit that authorizes a user to make—

without the need for a separate individual permit—certain minimal discharges of

dredged and fill materials into waters of the United States associated with the

construction, maintenance, repair, and removal of utility lines.

Plaintiffs challenge the regulation because the Corps' definition of "utility

line" include pipelines.  Thus, their theory goes, the Corps has "approved" or

"authorized" construction and operation of oil pipelines.  They claim this was

contrary to Section 404(e), the National Environmental Policy Act ("NEPA"), and

the Endangered Species Act ("ESA").  But the premise of Plaintiffs' theory is

incorrect.  NWP 12's role is not one that "approves" or "authorizes" construction

of an entire pipeline, let alone its operation.

Summary judgment should be granted in favor of Federal Defendants.  First,

the Corps' decisions implementing and interpreting Section 404(e) are entitled to

deference.  Second, NEPA did not require the Corps to consider the potential

effects from upland construction and pipeline operations because the Permit does

not have a "reasonably close causal relationship" with those impacts.  Third, the

Permit does not, standing alone, authorize any activity that might affect a listed species or critical habitat.

BACKGROUND

## I.     Section 404(e) General Permits

The Clean Water Act ("CWA") is designed to "restore and maintain the chemical, physical and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To that end, Section 404 of the Act prohibits the discharge of dredged or fill material into "waters of the United States" without a permit from the Corps. *See* § 1344(a).  Section 404 originally authorized the Corps to issue only individual permits.  This can require a resource-intensive, case-by-case review, including extensive site- and permit-specific documentation and public comment.  *Id.*; *see* 33 C.F.R. pts. 323 and 325.

In 1977, Congress concluded that requiring individual Section 404 permits for routine activities imposes unnecessary delay and administrative burdens on the public and the Corps.  H.R. Rep. No. 95-830, at 38, 98, 100 (1977) (Conf. Rep.), *reprinted in* 1977 U.S.C.C.A.N. 4424.  Those concerns led Congress to create the general permit program.  *See* 33 U.S.C. § 1344(e).  Specifically, Section 404(e) authorizes the Corps to issue general permits "for any category of activities involving discharges of dredged or fill material if the [Corps] determines that the activities in such category are similar in nature, will cause only minimal adverse

environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." § 1344(e)(1). General permits are valid for no more than five years. § 1344(e)(2). They also must comply with the CWA Section 404(b)(1) Guidelines promulgated by the U.S. Environmental Protection Agency ("EPA").

## II.     Nationwide Permits

Nationwide permits are general permits that authorize activities on a nationwide basis. 33 C.F.R. § 330.2(b). They are aimed at advancing Congress's goal "to regulate with little, if any, delay or paperwork certain activities having minimal impacts." § 330.1(b). They uphold environmental protections while maximizing administrative efficiency.

That is not to say a nationwide permit is an unlimited license to impact waters of the United States. Corps regulations set out policies and procedures used to issue, condition, modify, suspend, or revoke general permits, including nationwide permits. 33 C.F.R. pts. 325 and 330; § 330.2(c). Accordingly, nationwide permits are subject to certain terms and conditions. *See id.* Further, as explained below, Corps divisions and districts have discretionary authority to (among other things) condition or restrict a nationwide permit based on concerns for the aquatic environment or public interest factors. *See* § 330.1(d).

The Corps addresses nationwide permit activities at three levels: (1) nationally, (2) within each Corps geographically-based division, and (3) at the districts within each division.  *See* §§ 320.1(a)(2), 330.5; *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 19–22 (D.D.C. 2013).

First Level: National Review.  Before issuing nationwide permits, the Corps' Chief of Engineers conducts a predictive environmental analysis at the national level to determine whether the individual and cumulative adverse environmental impacts of the category of activities authorized by each proposed permit for the next five years are no more than "minimal."  *See* 33 U.S.C. § 1344(e).  At this level, analysis of potential adverse effects necessarily consists of "reasoned predictions."  *Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493, 501 (4th Cir. 2005).  The Corps ensures minimal impact, in part, through "General Conditions."  All authorized nationwide permit activities must comply with these.  *See* 33 C.F.R. § 330.1(c).  Some limit the types of activities authorized.  *See id.*

The Corps seeks public comment, prepares appropriate NEPA documentation, and analyzes a number of factors relevant under the 404(b)(1) Guidelines.  § 330.5(b)(2), (3); 40 C.F.R. § 230.7(b).  The Corps ultimately memorializes its 404(b)(1), NEPA, and other national-level environmental analyses in a decision document for each nationwide permit.  33 C.F.R. § 330.5(b)(3).

4

Second Level: Division Engineer Review. The Corps recognizes that there are "regional differences in aquatic resource functions and services across the country." 81 Fed. Reg. 35,186, 35,188 (June 1, 2016). Thus, each division engineer has "discretionary authority to modify, suspend, or revoke [nationwide permit] authorizations for any specific geographic area, class of activities, or class of waters within his division . . . ." 33 C.F.R. § 330.5(c)(1). The division engineer may exercise this authority "whenever he determines sufficient concerns for the environment under the section 404(b)(1) Guidelines or any other factor of the public interest so requires, or if he otherwise determines that the [nationwide permit] would result in more than minimal adverse environmental effects either individually or cumulatively." § 330.4(e)(1); *see* § 330.1(d).

Before a division engineer can modify, suspend, or revoke a nationwide permit within a specific geographical boundary, the proposed changes must undergo public notice and comment. *See* § 330.5(b)(2)(ii), (c)(1). This comment process is conducted concurrently with the national-level notice and comment process for the proposed nationwide permits. *See* § 330.5(b)(2)(ii). The division engineers' consideration and conclusions, however, are documented separately from the national-level decision documents. The division engineers impose regional conditions for specific authorized activities within the Corps' districts. *Id.* §§ 330.5(c)(1)(i), 330.1(d).

Third Level: Project-Specific Review by District Engineers. In some cases, permittees may proceed with nationwide permit-authorized activities without notifying the Corps. *Id.* §§ 330.1(e)(1), 330.2(c). In other circumstances, the nationwide permit or a general or regional condition may require a prospective permittee to submit to the Corps a pre-construction notice ("PCN") seeking verification that the activity complies with the applicable terms and conditions. *Id.* §§ 330.1(e)(1), 330.6(a). In those situations, the district engineer evaluates the proposed activities on a case-by-case basis. 82 Fed. Reg. 1,860, 1,870 (Jan. 6, 2017). The district engineer "may add activity-specific conditions," such as compensatory mitigation requirements; these "ensure that the activity complies with the terms and conditions of the NWP" and that adverse impacts are no more than minimal individually and cumulatively. 33 C.F.R. § 330.1(e)(2),(3); § 330.6(a)(3)(i); *see* 82 Fed. Reg. at 1,880.

If the district engineer determines that "the adverse effects are more than minimal," he or she "will notify the prospective permittee that an individual permit is required . . . ." 33 C.F.R. § 330.1(e)(3). Following verification, the district engineer retains discretion to suspend, modify, or revoke the verification based on later arising "concerns for the aquatic environment under the . . . 404(b)(1) Guidelines or for any factor of the public interest." § 330.1(d). No additional

public comment or NEPA analysis is required for nationwide permit verifications. *See* § 330.6(a); *Sierra Club v. Bostick*, 787 F.3d 1043, 1053 (10th Cir. 2015).

