Jeffery J. Oven
Mark L. Stermitz
Jeffrey M. Roth
CROWLEY FLECK PLLP
490 North 31st Street, Ste. 500
Billings, MT 59103-2529
Telephone: 406-252-3441
Email: joven@crowleyfleck.com
         mstermitz@crowleyfleck.com
         jroth@crowleyfleck.com

Peter R. Steenland
Peter C. Whitfield
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: 202-736-8000
Email: psteenland@sidley.com
         pwhitfield@sidley.com

*Counsel for TransCanada Keystone Pipeline, LP and TC Energy Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, BOLD ALLIANCE, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, CENTER FOR BIOLOGICAL DIVERSITY, and FRIENDS OF THE EARTH,<br><br>                Plaintiffs,<br><br>vs.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS and LT. GENERAL TODD T. SEMONITE (in his official capacity as U.S. Army Chief of Engineers and Commanding General of the U.S. Army Chief of Engineers),<br><br>                Defendants.<br><br>TRANSCANADA KEYSTONE PIPELINE, LP, a Delaware limited partnership, and TC ENERGY CORPORATION, a Canadian Public company, THE STATE OF MONTANA, AMERICAN GAS | CV 19-44-GF-BMM<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY TRANSCANADA KEYSTONE PIPELINE, LP AND TC ENERGY CORPORATION** |

ASSOCIATION, AMERICAN PETROLEUM
INSTITUTE, ASSOCIATION OF OIL
PIPELINES, INTERSTATE NATURAL GAS
ASSOCIATION OF AMERICA, and
NATIONAL RURAL ELECTRIC
COOPERATIVE ASSOCIATION,

    Defendant-Intervenors.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ....................................................................................... 1

I.    BACKGROUND ................................................................................ 2

      A.    Statutory and Regulatory Background ................................... 2

            1.    Section 404 of the Clean Water Act ........................... 2

            2.    NEPA ........................................................................... 3

            3.    Endangered Species Act ............................................. 3

      B.    Nationwide Permit 12 ............................................................ 4

            1.    The Terms of NWP 12 and Applicable Regional
                  Conditions ................................................................... 5

            2.    The Corps' Reissuance of NWP 12 ........................... 8

      C.    Keystone XL Pipeline ........................................................... 10

            1.    Waterbodies ................................................................ 12

            2.    Wetlands ...................................................................... 13

            3.    ESA-Protected Species .............................................. 14

II.   ARGUMENT ...................................................................................... 14

      A.    The Corps Complied with NEPA in Issuing NWP 12 ......... 14

            1.    NEPA does not require a federal agency to analyze
                  impacts of actions it does not regulate or control ..... 15

            2.    The Corps Did Not Defer a Cumulative Effects Analysis ........ 19

            3.    The Corps Adequately Addressed Potential Impacts of
                  HDD Activities ........................................................... 19

      B.    The Corps Complied with the ESA ....................................... 19

1. The Corps' issuance of NWP 12 complies with the ESA. .......19

    a. The Corps was not required to undertake formal programmatic consultation to reissue NWP 12..............20

2. The Corps did not need to undertake formal programmatic consultation before reissuing NWP 12..............22

C. The Reissuance of NWP 12 Complies with the Clean Water Act Because It Authorizes Projects With Only Minimal Adverse Effects, Individually and Cumulatively ..............................................22

III. CONCLUSION................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*,
  941 F.3d 1288 (11th Cir. 2019) ............................................................ 14

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
  807 F.3d 1031 (9th Cir. 2015) .............................................................. 4

*Dep't of Transp. v. Public Citizen*,
  541 U.S. 752 (2004) ............................................................................ 15

*Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*,
  746 F.3d 698 (6th Cir. 2014) ........................................................ 14, 15

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
  663 F.3d 470 (D.C. Cir. 2011) ......................................................... 2, 3

*NRDC. v. EPA*,
  822 F.2d 104 (D.C. Cir. 1987) ............................................................ 15

*Ohio Valley Envtl. Coal. v. Bulen*,
  429 F.3d 493 (4th Cir. 2005) .............................................................. 25

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
  556 F.3d 177 (4th Cir. 2009) .............................................................. 15

*Save the Bay, Inc. v. U.S. Corps of Eng'rs*,
  610 F.2d 322 (5th Cir. 1980) ........................................................ 15, 17

*Sierra Club, Inc. v. Bostick*,
  787 F.3d 1043 (10th Cir. 2015) ....................................... 14, 23, 25, 27

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  803 F.3d 31 (D.C. Cir. 2015) ..................................... 14, 16, 17, 27

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  990 F. Supp. 2d 9 (D.D.C. 2013), *aff'd*, 803 F.3d 31 (D.C. Cir.
  2015) ............................................................................................ 17, 23

*Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs*,
  683 F.3d 1155 (9th Cir.2012) ...............................................................14

*Swinomish Indian Tribal Cmty. v. Skagit Cty. Dike Dist.*,
  618 F. Supp. 2d 1262 (W.D. Wash. 2008) ........................................21

*Sylvester v. U.S. Army Corps of Eng'rs*,
  884 F.2d 394 (9th Cir. 1989) ...............................................3, 14, 18

*Wetlands Action Network v. U.S. Army Corps of Eng'rs*,
  222 F.3d 1105 (9th Cir. 2000), *abrogated by Wilderness Soc'y v.*
  *U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011)............................15, 16, 17, 18

