TIMOTHY C. FOX
Montana Attorney General
ROB CAMERON
Deputy Attorney General
JEREMIAH LANGSTON
Assistant Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: 406-444-2026
Fax: 406-444-3549
rob.cameron@mt.gov
jeremiah.langston@mt.gov

COUNSEL FOR DEFENDANT-INTERVENOR
STATE OF MONTANA

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, et. al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>U.S. ARMY CORPS OF ENGINEERS and LIEUTENANT GENERAL TODD T. SEMONITE (in his official capacity as U.S. Army Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers),<br><br>    Defendants,<br><br>   and<br><br>THE STATE OF MONTANA, TRANSCANADA KEYSTONE PIPELINE, LP, TC ENERGY CORPORATION, AMERICAN GAS ASSOCIATION, AMERICAN PETROLEUM INSTITUTE, ASSOCIATION OF OIL PIPE LINES, INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA, and NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION,<br><br>    Defendant-Intervenors. | CV 19-44-GF-BMM<br><br><br>**STATE OF MONTANA'S BRIEF IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ....................................................................................1

ARGUMENT ...........................................................................................3

I.    States Have Siting Authority Over Oil Pipelines. ...........................................3

      A.    Federal history of regulating oil and gas pipelines ..............................3

      B.    Montana's regulation of oil pipelines. ..................................................6

      C.    MDEQ's grant of Keystone's certificate of compliance under
            MFSA and MEPA. ...............................................................................8

      D.    Plaintiffs misapprehend the Corps role in approving pipelines
            crossing of waterbodies. ....................................................................15

II.   This Case Will Impact Other Linear Infrastructure Projects........................17

CONCLUSION .....................................................................................23

# TABLE OF AUTHORITIES

## CASES

*In re Keystone XL Pipeline*,
  2018 SD 44, 914 N.W.2d 550................................................................1

*MATL LLP v. Salois*,
  Case No. DA 11-0009, (Mont. Sup. Ct. Apr. 7, 2011)....................................21

*Montana Envtl. Info. Ctr. v. Department of Envtl. Quality*,
  1999 MT 248, 296 Mont. 207, 988 P.2d 1236 (1999)........................................6

*Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*,
  556 F.3d 177, 195-96 (4th Cir. 2009)................................................ 15, 16, 17

*Sierra Club v. United States Army Corps of Eng'rs*,
  990 F. Supp. 2d 9 (D.D.C. 2013)...........................................................3

*TransCanada Keystone Pipeline, LP v. Dunavan*,
  303 Neb. 872, 932 N.W.2d 653 (Neb. 2019)...............................................1

## OTHER AUTHORITIES

Code of Federal Regulations
  33 C.F.R. § 323.2.........................................................................15

Federal Register
  72 Fed. Reg. 1,884.......................................................................19
  82 Fed. Reg. 1,860 (Jan. 6, 2017)................................................. 6, 17, 20
  69 Fed. Reg. 25,299 (Apr. 30. 2004).......................................................6
  73 Fed. Reg. 67,860 (Nov. 17, 2008)......................................................21

United States Code
  30 U.S.C. § 181...........................................................................5
  33 U.S.C. § 1321 .........................................................................5
  33 U.S.C. § 1344 .........................................................................3
  33 U.S.C. § 1344(a).......................................................................15
  49 U.S.C. §§ 601, 603 .....................................................................5

Montana Code Annotated
    § 69-3-113 ................................................................................22
    §§ 69-13-101 to -106 ...............................................................5
    § 75-1-102(2) ...........................................................................7
    § 75-1-201 ................................................................................8
    § 75-20-101 ..............................................................................6
    §§ 75-5-101 to -327 .................................................................7
    §§ 75-20-101 to -411 ...............................................................5
    § 75-20-113 ............................................................................22
    § 75-20-204 ..............................................................................3
    § 75-20-301(1)(b) .....................................................................7
    § 75-20-301(1)(g) .....................................................................7
    § 75-20-303(4)(b) ...................................................................14
    § 75-20-303(4)(c) ...................................................................14
    §§ 77-2-101 to -107 .................................................................8

Montana Constitution
    Art. II § 3 ................................................................................6
    Art. IX § 1 ...............................................................................6

Laws of Montana
    1971 Mont. Laws 238, §§ 1-7 ..................................................7
    1973 Mont. Laws 327, § 2 ........................................................6
    1975 Mont. Laws 494, § 1 ........................................................6
    2011 Mont. Laws 321 .............................................................22

Montana Administrative Rules
    Tit. 17, ch. 20 .........................................................................7

