William W. Mercer
Brianne C. McClafferty
HOLLAND & HART LLP
401 North 31st Street, Suite 1500
Billings, MT 59101
(406) 252-2166
wwmercer@hollandhart.com
bcmcclafferty@hollandhart.com

Deidre G. Duncan (*Pro hac vice*)
Karma B. Brown (*Pro hac vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1500
dduncan@HuntonAK.com
kbbrown@HuntonAK.com

*Counsel for Defendant-Intervenors American Gas Association,
American Petroleum Institute, Association of Oil Pipe Lines,
Interstate Natural Gas Association of America, and
National Rural Electric Cooperative Association*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, BOLD ALLIANCE, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, CENTER FOR BIOLOGICAL DIVERSITY, and FRIENDS OF THE EARTH,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS, and LIEUTENANT GENERAL TODD T. SEMONITE (in his official capacity as U.S. Army Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers),<br><br>Defendants,<br><br>and | Case No. 4:19-cv-44-GF-BMM<br><br>**Memorandum of the NWP 12 Coalition in Support of the Federal Defendants' Cross-Motion for Partial Summary Judgment** |

THE STATE OF MONTANA,
TRANSCANADA KEYSTONE
PIPELINE, LP, TC ENERGY
CORPORATION, AMERICAN GAS
ASSOCIATION, AMERICAN
PETROLEUM INSTITUTE,
ASSOCIATION OF OIL PIPE LINES,
INTERSTATE NATURAL GAS
ASSOCIATION OF AMERICA, and
NATIONAL RURAL ELECTRIC
COOPERATIVE ASSOCIATION,

Defendant-
Intervenors.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

I.    Introduction ........................................................................ 1

II.   Background .......................................................................... 5

      A.    Congress Amended the CWA in 1977 to Authorize the
            Corps to Issue General Permits for Minor Discharges with
            Only Minimal Adverse Effects. ........................................... 5

      B.    The Corps' Regulatory Framework Governing NWP 12
            Ensures the Statutory Minimal Effects Standard Is Met. ...................... 6

      C.    Courts Have Routinely Upheld the NWP Program, Including
            NWP 12. .................................................................... 8

      D.    Courts Have Repeatedly Confirmed that the Corps' Section
            404 NEPA Obligation Extends Only to Environmental
            Effects Proximately Caused by Discharges of Dredged or
            Fill Material into WOTUS. ................................................. 11

III.  Argument ............................................................................ 12

      A.    NWP 12's Structure and Project-Specific Review Ensure
            Compliance with CWA Section 404(e). ..................................... 12

            1.    The NWPs Provide for Project-Specific Review by
                  the Corps and Other Federal, State, and Local
                  Authorities. ........................................................ 14

            2.    Plaintiffs' Challenge to the "Separate and Distant"
                  Definition Is Indistinguishable from the Claim
                  Rejected by the Tenth Circuit in *Bostick*. ....................... 17

      B.    The Corps Complied with NEPA in Reissuing NWP 12 ................... 18

            1.    The Corps Was Not Required to Consider Oil Spills
                  or Climate Change before Reissuing NWP 12. ....................... 18

2. The Corps Properly Addressed Effects from the Inadvertent Return of Drilling Fluid When Reissuing NWP 12. ......................................................................21

3. The Corps Fully Considered the Cumulative Effects of NWP 12. ..............................................................22

C. Plaintiffs' ESA Attack on NWP 12 Fails on the Merits. ...................24

1. The Corps' "No Effect" Determination Is Appropriate and Consistent with the ESA and the Protections of GC 18. ......................................................................25

2. Programmatic Consultation Is Not Required. ..........................26

3. The Corps' Comprehensive Review at the Project-Level Pursuant to GC 18 Addresses Cumulative Impacts. ......................................................................28

4. Plaintiffs' Approach Would Defeat the Streamlining Approach Congress Intended for NWPs. ..................................30

IV. Conclusion ..........................................................................31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 833 F.3d 1274 (11th Cir. 2016) .................................................. 10, 22

*Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, No. C16-0950RSL, 2019 WL 5103309 (W.D. Wash. Oct. 10, 2019) ....................................................... 14

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) .................................... 29

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288 (11th Cir. 2019) ............................................. 18, 19, 20, 21

*Defenders of Wildlife v. Ballard*, 73 F. Supp. 2d 1094 (D. Ariz. 1999) ........................................................................ 23

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004) ........................ 11, 19

*Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698 (6th Cir. 2014) ............................................. 18

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) .................................................. 21

*Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402 (6th Cir. 2013) ............... 24

*Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290 (9th Cir. 1992) ........................................................................ 29

*Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1 (D.D.C. 2005) .................................................................... 27, 30

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) ....................................................... 24

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005) ......................................................... 19, 20

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177
(4th Cir. 2009) ............................................................... 12

*Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493 (4th Cir. 2005) ... 10, 14, 22

*Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir.
2005) ............................................................................. 23

*Save the Bay, Inc. v. U.S. Corps of Eng'rs*, 610 F.2d 322 (5th
Cir. 1980) ...................................................................... 18

*Sierra Club, Inc. v. Bostick*, No. CIV-12-742-R, 2013 WL
6858685 (W.D. Okla. Dec. 30, 2013), *aff'd*, 787 F.3d 1043
(10th Cir. 2015) .................................................... 8, 22, 24

*Sierra Club, Inc. v. Bostick*, 787 F.3d 1043 (10th Cir. 2015) ............ 3, 9, 13,
................................................................... 14, 17, 22, 24

*Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017) .............................. 20

*Sierra Club v. Sigler*, 695 F.2d 957 (5th Cir. 1983) ................................. 20

*Sierra Club v. U.S. Army Corps of Eng'rs*, 508 F.3d 1332 (11th
Cir. 2007) ...................................................................... 11

*Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31 (D.C.
Cir. 2015) ........................................................................ 9

