Robert L. Sterup
BROWN LAW FIRM, P.C.
315 North 24th Street
P.O. Drawer 849
Billings, MT 59103-0849
Tel. (406) 248-2611
Fax (406) 248-3128
rsterup@brownfirm.com

David Y. Chung (*pro hac vice*)
Amanda Shafer Berman (*pro hac vice*)
Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
(202) 624-2500
dchung@crowell.com

*Counsel for Amici Curiae Edison Electric Institute, Utility Water Act Group, and International Brotherhood of Electrical Workers*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS, *et al.*,<br>Defendants,<br><br>TC ENERGY CORPORATION, *et al.*,<br><br>Intervenor-Defendants. | Case No. CV 19-44-GF-BMM<br><br><br>**BRIEF OF AMICI CURIAE EDISON ELECTRIC INSTITUTE, UTILITY WATER ACT GROUP, AND INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS** |

# CORPORATE DISCLOSURE STATEMENT

The undersigned counsel for *amici curiae*, Edison Electric Institute ("EEI"), Utility Water Act Group ("UWAG"), and International Brotherhood of Electrical Workers ("IBEW"), certifies that EEI and IBEW are nonprofit corporations that have no parent corporation and have never issued any stock. IBEW is affiliated with the American Federation of Labor and Congress of Industrial Organizations, which is also a nonprofit.

UWAG is an *ad hoc*, unincorporated entity comprised of individual electric utilities and national trade associations. UWAG is not a parent, subsidiary, or affiliate of any corporation or other entity that has any outstanding securities in the hands of the public, and no publicly-held company has a 10% or greater ownership interest of UWAG.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

INTERESTS OF *AMICI CURIAE* ........................................................... 1

BACKGROUND ......................................................................................2

I.  Plaintiffs' Broad Facial Challenge to NWP 12. ..........................................2

II. Potential Negative Ramifications on Critical Infrastructure Development and Maintenance. ....................................................................................3

ARGUMENT ............................................................................................4

I.  NWP 12 Reflects the Corps' Longstanding, Deference-Worthy Expertise In Implementing the CWA and NEPA. ....................................................4

II. The Corps' Determination that Reissuance of NWP 12 had "No Effect" for ESA Purposes is Well Grounded and Warrants Deference. ..............................11

    A. Under the ESA, the Corps, as the Action Agency, is Responsible for Making "No Effect" Determinations for its Actions. ...................................12

    B. The Corps' Determination that NWP 12 Has "No Effect" on Species or Habitat Merits Deference. ............................................................16

CONCLUSION ........................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971), *abrogated on other grounds by Califano v.
  Sanders*, 430 U.S. 99 (1977)...............................................................12, 21

*Defenders of Wildlife v. Flowers*,
  414 F.3d 1066 (9th Cir. 2005) ............................................................15

*Defenders of Wildlife v. Kempthorne*,
  No. 04-1230-GK, 2006 WL 2844232 (D.D.C. Sept. 29, 2006) ........................13

*Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*,
  887 F.3d 906 (9th Cir. 2018) ...............................................................20

*NRDC v. Callaway*,
  392 F. Supp. 685 (D.D.C. 1975).............................................................5

*Pac. Rivers Council v. Thomas*,
  30 F.3d 1050 (9th Cir. 1994) ...............................................................13

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ...............................................................16

*Southwest Center for Biological Diversity v. U.S. Forest Service*,
  100 F.3d 1443 (9th Cir. 1996) .............................................................15

*Sw. Ctr. for Biological Diversity v. Glickman*,
  932 F. Supp. 1189 (D. Ariz.), *aff'd, Sw. Ctr. for Biological
  Diversity v. U.S. Forest Serv.*, 100 F.3d 1443 (9th Cir. 1996) ..........................20

**Statutes**

16 U.S.C. § 1536(a)(2)........................................................................12

33 U.S.C. § 1344(e) .......................................................................2, 4, 5, 7

33 U.S.C. § 1362...............................................................................4

## Other Authorities

33 C.F.R. § 330.1 ..........................................................................8

33 C.F.R. § 330.2(i) .....................................................................10

33 C.F.R. § 330.4(b) .....................................................................8

33 C.F.R. § 330.5 ..........................................................................7

50 C.F.R. § 402.14(a) ..................................................................13

42 Fed. Reg. 37,122 (July 19, 1977).........................................6, 7

47 Fed. Reg. 31,794 (July 22, 1982).........................................7, 8

51 Fed. Reg. 19,926 (June 3, 1986) ...........................................14

56 Fed. Reg. 59,110 (Nov. 22, 1991) ...........................................8

82 Fed. Reg. 1,860 (Jan. 6, 2017) ....................................... *passim*

84 Fed. Reg. 44,976 (Aug. 27, 2019) ..........................................14

H.R. Rep. No. 95-139 (1977).........................................................5

H.R. Rep. No. 95-830 (1977)......................................................5, 7

S. Rep. No. 95-370 (1977) .............................................................6

## <u>INTERESTS OF *AMICI CURIAE*</u>

Edison Electric Institute ("EEI"), Utility Water Act Group ("UWAG"), and International Brotherhood of Electrical Workers ("IBEW") (collectively "Electric Utility Amici") file this *amici curiae* brief supporting Defendants United States Army Corps of Engineers ("Corps"), *et al.*, and Defendant-Intervenors.

