Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, Montana 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for all Plaintiffs*
(additional counsel listed on signature pages)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, et al., | |
| Plaintiffs, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, et al., | CV 19-44-GF-BMM |
| Defendants, | **Plaintiffs' Reply in Support of Motion for Partial Summary Judgment and Opposition to Defendants' Cross-Motions for Partial Summary Judgment** |
| TC ENERGY CORPORATION, et al., | |
| Intervenor-Defendants, | |
| STATE OF MONTANA, | |
| Intervenor-Defendant, | |
| AMERICAN GAS ASSOCIATION, et al., | |
| Intervenor-Defendants. | |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................ 1

ARGUMENT .................................................................................. 3

I.      NWP 12 is a final permit authorizing the construction of oil pipelines
        through thousands of U.S. waterways, including hundreds of Keystone
        XL crossings .................................................................... 3

        A.      NWP 12 authorizes the construction of oil pipelines in U.S.
                waters ..................................................................... 3

        B.      NWP 12 has authorized construction of the majority of Keystone
                XL's water crossings ................................................ 4

        C.      Plaintiffs' challenge to NWP 12 is not duplicative of previous
                cases ...................................................................... 7

II.     The NWP 12 Environmental Assessment violates NEPA ........................... 9

        A.      The Corps failed to evaluate oil spills ............................. 10

        B.      The Corps failed to evaluate the impacts of frac-outs ........... 16

        C.      The Corps failed to adequately evaluate the cumulative effects of
                NWP 12-authorized pipelines ........................................ 21

        D.      The Corps failed to evaluate climate impacts ..................... 32

III.    The Corps failed to comply with the ESA when reissuing NWP 12 ........... 34

        A.      NWP 12 authorizes activities that adversely affect listed species
                and their habitats, requiring consultation ........................ 34

        B.      The Corps cannot rely on site-specific consultation to comply
                with the ESA ......................................................... 39

C.    The Corps' erroneous "no effect" determination wrongfully intended to avoid programmatic consultation ..................................... 44

IV.   NWP 12 violates Section 404(e) of the CWA by permitting activities with more than minimal impacts .................................................................. 47

A.    The Corps' "separate and distant" justification is unsupported by the record ............................................................................................. 48

B.    NWP 12's post-issuance procedures do not ensure that a project will have minimal effects ................................................................. 51

V.   Montana does not have predominant authority to evaluate water crossings or pipeline spills .............................................................................................. 54

VI.  Plaintiffs' requested relief is narrowly tailored and necessary to avoid irreparable harm ....................................................................................... 56

CONCLUSION ........................................................................................................ 58

# TABLE OF AUTHORITIES

## Cases

*City of Los Angeles v. U.S. Dep't of Agric.*,
  950 F. Supp. 1005 (C.D. Cal. 1996)......................................................24-25

*Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*,
  No. 16-cv-950, 2019 WL 5103309 (W.D. Wash. Oct. 10, 2019) .................29

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988) ....................................................... 35, 39, 40

*Ctr. for Biological Diversity v. NHTSA*,
  538 F.3d 1172 (9th Cir. 2008) ..........................................................32

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*,
  941 F.3d 1288 (11th Cir. 2019) ............................................... 14, 15

*Cty. of Los Angeles v. Shalala*,
  192 F.3d 1005 (D.C. Cir. 1999)...........................................................51

*Daniels-Hall v. Nat'l Educ. Ass'n*,
  629 F.3d 992 (9th Cir. 2010) .......................................................... 43, 55, 56

*Defs. of Wildlife v. Ballard*,
  73 F. Supp. 2d 1094 (D. Ariz. 1999) ...................................................... 30, 31

*Defs. of Wildlife v. Kempthorne*,
  No. 04-1230-GK, 2006 WL 2844232 (D.D.C. Sept. 29, 2006) ...................47

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004)........................................................... 10, 11, 12, 15, 32

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*,
  681 F.2d 1172 (9th Cir. 1982) .................................................... 17, 18, 21, 23

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
  702 F.3d 1156 (10th Cir. 2012) ...................................................26

*Idaho Sporting Cong., Inc. v. Rittenhouse,*
    305 F.3d 957 (9th Cir. 2002) ................................................................ 16, 19

*Indigenous Envtl. Network v. U.S. Dep't of State,*
    No. 17-cv-29, 2017 WL 5632435 (D. Mont. Nov. 22, 2017) ......................37

*Indigenous Envtl. Network v. U.S. Dep't of State,*
    347 F. Supp. 3d 561 (D. Mont. 2018) ................................................. 30, 55

*Indigenous Envtl. Network v. U.S. Dep't of State,*
    369 F. Supp. 3d 1045 (D. Mont. 2018) .........................................................58

*Karuk Tribe of Cal. v. U.S. Forest Serv.,*
    681 F.3d 1006 (9th Cir. 2012) ............................................................ 10-11

*Ky. Riverkeeper, Inc. v. Rowlette,*
    714 F.3d 402 (6th Cir. 2013) .........................................................................28

*Lands Council v. Powell,*
    395 F.3d 1019 (9th Cir. 2005) ............................................................ 21-22

*Lane Cty. Audubon Soc'y v. Jamison,*
    958 F.2d 290 (9th Cir. 1992) ......................................................... 35, 37, 40

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010).........................................................................................58

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)................................................................... 16, 45, 50-51

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.,*
    668 F.3d 1067 (9th Cir. 2011) ......................................................... 19-20, 29

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
    551 U.S. 644 (2007)................................................................................ 37, 38

*Nat'l Wildlife Fed'n v. Brownlee,*
    402 F. Supp. 2d 1 (D.D.C. 2005).................................................... 40, 42, 45

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) ........................................... 13, 14, 17

*Ohio Valley Envtl. Coal. v. Bulen*,
  429 F.3d 493 (4th Cir. 2005) ....................................................54

*O'Reilly v. U.S. Army Corps of Eng'rs*,
  477 F.3d 225 (5th Cir. 2007) ....................................................26

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*,
  482 F. Supp. 2d 1248 (W.D. Wash. 2007) ...................................40

*Res. Invs., Inc. v. U.S. Army Corps of Eng'rs*,
  151 F.3d 1162 (9th Cir. 1998) ..................................................55

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ...................................................46

*Save Our Sonoran, Inc. v. Flowers*,
  408 F.3d 1113 (9th Cir. 2005) ..................................................25

*Sierra Club v. Bostick*,
  No. 12-cv-742, 2013 WL 6858685 (W.D. Okla. Dec. 30, 2013).................23

*Sierra Club v. Bostick*,
  787 F.3d 1043 (10th Cir. 2015) ...................... 8, 11, 27, 29, 48, 53

*Sierra Club v. FERC*,
  867 F.3d 1357 (D.C. Cir. 2017)........................... 11, 12, 16, 32, 33

*Sierra Club v. Marsh*,
  769 F.2d 868 (1st Cir. 1985)....................................................26

*Sierra Club v. Sigler*,
  695 F.2d 957 (5th Cir 1983) ....................................................13

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  990 F. Supp. 2d 9 (D.D.C. 2013)................................................27

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  803 F.3d 31 (D.C. Cir. 2015).................................................................. 9, 28

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  205 F. Supp. 3d 4 (D.D.C. 2016)....................................................................8

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F. Supp. 3d 101 (D.D.C. 2017).............................................................55

*Stop the Pipeline v. White*,
  233 F. Supp. 2d 957 (S.D. Ohio 2002)............................................. 7, 13, 55

*Sw. Ctr. for Biological Diversity v. Glickman*,
  932 F. Supp. 1189 (D. Ariz. 1996).............................................................46

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
  100 F.3d 1443 (9th Cir. 1996)...................................................................46

*U.S. Philips Corp. v. KBC Bank N.V.*,
  590 F.3d 1091 (9th Cir. 2010).................................................................58

*W. Watersheds Project v. Kraayenbrink*,
  632 F.3d 472 (9th Cir. 2011) ................................. 35, 36, 38, 40, 45, 46, 54

*Wetlands Action Network v. U.S. Army Corps of Eng'rs*,
  222 F.3d 1105 (9th Cir. 2000).................................................................26

*White Tanks Concerned Citizens, Inc. v. Strock*,
  563 F.3d 1033 (9th Cir. 2009)............................................................ 25, 26

*Wilderness Soc'y v. Morton*,
  479 F.2d 842 (D.C. Cir. 1973)..................................................................24

*Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*,
  351 F. Supp. 2d 1232 (D. Wyo. 2005) .................................................. 30, 31

## Statutes and Regulations

16 U.S.C. § 1532 ..................................................................................45

16 U.S.C. § 1536 ............................................................................ 39, 44

33 U.S.C. § 1311 ....................................................................................3

33 U.S.C. § 1344 ................................................................... 12, 33, 54

33 C.F.R. § 320.4 ............................................................................ 12, 13

33 C.F.R. § 325 App. B ........................................................................24

33 C.F.R. § 330.1 ..................................................................................51

40 C.F.R. § 1500.1 ................................................................................18

40 C.F.R. § 1508.7 ................................................................................24

40 C.F.R. Part 230 ................................................................................13

50 C.F.R. § 402.02 ........................................................................ 39, 41, 42

50 C.F.R. § 402.14 ........................................................................ 39, 40, 41

## Other Authorities

77 Fed. Reg. 18,891 (Mar. 28, 2012).....................................................7

81 Fed. Reg. 35,186 (June 1, 2016) .....................................................45

FWS, Biological Opinion on the Effects of the Proposed Keystone XL Pipeline
   to the Federally Endangered American Burying Beetle (Dec. 23, 2019) .....43

Letter from Jon Kenning, Water Prot. Bureau Chief, MDEQ, to Robert Cole,
   Corps Helena Regulatory Office (Mar. 6, 2017)...........................................55

Letter from Steve Bullock, Governor, State of Montana, to U.S. Dep't of State
   (Nov. 18, 2019)...............................................................................56

# INTRODUCTION

Plaintiffs challenge the U.S. Army Corps of Engineers' ("Corps") 2017 reissuance of Nationwide Permit 12 ("NWP 12"), and the use of NWP 12 to authorize the construction of the Keystone XL pipeline across hundreds of rivers and wetlands. As Plaintiffs demonstrated in their opening brief, the Corps violated the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), and the Clean Water Act ("CWA") when it took these actions without adequately evaluating NWP 12's significant impacts on waterways, listed species, and the environment.

Defendants respond by erroneously minimizing the Corps' review obligations and relying on additional levels of Corps review that usually never occur. For example, Defendants argue that NEPA allows the Corps to ignore significant environmental impacts of oil pipelines, including oil spills, climate change, frac-outs, and the host of cumulative effects associated with pipeline construction and operation, and instead focus on just those impacts relating to small discharges of fill material into waterways. Such a narrow view of NEPA has been roundly rejected by the courts. The construction of oil pipelines through U.S. waters is a clear consequence of NWP 12, and the Corps is thus obligated to fully evaluate these projects' environmental effects.

Defendants also argue that the Corps was not required to undertake formal programmatic consultation with the National Marine Fisheries Service ("NMFS") and U.S. Fish and Wildlife Service ("FWS") (together, the "Services") under the ESA on the reissuance of NWP 12 because such a permit has "no effect" on listed species. However, contrary findings from NMFS and record evidence show that NWP 12 authorizes pipeline construction activities that have cumulative adverse effects on listed species and that the Corps' "no effect" determination is therefore incorrect.

