JONATHAN D. BRIGHTBILL
PRERAK SHAH (Acting)
JEAN E. WILLIAMS
Deputy Assistant Attorneys General

BENJAMIN J. GRILLOT
BRIDGET KENNEDY MCNEIL
KRISTOFOR R. SWANSON
Environment & Natural Resources Division
U.S. Department of Justice

[contact information in signature block]
*Attorneys for Federal Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| **Northern Plains Resource Council**, et al., | Case No. 4:19-cv-44-BMM |
| Plaintiffs, | |
| v. | |
| **U.S. Army Corps of Engineers**, et al., | **Federal Defendants' Reply in Support of Cross-Motion for Summary Judgment** |
| Defendants, and | |
| **TransCanada Keystone Pipeline, LP**, et al., | |
| Defendant-Intervenors. | |

# TABLE OF CONTENTS

INTRODUCTION.........................................................................................................1

ARGUMENT.............................................................................................................1

    I.   Plaintiffs Continue to Misconstrue the Nature of the Agency Action .......1

    II.  NWP 12 Complies with Section 404(e) of the Clean Water Act by
Ensuring Activities Will Cause Only Minimal Environmental Effects .....4

        A. The Corps' Treatment of Multiple Crossings Complies With
Section 404(e) of the Clean Water Act..............................................5

        B. The Corps' Deferral of Project-Specific Analysis of Impacts
Complies With the Clean Water Act .................................................6

    III. The Corps Complied with NEPA ............................................................9

    IV. The Corps Complied with the Endangered Species Act.........................15

    V.   Any Remand Should Be Limited ............................................................20

CONCLUSION .........................................................................................................21

## T<span>ABLE OF</span> A<span>UTHORITIES</span>

**Cases**

*All. for the Wild Rockies v. Zinke*,
265 F. Supp. 3d 1161 (D. Mont. 2017) ...............................................................5

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
462 U.S. 87 (1983)...................................................................................................6

*Cal. Communities Against Toxics v. EPA*,
688 F.3d 989 (9th Cir. 2012)................................................................................20

*Dep't of Transp. v. Public Citizen*,
541 U.S. 752 (2004)...................................................................................9, 10, 12

*EarthReports, Inc. v. FERC*,
828 F.3d 949 (D.C. Cir. 2017)..............................................................................11

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
702 F.3d 1156 (10th Cir. 2012) ............................................................................13

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) .............................................................................................6

*Monsanto Co. v. Geertson Seed Farm*,
561 U.S. 1397 (2010 .............................................................................................21

*Nat'l Wildlife Fed. v. Brownlee*,
402 F. Supp. 2d 1 (D.D.C. 2005) .........................................................................18

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
167 F. Supp. 2d 1200 (W.D. Wash. 2001),
*rev'd in part by* 402 F.3d 846..............................................................................12

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
402 F.3d 846 (9th Cir. 2005)................................................................................12

*O'Reilly v. U.S. Army Corps of Eng'rs*,
477 F.3d 225 (5th Cir. 2007).................................................................................13

*Palm Beach Cnty. Envtl. Coal. v. Florida*,
   651 F. Supp. 2d 1328 (S.D. Fla. 2009) ................................................................3

*Save Our Sonoran, Inc. v. Flowers*,
   408 F.3d 1113 (9th Cir. 2005) ...........................................................................13

*Sierra Club, Inc. v. Bostick*,
   787 F.3d 1043 (10th Cir. 2015) .......................................................................4, 8

*Sierra Club v. Bosworth*,
   510 F.3d 1016 (9th Cir. 2007) .............................................................................4

*Sierra Club v. FERC*,
   867 F.3d 1357 (D.C. Cir.  2017) ...................................................................10, 11

*Sierra Club v. FERC*,
   827 F.3d 36 (D.C. Cir. 2016) .............................................................................11

*Sierra Club v. FERC*,
   827 F.3d 59 (D.C. Cir. 2016) .............................................................................11

*Sierra Club v. Marsh*,
   769 F.2d 868 (1st Cir. 1985) ..............................................................................13

*Sierra Club v. MasTec N. Am.*,
   Case No. 03-cv-1697-HO, 2009 WL 426205 (D. Or. Feb. 19, 2009) ..................3

*Sierra Club v. Sigler*,
   695 F.2d 957 (5th Cir. 1983) ..............................................................................13

*Stop the Pipeline v. White*,
   233 F. Supp. 2d 957 (S.D. Ohio 2002).............................................................13

*Tri-Valley CARES v. Dept. of Energy*,
   671 F.3d 1113 (9th Cir. 2012) .............................................................................5