## III. Nationwide Permit 12

The Corps issued the current set of nationwide permits—including NWP 12—in January 2017.  82 Fed. Reg. at 1,860.  As with all the nationwide permits, the Corps' review for NWP 12 included an Environmental Assessment (to consider the permit's potential environmental effects), a public interest review, and an analysis under the 404(b)(1) Guidelines.  *See* NWP005262–347.[1]

NWP 12 is aimed at reducing what could otherwise be individual permit-based administrative burdens and delays associated with "the construction, maintenance, repair, and removal of utility lines and associated facilities in waters of the United States."  82 Fed. Reg. at 1,860, 1,868, 1,985–86.  "Utility line" is defined to include electric, telephone, internet, radio, and television cables, lines, and wires, as well as oil or gas pipelines.  82 Fed. Reg. at 1,985.

NWP 12 only applies, however, if "the activity does [1] not result in the loss of greater than ½-acre of waters of the United States for [2] each single and complete project."  82 Fed. Reg. at 1,985.  There also "must be no change in pre-construction contours of waters of the United States."  *Id.*  For linear projects like

---

[1] The citations to NWPxxxxxx and NWPRCxxxxx are to the administrative records.  *See* ECF No. 54.

7

pipelines that cross "a single or multiple waterbodies[2] several times at separate and distant locations, each crossing is considered a single and complete project for purposes of [nationwide permit] authorization." 82 Fed. Reg. at 2,007. NWP 12 requires a pre-construction notice to the district engineer "prior to commencing the activity" if, among other reasons, the "discharges [will] result in the loss of greater than 1/10-acre of waters of the United States." 82 Fed. Reg. at 1,986.[3]

NWP 12 is also subject to thirty-two General Conditions. *See* 82 Fed. Reg. at 1,998–2,005. Among them are General Conditions 15 and 18. General Condition 15 prohibits the use of the same nationwide permit "more than once for the same single and complete project" (i.e., for linear projects like pipelines, at each individual waterbody crossing). 82 Fed. Reg. at 1,999. General Condition 18 prohibits the use of any nationwide permit for activities that would jeopardize species listed under the ESA or adversely modify designated critical habitat for such species. 82 Fed. Reg. at 1,999; *see also* 33 C.F.R. § 330.4(f). If any listed species or designated critical habitat might be affected or is in the vicinity of the

---

[2] "For purposes of the [nationwide permits], a waterbody is a jurisdictional water of the United States." 82 Fed. Reg. at 2,008. That is, one that is subject to regulation under CWA Section 404 or Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403.

[3] NWP 12 could also authorize, with pre-construction notice and verification, crossing of navigable waters under Section 10 of the Rivers and Harbors Act. 82 Fed. Reg. at 1,985–86. Plaintiffs, however, focus only on wetlands.

proposed nationwide permit activity, General Condition 18 requires a pre-construction notice. 82 Fed. Reg. at 1,957, 1,999–2,000. If a PCN is required under General Condition 18, prospective permittees may not independently begin work under authority of the nationwide permit. The district engineer must first notify them that the ESA's requirements have been satisfied and that the activity is authorized. 82 Fed. Reg. at 1,999; *see* 33 C.F.R. § 330.4(f)(2).

Thus, NWP 12 only authorizes discharges of dredged or fill material into waters of the United States for linear utility line projects (including pipelines) without notification to the Corps if: the loss at each waterbody crossing is no more than 1/10 of an acre; each crossing makes only one use of the Permit; and the activity in question is not one that "might affect" a threatened or endangered species or critical habitat.

## IV.    Procedural Posture

This case includes five claims. Counts One, Two, and Four—the subject of the present cross-motions for summary judgment—allege that the Corps issued NWP 12 in violation of Section 404(e), NEPA, and the ESA. *See* Am. Compl. ¶¶ 191–205, 218–87, ECF No. 36. Counts Three and Five, by contrast, challenge the Corps' verification of NWP 12's applicability to certain waterbody crossing associated with the Keystone XL Pipeline. *See* Am. Compl. ¶¶ 206–17, 228–36. The Corps has since suspended those verifications. *Id.* ¶ 189. Thus, the parties

stipulated to stay those as-applied challenges and proceed with the facial

challenges in Counts One, Two, and Four. *See* Stipulation to Stay Claims Three &

Five 1–2, ECF No. 56.

**STANDARD OF REVIEW**

Section 706(2) of the Administrative Procedure Act authorizes courts to

"hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." 5 U.S.C. § 706(2)(A). A court's review is limited to the agency's

administrative record. 5 U.S.C. § 706. Further, "the ultimate standard of review is

a narrow one. The court is not empowered to substitute its judgment for that of the

agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971),

*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The

reviewing court's task is to determine "whether the [agency's] decision was based

on a consideration of the relevant factors and whether there has been a clear error

of judgment." 401 U.S. at 416. The same standard applies to claims against

federal agencies brought under the Endangered Species Act's citizen suit provision.

*See All. for the Wild Rockies v. Krueger*, 664 F. App'x 674, 675 (9th Cir. 2016).

Review of the Corps' interpretation of its statutory and regulatory authority

is governed by *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837

10

(1984) (statutory interpretation), and *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417–18 (2019) (agency's interpretation of its own regulations).

**ARGUMENT**

Summary judgment should be granted in favor of Federal Defendants on Claims One, Two, and Four.

## I.    Nationwide Permit 12 Does Not "Authorize" or "Approve" Oil Pipelines

Plaintiffs ignore three important points about NWP 12, the agency action they challenge in the present cross-motions.  When properly considered, these points undercut Plaintiffs' legal analyses.

First, neither the Corps nor NWP 12 "authorizes" or "approves" oil pipelines.  Oil pipelines are distinct from natural gas pipelines in that there is no requisite federal approval on the whole.  *See Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 50 n.8 (D.C. Cir. 2015).  As relevant here, the Corps' authority "is limited to regulating discharges of dredged or fill material into waters of the United States" that may be associated with construction, repair, or removal of utility lines.  NWP005268; NWP005285; *see Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 7 (D.D.C. 2016).  Despite this legal reality, Plaintiffs state no less than ten times that NWP 12 has "authorized" or "approved" oil pipelines.  Pls.' Mem. at 1, 3, 5, 14, 17, 29, 38, 39, 43, 44.

11

Second, the Corps' issuance of NWP 12—the agency action Plaintiffs challenge in Counts One, Two, and Four—certainly did not "authorize" or "approve" the Keystone XL Pipeline. NWP 12 pre-dates the President's invitation for TC Energy to reapply for the previously-denied Presidential permit. *See* 82 Fed. Reg. at 1,860 (Jan. 6, 2017, issuance); Construction of Keystone XL Pipeline, 82 Fed. Reg. 8,663 (Jan. 24, 2017). Plaintiffs nonetheless attempt to use the post-decisional Keystone XL project as a basis to collaterally attack the pre-existing Nationwide Permit. Pls.' Mem. at 1, 3, 22–23, 37, 41–43. In addition to being contrary to principles governing judicial review of agency action, the effort makes little sense. Counts Three and Five in this case separately challenge supposed NWP 12 verifications that do relate to Keystone XL. *See* Am. Compl. ¶¶ 206–17, 228–36. But those claims are stayed.