*Winnebago Tribe of Nebraska v. Ray*,
  621 F.2d 269 (8th Cir. 1980) ...............................................................15

**Statutes**

16 U.S.C. § 1536......................................................................................4, 20

33 U.S.C. § 1344..................................................................................1, 2, 23

42 U.S.C. § 4332..........................................................................................3

**Other Authorities**

33 C.F.R. pt. 325 .......................................................................................2

33 C.F.R. § 325.2........................................................................................3

33 C.F.R. pt. 330 .......................................................................................3

33 C.F.R. § 330.2........................................................................................6

40 C.F.R. § 1508.9......................................................................................3

40 C.F.R. § 1508.13....................................................................................3

50 C.F.R. § 402.14......................................................................................4

53 Fed. Reg. 3,120 (Feb. 3, 1988) ............................................................3

56 Fed. Reg. 59,110 (Nov. 22, 1991).......................................................26

80 Fed. Reg. 26,832 (May 11, 2015) .......................................................22

# INTRODUCTION

Plaintiffs have long sought comprehensive federal oversight over the construction of oil pipelines, much like the charge given to the Federal Energy Regulatory Commission to regulate interstate gas pipelines. Frustrated by Congressional inaction, Plaintiffs have turned to the courts in a series of unsuccessful efforts to expand the duties of the U.S. Army Corps of Engineers (Corps) beyond that authorized by Section 404(e) of the Clean Water Act. Once more, Plaintiffs have mounted a facial attack on the Corps' Nationwide Permit (NWP) Program. Whether seen through the prism of the National Environmental Policy Act (NEPA), the Endangered Species Act (ESA) or the Clean Water Act (CWA), Plaintiffs' facial attack comes up short; each Circuit that addressed these issues has rebuffed Plaintiffs' attempts to reshape this program and expand the Corps' authority. The same result is appropriate here. Because the Corps' authority under Section 404 of the Clean Water Act is limited, Federal Defendants and Defendant Intervenors'[1] motions for summary judgment should be granted.

---

[1] TC Energy and TransCanada Keystone Pipeline LP are collectively referred to as TC Energy.

# I.     BACKGROUND

## A.     Statutory and Regulatory Background

### 1.     Section 404 of the Clean Water Act

The CWA generally requires any party seeking to construct a project that
will discharge dredged or fill material into "waters of the United States" to obtain
approval from the Corps in one of two ways. *See* 33 U.S.C. § 1344(f)(2). The party
may apply for an individual permit under Section 404(a), *id.* § 1344(a), which is
"granted on a case-by-case basis and involve[s] a costly review process, often
requiring extensive documentation regarding specific site, public notice and
comment, and sometimes a public hearing." *Nat'l Ass'n of Home Builders v. U.S.
Army Corps of Eng'rs*, 663 F.3d 470, 472 (D.C. Cir. 2011); *see also* 33 C.F.R. pt.
325. In some situations, however, the party may proceed under a general permit
issued by the Corps under Section 404(e) for a "category of activities involving
discharges of dredged or fill material." 33 U.S.C. § 1344(e). The Corps may issue a
general permit if it determines that a category of activities will be similar in nature;
will cause only minimal adverse effects when performed separately; and will have
only minimal cumulative adverse effect on the environment. *Id*. General permits
are issued through notice and comment rulemaking for a maximum period of five
years, after which they may be reissued or allowed to expire. 33 U.S.C. §
1344(e)(2). General permits "allow parties to proceed with much less red tape"

than is involved with individual permits. *Nat'l Ass'n of Home Builders*, 663 F.3d at 472; *see also* 33 C.F.R. § 325.2(e)(2); *id.* pt. 330.

## 2. NEPA

NEPA requires federal agencies to prepare an environmental impact statement (EIS) before undertaking "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). An agency need not complete an EIS if it finds, on the basis of a shorter "environmental assessment" ("EA"), that the proposed action will not have a significant impact on the environment. 40 C.F.R. §§ 1508.9(a), 1508.13.

The Corps must comply with NEPA when it issues permits under the CWA, and its NEPA analysis reflects the scope of its permitting authority:

> NEPA requires Federal agencies to consider the direct and indirect consequences of Federal actions, not State or private actions …. The Corps authorizes the discharge of dredged or fill material in 404 permits. Therefore, the activity the Corps studies in its NEPA document is the discharge of dredged or fill material.

53 Fed. Reg. 3,120, 3,121 (Feb. 3, 1988); *see also Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394, 399 (9th Cir. 1989) (upholding Corps' NEPA regulations).

## 3. Endangered Species Act

Section 7(a)(2) of the ESA requires that federal agencies "shall, in consultation with and with the assistance of" the U.S. Fish and Wildlife Service

(FWS) or National Marine Fisheries Service (NMFS), ensure that actions they authorize are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). Formal consultation is required when a proposed action "may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). At the completion of the consultation process, a consulting agency issues a Biological Opinion (BiOp) reflecting its expert judgment regarding the effect of the proposed action on the species or its habitat. 16 U.S.C. § 1536(b)(3)(A). If the agency concludes that an action will not jeopardize a listed species, it will issue an incidental take statement that sanctions the incidental taking of the protected species and exempts the agency from the prohibition on takings found in Section 9 of the ESA. *See* 16 U.S.C. § 1536(b)(4); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1037 (9th Cir. 2015).