Coleman, James W.,
    *Pipelines & Power-lines: Building the Energy Transport Future*,
    80 Ohio St. L.J. 263, 268-72, 289-93 (2019) .........................2

Klass, Alexandra & Danielle Meinhardt,
    *Transporting Oil and Gas: U.S. Infrastructure Challenges*,
    100 Iowa L. Rev. 947, 962 (2015) ...................................4, 19

# **INTRODUCTION**

The siting of oil pipelines is a matter of state, not federal, jurisdiction. In Montana, such jurisdiction is the province of several state agencies. For example, the Montana Department of Environmental Quality (MDEQ) has authority under the Montana Major Facility Siting Act (MFSA) and the Montana Environmental Policy Act (MEPA) to regulate and approve the construction and location of oil pipelines such as TransCanada Energy Corp.'s proposed Keystone XL Pipeline (Keystone). The Montana State Board of Land Commissioners (Montana Land Board) provides oversight and authorization of pipeline rights-of-way over state lands and navigable waterways.

Montana's evaluation of Keystone for the purposes of approving stream crossings and mitigating the risk of oil spills has thus been extensive and comprehensive. South Dakota and Nebraska have conducted comparable siting review of Keystone, which have been upheld by their respective supreme courts. *In re Keystone XL Pipeline*, 2018 SD 44, 914 N.W.2d 550; *TransCanada Keystone Pipeline, LP v. Dunavan*, 303 Neb. 872, 932 N.W.2d 653 (Neb. 2019).

In the present case, the Plaintiffs ignore the central role states play in oil pipeline siting, and focus on the federal government, particularly the U.S. Army Corps of Engineers, whose jurisdiction is generally limited to regulation of dredged and fill materials in waters of the United States—not pipeline siting.

Consequently, Plaintiffs do not tell the whole story and give the false impression that this issue has been entirely neglected.

Beyond attempting to force the Corps to regulate outside of its jurisdiction, Plaintiffs' arguments have broad policy implications for other types of linear infrastructure. If these arguments are accepted by this Court, it would create a roadmap for future litigants to object to the construction of projects covered by NWP 12; *e.g.*, electricity transmission lines. *See generally* James W. Coleman, *Pipelines & Power-lines: Building the Energy Transport Future*, 80 Ohio St. L.J. 263, 268–72, 289–93 (2019). Oil can be transported in numerous ways in addition to pipelines; whereas, electricity can only be transported by transmission and distribution lines. This roadmap for obstructionism of linear infrastructure argued by the Plaintiffs here would be particularly detrimental to renewable wind generators because the best areas for wind generation are in sparsely populated areas of the United States—like Montana—and wind developers often rely on long-range, interstate transmission lines to deliver renewably-sourced electricity to large markets. *Id.*

Accordingly, this Court should reject of Plaintiffs' arguments to ensure: (1) the U.S. Army Corps of Engineers' jurisdiction under § 404 of the Clean Water Act (CWA) is limited, as Congress intended, to permitting the discharge of fill and dredge material; and (2) continued streamlined permitting of a variety of linear

infrastructure projects under NWP 12. In the interest of brevity and to minimize

unnecessary duplication, Montana adopts and incorporates the Federal Defendants'

Background and Standard of Review sections.

## ARGUMENT

### I. States have siting authority over oil pipelines.

#### A. Federal history of regulating oil and gas pipelines

To understand the states' role in regulating oil pipelines, it is helpful to

examine the federal government's divergent roles in regulating natural gas and oil

pipelines. The scope of subject matter authority Congress grants federal agencies

often dictates what authority is left to the states. For example, Congress has

granted the Federal Energy Regulatory Commission (FERC) comprehensive

authority over siting natural gas pipelines and preempted state authority. 33 U.S.C.

§ 1344; *see also* Mont. Code Ann. § 75-20-204 (acknowledging FERC's siting

authority over certain facilities). In contrast, Congress has not done the same for oil

pipelines and states have retained siting authority over the construction of these

facilities. *Sierra Club v. United States Army Corps of Eng'rs*, 990 F. Supp. 2d 9,

n.13 (D.D.C. 2013). A historical investigation illuminates the differing treatment of

these two seemingly similar activities.

The federal government was not always absent from oil pipeline siting.