*Snoqualmie Valley Preservation Alliance v. U.S. Army Corps of
Eng'rs*, 683 F.3d 1155 (9th Cir. 2012) ................................. 9

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F.
Supp. 3d 101 (D.D.C. 2017) ............................................... 20

*Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394 (9th Cir.
1989) ............................................................................. 11

*United States v. Norton*, 97 U.S. 164 (1877) .............................................. 30

*Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222
F.3d 1105 (9th Cir. 2000) .................................................. 11

*Winnebago Tribe of Neb. v. Ray*, 621 F.2d 269 (8th Cir. 1980) ................. 18

*Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F.
Supp. 2d 1232 (D. Wyo. 2005) ......................................... 23

## FEDERAL STATUTES

16 U.S.C. §1536(a)(2) ................................................................. 25

33 U.S.C. §1344(e) ............................................................... 2, 5

## LEGISLATIVE HISTORY

H.R. Rep. No. 95-139 (1977), *reprinted in* 4 A Legislative
History of the Clean Water Act of 1977 (1978) ................................. 5

## FEDERAL REGULATIONS

33 C.F.R. §330.1(d) .................................................................. 7

33 C.F.R. §330.2(i) ................................................................. 17

33 C.F.R. §330.6 ..................................................................... 7

33 C.F.R. §330.6(a) .................................................................. 7

50 C.F.R. §402.14(a) ................................................................ 27

## FEDERAL REGISTER

42 Fed. Reg. 37,122 (July 19, 1977) ............................................. 6

47 Fed. Reg. 31,794 (July 22, 1982) ............................................. 6

53 Fed. Reg. 3120 (Feb. 3, 1988) ............................................... 11

80 Fed. Reg. 26,832 (May 11, 2015) ........................................ 27, 28

82 Fed. Reg. 1860 (Jan. 6, 2017)................................2, 7, 15, 16, 17, 23, 26

## I.    Introduction

Plaintiffs' challenge is a rehash of prior arguments asked and
answered by courts across the country.  Plaintiffs argue, as they have
numerous times before, that Nationwide Permit 12 ("NWP 12") is unlawful.
But multiple courts of appeals have rejected similar claims brought by
Plaintiffs and concluded that NWP 12 is consistent with the Clean Water
Act ("CWA"), and that the U.S. Army Corps of Engineers ("Corps")
complied with the National Environmental Policy Act ("NEPA") in
evaluating the effects associated with reissuance of the NWPs.  This Court
should do the same.[1]

Before the Court are Plaintiffs' facial challenges to NWP 12 under the
CWA, NEPA, and the Endangered Species Act ("ESA").  The cross-motions
for partial summary judgment do not involve NWP 12 verifications for the
Keystone XL Pipeline, or any other case-specific application of NWP 12.
Plaintiffs take issue with construction of Keystone XL, but it is purely
speculative whether the Corps' District Engineer will authorize the use of
NWP 12 for discharges of dredged or fill material associated with the

---

[1] The American Gas Association, American Petroleum Institute,
Association of Oil Pipe Lines, Interstate Natural Gas Association of
America, and National Rural Electric Cooperative Association ("NWP 12
Coalition" or "Coalition") file this memorandum in support of the Federal
Defendants' Cross-Motion for Partial Summary Judgment.  (Doc. 87).

construction of Keystone XL and, if so, what project-specific requirements may be imposed. In short, upholding the Corps Headquarters' reissuance of NWP 12 does not necessarily allow Keystone XL to proceed. But a decision calling into question or invalidating NWP 12 would have significant ramifications for the Corps, the NWP 12 Coalition's members, and other public and private entities that rely on NWP 12 to undertake critical and time-sensitive utility line activities nationwide.

For over 40 years, consistent with Congress' direction, the Corps has issued general CWA permits for discharges of dredged or fill material into navigable waters for specific categories of activities with no more than "minimal adverse environmental effects." 33 U.S.C. §1344(e). Through NWP 12, the Corps authorizes minor, and typically temporary, discharges of dredged or fill material for "construction, maintenance, repair, and removal of utility lines and associated facilities." 82 Fed. Reg. 1860, 1985 (Jan. 6, 2017). Covered "utility lines" include water, gas, oil, or sewer pipelines and electric or communication lines. *Id.* Many of the utility line activities covered by NWP 12 are either overhead lines, which cross above waterbodies, or lines placed underground with only minor, temporary impacts. *Id.* at 1986.

The Coalition's members rely on NWP 12 for the timely authorization of minor discharges associated with utility line activities, which are critical to the safe, affordable, and reliable delivery of energy to U.S. consumers, including rural customers, schools, hospitals, and businesses. The specific utility line activities undertaken by the Coalition's members include necessary maintenance and servicing of linear pipelines and electrical transmission, distribution, and water lines, which are conducted on tight schedules designed to ensure the safety, security, and reliability of linear infrastructure.

The Corps' review and approval of NWP 12 is robust, and Coalition members, as well as Plaintiffs, participated in the reissuance process. Plaintiffs may (again) be unhappy with the Corps' reissuance of NWP 12, but no matter how many times they argue that the Corps' action is unlawful, substantively and procedurally, the Corps' decision is plainly permissible.

Substantively, many of Plaintiffs' CWA claims are indistinguishable from the claims rejected by the Tenth Circuit, which upheld the structure and substance of NWP 12. *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043 (10th Cir. 2015) ("*Bostick*"). Plaintiffs offer no persuasive reason for this Court to depart from the Tenth Circuit's well-reasoned decision. With respect to the ESA, the Corps acted reasonably when it determined that reissuance of

the NWPs has "no effect" on listed species or designated critical habitat, and ensured, through General Condition ("GC") 18, that project-specific application of an NWP that "may affect" listed species or designated critical habitat will undergo appropriate ESA consultation.