Electric Utility Amici represent the electric power sector and its workers, and their members routinely rely on nationwide permit ("NWP") 12 for the efficient and environmentally responsible construction, maintenance, and repair of electric transmission and distribution lines and associated facilities. Because Electric Utility Amici's members are mandated to provide safe and reliable electricity, often over long distances, those lines and facilities sometimes impact waters of the United States ("WOTUS") subject to Clean Water Act ("CWA") jurisdiction. Electric Utility Amici have participated in the development of NWP 12 since its first issuance, and their members regularly conform their construction, maintenance, and repair activities to NWP 12's requirements. They have a strong interest in the current and future availability of NWP 12 to continue to provide secure and reliable electricity to homes; public institutions like schools, hospitals, and fire stations; industrial and commercial facilities; and other customers. The public health, safety, and welfare depend on safe and reliable delivery of electricity, and the providers of that electricity depend on NWP 12.

## BACKGROUND

**I.    Plaintiffs' Broad Facial Challenge to NWP 12.**

Plaintiffs challenge the Corps' 2017 reissuance of NWP 12, a general permit issued under CWA section 404(e), 33 U.S.C. § 1344(e), used to authorize discharges of dredged or fill material into WOTUS associated with many activities undertaken by the electric sector. Specifically, NWP 12 in part authorizes discharges in connection with "the construction, maintenance, or repair of utility lines" "for the transmission for any purpose of electrical energy." 82 Fed. Reg. 1,860, 1,985 (Jan. 6, 2017). The Corps reviews and reissues NWP 12 through notice and comment rulemaking every five years to ensure ongoing compliance with applicable statutory requirements. *See generally id*.

Plaintiffs challenge the application of NWP 12 to activities related to the Keystone XL oil pipeline, but they also bring facial claims alleging that NWP 12 was issued in violation of the National Environmental Policy Act ("NEPA"), the CWA, and the Endangered Species Act ("ESA"). *See* Amended Complaint at 73-77, 81-84 (ECF No. 36). Plaintiffs request the Court "declare the Corps' issuance of NWP 12 in violation" of those statutes and remand NWP 12 to the Corps. *Id.* at 87-88 (Prayer for Relief at (a)-(b)). In their summary judgment brief, Plaintiffs attack NWP 12 broadly, including its use for electric infrastructure projects, not

just its application to Keystone XL or pipelines generally. *See* Mem. in Supp. Mot. for Summ. J. at 1, 17-42 (ECF No. 73) ("SJ Br.").

## II. Potential Negative Ramifications on Critical Infrastructure Development and Maintenance.

NWP 12 was largely designed for use by electric utilities, reflecting both the importance of a streamlined permit process for discharges of dredged or fill material into WOTUS associated with utility line activities, including electric transmission and distribution lines, and the minimal effect of such discharges on the aquatic environment. Many of NWP 12's terms and conditions are specific to electric transmission and distribution lines, such as provisions on foundations for overhead utility line towers, poles, and anchors; the exclusion from the preconstruction notification requirement for overhead utility lines in WOTUS that exceed 500 feet; and construction authorization for electric utility substations. *See* 82 Fed. Reg. at 1,985-86.

NWP 12 allows electric utilities to expedite CWA section 404 permits for projects that will have minimal adverse environmental impacts to jurisdictional waters, such as the construction, maintenance, and repair of electric utility infrastructure. NWP 12 is especially important in emergency situations where critical electric lines are damaged or destroyed by extreme weather or some other cause and must be repaired or replaced expeditiously. In such circumstances, a streamlined permitting process is critical to efficiently restore customers' access to

electricity. It is essential to Electric Utility Amici's operations that they can rely on NWP 12 to authorize discharges associated with electric utility activities.

The Corps' 2017 reissuance of NWP 12 complied with the CWA, NEPA, and the ESA. Any concerns Plaintiffs or the Court may have regarding NWP 12's application to the Keystone XL pipeline do not undermine its lawful use by electric utilities to provide power to consumers. The court should not enjoin that use.