Finally, Defendants argue that the Corps complied with the CWA because project-level procedural safeguards guarantee that NWP 12-authorized pipelines will have only minimal environmental impacts. But that argument is belied by the fact that project-level reviews never occur for most projects; indeed, over 99 percent of Keystone XL's water crossings were authorized by NWP 12 without any such review.

Defendants have offered no convincing response to Plaintiffs' arguments that the Corps' reissuance of NWP 12 and the use of NWP 12 to authorize construction for the majority of Keystone XL's water crossings violated bedrock environmental laws. Accordingly, the Court should grant Plaintiffs' motion for partial summary judgment and deny Defendants' cross-motions.

# ARGUMENT

I. **NWP 12 is a final permit authorizing the construction of oil pipelines through thousands of U.S. waterways, including hundreds of Keystone XL crossings**

Defendants make three factual assertions throughout their briefs that warrant addressing at the outset: (1) NWP 12 does not "approve" or "authorize" the construction of oil pipelines in U.S. waters; (2) NWP 12 has not authorized the construction of Keystone XL water crossings; and (3) this case is Plaintiffs' third identical attempt at attacking NWP 12. Each is inaccurate and should be rejected.

## A. NWP 12 authorizes the construction of oil pipelines in U.S. waters

Defendants argue that NWP 12 does not "authorize" or "approve" oil pipelines; rather, it authorizes discharges of dredge or fill material associated with the construction of pipelines. *See, e.g.*, Fed. Defs.' Br. ("Fed. Br.") 11, ECF No. 86. Defendants' attempt to use semantics to avoid reality is untenable. The CWA's prohibition on discharges of dredge or fill material into U.S. waters means oil pipelines cannot be constructed through U.S. waters absent a Section 404 permit from the Corps. 33 U.S.C. § 1311(a). NWP 12 is a Section 404 permit that explicitly and necessarily authorizes oil pipelines and other utility projects to be built in U.S. waters where they would otherwise be prohibited. NWP000127.

Defendants also assert that "[i]f a company building an oil pipeline avoids waters of the United States, the Corps would have no Section 404 authority over

the project at all." Fed. Br. 25. That is irrelevant. Plaintiffs have never suggested

that the Corps must evaluate the impacts of *all* oil pipelines. For oil pipelines that

do cross U.S. waters, however, a Section 404 permit is *required* and, thus, the

Corps has an obligation to evaluate the pipelines' impacts under the CWA, NEPA,

and ESA. *See* Pls.' Opening Br. ("Pls. Br.") 1-3, ECF No. 73.

In short, as this Court has already recognized, NWP 12 "*approves* the

construction of pipelines and other linear utility projects through waters and

wetlands." Order re Mot. to Suppl. Admin. R. 2, ECF No. 99 (emphasis added).

**B.     NWP 12 has authorized construction of the majority of Keystone XL's water crossings**

Defendants argue NWP 12 did not "approve" Keystone XL or any part

thereof, at least not yet. Fed. Br. 12. That is false. Approximately 685 of the 688

waterways that Keystone XL would cross do not require a preconstruction

notification ("PCN"). Pls. Br. 8-9 & n.2. Federal Defendants stipulated that

"Claims One, Two, and Four challenge the Corps' issuance of NWP 12 as a final

permit authorizing potentially thousands of utility water crossings nationwide,

including most or all of those identified as non-PCN waters in TC Energy's 2017

PCNs." Stipulation to Stay Claims ("Stipulation") 2, ECF No. 53. Thus, Keystone

XL's 685 non-PCN water crossings "*are already authorized without the need for*

*any Corps verification or other project-level approval*." *Id.* (emphasis added).

The Corps' position that only those few waterways requiring a PCN require project-level review is reinforced by the Corps' verifications and "Memorand[a] for Record" ("MFRs") for Keystone XL's Cheyenne and Yellowstone River crossings, which were limited to those two rivers, ECF Nos. 75-4 to 75-7, and the Corps' letter to TC Energy stating that no Corps authorization was required at all in Nebraska, ECF No. 75-8. *See* Pls. Br. 8-9 & n.2, 22-23.

Despite this, Defendants inexplicably claim that "it is purely speculative whether the Corps' District Engineer will authorize the use of NWP 12" for Keystone XL. NWP 12 Coals.' Br. ("Coal. Br.") 1-2, ECF No. 93; *see also* Fed. Br. 1-2; TC Energy's Br. ("TC Br.") 13-14, ECF No. 91. That may be accurate with respect to the Corps' verifications of the Cheyenne and Yellowstone River crossings, which are the subject of presently stayed Claims Three and Five. But Defendants have admitted that there is no action left for the Corps to take for the 685 remaining non-PCN waters. Thus, Plaintiffs' challenge to NWP 12 as a final permit approving Keystone XL's non-PCN water crossings is ripe for review.

Defendants nonetheless suggest that this Court should defer such review because the Corps' project-level analysis of Keystone XL's PCN waters, like the Cheyenne and Yellowstone Rivers, will include analysis of its non-PCN waters.

Fed. Br. 15-16.[1] But TC Energy is authorized to begin construction in the non-PCN waterways *now*, and has recently announced its intention to do so in the coming months. *See* Am. Status Report, ECF No. 103. Any future analysis—and corresponding judicial review—of the non-PCN waterways will be futile if the pipeline has already been built through them. And, in any event, such analysis is unlikely to occur. *See* Pls. Br. 39-41; *infra* pp. 51-52.

Finally, Defendants' characterization of Plaintiffs' challenge as a "facial" claim to a "regulation" with no immediate consequences is incorrect. Fed. Br. 1. NWP 12 is not a regulation; it is a *final permit* authorizing the construction of pipelines and other utility projects, usually with no further Corps involvement. And since NWP 12 has already authorized Keystone XL's non-PCN water crossings, Claims One, Two, and Four clearly apply to Keystone XL as well as to NWP 12 generally.

---

[1] Similarly, TC Energy points to the 2019 Supplemental Environmental Impact Statement ("SEIS") for Keystone XL prepared by the U.S. State Department to imply that a full analysis of these waters appears there and can be challenged by Plaintiffs at a later date. TC Br. 12-13. However, the Corps does not rely on that SEIS to satisfy its NEPA obligations with respect to Keystone XL and its use of NWP 12; rather, the Corps acknowledges that the NWP 12 Environmental Assessment constitutes the operative NEPA document for all NWP 12-authorized activities. *See* NWP000003. Furthermore, the State Department finalized the SEIS in December 2019; meanwhile, Keystone XL's non-PCN waters were authorized under NWP 12 upon its reissuance in 2017. And finally, the SEIS fails to evaluate any specific water crossings, instead deferring to the Corps' Section 404 review.

**C.  Plaintiffs' challenge to NWP 12 is not duplicative of previous cases**

Defendants suggest that the Corps has used NWP 12 to approve pipelines like Keystone XL for four decades and that this case marks Plaintiffs' "third bite" at overturning it. *See, e.g.*, TC Br. 14; Coal. Br. 5, 8-10. That is incorrect.

Although NWP 12 is not new, the Corps began using it to fast-track major interstate crude oil pipelines only in 2012. Before then, the Corps routinely required such pipelines to seek individual Section 404 permits, reserving NWP 12 for projects with truly minimal impacts. For example, *Stop the Pipeline v. White*, 233 F. Supp. 2d 957, 961-63 (S.D. Ohio 2002), describes how an applicant sought verification from the Corps under NWP 12 to construct a 149-mile oil pipeline through 400 waterways. The Corps declined, determining that the project's impacts would be more than minimal and requiring an individual permit and a NEPA analysis that covered the entire pipeline—not just its water crossings. *Id*. at 963.

Following the State Department's rejection of TransCanada's (now TC Energy) 2008 application for a cross-border permit for Keystone XL, TransCanada segmented the southern half of the proposal into a separate project, the Gulf Coast pipeline. President Obama subsequently issued a Presidential Memorandum directing federal agencies to expedite their reviews of that and other pipeline projects. *See* 77 Fed. Reg. 18,891, 18,892 (Mar. 28, 2012). Soon thereafter, the Corps verified the Gulf Coast pipeline's more than 2,000 water crossings pursuant

to the 2012 version of NWP 12 without any further public involvement or project-level NEPA review. Plaintiffs are not aware, and Defendants have offered no example, of the Corps verifying a pipeline project of that magnitude ever before under NWP 12. *See* Coal. Br. 5-6; Amici Curiae Br. ("Amici Br.") 4-8, ECF No. 106. Until its expiration in 2017, the Corps used the 2012 version of NWP 12 to fast-track several more major oil pipelines, most notably the Dakota Access pipeline. *See, e.g.*, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4 (D.D.C. 2016).

Several environmental groups, including Sierra Club, challenged the 2012 version of NWP 12 using some of the NEPA arguments advanced in this case (e.g., that the Corps' Environmental Assessment failed to evaluate oil spills or cumulative effects). *See Sierra Club v. Bostick*, 787 F.3d 1043, 1048-51 (10th Cir. 2015). The Tenth Circuit did not rule on these claims, however, as Defendants aver, but rather held that the plaintiffs waived their NEPA arguments by not raising them in comments prior to litigation. *Id.* As the plaintiffs explained, they failed to do so because it had been inconceivable that the Corps could or would use NWP 12 to approve such a massive, controversial oil pipeline crossing three states and thousands of waterways, thereby avoiding public scrutiny and a full project-level NEPA review. *See id.* at 1048 n.6.

Defendants cite *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31 (D.C. Cir. 2015), as Plaintiffs' second attack of NWP 12. There, however, environmental groups specifically challenged the Corps' NWP 12 *verifications* of the Enbridge Flanagan South pipeline under the 2012 version of NWP 12. *See id.* at 52-53. The groups did not challenge the Corps' issuance of NWP 12 more broadly, and thus the claims in that case were distinct from those raised here.

When the Corps proposed reissuing NWP 12 in 2016, several Plaintiffs submitted extensive comments urging the Corps to limit its use of NWP 12 and/or evaluate the full host of impacts from oil pipelines in the NWP 12 Environmental Assessment. *See, e.g.*, NWP043758-45827; *see also* NWP032643-44 (comments of U.S. Environmental Protection Agency ("EPA") raising similar concerns). The Corps largely ignored those comments and reissued the 2017 version of NWP 12 without any meaningful changes. That reissuance is a new, final agency action subject to judicial review. Therefore, contrary to Defendants' misplaced assertions, Plaintiffs' claims regarding the Corps' 2017 reissuance of NWP 12 have never been ruled on.

## II. The NWP 12 Environmental Assessment violates NEPA

As Plaintiffs explained in their opening brief, Pls. Br. 10-27, the Corps violated NEPA when it failed to fully consider oil pipelines' environmental effects in the Environmental Assessment for NWP 12. Although Defendants largely

respond that such effects fall outside the Corps' jurisdiction, none of their arguments withstand scrutiny.

### A. The Corps failed to evaluate oil spills

The risk of spills and leaks from oil pipelines that run through waterways is a quintessential example of an issue the Corps must evaluate pursuant to NEPA. None of Defendants' arguments attempting to excuse the Corps' failure to do so have merit.