*W. Watersheds Project v. Kraayenbrink*,
   632 F.3d 472 (9th Cir. 2011) .............................................................................17

*White Tanks Concerned Citizens, Inc. v. Strock*,
  563 F.3d 1033 (9th Cir. 2009) ...............................................................12

*WildEarth Guardians v. U.S. Army Corps of Eng'rs*,
  847 F.3d 635 (10th Cir. 2020) ..............................................................17

**Statutes**

15 U.S.C. § 717f(c)(1)(A) .......................................................................10

33 U.S.C. § 403 .......................................................................................12

33 U.S.C. § 1311 .....................................................................................11

33 U.S.C. § 1311(a) .................................................................................11

**Code of Federal Regulations**

33 C.F.R. § 323.1 ....................................................................................11

33 C.F.R. § 325.4(a) ..................................................................................7

33 C.F.R. pt. 330 .....................................................................................11

33 C.F.R. § 330.1 ....................................................................................11

40 C.F.R. § 1502.15 ................................................................................14

**Federal Registers**

47 Fed. Reg. 31,794 (July 22, 1982)........................................................3

65 Fed. Reg. 12,818 (Mar. 9, 2000) .........................................................3

77 Fed. Reg. 10,184 (Feb. 21, 2012) ........................................................5

82 Fed. Reg. 1,860 (Jan. 6, 2017) ................................................. 2, 4, 5, 7

**INTRODUCTION**

Nationwide Permit 12 ("NWP 12" or "Permit") authorizes—assuming all its terms and conditions are met—a single dredge or fill activity of no more than ½-acre of waters of the United States at a single waterbody when associated with the construction, maintenance, repair, and removal of utility lines.  An estimated eighty-two percent of the Permit's potential uses are submitted to the Corps for verification of the Permit's applicability either because the authorization would affect more than one-tenth of an acre of jurisdictional waters or because some other Permit condition requires it.  If the Corps determines that the work in question falls outside the Permit's scope or conditions, the Permit does not apply.

Plaintiffs' response brief continues to ignore NWP 12's terms and conditions, the deference due to the Corps in interpreting its authorities, and what it is that the Permit (and, thus, the Corps) actually authorized.  When properly considering the Corps' authorities and NWP 12, Plaintiffs' facial challenges to the Permit fail.  Summary judgment should be granted in favor of Federal Defendants on Counts One, Two, and Four.

**ARGUMENT**

**I.      Plaintiffs Continue to Misconstrue the Nature of the Agency Action**

Counts One, Two, and Four are facial challenges to NWP 12.  *See* Am. Compl. ¶¶ 191–205, 218–27, ECF No. 36.  As explained in our opening brief, this

is significant in several ways, including the fact that those claims have nothing substantively to do with the Keystone XL pipeline. *See* Fed. Defs.' Mem. 11–12, ECF No. 88. Plaintiffs' challenges to the application of NWP 12 to Keystone are stayed, *see* ECF No. 56, and thus not at issue here.

Plaintiffs nonetheless continue to make Keystone a primary focus, again implying that NWP 12 approved the Keystone pipeline. *See* Pls.' Resp. 4–6, 18, 43 n.12, 48–49, 50, 52–53, ECF No. 107. Factually, of course, that cannot be the case. There was no proposal for Keystone before the Corps at the time it issued NWP 12. *See* Fed. Defs.' Mem. 12. Plaintiffs argue that Keystone remains substantively relevant because TC Energy plans to use NWP 12 and because, it appears, most of the NWP-authorized activities would not independently require a pre-construction notice.[1] *See* Pls.' Resp. 4–7. But TC Energy's use of an existing permit is not the same as the Corps "approving" the pipeline.

Plaintiffs also ignore a practical reality. NWP 12 requires that any pre-construction notice for a linear project identify (and the Corps district engineer review) *all* the NWP-authorized activities for that line. *See* 82 Fed. Reg. at 1,986 (Note 8). That is true regardless of whether those other authorized activities independently require pre-construction notice. *See id.* Any argument that

---

[1] If no pre-construction notice is required, it is because the authorization in question is less than 1/10 of an acre and falls outside the Permit's other notice thresholds. *See* 82 Fed. Reg. 1860-01, 1,986, 1,999 (Jan. 6, 2017).