Third, NWP 12 is about much more than activities in waters of the United States related to the construction of oil pipelines. Yes, it could authorize certain fill activities associated with that construction. But it could also authorize the same fill activities for installation of a fiber-optic cable to provide internet access to a rural community, or for removal of an old and corroded natural gas pipeline. Further, Plaintiffs' effort to cast NWP 12 as blindly authorizing 69,700 wetlands impacts over five years again ignores reality. *See* Pls.' Mem. at 2. Of all the potential uses, the Corps estimates that 82 percent of them—and 97 percent of the

potentially-impacted acreage—would be subject to the Permit's pre-notification requirements.  *See* NWP005331.

## II.  The Corps' "Minimal Effects" Determination in Nationwide Permit 12 Complies with CWA Section 404(e)

The Corps has concluded that the environmental impacts of NWP 12 would be minimal for purposes of Section 404(e).  82 Fed. Reg. 1,868.  Because this determination required the agency's technical, scientific expertise, the reviewing court must "be at its most deferential."  *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).  Accordingly, to succeed, Plaintiffs must show that this determination lacks a "substantial basis in fact"—a heavy burden they fail to meet.  *Bostick*, 787 F.3d at 1055 (internal quotation marks and citation omitted).

### A.  The Corps Did Not Improperly Defer Analysis of Impacts

Plaintiffs assert that the Corps' use of activity-specific review fails to ensure that NWP 12 will only have minimal effects under 404(e).  However, this attack strikes at the very structure of Section 404(e) and fails.  Essentially, Plaintiffs wish to invert the process, requiring the Corps to make a *final* 404(e) minimal effects determination for *all* activities that might potentially proceed under the Permit. Such an approach is contrary to Section 404(e) and would be impractical, if not impossible.

Under Section 404(e), the Corps can issue general permits "for any *category of activities* involving discharges of dredged or fill material." 33 U.S.C. § 1344(e)(1)(emphasis added). Thus, the focus of the statute is properly on categories of activities that are reasonably known—not on specific projects which are unknown—at the time that a permit is issued. "Given the inevitable *ex ante* uncertainty the Corps confronts when issuing a nationwide permit, its reliance on post-issuance procedures is a reasonable, if not the only possible, way for it to cement its determination that the projects it has authorized will have only minimal environmental impacts." *Bulen*, 429 F.3d at 501.

The specific projects, and discharges from those projects, are unknown when a nationwide permit is issued. So, the Corps need only make "reasoned predictions" regarding potential future minimal adverse environmental and cumulative effects by category. *Id.* at 500–01; *see also Bostick*, 787 F.3d at 1058–59. Once those categories are established, specific projects then undergo multi-stage safeguards at the division and district levels. These then account for the details of individual projects and their potential site-specific environmental impacts.

Provided there is at least some analysis of minimal-impact determinations at the issuance of the category-wide permit, the subsequent timing of the activity-specific analysis under the CWA has been repeatedly upheld. *Bostick*, 787 F.3d at

1056; *Bulen*, 429 F.3d at 502; *Sierra Club v. U.S. Army Corps of Eng'rs*, 508 F.3d

1332, 1335–37 (11th Cir. 2007); *Alaska Ctr. for the Env't v. West*, 157 F.3d 680,

683 (9th Cir. 1998); *Black Warrior Riverkeeper, Inc. v U.S. Army Corps of Eng'rs,*

833 F.3d 1274, 1285–89 (11th Cir. 2016).

Plaintiffs, however, raise the specter of district engineers not doing their

jobs.  They claim, "[e]ven in cases where PCNs are required, it is far from certain

that district engineers will conduct any further analysis."  Pls.' Mem. at 40.  This

allegation must be rejected.  There is a presumption in the Ninth Circuit that

federal agencies will follow the law.  *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d

1069, 1082 (9th Cir. 2010); *see also WildEarth Guardians v. Conner*, 920 F.3d

1245, 1261 (10th Cir. 2019).  Here, Note 8 of NWP 12 requires engineers to

carefully consider the entire PCN (including non-PCN crossings identified by the

permittee) in making their determination that an activity results in no more than

minimal impacts, and to require mitigation if necessary.  82 Fed. Reg. 1,986.

Plaintiffs cite *Coalition to Protect Puget Sound Habitat*, arguing that the

case found that reliance "on post-issuance procedures to make [a] pre-issuance

minimal impact determination[s]" violates the CWA.  Pls.' Mem. at 40.  However,

*Puget Sound* instead recognized that "[t]iering the review and decision-making

tasks is permissible" provided that there is some pre-issuance analysis of

environmental impacts.  Here, as in *Bulen*, the Corps undertook a "good-faith,

15

comprehensive, pre-issuance review of the anticipated environmental effects" of the activities authorized by NWP 12. NWP005303–16 (describing in detail reasonably foreseeable effects). It thus properly, partially relied on post-issuance procedures to make sure that any impacts were minimal. *Bulen*, 429 F.3d at 502. Even if "inherently speculative," this forecast of the environmental effects that authorized activities could take is permissible under Section 404(e). *Bostick*, 787 F.3d at 1059.

Plaintiffs complain that the "project-level review fails" because "in most cases, the review never occurs;" arguing that "[b]ecause the Corps is not notified about most projects, it does not have the opportunity to ensure that the project's environmental effects are actually minimal." Pls.' Mem. at 40. However, Plaintiffs ignore NWP 12's stringent requirement that a permittee submit a pre-construction notice if, among other things, a discharge would result in a loss greater than 1/10 of an acre of waters of the United States, or if any listed species or designated critical habitat might be affected. 82 Fed. Reg. 1986. And then, if a PCN is required, a permittee must submit a list of all *non-PCN* crossings associated with the same proposed project. The district engineer can thus evaluate the totality of that information. It is highly unlikely that any sizeable project would not, at some point in its route, require a PCN, triggering the requirement that the permittee provide a list of *all* non-PCN crossings for consideration at the district level. This

ensures that the non-PCN activity results in no more than minimal individual and cumulative impacts for purposes of Section 404(e).

Finally, Plaintiffs argue that the verifications of Keystone XL "bear out" their concerns. But Plaintiffs are attempting to justify their facial challenge with post-decisional documents related to verifications that are both moot and unripe. The verifications Plaintiffs rely upon have been withdrawn by TC Energy, were suspended by the Corps, and are not in effect. Indeed, for those reasons, Plaintiffs' verification-related claims are currently stayed. ECF No. 56. If the Corps later verifies any PCNs for the Keystone XL Pipeline, at that point this Court can evaluate the administrative record for those PCNs and determine whether the Corps reasonably evaluated the individual and cumulative effects of the proposed activity. At present, however, Plaintiffs have failed to overcome the presumption that agencies will comply with the law. They failed to demonstrate that the Corps' conclusion that NWP 12's impacts for purposes of Section 404(e) would be minimal across the nation—given the many procedures and controls to backstop it—lacks a substantial basis in fact and thus violates the CWA.