### B.    Nationwide Permit 12

This case involves a facial challenge to Nationwide Permit 12 ("NWP 12"), a general permit issued by the Corps under CWA Section 404(e) that may be used by utility lines. The Corps first promulgated NWP 12 and several other nationwide permits in 1977 and the Corps has revised and reissued NWP 12 multiple times, most recently in the 2017 rulemaking challenged here, *see* NWP001989. In

addition, the Omaha District of the Corps' Northwestern Division (which includes Montana, Nebraska, North Dakota, South Dakota, and Wyoming) conducted a separate notice-and-comment rulemaking procedure to adopt additional regional conditions for the use of NWP 12 within its region. NWPRC000001-NWPRC19; NWPRC00020-NWPRC000080. The regional conditions "were carefully developed to address potential cumulative effects within the Omaha District that could result in adverse cumulative effects over time." NWPRC000064.

### 1. The Terms of NWP 12 and Applicable Regional Conditions

NWP 12 "authorizes discharges of dredged or fill material into waters of the United States and structures or work in navigable waters … for crossings of those waters associated with the construction, maintenance, or repair of utilities", NWP002084, if they satisfy many conditions. Utility line projects may be authorized by a NWP because most of their water crossings "result in *temporary impacts*" to waters and wetlands. NWP005279 (emphasis added).

To use NWP 12, a utility line must be "designed and constructed to avoid and minimize adverse effects, both temporary and permanent, to the waters of the United States to the maximum extent practical at the project site." NWP002572 (General Condition 23(a)). Appropriate soil erosion and sediment controls must be used; measures must be taken to minimize soil disturbance in wetlands; and temporary fills must be removed and the area revegetated and returned to pre-

construction elevations. NWP002563-64 (General Conditions 11-13). Additional conditions are imposed by the Corps' regional offices to protect specific waters and address conditions unique to the region. See, e.g., NWPRC000003-NWPRC000007 (prohibiting use of NWP 12 in peatlands in Montana and imposing special conditions for use of NWP 12 in the Special River Management Zone of the Upper Yellowstone River in Montana).

"No activity is authorized" under NWP 12 that is "likely to directly or indirectly jeopardize the continued existence of a threatened or endangered species" (or one "proposed for such designation"), or "which will directly or indirectly destroy or adversely modify the critical habitat for such species." NWP002565 (General Condition 18). In addition, NWP 12 can only be used if (1) the utility obtains an "individual 401 Water Quality Certification" from the relevant state under Section 401 of the CWA, or (2) the state granted certification for all activities authorized by NWP 12. NWP002577 (General Condition 25).

Finally, NWP 12 can only be used if "the activity does not result in the loss of greater than 1/2 acre of waters" for each "single and complete project." NWP002506. For a "linear project"—like a pipeline—the Corps' regulations have long treated each crossing of a separate water body or the "separate and distant" crossing of the same water body as a "single and complete project." 33 C.F.R. § 330.2(i); *see* NWP002455; 2473-76. Thus, a pipeline may be able to use NWP 12

even if the total loss of waters from the various water crossings exceeds 1/2 acre. However, to ensure that this does not result in more than a minimal adverse effect on jurisdictional waters, NWP 12 requires that the pipeline submit "a pre-construction notification" (PCN) to a Corps District Engineer if any crossing has "discharges that result in the loss of greater than 1/10 acre[s] of waters." NWP002510.

A PCN is also required if (1) the "activity involves mechanized land clearing in a forested wetland for the utility line right-of-way," (2) a permit is required under section 10 of the Rivers and Harbors Act; (3) the utility line exceeds 500 feet in jurisdictional waters; (4) the utility line is placed within a jurisdictional water "and it runs parallel to or along a stream bed that is within the jurisdictional area;" or (5) permanent access roads are constructed in jurisdictional waters with impervious materials or are constructed above grade in jurisdictional waters for more than 500 feet. NWP002509. Additional PCN requirements are imposed at the regional level. *See, e.g.* NWPRC000003 (PCNs required for utility projects in Montana in waters adjacent to natural springs, on tribal reservation or trust land, or within specific waterways, including the Missouri River and Yellowstone River); NWPRC000008-NWPRC00009 (PCNs required in Nebraska for activities in peatlands or rainwater river basins, in waters adjacent to natural springs, and in several rivers and creeks, including the Missouri River and Platte River).

For linear utility lines, the PCN must contain not only the water that triggered the pre-construction notification, but also the "other separate and distant crossings" that do not themselves "require pre-construction notification." NWP002511 (NWP 12, Note 8). The District Engineer will evaluate the crossings to "determine whether they individually satisfy the terms and conditions" of NWP 12, and will look at the "cumulative effects … of all the crossings authorized by the NWP" and determine whether they "will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest." NWP002587. If the District Engineer determines that "the adverse environmental effects of the proposed activity are more than minimal," the District Engineer may impose conditions or a mitigation plan or require the applicant "to seek authorization under an individual permit." NWP002590. "Many of the activities authorized by NWP 12 result in temporary impacts to jurisdictional waters and wetlands, and often district engineers do not require compensatory mitigation to offset those temporary impacts because those waters and wetlands continue to provide ecological functions and services." NWP005286.