Prior to World War II, most oil in the United States was shipped by rail and oil

tankers. Alexandra Klass & Danielle Meinhardt, *Transporting Oil and Gas: U.S. Infrastructure Challenges*, 100 Iowa L. Rev. 947, 962 (2015). During World War II, German U-boats sank 55 tankers just six months into the war. As a result, tanker deliveries of oil reduced to one-fifth prewar levels. *Id*. Frustrated by the railroads' obstructionist tactics within state governments to prevent oil pipelines from being built, Congress passed the Cole Act which established federal eminent domain for oil pipelines. *Id*. at 963. Once World War II ended and shipping risks returned to normal, the Cole Act expired and was never replaced. *Id*. Because oil may be shipped by a variety of methods (*e.g.*, rail, pipeline, truck, and ship), it is difficult for one industry or firm to exercise undue interference to stifle competition. *Id*. at 1015–16. This, in turn, justifies allowing the various states to regulate oil pipeline siting. *Id*.

For natural gas pipelines, Congress and the Federal Trade Commission (FTC) had turned their attention to this industry in the 1920s. *Id*. at 994. Prior to natural gas being extracted from the ground, natural gas was manufactured through coal. *Id*. at 990. The FTC discovered the natural gas industry was largely consolidated into four public utility holding companies. *Id.* at 994–95. Efforts to build natural gas pipelines to deliver natural gas extracted from the ground were thwarted by coal and rail interests within state government to protect their control over the market. *Id*. In order to counter this anticompetitive behavior, Congress

passed the Natural Gas Act of 1938, which provided natural gas pipelines federal eminent domain and the attendant siting authority to the federal Interstate Commerce Commission. *Id*. at 995. This authority never expired and was eventually transferred to FERC. *Id.* at 999. This type of federal regulation is still viewed as necessary because natural gas can only be economically transferred by pipeline and, thus, potential interference by the states in building this infrastructure would jeopardize the United States' ability to transport this important energy source. *Id.* at 1016.

This historical perspective reveals that oil pipelines do not have a central federal agency to coordinate the approval process for their construction like FERC's authority over natural gas pipelines. Regulation of oil pipelines is instead shared among state and federal agencies. As mentioned above, states have been left to regulate oil pipeline siting and eminent domain. *See, e.g.*, Mont. Code Ann. §§ 75-20-101 to -411, 69-13-101 to -106. If a pipeline does cross federal lands, the Bureau of Land Management within the U.S. Department of the Interior is responsible for issuing right-of-way permits. 30 U.S.C. § 181. The U.S. Department of Transpiration is responsible for pipeline safety regulation. 49 U.S.C. §§ 601, 603. The Environmental Protection Agency and the U.S. Coast Guard have jurisdiction over oil spills from large transportation pipelines. 33 U.S.C. § 1321. Finally, a presidential permit is required when an oil pipeline crosses an international border

and is considered under the national interest standard. Exec. Order 13,337, 69 Fed. Reg. 25,299 (Apr. 30. 2004); *see also Issuance and Reissuance of Nationwide Permits*, 82 Fed. Reg. 1,860, 1,883–84 (Jan. 6, 2017) (providing an overview of federal regulation of oil pipelines). Because Plaintiffs omit the states' predominant role in this regulatory scheme, it appears that no one has given any attention to water body crossings. This, however, is not the case because Montana and other states have examined this issue, as well as other environmental concerns, extensively.

## B. Montana's regulation of oil pipelines

In 1972, Montana passed its current Constitution, which included the right to a clean and healthful environment. Mont. Const., Art. II § 3, Art. IX § 1. Its drafters intended it "to be the strongest environmental protection provision found in any state constitution." *Montana Envtl. Info. Ctr. v. Department of Envtl. Quality*, 1999 MT 248, ¶ 66, 296 Mont. 207, 988 P.2d 1236 (1999). Shortly thereafter, the Montana Legislature passed the Montana Utility Siting Act of 1973 pursuant to this constitutional obligation. 1973 Mont. Laws 327, § 2. In 1975, this chapter was renamed the "Montana Major Facility Siting Act". 1975 Mont. Laws 494, § 1 (codified at Mont. Code Ann. § 75-20-101).

Significant environmental protections exist under the MFSA, and the MDEQ has properly applied them in its approval of Keystone. In approving a proposed

facility under MFSA, MDEQ must "find and determine . . . the nature of the probable environmental impact" and "that the facility minimizes adverse environmental impact." Mont. Code Ann. § 75-20-301(1)(b). Additionally, MDEQ must first issue "any necessary air or water quality decision, opinion, order, certification, or permit," *id.* at (1)(g), which in turn requires MDEQ to consider other relevant environmental laws such as the Montana Water Quality Act, *id.* § 75-20-216(3); *see also id.* §§ 75-5-101 to -327 (water quality statutes). Title 17, chapter 20 of Montana Administrative Rules also governs MDEQ's siting of facilities. The MDEQ has fulfilled its duties in protecting Montanans' constitutional right to a clean and healthful environment with respect to the siting of Keystone in Montana.