Plaintiffs' procedural NEPA challenge fares no better. Plaintiffs disregard key principles about the scope of the Corps' NEPA review, as well as the deference owed to the Corps' interpretation of its longstanding, judicially approved, NEPA regulations. The Corps' review of environmental effects under NEPA extends only to those effects proximately related to "discharges" into "waters of the United States" ("WOTUS"). The Corps met its NEPA obligation here by evaluating the environmental effects of discharges that could be authorized by NWP 12. The Corps properly declined to evaluate effects outside its jurisdiction.

In sum, the minor utility line discharges authorized by NWP 12 have been determined by the Corps based on its decades of experience—and in full compliance with the CWA, NEPA, ESA, and Congressional intent—to cause only minimal disturbances to jurisdictional waters. The Corps' decision is correct and entitled to deference. This Court should follow the well-trod path and uphold NWP 12. To do otherwise could effectively

nullify the NWP program and put in peril many important utility line activities across the country.

## II.    Background

### A.    Congress Amended the CWA in 1977 to Authorize the Corps to Issue General Permits for Minor Discharges with Only Minimal Adverse Effects.

CWA §404 authorizes the Corps to issue permits for discharges of dredged or fill material into WOTUS.  Congress amended §404 in 1977 to authorize the Corps to issue general permits for categories of discharges that (1) "are similar in nature"; (2) will cause only minimal adverse effects; and (3) will have only minimal cumulative adverse effects.  33 U.S.C. §1344(e).

Congress recognized the importance of streamlined permitting to protect the efficiency and usefulness of the §404 program, fearing that lengthy reviews of relatively minor activities would undermine environmental protection by impairing the Corps' ability to focus on more significant activities.  H.R. Rep. No. 95-139 (1977), *reprinted in* 4 A Legislative History of the Clean Water Act of 1977, at 1217 (1978).

For over four decades, the Corps has viewed utility line activities as an appropriate category for an NWP.  The selection of utility lines in 1977 as one of the first NWPs reflects the Corps' longstanding determination that utility line activities have relatively minor, and often temporary, impacts on

WOTUS. 42 Fed. Reg. 37,122, 37,146, 37,131 (July 19, 1977). This is so because utility lines tend to be narrow and to follow the contours of the land, and frequently either are buried below or span above waters they cross.

Indeed, the Corps' original 1977 Utility Line Permit, the ancestor of NWP 12, was before Congress when it amended §404 to provide for general permits. The original utility line permit, unlike today's NWP 12, imposed no limit on the acreage of authorized discharges and required no preconstruction notification ("PCN"). *Id.* at 37,146. Nevertheless, the House and Senate recognized with approval the Corps' 1977 NWPs. *See, e.g.*, 47 Fed. Reg. 31,794, 31,798 (July 22, 1982) (noting many of the NWPs "were in effect at the time Congress adopted Section 404(e)," and "[t]he legislative history clearly shows Congress' intent to endorse the program … and to encourage its expansion").

**B.    The Corps' Regulatory Framework Governing NWP 12 Ensures the Statutory Minimal Effects Standard Is Met.**

Over the years, based on its technical experience, the Corps has developed and refined NWP 12 to include numerous terms and restrictions, PCN requirements, and GCs, which collectively ensure the statutory minimal effects standard is met.

As the Federal Defendants explain, the Corps carefully addresses NWP activities at three levels—Headquarters, Division, and District—with each review providing additional analysis and conditioning at the national, regional, and project-specific levels, respectively, to ensure the statutory minimal effects standard is met. (Doc. 86 at 4-6).

As authorized, NWP 12 provides for minor discharges of dredged or fill material for the construction, maintenance, repair, and removal of utility lines and associated facilities, provided the activity meets NWP 12's strict terms and conditions, including 32 GCs. 82 Fed. Reg. at 1985, 1998-2004. Project proponents must provide PCN to the Corps District in at least seven distinct circumstances. *Id.* at 1986.

When PCN is required, the project proponent must await verification from the District Engineer that the activity complies with NWP 12 before proceeding. *Id.* at 1986. The District Engineer may add project-specific conditions to ensure the minimal effects standard is met, or conclude the project does not qualify for NWP 12 and require an individual permit, *id.* at 1862; 33 C.F.R. §330.6, and retains discretion to suspend, modify, or revoke any verification. 33 C.F.R. §330.1(d). No additional NEPA analysis is required for NWP verifications. *Id.* §330.6(a).

## C. Courts Have Routinely Upheld the NWP Program, Including NWP 12.

Many of Plaintiffs' facial claims have already been reviewed and rejected by the courts.

Most relevant is *Sierra Club, Inc. v. Bostick*, No. CIV-12-742-R, 2013 WL 6858685 (W.D. Okla. Dec. 30, 2013), *aff'd*, 787 F.3d 1043 (10th Cir. 2015), in which the same Plaintiffs raised facial and as-applied challenges to NWP 12, under NEPA and the CWA, regarding a different segment of the Keystone pipeline. In *Bostick*, the district court rejected Plaintiffs' attempts "to cast NWP 12 as solely applying to oil pipelines," *id.* at *9, as well as Plaintiffs' reliance on cases involving individual CWA permits, recognizing they "are not helpful in the context of assessing an NWP, because NWPs are not directed to particular projects, but rather assess on a nationwide basis the impact of a category of activity." *Id.* The court upheld the "single and complete linear project" definition, *id.* at *19-20, and confirmed the Corps made the necessary minimal effects determination when it reissued NWP 12, which was entitled to deference. *Id.* at *22-23. The court similarly rejected Plaintiffs' NEPA claim, holding that the Corps properly considered the cumulative impacts of discharges of dredged or fill material, and reasonably studied the impacts of NWP 12, which did not require analysis of oil spills. *Id.* at *9.