## ARGUMENT

### I. NWP 12 Reflects the Corps' Longstanding, Deference-Worthy Expertise In Implementing the CWA and NEPA.

When the Corps reissues NWPs—as it most recently did in 2017—it is not undertaking a simple box-checking exercise. Rather, the Corps relies on its extensive technical expertise to thoroughly assess potential aquatic impacts under the CWA and NEPA. Over several decades, the Corps has carefully updated, refined, and implemented the NWPs, including the protective terms and conditions that govern the use of NWP 12, and its decisions are entitled to deference.

NWP 12 is supported by an extensive statutory and regulatory history. When Congress enacted CWA section 404 in 1972, it authorized the Corps to permit the discharge of dredged or fill material into "navigable waters." 33 U.S.C. §§ 1344, 1362. In 1977, Congress added Section 404(e) specifically to eliminate regulatory hurdles for discharges related to projects with minimal impacts on jurisdictional waters. *See* H.R. Rep. No. 95-830, at 38, 98, 100 (1977), *reprinted in* 3 A

Legislative History of the Clean Water Act of 1977 ("Leg. Hist.") at 348 (1978) (Conf. Rep.). That provision authorizes the issuance of permits on a nationwide basis covering entire categories of discharges that have no more than "minimal" individual or cumulative environmental effects. 33 U.S.C. § 1344(e). The Corps has developed and administered an extensive regulatory framework for over 40 years to ensure that its NWPs meet the CWA "minimal effects" standard.

At the time of the CWA's enactment, the Nation relied on extensive networks of wires to transmit electricity, but the 1972 Act did not provide for nationwide permits authorizing certain discharges related to the construction and repair of those critical networks. After a 1975 court decision ordered the Corps to regulate "navigable waters" under the CWA "to the maximum extent permissible under the Commerce Clause," *NRDC v. Callaway*, 392 F. Supp. 685, 686 (D.D.C. 1975), it quickly became apparent that a streamlined permit process was desperately needed for minor discharges of dredged or fill material associated with routine activities, such as construction of and work on electric utility infrastructure.

Without waiting for Congress to act,[1] the Corps established five nationwide permits in July 1977, including a permit for discharges associated with utility lines.

---

[1] *See* H.R. Rep. No. 95-139 (1977), *reprinted in* 4 Leg. Hist. at 1217 ("While considerable opposition to any increase in regulatory activity under section 404 was expressed, the Subcommittee . . . strongly urged the Corps of Engineers and the EPA to . . . develop workable regulations which would be capable of effective

The 1977 Utility Line NWP—the direct ancestor of today's NWP 12—defined "utility line" the same way NWP 12 does today: "any pipe or pipeline for the transportation of any gaseous, liquid, liquifiable, or slurry substance, for any purpose, and any cable, line, or wire for the transmission for any purpose of electrical energy, telephone and telegraph messages, and radio and television communication." 42 Fed. Reg. 37,122, 37,146 (July 19, 1977). But unlike today, the 1977 permit imposed no limit on the total acreage of authorized discharges and required no preconstruction notification ("PCN") to the Corps.[2]

After the Corps established the initial NWPs in 1977, the Senate began considering a bill to amend the CWA to "provide[] for the use of general permits as a mechanism for eliminating [] delays and administrative burdens[.]" S. Rep. No. 95-370, at 74, 80 (1977), *reprinted in* 4 Leg. Hist. at 707, 713. Notably, members in both chambers of Congress recognized with approval the Corps' new NWPs. *See* Senate Debate on the Clean Water Act of 1977 (Aug. 4, 1977),

---

administration and would not create undue hardship and inconvenience to potential applicants for permits.").

[2] The 1977 Utility Line NWP authorized the discharge of "[d]redged or fill material placed as backfill or bedding for utility line crossings provided there is no change in preconstruction bottom contours." 42 Fed. Reg. at 37,146. The Corps explained that the NWP set no acreage limit and required no PCN because its terms, such as preservation of contours, "limit any sedimentation or disruption of water flow in streams as a result of these activities." *Id*. at 37,131.

*reprinted in* 4 Leg. Hist. at 922 (statement of Sen. Baker that NWPs "received a favorable reaction by all interest groups"); H.R. Rep. No. 95-830 (1977).

In fact, in the 1977 CWA amendments establishing section 404(e), Congress adopted concepts and language from the Corps' 1977 NWP rule, including "nationwide" permits for "categories" of activities with "minimal" adverse individual or "cumulative" impacts. *Compare* 33 U.S.C. § 1344(e) *with* 42 Fed. Reg. at 37,130-31, 37,146-47. Congress thus confirmed that the Corps' NWPs—including the 1977 Utility Line NWP, which was much less stringent than today's NWP 12—met the statutory minimal effects requirement. When the Corps reissued the NWPs in 1982 after public comment,[3] it noted that many of the NWPs "were in effect at the time Congress adopted Section 404(e)" and that the "legislative history clearly shows Congress' intent to endorse the program . . . and to encourage its expansion." 47 Fed. Reg. 31,794, 31,798 (July 22, 1982).