As an initial matter, Defendants accuse Plaintiffs of federalizing entire oil pipelines, and cite several cases discussing the *geographic* scope of the Corps' NEPA obligations. *See, e.g.*, TC Br. 16-17; Coal. Br. 18-19. But that is a red herring. The question of whether the Corps' NEPA obligations extend to physical areas outside its jurisdiction is a distinct issue, discussed below. *Infra* pp. 23-28. NWP 12 authorizes the construction of oil pipelines *in U.S. waters*, where they pose a risk of spilling or leaking into those waters. As such, the Corps must, at a minimum, evaluate the impacts of oil spills that could occur within its jurisdiction.

In arguing otherwise, Defendants primarily rely on an overbroad interpretation of *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), that is easily rejected.[2] At issue in *Public Citizen* was a rulemaking by the

---

[2] The Corps is not entitled to deference on its legal interpretations of NEPA because the Council on Environmental Quality ("CEQ"), not the Corps, administers that statute. *See Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d

Federal Motor Carrier Safety Administration ("FMCSA") to establish safety standards for Mexican trucks operating in the United States. *Id.* at 760. The Court held that FMCSA was not required to analyze the impacts of those trucks' operation under NEPA because FMCSA was statutorily precluded from preventing them from entering the United States to begin with. *Id.* at 766-70. Because the environmental harms associated with Mexican trucks operating in the United States would occur regardless of FMCSA's decision, the Court found that the agency's decision was not a "legally relevant 'cause'" of the trucks' impacts. *Id.* at 770. That situation is distinguishable from the discretionary permitting authority under CWA Section 404 that allows the Corps to approve or disapprove oil pipelines that would cross U.S. waters.

*Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017), is illustrative. There, the D.C. Circuit applied *Public Citizen* to FERC's approval of a gas pipeline. The court found that FERC's permit was a "legally relevant cause" of the direct and indirect effects of the pipeline because FERC was tasked with balancing the public benefits of the project against the adverse effects and "could deny a pipeline certificate on the ground that the pipeline would be too harmful to the environment." *Id.* at 1373.

---

1006, 1017 (9th Cir. 2012) (en banc); *Bostick*, 787 F.3d at 1063 (McHugh, J., concurring). Defendants' suggestions to the contrary should therefore be rejected. *See* TC Br. 15; Coal. Br. 18.

Similarly here, the Corps' Section 404 regulations require the agency to broadly evaluate a proposed project under at least 20 public interest factors, and balance its "reasonably foreseeable detriments" against "the benefits which reasonably may be expected to accrue." 33 C.F.R. § 320.4(a)(1). And of course, Section 404(e)'s minimal effects threshold means that the Corps is ultimately prohibited from issuing a nationwide permit for a category of activities if the activities would be too harmful to the environment. 33 U.S.C. § 1344(e)(1).

In issuing NWP 12, the Corps evaluated these public interest factors, which included, inter alia, considerations of safety, conservation, economics, energy needs, wetlands, and general environmental concerns. NWP005317-23. The Corps can hardly maintain that potential oil spills into the nation's waterways are not safety or general environmental concerns that affect the public interest. Yet its reissuance of NWP 12 reflects a determination that oil pipelines satisfy Section 404's standards. That action is therefore a "legally relevant cause" of the impacts of NWP 12-authorized pipelines. *FERC*, 867 F.3d at 1373.

Defendants are wrong, then, to suggest that the Corps, unlike FERC, lacks jurisdiction to approve or deny the construction of pipelines or any "ability to prevent a certain effect" from those projects. Fed. Br. 24-25 (quoting *Pub. Citizen*, 541 U.S. at 770). Accordingly, NEPA requires the Corps to evaluate the impacts stemming from construction of oil pipelines through U.S. waters, including from

oil spills. Indeed, as Plaintiffs detailed in their opening brief, courts have

consistently recognized the Corps' obligation to evaluate the oil spill risks from

projects it permits even though it does not directly "regulate" oil spills. *See* Pls. Br.

11-12 (citing *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 867-

68 (9th Cir. 2005); *Sierra Club v. Sigler*, 695 F.2d 957, 968-75 (5th Cir 1983);

*Stop the Pipeline*, 233 F. Supp. 2d at 967-70).

Defendants attempt to distinguish these cases on the ground that they

involved individual Section 404 permits instead of Nationwide Permits ("NWPs").

Fed. Br. 26; *see also* Coal. Br. 19-20. However, the causal connection between

permitting dredge and fill activities for pipelines and the risk of oil spills is the

same—and just as obvious—regardless of whether the Corps issues a permit for a

single project pursuant to Section 404(a) or a general permit for 11,500 projects a

year pursuant to Section 404(e). Under both provisions, the extent of the Corps'

jurisdiction is identical: the agency must decide whether to permit dredge and fill

of U.S. waters. Under both provisions, the Corps must make that decision by

applying the public interest factors at 33 C.F.R. § 320.4(a)(1) and EPA's Section

404(b)(1) guidelines at 40 C.F.R. Part 230. *See* NWP005262. And under both

provisions, NEPA requires the Corps to evaluate the direct, indirect, and

cumulative impacts resulting from the authorized activity. The NWP 12

Environmental Assessment even acknowledges this:

> The activities regulated by the Corps, as well as the Corps' analysis of
> direct and indirect effects caused by those regulated activities, are the
> same regardless of whether the Corps processes an individual permit
> application or uses NWPs or other general permits to authorize the
> regulated activities.

NWP005279. Thus, the holding in *Ocean Advocates* and similar cases applies

equally to the Corps' issuance of individual permits under Section 404(a) and

general permits under Section 404(e). If anything, the Corps' NEPA analysis

should be *more* rigorous when issuing a blanket permit for tens of thousands of

water crossings nationwide under Section 404(e) than when issuing a permit for a

single project under Section 404(a).

Defendants further rely on *Center for Biological Diversity v. U.S. Army

Corps of Engineers*, 941 F.3d 1288, 1292 (11th Cir. 2019), to argue that the Corps'

NEPA obligations extend no further than discharges of fill material. However, not

only is that case a non-binding outlier that is contrary to well-settled Ninth Circuit

caselaw, *see, e.g.*, *Ocean Advocates*, 402 F.3d at 868, but it is also factually

distinguishable. There, the court held that when the Corps issued an individual

Section 404 permit for a phosphate mine, it was not required under NEPA to

evaluate the impacts of phosphogypsum, a byproduct from converting phosphate

ore into fertilizer. *Ctr. for Biological Diversity*, 941 F.3d at 1294. The court

reasoned that there were several "[i]ntervening events" that broke the "causal

chain" between the Corps' permit and the phosphogypsum produced at the

downstream production plants. *Id*. at 1295. For example, the mined ore would be sent to multiple downstream production plants that were already operating, and that received ore from numerous sources. *Id*. at 1296. Thus, it was not clear that the Corps' issuance of the permit would directly cause the environmental impacts of phosphogypsum, and there was no indication that phosphogypsum would pollute any U.S. waters, let alone those subject to the Section 404 permit. *See id*.

That attenuated connection is a far cry from the direct causal connection between NWP 12 and the risk of oil spills. Here, the Corps' issuance of NWP 12 *directly authorizes* oil pipelines to be constructed in U.S. waters, where they risk spilling or leaking *into U.S. waters*. Limiting the scope of the Corps' analysis as Defendants urge would preclude any analysis of the potentially devastating environmental harm resulting from oil spills; that cannot be squared with NEPA's purpose. *Pub. Citizen*, 541 U.S. at 767-68 (discussing NEPA's twin aims).

TC Energy also argues that the Corps need not address oil spills because such impacts are addressed by other regulatory authorities. TC Br. 16. TC Energy fails to cite any authority for that argument and neglects to address the several cases Plaintiffs provided to the contrary. *See* Pls. Br. 13-14. TC Energy further suggests that NEPA does not require the Corps to evaluate oil spills because "such events are not leading causes of impairment" of rivers, streams, or wetlands. TC Br. 18-19. This is inapposite, as NEPA does not limit its scope to "leading causes

of impairment," *id.*, but rather requires consideration of "all foreseeable direct and indirect impacts," *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002). That oil spills are not among the top 10 sources of pollution for all waters nationwide does not justify the Corps' decision to ignore the impacts of oil spills for projects it permits through NWP 12.[3]

### B.     The Corps failed to evaluate the impacts of frac-outs

Oil pipelines permitted by NWP 12 present the risk of frac-outs, or inadvertent releases of drilling fluids during horizontal directional drilling ("HDD"), into U.S. waterways, which can impair water quality and harm aquatic habitat. NWP 12 is the "legally relevant cause" of these releases, which occur during pipeline construction under jurisdictional waterways. *FERC*, 867 F.3d at 1373. Thus, NEPA requires the Corps to evaluate the impacts of frac-outs and potential mitigation measures before deciding whether to issue NWP 12.

In attempting to justify the Corps' failure to analyze these impacts, Defendants argue that the discharges of drilling fluids are not themselves discharges of fill material under Section 404, and therefore fall outside the Corps' NEPA obligations. *See* Fed. Br. 29-30; Coal. Br. 21. But the fact that drilling fluid

---

[3] Notably, the Corps failed to articulate this reason for ignoring oil spill impacts in the NWP 12 Environmental Assessment or Decision Document; therefore, it is at best a post-hoc rationalization that the Court should disregard. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).

itself is not a fill material is irrelevant, just as it was irrelevant that crude oil was not a fill material in *Ocean Advocates*. *See* 402 F.3d at 869. Discharges of both substances are consequences of the Corps' issuance of permits for oil pipelines under Section 404 that require evaluation under NEPA.

Defendants assert that the Corps nonetheless disclosed that "there is a possibility an inadvertent return could have indirect effects." Fed. Br. 30. But simply disclosing the possibility of an effect, without analyzing it, hardly satisfies NEPA's "hard look" requirement. *See Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1178-79 (9th Cir. 1982) ("shunt[ing] aside" significant questions "with mere conclusory statements" "precludes the type of informed decision-making mandated by NEPA").

Here, the Corps' bare-bones statement about frac-outs leaves the public with many unanswered questions regarding their frequency, potential size, adverse impacts to various species (particularly from the smothering of benthic habitat), the types of chemicals present in the drilling fluids, any alternative crossing methods and fluids that may be available, and the length of time these contaminants persist in the environment. The Corps' failure to evaluate this information contravenes NEPA's core purpose. *See id.*

NWP 12 Coalition tries to defend the Corps' lack of analysis by claiming the agency took "appropriate steps" to mitigate the impacts of frac-outs by modifying

17

NWP 12 to authorize remediation of released drilling fluids and to allow district engineers to add conditions to verifications requiring project-specific remediation plans. Coal. Br. 21-22. Simply allowing for remediation after a discharge occurs, however, does not satisfy NEPA's requirement that an agency evaluate the impacts of a permit *before* it is issued. *See* 40 C.F.R. § 1500.1(b) (environmental information must be available to public officials and citizens *before* decisions are made); *Found. for N. Am. Wild Sheep*, 681 F.2d at 1181 (NEPA prohibits agencies from "act[ing] now and [deal]ing with the environmental consequences later"). And the Coalition's reliance on district engineers to potentially add conditions to project verifications is misplaced: in most cases, NWP 12-authorized projects that drill under waterways will not require a PCN or Corps verification, so district engineers will have no opportunity to add such conditions. Pls. Br. 39-40.