Keystone presents cumulative impacts that require an individual Section 404 permit is an unripe challenge to the Permit's application, not a challenge to its issuance.[2]

Plaintiffs' response contains two other factual inaccuracies. First, Plaintiffs incorrectly state that, before 2012, the Corps "routinely required [oil pipelines] to seek individual Section 404 permits." *See* Pls.' Resp. 7–9. General permits for utility lines have been approved in nearly the same form as NWP 12 since 1977. 47 Fed. Reg. 31,833; 65 Fed. Reg. 12,887; *see also Palm Beach Cnty. Envtl. Coal. v. Florida*, 651 F. Supp. 2d 1328, 1332, 1333 (S.D. Fla. 2009) (NWP 12 use for pipeline route crossing 122 water bodies); *Sierra Club v. MasTec N. Am.*, Case No. 03-cv-1697-HO, 2009 WL 426205 *1 (D. Or. Feb. 19, 2009) (NWP 12 use along 60-mile pipeline). Any argument that district engineers are now applying the permit impermissibly when reviewing pre-construction notices is a claim challenging the application of the Permit to a given pipeline, not a challenge to the Corps' issuance of the Permit itself.

Second, Plaintiffs continue to incorrectly state that the majority of NWP 12 authorizations do not require pre-construction notices. *See* Pls.' Resp. 28, 29 n.7. As noted in our opening brief, the Corps estimated (based on historical data) that

---

[2] On February 3, the Corps received new pre-construction notices from TC Energy. Those notices are currently under review.

82 percent of NWP 12 authorizations would likely require pre-construction notice. *See* Fed. Defs.' Mem. 12–13 (citing NWP005331).  And, when a linear project is involved, that notification needs to include all the NWP-authorized activities along the line.  *See* 82 Fed. Reg. at 1,986.

## II.   NWP 12 Complies with Section 404(e) of the Clean Water Act by Ensuring Activities Will Cause Only Minimal Environmental Effects

As explained in our opening brief, to succeed on their facial challenge to NWP 12, Plaintiffs must show that the Corps' determination that NWP 12 would have only "minimal effects" under Section 404(e) lacks a "substantial basis in fact."  *Sierra Club v. Bostick*, 787 F.3d 1043, 1055 (10th Cir. 2015) (internal quotation marks and citation omitted); *see also Sierra Club v. Bosworth*, 510 F.3d 1016, 1023–24 (9th Cir. 2007).  Plaintiffs again fail to meet that heavy burden. Plaintiffs' response largely re-states their opening brief and relies, improperly, upon post-decisional documents that are irrelevant.  However, we respond to make two points.

### A.   The Corps' Treatment of Multiple Crossings Complies With Section 404(e) of the Clean Water Act

First, Plaintiffs claim that the Corps' treatment of multiple crossings of a single waterway by a linear project is "unsupported by the record" and thus arbitrary and capricious.  Pls.' Resp. 48.  However, the "record" that Plaintiffs

point to in support of this argument consists of select post-decisional documents related to suspended pre-construction notice ("PCN") verifications for the Keystone XL Pipeline. Pls.' Resp. 50. These verifications are both moot and unripe—and, thus, irrelevant. *See All. for the Wild Rockies v. Zinke*, 265 F. Supp. 3d 1161, 1175 (D. Mont. 2017), quoting *Tri-Valley CARES v. U.S. Dept. of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012) (record limited to "information available at the time, not post decisional information").

As explained in our opening brief, for over thirty years the Corps has treated each crossing of a waterway by a linear project (like a pipeline) as a "single and complete" project if the crossings are at "separate and distant" locations. Fed. Defs.' Mem. 17–19. This is because "the distance between those crossings will usually dissipate the direct and indirect environmental effects so that the cumulative adverse environmental effects are no more than minimal." 82 Fed. Reg. at 1,885. The Corps recognizes that sometimes the distance does not dissipate the effects, and in those situations district engineers "will exercise [their] discretionary authority and require an individual permit." *Id.* This flexibility is reasonable because the determination requires "a judgment call [based on] the substantial variability in landscapes and environmental conditions across the country." Reissuance of Nationwide Permits, 77 Fed. Reg. 10184-01, 10,264 (Feb. 21, 2012). The Corps' longstanding, reasonable interpretation of what constitutes a

"single and complete project" is entitled to deference.  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417–18 (2019); *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983) (court must be "at its most deferential" when determination requires agency's technical or scientific expertise).

Plaintiffs' insistence on a "consistent definition"—on a nationwide basis—of "separate and distant" would be impractical and is not required by the Clean Water Act.  Instead, the Corps reasonably decided to enumerate the factors relevant to such a determination, and allows district engineers to utilize those factors to ensure cumulative effects are no more than minimal.  Because the Corps' definition ensures (where appropriate) that closely-spaced, multiple crossings are treated as one "single and complete project"—its interpretation is reasonable and Plaintiffs' facial challenge must fail.