### B. The Corps' Long-Standing Construction of Section 404(e) to Allow Separate Evaluation of "Separate and Distinct Crossings" Is Permissible Under *Chevron*

Section 404(e) allows the Corps to authorize a "category of activities" only if the environmental impact is minimal, but Congress did not define "minimal." 33

U.S.C. § 1344(e). Nor did it put any restrictions on the number of times a particular nationwide permit could be used. Accordingly, under step two of *Chevron*, 467 U.S. at 842–43, the only question for the Court is whether the Corps' determination is "based on a permissible construction of the statute." *Id.* It is.

For linear projects that cross a single waterbody more than one time (or multiple waterbodies) the Corps treats each crossing as a "single and complete project" provided the crossings are at "separate and distant locations." 82 Fed. Reg. at 1,986 (Note 2). Plaintiffs suggest that because the Corps does not "impose any spacing requirements," nor explicitly require district engineers to make "separate and distant" findings, the Corps' interpretation is arbitrary and capricious. Pls.' Mem. at 42. This ignores the Corps' longstanding reasonable construction of the statute and interpretation of its regulations.[4] 33 C.F.R. § 330.2(i); *see* 56 Fed. Reg. 59,110, 59,113 (Nov. 22, 1991). This long-standing regulatory approach is entitled to deference. *Kisor*, 139 S. Ct. at 2417–18.

As the Corps explained, the agency does not establish national thresholds for what constitutes a "separate and distant" crossing. This is because "a variety of factors should be considered by district engineers when making those decisions, such as topography, geology, hydrology, soils, and the characteristics of wetlands,

---

[4] The Corps first defined "single and complete" in a 1988 regulatory guidance. *See* Regulatory Guidance Letter 88-06 at 2, 3 (June 27, 1988). In 1991, the Corps codified this principle in the Part 330 regulations.

streams, and other aquatic resources." NWP005278. Accordingly, Corps districts may establish local guidelines to identify "separate and distant" crossings. *Id.*

Plaintiffs' insistence that there is "no mechanism to ensure impacts would be minimal" (Pls.' Mem. at 43) ignores the Permit's limitations. It applies solely to activities that result in less than ½ of an acre of loss. For those activities, other permit requirements (including PCNs) ensure any impacts are less than minimal.

Further, Plaintiffs misleadingly state that "the Corps has acknowledged that it will *never conduct* a minimal effects analysis" for non-PCN crossings, citing the parties' stipulation regarding the now-suspended PCNs. Pls.' Mem. at 43. First, this is another attempt to buttress Plaintiffs' facial challenge to the NWP with reference to extra-record, post-decisional documents that, by definition, are irrelevant. *See, e.g., Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) ("review [of] more than the information before the Secretary at the time she made her decision risks our requiring administrators to be prescient . . . .") (citation omitted). Plaintiffs also ignore that a PCN must contain information on non-PCN activities. This includes the quantity of anticipated losses of wetlands, other special aquatic sites, and other waters. The district engineer can then evaluate the specific activities to ensure that they will have no more than minimal effects under Section 404(e). 82 Fed. Reg. at 2,003.

Thus, the Corps reasonably interprets Section 404(e)'s minimal effects requirement as met without incorporating into NWP 12 an arbitrary limit on the number of "single and complete projects" that may exist within an overall linear project. *Bostick*, 787 F.3d at 1056 (citing *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1269–73 (10th Cir. 2004)).

## III.  The Corps Complied with NEPA

NEPA focuses governmental and public attention on potential environmental effects from any proposed "major Federal action." *See* 42 U.S.C. § 4332(2)(C); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).  But NEPA is "essentially procedural." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).  It does not mandate particular results; it prescribes a process to ensure that federal decision-makers consider, and that the public is informed about, potential environmental consequences. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

"Major Federal action includes actions with effects that may be [significant] and which are potentially subject to Federal control."  40 C.F.R. § 1508.18.[5]  The Supreme Court has held "that, where an agency has no ability to prevent a certain

---

[5] Council on Environmental Quality NEPA regulations apply to all federal agencies. *See* 40 C.F.R. §§ 1500–1508.  They include definitions of "direct," "indirect," and "cumulative" effects. *Id.* §§ 1508.7, 1508.8.

effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 770 (2004). Where there is no legally relevant cause, "the agency need not consider [those] effects" under NEPA. *Id.*

### A. The Corps Properly Assessed the Potential Effects From Nationwide Permit 12

The Corps' Environmental Assessment ("EA") properly evaluated the potential impacts from the "major Federal action" here: the issuance of NWP 12.[6] The EA details (at a national level) the affected environment, summarizing national databases. NWP005289–303. It disclosed the relevant environment's current state, with particular emphasis on water quality impairment and causes. NWP005296–303. The EA then evaluated the proposed action's potential impacts. NWP005303–28, NWP005330–39. This included impacts to water quality (NWP005335–36) and fish and wildlife, including endangered species (NWP005319–20, NWP005324–28, NWP005337).

---

[6] An EA is a concise public document that briefly describes the proposal, examines alternatives, and considers environmental impacts. 40 C.F.R. § 1508.9; *see id.* § 1501.4(b), (c), (d). A more-detailed Environmental Impact Statement is not required where an EA leads, as it did here, to a Finding of No Significant Impact. *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 575 (9th Cir. 1998); NWP005340.

The EA focused primarily on cumulative effects to aquatic resources.  *See*
NWP005305–16; NWP005330–35.  The EA references its prior discussion on the
current status of waters of the United States (NWP005311); discusses the activities
that have and can impact those waters (NWP005311–13); and qualitatively
conveys how activities authorized under the Permit would add to those impacts
(NWP005313, NWP005330–35).[7]  The Corps also estimated the number of times
NWP 12 could be used, and quantified the waters of the United States that could be
impacted over its five-year period.  NWP005331.

Plaintiffs claim the cumulative effects analysis is too general and fails to
consider conversion of forested wetlands.  *See* Pls.' Mem. at 23–24, 25–26.  But
Plaintiffs ignore the nature of the "major Federal action" at issue.  The Corps'
cumulative effects analysis is general because, given the nature of the nationwide
permit program, the analysis can only be predictive.  *Bulen*, 429 F.3d at 501.
Specifics on where, when, and in what waters authorized activities could occur is
unknown at the time of authorization.[8]  *See* NWP005303.  As NEPA required—and

---

[7] There is nothing improper about qualitative, rather than quantitative, effects
analyses.  *League of Wilderness Defs. v. U.S. Forest Serv.*, 689 F.3d 1060, 1076
(9th Cir. 2012).

[8] The circumstances here are thus different than those in *Northern Plains Resource
Council, Inc. v. Surface Transportation Board* (*see* Pls.' Mem. at 24), which
involved an application to construct a railroad line.  *See* 668 F.3d 1067, 1073 (9th
Cir. 2011).  The route was known, as was a future coal bed methane development

consistent with the rule of reason that governs NEPA analyses—the Corps

conveyed those circumstances to the public and its decision-maker, and undertook

a global analysis with the information that it did have.  *See* 40 C.F.R. § 1502.22;

*League of Wilderness Defs.*, 689 F.3d at 1075; NWP005303, NWP005311,

NWP005313.  Consistent with that standard, the Corps explicitly discussed

conversion of forested wetlands.  NWP005318; *see also* NWP005344 (literature

considered on wetlands conversions); *Sierra Club v. Bostick*, No. 12-cv-742-R,

2013 WL 6858685, *12 (W.D. Okla. Dec. 30, 2013) ("Defendants' interpretation of

the conversion from forested wetland to another type of wetland, which does not

change the use of a body of water, is not arbitrary and capricious.") *aff'd*, 787 F.3d

1043 (10th Cir. 2015).