## 2. The Corps' Reissuance of NWP 12

The Corps explained the reissuance of NWP 12 in a final Decision Document. *See* NWP005262-NWP005349. The Decision Document contains an EA analyzing the impacts under NEPA, including the cumulative effects of

activities authorized by NWP 12 to aquatic ecosystems, coastal areas, and to endangered and threatened species; the impact on climate change; and the public interest review factors. NWP005303-NWP005324. It concluded that "the issuance of this NWP will not have a significant impact on the quality of the human environment. Therefore, the preparation of an [EIS] is not required." NWP005340.

The Decision Document also explained that the "regulations and procedures" for NWP 12 result in compliance with the ESA because Condition 18 provides that "no activity that 'may affect' listed species or critical habitat is authorized by NWP" unless ESA" consultation with FWS and/or NMFS has been completed. NWP005324-NWP005325. "Unauthorized activities are subject to the prohibitions of Section 9 of the ESA," and can result in enforcement actions being initiated under the ESA. NWP005325.

Finally, the Decision Document addressed the direct, secondary, and cumulative effects on the aquatic environment caused by discharges authorized by NWP 12, as required by the Corps' Section 404(b)(1) Guidelines. NWP005328-NWP005339. It concluded that NWP 12 will be used approximately 11,500 times per year, resulting in mostly temporary impacts to approximately 1,700 acres of U.S. waters, and that approximately 300 acres of compensatory mitigation will be required annually to offset these impacts. NWP005331. The quality of waters and wetlands varies, and District Engineers will consider that in determining whether

to require compensatory mitigation. NWP00532. Mitigation usually will not be required because most of the impacts from NWP 12 activities will be temporary. NWP005286, 5330. In addition, "[e]fforts to reestablish or establish wetlands have increased wetland acreage in the United States." NWP005335. For these and other reasons, NWP 12 "will result in no more than minimal individual and cumulative adverse effects on the aquatic environment." NWP005340.

## C. Keystone XL Pipeline

Although the present motion involves only a facial challenge to NWP 12, Plaintiffs' brief makes assertions about how it might be applied to the Keystone XL pipeline. Those assertions are not relevant to the facial challenge to NWP 12, which is the only challenge at issue in the present motions for partial summary judgment. But we provide this background information to dispel any misimpression that NWP 12 will permit the Keystone XL pipeline to cause significant and unreviewable harm to U.S. waters.

As this Court is aware, the environmental effects of construction and operation of the pipeline were analyzed in the Final Supplemental Environmental Impact Statement issued by the Department of State in 2014. Another supplemental analysis has been issued, addressing the revised route through

Nebraska and the additional issues identified by this Court in the prior litigation brought by these Plaintiffs and others.[2]

Keystone XL will cross the U.S. border near Morgan, Montana, and continue for approximately 882 miles to Steele City, Nebraska, where it will connect to the existing Keystone pipeline system. The "route has been selected and modified to minimize the potential for impacts to surface water resources, as well as other sensitive environments, by avoiding them whenever possible and shifting the route to limit the area affected." 2014 Final SEIS at 4.3-20. Only 19.7 miles will traverse U.S. waters, roughly 2.2 percent of the project. The pipeline will be constructed in "spreads" (or segments) of "approximately 46 to 122 miles long." 2014 FSEIS at 2.1-42. Construction of each segment follows a sequence of activities that involve "survey and staking of the ROW, clearing and grading, pipe stringing, bending, trenching, welding, lowering in, backfilling, hydrostatic testing, and cleanup." *Id.* at 2.1-47, *see also id.* at 2.1-48 (Figure 2.1.7-2). Work on a segment does not begin until authorization for the full segment is obtained, and TC Energy has developed a Construction, Mitigation and Reclamation Plan (CMRP) to minimize impacts to waterbodies and wetlands, as well as upland impacts.

---

[2] United States Department of State, *Final Supplemental Environmental Impact Statement for the Keystone XL Project* (Dec. 2019) (2019 Final SEIS) *available at* https://cdxnodengn.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=286595

### 1. Waterbodies

Construction of the pipeline will have only temporary and minor adverse effects on surface waters.[3] Impacts are minimized because the most appropriate method for each crossing is selected "based on site-specific conditions (i.e., environmental sensitivity of the waterbody, depth, rate of flow, subsurface soil conditions and the expected time and duration of construction) at the time of crossing." 2019 Final SEIS at 4-25. When horizontal directional drilling (HDD) is used, the drilling fluids will be non-toxic, and there will be a "contingency plan to address a frac-out." *Id.* Water quality will also be protected by TC Energy's compliance with the CWA Section 401 Water Quality Certification process, which may require additional review by the states. *See, e.g.*, NWP005266; 2014 FSEIS at 4.3-26.

During construction, adequate flow rates will be maintained to protect aquatic life and prevent the interruption of downstream uses. 2014 FSEIS, Appendix G, at 54. Following construction, waterbody banks will be restored to preconstruction contours or a stable slope and reseeded with native vegetation, and erosion control measures will be installed. 2019 Final SEIS at 4-25-4-26.

---

[3] *See* 2019 Final SEIS at 4-26; 2014 FSEIS 4.3-20-4.3.25 & Appendix G § 7.