Additionally, even prior to the ratification of the 1972 Montana Constitution, Montana had adopted MEPA. *See* 1971 Mont. Laws 238, §§ 1-7. Modeled after the National Environmental Policy Act (NEPA), MEPA declares it the State policy to

> encourage productive and enjoyable harmony between humans and their environment, . . . to promote efforts that will prevent, mitigate, or eliminate damage to the environment and biosphere and stimulate the health and welfare of humans, [and] to enrich the understanding of the ecological systems and natural resources important to the state.

Mont. Code Ann. § 75-1-102(2). Much like NEPA, MEPA requires a consideration of adverse environmental effects of the proposed action and reasonable alternatives to the proposed action. *Id.* § 75-1-201. Furthermore, the Montana Land Board and

DRNC must approve right of way on state lands and over navigable rivers. *Id.*
§§ 77-2-101 to -107 (easements), 77-1-1109 to -1117 (navigable rivers).

### C. MDEQ's grant of Keystone's certificate of compliance under MFSA and MEPA

On December 22, 2008, Keystone filed its application with MDEQ for the
construction, operation, and maintenance for the Montana portion of the pipeline
under the MFSA. Mont. Dep't of Envtl. Quality, Keystone XL Certificate of
Compliance 1 (Mar. 30, 2012) (Certificate of Compliance).[1] On March 30, 2012,
MDEQ approved Keystone's application through a certificate of compliance. Prior
to issuing this certificate of compliance, MDEQ issued its own MEPA analysis in
coordination with the U.S. Department of State's Final Environmental Impact
Statement published on August 26, 2011. Mont. Dep't of Envtl Quality, DOS Final
EIS, App. I at I-2 (Aug. 26, 2011) (MDEQ App. I).[2] This MEPA analysis is
necessary for the project's authorization in Montana:

> This appendix provides supplemental information needed to support
> the findings that must be made by MDEQ before the proposed Project
> could be approved in Montana under MFSA. Without this approval,
> Keystone would not be able to construct the pipeline in Montana.
> Further, without the approval of MDEQ, Keystone would not be able
> to exercise the right of eminent domain in Montana, and there is no
> federal eminent domain authority for crude oil pipelines.

*Id.* at I-2.

---

[1] https://deq.mt.gov/Portals/112/DEQAdmin/MFS/Documents/KXL_Cert_Final
Signed.PDF

[2] https://deq.mt.gov/Portals/112/DEQAdmin/MFS/Documents/Vol6Comb.pdf

This MEPA analysis included an extensive examination of Keystone's potential impacts on waterbodies. *Id*. at I-135 to 140. In preparing the analysis on waterbodies, a third-party environmental contractor "conducted on-site inspections of selected crossing sites for Keystone's proposed route in Montana and submitted a report about the inspections to MDEQ." *Id*. at I-136. Of the total 389 waterbodies the proposed pipeline would cross, MDEQ provided detailed review of 55 waterbody crossings. *Id*. Those crossings were selected for detailed review if one of the following conditions existed: 1) the route crossed a perennial stream; 2) the crossing site was within a designated floodplain of the state; 3) the route crossed a waterbody containing fish designated as Species of Concern to the state or which was known to include the habitats of those fish species; or 4) the route crossed a stream of special interest to the state. *Id*.

All 20 of the perennial steams were inspected in the field, focusing on whether the proposed design would withstand stream scour, incision, and lateral stream movement; likelihood of turbidity; and potential environmental effects of the proposed design. *Id.* at I-136 to 137. Sixteen of the 35 intermittent streams were field inspected. *Id*. at I-136. The remaining 19 intermittent streams were evaluated using in-office analytical procedures. *Id*. Some of the field inspected crossings had indications of current or future instability resulting in MDEQ considering an alternative crossing technique. *Id.* at I-138. Notably, MDEQ did not

identify instability or propose an alternative crossing technique for either the Missouri or Yellowstone rivers. *Id*. at I-138 to 139. MDEQ proposed several mitigation measures to address these instability issues for many of the other 55 waterbody crossings. *Id*. at I-139 to 140.

This MEPA analysis informed MDEQ's decision to grant Keystone's certificate of compliance. *See* MDEQ Certificate of Compliance at 4. In addition to incorporating Keystone's construction, mitigation, and reclamation plan, (*see id.* at 5), MDEQ issued its own set of environmental specifications, *see* Mont. Dep't of Environmental Quality, Certificate of Compliance Attach. 1B: Environmental Specifications (Mar. 30, 2012) (MDEQ Environmental Specifications).[3] Relevant to present litigation, these environmental specifications require Keystone to perform and comply with several requirements related to the design of the pipeline at stream crossings and ensure Keystone's cleanup of a possible oil spill. MDEQ Environmental Specifications at 5, 24, 32–79, 86.