The Tenth Circuit affirmed, upholding the structure and substance of NWP 12. *Bostick*, 787 F.3d 1043. The Tenth Circuit specifically rejected Plaintiffs' argument that the Corps should have conducted a NEPA analysis before issuing verifications, holding that a NEPA analysis is not necessary at the verification stage. *Id.* at 1051; *accord Snoqualmie Valley Preservation Alliance v. U.S. Army Corps of Eng'rs,* 683 F.3d 1155, 1160 (9th Cir. 2012) (per curiam) (NWPs undergo NEPA review at the time of reissuance, not when a particular project is verified). The Tenth Circuit further held that the Corps' reissuance of NWP 12 complied with §404(e)'s minimal effects standard, and that the Corps permissibly interpreted §404 to allow a partial deferral of its minimal impacts analysis. *Bostick*, 787 F.3d at 1055.

The Tenth Circuit is not alone. Plaintiffs also challenged NWP 12 verifications for the Flanagan South oil pipeline, but the D.C. Circuit squarely rejected Sierra Club's expanded view of NEPA and §404, confirming that the Corps' NEPA duties are limited by the nature of its permitting authority. *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31 (D.C. Cir. 2015). The D.C. Circuit thus rejected Plaintiffs' argument that the Corps should have analyzed the impact of the construction and operation of the entire pipeline when issuing NWP 12 verifications for the

project, and upheld the Corps' NEPA and cumulative effects analyses for NWP 12 undertaken at the time of reissuance.

Separately, NWP 21, which authorizes minor discharges of dredged or fill material for surface coal mining operations, has been upheld as consistent with the CWA and NEPA by the Eleventh and Fourth Circuits. The Eleventh Circuit recognized the special deference afforded to the Corps with regard to determining whether activities authorized by NWPs meet statutory requirements because the Corps "is 'making predictions, within its area of special expertise'" and "[t]his is not an area where we may easily second-guess the Corps." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 833 F.3d 1274, 1289 (11th Cir. 2016). The Fourth Circuit, in upholding NWP 21, affirmed the Corps' approach in evaluating NWPs at the national and project-specific levels. *See Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493, 502 (4th Cir. 2005) ("*Bulen*"). Rejecting the argument that §404(e) requires the Corps to guarantee the absence of more than minimal impacts when it issues an NWP, *Bulen* held that "neither that section nor any other provision of the CWA specifies how the Corps must make the minimal-impact determinations, the degree of certainty that must undergird them, or the extent to which the Corps may rely on post-issuance procedures in making them." *Id.* at 500.

And the Eleventh Circuit reached the same conclusion in reviewing a general permit authorizing certain limited fills for suburban development. *Sierra Club v. U.S. Army Corps of Eng'rs*, 508 F.3d 1332 (11th Cir. 2007) (per curiam). Relying on *Bulen*, the court upheld the district court's determination that §404(e) allows the Corps to comply with the minimal effects standard, based, in part, on project-specific review. *Id.* at 1335-37.

> **D. Courts Have Repeatedly Confirmed that the Corps' Section 404 NEPA Obligation Extends Only to Environmental Effects Proximately Caused by Discharges of Dredged or Fill Material into WOTUS.**

The scope of a federal agency's analysis under NEPA is determined by the precise nature of the federal action, which in turn depends on the activities subject to the agency's control and responsibility. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767-68 (2004). The Corps' NEPA regulations—which have been approved by the Council on Environmental Quality and upheld by the Ninth Circuit, *see Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394, 399 (9th Cir. 1989) —confirm that "the activity the Corps studies in its NEPA document is the discharge of dredged or fill material." 53 Fed. Reg. 3120, 3121 (Feb. 3, 1988). The Corps' review does not extend to any larger activity outside the Corps' jurisdiction. *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1115-18 (9th Cir. 2000) (Corps' NEPA review of CWA permit need not include effects of

larger development project); *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 195 (4th Cir. 2009) ("the fact that the Corps' § 404 permit is central to the … valley-filling [of a mine] does not … give the Corps' 'control and responsibility' over" area outside Corps' jurisdiction).

## III.   Argument

Plaintiffs' facial challenge to NWP 12 fails for the same reasons courts have rejected prior challenges.  Substantively, the Corps fully complied with the CWA and the ESA in reissuing NWP 12.  And Plaintiffs' procedural NEPA claims are without merit—the Corps properly considered all environmental effects proximately caused by the discharge of dredged or fill material into WOTUS.  Plaintiffs' facial challenge to NWP 12 should be denied.

### A.   NWP 12's Structure and Project-Specific Review Ensure Compliance with CWA Section 404(e).

Plaintiffs argue that authorized utility line activities under NWP 12 will have more than "minimal adverse environmental effects," and that the Corps cannot rely on project-level review to comply with the CWA.  (Doc. 73 at 38-43).  But Plaintiffs' claims are the same ones they raised in *Bostick*, which the Tenth Circuit wholly rejected:  "The environmental groups have not shown that [NWP 12] authorizes linear projects with more-than-minimal

impacts, and the Corps has permissibly interpreted the statute to allow partial deferral of its minimal-impacts analysis." *Bostick*, 787 F.3d at 1055.

The Corps' approach and structure for its minimal effects determination, allowing for project-specific review, and the terms and conditions of NWP 12 are substantively the same as those reviewed and upheld by the Tenth Circuit. There is no reason for the Court to depart from the Tenth Circuit's determination that the Corps complied with the CWA when reissuing NWP 12.

As in *Bostick*, at the Headquarters level, when reissuing NWP 12, the Corps analyzed the impacts of utility line activities authorized by NWP 12 to ensure the minimal effects standard was met. *Id.* at 1056; *accord* NWP005328. The Corps acknowledged "that its analysis [entailed] some level of speculation about future operations." *Bostick*, 787 F.3d at 1056; *accord* NWP005330-31 (estimating uses of NWP 12). To counteract the uncertainty that exists due to the predictive nature of the NWPs, "the Corps added safeguards involving the use of project-level personnel, requiring them to ensure that particular activities would not have more than a minimal impact on the aquatic environment." *Bostick*, 787 F.3d at 1056; *accord* NWP005335. Put simply, "[t]he Corps made an environmental assessment of the predictable uses of [NWP] 12, but recognized the futility of

13

predicting every conceivable use for every conceivable type of utility line anywhere in the United States." *Bostick*, 787 F.3d at 1059.