The Corps has refined its NWP for utility lines through multiple renewal proceedings, thereby ensuring its continuing compliance with the statutory minimal effects standard. When the Corps reissued its five original NWPs in 1982, it also established new NWPs. *See id*. The 1982 NWP rulemaking created separately numbered NWPs for specific categories of activities, re-designated the

---

[3] The Corps headquarters issues notice and takes comment on proposed NWPs, 33 C.F.R. § 330.5(b)(2), (3), and Division Engineers provide notice and comment on proposed regional conditions. *Id*. § 330.5(c).

1977 Utility Line NWP as NWP 12, established regulations governing the NWP program in 33 C.F.R. Part 330, authorized Division Engineers to modify NWPs by adding regional conditions, and gave District Engineers the discretion to require individual permit applications. *See* 47 Fed. Reg. at 31,795, 31,798, 31,832-34. And the Corps "prepared environmental assessments for all proposed nationwide permits" to comply with NEPA. *Id*. at 31,798.

The 1991 NWP reissuance included significant amendments to the NWP regulations at 33 C.F.R. Part 330. *See* 56 Fed. Reg. 59,110, 59,134-47 (Nov. 22, 1991). Among other things, those amendments detailed the Chief of Engineers' responsibility to issue and condition NWPs at the headquarters level, the Division Engineers' responsibility to establish more restrictive regional conditions within Corps Districts and States, and District Engineers' responsibility to review specific projects and, if appropriate, impose project-specific conditions or require individual permits. 33 C.F.R. §§ 330.1(b), (d), 330.4(b)(1), (2).

When it reissued NWP 12 in 2017, the Corps provided an even more detailed qualitative and quantitative analysis of effects, ultimately concluding that the permit's impacts would be insignificant. *See* 82 Fed. Reg. at 1,890-91. The Corps explained that numerous general conditions, as well as regional and project-specific conditions, provide additional safeguards and mitigation that further support a finding of no significant impact. *See id*.

The current terms of NWP 12 do not authorize any activity that will result in a loss of more than 1/2 acre of jurisdictional waters, and require PCN for any activity that will result in a loss of more than 1/10 acre of jurisdictional waters, 82 Fed. Reg. at 1,986, or might affect endangered species. Because of these requirements, only activities with minor impacts—*e.g.*, construction and maintenance of electric utility lines that cross waters or wetlands at discrete points—may be conducted under NWP 12. The majority of those projects undergo PCN review, *see id*. at 1,864-65, further ensuring that they will have only minimal impacts.

The comprehensive terms and conditions that govern NWP 12 today assure that its use for electric utility line construction and maintenance satisfies the minimal effects requirement. For example, NWP 12 limits the allowable loss of waters for a single and complete project to half of an acre, 82 Fed. Reg. at 1,885, 1,985; requires that there be no change to preconstruction contours of WOTUS, *id.* at 1,985; requires that temporary fills be removed in their entirety and the affected areas returned to their original preconstruction elevations and revegetated, *id.* at 1,986; and requires that normal downstream flows be maintained, *id*. Furthermore, all NWPs are subject to 31 general conditions, which (inter alia) require the avoidance and minimization of adverse impacts through design and construction measures, 82 Fed. Reg. at 2,001; prohibit substantial disruption of

aquatic life cycle movements, *id.* at 1,998; and require the use of mats for heavy equipment used in wetlands, as well as soil erosion and sediment controls, *id.* at 1,999. Thus, NWP 12—which has evolved considerably from its 1977 origins—includes many safeguards to ensure that impacts from authorized discharges are individually and cumulatively minimal.

Critically, NWP 12 limits the total impacts at any single water crossing and simultaneously limits cumulative impacts. Plaintiffs attempt to downplay these protections, alleging that NWP 12 "can be used numerous times along a pipeline or utility route . . . with no mechanism to ensure that impacts would be minimal . . . ." SJ Br. at 43. They argue that nothing prevents reliance on NWP 12 for numerous water crossings in close proximity to each other. But most utility lines (including electric transmission lines) are narrow and linear, typically crossing separate water bodies at distant points and with only minimal impacts that do not accumulate in an ecologically material manner as they follow their path connecting generating stations and communities. *See* 82 Fed. Reg. at 1,883-85. Moreover, NWP 12 requires that crossings of single waterbodies must be sufficiently separate that they do not comprise individual channels in a braided stream, or individual arms of a large, irregularly shaped wetland or lake, further preventing cumulative impacts. 33 C.F.R. § 330.2(i).