Keystone XL provides a useful example. The 2017 PCNs indicated that the pipeline would cross approximately 36 wetlands and waterways using HDD. *See* ECF No. 75-1 at 26, 54-59 (listing 13 HDD crossings in Montana); ECF No. 75-2 at 28, 55-65 (listing 9 HDD crossings in South Dakota); ECF No. 75-3 at 22, 60-64 (listing 14 HDD crossings in Nebraska). Each location poses a substantial risk of frac-out. However, according to the Corps, only two of those waterways required verifications, while all others were approved by NWP 12 without any project-level review. Stipulation 2. Therefore, the Corps never evaluated the full range of

impacts of frac-outs in the approximately 34 waterways for which construction is already authorized, and will have no opportunity to add any conditions for them.

Defendants also attempt to minimize the impacts of frac-outs by claiming that the "information before the Corps showed that most inadvertent returns do not enter surface waters." Fed. Br. 30 (citing NWP006790). But the Corps acknowledged that *some* drilling fluid may enter surface waters, cause adverse effects, and require remediation activities. Pls. Br. 15-17. NEPA requires an analysis of all reasonably foreseeable impacts, not only the most frequent or probable ones. *See Idaho Sporting Cong.*, 305 F.3d at 973.

Furthermore, the only record citation provided for the proposition that inadvertent returns do not often enter surface waters is a PowerPoint presentation attached to an internal email from Jennifer Moyer, Chief of the Corps' Regulatory Program, during an exchange about CEQ's ongoing concerns about frac-outs. NWP006778-804. The Corps' reliance on this 2014 document, which Ms. Moyer states she found after searching the internet and public comments and which she believes "looks like a good overview" of the issue, NWP006778; NWP006784, is tenuous at best. It is unclear whether the presentation contains accurate information from a reputable source, whether its findings apply nationwide, whether any new information on frac-outs had been generated since 2014, or whether the Corps independently verified the information, as NEPA requires. *See, e.g.*, *N. Plains Res.*

*Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (An agency "must, at a minimum, support its conclusions with studies that the agency deems reliable.").

In any event, the presentation includes substantial information supporting Plaintiffs' position that further analysis of frac-outs is warranted. It states that many frac-out incidents have been reported and that releases range "from a few gallons to 10,000+ gallons" and "from a few square feet to several acres of wetlands, and up to a mile of stream," NWP006790; and that, in addition to water and bentonite, drilling mud can contain lignosulfates, which are "highly toxic to aquatic organisms," barium sulfate, which has "significant ecotoxicity to aquatic organisms," and other substances like calcium carbonate and hematite for which the ecotoxicity is unavailable, NWP006792. It also describes some known impacts of drilling mud on surface waters, e.g., that it "[s]mothers and displaces macroinvertebrates," "[r]educes food availability to upper trophic levels," "[r]educes quality of fish spawning and rearing areas," and "[r]educes fish refuge sites," and that "[s]uspended solids interfere with fish gill development and function." NWP006794. The presentation goes as far as concluding that the environmental risks of inadvertent returns could outweigh the impacts of a non-HDD crossing method. NWP006799 (referring to "a well-managed open cut in high quality waters").

None of this information was included in either the draft or final Environmental Assessment for NWP 12. Thus, although the source and accuracy of this particular presentation is unclear, it provides examples of the types of impacts the Corps should have considered. The agency's decision to instead state, in a single sentence, that inadvertent releases "can adversely affect aquatic organisms if released into bodies of water" falls well short of NEPA's hard look requirement. *See Found. for N. Am. Wild Sheep*, 681 F.2d at 1178-79.

## C. The Corps failed to adequately evaluate the cumulative effects of NWP 12-authorized pipelines

Defendants argue that the Corps completed a cumulative effects analysis for NWP 12-authorized projects in the Environmental Assessment and *did not* defer any portion of that analysis to the project level. Fed. Br. 30; *see also* Coal. Br. 22. But the Environmental Assessment's section on cumulative effects is only a general discussion of wetlands loss nationwide that appears verbatim in the environmental assessments for each of the 52 reissued NWPs, without any pipeline-specific information. Clearly the cumulative effects associated with constructing major interstate oil pipelines are different than the cumulative effects of other NWP-authorized activities like cranberry production activities, NWP003912-22, mooring buoys, NWP005424-35, or shellfish farming activities, NWP03074-003085. The generic analysis in the NWP 12 simply does not provide the "hard look" that NEPA requires. *Lands Council v. Powell*, 395 F.3d 1019,

1027-28 (9th Cir. 2005) (explaining that a cumulative effects analysis "must give a sufficiently detailed catalogue of past, present, and future projects" and an "adequate analysis" of their impacts).

The inadequacy of the Corps' cumulative effects analysis is best illustrated by discussing some of the analyses that are missing. For example, the Corps failed to discuss the cumulative effects from numerous NWP 12-approved pipeline crossings constructed in close proximity to each other. *See* Pls. Br. 42-43 (explaining that pipelines like Keystone XL can have many such crossings, often on the same waterbodies). These impacts include increased erosion, increased stream instability and turbidity, loss of habitat, changes in thermal conditions, soil damage, water quality degradation and harm to fish, impacts to bank stability and floodplain vegetation, sedimentation, release of toxic substances, and reduced biodiversity and productivity. Pls. Br. 24-25 (citing NWP043863-65, NWP044441-85, NWP045071-80, NWP045134, NWP045068-202, NWP045137-65).

Similarly, the Corps failed to adequately discuss the cumulative effects of forested wetlands conversion from NWP 12-authorized projects. While Defendants argue the Corps "explicitly discussed" this issue, Fed. Br. 23, the record citation on which they rely includes only a single paragraph that simply discloses the

existence of the problem without any substantive analysis.[4] *See* NWP005318.

Again, this leaves the public with many unanswered questions. Although Plaintiffs

submitted a scientific study on the impacts of forested wetlands conversion,

NWP044441, the Corps failed to discuss which wetlands functions are lost and for

how long, whether impacts vary by region or by forest type, whether mitigation is

available, and what level of forested wetland conversion at a single crossing, or

within a single watershed, might result in more than minimal cumulative impacts

(e.g., if/when NWP 12 allows over 10 acres of permanent forested wetlands loss at

a single crossing, or over 60 acres within a particular bayou, as was the case with

the Gulf Coast pipeline, *see* NWP043791, NWP044378). NEPA demands more

than a bare acknowledgment of potential impacts. *See Found. for N. Am. Wild

Sheep*, 681 F.2d at 1178-79.

      The Corps also failed to discuss the cumulative harm from non-aquatic

impacts associated with NWP 12-approved projects. Defendants concede as much,

arguing that the Corps' NEPA review "does not extend to any larger activity

outside the Corps' jurisdiction." Coal. Br. 11; Fed. Br. 22 (noting the Corps

"focused primarily on cumulative effects to aquatic resources"). But this position is

---

[4] Defendants cite *Sierra Club v. Bostick*, No. 12-cv-742, 2013 WL 6858685 (W.D. Okla. Dec. 30, 2013), but that decision held only that forested wetlands conversion did not fall within the Corps' definition of wetlands "loss." It did not absolve the Corps of analyzing the impacts of conversion under NEPA.

directly contradicted by NEPA's implementing regulations, as even the

Environmental Assessment acknowledges:

> [T]he NEPA cumulative effects analysis for an NWP is not limited to activities authorized by the NWP, other NWPs, or other [Corps] permits (individual permits and regional general permits). . . . [I]t must also include other Federal and non-Federal activities that affect the Nation's wetlands, streams, and other aquatic resources, as well as other resources (e.g., terrestrial ecosystems, air) that may be directly or indirectly affected by the proposed action and other actions.

NWP005305-06 (quoting 40 C.F.R. § 1508.7).

The Corps' NEPA regulations further clarify that the Corps must analyze "the impacts of the specific activity requiring a [§404] permit *and those portions of the entire project* over which the district engineer has sufficient control and responsibility to warrant Federal review." 33 C.F.R. § 325 App. B(7)(b) (emphasis added). For linear projects, "control and responsibility" is determined partly based on whether or not the regulated activity comprises "'merely a link' in a corridor type project." *Id.* § 325 App. B(7)(b)(2)(i). Therefore, for pipelines approved under NWP 12, the Corps' NEPA analysis must include upland impacts because the "environmental consequences of the larger project are essentially products of the Corps' permit action."[5] *Id.* § 325 App. B(7)(b)(2).

---

[5] Other agencies with various levels of jurisdiction over oil pipelines have routinely prepared NEPA analyses that covered entire projects. *See, e.g.*, *Wilderness Soc'y v. Morton*, 479 F.2d 842, 846-47 (D.C. Cir. 1973) (Department of Interior prepared EIS for 789-mile oil pipeline); *City of Los Angeles v. U.S.*

Indeed, courts have long required the Corps to evaluate the "uplands" or non-jurisdictional impacts of projects they approve under Section 404. For example, in *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1119-20 (9th Cir. 2005), the Corps issued a Section 404 permit for a housing development that would be constructed over several jurisdictional waters that comprised only a small percentage of the total project area. The Ninth Circuit held that the Corps violated NEPA by evaluating only the waterways and not the entire project, including the upland areas. *Id.* at 1121. The court stated:

> Although the Corps' permitting authority is limited to those aspects of a development that directly affect jurisdictional waters, it has responsibility under NEPA to analyze all of the environmental consequences of a project. Put another way, while it is the development's impact on jurisdictional waters that determines the scope of the Corps' permitting authority, it is the impact of the permit on the environment at large that determines the Corps' NEPA responsibility. The Corps' responsibility under NEPA to consider the environmental consequences of a permit extends even to environmental effects with no impact on jurisdictional waters at all.

*Id.* at 1122; *see also White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033, 1040-41 (9th Cir. 2009) (requiring Corps to analyze entire project where federal waters comprised less than 1 percent of project but were spread throughout project area).

---

*Dep't of Agric.*, 950 F. Supp. 1005, 1007-08 (C.D. Cal. 1996) (Forest Service prepared EIS for 171-mile oil pipeline).

Defendants largely ignore these cases and rely instead on *Wetlands Action Network v. U.S. Army Corps of Engineers*, 222 F.3d 1105 (9th Cir. 2000), but the Ninth Circuit has since distinguished that holding. In *White Tanks*, the court discussed its decisions in *Wetlands Action Network* and *Save Our Sonoran* as representing two ends of a factual spectrum:

> At one end, the jurisdictional waters are concentrated in certain areas, making it easy to build around them, so that substantial development can go forward without a Section 404 permit. In these cases, the Corps' analysis may be limited to the effect on the waters. *Wetlands* is closer to this end of the spectrum. At the other end of the spectrum, the waters are dispersed throughout the site, so that any construction on the site would be impossible without affecting the waters, and a Section 404 permit would be required for any building. In these cases, the Corps' analysis must include the effects of the entire development. This is the end of the spectrum that [*Save Our Sonoran*] illustrates.

563 F.3d at 1040. NWP 12-authorized pipelines that cross hundreds or thousands of waterways spread along their length clearly fall into the latter category. Thus, the Corps' NEPA responsibilities for NWP 12 include the uplands.[6]

---

[6] Other circuits similarly recognize the Corps' obligation to evaluate impacts to uplands areas. *See, e.g.*, *Sierra Club v. Marsh*, 769 F.2d 868, 877-78 (1st Cir. 1985) (requiring Corps to evaluate future industrial development when issuing Section 404 permit for port and causeway); *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 232-34 (5th Cir. 2007) (requiring Corps to evaluate subdivision's adverse effects on flood capacity due to increased pavement and adverse effects of increased traffic); *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1164, 1172-77 (10th Cir. 2012) (upholding Corps' evaluation of uplands impacts, including impacts to land use, air quality, noise, and traffic, of Section 404 permit for railroad and truck terminal).