## B.      The Corps' Deferral of Project-Specific Analysis of Impacts Complies With the Clean Water Act

Second, Plaintiffs again insist that "in most cases there is no project-level review at all for NWP 12-authorized activities."  Pls.' Resp. 51.  Plaintiffs again ignore NWP 12's stringent requirement that a permittee submit a pre-construction notice if—among other things—a discharge will result in a loss greater than 1/10 of an acre (about the size of a basketball court) of waters of the United States, or if any listed species or designated critical habitat might be affected.  82 Fed. Reg.

1986.  As a practical matter, this means that large pipeline projects—like Keystone

XL—will probably require submission of a pre-construction notification.

Once a pre-construction notice is submitted, Note 8 of NWP 12 requires the

permittee to submit a list of all non-PCN crossings associated with the same

project.  *Id.*  If the district engineer determines that the crossings have more than

minimal impacts, the district engineer can then add special conditions to permits,

or deny the application of NWP 12 completely—requiring the permittee to apply

for an individual Section 404 permit.  *See* 33 C.F.R. § 325.4(a).

Nevertheless, Plaintiffs claim that Keystone XL "is illustrative," alleging

that "over 99 percent" of Keystone XL crossings were authorized without a PCN

(Pls.' Resp. 52, n.18).  First, as discussed above, this reliance on post-decisional

documentation is improper and irrelevant to the consideration of NWP 12's facial

validity.  Second, Plaintiffs ignore that the Corps does not have authority under the

Rivers and Harbors Act or Clean Water Act to regulate the upland horizontal

directional drilling contemplated for Keystone XL at the Platte and Niobrara River

crossings in Nebraska, and therefore NWP 12 does not apply.

But even if Keystone XL is "illustrative," Plaintiffs ignore the fact that all of

Keystone XL's proposed crossings were included in TC Energy's PCN

submissions pursuant to Note 8.  This is consistent with the Corps' reasonable pre-

issuance estimate that of the 14,000 anticipated uses of NWP 12 each year, 11,500

(or 82 percent) would be reported to the Corps through a pre-construction notice. NWP005331.

Because they conflate the facial and as-applied challenges here, Plaintiffs' attempt to distinguish *Bostick* fails. Pls' Resp. 53–54. In *Bostick*, both facial and as-applied challenges to NWP 12 were present. Here, Plaintiffs are only—at present—making a facial challenge to NWP 12. Accordingly, *Bostick*'s findings regarding whether the district engineers there issued verifications that adequately analyzed project-specific effects are irrelevant.

Instead, what *is* relevant in *Bostick* is that the 10th Circuit found that the structure of NWP 12—including reliance on post-issuance review of project-specific impacts—was, and remains, reasonable on its face. 787 F.3d at 1055. Because Plaintiffs have failed to show that the Corps' approach lacks a substantial basis in fact and thus violates the CWA, summary judgment should be granted in favor of Federal Defendants.

## III.   The Corps Complied with NEPA

Summary judgment should also be granted in favor of Federal Defendants on the NEPA claim. Our opening brief explained the application of *Public Citizen* to the Corps' Section 404(e) authority; why the Corps was not required to consider effects from upland construction or pipeline operations; and why the Corps

otherwise complied with NEPA. *See* Fed. Defs.' Mem. 22–30. Plaintiffs' responses largely repeat their opening arguments. We make four additional points.

First, Plaintiffs ignore *Public Citizen*'s import and facts. *See* Pls.' Resp. 10–11, 32. The Supreme Court held "that, where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered the legally relevant 'cause' of the effect" for NEPA purposes. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765–66 (2004). Contrary to what Plaintiffs seem to assume, the holding did not turn on a conclusion that there was no causal link between the Federal Motor Carrier Safety Administration's action—regulations establishing a safety regime for Mexican trucks operating in the United States—and impacts from increased trucking. *See id.* at 765–66; Pls.' Resp. 11. The Court recognized that Congress had effectively prohibited Mexican trucks from operating in the United States until the Safety Administration issued its regulations. *Pub. Citizen*, 541 U.S. at 765. But that "but for" causation was insufficient because the Safety Administration did hold the authority to "categorically exclude Mexican motor carriers from operating within the United States." *Id.* at 766–67. That authority—and thus the *legally relevant* cause of any effects from trucking operations—rested with the President in deciding whether to lift a moratorium. *See id.* at 769, 770.