## B.    Plaintiffs' Arguments for a Broader NEPA Analysis of Oil Pipeline Impacts are Contrary to *Public Citizen*

Plaintiffs' argument that the Corps was required to consider oil spills, upland

construction, and climate change impacts is based on an incorrect assumption

about the Corps' authority and a fundamental misunderstanding of law.  *See* Pls.'

Mem. at 11–15, 17–27.  The Corps does not authorize, approve, or regulate any of

the utility line projects that can make use of NWP 12, including oil pipelines.

---

that could contribute to cumulative effects.  *Id.* at 1079.  And Plaintiffs' citation (at
24) to *Coalition to Protect Puget Sound* is to a discussion on the requirements of
the Corps' Clean Water Act regulations.  *See* No. 16-cv-0950-RSL, 2019
WL5103309 at *3.

NWP005268.  For purposes of NEPA, this means that the Corps was not required

to undertake Plaintiffs' desired analyses because NWP 12 is not "a legally relevant

'cause'" of upland construction or pipeline operation.  *Pub. Citizen*, 541 U.S. at

770.

The Supreme Court has held that "a 'but for' causal relationship is

insufficient to make an agency responsible for a particular effect under NEPA."  *Id.*

at 767.  Instead, NEPA requires agencies to consider effects that have a "reasonably

close causal relationship" with the agency action, and that are "useful[ ]" to

consider in the agency's "decisionmaking process."  *Id.*  That is because NEPA's

purpose is to inform the agency's decision-making; studying the possible effects of

an agency action that are beyond the agency's decision-making authority would

not be useful in considering the decision to be made.  *Id.* at 767–68.  "[W]here an

agency has no ability to prevent a certain effect due to its limited statutory

authority over the relevant actions, the agency cannot be considered a legally

relevant 'cause' of the effect."  *Id.* at 770.

The Corps' authority here—and the "major Federal action" being

analyzed—is not for approval or direct regulation of utility lines.  It is for a

"category of activities involving discharge of dredged or fill material" where the

activities in such category are determined to cause only minimal adverse

environmental and cumulative effects.  33 U.S.C. § 1344(e).  Congress made clear

that the Corps' task is to focus on categories of activities that involve the discharge of dredged or fill material in that context.

The CWA gives the Corps no authority to prevent the non-aquatic environmental impacts of various types of utilities that might utilize NWP 12, or to address issues like the adequacy of plans for preventing oil spills or other accidents, or potential climate change impacts. *Cf. Pub. Citizen*, 541 U.S. at 766 (describing limited agency authority at issue there). If a company building an oil pipeline avoids waters of the United States, the Corps would have no Section 404 authority over the project at all. And if the company does cross waters of the United States but complies with all conditions found in NWP 12, the Corps cannot block the project on grounds that it believes an alternative means of transporting the oil might have lower risks of oil spills.

Plaintiffs' attempted analogy to *Sierra Club v. FERC* illustrates the point. *See* Pls.' Mem. at 18, 19 (citing 867 F.3d 1357 (D.C. Cir. 2017)). The case challenged a Federal Energy Regulatory Commission decision "to approve the construction and operation of three new interstate natural-gas pipelines." 867 F.3d at 1363. FERC—unlike the Corps—"has jurisdiction to approve or deny the construction of" such pipelines. *Id.* at 1364 (citing 15 U.S.C. § 717f). FERC approval is necessary "[b]efore any such pipeline can be built." 867 F.3d at 1364 (citing 15 U.S.C. § 717f(c)(1)(A)). And FERC can condition its approval on the

pipeline operator's compliance with certain terms and conditions necessary to protect public health. 867 F.3d at 1364 (citing 15 U.S.C. § 717f(e)). Based upon those authorities, the D.C. Circuit determined that FERC was the "legally relevant cause of the direct and indirect environmental effects of pipelines it approves." *FERC*, 867 F.3d at 1372–74. The Corps' authority under CWA § 404(e), however, comes nowhere near that of FERC. *Accord Sierra Club*, 803 F.3d at 46–48 (Corps implementation of ESA-related conditions as part of verifications under NWP 12 did not expand scope of required NEPA analyses beyond jurisdictional waters).

Plaintiffs also rely upon case law involving the Corps. *See* Pls.' Mem. at 12, 14–15, 26–27. All but two of the cases, however, involved Corps individual permits rather than general permits. This is critical. With an individual permit, the Corps' role may be larger. There might be a "reasonably close causal relationship" between the permit and the operational or other activity that could lead to the impact in question. *See, e.g., Ocean Advocates v. U.S. Army Corps Eng'rs*, 402 F.3d 846, 855, 867–68 (9th Cir. 2005) (permit required to construct a dock that would increase tanker traffic); *Sierra Club v. Sigler*, 695 F.2d 957, 961, 967, 974–75 (5th Cir. 1983) (permit required to extend and deepen shipping channel).[9] But, even in the context of an individual permit, NEPA does not require the Corps to

_____

[9] *Sigler*'s conclusion that NEPA requires a "worst case analysis" is no longer good law. *See Robertson*, 490 U.S. at 354–57.

26

consider "tenuously caused" effects. *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1294–98 (11th Cir. 2019); *see Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 115–18 (9th Cir. 2000) *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 603 F.3d 1173 (9th Cir. 2011). None of the individual permit cases imply that analysis of possible spills from oil pipelines is required where a general permit is invoked.

The two of Plaintiffs' cases that did involve general permits also do not support their case. *See* Pls.' Mem. at 24, 26–27. *Defenders of Wildlife v. Ballard* did not involve a *Public Citizen* issue and reviewed an EA that—unlike the EA here—did not analyze cumulative impacts at a national level. *See* 73 F. Supp. 2d 1094, 1112 (D. Ariz. 1999). And the court in *Wyoming Outdoor Council v. U.S. Army Corps of Engineers* noted, consistent with our argument, that "the Corps need not undertake a broad-based analysis of cumulative impacts" for all the coal bed methane development that could make use of the permit. 351 F. Supp. 2d 1232, 1242 (D. Wyo. 2005) (citing *Pub. Citizen*, 541 U.S. 752).

Plaintiffs retreat into an argument that the Corps must analyze oil spills because the EA for NWP 12 is "the *only* NEPA document for the majority of these projects." Pls.' Mem. at 13. The point is irrelevant. The Corps' NEPA responsibility depends on the nature of *the Corps'* action and *the Corps'* authority.

*See Pub. Citizen*, 541 U.S. at 770.  The Corps' NEPA obligations do not expand or contract based on the extent to which other federal agencies also have jurisdiction.

This is not to say the Corps could entirely ignore oil spills or pipeline construction in assessing NWP 12.  NEPA certainly required the Corps to consider the Permit's effects where the Permit *would* be the legally relevant cause: during implementation of the authorized fill activities.  *See Pub. Citizen*, 541 U.S. at 767–68.  But that is precisely what the Corps did.  *See* NWP005322.  Similarly, NEPA required the Corps to consider the effects of past, present, and reasonably foreseeable future impacts from oil spills and climate change among the cumulative effects on the nation's aquatic resources to which NWP 12 could be adding.  *See Pub. Citizen*, 541 U.S. at 769–70 (citing 40 C.F.R. § 1508.7).  But, again, that is precisely what the Corps did.  *See* NWP005284, NWP005298, NWP005308–17; NWP005345–46, NWP005348 (climate change literature considered).  NEPA, however, did not require the Corps to consider oil spills or other operational impacts from utility lines that could make use of the Permit.