### 2. Wetlands

In the early stages of the project, TC Energy met with the Army Corps, FWS, and other federal and state agencies and made numerous modifications to its initial proposed route "to avoid known wetland areas and to generally minimize wetland impacts." 2014 FSEIS at 4.4-15. The revised route through Nebraska and "use of HDD along riparian crossings containing larger wetland complexes have also helped minimize the total wetland acreage that would be affected." 2019 Final SEIS at 4-27. TC Energy has made additional commitments to protect wetlands, including employing special construction techniques and restoring impacted wetlands to near preconstruction conditions following pipeline installation. *See* 2019 Final SEIS at 4-25-4-25; 2014 FSEIS, Appendix G §§ 6-7. As a result, most of the impacts to wetlands will be temporary.[4]

If Plaintiffs disagree with the environmental analysis in the 2019 Final SEIS or any future PCN verifications from the Corps, they can raise those disagreements in future claims challenging the PCNs or permitting decisions relying on the 2019 Final SEIS. Plaintiffs' speculation about how the Corps will analyze the PCNs for

---

[4] *See* 2019 Final SEIS at 4-28 ("Following construction, 0.6 acres of forested wetland would be converted to and permanently maintained in an herbaceous scrub-shrub state on the permanent ROW [in Nebraska]. The herbaceous wetlands temporarily affected by construction would be restored and allowed to revert to their previous condition"); 2014 FSEIS at 4.4-2-4.4-4 (anticipating only "2 acres of permanent wetland loss (wetland to upland conversion)").

Keystone XL is irrelevant to the facial challenge presently before the Court and cannot be grounds for declaring that NWP 12 is unlawful on its face.

### 3. ESA-Protected Species

Following this Court's decision in the earlier litigation, the federal agencies reinitiated consultation with FWS, which is currently preparing a new BiOp to discuss potential impacts to protected species. The BiOp will address any potential impacts to protected species.

## II. ARGUMENT

### A. The Corps Complied with NEPA in Issuing NWP 12

This facial challenge to NWP 12 is Plaintiffs' "third bite" at this vital program. Here, as in past efforts, Plaintiffs ask the court to expand the Corps' NEPA responsibility beyond the scope of its regulatory authority over waters of the United States. The Tenth and D.C. Circuits previously denied Plaintiffs' request. *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1055 (10th Cir. 2015); *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 34 (D.C. Cir. 2015). This Court should do the same. Those decisions are well-reasoned, and Ninth Circuit precedent, as well as that of many other Circuits, provides Plaintiffs no support either. *Sylvester*, 884 F.2d at 399; *Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs,* 683 F.3d 1155 (9th Cir. 2012); *see also Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs,* 941 F.3d 1288 (11th Cir. 2019)*; Kentuckians for the*

*Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 710 (6th Cir. 2014);

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 195 (4th Cir. 2009);

*Winnebago Tribe of Nebraska v. Ray*, 621 F.2d 269, 273 (8th Cir. 1980); *Save the*

*Bay, Inc. v. U.S. Corps of Eng'rs*, 610 F.2d 322, 327 (5th Cir. 1980).

### 1. NEPA does not require a federal agency to analyze impacts of actions it does not regulate or control

Although NEPA is intended to assure that federal agencies take a "hard

look" at the environmental impacts of actions they authorize, it does not expand an

agency's organic statutory authority or require it to consider the effects of private

activity it has no authority to regulate.  *See Dep't of Transp. v. Public Citizen*, 541

U.S. 752, 770 (2004) ("where an agency" cannot prevent a certain effect . . . "the

agency need not consider" such effect in a NEPA analysis); *NRDC v. EPA*, 822

F.2d 104, 129 (D.C. Cir. 1987) ("NEPA, as a procedural device, does not work a

broadening of the agency's substantive powers."). NEPA also does not require the

Corps to analyze that which is not foreseeable.

Thus, the Corps' duty under NEPA is to consider the reasonably foreseeable

impacts of activities it authorized and had authority to regulate in a NWP issued

pursuant to Section 404(e) of the CWA: limited discharges of dredge or fill

material in U.S. waters with minimal impacts.  The Corps' decision to so limit its

NEPA analysis was reasonable and entitled to deference. *See Wetlands Action*

*Network*, 222 F.3d 1105, 1115 (9th Cir. 2000) (holding that Corps' decision to limit

scope of environmental review is accorded deference), *abrogated by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011).

Adhering to these principles, the Corps reasonably confined the scope of its analysis to those portions of utility lines that traverse U.S. waters. *Sierra Club*, 803 F.3d at 34 ("We hold that the federal government was not required to conduct NEPA analysis of the entirety of the Flanagan South pipeline, including portions not subject to federal control or permitting."). Because the Corps does not regulate oil pipelines or other utility line projects, it was not necessary for the agency to look at the potential operational impacts (*e.g.*, oil spill risks or climate change impacts) of such projects. Such impacts are addressed by the regulatory authorities with authority over those projects.