Appendix L of MDEQ's environmental specifications, titled "Requirements at Stream Crossings," mandates Keystone to do several things prior to the construction of the pipeline. *Id.* at 32–79. Keystone is required to file site-specific

---

[3]https://deq.mt.gov/Portals/112/DEQAdmin/MFS/Documents/KXL_Attach1B_ENV_SPCS_FINAL.pdf

plans for the 21 following stream crossings:

1. Frenchman Creek,

2. Rock Creek,

3. Willow Creek,

4. Buggy Creek,

5. Cherry Creek,

6. Milk River,

7. Missouri River,

8. Strupel Coulee Tributary,

9. Jorgenson Coulee Tributary,

10. East Fork Prairie Elk Creek,

11. Red Water River,

12. Clear Creek,

13. Yellowstone River,

14. Dry Fork Creek,

15. Unnamed Tributary of Pennel Creek,

16. Pennel Creek,

17. Sandstone Creek,

18. Little Beaver Creek,

19. North Fork Coal Bank Coulee,

20. South Fork Coal Bank Coulee, and

21. Boxelder Creek.

*Id.* at 33–79. For each of these 21 stream specific discussions, Keystone is required

to follow certain design requirements:

> In the following stream specific discussions, various burial depths are
> specified. These burial depths at stream crossings take into account
> the calculated depth of stream channel erosion and scour that may
> occur in a flood event. *Most of these burial depths are deeper than*
> *required by federal regulations.* Burying the pipeline below scour
> depth helps to prevent future construction activities in and near
> streams to rebury the pipeline should it be exposed. The burial depths
> described below assume that alluvial materials are encountered. If
> bedrock is encountered during construction, the pipeline would be
> buried to a minimum of two feet below the top of the bedrock surface.

*Id.* at 32 (emphasis added). Prior to construction, MDEQ, other governmental

entities, and the landowner shall conduct an on-site inspection for any perennial

stream crossing or streams containing a fish species of special concern. *Id.*

Keystone must take other measures for erosion and sediment control at stream

crossings, *id.* at 20–23, and comply with all local, state and federal laws including

Montana's water quality standards, *id.* at 4.

Furthermore, MDEQ analyzed potential impacts of an oil spill on threatened

and endangered species in Montana. MDEQ looked individually at pallid sturgeon,

piping plovers, whooping crane, and black-footed ferrets. *See* MDEQ Certificate of

Compliance at 12–14. For each of these species, MDEQ arrived at similar

conclusions, generally stating: "Habitat loss or alteration resulting from a crude oil

spill from the pipeline is unlikely due to: 1) the low probability of a spill, and

2) the low probability of a spill coinciding with the presence of [the species]."
*Id*. at 14.

Finally, understanding that these other measures only mitigate the possibility of an oil spill and cannot eliminate that risk altogether, MDEQ has required Keystone "to provide assurance that any spill or leak of crude oil from the pipeline or appurtenant facilities is adequately cleaned up . . . ." MDEQ Environmental Specifications at 5. Keystone is required to post a bond of $100 million dollars as adjusted by Gross Domestic Product and proof of liability insurance of at least $200 million. *Id*. Keystone is not permitted to intentionally release any oil or other toxic substances, and any accidental spill must be reported immediately to a state inspector. *Id.* at 24. These requirements are a part of MDEQ's hazardous materials management plan for Keystone. *Id.* at 80.

After MDEQ had issued its certificate of compliance, the Montana Land Board considered and approved Keystone's right-of-way across state owned lands and navigable riverbeds on December 17, 2012. Mont. Bd. of Land Comm'n, Mins. at 4 (Dec. 17, 2012).[4] As the Montana Attorney General at that time and a member of the Land Board, Steve Bullock "moved to approve the Keystone Pipeline Easements contingent upon: (1) issuance of the Presidential Permit; and

---

[4] http://dnrc.mt.gov/landboard/docs/december_minutes.pdf.

(2) that the easements contain the protections included within the state and federal permitting process." *Id*. This motion was approved unanimously. *Id*.

On January 23, 2019, MDEQ approved a modification of Keystone's Certificate of Compliance. *See* Mont. Dep't of Envtl. Quality, Decision Doc. on Amendment Appl. (Jan. 23, 2019).[5] For the purposes of reclaiming areas around the project, Keystone is required to collect sagebrush seed. Keystone was previously required to collect sagebrush seed from within 100 miles of reclaimed area. As a result of the modification, Keystone may now collect sagebrush seed from with 300 miles of the reclaimed area or "from appropriate seed transfer zones." *Id.* at 1.