Courts have routinely approved of the Corps' interpretation of §404(e) to allow project-specific review: "given the inevitable *ex ante* uncertainty the Corps confronts when issuing [an NWP], its reliance on post-issuance procedures is a reasonable, if not the only possible, way for it to cement its determination that the projects it has authorized will have only minimal environmental impacts." *Bulen*, 429 F.3d at 501; *accord Bostick*, 787 F.3d at 1060-61.[2]  This Court should do the same.

### 1. The NWPs Provide for Project-Specific Review by the Corps and Other Federal, State, and Local Authorities.

Plaintiffs attempt to distinguish the Tenth Circuit's approval of NWP 12 in *Bostick* by claiming there will be no "project-level review for most of the water crossings authorized under NWP 12."[3]  (Doc. 73 at 41).  But the

---

[2] *Coalition to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, No. C16-0950RSL, 2019 WL 5103309 (W.D. Wash. Oct. 10, 2019), is distinguishable because it involved a different NWP, authorizing shellfish aquaculture activities in a narrow geographic area.  That a district court found the Corps' analysis of the shellfish aquaculture NWP to be lacking bears no relevance to the Corps' analysis of NWP 12, which has been upheld by the Tenth Circuit.  NWP 12, unlike the NWP at issue in *Puget Sound*, authorizes utility line activities that are similar in nature nationwide, and the Corps has provided a detailed and judicially-approved minimal effects analysis.

[3] Plaintiffs reference the now-suspended Keystone XL verifications to support their broad assertion.  (Doc. 73 at 41).  What may or may not have

structure and requirements of NWP 12, as reviewed and upheld by the Tenth

Circuit, do not vary from the 2017 NWP 12.  NWP 12, as conditioned, is

protective and requires PCN in many circumstances.  In fact, in the

Coalition's experience, most (if not all) linear infrastructure projects relying

on NWP 12 will involve at least one crossing that triggers PCN, ensuring

project-specific review by the District Engineer.

Plaintiffs further claim that "[i]n practice … the Corps generally

limits any project-level review to those water crossings requiring a PCN,

which are often a small subset of the project's total crossings." (Doc. 73 at

6).  Nothing could be further from the truth.  Once PCN is required for one

crossing, Note 8 of NWP 12 confirms that the PCN must include a

description of all crossings authorized by an NWP, including any non-PCN

crossings, thus ensuring the Corps will examine the cumulative impacts of

the proposed project.  82 Fed. Reg. at 1986.

Moreover, Plaintiffs' assertion that construction in non-PCN waters

might commence before an entire project is reviewed (Doc. 73 at 9, 23),

significantly misapprehends the practical realities of linear project

---

occurred with respect to the Corps' review of verifications for Keystone XL
is irrelevant to this Court's review of Plaintiffs' facial challenges and
outside the record.  (Doc. 89).

construction.  Linear projects, such as natural gas and oil pipelines and transmission and communication lines, undergo detailed review by federal, state, and local authorities.  These capital intensive projects are subject to tight timelines and complex funding mechanisms, and incorporate best management practices to minimize adverse impacts on the environment. Due to the extensive regulatory and funding requirements, project developers will typically await all necessary authorizations *before* commencing construction.  It would be inefficient and costly and create financial risk for a project developer to proceed *ad hoc* with construction of a minor portion of an interstate project in non-PCN waters, while awaiting verifications for the PCN-portions of the line (not to mention any other necessary federal, state, or local approvals).

As the Corps recognized, utility line activities are subject to other federal laws administered by other federal agencies, which address requirements outside the Corps' authority and control.  82 Fed. Reg. at 1884.  For example, interstate natural gas pipelines undergo comprehensive environmental review by the Federal Energy Regulatory Commission ("FERC") under the Natural Gas Act ("NGA"); the Department of Transportation extensively regulates the safety of pipeline transportation and facilities (including with regard to design, installation, construction, and

maintenance), and EPA and the Coast Guard address oil spills through the Oil Pollution Act. *Id.* In addition, construction of linear projects may require, *inter alia*, ESA consultation with the U.S. Fish and Wildlife Service or National Marine Fisheries Service ("Services"), compliance with the National Historic Preservation Act, and CWA §402 permits. Moreover, there may be state and local reviews, including state-NEPA and CWA §401 water quality certification. An NWP 12 authorization for a linear project of this nature would thus represent just one of many required permits, authorizing a small portion of the overall project.

> 2. **Plaintiffs' Challenge to the "Separate and Distant" Definition Is Indistinguishable from the Claim Rejected by the Tenth Circuit in *Bostick*.**

Plaintiffs argue, as they did in *Bostick*, that allowing NWP 12 to be used for "separate and distant" crossings does not comply with §404(e). (Doc. 73 at 42-43). As the Federal Defendants explain (Doc. 86 at 17-20), since 1988, the Corps has "calculate[d] the ½-acre threshold 'separately for each separate and distant crossing.'" *Bostick*, 787 F.3d at 1056; *see also* 33 C.F.R. §330.2(i). The Corps did not act arbitrarily or capriciously by relying on its long-standing "separate and distant" definition, codified in Corps regulations, and upheld by the Tenth Circuit in *Bostick*, when reissuing NWP 12.

**B.      The Corps Complied with NEPA in Reissuing NWP 12.**

Before reissuing NWP 12, the Corps fully analyzed relevant environmental effects proximately caused by minor discharges of dredged or fill material into WOTUS. The Corps' NEPA analysis was not arbitrary or capricious and is entitled to deference.