Finally, the Corps' conclusion that the Environmental Assessment and Finding of No Significant Impact issued in conjunction with the 2017 NWP 12 satisfies NEPA is sound for the same reason as its minimal effects conclusion: the permit's many conditions ensure that environmental impacts are both individually and cumulatively minimal. This conclusion is informed by the Corps' long experience administering the NWP program, as well as issuing individual 404 permits for projects with impacts above NWP thresholds. A more expansive analysis is unwarranted given that NWP 12 projects, such as maintenance on above-water electric utility lines, are short-term activities with minimal impacts. The court should defer to the Corps' determination, underscored by decades of experience implementing the 404 program, that NWP 12's many conditions ensure that it will have minimal cumulative effects on aquatic resources.

## II. The Corps' Determination that Reissuance of NWP 12 had "No Effect" for ESA Purposes is Well Grounded and Warrants Deference.

The Corps' determination that its 2017 reissuance of NWP 12 would have "no effect" on listed species for ESA section 7 consultation purposes was grounded in the NWP framework that *precludes* any NWP use that is in the vicinity of, or might affect, listed species or critical habitat absent any required project-specific ESA section 7 consultation and verification. Thus, reissuance of NWP 12 itself had no effect on listed species or critical habitat, and the Corps' "no effect" determination is therefore sound and entitled to deference.

Plaintiffs fundamentally misconstrue the NWP framework. The Corps' reissuance of NWP 12 does not authorize any use of NWP 12 "if any listed species or designated critical habitat might be affected or is in the vicinity of the activity, or if the activity is located in designated critical habitat," "until notified by the district engineer that the requirements of the ESA have been satisfied and that the activity is authorized." 82 Fed. Reg. at 1,999. Contrary to Plaintiffs' arguments and hypothetical examples, *see* SJ Br. at 42, reissuance of NWP 12 did not authorize any activities that could affect listed species or critical habitat, but instead required project-specific ESA section 7 consultation, as necessary, prior to any such use of NWP 12. The Corps' corresponding conclusion that the issuance of NWP 12 itself has "no effect" on listed species or critical habitat was entirely correct, rather than a "clear error of judgment," and so must be upheld. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

A.    **Under the ESA, the Corps, as the Action Agency, is Responsible for Making "No Effect" Determinations for its Actions.**

When an agency determines that its own action will have no effect on listed species or critical habitat, it fulfills ESA section 7's requirement to "insure" that an action is not likely to jeopardize a listed species or adversely modify habitat. *See* 16 U.S.C. § 1536(a)(2). As the "action agency" within the ESA framework, the

Corps is responsible for making threshold effects determinations when it issues nationwide permits, as it properly did when reissuing NWP 12 in 2017.

Since the NWP program's inception, the Corps has issued nationwide permits in accordance with its longstanding view that it is required to initiate ESA consultation only for actions that it determines may affect listed species or critical habitat. *See* 50 C.F.R. § 402.14(a) (2015). This view is consistent with decisions from numerous courts recognizing that "Congress intended to allow Action Agencies to initially evaluate the potential environmental consequences of federal actions and to move forward on many of them without first consulting the Services[.]" *Defs. of Wildlife v. Kempthorne*, Civ. A. No. 04-1230 (GK), 2006 WL 2844232, at *19 (D.D.C. Sept. 29, 2006); *see also Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994) ("[I]f the [action] agency determines that a particular action will have no effect on an endangered or threatened species, the consultation requirements are not triggered.").

The consulting wildlife agencies—U.S. Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS") (together, "Services")—share the view that action agencies have authority to make threshold "no effect" determinations. When the Services promulgated the consultation regulations in 1986, they explained that while they may, "when appropriate, request consultation on particular Federal actions, [they] lack[] the authority to require the initiation of

consultation" and that "[t]he determination of possible effects is the Federal agency's responsibility." *Interagency Cooperation-Endangered Species Act of 1973*, 51 Fed. Reg. 19,926, 19,949 (June 3, 1986). Decades later, when revising their regulations, the Services reaffirmed their confidence in action agencies' ability to make informed "no effect" determinations, noting that "while the Services may recommend consultation, it is the Federal agency that must request initiation of consultation." 84 Fed. Reg. 44,976, 44,980 (Aug. 27, 2019).

Plaintiffs wrongly seek to strip the Corps of its lawful authority to make its own "no effect" determinations when reissuing NWPs. They misleadingly assert that "several courts" have rejected the Corps' interpretation that the act of reissuing NWPs has "no effect" on listed species, but in reality, no court has reviewed that interpretation. *See* SJ Br. at 33. Indeed, the cases that Plaintiffs rely on are inapposite, because they did not involve threshold "no effect" determinations comparable to the Corps' determination at issue in this case. *See id.* at 34-35.