Defendants further rely on *Bostick*, 787 F.3d at 1051, in support of the Corps' limited cumulative effects analysis, but there, the majority declined to address the adequacy of the Corps' cumulative effects determination because it held the environmental groups had waived that claim. However, in a concurring opinion, Judge McHugh soundly rejected the Corps' argument that the geographic scope of its NEPA analysis for NWP 12 could be limited to waterways. *Id.* at 1064 (noting that her "understanding" of the Corps' broad NEPA responsibilities "has been universally adopted" by courts).

TC Energy also cites *Sierra Club v. U.S. Army Corps of Engineers*, 990 F. Supp. 2d 9, 29-30 (D.D.C. 2013), to argue that the Corps can ignore all cumulative effects of pipelines occurring on uplands. TC Br. 17-18. But that case involved a challenge to the Corps' verifications under NWP 12 for a specific pipeline. In that context, the court held that because the Corps had already discharged its NEPA obligations upon issuance of NWP 12, the Corps was not required to prepare a NEPA analysis that included uplands at the project-verification stage. 990 F. Supp. 2d at 25-27. By confirming that the Corps has no NEPA obligations at the project level, this holding illustrates the importance of the Corps conducting a broad review before reissuing NWP 12.

Moreover, on appeal, the D.C. Circuit made clear that "[t]o the extent that the Corps . . . understood its NEPA obligations as confined to considering

environmental effects on CWA jurisdictional waters, its view misapprehends the obligations of any agency taking action subject to NEPA to do a comprehensive analysis of all types of foreseeable environmental effects." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d at 40-41 n.3 (citing Judge McHugh's concurrence in *Bostick* and describing it as a "thoughtful analysis of the scope of the Corps' obligations under NEPA"). This assertion completely undermines Defendants' arguments.

Notwithstanding its glaring omissions, Defendants defend the Corps' analysis for NWP 12 as necessarily "predictive" and "general" in nature, admitting that the Corps relies on district engineers to "confirm" minimal cumulative effects on a case-by-case basis. Fed. Br. 31; Coal. Br. 23. That is precisely the type of partial deferral that courts have prohibited. *See Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 409-11 (6th Cir. 2013) (holding that Corps' failure to consider cumulative impacts upon reissuing NWP was arbitrary and capricious). Importantly, if such partial deferral were allowed, it would permit the Corps to avoid analyzing cumulative effects altogether because the vast majority of pipeline crossings permitted by NWP 12 do not require PCNs. Pls. Br. 39-40. Even assuming Defendants are correct that large projects like Keystone XL do require PCNs, it is undisputed that the Corps conducts no NEPA analysis upon

verification.[7] Thus, it was imperative that the Corps conduct a thorough cumulative effects analysis upon reissuing NWP 12.

And, though a cumulative effects analysis that covers all NWP 12-authorized pipelines, including site-specific, watershed-scale, and uplands impacts, may be a daunting and inherently predictive task, that does not give the Corps license to skip it altogether. "[C]ompliance with NEPA is not excused simply because compliance is difficult," particularly where "the problem was exacerbated by the Corps' decision to draft a nationwide permit that defines utility lines expansively." *Bostick*, 787 F.3d at 1066-67 (McHugh, J., concurring); *see also Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, No. 16-cv-950, 2019 WL 5103309, at *7-8 (W.D. Wash. Oct. 10, 2019) (rejecting the Corps' "abdication of [NEPA] responsibility" where "the Corps effectively threw up its hands and turned the impact analyses over to the district engineers"); *N. Plains Res. Council*, 668 F.3d at 1079 ("Because speculation is . . . implicit in NEPA, [ ] we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball

---

[7] Defendants note that district engineers could determine that a project's cumulative impacts are not minimal and therefore that NWP 12 does not apply, and instead require an individual permit and NEPA analysis. But district engineers never have the opportunity to make that determination for the vast majority of projects that do not require PCNs. And Keystone XL demonstrates that such a project-wide cumulative effects review does not always occur. Pls. Br. 8, 22-23.

inquiry. . . . '[R]easonably foreseeable future actions need to be considered even if they are not specific proposals.'").

Indeed, an agency's analysis under NEPA is always inherently predictive. The State Department's SEIS for Keystone XL provides an example: though it is impossible to know when or where an oil spill from that pipeline might occur, that did not mean the agency could forgo an analysis of oil spills altogether. *Cf. Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 582 (D. Mont. 2018) (holding oil spill analysis inadequate). The same reasoning holds true for the NWP 12 Environmental Assessment. At the time of the permit's reissuance, the Corps was well aware that it would be used to authorize the construction of large oil pipelines through thousands of U.S. waters. The agency was obligated to assess the cumulative impacts of those projects based on their reasonably anticipated effects and the best information available. *See Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1242 (D. Wyo. 2005) (rejecting Corps' argument that robust cumulative impacts analysis was not required for general permit because it was "impossible to know 'precisely what specific impacts might result until a particular project is proposed'"); *Defs. of Wildlife v. Ballard*, 73 F. Supp. 2d 1094, 1112-13 (D. Ariz. 1999) (NEPA requires that an

agency "engage[] in a 'reasonably thorough discussion of the significant aspects of probable environmental consequence")."[8]

Although such a cumulative effects analysis may not be as specific or certain as for an individual project, there is certainly more analysis the Corps should have conducted at the national level. For example, the Corps should have evaluated the cumulative effects of numerous pipeline crossings in close proximity to each other (at various distances, and of various sizes) in representative ecosystems; the short- and long-term impacts of conversion of various types and amounts of forested wetlands at the water crossing, watershed, and regional level; and the reasonably foreseeable non-aquatic impacts from NWP 12-authorized projects, such as those associated with constructing and permanently maintaining a right-of-way and all related uplands facilities. NEPA does not allow the Corps to evade its responsibilities altogether simply because an analysis would be predictive or difficult.

---

[8] Defendants attempt to distinguish these cases on the grounds that the agencies there "failed to analyze cumulative impacts at all." Coal. Br. 23 n. 4; Fed. Br. 27. That is incorrect. *See Defs. of Wildlife*, 73 F. Supp. 2d at 1106 ("The EAs for each of these NWPs include individual and cumulative impact analyses."); *Wyo. Outdoor Council*, 351 F. Supp. 2d at 1241 (stating that the Corps discussed cumulative impacts in relation to wetlands).

**D.      The Corps failed to evaluate climate impacts**

The climate change impacts associated with the burning of oil transported by NWP 12-authorized pipelines are reasonably foreseeable, yet the Corps failed to evaluate this important issue in the NWP 12 Environmental Assessment, in violation of NEPA. *FERC*, 867 F.3d at 1372; *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1217 (9th Cir. 2008) ("The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct.").

Defendants argue that NEPA allows the Corps to ignore these climate impacts for the same reason it need not evaluate oil spills—the Corps lacks the legal authority to "regulate" them. Fed. Br. 23-24 (citing *Pub. Citizen*, 541 U.S. at 770); TC Br. 15-16; Coal. Br. 18-21. However, as detailed above, this Circuit's application of *Public Citizen* is not so narrow, and therefore climate change impacts may not be ignored.

Similarly, Defendants attempt to distinguish *FERC*, 867 F.3d 1357, by arguing that FERC had broad authority to approve or deny the entire gas pipeline at issue, whereas here the Corps' authority over oil pipelines is limited to their water crossings. This distinction is unpersuasive. First, FERC had no authority to regulate the end use burning of the gas at downstream power plants; yet the court still required the agency to evaluate the reasonably foreseeable climate impacts

32

caused by the pipeline. The same result is compelled here.

Second, the relevant inquiry under NEPA is not whether the Corps has jurisdiction over the entire geographic scope of NWP 12-approved pipelines. Rather, the Corps' NEPA analysis must evaluate environmental impacts—such as contributions to climate change—where it has the ability to act on that information, in a way that might affect whether/how those impacts occur. *See FERC*, 867 F.3d at 1373. Here, the Corps applies a broad set of public interest factors when issuing Section 404 permits, and can only issue a NWP if it determines the environmental impacts would be minimal. 33 U.S.C. § 1344(e). Absent a Section 404 permit (either individual or general), oil pipelines that cross U.S. waters could not be constructed and their attendant climate change impacts would not occur.

The NWP 12 Environmental Assessment acknowledges this causal connection by claiming NWP 12 would authorize clean energy projects that could reduce greenhouse gas emissions. NWP005270. Plaintiffs pointed this out in their opening brief and argued the Corps violated NEPA by making that unsupported assertion without providing any qualitative data to determine whether, on balance, emissions from NWP-12 authorized activities would increase or decrease. Pls. Br. 19-20 (citing *FERC*, 867 F.3d at 1375). No party responded to that argument.

In sum, the Corps' failure to adequately address climate change impacts in the NWP 12 Environmental Assessment violates NEPA.

**III.     The Corps failed to comply with the ESA when reissuing NWP 12**

The Corps undoubtedly failed to comply with its duty to ensure that the reissuance of NWP 12 will not result in jeopardy to listed species by refusing to undertake programmatic consultation with the Services, as the ESA requires. NWP 12 authorizes activities that cumulatively affect listed species and their habitats, and the Corps may not circumvent the required ESA analysis by issuing an untenable "no effect" determination.

**A.     NWP 12 authorizes activities that adversely affect listed species and their habitats, requiring consultation**

Defendants' central argument is that the Corps' reissuance of NWP 12 does not authorize activities that may affect listed species, because any activities that "might affect" such species are subject to site-specific ESA analysis. Fed. Br. 33-34; TC Br. 20-21; Coal. Br. 26. To suggest that NWP 12 does not authorize activities that affect listed species in any manner is patently absurd and impossible to square with the permit's plain terms. NWP 12 specifically authorizes the construction of oil pipelines (and other utility lines) through wetlands, streams, and rivers, resulting in habitat fragmentation, water quality degradation, and the risk of catastrophic spills. NWP000127. While project-specific analysis *may* occur prior to *some* of these activities taking place, that does not preclude NWP 12 from having cumulative adverse effects.

The record supports this conclusion. In its 2014 Biological Opinion, NMFS concluded that NWP-authorized "activities and stressors are among factors contributing to the decline and ESA listing of NMFS threatened and endangered species." NWP030903. NMFS in fact found that degradation of certain habitats for listed species was "specifically attributed to" activities authorized by NWP 12. *Id.* Indeed, the Corps' Environmental Assessment for NWP 12 also acknowledged the potential for harm to species from NWP-12 authorized activities. Pls. Br. 28-29.

Ignoring this reality, Defendants insist that the cases Plaintiffs rely on regarding the need for consultation are inapposite. Fed. Br. 40-42; Coal. Br. 28-29. Their reasoning is flawed. As with the regulatory amendments at issue in *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011), the establishment of timber management standards in *Lane County Audubon Society v. Jamison*, 958 F.2d 290, 294 (9th Cir. 1992), and the issuance of oil and gas leases in *Conner v. Burford*, 848 F.2d 1441, 1453-58 (9th Cir. 1988), NWP 12 authorizes construction activities that directly affect the development and use of land and water, resulting in impacts that adversely affect species. *See* NWP030607 (general permits, including NWPs, are "the most common mechanism for authorizing placement of dredged or fill material into waters of the United States").