The circumstances here are analogous.  NWP 12 certainly has some causal connection to construction and operation of a pipeline that would make use of the Permit's authority.  But, just as the Safety Administration lacked the authority to categorically exclude trucks or establish or enforce emissions controls (*id.* at 759, 765–66), the Corps lacks the authority to prevent pipeline operations or upland construction.  Thus, just as in *Public Citizen*, the Corps is not the *legally relevant* cause of effects from operations and upland construction under NWP 12.

Second, Plaintiffs' renewed analogy to *Sierra Club v. FERC* again illustrates our point.  *See* Pls.' Resp. 11–12, 32–33 (discussing 867 F.3d 1357 (D.C. Cir. 2017)).  Plaintiffs posit that the case stands for the proposition that effects need to be considered if the agency's decision-making procedures require it to weigh the public interest.  *See* Pls.' Mem. 11, 33 (citing 867 F.3d at 1373).  Even if that were the driver of NEPA-based requirements, however, Plaintiffs skip a step in the analysis.  The issue in *Sierra Club v. FERC* was *which* operational impacts FERC needed to consider, not *if* the agency needed to consider them.  *See* 867 F.3d at 1373–74.  There was no dispute that FERC was authorized to prevent the pipeline from being constructed or operating.  *See* 867 F.3d at 1363–64 (citing 15 U.S.C. § 717f(c)(1)(A)).  The Corps holds no similar authority.  Thus, we do not even reach the question of which operational impacts the Corps would need to consider.

Instead, a better analogy rests in the three cases the court distinguished in *Sierra Club v. FERC*. *See* 867 F.3d at 1372–73. In those cases, FERC was not the legally relevant cause of effects from anticipated liquefied natural gas exports because its authority was to license terminal upgrades, not to approve or regulate exports. *See EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2017); *Sierra Club v. FERC*, 827 F.3d 36, 47 (D.C. Cir. 2016); *Sierra Club v. FERC*, 827 F.3d 59, 68–69 (D.C. Cir. 2016). Similarly, as Plaintiffs themselves recognize, the Corps—rather than approve pipeline siting, upland construction, or operations—"must decide whether to permit dredge and fill of U.S. waters." Pls.' Resp. 13. Given NWP 12's terms and conditions, that authority plays only a nominal role in pipeline construction and no role whatsoever in eventual operations.

<u>Third</u>, the Corps authority at issue is Clean Water Act Section 404(e), not Section 404(a).[3] Accordingly, regulations and cases involving Corps individual permits issued under Section 404(a) are inapt. *See* Pls.' Resp. 13–15, 23–26. For one, 33 C.F.R. part 325 Appendix B is not applicable here. Part 325 applies to the Corps' review of individual permits. *See* 33 C.F.R. § 323.1 (identifying applicable regulations for individual permit applications). The Corps' issuance of general permits like NWP 12 is governed by 33 C.F.R. part 330. *See* 33 C.F.R. § 330.1. In

_____

[3] Plaintiffs also reference 33 U.S.C. § 1311(a) as a basis for the Corps' authority. *See* Pls.' Resp. 3. But that Clean Water Act section relates to effluent limitations. *See* 33 U.S.C. § 1311.

any event, Plaintiffs are wrong in stating that the causal connection between a Corps permit and a project's operational effects is always the same, regardless of the permit at issue. *See* Pls.' Resp. 13. The question of whether the Corps' action is the legally relevant cause of a given effect is circumstance-specific. *See Pub. Citizen,* 541 U.S. at 765–70 (examining causal link between the authority and specific effects at issue).

Even if they were relevant, the Corps' actions in the individual permit cases upon which Plaintiffs rely are a far cry from one authorizing minimal dredge and fill activities associated with construction, maintenance, and repair of utility lines. For example, *Ocean Advocates* involved a permit for expansion of an oil refinery dock in Puget Sound. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 855 (9th Cir. 2005). The project was located entirely in waters of the United States. *See id.* It also could not be constructed without a Corps permit under Section 10 of the Rivers and Harbors Act. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 167 F. Supp. 2d 1200, 1215 (W.D. Wash. 2001), *rev'd in part by* 402 F.3d 846; *see* 33 U.S.C. § 403. In that causal context, the Corps was required to consider increases in tanker traffic (including spills) as a potential indirect effect of its action. *See Ocean Advocates*, 402 F.3d at 867–68.