### C. The Corps Properly Assessed Effects from the Inadvertent Return of Drilling Fluid

Plaintiffs are also incorrect that the Corps failed to consider potential impacts from the inadvertent return of drilling fluid for construction activities involving hydraulic directional drilling.[10]

An inadvertent return of drilling fluid is implicated in two ways relative to the relevant Corps authorities. First, a fluid return could occur as part of upland construction activity—i.e., an activity for which the Corps has no approval authority and is therefore not undertaken pursuant to NWP 12. *See* NWP006778. In that scenario, NWP 12 would not have a "reasonably close clausal relationship" with the inadvertent return for the reasons explained above. *See Public Citizen*, 541 U.S. at 767. The Permit, however—assuming its terms and conditions were met—could authorize activities associated with the *clean-up* of that inadvertent return. NWP005263.

Second, an inadvertent return could occur as part of a construction activity that NWP 12 does authorize for Section 404 purposes if the drilling occurs in, or staging materials or access roads impact, a wetland. *See* NWP006778. In that

---

[10] The term "frac-out" is a misnomer. Hydraulic directional drilling is used in utility line construction to, among other reasons, avoid high quality streams and wetlands that would be otherwise impacted by trench-based installation. NWP005275, NWP006785–88. This drilling has nothing to do with the hydraulic fracturing used in oil and gas extraction. *See* NWP02273–4.

scenario, however, the direct wetland impact associated with the drilling itself would already be captured in the Corps' qualitative analyses and quantification of impacted acreage. As to indirect impacts from an inadvertent return, information before the Corps showed that most inadvertent returns do not enter surface waters. *See* NWP006790. As NEPA requires, however, the Corps nonetheless disclosed to the public and its decision-makers that there is a possibility an inadvertent return could have indirect effects. *See* NWP005274–76, NWP005306. Plaintiffs' desire for a more-detailed analysis (Mem. at 16) again ignores the nature of the nationwide permit program and practical limitations on the Corps' review. *See Bulen*, 429 F.3d at 501.

### D. The Corps Did Not "Defer" Its Cumulative Impacts Analysis

Plaintiffs are wrong in arguing that NWP 12 defers NEPA review to a later date by the district engineers. Pls.' Mem. at 20–27. The Corps analyzes activities authorized by nationwide permits "at the time the permit is promulgated, rather than at the time an applicant seeks to discharge fill material under such a permit." *Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155, 1158 (9th Cir. 2012); *see* 33 C.F.R. § 330.5(b)(3); *Sierra Club v. U.S. Army Corps of Eng'rs*, 64 F. Supp. 3d 128, 144–47. Thus, the EA analyzed, at the national level, the potential effects of *all* fill activities that could be authorized under the Permit. *See* NWP005306.

In verifying pre-construction notices, the district engineers are doing just that for Section 404(e) purposes: verifying whether the activities in question fall within the scope of the Permit and, thus, its assessment of cumulative effects. *See* NWP000146–47. Should, based upon the information presented in the notice, a district engineer determine that the activities in question do not fall within NWP 12's terms and conditions, the Nationwide Permit—and the NEPA review for that Permit—do not apply to the activities. *See* NWP000147. Instead, an individual permit (and NEPA review by the district engineer) would be required. *See* 33 C.F.R. § 330.1(e)(3). If, by contrast, the district engineer determines, based upon the information presented in the PCN, that the activities are already authorized by NWP 12, there is no new "major Federal action" that needs be analyzed under NEPA. *Bostick*, 787 F.3d at 1052–54.

Plaintiffs' remaining points are that the Corps should have considered the operational impacts of oil pipelines and, specifically, the project-specific impacts from the Keystone XL Pipeline. *See* Pls.' Mem. at 22–23, 25, 26. The former is simply a restatement of the arguments we address above. The latter makes little sense. There was no proposal for Keystone XL before the Corps at the time it issued NWP 12. The Corps complied with NEPA.

## IV.    The Corps Complied with the ESA

Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and to recover such species.  16 U.S.C. §§ 1531(b), 1532(3).  ESA Section 7(a)(2) directs each federal agency to ensure, in consultation with the United States Fish and Wildlife Service ("FWS") or the National Marine Fisheries Service ("NMFS"), that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" any listed species or destroy or adversely modify designated critical habitat.  16 U.S.C. § 1536(a)(2).  This requirement applies to all actions where there is discretionary Federal involvement or control.  50 C.F.R. § 402.03.  The wildlife agencies have long recognized that the action agency "makes the final decision on whether consultation is required, and it likewise bears the risk of an erroneous decision." 51 Fed. Reg. 19,926, 19,949 (June 3, 1986).

### A.    The Corps' "No Effect" Determination is Well-Considered

The Corps began voluntary consultation with NMFS and FWS for the 2007 reissuance of nationwide permits.  NWP031044.  The Corps informed the Services of numerous requirements and procedures in place to comply with the ESA, including General Condition 18 and 33 C.F.R. § 330.4(f), and coordination between Corps districts and regional offices of the Services.  *Id.*  The Corps

continued voluntary Section 7 consultations with both wildlife agencies for the nationwide permits issued in 2012. *Id.* FWS did not conclude the consultation and NMFS issued a belated biological opinion that failed to consider changes made to the nationwide permits during the rulemaking process. NWP030588. The Corps reinitiated consultation, which resulted in the "no jeopardy" 2014 biological opinion included in the record. Despite the reinitiation of voluntary consultation, in an October 2012 letter to FWS and NMFS, the Corps explained the agency's legal position that issuance of the nationwide permits had "no effect" on protected species or designated critical habitat due to the permits' conditions and terms. NWP031043–50.

This rationale was carried forward into the 2016 proposed rule for nationwide permit reissuance. All nationwide permits require PCNs for any activity that might affect[11] listed species or designated critical habitat under the

_____

[11] This is required by both General Condition 18 and Corps regulations. NWP018367. "The Corps established the 'might affect' threshold . . . because it is more stringent than the 'may affect' threshold" for ESA Section 7 consultation. *Id*. "The word 'might' is defined as having 'less probability or possibility' than the word 'may'." *Id.* This purposeful choice ensures that PCNs are submitted "for any proposed NWP that has the potential" to affect listed species or critical habitat. NWP00096. The general condition "is written so that prospective permittees do not decide whether ESA section 7 consultation is required." *Id*.; NWP00097 ("that is the Corps' responsibility"). The Court should thus reject Plaintiffs' argument that the Corps has improperly delegated the effects determination to applicants. Pls.' Mem. at 36-37. Furthermore, if the applicant does not comply with the requirement to submit a PCN in such a situation, the activity is not authorized and

ESA. NWP018362. In such cases, the activity is not authorized by the nationwide permit until the Corps either makes a "no effect" determination or completes ESA Section 7 consultation. NWP018367. Thus, because any activity that may affect protected species or habitat must undergo site-specific ESA Section 7 consultation before the district engineer can verify that a NWP authorizes the activity, the Corps determined that reissuance of the nationwide permits has "no effect" on listed species or critical habitat. NWP018368.