In analyzing the impacts of the water crossings over which it has jurisdiction, the Corps reasonably concluded that utility projects generally cover long distances between starting and ending points, and the restrictions in NWP 12 further limit the amount of U.S. waters that can be harmed. *See supra* at 5-8 (*e.g.*, utility line must be designed to minimize adverse effects and cannot result in loss of greater than 1/2 acre of U.S. waters for each crossing authorized by NWP 12). Consequently, the sum total of the water crossings for those projects will constitute a small portion of the overall project. *See, e.g.,* NWP005268 (Corps indicated the water crossings were 2.3% of a pipeline project). The majority of such projects can

be constructed with no Corps involvement. The preconstruction notification requirements (*e.g.*, utility lines in waters that exceed 500 feet and crossings that will result in the loss of greater than 1/10 acres of U.S. waters), and the requirements for an applicant to include all water crossings in a PCN notification ensure the Corps will be aware if there is substantial federal control over a project and can prevent the use of NWP 12 where impacts will be more than minimal. *See supra* at 7-8.

Despite these limitations, Plaintiffs argue that the Corps must perform a full NEPA analysis on oil pipelines because no other agency will. Plaintiffs' argument has no legal basis. NEPA applies to major federal action, not private action. *Wetlands Action Network*, 222 F.3d at 1117; *Save the Bay, Inc.*, 610 F.2d at 326–27 ("a private project does not become a 'major Federal action' merely because of some incidental federal involvement"). Thus, there is no authority for concluding the Corps must review an entire pipeline simply because no other federal regulatory authority will.

This limited control over NWP 12-eligible projects makes Plaintiffs' cited cases irrelevant. These authorities were persuasively distinguished by Judge Brown in her denial of Plaintiffs' effort to enjoin construction of the Flanagan South pipeline. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 29-30 (D.D.C. 2013), *aff'd*, 803 F.3d 31 (D.C. Cir. 2015) (distinguishing cases where

Corps was issuing individual permits from NWP 12 verifications).  In circumstances where a federal agency has control or responsibility over the entire project, an expanded NEPA review may be warranted. Here, the Corp's control over eligible utility projects is substantially limited. Such limited control does not grant a federal agency sufficient basis for analyzing the larger non-federal project. *Wetlands Action Network*, 222 F.3d at 1116-17; *Sylvester*, 884 F.2d at 400-01.

Additionally, it is logical for the Corps to limit the scope of the NEPA analysis for NWP 12 considering its duties under the CWA.  The Corps should spend its time analyzing actions that may impact jurisdictional waters and authorize activities with minimal impact under general permits as Congress directed.  NWP activities have little, if any impact. As the Corps indicates, for the five-year period between 2004 and 2009, there "was no statistically significant difference in wetland acreage in the conterminous United States."  NWP005291. And while Plaintiffs complain of potential oil spill impacts, such events are not leading causes of impairment.  In fact, "[m]ost causes and sources of impairment are not due to activities regulated under Section 404 of the Clean Water Act or Section 10 of the Rivers and Harbors Act of 1899." For rivers and streams, the ("top 10 causes were pathogens, sediment, nutrients, mercury, organic enrichment/oxygen depletion, polychlorinated biphenyls, metals (other than mercury), temperature, habitat alterations, and flow alteration(s).").  NWP005297-

98. For wetlands, the primary sources of impairment were "agriculture, atmospheric deposition, industrial, municipal discharges/sewage, recreational boating and marinas, resource extraction, natural/wildlife, hydromodification, and unspecified point sources." NWP005298. Releases from oil pipeline or oil spills of any variety were not listed as top issues of concern.

### 2. The Corps Did Not Defer a Cumulative Effects Analysis

Plaintiffs also contend that the Corps improperly deferred a cumulative impacts analysis to the project level. TC Energy disagrees, and adopts the response provided by Federal Defendants.

### 3. The Corps Adequately Addressed Potential Impacts of HDD Activities

Plaintiffs contend the Corps violated NEPA by not analyzing the potential impacts of the inadvertent return of drilling fluids from the use of horizontal directional drilling ("HDD") in reissuing NWP 12. This is not so. TC Energy incorporates Federal Defendants' arguments on this issue.

### B. The Corps Complied with the ESA

### 1. The Corps' issuance of NWP 12 complies with the ESA.

The Corps issued NWP 12 in accordance with the ESA's requirement to ensure that its activities do not jeopardize the continued existence of listed endangered or threatened species or adversely modify those species' critical

habitats. 16 U.S.C. § 1536(a)(2).[5] Put simply, NWP 12 does not authorize projects or activities that impact threatened or endangered species or critical habitat. *See* NWP000141. Any activity that "may affect" listed species or critical habitat must be scrutinized to determine whether Section 7 consultation is necessary prior to any work being done. NWP000141-42. Thus, the Corps' determination that NWP 12 would have no effect was reasonable, as was its decision not to undertake formal programmatic consultation. *See* NWP005324-25.

        a.        The Corps was not required to undertake formal programmatic consultation to reissue NWP 12

The Corps explained at length that ESA consultation was not required for NWP 12 because the permit does not authorize activities that impact ESA-listed species or designated critical habitat. NWP000002-150; NWP005262-349. The plain language of NWP 12 makes this clear. General Condition 18 provides that NWP 12 does not authorize *any* activity that is likely to directly or indirectly jeopardize the continued existence of a threatened or endangered species or adversely modify the critical habitat of such species. *See* NWP000140-41. If an activity would occur where any listed species or designated critical habitat might

---

[5] FWS recently concluded consultation over the full Keystone XL pipeline. The Corps will have the benefit of this analysis prior to verification of any PCNs. Thus, argument by Plaintiffs that the Corps violated the ESA in issuing NWP 12 on account of Keystone XL's potential impacts is not ripe for review.

be affected, the permittee must submit a PCN notifying the Corps, NWP000141, and cannot begin construction until the Corps provides a "no effect" determination or until "any consultation required under Section 7 of the Endangered Species Act . . . has been completed." NWP000145.