Keystone has 10 years from issuance of the certificate of compliance on March 30, 2012, to complete construction unless MDEQ finds "a good faith effort is being undertaken to complete construction." Mont. Code Ann. § 75-20-303(4)(c); MDEQ Certificate of Compliance at 55. Otherwise, the certificate lapses and is void. Mont. Code Ann. § 75-20-303(4)(b). "[A] good faith effort includes the process of acquiring any necessary state or federal permit or certificate for the facility and the process of judicial review of a permit or certificate." *Id*. at (4)(c).

---

[5]https://deq.mt.gov/Portals/112/DEQAdmin/MFS/Documents/DEQDecision_SBSeedAmendment.pdf?ver=2019-02-01-085504-733

**D.     Plaintiffs misapprehend the Corps role in approving pipelines crossing of waterbodies.**

The states—not the Corps—have a responsibility to evaluate the possibility of oil spills at stream crossings. Plaintiffs misconstrue the Corps' jurisdiction when they fault the agency for conducting "absolutely no analysis of the risk of oil spills from pipelines permitted by NWP 12." (Doc. 73 at 11.) The Corps' responsibility is limited to permitting "the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). Oil simply is not dredged or fill material. *See* 33 C.F.R. § 323.2.

Plaintiffs' attempt to fit a round peg into a square hole is telling. As described above, no comprehensive federal oil pipeline siting authority exists. Accordingly, neither the Corps nor any other federal agency is obligated to evaluate the potential for oil spills in this context; therefore, any "omission" in this regard cannot trigger NEPA review. Thus, Plaintiffs have found the closest federal regulation of this—the Corps' permitting of the discharge of dredged and fill material—and attempted to shoehorn the Corps into this regulatory role.

The Fourth Circuit has rejected this approach to expanding the reach of NEPA in the context of the Corps' authority under the CWA. In *Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*, West Virginia already provided comprehensive regulation of surface coal mining and reclamation operations. 556 F.3d 177, 195–96 (4th Cir. 2009). The Fourth Circuit recognized "Corps' jurisdiction under CWA

§ 404 is limited to the narrow issue of the filling of jurisdictional waters." *Id*. at

195. The Fourth Circuit found the environmental plaintiffs' attempt to expand the

Corps' CWA responsibilities through an expansive interpretation of NEPA was

contrary to federal policy:

> If the Corps, by issuing a § 404 permit, can turn a valley fill project
> "into a Federal action," the [West Virginia Department of
> Environmental Protection's] regulation of the fill process becomes *at
> best duplicative, and, at worst, meaningless*. NEPA plainly is not
> intended to require duplication of work by state and federal agencies.
> The Corps' general regulatory approach echoes this sentiment.

*Id.* at 196 (internal citations omitted) (emphasis added). The Fourth Circuit further

expressed an understanding of environmental plaintiffs' argument that the project

could only advance through the Corps' issuance of a permit, but that is insufficient

to trigger NEPA review for actions beyond the Corps' jurisdiction:

> But for the Corps' § 404 permit, a valley fill could not be built; yet it
> is [West Virginia Department of Environmental Protection], and not
> the Corps, that has "control and responsibility" over all aspects of the
> valley fill projects beyond the filling of jurisdictional waters. Thus,
> under the plain language of the regulation, activity beyond the filling
> of jurisdictional waters is not within the Corps' "control and
> responsibility" because upland environmental effects are "not
> essentially a product of Corps action[.]"

*Id.* at 197 (internal citations omitted).

This case is strikingly similar to *Ohio Valley Envtl. Coalition*. This case

involves a § 404 permit under the Corps' authority. (*See* Doc. 73 at 2.) Here,

Plaintiffs make this same but for argument rejected by the Fourth Circuit:

NEPA requires consideration of the reasonably foreseeable effects—like oil spills—that would occur as a result of using NWP 12 to authorize oil pipelines. This is particularly true because none of the other federal agencies charged with regulating oil pipelines is required to conduct NEPA analyses for them, meaning that, in many cases, the Corps is the only agency to complete such a review.

*Id*. at 14. Despite the possibility that the Corps could prevent Keystone from being constructed by denying it a § 404 permit, it is the states that have the "control and responsibility" of whether Keystone may cross streams based on an assessment of the likelihood of an oil spill at that location. MDEQ has correctly asserted that Keystone cannot advance without its approval. MDEQ App. I at I-2.