> **1.      The Corps Was Not Required to Consider Oil Spills or Climate Change before Reissuing NWP 12.**

Plaintiffs argue that the Corps was required to consider oil spills and climate change before reissuing NWP 12. (Doc. 73 at 11-15, 17-20). That argument is fundamentally flawed.

The Corps' substantive authority is limited to the discharge of dredged or fill material into WOTUS. *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1296 (11th Cir. 2019) ("*CBD*"). And the Corps' NEPA obligation is similarly limited to environmental effects proximately caused by discharges of dredged or fill material authorized by the Corps permit. *Id.; Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 706 (6th Cir. 2014). *See also Winnebago Tribe of Neb. v. Ray*, 621 F.2d 269, 272-73 (8th Cir. 1980) (Corps' NEPA review for transmission line river crossing limited to those parts of the power line that affected navigable waters, not entire transmission line); *Save the Bay, Inc. v. U.S. Corps of Eng'rs*, 610 F.2d 322, 327 (5th Cir. 1980)

(NEPA review of Corps permit authorizing construction of facility wastewater pipeline not required to consider overall impacts of facility).

The Corps does not authorize or control oil pipelines. The Corps does not have authority to (1) "regulate the construction, maintenance, or repair of upland segments of pipelines"; (2) "regulate the operation of oil and gas pipelines"; (3) "address spills or leaks from oil and gas pipelines;" NWP005268, or (4) "regulate the burning of fossil fuels that are being transported by pipelines." NWP005270. Rather, the Corps' authority and the action analyzed for NEPA purposes is reissuance of NWP 12, authorizing utility line activities involving minor discharges of dredged or fill material into WOTUS. The Corps' focus for NEPA purposes is therefore on the minor discharges authorized by NWP 12, not oil spills or other operational impacts from utility lines that could make use of NWP 12. *Pub. Citizen*, 541 U.S. at 770; *CBD*, 941 F.3d at 1296-98.

Plaintiffs rely on cases that are plainly distinguishable because they involve challenges to individual §404 permits for specific projects, as opposed to NWPs. (Doc. 86 at 26). *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 867-68 (9th Cir. 2005), involved an individual permit for an oil tanker port, where the environmental effects associated with increased maritime traffic at a new dock were the direct consequence

of the individual permit. *See also Sierra Club v. Sigler*, 695 F.2d 957, 961

(5th Cir. 1983) (individual permit to construct deepwater port and crude oil

distribution system). In that specific context, consideration of oil spills

makes sense because of the direct link between the authorized activity and

an increased risk of oil spills. *Ocean Advocates*, 402 F.3d at 868. The same

is true of *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,

where the Corps expressly considered the possibility of oil spills when

granting a federal easement for a specific oil pipeline. 255 F. Supp. 3d 101,

116, 122, 132-34 (D.D.C. 2017).

Second, with respect to climate change, Plaintiffs' argument relies

almost entirely on *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017).

As explained by the Federal Defendants (Doc. 86 at 25-26), that case is

distinguishable, and the Corps' limited authority here bears little

resemblance to FERC's broad authority under the NGA. *CBD*, 941 F.3d at

1300. Moreover, the interpretation advanced in *Sierra Club v. FERC* has

been called into question by the Eleventh Circuit, *id.* at 1299-1300, and is

not binding precedent for this Court.

In sum, what is appropriate for the Corps to consider in connection

with an individual permit for a specific, known project is far different from

what the Corps must consider in reissuing NWP 12. At a minimum, the

Corps has applied "a reasonable interpretation of its own regulations and its own substantive expertise," *id.* at 1300, in deciding that oil spills and climate change are not proximately related to the reissuance of NWP 12, and that reasonable decision is entitled to deference. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-18 (2019).

> ### 2. The Corps Properly Addressed Effects from the Inadvertent Return of Drilling Fluid When Reissuing NWP 12.

Plaintiffs wrongly claim that the Corps did not analyze so-called "frac-outs" when reissuing NWP 12. (Doc. 73 at 16-17). As the Federal Defendants explain (Doc. 86 at 29-30), this is incorrect.

"Frac-out" refers to the "inadvertent return[] of drilling fluids that can occur during horizontal directional drilling operations to install utility lines below jurisdictional waters and wetlands." NWP005274. Although the inadvertent release of drilling fluid is outside the scope of the Corps' §404 authority because drilling fluid is not dredged or fill material, NWP005274, the Corps took appropriate steps to ensure that any inadvertent release of such fluid is timely remediated. Specifically, the Corps modified NWP 12 to authorize remediation activities that involve discharges of dredged or fill material into WOTUS and are necessary to address "inadvertent returns to protect the aquatic environment." NWP005275. This provision is intended

"to encourage timely remediation of these inadvertent returns of drilling fluids to protect the aquatic environment." NWP005276. Moreover, "where there is the possibility of such inadvertent returns, district engineers may add conditions to the NWP 12 verification requiring activity-specific remediation plans to address these situations, should they occur during the installation or maintenance of the utility line." NWP005274. Accordingly, the Corps' analysis was not arbitrary and capricious.

### 3. The Corps Fully Considered the Cumulative Effects of NWP 12.

Plaintiffs again argue that the Corps did not fully consider the cumulative effects associated with NWP 12. (Doc. 73 at 20-27). But the Corps' cumulative effects approach and analysis for NWP 12 was upheld in *Bostick*. *Bostick*, 2013 WL 6858685, at *9 ("[T]he Corps cumulative impacts analysis with regard to the reissuance of NWP 12 was not arbitrary and capricious."); *see also Bostick*, 787 F.3d at 1051-54. And other courts have upheld the Corps' approach for analyzing cumulative effects in connection with other NWPs. *Black Warrior Riverkeeper*, 833 F.3d at 1286; *Bulen*, 429 F.3d at 499.