Plaintiffs also overstate the significance of the NMFS's objection to the Corps' "no effect" determination. As explained above, the "no effect" determination is the Corps' alone to make. *See* 51 Fed. Reg. at 19,949. Importantly, the Ninth Circuit has upheld action agencies' "no effect" determinations even in cases where there is disagreement between the action agency and one of the wildlife agencies. For example, in *Defenders of Wildlife v.*

*Flowers*, 414 F.3d 1066, 1068-70 (9th Cir. 2005), the Ninth Circuit upheld a Forest Service "no effect" determination even though the FWS objected twice. In that case, FWS requested formal consultation, but the Court concluded that "[n]othing in the regulations mandates the action agency to enter into consultation after it receives such a request." *Id*. at 1069-70.

The Ninth Circuit similarly concluded that a "no effect" determination was not arbitrary and capricious in *Southwest Center for Biological Diversity v. U.S. Forest Service*, even after recognizing that the determination was "in tension with an internal [FWS] policy on agency actions that may affect the Mexican Spotted Owl." 100 F.3d 1443, 1446 (9th Cir. 1996). There, FWS's policy proclaimed that "agency actions within one mile of a Mexican Spotted Owl Protected Activity Center, or actions that alter mixed conifer or pine-oak forest habitats, may affect the Mexican Spotted Owl." *Id.* The challenged Forest Service action implicated both of those concerns. *Id.* Nonetheless, the Forest Service concluded that its action would not affect the Mexican Spotted Owl. The court upheld the Forest Service's determination, emphasizing that the agency "had no obligation to consider the views of [FWS]" and "was entitled to rely on the opinions and recommendations of its own experts." *Id*. at 1449.

Ultimately, the Corps is the action agency when it comes to the issuance of NWPs, and it appropriately exercised its authority to make a "no effect" determination when reissuing the NWPs in 2017.

### B.     The Corps' Determination that NWP 12 Has "No Effect" on Species or Habitat Merits Deference.

The Corps' determination that the issuance of NWP 12 will have "no effect" on species or habitat is sound, reflects the structure of the NWPs, and was based on its decades of experience administering the NWP program and NWP 12 specifically. In making that determination, the Corps made the sort of expert technical and scientific judgments that action agencies are entrusted to make, which receive heightened deference from reviewing courts. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601-02 (9th Cir. 2014) ("When examining this kind of scientific determination . . . a reviewing court must generally be at its most deferential.") (quotation marks and citation omitted).

Specifically, the Corps' 2017 "no effect" determination for NWP 12 was based in large part on its longstanding General Condition 18 ("GC 18") PCN requirement. *See* 82 Fed. Reg. at 1,874. GC 18 functions as a limitation on use of NWP 12, providing that NWP 12 does not authorize any activity "which is likely to directly or indirectly jeopardize the continued existence of a threatened or endangered species or a species proposed for such designation . . . or which will directly or indirectly destroy or adversely modify the critical habitat of such

species."[4] GC 18 also provides that NWP 12 does not authorize any activity which "may affect" a listed species or critical habitat without ESA section 7 consultation. *Id*. In fact, GC 18 specifies that any activity that "might" impact species or habitat—a lower bar than the statutory "may effect" standard—cannot proceed under NWP 12 unless and until it undergoes review in response to a PCN. *See* 82 Fed. Reg. at 1,888. The Corps must then either determine that the specific activity will have "no effect" on listed species or critical habitat, or, if it will have an effect, undertake consultation. *See id.* at 1,873. Thus, while reissuance of NWP 12 by Corps Headquarters directly authorized certain uses of NWP 12 (i.e., those that do not trigger PCN requirements), it did not itself allow any use of NWP 12 that would have any effect on listed species or critical habitat. Rather, any such authorized use of NWP 12 can only come later, on a case-by-case basis, following any required ESA consultation.

Plaintiffs assert that species and habitat could be negatively affected by NWP 12 despite GC 18, but fail to explain how that is possible in light of NWP 12's clear mandate that any activity that might affect species or habitat must undergo PCN. They seem to suggest that persons may simply ignore that

_____

[4] *2017 Nationwide Permit General Conditions*, Nationwide Permit Information - Army Corps of Engineers, *available at* https://www.nap.usace.army.mil/Portals/39/docs/regulatory/publicnotices/2017%2 0Nationwide%20Permit%20General%20Conditions.pdf.

requirement and unilaterally (and improperly) rely on NWP 12 to conduct activities that may harm species. But Plaintiffs' suggestion that persons conducting activities subject to CWA Section 404 permitting requirements will ignore the PCN requirement disregards the fact that such an activity would not be authorized by NWP 12, and is at odds with the Corps' past experience, and its informed projection that approximately 82 percent of projects conducted under NWP 12, accounting for over 97 percent of aquatic acreage impacted, will undergo PCN review. NWP005331.