The Ninth Circuit's decision in *Kraayenbrink* is particularly pertinent because it was premised on the "sheer number of acres affected" by the BLM's

regulations and the number of listed species present on those lands, which "alone suggest that the proposed amendments 'may affect' a listed species or its critical habitat." 632 F.3d at 496 ("The minimum threshold for an agency action to trigger consultation . . . is low, and we conclude that the regulatory amendments . . . handily meet that threshold."). Here, the Corps estimated that NWP 12 will be used for 69,700 activities and impact 8,900 acres of waters, NWP005331, evidencing a similarly significant effect on the hundreds of listed species that rely on wetlands, streams, and rivers across the country. *See* Pls. Br. 28-29.

The Services' use of the NWPs in the 2015 regulations amending the provisions on incidental take statements as a prime example of a federal "action" for purposes of programmatic consultation—despite previous arguments from the Corps that the NWPs have "no effect" and so do not trigger any consultation obligations—reflects those expert agencies' opinion that the NWP program *does* require such consultation. *See* Pls. Br. 30. Defendants' reliance on a subsequent sentence stating that consultation is not required for framework programmatic actions that have no effect on listed species misses the point. Fed. Br. 37; Coal. Br. 27-28. While framework programmatic actions that truly have no effect on listed species would not require consultation, NWP 12 clearly *does* affect listed species, as discussed above. *Cf. Kraayenbrink*, 632 F.3d at 498 (rejecting BLM's argument that the regulatory amendments were "purely administrative" and so would not

36

affect listed species); *Lane Cty.*, 958 F.2d at 294 (holding that BLM must conduct programmatic consultation on timber management strategy even though strategy would be "implemented through the adoption of individual sale programs").

Programmatic consultation with FWS *and* NMFS on NWP 12 is therefore required for the Corps to comply with the ESA, as is evident from the Corps' past consultations with NMFS.[9] The Corps' insistence that these past consultations were "voluntary" is baseless—if consultation was not required the Corps would not have spent time and energy completing the process in 2012 and then requesting reinitiation in 2014 following NMFS's jeopardy determination. *Cf. Indigenous Envtl. Network v. U.S. Dep't of State*, No. 17-cv-29, 2017 WL 5632435, at *11 (D. Mont. Nov. 22, 2017) (federal agencies "rarely undertake[] voluntarily needless activities as acts of grace to our citizens"). Indeed, the 2014 Biological Opinion states that the Corps "initiated formal consultation with NMFS" on the 2012 NWP program, never indicating that the consultation was "voluntary." *See* NWP030590.

Defendants' assertion that the Corps was entitled to change its mind about the need for programmatic consultation is also misplaced. Fed. Br. 39-40. The Corps relies on *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658-59 (2007), but that case is inapposite because there the agency's

---

[9] That these prior consultations did not "ensnarl the NWP program" or disrupt the streamlined NWP process undermines Defendants' arguments to the contrary. *See* Coal. Br. 30.

initial decision to consult on a CWA permit program was a "preliminary determination" that the agency retracted before it took final action approving the program. Here, the Corps did not alter a "preliminary determination," *id.* at 659, but rather *completed* consultation on the reissuance of the NWPs in 2012 and then chose not to do so upon the NWPs' reissuance in 2017.

*Kraayenbrink* is again instructive. There, the court found BLM's failure to undertake programmatic consultation upon amending its grazing regulations arbitrary and capricious in part because the agency had conducted such consultation on a previous version of the regulations and did not give a rational basis for its new position that the regulations would not affect listed species. 632 F.3d at 498. So too here. The Corps previously undertook programmatic consultation on the NWPs but subsequently determined, without a rational basis, that the NWPs would not affect listed species and so did not require programmatic consultation. That determination is arbitrary and capricious.

Finally, the Corps misconstrues Plaintiffs' argument, averring that the "overall thrust" is that programmatic consultation provides some "value" that site-specific analysis does not and asserting that "value" is not the legal threshold. Fed. Br. 40. To the contrary, Plaintiffs invoke the applicable legal threshold: the ESA requires consultation for all agency actions, including "programs," that may affect listed species in order to "insure" that such actions are not likely to jeopardize such

species, and it is readily apparent that NWP 12 is an agency program that affects listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.02, 402.14. Plaintiffs' reference to the "value" of such consultation merely illustrates *why* that legal obligation exists. As discussed further below, that "value" lies in requiring the Corps to analyze the cumulative impacts of NWP 12-authorized activities, which cannot be accomplished through site-specific analysis.

**B.    The Corps cannot rely on site-specific consultation to comply with the ESA**

Defendants' reliance on site-specific consultation to meet the Corps' duty to prevent jeopardy is entirely misplaced. Fed. Br. 33-34; TC Br. 20; Coal. Br. 26. As set forth in Plaintiffs' opening brief, Pls. Br. 34-37, site-specific consultation does not encompass the cumulative impacts of NWP 12 on listed species, and absent such analysis the Corps cannot ensure that species will not be jeopardized by NWP 12-authorized activities.[10]

---

[10] The Corps boasts that for the prior version of the NWPs, it conducted on average 4,500 consultations. Fed. Br. 37 n.15. This number is unremarkable. It represents the average number of consultations *for all 50 NWPs*; yet NWP 12 *alone* is used tens of thousands of times. *See* NWP005331. Regardless, project-specific and regional consultations are inadequate substitutes for national-scale consultation, no matter how many are conducted. "Although agencies may include in their [framework] programs additional safeguards. . . such safeguards cannot substitute for an initial, comprehensive biological opinion." *Burford*, 848 F.2d at 1458 n.41.

Defendants fail to persuasively distinguish the only court decision directly on point, *National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d 1 (D.D.C. 2005), where the court held that the Corps' reissuance of the NWPs required ESA consultation and found that "overall consultation for the NWPs is necessary to avoid piece-meal destruction of . . . habitat through failure to make a cumulative analysis of the program as a whole." *Id.* at 10. Nor do Defendants cite a single case to support their contrary view.

The ESA's implementing regulations and related caselaw further bolster the court's decision in *Brownlee. See* 50 C.F.R. § 402.14(c)(4) (clarifying that, while consultation "may encompass . . . a number of similar individual actions within . . . a programmatic consultation," that "does not relieve the Federal agency of the requirements for considering the effects of the action or actions as a whole"); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 482 F. Supp. 2d 1248, 1266-67 (W.D. Wash. 2007) (holding that deferral of analysis to project level "improperly curtails the discussion of cumulative effects"). Notably, BLM's approval of grazing activities undertaken pursuant to the regulations at issue in *Kraayenbrink*, its permitting of logging projects under the timber management strategy at issue in *Lane County*, and the Forest Service's permitting of oil/gas extraction projects undertaken on the leases at issue in *Burford* would all require site-specific ESA consultation; yet this did not allow the agencies to avoid

consultation when the programmatic-level actions were taken, as the Corps claims for the NWPs.

Defendants go on to argue that NWP 12 "does not change the legal landscape for ESA Section 7(a)(2) purposes," because in the absence of the NWPs the Corps would engage in project-specific analysis for individual permits. Fed. Br. 42. To begin, unlike individual review, the NWP program does not ensure that consultation will take place for all actions that may affect listed species. *See* Pls. Br. 36. In any event, the Corps' argument is inapposite. The NWPs are a federal *program*, and the ESA clearly mandates consultation not only for the issuance of individual permits, but also for all "programs" authorized by federal agencies that may affect listed species. *See* 50 C.F.R. §§ 402.02, 402.14.

The critical importance of a cumulative impact analysis at the programmatic level is highlighted by the fact that the NWP program accounts for "between 80 and 92% of all [CWA 404] authorizations." NWP030607. Absent programmatic review, the cumulative impacts of that multitude of NWP actions may result in jeopardy to listed species through death by a thousand cuts.

For example, site-specific (and even regional) consultation would fail to capture cumulative impacts to imperiled migratory birds that cross regions, such as whooping cranes, or species with isolated and distant populations, such as pallid sturgeon in the Platte and Missouri Rivers. Consultation on individual projects

such as Keystone XL would not ensure that adequate protections are in place to prevent jeopardy to these species from the significant *cumulative* effects of all NWP 12-authorized pipelines—e.g., from habitat loss and contamination associated with construction and oil spills—across their remaining habitat.[11] Just as the Corps was required to examine the cumulative effects of numerous pipeline crossings in representative ecosystems around the country under NEPA, *supra* pp. 28-31, the Corps was required to examine the effects of those pipeline crossings on listed species and their habitats under the ESA.

Furthermore, Defendants acknowledge that project-specific consultation "would be limited to that project," and that any cumulative effects analysis would be confined to the "action area." Fed. Br. 42-43; *see also* 50 C.F.R. § 402.02 (defining cumulative effects as "those effects . . . that are reasonably certain to occur within the action area"). As *Brownlee* noted, and as common sense dictates, this is insufficient to ensure analysis of the national-scale cumulative impacts of NWP-authorized activities. 402 F. Supp. 2d at 10-11.

Notably, Defendants failed entirely to address Plaintiffs' argument that even when PCNs are submitted, the Corps does not undertake consultation on the water

---

[11] Programmatic consultation on the 2017 reissuance of NWP 12 is also necessary for NMFS to assess whether the measures in its 2014 Biological Opinion are effectively preventing jeopardy to listed species. Moreover, the Corps has never completed programmatic consultation with FWS to ensure that species under its jurisdiction will not be jeopardized by NWP 12.

crossings that do not trigger the PCN requirement—such as the hundreds of non-PCN water crossings for Keystone XL—since it is the Corps' position that these are "already authorized without the need for any Corps verification or other project-level approval." *See* Pls. Br. 37 (quoting Stipulation 2). Nor have Defendants addressed NMFS's finding that "the Corps has historically not reviewed significant percentages of PCNs to insure they are complete and the information is correct." *Id.* (quoting NWP030857). The Corps has therefore ostensibly conceded that an adequate cumulative effects analysis does not occur during project-level consultation, meaning that—in addition to the reasons above—such consultation cannot cure the Corps' failure to conduct programmatic consultation when it reissued NWP 12.[12]

---

[12] Keystone XL provides an example of inadequate review at the project-specific level. According to a recent Biological Opinion, TC Energy will not submit new PCNs for Keystone XL until *after* Section 7 consultation is completed. FWS, Biological Opinion on the Effects of the Proposed Keystone XL Pipeline to the Federally Endangered American Burying Beetle 9 (Dec. 23, 2019), https://eplanning.blm.gov/epl-front-office/eplanning/projectSummary.do?methodName=renderDefaultProjectSummary&projectId=1503435; *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010) (taking judicial notice of information publicly available on government websites). This backwards approach cannot ensure that all water crossings that may affect listed species are adequately analyzed, since project-specific consultation must be based on the information provided in the PCNs.

**C.    The Corps' erroneous "no effect" determination wrongfully intended to avoid programmatic consultation**

The Corps' attempt to avoid programmatic ESA consultation through a "no effect" determination for the NWPs is unlawful. That determination is inconsistent with the record, and was in fact explicitly rejected by NMFS. NWP027751 ("[S]uch a conclusion is not supportable under the ESA.").