The other individual permit cases are similarly distinct. *See White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033, 1040–42 (9th Cir. 2009) (waters

situated such that development could not proceed without the permit); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1122–23 (9th Cir. 2005) (same); *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1162–63 (10th Cir. 2012) (permit for facility on site impacting 17,300 feet of streams and 4.6 acres of wetlands); *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 229 (5th Cir. 2007) (permit for development on 81 acres, 40 of which were wetlands); *Sierra Club v. Marsh*, 769 F.2d 868, 872, 873, 876–78 (1st Cir. 1985) (permit for construction of a cargo port and causeway connecting island to mainland); *Sierra Club v. Sigler*, 695 F.2d 957, 961, 975–75 (5th Cir. 1983) (permit to extend and deepen a shipping channel); *Stop the Pipeline v. White*, 233 F. Supp. 2d 957, 963, 967–70 (S.D. Ohio 2002) (proposed impacts exceeded the NWP's criteria, therefore requiring an individual permit).

Fourth, Plaintiffs are incorrect that the Corps failed to appropriately assess potential effects from the inadvertent return of drilling fluid. *See* Pls.' Resp. 16–21. We did not argue that inadvertent returns were irrelevant solely because the fluid would not constitute a discharge under Section 404. *Compare* Pls.' Resp. 16–17 *with* Fed. Defs.' Mem. 29–30. As we explained, Plaintiffs' concern with hydraulic directional drilling in upland areas only restates their argument that the Corps was required to consider effects from upland activities. Fed. Defs.' Mem. 29. This would include inadvertent returns from drilling undertaken to *avoid* work

in waters of the United States. Plaintiffs seem primarily concerned with that scenario; drilling under a jurisdictional water could create the possibility of an inadvertent return into those waters. But NWP 12 is simply not the legally relevant cause of that work. And the return itself would not be a discharge of dredge or fill material for purposes of Section 404 and would therefore not be authorized by NWP 12. *See* NWP005274.

As to potential drilling done under NWP 12 (i.e., drilling through, or staging in, a jurisdictional water), the Corps assessed indirect impacts from inadvertent returns in response to public comments. *See* NWP006778–79, NWP006784–804. Thus, it was an example of the NEPA process at work. Ironically, Plaintiffs attempt to support their argument that the Corps failed to consider these effects by citing to the administrative record's detailing of them. *See* Pls.' Mem. 20. And Plaintiffs' selective quoting of the presentation in question takes it greatly out of context. *Compare* Pls.' Resp. 20 *with* NWP006784–803. The Corps clearly considered the issue and summarized that consideration in the EA, thereby meeting NEPA's requirement.[4] *See* NWP005274–76, NWP005284–85. Plaintiffs appear to dispute the Corps' conclusion as to the significance of the potential effects. But

---

[4] Plaintiffs themselves only dedicated two paragraphs of their comments to inadvertent returns. *See* NWP043886–87. Thus, the Corps' assessment was entirely reasonable. *See* 40 C.F.R. § 1502.15 ("Data and analyses in a statement shall be commensurate with the importance of the impact . . . .").

Plaintiffs have not argued that the Corps' Finding of No Significant Impact based on the record before the agency was arbitrary and capricious.[5] The Corps complied with NEPA.

## IV. The Corps Complied with the Endangered Species Act

In our opening brief, we showed that the Corps reasonably determined that the reissuance of NWP 12 would have "no effect" on listed species and protected habitat and does not trigger the ESA Section 7(a)(2) consultation requirements. Fed. Defs.' Mem. 32–43. As with their other arguments, Plaintiffs' reply simply restates points made in their opening brief without meaningfully rebutting our arguments, but we make two additional arguments in this response.

First, the Corps' "no effect" determination rests on the requirement that the 2017 nationwide permits do not authorize activities that "might affect" listed species or protected habitat (a lower threshold than required by ESA Section 7(a)(2)). For all such cases, case-by-case review is required, resulting in ESA consultation unless the Corps determines the activity will have "no effect" on protected species or habitat. NWP005266; NWP005304.[6] However, Plaintiffs'

_____

[5] Plaintiffs fault the cumulative effects analysis as being similar to that for other 2017 nationwide permits. *See* Pls.' Resp. 21. But of course the analyses are similar. The Corps was assessing cumulative effects on the nation's aquatic environment, which would include effects from all the nationwide permits.