Prior to the 2016 proposed rule, the Corps informed NMFS that it would not be initiating ESA Section 7 consultation on the reissuance of the nationwide permits.[12] However, the Corps offered to voluntarily engage in ESA Section 7(a)(1) consultation and to continue implementation of most of the protective measures from the 2014 biological opinion. NWP030588–89. The White House's Office of Management and Budget led the interagency coordination effort, hosting a series of meetings in the spring of 2016. *See* NWP026565. The agencies resolved the issues by NMFS agreeing to the ESA Section 7(a)(2) "no effect"

the Corps district will determine the appropriate enforcement response. NWP000096.

[12] For its part, FWS acknowledged the Corps' 2012 "no effect" determination and continued to recognize that position through the decisionmaking process for the 2017 reissuance. NWP030589; NWP031139.

determination and the Corps initiating ESA Section 7(a)(1) consultation on the

implementation of the nationwide permit program,[13] including the continuation of

the majority of the protective measures from NMFS' 2014 biological opinion.

NWP018197–201.

In reissuing NWP 12, the Corps reiterated its legal position: because of the

conditions in its regulations, General Condition 18, and the regional conditions that

further restrict use of the nationwide permits, the reissuance would have "no

effect" on protected species and critical habitat.  NWP005324–27.  In March 2017,

the Corps' Omaha District imposed regional conditions on the use of nationwide

permits, many of them to protect listed species or habitat areas upon which they

depend.[14] NWPRC000001–19.  Some of these conditions include: revoking the use

of NWP 12 in peatlands; requiring PCNs for activities near a natural spring and in

Nebraska habitat for protected species including the whooping crane, pallid

sturgeon, and American burying beetle; and forbidding dredging in Nebraska areas

that require a PCN.  NWPRC00022, 32-35, 39, 41–42, 50.  The Omaha District has

---

[13] ESA Section 7(a)(1) directs that agencies shall consult with the wildlife agencies on how to utilize their authorities to carry out programs for the conservation of listed species. 16 U.S.C. § 1536(a)(1). Agencies are afforded substantial discretion in determining how best to fulfill their Section 7(a)(1) obligations. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1418 (9th Cir. 1990).

[14] These were developed in coordination with FWS, NMFS, and other federal, state and tribal entities.  NWP018370; NWPRC000249–57, 258–65, 352–57, 410–11, 415–21.

regional programmatic consultations for certain species and specific nationwide permits, in addition to standard local operating procedures for endangered species in North Dakota and western Montana. NWPRC00055. For nationwide permits and species not covered by these documents, ESA compliance will be conducted on a species-specific basis. *Id.*

Based on these factors, the Corps' "no effect" determination is reasonable, supported by the record, and entitled to deference. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011).

**B.** **Plaintiffs' Arguments Do Not Undermine the Corps' Determination**

First, in arguing that NWP 12 "may affect" listed species or critical habitat, Plaintiffs continue to obfuscate what the Permit does, and does not, authorize. Pls.' Mem. at 28–29 (arguing that the permit "authorizes activities" impacting species). The administrative record examples Plaintiffs cite discuss generalized environmental impacts from NWP 12-authorized activities, but they do not establish that NWP 12 authorizes an activity impacting a listed species or critical habitat. And for good reason, because if a "proposed activity might affect listed species or critical habitat, the activity is not authorized by NWP" until the Corps district makes a "no effect" determination or completes any required site-specific

consultation.[15]  NWP00015.  To the extent Plaintiffs' cited impacts affect protected species or habitat, they are not authorized by NWP 12 because such activities are not eligible for authorization without site-specific ESA compliance.

Plaintiffs point to statements made by FWS and NMFS in a revision to the Section 7(a)(2) consultation regulations.  Pls.' Mem. at 30.  That rule change did not impact the triggers for consultation; rather, it allowed the wildlife agencies to issue a biological opinion on a programmatic action without providing an incidental take statement, as otherwise required by the statue.  80 Fed. Reg. 26,832 (May 11, 2015).  While the agencies gave the nationwide permit program as an example of programmatic action, this statement did not "explicitly direct" the Corps to engage in Section 7(a)(2) consultation, as Plaintiffs claim.  To the contrary, the agencies "explicitly" recognized that their 2015 regulatory change "does not imply that section 7 consultation is required for a framework programmatic action that has no effect on listed species or critical habitat."  *Id.* at

---

[15] Contrary to Plaintiffs' argument that "most projects" proceed without site-specific consultation when needed, Pls.' Mem. at 37, the record shows that, for the nationwide permits in effect from 2012 to September 2016, Corps districts conducted 1,402 formal ESA Section 7 consultations and 9,302 information consultations.  NWP000016.  During the same period, the Corps also used regional programmatic consultations for 9,829 nationwide permit verifications.  *Id*.  On average, this amounted to 4,500 formal, informal, and regional programmatic consultations for activities under nationwide permits.  *Id*.; *see also* NWP005326 (study of FWS consultations found that majority are with the Corps).

26,835. The Corps determined that its nationwide permit program is one such action.

Even if this preamble statement is given more weight, it does not undercut the Corps' assessment of its own program's effects, in which it has substantial expertise. The Corps is entitled to deference on its predictive judgments on implementation of the nationwide permit program. *See Sw. Ctr. for Biological Diversity v. Glickman*, 932 F. Supp. 1189, 1193–94 (D. Ariz.), *aff'd*, 100 F.3d 1443 (9th Cir. 1996) (deferring to "no effect" determination and recognizing that a "deferential approach is especially appropriate where, as here, the challenged decision implicates substantial agency expertise"); *Defs. of Wildlife v. Kempthorne*, No. 04-1230-GK, 2006 WL 2844232, at *19 (D.D.C. Sept. 29, 2006) ("Congress intended to allow Action Agencies to initially evaluate the potential environmental consequences of federal actions and to move forward on many of them without first consulting the Services."). In short, the "no effect" determination is the Corps' to make and there is no corresponding requirement for the wildlife agencies to concur with, or opine on, the determination.[16] *E.g., Defs. of Wildlife v. Flowers*, 414 F.3d 1066, 1070–1071 (9th Cir. 2005).

---

[16] Thus, NMFS' objections to the "no effect" finding are not determinative, as claimed by Plaintiffs, Pls.' Mem. at 33–34, who also ignore that those concerns were resolved, as discussed above.

Plaintiffs next highlight a 2014 email—two years before the decisionmaking process on the 2017 nationwide permits began—to imply some type of bad faith on the part of the Corps. Pls.' Mem. at 32-33. This argument fails for several reasons. First, Plaintiffs take the correspondence out of context. The email responds to a query whether, by completing the voluntarily reinitiated consultation with NMFS, the Corps would be locking itself into Section 7(a)(2) consultation on future nationwide permits, despite the 2012 letter laying out the Corps' legal position that the nationwide permits have "no effect" on protected species of habitat. NWP036482. The response notes only that, having engaged in voluntary consultation in 2012, the Corps is bound by that consultation's five-year period. NWP036481. This statement has no bearing on whether the Corps would be required to engage in Section 7(a)(2) consultation for the next round of nationwide permits in 2017.