This does not unlawfully delegate an initial effects determination to the applicant. MSJ 36. The PCN identifies all of a project's crossings, *see* NWP000145, NWP005265, which assists a District Engineer in determining whether the proposed activity "may affect" listed species or designated critical habitat and would require Section 7 consultation with the Services. NWP000145. In Plaintiffs' hypothetical situation where an applicant fails to apprise the Corps of the presence of protected species or habitat, the applicant cannot avail itself of NWP 12. *See, e.g.*, *Swinomish Indian Tribal Cmty. v. Skagit Cty. Dike Dist.*, 618 F. Supp. 2d 1262, 1269 (W.D. Wash. 2008); NWP005325.

Plaintiffs' argument that the Corps fails to undertake a cumulative assessment of impacts to protected species is also misplaced. *See* MSJ 30. The Corps does so in assessing a PCN. NWP000146-147. If the District Engineer determines the proposed activity "may affect" a listed species or designated critical habitat, the Corps initiates consultation, which also includes a cumulative effects analysis. NWP00146. Thus, Plaintiffs' worry that the Corps is engaged in a

"scheme to avoid programmatic consultation" is unwarranted and ignores NWP

12's detailed process. MSJ 32.

> **2.  The Corps did not need to undertake formal programmatic consultation before reissuing NWP 12.**

Plaintiffs mischaracterize a regulatory preamble to argue that the Services

require the Corps to undertake formal programmatic consultation before issuing

any NWP. MSJ 33-34.  But the Services nowhere set forth such a *per se*

requirement; in fact, they expressly reject that reading. In the preamble, the

Services state that framework programs, such as the Corps' NWP program, can

authorize "future actions" that are "subject to section 7 consultation requirements

at a later time as appropriate." 80 Fed. Reg. 26,832, 26,835 (May 11, 2015). The

Services elaborate that their incidental take regulation "does not imply that section

7 consultation is required for a framework programmatic action that has no effect

on listed species or critical habitat. . . . Adoption of the program itself, by

definition, only establishes a framework for later action. ESA consultations will

occur when subsequent actions may affect listed species . . . ." 80 Fed. Reg. at

26,835. These statements directly and specifically contradict Plaintiffs' argument.

> **C.  The Reissuance of NWP 12 Complies with the Clean Water Act Because It Authorizes Projects With Only Minimal Adverse Effects, Individually and Cumulatively**

The Corps issued a lengthy Decision Document explaining why the utility

line activities authorized by NWP 12 "will cause only minimal adverse

environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment," 33 U.S.C. § 1344(e)(1). *See* NWP005262-NPW005349. The Corps explained that "actions to minimize adverse effects" were "thoroughly considered and incorporated into the NWP," NWP005329, so "[p]otential adverse impacts" are "controlled by the terms and conditions of" NWP 12 and the applicable "regional and case-specific conditions," NWP005265; *see also supra* at 5-8 (discussing NWP 12 conditions). These conditions are supported by extensive scientific research and decades of experience under prior versions of NWP 12. *See* NWP005262-NWP005349. And they are at least as stringent as the conditions in the prior version of NWP 12, which the Tenth Circuit upheld in the face of legal arguments similar to the arguments Plaintiffs present in this Court. *See Bostick*, 787 F.3d at 1055 (rejecting argument that NWP 12 "authorizes linear projects with more-than-minimal-impacts"); *see also, Sierra Club*, 990 F. Supp. 2d at 28 (rejecting challenge to NWP 12 applicability where "four different Corps district engineers verified approximately 1,950 separate water crossings related to the FS Pipeline under NWP 12").

Plaintiffs nevertheless claim that NWP 12 *could* authorize projects with more than "minimal adverse effects" because there is "no cap on the total number of times a single pipeline can use NWP 12;" no "maximum number of acres a pipeline can impact while still qualifying for NWP 12;" and no "spacing

requirements" to ensure that multiple water crossings on a linear pipeline are "separate and distant" enough to have minimal cumulative adverse impact. MSJ 38, 42. Plaintiffs further suggest that an EPA comment confirms that this "'raises the likelihood that projects will result in greater than minimal cumulative effects." *Id.* at 39 (quoting NWP032639). They are mistaken.

The Corps addressed EPA's concern by adding Note 8 to proposed NWP 12 to make clear that if one crossing of a linear project requires pre-construction notification, all other crossings must be identified, and the District Engineer should consider their cumulative impact and impose mitigation or require the project to obtain an individual permit if the adverse impacts are more than minimal. *See* NWP026089, NWP026175-NWP026176 (revised draft responding to EPA's comments); NWP18395 (proposed NWP 12 published June 1, 2016).

The Corps reiterated this point when it adopted NWP 12 at the end of the rulemaking process. *See* NWP2110-11. The Corps explained "[f]or pipelines and other linear projects, the cumulative effects of the activities authorized by NWPs for the overall project, within an appropriate geographic region, will be evaluated by district engineers." NWP002459.