Montana has issued comprehensive, detailed requirements for Keystone at stream crossings to prevent oil spills and bonding and insurance requirements to assure clean up. By ignoring relevant state environmental regulation, Plaintiffs attempt to render MFSA and MEPA entirely meaningless. Additionally, as in *Ohio Valley Envtl. Coalition*, the Corps has disclaimed any authority over oil spill mitigation here. 82 Fed. Reg. at 1,883. Thus, the Corps here should be granted deference in its conclusion that it does not regulate oil spills in the manner suggested by Plaintiffs. *Ohio Valley Envtl. Coalition*, 556 F.3d at 197.

## II.     This case will impact other linear infrastructure projects.

Throughout this litigation, Plaintiffs request for relief has been everchanging and, to say the least, ambiguous. In the intervention stages of this proceeding,

Montana expressed an interest in ensuring that NWP 12 continues to allow other types of linear infrastructure—like electricity transmission lines and broadband—to be built efficiently and economically. (Doc. 43 at 9–10.) Plaintiffs opposed Montana's intervention claiming:

> [T]his case would not limit Montana's ability to build or repair other types of utility projects, such as broadband cable, transmission lines, or wind energy projects, as it concerns only the Corps' use of NWP 12 to fast-track the approval of oil pipelines, which pose risks (i.e., from oil spills) that are not pertinent to other uses of NWP 12. Indeed, Plaintiffs have not sought to have NWP 12 broadly enjoined; rather, they seek narrowly tailored relief to ensure adequate environmental review of oil pipelines, especially Keystone XL.

(Doc. 50 at 3.)

Now in their Opening Brief Plaintiffs assert they "challenge the U.S. Army Corps of Engineers' 2017 reissuance of Nationwide Permit 12, *a general permit that will be used an estimated 69,700 times over five years to approve pipelines and other utility projects under the Clean Water Act.*" (Doc. 73 at 1); *see also id.* at 43 ("the Court should hold that NWP 12, *as well as* its specific application to Keystone XL, is arbitrary and capricious and otherwise not in accordance with law.") (emphasis added). The fact that Plaintiffs complain that a general permit will be used 69,700 times demonstrates that they do not seek narrowly tailored relief as asserted earlier.

Rather than wading through the various filings to solve the mystery of what relief Plaintiffs seek in this case, this Court should recognize Plaintiffs'

arguments are not unique to Keystone or oil pipelines. Most obviously, Plaintiffs'

concern that "NWP 12 authorizes activities that cause impacts to listed species

from . . . avian power line collisions" is not limited to oil pipelines and would

apply to future construction of other electric transmission lines. (Doc. 73 at 28.);

*see also id.* at 26 (arguing that the Corps' Environmental Assessment ignores the

impacts of transmission lines).

More importantly, if this Court grants Plaintiffs' requests for relief, it brings

into question the Corps' regulations allowing for streamlined approval of linear

infrastructure. *See* 72 Fed. Reg. at 1,884 (explaining the purpose of nationwide

permits is to provide streamlined regulatory review). Future litigants could

redeploy Plaintiffs' general argument that the Corps failed to comply with NEPA's

requirement "to take a hard look at an action's environmental effects" or ESA's

requirement to "undertake programmatic consultation" (*see* Doc. 73 at 1) in

authorizing any project under NWP 12 regardless of the type of linear

infrastructure being built.

This uncertainty in NWP 12 could potentially be most detrimental to

electricity transmission lines. As mentioned above, oil can be transported in several

ways. Klass & Meinhardt, *supra*, at 1015–16. Electricity can only be transported

by transmission and distribution lines. This particularly impacts renewable wind

developers in several ways. First, the best producing wind areas are also located in

the least populous parts of the United States like Montana. *Coleman*, *supra*, at 269.

To transport wind energy to more populated markets, long electricity transmission

lines are required. *Id.* at 270. Second, "long-range inter-regional transmission can

help smooth local fluctuations in renewable power—when it is cloudy and still in

one region, it may be sunny and windy in another region that could be connected

by transmission." *Id*. In other words, when the wind stops blowing on the Rocky

Mountain Front in Montana, Montana customers will benefit from the transmission

of electricity generated from wind turbines in the Columbia Gorge in Washington

and vice versa. From an engineering and operations standpoint, wind energy

developers are more dependent on linear infrastructure—and subsequently

NWP 12—than oil producers. *See also* 82 Fed. Reg. at 1,884 (noting NWP 12

plays an "important role in helping the nation achieve goals regarding the

increased reliance on clean energy.").