Before reissuing NWP 12, the Corps expressly recognized that its cumulative effects analysis must "include other Federal and non-Federal activities that affect the Nation's wetlands, streams, and other aquatic

resources, as well as other resources … that may be directly or indirectly affected by the proposed action and other actions," NWP005305-06, including "present effects of past actions, including activities authorized by NWPs issued from 1977 to 2012 and constructed by permittees…." NWP005306.[4]

Moreover, following Headquarters level review of cumulative effects, NWP005305-16, Division Engineers confirm that use of NWP 12 on a regional level, as conditioned, meets the minimal effects standard, NWP005272, and District Engineers confirm that use of an NWP on a project-specific basis meets the minimal effects standard, including through imposition of activity-specific conditions such as mitigation. NWP005265. Note 8 to NWP 12 confirms that PCN must include a description of all crossings authorized by an NWP, ensuring that the District Engineer will examine the cumulative impacts of a project, 82 Fed. Reg. at 1889-90, and if

---

[4] Plaintiffs' reliance on *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1122 (9th Cir. 2005) is misplaced because the Corps did consider all proximately related environmental effects of NWP 12, and *Save Our Sonoran* involved an individual permit. *Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232 (D. Wyo. 2005), and *Defenders of Wildlife v. Ballard*, 73 F. Supp. 2d 1094 (D. Ariz. 1999), are distinguishable because, unlike here, in those cases, the Corps failed to analyze cumulative impacts at all.

the project does not meet the terms and conditions of NWP 12, an individual permit would be required. (Doc. 86 at 31).

Because NWPs are forward-looking and predictive with respect to potential environmental effects, it is appropriate to authorize Division and District Engineers to adopt additional conditions for NWP-authorized activities, if necessary. *See Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 413 (6th Cir. 2013) ("acknowled[ing] that the Corps may rely on post-issuance mitigation procedures to minimize environmental impacts" so long as it has "provide[d] some documented information supporting" its "minimal-cumulative-impact finding"). The Corps' cumulative effects approach and analysis is proper and complies with NEPA. *Bostick*, 2013 WL 6858685, at *9.[5]

## C. Plaintiffs' ESA Attack on NWP 12 Fails on the Merits.

Finally, Plaintiffs have not demonstrated that the Corps violated the ESA. The Chief of Engineers' reissuance of the NWPs only authorizes activities that have "no effect" on listed species or designated critical

---

[5] Plaintiffs cite *Northern Plains Resource Council, Inc. v. Surface Transportation Board*, 668 F.3d 1067, 1078 (9th Cir. 2011). But, as Federal Defendants discuss (Doc. 86 at 22), the Corps' cumulative effects analysis for a specific permit with a known route obviously differs from the Corps' cumulative effects analysis for a general permit like NWP 12, which is inherently predictive and has been upheld. *Bostick*, 787 F.3d at 1051-54.

habitat, and any project-specific application to use NWP 12 that "may affect" listed species or designated critical habitat must undergo ESA §7 consultation. Programmatic consultation on the Headquarters' reissuance of NWP 12 is unnecessary in light of the Corps' "no effect" determination, and it is the Corps' role and responsibility to define its action as reissuance of the NWPs and to make a "no effect" determination, as appropriate. The Corps' determination fully complies with the ESA, is reasonable and supported by the record, and is entitled to deference.

1. **The Corps' "No Effect" Determination Is Appropriate and Consistent with the ESA and the Protections of GC 18.**

Plaintiffs assert that the Corps violated the ESA by failing to initiate formal programmatic consultation with the Services to consider the impacts of NWP-authorized activities on protected species or critical habitat. (Doc. 73 at 27). Plaintiffs misunderstand programmatic consultation.

ESA §7(a)(2) requires a federal agency to ensure, through consultation, that "any action authorized, funded, or carried out" by that agency is not likely to jeopardize listed species or adversely modify designated critical habitat. 16 U.S.C. §1536(a)(2). In assessing application of ESA §7 to the NWPs, the focus is on the nature and extent of the Corps' action and the specific activities "authorized" by the NWPs.

The action under review at the Chief of Engineers level is reissuance of the NWPs, which authorizes only those activities that have "no effect" on listed species or designated critical habitat. 82 Fed. Reg. at 1999. Any activity that "may affect" a listed species or designated critical habitat must undergo project-specific consultation and verification by the District Engineer pursuant to GC 18, which requires PCN if any listed species "might be affected" or "is in the vicinity of the activity." *Id.* GC 18's "might be affected" and "in the vicinity of" standards are much broader and more conservative than the "may affect" standard under the Services' consultation regulations, and are protectively designed to ensure that any action even potentially triggering consultation is reviewed. GC 18 also specifies that "[n]o activity is authorized under any NWP which 'may affect' a listed species or critical habitat" until §7 consultation has been completed. *Id.*

These provisions, taken together, ensure that all activities authorized by NWPs comply with the ESA.

## 2. Programmatic Consultation Is Not Required.

Plaintiffs would have this Court substitute its judgment for the Corps' and compel the Corps to undertake formal programmatic consultation at the time of NWP reissuance. The broad programmatic consultation Plaintiffs

seek is not required by the statute or regulation, would lead to unnecessary and duplicative procedures, and would not further the purposes of the ESA.