Plaintiffs' suggestion that regulated entities will simply ignore NWP 12 requirements is also at odds with Electric Utility Amici's members' experience, which includes frequent interaction with the Corps and the Services to ensure full compliance with all requirements. Concurrently with the identification and delineation of WOTUS during project planning, Electric Utility Amici's members review whether federally protected species or their habitat (including designated critical habitat) may occur within the vicinity of or might be affected by the project. The process for conducting such reviews is often outlined in a District's regional conditions and consists of database reviews, suggested contacts for inquiries, or explicit lists for an activity or work in a waterbody.[5] In coordination

---

[5] *See, e.g.*, www.saw.usace.army.mil/Missions/Regulatory-Permit-Program/Agency-Coordination/ESA/. Based on Electric Utility Amici members' experience, NWP 12 applicants make full and careful use of those tools to ensure

with the Services, the Corps often includes species-protective special conditions in

NWP verification letters, requiring the project proponent to tailor activities to

avoid potential effects to species through monitoring, time of year restrictions,

barriers to avoid contact, requirements to stop work if species are observed, and/or

compliance with a conservation plan.[6] In addition, NWP verifications typically

include language requiring that ESA Section 7 obligations must be reconsidered

(and, if necessary, consultation reinitiated) if the project materially changes or if

new information reveals impacts of the project that may affect species or critical

---

compliance. For example, in 2019, an Electric Utility Amici member company working on a proposed access road reviewed FWS's "Information for Planning and Consultation" system. The system identified the Indiana Bat and Northern Long-eared Bat on the Official Species List for the project, but no critical habitat was identified within the project area. Based on that information, the member proposed that "no effect" and "not likely to adversely affect" determinations were appropriate. FWS, however, required the member to utilize a second data tool to look for specific habitat features. Using that tool, the member found possible habitat features and followed up with field surveys, ultimately finding no physical evidence of such features. After coordinating with FWS, which concurred with the "not likely to adversely affect" determinations, the member proceeded with construction. This example illustrates the availability of information to assist applicants in complying with GC 18, applicant diligence in complying with GC 18, Service diligence in ensuring compliance, and the conservative and protective approach taken by applicants and the Service.

[6] For example, before receiving an NWP 12 verification in 2019 for an electric transmission line, an Electric Utility Amici member company submitted the results of a threatened and endangered species database review to the Corps. The Corps forwarded the results to FWS, which requested preparation and implementation of an Indiana Bat Conservation Plan. The NWP 12 verification letter included a list of conditions, including that "the applicant must fully implement the avoidance, minimization, and conservation measures of the Indiana Bat Conservation Plan."

habitat in a manner not previously considered. Plaintiffs' suggestion that permittees will violate those conditions and other NWP 12-associated requirements ignores that noncompliance with CWA, ESA, and NWP requirements carries significant enforcement and citizen suit risks, and would be inconsistent with utility companies' environmental stewardship obligations and commitments.

An action agency's "no effect" determination warrants deference where it is based on the agency's expertise and experience. *See Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 924-26 (9th Cir. 2018) (holding the Corps reasonably concluded that a project's discharges would have "no effect" on Southern California steelhead, declining to "substitute our scientific judgment for that of the agency"); *Sw. Ctr. for Biological Diversity v. Glickman*, 932 F. Supp. 1189, 1193-94 (D. Ariz.), *aff'd*, *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443 (9th Cir. 1996) (deferring to Forest Service's "no effect" determination and recognizing that "[a] deferential approach is especially appropriate where, as here, the challenged decision implicates substantial agency expertise") (internal quotation marks and citation omitted).

That is precisely the case here. The Corps' conclusion that reissuance of the NWPs—in contrast to project-specific uses of NWPs that are authorized only after they undergo consultation under GC 18—has no effect on listed species was based in no small part on its experience administering the 404 program. The Corps is

well aware that most NWP 12 uses, including many electric utility-specific uses, require PCN, which gives the Corps the opportunity to review permittees' plans and confirm that their proposed activities will not harm species or habitat. *See* 82 Fed. Reg. at 1,861, 1,864. And the Corps' own data shows that consultation regularly occurs pursuant to the PCN requirement of NWPs. *See id.* at 1,873-74 (finding that thousands of consultations occurred annually under the NWP program in 2012-16). It was therefore reasonable for the Corps to conclude, based on the structure of the NWPs and its technical expertise—as well as decades of experience administering the nationwide permit program—that reissuance of NWP 12 itself had "no effect" on listed species or critical habitat, and that any uses of NWP 12 that have such effects would undergo separate consultation. That conclusion was not a "clear error of judgment," and deference is warranted. *Citizens to Pres. Overton Park*, 401 U.S. at 416.