Defendants aver that NMFS eventually agreed to the "no effect" determination, Fed. Br. 34-35; but they only cite to a letter the Corps sent to NMFS reiterating that determination, offering to enter into Section 7(a)(1) consultation,[13] and setting forth the subset of measures from the 2014 Biological Opinion that the Corps would continue to implement, *see* NWP018197-201. Nowhere does this suggest that NMFS agreed with the Corps' determination.[14] That the Corps agreed to implement some, but not all, of the protective measures from the 2014 Biological Opinion further undermines the Corps' "no effect" determination, given these measures were necessary to reverse NMFS's 2012 jeopardy determination.[15]

---

[13] Section 7(a)(1) requires a program for the conservation of listed species. 16 U.S.C. § 1536(a)(1). "Consultation" under that subprovision is not the formal consultation process required under Section 7(a)(2) and will not ensure that an agency action will not jeopardize species or avoid harming critical habitat. *See id.* § 1536(a)(2).

[14] Defendants further aver that FWS "acknowledged the Corps' 2012 'no effect' determination." Fed. Br. 34 n.12. However, *acknowledging* the Corps' position is a far cry from *accepting* it.

[15] For example, the Biological Opinion required *consultation* with NMFS Regional Offices, NWP030602, while the Corps' July 20, 2016 letter only calls for

Defendants next argue that the Corps' "no effect" determination is entitled to deference. Fed. Br. 38. But it is the Services—not the Corps—that Congress entrusted to administer the ESA, and therefore NMFS's determination that programmatic Section 7(a)(2) consultation is required, NWP027751, is more deserving of deference. *See* 16 U.S.C. § 1532(15); *Brownlee*, 402 F. Supp. 2d at 11 (declining to defer to Corps' determination that it was not required to conduct programmatic consultation before issuing four NWPs); *Kraayenbrink*, 632 F.3d at 497 (finding it "significant that FWS," the agency with "the more appropriate expertise," concluded that the regulations at issue "*would* affect status species and their habitat" (citation omitted)).

Regardless, deference—if applicable—does not provide a blank check. *Kraayenbrink*, 632 F.3d at 498 ("Although our review . . . is deferential, it does not condone a clear error of judgment." (citation and internal quotation marks omitted)). The Corps' "no effect" decision must be rational and consistent with the evidence in the record. *See State Farm*, 463 U.S. at 43. That is certainly not the case here, especially in view of NMFS's statement that the Corps' position is simply "not supportable" based on its experience with NWP 12. *See supra* p. 44.

---

*coordination*, NWP018200. "Coordination" suggests the Corps can decline to comply with regional conditions that NMFS believes are necessary to protect listed species. *See* 81 Fed. Reg. 35,186, 35,194 (June 1, 2016) ("[T]he Corps decides whether suggested regional conditions identified during this coordination are appropriate for the NWPs.").

Accordingly, the Court should find the Corps' determination to be arbitrary and capricious regardless of any purported deference to which the Corps claims it is entitled. *See Kraayenbrink*, 632 F.3d at 496-98 (concluding, despite deferential standard of review, that BLM's failure to articulate a rational explanation for its no effect finding rendered its resulting failure to consult arbitrary and capricious).

The cases cited by Defendants in support of agency deference in fact support Plaintiffs' position. In *Southwest Center for Biological Diversity v. Glickman*, 932 F. Supp. 1189, 1193-94 (D. Ariz. 1996), the court's deference was premised on an agency biologist's opinion in a Biological Assessment and Evaluation.[16] Here, however, the Corps did not undertake a biological assessment for the 2017 NWPs or otherwise apply any biological expertise to support the "no effect" determination. Rather, the Corps' Regulatory Program Manager, David Olson, concocted this scheme specifically to bypass programmatic consultation. NWP036481 ("If we lose in federal court, then we would start doing the national programmatic consultations again."). Defendants' contention that Mr. Olson's statement "has no bearing" on whether the Corps would be required to engage in consultation for the 2017 NWPs, Fed. Br. 39, is belied by the prior statement in

---

[16] Likewise, in the cases cited by Edison Electric Institute et al., Amici Br. 15-16, the courts' deference was predicated on the agencies' scientific determinations and expert analyses. *See Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1449 (9th Cir. 1996); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601-02, 610 (9th Cir. 2014).

Mr. Olson's email that "for the 2017 NWPs, *we would have to do a new*

*consultation*." NWP036481 (emphasis added). The Corp therefore clearly knew it

had to undertake programmatic consultation, but made the "no effect"

determination to evade its ESA duties.

Defendants' reliance on *Defenders of Wildlife v. Kempthorne*, No. 04-1230-

GK, 2006 WL 2844232 (D.D.C. Sept. 29, 2006), Fed. Br. 38, is also misplaced and

cannot justify the "no effect" determination. While the *Kempthorne* court stated, in

dicta, that action agencies are responsible for making an *initial* determination as to

whether a proposed action may affect listed species, 2006 WL 2844232, at *19,

that determination has already been made for NWP 12, as evidenced by the Corps'

previous programmatic consultations with NMFS, and the Corps has failed to

provide a rational basis for reversing it, *see* Pls. Br. 31-33; *supra* pp. 37-38. The

Corps' "no effect" determination and consequent failure to undertake

programmatic consultation with the Services when reissuing NWP 12 violates the

ESA and APA.

## IV.   NWP 12 violates Section 404(e) of the CWA by permitting activities with more than minimal impacts

NWP 12 allows the Corps to artificially treat massive oil pipelines like

Keystone XL as hundreds or even thousands of "single and complete projects" that

each qualify for NWP 12 individually, with no effective way to ensure that the

cumulative impacts of these numerous water crossings would be only minimal.

Pls. Br. 38-43. As such, NWP 12 violates Section 404(e)'s minimal effects threshold.

Defendants nonetheless urge the court to uphold NWP 12, arguing that minimal effects are guaranteed because multiple water crossings along linear projects occur at "separate and distant locations" and "post issuance procedures" exist as a safeguard. Neither argument withstands scrutiny.

## A.   The Corps' "separate and distant" justification is unsupported by the record

The Corps determined that NWP 12, although allowing *unlimited* usage for a single linear project, does not run afoul of Section 404(e)'s minimal effects threshold because water crossings on pipelines are usually at "separate and distant locations" and/or separate waterbodies or watersheds along a pipeline route, such that their cumulative effects are dissipated. NWP000027. Defendants argue this determination is entitled to deference, which Plaintiffs can only overcome by showing it "lacked a substantial basis in fact." Fed. Br. 13 (quoting *Bostick*, 787 F.3d at 1055).

Plaintiffs meet that burden here.[17] As discussed in Plaintiffs' opening brief, the Keystone XL PCNs provide an example of a pipeline with high densities of

---

[17] Plaintiffs do not argue that, as a legal matter, Section 404(e) prohibits project-specific review. Rather, they assert that, as a practical matter, such review does not ensure minimal effects for NWP 12-authorized activities. Accordingly,

water crossings concentrated in specific areas. ECF No. 75-1 at 53-59; ECF No. 75-2 at 54-65; ECF No. 75-3 at 59-64; *see also* Pls. Br. 42-43.

Keystone XL is not an isolated instance. During the Corps' reissuance of NWP 12, commenters (including several Plaintiffs) raised this specific issue, noting there was no definition of "separate and distant" that actually applied on the ground in any meaningful way. NWP043783. Commenters pointed to the Corps' 2012 verification of TC Energy's Gulf Coast pipeline, which demonstrated that many of the pipeline's water crossings were not, in fact, located on "separate and distant" waterways in separate watersheds. *Id*. Instead, commenters explained that many crossings were within one-tenth of a mile of each other, and some watersheds had very high concentrations of impacts. *Id*. (citing 41 water crossings and 72 acres of forested wetlands conversion in Texas's Pine Island Bayou alone). The Corps ignored these comments and reissued NWP 12 without alteration.

Thus, Plaintiffs have demonstrated that the Corps' "separate and distant" theory lacks a substantial basis in fact, both in comments during the reissuance process and now again through the example of Keystone XL. The Corps cannot continue to bury its head in the sand and stand by what it calls "reasoned predictions" in the face of clear evidence to the contrary.

---

Defendants' arguments concerning the Corps' legal interpretation of Section 404 are irrelevant. *See* Fed. Br. 17-18; Coal. Br. 14.

Defendants further attempt to justify its "separate and distant" theory by arguing there cannot be a one-size-fits-all definition of the phrase to be applied nationwide; rather, a "variety of factors should be considered" by district engineers in applying the phrase on a regional basis. Fed. Br. 18-19 (quoting NWP005278). The obvious flaw in this argument is that there is no actual requirement that district or regional engineers come up with region-specific definitions of "separate and distant" or apply any consistent definition to projects upon receipt of PCNs. And of course, for projects that do not require PCNs at all, there is no opportunity for district engineers to apply any definition of "separate and distant" to begin with.

Again, the Keystone XL verifications and MFRs bear this out. They demonstrate that although the 2017 PCNs listed hundreds of water crossings in each respective state, the district engineers never evaluated whether those crossings were truly "separate and distant" using any definition or criteria. *See generally* ECF No. 75-4 to 75-7; *see also* ECF No. 75-8 (stating that no PCN was required for Nebraska). Instead, the verifications and MFRs focused only on the individual rivers requiring PCNs; the Corps, meanwhile, admits that all non-PCN waters were approved by NWP 12 without any further Corps evaluation. Stipulation 2.

The Corps' use of the undefined "separate and distant" standard to justify NWP 12's authorization of massive oil pipelines with more than minimal effects is counter to the evidence in the record, rendering it arbitrary and capricious. *State*

*Farm*, 463 U.S. at 43; *Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (agency decision must be set aside "where the record belies the agency's conclusion" (citation and internal quotation marks omitted)).

### B. NWP 12's post-issuance procedures do not ensure that a project will have minimal effects

Defendants argue that, under NWP 12, "specific projects undergo multi-stage safeguards at the division and district levels," which "account for the details of individual projects and their potential site-specific environmental impacts." Fed. Br. 14; *see also* Coal. Br. 12-13; TC Br. 23-25. Because these procedures are in place, Defendants argue, the Corps should be entitled to a presumption that they will be followed.

However, as Plaintiffs emphasized in their opening brief, in most cases there is no project-level review at all for NWP 12-authorized activities. The Corps has repeatedly acknowledged that "[f]or the *vast majority of actions permitted by NWP 12, the action can proceed with no further review or verification by the Corps.*" NWP044263 (emphasis added); *see also* 33 C.F.R. § 330.1(e)(1) ("In most cases, permittees may proceed with activities authorized by NWPs without notifying the [Corps].")"; *accord* TC Br. 16-17. Defendants fail to explain how the procedures they cite could possibly ensure minimal effects for all of the projects (or portions of projects) for which the Corps is never notified, or for which it is notified but determines that verification—and thus project-level analysis—is not required for

all but a few crossings.