[6] Plaintiffs continue to claim that the NWP program does not ensure consultation for all actions affecting species, Pls.' Resp. 41, but fail to respond to our rebuttal of

critiques of this approach ignore the fact that this site-specific consultation is not the only element of the Corps' "no effect" determination. The determination also factored in regional conditions that further restrict use of the nationwide permits. NWP005326–27. Here, those conditions include, but are not limited to, a revocation of NWP 12 in peatlands and a moratorium on dredging in Nebraska areas requiring pre-construction notice. The district also had conducted regional programmatic consultations for certain species and specific nationwide permits, in addition to standard local operating procedures for endangered species in North Dakota and western Montana. NWPRC00055. Furthermore, the record shows that the Corps carried forward the majority of the protective measures from NMFS' earlier biological opinion and "voluntarily incorporated them into the 2017 package."[7] NWP026529. These measures include elements such as consultation with regional offices to identify or modify regional conditions, semi-annual reports

---

this point. Fed. Defs.' Mem. 33, n.11. Similarly, Plaintiffs gain nothing from a statement in the 2014 NMFS biological opinion alleging that the Corps historically did not review most pre-construction notices to ensure they are complete. Pls.' Resp. 43. Since all activities that might affect listed species or habitat require site-specific ESA consultation, that process necessarily requires review and analysis of pre-construction notices. Also, this statement was made in service of the broader point that the Corps could improve its tracking of NWP activities and impacts, *see* NWP030857-58; as discussed below, the Corps continues to implement the protective measures designed by NMFS to address this concern.

[7] The other three measures were not carried forward because NMFS itself had determined they were infeasible. NWP 026529; NWP026558.

on authorized activities, impacts, and mitigation, and requiring compensatory mitigation for wetland losses where required. NWP026555.

These are exactly the types of "adequate protections" that Plaintiffs claim are lacking. Plaintiffs fail to articulate what else could be added by a programmatic consultation on the NWP program. More importantly, they fail to undermine the Corps' reasonable determination that the NWP program, with these general conditions, regional conditions, and continued implementation of the protective measures, will have "no effect" on protected species or habitat. The record shows that the prior iteration of the NWP program did not include these protective measures, nor the changes made in the 2017 reissuance; thus, the current NWP program is *not* the same as the action analyzed in the 2014 NMFS biological opinion and the Court cannot simply transfer any statements about the impacts of the prior NWP program to the current NWP program.[8]

Thus, this situation is not like *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011), as Plaintiffs argue. Pls.' Resp. 38. Here, the Corps was not bound by the prior, voluntary consultation process. As in *WildEarth Guardians v. U.S. Army Corps of Engineers*, 947 F.3d 635, 641–42 (10th Cir.

---

[8] Furthermore, the 2014 NMFS biological opinion addressed only activities in coastal Corps districts with species under NMFS' jurisdiction. NWP0030694. Activities authorized by the Omaha District, such as the Keystone XL project, were not analyzed in that biological opinion, making any statements from that document even less applicable to Plaintiffs' (inappropriate) Keystone XL examples.

2020), the agency is entitled to re-evaluate its programs and authorities to

determine whether they trigger ESA Section 7(a)(2) consultation duty.  Here, the

Corps' re-evaluated position rests not only on a lengthy explanation provided in

October 2012, NWP031043–50, but also the reasonable determination that further

improvements and modifications to the NWP program since the prior consultation

resulted in a "no effect" determination.  For this same reason, the conclusions of

*National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d 1 (D.D.C. 2005), are

inapplicable here.  In addition to our prior discussion of why it is distinguishable,

Fed. Defs.' Mem. 42, n.18, the *Brownlee* Court evaluated the 2002 NWP 12 permit,

which is three iterations and many improvements removed from the permit here.

Second, Plaintiffs continue to insist that NMFS objected to the Corps' "no

effect" determination for the 2017 NWP program.  Pls.' Resp. 44–45.  But this

argument inexplicably ignores the clear record evidence that the agency's concerns

were resolved through the interagency process coordinated by the White House's

Office of Management and Budget ("OMB").  The statement Plaintiffs repeatedly

quote—that NMFS viewed the determination as "not supportable"—comes from a

set of April 4, 2016 comments on the draft proposed rule.  NWP027751.  The

record shows that the subsequent OMB process resulted in reconciliation of the

agencies' positions, with NMFS agreeing with the Corps' "no effect" determination

and both agencies agreeing to work together, through ESA Section 7(a)(1)

consultation, to collaborate on the identification of additional regional approaches to improve species and habitat conservation. *See* NWP026489 (summary of April 21, 2016 meeting); NWP026451; NWP025554 (May 5, 2016 email relaying OMB's view that NOAA's concerns were resolved); NWP024924 (May 9, 2016 email expressing same); NWP018202 (July 2016 letter on Section 7(a)(1) consultation).