Second, the fact that the Corps engaged in voluntary consultation on a prior iteration of the program does not mean that its 2017 determination is invalid. Agencies are "fully entitled" to "change[ ] their minds . . . as long as the proper procedures were followed." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658-59 (2007). In *Home Builders*, EPA voluntarily initiated ESA Section 7(a)(2) consultation on a decision to transfer a CWA permit program to the state of Arizona, before determining that there was no duty to consult because the

nondiscretionary decision was not an "action" triggering the Section 7(a)(2)

consultation requirements.  The lower court held that the agency's inconsistent

position rendered arbitrary the decision not to consult. The Court disagreed,

holding that "federal courts ordinarily are empowered to review only an agency's

*final* action" and that a change of position during the decisionmaking process does

not render it arbitrary and capricious.  *Id.* (citing 5 U.S.C. § 704).  Here, the

situation is even further removed from *Home Builders*.  The Corps voluntarily

completed consultation on the 2012 nationwide permits, but determined that the

2017 nationwide permits do not trigger the consultation requirement.  This

rationale is to be evaluated for its stated reasons, not the agency's prior

determinations.

The overall thrust of Plaintiffs' arguments seems to be that a programmatic

consultation on the issuance of NWP 12 would provide value that site-specific

consultation does not.  But value is not the relevant legal threshold—it is whether

the Corps' action may affect protected species or habitat.  As discussed above,

NWP 12 does not authorize any such activity.  Cases cited by Plaintiffs are not to

the contrary.[17]  For example, in *Kraayenbrink*, 632 F.3d 472, the Ninth Circuit

---

[17] *Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010), and *American Rivers v. U.S. Army Corps of Engineers*, 271 F. Supp. 2d 230 (D.D.C. 2003), are irrelevant to the "no effect" issue, as the agencies there consulted but did not address the action's full temporal scope.

faulted BLM's "no effect" determination for amendments to the national grazing regulations. While BLM viewed them as purely administrative, the court rejected this position because the amendments "alter ownership rights to water on public lands; increase the barriers to public involvement in grazing management; and substantially delay enforcement on failing allotments, in ways that will have a substantive effect on special status species." *Id.* at 498. In other words, the action itself authorized the changes potentially impacting species. Here, NWP 12 does not authorize any activity that "might affect" protected species and critical habitat.

Similarly, in *Lane County Audubon Society v. Jamison*, the trigger for consultation was not simply that the timber management strategy was a programmatic action. Rather, the court found the strategy itself "may affect" the endangered Northern spotted owl since it set annual timber harvests, land use allocations, and criteria for harvesting owl habitat. 958 F.2d 290, 294 (9th Cir. 1992). And in *Conner v. Burford,* 848 F.2d 1441 (9th Cir. 1988), the action was the issuance of oil and gas leases for 1,300,000 acres of national forest land. These courts did not find that site-specific consultation was insufficient simply because there was a broader programmatic action. Rather, consultation was required on the programmatic action because that action itself impacted the development or use of the land. The statute does require assessment of such impacts in addition to the site-specific project activities. But here, NWP 12 does not designate habitat areas

for specific land use, set criteria allowing certain types of land use, or sell development rights to any particular lessee. Indeed, NWP 12 explicitly *does not* authorize an activity that "might affect" protected species or habitat and, through regional conditions, restricts use in certain sensitive habitat areas. Thus, it is not the equivalent of the leases in *Connor* or the timber strategy in *Lane County*.[18] Unlike these cases, there is no broader land management decision and no concurrent impacts requiring evaluation.

At bottom, because NWP 12 does not authorize an activity that might affect protected species or habitat, it does not change the legal landscape for ESA Section 7(a)(2) purposes. In the absence of NWP 12, applicants would apply for an individual permit from the Corps, which would engage in site-specific ESA Section 7(a)(2) consultation on the impacts to protected species and habitat. Such a consultation would be limited to that project, including the cumulative effects of that project together with other species impacts in the action area. With NWP 12, applicants notify the Corps if the activity might affect protected species or habitat and, if the Corps determines the Section 7(a)(2) threshold is triggered, it engages in

---

[18] The court in *National Wildlife Foundation v. Brownlee*, 402 F. Supp. 2d 1 (D.D.C. 2005), failed to understand this distinction and misapplied *Lane County*; thus, the *Brownlee* holding is not determinative, as claimed by Plaintiffs. Pls.' Mem. at 28.

site-specific consultation.  The ESA Section 7(a)(2) consultation result is the same either way.

Even if Plaintiffs' arguments had merit, they fail to demonstrate what additional type of cumulative effects analysis could be done, or additional protections implemented, at the nationwide programmatic level.  Plaintiffs assert that programmatic consultation would allow for the development of broad conservation measures like monitoring or restrictions to limit impacts at the programmatic level.  Pls.' Mem. at 30–31.  But the record shows that the Corps voluntarily continues to implement these types of protective measures identified in the prior nationwide consultation with NMFS.  NWP018197–201.

Finally, as discussed above, Plaintiffs' Keystone-specific arguments are irrelevant to this Court's review of whether the Corps' January 2017 "no effect" determination is reasonable.  The Court should uphold the Corps' determination that reissuance of NWP 12 does not trigger Section 7(a)(2) consultation.

## CONCLUSION

Summary judgment should be granted in favor of Federal Defendants on Counts One, Two, and Four.  The Corps' implementation and interpretation of Section 404(e) are entitled deference.  NEPA did not require the Corps to consider potential environmental effects from upland construction or oil pipeline operation.

And NWP 12 does not, standing alone, authorize any activity that might affect a

listed species or critical habitat.


Date: December 23, 2019

MARK STEGER SMITH
Assistant U.S. Attorney
Office of the United States Attorney
2601 Second Ave. North, Suite 3200
Billings, MT 59101
Tel: (406) 247-4667
Fax: (406) 657-6058
mark.smith3@usdoj.gov

JONATHAN D. BRIGHTBILL
JEAN E. WILLIAMS
Deputy Assistant Attorneys General

___*s/ Kristofor R. Swanson*____
KRISTOFOR R. SWANSON
(Colo. Bar No. 39378)
Senior Attorney
Natural Resources Section
Envt. & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0248
Fax: (202) 305-0506
kristofor.swanson@usdoj.gov

__*s/ Benjamin J. Grillot*_____
BENJAMIN J. GRILLOT
(D.C. Bar No. 982114)
Environmental Defense Section
Envt. & Natural Resources Div.
U.S. Department of Justice

P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0303
Fax: (202) 305-0506
benjamin.grillot@usdoj.gov

__s/ Bridget Kennedy McNeil___
BRIDGET KENNEDY MCNEIL
Senior Trial Attorney
Wildlife & Marine Resources Section
Envt. & Natural Resources Div.
U.S. Department of Justice
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
303-844-1484
bridget.mcneil@usdoj.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(d)(2)(B) and the Court's November 15, 2019, Order (ECF No. 68), I hereby certify that the above memorandum is 9,999 words, exclusive of the caption, tables, and certificates of service and compliance.

_Kristofor R. Swanson_____
Kristofor R. Swanson

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2019, I filed the above pleading with the Court's electronic case management system, which caused notice to be sent to all parties.

_Kristofor R. Swanson_____

Kristofor R. Swanson