The Corps further determined that it "cannot establish national thresholds for determining when crossings of waters of the United States are 'separate and distant' because a variety of factors should be considered by district engineers

when making those decisions, such as topography, geology, hydrology, soils, and the characteristics of wetlands, streams, and other aquatic resources." NWP005278. As the Tenth Circuit held in upholding the Corps' prior issuance of NWP 12, the "'separate and distant' test" is "not arbitrary and capricious," and NWP 12's combination of set conditions supplemented with review by district engineers in certain situations is a reasonable exercise of the Corps' technical expertise that is consistent with Section 404(e). *Bostick*, 787 F.3d at 1055-57.

Section 404(e) "does not specify how or when the Corps must make its minimal-impact determination," so the Corps is authorized "to fill in the gaps." *Id.* at 1057. In NWP 12, the Corps reasonably "adopted a set of conditions reflecting the foreseeable effects of activities authorized by the nationwide permit," while using pre-construction notification and review as a "reasonable way of safeguarding the environment from unforeseen impacts." *Id.* at 1058; *see also Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493, 503 (4th Cir. 2005) ("nothing in section 404 prohibits the Corps from issuing a general permit that contains a requirement of post-issuance individualized consideration or authorization by the Corps").

Plaintiffs claim that "project-level review fails" to act as a safeguard for large pipelines with many water crossings because "in most cases, the review never occurs." MSJ 39. But when the Corps first issued NWP 12 in 1991, it said that, in light of the PCN requirements, it "believe[d] that major utility lines will have little

opportunity to escape our notice and this fact will allow the DE to assert discretionary authority, where appropriate." 56 Fed. Reg. 59,110, 59,122 (Nov. 22, 1991). The Corps thus decided it was not necessary to put "a limit on the size/length of the project that may be considered under this NWP." *Id.*

When it reissued NWP 12 in 2017, the Corps continued that approach. It rejected a comment that "PCNs should be required for all activities authorized by this NWP because the current PCN thresholds have been effective in identifying proposed NWP 12 activities that should be reviewed by district engineers on a case-by-case basis to ensure that they result in only minimal individual and cumulative adverse environmental effects." NWP005276. Plaintiffs do not acknowledge this statement, much less explain why it is arbitrary and capricious. They do not identify any major oil pipelines that utilized NWP 12 without filing any PCNs and undergoing Corps review. And it is undisputed that Keystone XL— the pipeline that allegedly will harm Plaintiffs' members and gives rise to their standing (*see* MSJ Exs. 1-14)—will require multiple PCNs.

Plaintiffs' further claim that district engineers may not "conduct any further analysis at the project level" for Keystone XL is unfounded and will be addressed in detail once the Corps has acted on the project's PCNs.[6] If, after reviewing the

---

[6] MSJ at 41. Plaintiffs' characterization of the prior verifications for the Cheyenne and Yellowstone River crossings for Keystone XL is also inaccurate. *See* MSJ at

PCNs for Keystone XL, the district engineers issue verifications without considering the cumulative impact of the PCN and non-PCN crossings, Plaintiffs can challenge those verifications and the application of NWP 12 to Keystone XL, just like the Sierra Club challenged the application of NWP 12 to other pipelines.[7] But NWP 12 cannot be declared facially unlawful based on a presumption that the Corps will disregard its terms.

---

41-43. Both verifications acknowledged the non-PCN crossings and discussed the cumulative impacts of all crossings authorized by NWP 12. *See* ECF No. 75-5 at 10 (Yellowstone); ECF No. 75-7 at 8-9 (Cheyenne). Plaintiffs may disagree that there was a "meaningful minimal effects analysis," MSJ at 43, but any dispute about those verifications is moot and irrelevant to the present motion, because they have been withdrawn.

[7] *See Sierra Club*, 803 F.3d at 52-53 (rejecting challenge to verifications of Flanagan South pipeline with "approximately 1,950 discrete crossings of waters subject to the [CWA]" because "the Corps's cumulative effects conclusions were adequately supported and reasoned"); *Bostick*, 787 F.3d at 1061 (the Corps "analyzed the cumulative impacts of the proposed crossings" and its "issuance of the verification letters was not arbitrary or capricious").

## III. CONCLUSION

For the reasons stated above, TC Energy requests the Court grant its partial motion for summary judgment and deny Plaintiffs' motion.

DATED this 23rd day of December, 2019,

*/s/ Peter R. Steenland, Jr.*
Peter R. Steenland, Jr.
Peter C. Whitfield
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000 (telephone)
(202) 736-8711 (fax)
Email: psteenland@sidley.com
       pwhitfield@sidley.com


*/s/ Jeffery J. Oven*
Jeffery J. Oven
Mark L. Stermitz
Jeffrey M. Roth
CROWLEY FLECK PLLP
490 North 31st Street, Ste. 500
P.O. Box 2529
Billings, MT 59103-2529
Telephone: 406-252-3441
Email: joven@crowleyfleck.com
       mstermitz@crowleyfleck.com
       jroth@crowleyfleck.com

*Counsel for TransCanada Keystone Pipeline LP and TC Energy Corporation*

# CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), I certify that this brief is printed in 14-point font, double spaced, and contains 6154 words, excluding tables, caption, signatures, and certificates of service and compliance.

*/s/ Jeffery J. Oven*

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served today via the Court's CM/ECF system on all counsel of record.

*/s/ Jeffery J. Oven*