Furthermore, electricity transmission lines could face the same type of

opposition as Keystone. Historically, electricity transmission lines have faced more

opposition because the facilities are located above ground and obstruct views.

*Coleman*, *supra*, at 291. Renewable energy generating projects themselves already

face local opposition for the same reasons. *Id*. "With an expanded environmental

impact assessment, the transmission approval process will provide another

opportunity to re-litigate familiar disputes that wind turbines endanger bird

populations and damage scenic vistas or that solar farms have impacts on water use, land use, and endangered species." *Id*.

The Montana-Alberta Tie-Line (MATL) is an example of this. MATL is a merchant transmission line[6] used to transmit electricity generated by wind turbines. *Record of Decision; Montana Alberta Tie Ltd.*, 73 Fed. Reg. 67,860 at 67,860, 67,863 (Nov. 17, 2008). Outside of the environmental review conducted by MDEQ and Department of Energy, MATL faced opposition from local landowners claiming that the project was not being put to "public use" because it involved a merchant transmission line rather than a vertically integrated public utility. *MATL LLP v. Salois*, Case No. DA 11-0009, Appellee Resp. Br. 13–15 (Mont. Sup. Ct. Apr. 7, 2011). A Montana district court agreed with objecting landowners that "MATL does not possess the power of eminent domain, either express or implied, and it has no authority to take the private property of a nonconsenting landowner." *MATL LLP v. Salois*, 2011 MT 126, ¶ 2, 360 Mont. 510, 255 P.3d 158. Later, the Montana legislature intervened clarifying the State's eminent

---

[6] "Merchant transmission providers are private companies that finance and own transmission facilities independent of generation developers or customer-serving utilities. Merchant transmission projects are defined as those for which the costs of constructing the proposed transmission facilities are recovered through negotiated rates instead of the cost-based rates used by utilities." Nat'l Ass'n of Regulatory Util. Comm'rs et al., Transmission Planning White Paper 22 (2014) *available at* <https://pubs.naruc.org/pub.cfm?id=53A151F2-2354-D714-519F-53E0785A966A>.

domain law permitting the project to advance. *Id.* ¶ 3; 2011 Mont. Laws 321

(codified at Mont. Code Ann. §§ 69-3-113, 75-20-113). This example, while

different in substance, shows that objectors will advance any colorable legal

argument to prevent the construction of a project. (It is unlikely the landowners

had strong feelings about the comparative merits of a vertically integrated public

utility versus a merchant transmission line.) Plaintiffs' arguments, if accepted,

would be just another arrow in the quiver of individuals and groups opposed to

these types of projects.

This problem presented here with NWP 12 is likely to return in the context

of electricity transmission lines because, unlike natural gas pipelines before FERC,

there is again no central federal siting authority to permit these projects. *Id.* at 292.

With this same unconsolidated form of governmental regulation, future opponents

to transmission lines could complain about the lack of federal review of an issue

when that review was conducted at the state level as Plaintiffs do here. This would

undoubtedly decrease likelihood of transmission lines being built and at a

minimum increase the risk associated with the project resulting in higher costs for

both producers and consumers. *Coleman, supra*, 265–66. Simply put,

"[p]roponents of a cleaner energy system have more to gain from considering

energy transport methods together and aligning them, rather than by attacking the

system piece-meal." *Id.* at 292–93.

## CONCLUSION

The states have authority over the siting of oil pipelines. By claiming that the Corps failed to do its job of evaluating waterbody crossings and mitigating the possibility of oil pipeline spills, Plaintiffs attempt to force the Corps to usurp state authority in a manner that would render the states' regulation of this issue duplicative and meaningless. Additionally, policy arguments show how Plaintiffs' position, if accepted, would negatively impact other linear infrastructure projects like electricity transmission lines. For the foregoing reasons, this Court should grant the Federal Defendants' Cross-Motion for Summary Judgment and deny the Plaintiffs' Partial Motion for Summary Judgment.

Respectfully submitted this 30th day of December, 2019.

TIMOTHY C. FOX
Montana Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401

By:  */s/ Jeremiah Langston*
JEREMIAH LANGSTON
Assistant Attorney General

Counsel for Defendant-Intervenor

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 5,134 words, excluding certificate of service and certificate of compliance.

/s/ *Jeremiah Langston*
JEREMIAH LANGSTON
Assistant Attorney General

Counsel for Defendant-Intervenor


## CERTIFICATE OF SERVICE

I hereby certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: December 30, 2019        /s/ *Jeremiah Langston*
JEREMIAH LANGSTON
Assistant Attorney General

Counsel for Defendant-Intervenor