GC 18 ensures ESA compliance by requiring consultation on an activity-specific basis. The appropriate time for consultation is when an activity is authorized that "may affect" listed species. 50 C.F.R. §402.14(a). The Corps' approach in the NWPs does just that.[6]

Plaintiffs point to the preamble of a rule revising ESA §7's consultation regulations, which cites the NWP program as an example of a program that provides a framework programmatic action. (Doc. 73 at 28 (citing 80 Fed. Reg. 26,832, 26,837 (May 11, 2015))). Simply providing the NWP program as an example is far different from the Services "explicitly direct[ing] the Corps to complete programmatic consultation," and the "Corps unlawfully ignor[ing] that directive," as Plaintiffs contend. (Doc. 73 at 30). Moreover, the Corps' "no effect" determination coupled with GC 18, which provides for consultation on future actions that "may affect" listed

_____

[6] Plaintiffs suggest that the Corps' approach is at odds with *Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1 (D.D.C. 2005), which held that programmatic consultation was necessary to determine potential effects of four NWPs implemented by the Corps' Jacksonville District in panther habitat. GC 18 has been updated twice since *Brownlee* to provide more detailed instruction to ensure consultation requirements are fully met. Moreover, *Brownlee* was focused on whether an action may affect the panther and specific provisions relating to consultation over panther habitat.

species or critical habitat, is consistent with the incidental take rule's provisions. The preamble to the incidental take rule confirms that "this regulatory change does not imply that §7 consultation is required for a framework programmatic action that has no effect on listed species or critical habitat." 80 Fed. Reg. at 26,835.

### 3. The Corps' Comprehensive Review at the Project-Level Pursuant to GC 18 Addresses Cumulative Impacts.

Plaintiffs further assert that regional conditions and project-level consultations are inadequate substitutes for programmatic consultation because such "analyses fail to adequately analyze NWP 12's cumulative impacts to listed species…." (Doc. 73 at 35-36).

Plaintiffs are incorrect. NWP 12 itself does not authorize any activity that "may affect" listed species or habitat. The Corps confirms, through consultation pursuant to GC 18 and the ESA regulations, that project-specific use of NWP 12 does not jeopardize listed species, or lead to destruction or adverse modification of critical habitat. Plaintiffs fail to identify any specific instances where an NWP-authorized activity led to jeopardy of listed species or destruction or adverse modification of critical habitat despite the Corps' project-specific review and consultation.

The cases Plaintiffs cite are distinguishable (Doc. 73 at 35), because they involved specific agency action that impacted protected species or their

habitat. (Doc. 86 at 41-42); *Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290 (9th Cir. 1992) (BLM must consult on management strategy for timber sales within spotted owl habitat); *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) (FWS must consider post-leasing impacts to four species during consultation on oil and gas lease sales). Importantly, the nature of the activities authorized at the federal level in *Lane County* and *Conner* impacted protected species or habitat, while the Headquarters' reissuance of NWP 12 has "no effect" on listed species or habitat.

Plaintiffs further allege, without evidence, that "[t]here is … no assurance that project-specific consultation will even occur," because the PCN requirement "unlawfully delegates the initial effects determination to the applicant, whereas ESA Section 7(a)(2) requires federal agencies to make that determination." (Doc. 73 at 36).

This claim is merely speculative. There is no evidence of unauthorized conduct or noncompliance with GC 18 leading to jeopardy or destruction or adverse modification of critical habitat. GC 32 requires the Corps to ensure that every PCN provides complete information. Even where PCN is not required, the Corps monitors and enforces the NWP program, including compliance with the ESA. Governing legal principles establish that the Corps and Services should presume that permittees will comply with

29

the applicable terms and conditions of the NWPs, including GC 18. *See, e.g., United States v. Norton*, 97 U.S. 164, 168 (1877) ("It is a presumption of law that official and citizens obey the law and do their duty…."); *Brownlee*, 402 F. Supp. 2d at 5 n.7 (courts must presume that permittees will comply with permit conditions).

### 4. Plaintiffs' Approach Would Defeat the Streamlining Approach Congress Intended for NWPs.

Plaintiffs are not suggesting the revocation of GC 18 or any project-specific consultations, but rather argue for the addition of more layers of consultation so that there would be a consultation procedure at the national, regional, and project-specific levels. Plaintiffs' argument would ensnarl the NWP program in the very same administrative and procedural red tape Congress sought to avoid in adopting the NWP program, without improving the project-specific review provided by existing conditions and procedures.

Through its project-specific analysis, the Corps has fully complied with its obligations under the ESA while remaining faithful to Congressional intent in establishing the NWP program. The Court should uphold the Corps' decision to reissue NWP 12, as so conditioned.

## IV. Conclusion

For the foregoing reasons, this Court should grant the Federal

Defendants' Cross-Motion for Partial Summary Judgment, and deny the

Plaintiffs' Motion for Partial Summary Judgment.[7]

Dated: December 30, 2019      Respectfully submitted,

/s/ *Karma B. Brown*
Deidre G. Duncan (*pro hac vice*)
Karma B. Brown (*pro hac vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1500
dduncan @HuntonAK.com
kbbrown@HuntonAK.com

/s/ *Brianne C. McClafferty*
William W. Mercer
Brianne C. McClafferty
HOLLAND & HART LLP
401 North 31st Street, Suite 1500
Billings, MT 59101
(406) 252-2166
wwmercer@hollandhart.com
bcmcclafferty@hollandhart.com

*Counsel for Defendant-Intervenors*
*American Gas Association, American*
*Petroleum Institute, Association of Oil Pipe*
*Lines, Interstate Natural Gas Association of*
*America, and National Rural Electric*
*Cooperative Association*

---

[7] The NWP 12 Coalition reserves the right to address remedies, if that stage is reached.

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Memorandum of the NWP 12 Coalition in Support of the Federal Defendants' Cross-Motion for Partial Summary Judgment complies with the requirements of Local Rule 7.1(d)(2) and contains 6,487 words, excluding the parts exempted by Local Rule 7.1(d)(2)(E), according to the word count calculated by Microsoft Word 2016.

/s/ *Karma B. Brown*

## CERTIFICATE OF SERVICE

I hereby certify that on December 30, 2019, I filed the above pleading with the Court's electronic case management system, which caused notice to be sent to counsel for all parties.

/s/ *Karma B. Brown*