## CONCLUSION

Electric Utility Amici respectfully request that the Court find that NWP 12 is facially lawful, and dismiss Plaintiffs' first, second, and fourth claims.

DATED this 24th day of January, 2020.

/s/ Robert L. Sterup
BROWN LAW FIRM, P.C.
315 North 24th Street
P.O. Drawer 849
Billings, MT 59103-0849

/s/ David Y. Chung

David Y. Chung (*pro hac vice*)
Amanda S. Berman (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
(202) 624-2500
dchung@crowell.com

*Counsel for Amici Curiae Edison Electric Institute, Utility Water Act Group, and International Brotherhood of Electrical Workers*

**CERTIFICATE OF COMPLIANCE**

The undersigned, David Y. Chung, certifies that the brief of Amici Curiae Edison Electric Institute, Utility Water Act Group, and International Brotherhood of Electrical Workers complies with the requirements of Rule 7.1(d)(2). The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionately spaced with Times New Roman Font typeface consisting of fourteen characters per inch. The total word count is 4,991 words, excluding the caption, corporate disclosure statement, and certificates of compliance and service. The undersigned relies on the word count of the word processing system used to prepare this document.

/s/ David Y. Chung
David Y. Chung

# CERTIFICATE OF SERVICE

I hereby certify that, on the 24th day of January, 2020, an accurate copy of the foregoing brief was served electronically through the Court's CM/ECF system on all of the following registered counsel:

*Counsel for Plaintiffs*:

1.   Doug Hayes
     Eric Huber
     Sierra Club Environmental Law Program
     1650 38th Street, Suite 102W
     Boulder, CO 80301
     doug.hayes@sierraclub.org
     eric.huber@sierraclub.org
     *Attorneys for Sierra Club and Northern
     Plains Resource Council*

2.   Jaclyn H. Prange
     Cecilia D. Segal
     Natural Resources Defense Council
     111 Sutter Street, Floor 21
     San Francisco, CA 94104
     jprange@nrdc.org
     csegal@nrdc.org
     *Attorneys for Bold Alliance and Natural
     Resources Defense Council*

3.   Jared Margolis
     Center for Biological Diversity
     P.O. Box 11374
     Portland, OR 97211
     jmargolis@biologicaldiversity.org
     *Attorneys for Center for Biological Diversity
     and Friends of the Earth*

4.   Timothy M. Bechtold
     Bechtold Law Firm, PLLC

P.O. Box 7051
Missoula, MT 59807
tim@bechtoldlaw.net
*Attorney for all Plaintiffs*

**Counsel for Defendants:**

5.    Benjamin J. Grillot
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044-7611
benjamin.grillot@usdoj.gov

6.    Kristofor R. Swanson
Senior Attorney, Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
kristofor.swanson@usdoj.gov

7.    Bridget Kennedy McNeil
Senior Trial Attorney
Wildlife & Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
bridget.mcneil@usdoj.gov

    *Attorneys for Federal Defendants*

8.    Peter R. Steenland, Jr.
Peter C. Whitfield
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
psteenland@sidley.com
pwhitfield@sidley.com

9.    Jeffery J. Oven
Mark L. Stermitz
Jeffrey M. Roth
CROWLEY FLECK PLLP

490 North 31st Street, Ste. 500
P.O. Box 2529
Billings, MT 59103-2529
joven@crowleyfleck.com
mstermitz@crowleyfleck.com
jroth@crowleyfleck.com
*Counsel for TransCanada Keystone Pipeline LP*
*and TC Energy Corporation*

**Counsel for Defendant-Intervenors:**

10.    Deputy Attorney General
215 N. Sanders
P.O. Box 201401
Helena, MT 59620-1401
rob.cameron@mt.gov
*Attorneys for Defendant-Intervenor*
*State of Montana*

11.    William W. Mercer
Brianne McClafferty
Holland & Hart LLP
401 North 31st Street, Suite 1500
Billings, MT 59101
wwmercer@hollandhart.com
bcmcclafferty@hollandhart.com

12.    Deidre G. Duncan
Karma B. Brown
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
dduncan@HuntonAK.com
kbbrown@HuntonAK.com

*Counsel for Defendant-Intervenors American Gas*
*Association, American Petroleum Institute,*
*Association of Oil Pipe Lines, Interstate Natural*
*Gas Association of America, and National Rural*
*Electric Cooperative Association*

/s/ David Y. Chung
David Y. Chung