Again, Keystone XL is illustrative. TC Energy submitted a PCN for
Nebraska for the Platte and Niobrara River crossings, which identified 242 other
non-PCN water crossings in the state. ECF No. 75-3 at 30, 60-64. Rather than
evaluate the cumulative effects of all these crossings, the Corps notified TC Energy
that "the activity is not subject to [Corps] regulatory authorities and no permit
pursuant to Section 404 is required." ECF No. 75-8 at 2. In other words, the Corps
determined that TC Energy could construct the entire pipeline through Nebraska
without any Corps notification and without any project-level review, and therefore
without any analysis of whether the environmental impacts of these numerous
water crossings would indeed be minimal. Defendants' reliance on NWP 12's PCN
requirements to ensure minimal effects is therefore misplaced. Fed. Br. 12-13, 16.[18]

Even when an applicant is required to submit a PCN, the Keystone XL
documents demonstrate that the district engineers' purported project-wide
cumulative effects analysis is entirely fictional.[19] Though the Keystone XL PCNs

---

[18] Defendants suggest 82 percent of water crossings "would be subject to the
Permit's pre-notification requirements." Fed. Br. 12-13. The basis for this
statement is unclear, and is contradicted by the Corps' many other clear statements
to the contrary, as well as by Keystone XL, where over 99 percent of water
crossings were authorized under NWP 12 without requiring PCNs.

[19] Defendants appear to concede there is no meaningful cumulative effects
analysis at the project level. *See* Fed. Br. 30-31 (arguing that the Corps analyzed
"the potential effects of *all* fill activities" at the national level, and the only thing

listed all non-PCN waterways, the district engineers failed to conduct a cumulative effects analysis when they issued the verifications for the Cheyenne and Yellowstone Rivers, even though NWP 12 note 8 supposedly requires such review. *See* Pls. Br. 22-23, 41. Thus, Defendants are wrong to suggest that Plaintiffs merely raise the *specter* that district engineers might fail to comply with the procedures requiring broad project-level review. Fed. Br. 15. Rather, the evidence demonstrates that Plaintiffs' concerns are justified and rebuts any presumption that NWP 12's project-level procedures ensure pipelines such as Keystone XL will have only minimal cumulative effects.

The NWP 12 Coalition's reliance on *Bostick*, meanwhile, is misplaced. *See, e.g.*, Coal. Br. 3, 12. There, the court upheld NWP 12 on the basis of the project-specific safeguards Defendants tout because evidence showed that district engineers had in fact utilized them to evaluate a pipeline's cumulative impacts. 787 F.3d at 1061. After examining the administrative record, the court determined that the district engineers had conducted an adequate project-specific cumulative effects analysis for the Gulf Coast pipeline and issued verifications that covered all water crossings (including non-PCN waters), and also found no evidence that the crossings were not "separate and distant" enough to prevent aquatic impacts. *See*

---

district engineers do is "verify[] whether the activities in question fall within the scope of the Permit").

*id.* at 1056, 1060-62. The Corps has since abandoned any pretense of conducting project-level cumulative effects reviews that cover all water crossings.[20] The lack of such review, or of any "separate and distant" determination, for most water crossings authorized under NWP 12, including over 99 percent of water crossings for Keystone XL, thus distinguishes this case from *Bostick*.

The Corps' failure to conduct the required review to ensure that projects, such as Keystone XL, will not have more than minimal impacts violates the CWA. 33 U.S.C. § 1344(e)(1); *see also Kraayenbrink*, 632 F.3d at 498 (deferential review "does not condone a clear error of judgment" (citation and internal quotation marks omitted)).

## V. Montana does not have predominant authority to evaluate water crossings or pipeline spills

Montana argues that the states, not the Corps, have the "predominant" role in approving pipeline water crossings. Montana's Br. ("MT Br.") 6, ECF No. 92. Although Montana is correct that states exercise various levels of regulatory authority over oil pipelines that operate concurrently with federal laws, those state laws do not usurp the Corps' jurisdiction over U.S. waters. *See* Pls.' Resp. to Mont.

---

[20] This fact distinguishes NWP 12 from the Corps' general permit in *Ohio Valley Environmental Coalition v. Bulen*, 429 F.3d 493, 501 (4th Cir. 2005), which required "post-issuance individualized authorization" for all projects. The Corps' position here is that NWP 12 already authorizes the vast majority of crossings without any project-level involvement.

Mot. to Intervene ("Resp. to MT Intervention") 3-4, ECF No. 50. "Congress gave the Corps the responsibility of regulating the discharge of dredged or fill material into navigable waters . . . ." *Res. Invs., Inc. v. U.S. Army Corps of Eng'rs*, 151 F.3d 1162, 1166 (9th Cir. 1998). Montana's lengthy recitation of its evaluation of Keystone XL, MT Br. 8-14, is irrelevant to whether the Corps complied with the CWA, NEPA, and ESA in reissuing NWP 12.[21]

Montana similarly argues that states, not the Corps, have authority to evaluate the risk of oil spills. MT Br. 15. That argument is simply wrong. This Court and many others have recognized federal agencies' obligation under NEPA to evaluate the risk of oil spills. *See, e.g.*, *Indigenous Envtl. Network*, 347 F. Supp. 3d at 581-82; *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 134 (D.D.C. 2017); *Stop the Pipeline*, 233 F. Supp. 2d at 967-70. Even Federal Defendants concede that the Corps is required to evaluate the

---

[21] Montana lists several permits and approvals it has issued for Keystone XL. MT Br. 8-14. Notably absent from that list is the issuance of a water quality certification pursuant to Section 401 of the CWA by the Montana Department of Environmental Quality ("MDEQ"). MDEQ issued a conditional Section 401 certification for NWP 12-authorized activities on March 6, 2017. *See* Letter from Jon Kenning, Water Prot. Bureau Chief, MDEQ, to Robert Cole, Corps Helena Regulatory Office (Mar. 6, 2017), http://deq.mt.gov/Portals/112/Water/WPB/Documents/MDEQ_WQC_2017_NWP.pdf; *see also Daniels-Hall*, 629 F.3d at 998-99. But that certification only covers the Keystone XL crossings that would use HDD and excludes the majority of crossings that use other methods. It is unclear whether and how the Corps or TC Energy plans to obtain Section 401 certification from MDEQ prior to pipeline construction beginning in that state.

impacts of pipeline oil spills in certain circumstances. Fed. Br. 26-27. As discussed above, that Montana may have concurrent authority to evaluate oil spills neither relieves the Corps of its distinct obligation to assess oil spill risks nor excuses the Corps' failure to do so.

In fact, Montana's own public comments on the recent draft SEIS for Keystone XL support Plaintiffs' argument. There, Montana Governor Steve Bullock urged the U.S. State Department and Corps to better evaluate the potential impacts of oil spills from Keystone XL to water resources, including spills that can travel further than 40 miles downstream and spills into iced-over rivers; indicated he had expressed the same concerns to the Corps in two previous letters; and stated he was "deeply troubled" by the insufficient analysis to date.[22] Montana's litigation position—that federal agencies should not evaluate oil spills—must be rejected.

## VI.    Plaintiffs' requested relief is narrowly tailored and necessary to avoid irreparable harm

Montana argues that Plaintiffs' request for relief has been "everchanging" and "ambiguous" throughout this litigation, and suggests Plaintiffs are seeking broad relief that might impact other uses of NWP 12. MT Br. 17. Not so. Plaintiffs, from the outset, have asked the Court to declare that the Corps' issuance of NWP

---

[22] Letter from Steve Bullock, Governor, State of Montana, to U.S. Dep't of State (Nov. 18, 2019), http://governor.mt.gov/Portals/16/DSEIS%20Keystone%20Comments%20MT%2011.18.2019.pdf?ver=2019-11-18-131000-473; *see also Daniels-Hall*, 629 F.3d at 998-99.

12 violated the CWA, NEPA, and the ESA; remand NWP 12 to the Corps for compliance with these laws; declare unlawful and vacate the Corps' use of NWP 12 to approve Keystone XL; and enjoin activities in furtherance of Keystone XL's construction. *See* First Am. Compl. 87-88, ECF No. 36. If the Court granted such relief, the Corps would be enjoined from using NWP 12 to fast-track Keystone XL's construction, but TC Energy would still be free to seek an individual Section 404 permit and/or wait for the Corps to correct NWP 12's legal deficiencies and then seek verification under an amended NWP 12.

Plaintiffs have not sought to have NWP 12 broadly enjoined for the very reason Montana is concerned about—this case focuses on the Corps' use of NWP 12 to approve massive oil pipelines like Keystone XL, and is not meant to affect other uses of NWP 12 that provide a public benefit and would have only minimal environmental impacts. *See* Resp. to MT Intervention 3; *contra* MT Br. 19-22; Amici Br. 2-4.

Finally, Plaintiffs reiterate that timely resolution of this case is critical. No party contests that TC Energy is already authorized to construct Keystone XL through non-PCN waters. And while the NWP 12 Coalition argues that, as a practical matter, such construction will not begin until TC Energy receives *all* its necessary permits, Coal. Br. 15-16, that argument is belied by TC Energy's own status report, which states that it plans to begin preliminary construction activities

for Keystone XL in February and actual construction in April. ECF No. 103.

If the Court were to rule in Plaintiffs' favor on the merits but allow construction to begin as planned, Plaintiffs would suffer irreparable harm from the ensuing environmental degradation associated with construction and the risk that "bureaucratic momentum" could "skew" the Corps' future analysis and decision-making regarding the project. *Indigenous Envtl. Network v. U.S. Dep't of State*, 369 F. Supp. 3d 1045, 1050-51 (D. Mont. 2018). As this Court previously found, environmental injuries "can seldom be adequately remedied by money damages," such injuries outweigh TC Energy's "pecuniary interest," and the public interest favors a complete environmental review of Keystone XL before construction begins. *Id.* at 1051-52. Plaintiffs therefore satisfy the four-factor test for a permanent injunction under *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). As such, Plaintiffs respectfully request the relief identified above, including an injunction barring construction of Keystone XL until the Corps complies with the CWA, NEPA, and the ESA.[23]

---

[23] In light of TC Energy's status report, Plaintiffs may need to move for a preliminary injunction in the coming weeks to preserve the status quo while the Court hears argument and reaches a decision on their claims. *See U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for partial summary judgment and deny Defendants' cross-motions for partial summary judgment.

Dated: January 29, 2020          Respectfully submitted,

/s/ Doug Hayes
Doug Hayes (*pro hac vice*)
/s/ Eric Huber
Eric Huber (*pro hac vice*)
Sierra Club Environmental Law Program
1650 38th Street, Suite 102W
Boulder, CO 80301
(303) 449-5595
doug.hayes@sierraclub.org
eric.huber@sierraclub.org
*Attorneys for Sierra Club and Northern*
*Plains Resource Council*

/s/ Cecilia D. Segal
Cecilia D. Segal (*pro hac vice*)
Natural Resources Defense Council
111 Sutter Street, Floor 21
San Francisco, CA 94104
(415) 875-6100
csegal@nrdc.org
*Attorney for Bold Alliance and Natural*
*Resources Defense Council*

/s/ Jared Margolis
Jared Margolis (*pro hac vice*)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
(503) 283-5474
jmargolis@biologicaldiversity.org
*Attorney for Center for Biological Diversity*
*and Friends of the Earth*

/s/ Timothy M. Bechtold
Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for all Plaintiffs*

**WORD COUNT CERTIFICATION**

I certify that the foregoing response contains 13,995 words, as counted with Microsoft Word's "word count" tool, and excluding material Local Civil Rule 7.1(d)(2)(E) omits from the word-count requirement.

/s/ Cecilia D. Segal

**CERTIFICATE OF SERVICE**

I certify that I served the foregoing brief on all counsel of record via the

Court's CM/ECF system.

/s/ Cecilia D. Segal