Thus, Plaintiffs' implication that NMFS (or FWS) objected to the "no effect" determination is unfounded and must be rejected. For the same reason, Plaintiffs' continued repetition of the example given in the wildlife agencies' 2015 revision to the ESA Section 7(a)(2) consultation regulations, Pls.' Resp. 36, is not persuasive. That was a generalized statement from 2015 (and also caveated by the agencies' recognition that some programmatic actions do not trigger the consultation requirement) concerning an earlier iteration of the NWP program; it simply cannot take precedence over the wildlife agencies' specific agreement with the Corps' "no effect" determination for the 2017 NWP program. The record shows that both wildlife agencies were involved in the interagency process to ensure appropriate ESA compliance for the 2017 NWP program and neither agency requested the Corps to engage in Section 7(a)(2) consultation. Thus, contrary to Plaintiffs' argument, Pls.' Resp. 45, there is nothing to undermine the Corps' "no effect"

determination which is based on its decades-long expertise in administering the NWP program and deserving of deference. *See* Fed. Defs.' Mem. 38.

## V. Any Remand Should Be Limited

For the reasons explained above and in our opening brief, the Court should not reach the question of remedy. We nonetheless note that Plaintiffs seek, at least as it pertains to the Corps, a remand without vacatur of NWP 12. *See* Pls.' Resp. 56–57. Should Plaintiffs prevail on any portion of Claims One, Two, or Four, we agree that remand without vacatur would be the appropriate remedy. Given the multitude of other activities for which NWP 12 can authorize work—including emergency repairs to utility lines—vacatur would be inappropriate, over-broad, and extremely disruptive. *See Cal. Communities Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). Further, given that Plaintiffs focus solely on the use of NWP 12 for construction of new oil pipelines, any remand should similarly be limited to the portion of the Permit authorizing fill activities for construction of new oil pipelines. *See* Pls.' Resp. 57.

Plaintiffs seem to assume that, under a remand, "the Corps would be enjoined from using NWP 12" for the Keystone XL pipeline. Pls.' Resp. 57. The basis for that assumption is less than clear given that, absent a pre-construction notice, the Corps does not independently approve a utility line's use of the Permit; it is not the Corps that "uses" the Permit. To the extent Plaintiffs are referring to

permanent injunctive relief against TC Energy prohibiting the company from relying on NWP 12 during the pendency of any remand, further briefing would be required. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (four-factor test for permanent injunctive relief). To the extent Plaintiffs are referring to any Corps verification of TC Energy's pre-construction notices for Keystone XL, the point would relate to the presently-stayed Claims Three and Five and any remedy—assuming the Corps verifies use of the Permit and Plaintiffs were to prevail on any challenge to those verifications—could be addressed at the appropriate time.

## CONCLUSION

The Corps' implementation and interpretation of Section 404(e) are entitled to deference. NEPA did not require the Corps to consider potential effects from upland construction or oil pipeline operations. And NWP 12 does not, standing alone, authorize any activity that might affect a listed species or critical habitat. Summary judgment should be granted in favor Federal Defendants on Counts One, Two, and Four.

Respectfully submitted this 14th day of February, 2020,

MARK STEGER SMITH
Assistant U.S. Attorney
Office of the United States Attorney
2601 Second Ave. North, Suite 3200

Billings, MT 59101
Tel: (406) 247-4667
Fax: (406) 657-6058
mark.smith3@usdoj.gov

JONATHAN D. BRIGHTBILL
PRERAK SHAH (Acting)
JEAN E. WILLIAMS
Deputy Assistant Attorneys General

___*Kristofor R. Swanson*_____
KRISTOFOR R. SWANSON
(Colo. Bar No. 39378)
Senior Attorney
Natural Resources Section
Envt. & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0248
Fax: (202) 305-0506
kristofor.swanson@usdoj.gov

__*Benjamin J. Grillot*_____
BENJAMIN J. GRILLOT
(D.C. Bar No. 982114)
Environmental Defense Section
Envt. & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0303
Fax: (202) 305-0506
benjamin.grillot@usdoj.gov

__*Bridget Kennedy McNeil*_____
BRIDGET KENNEDY MCNEIL
Senior Trial Attorney
Wildlife & Marine Resources Section
Envt. & Natural Resources Div.

U.S. Department of Justice
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
303-844-1484
bridget.mcneil@usdoj.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(d)(2)(B) and the Court's February 11, 2020, Order (ECF No. 109), I hereby certify that the above memorandum is 4,993 words, exclusive of the caption, tables, signature blocks, and certificates of service and compliance.

*Kristofor R. Swanson*
Kristofor R. Swanson

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2020, I filed the above pleading with the Court's electronic case management system, which caused notice to be sent to all parties.

*Kristofor R. Swanson*
Kristofor R. Swanson