TIMOTHY C. FOX
Montana Attorney General
ROB CAMERON
Deputy Attorney General
JEREMIAH LANGSTON
Assistant Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: 406-444-2026
Fax: 406-444-3549
rob.cameron@mt.gov
jeremiah.langston@mt.gov

COUNSEL FOR DEFENDANT-INTERVENOR
STATE OF MONTANA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, et al., | CV-19-44-GF-BMM |
| Plaintiffs, | **STATE OF MONTANA'S REPLY BRIEF IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, et al., | |
| Defendants, | |
| TC ENERGY CORPORATION, et al., | |
| Defendant-Intervenors, | |
| STATE OF MONTANA, | |
| Defendant-Intervenor, | |
| AMERICAN GAS ASSOCIATION, et al., | |
| Defendant-Intervenors. | |

# INTRODUCTION

The states have siting authority over oil pipelines. Congress, in contrast to its regulation of natural gas pipelines, has not granted any federal agency comprehensive siting authority for oil pipelines. When the federal government does regulate oil pipeline siting, it is in discrete circumstances; *e.g.*, when a pipeline will cross an international border or federal lands.

Rather than acknowledge this straightforward jurisdictional divide, Plaintiffs attempt to turn the U.S. Army Corps of Engineers' ("Corps") authority to permit the discharge of dredged and fill material into navigable waters into something it is not. Contrary to the plain text of 33 U.S.C. § 1444, Plaintiffs seek to confer the Corps' authority over siting oil pipelines at stream crossings for the purposes of evaluating the risk of an oil spill. If granted, this would render Montana's extensive evaluation of the Keystone XL Pipeline's ("Keystone") stream crossings under the Montana Major Facility Siting Act ("MFSA") and the Montana Environmental Policy Act ("MEPA") duplicative and meaningless. *See Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 196 (4th Cir. 2009) (finding the Corps was not required to do National Environmental Policy Act ("NEPA") review beyond its authority under § 404 of the Clean Water Act ("CWA") because it would be redundant to state environmental review).

Plaintiffs also attempt to assure this Court that the relief they seek is limited. They claim their request for relief focuses only on Keystone. (Doc. 107 at 56.) This claim is at odds with their arguments that Nationwide Permit 12 ("NWP 12") is "a final permit authorizing the construction of oil pipelines through thousands of U.S. waterways" (*id.* at 3) and the reissuance of NWP 12 is unlawful because it violates various federal laws (*id.* at 9–53). The relief Plaintiffs seek, if granted, would significantly impact other linear infrastructure projects by signaling to future litigants and project developers alike that NWP 12 does not provide streamlined review of linear infrastructure but instead these projects may be subject to extensive National Environmental Policy Act ("NEPA") review.

## ARGUMENT

I.      **The cases cited by Plaintiffs do not support federalizing oil pipeline siting in the present case.**

Plaintiffs point to three instances in which the federal government has evaluated the risk of oil spills. (Doc. 107 at 63 (citing *Indigenous Envtl. Network v. United States Dep't of State*, 347 F. Supp. 3d 561, 581–82 (D. Mont. 2018); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 134 (D.D.C. 2017); *Stop the Pipeline v. White*, 233 F. Supp. 2d 957, 967–70 (S.D. Ohio 2002)). All three are distinguishable from the present case and do not stand for the

general proposition that the Corps is responsible for regulating the risk of oil spills at every water crossing subject to the CWA.

In *Indigenous Envtl. Network*, this Court evaluated the U.S. Department of State's ("State Department") issuance of a presidential permit to Keystone under the national interest standard. 347 F. Supp. 3d at 561. This review occurred because of "Keystone's crossing of the international border between the United States and Canada." *Id.* at 572. Other federal courts have noted in the context of evaluating NWP 12 that "there is no federal statute that requires or permits federal oversight of an entirely domestic oil pipeline such as the one at issue here." *Sierra Club v. United States Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 17 (D.D.C. 2013); *see also id.* at n.13 (noting Keystone "is an international project that requires the State Department to issue a Presidential Permit finding that it is in the 'national interest' before it can be constructed. For this reason alone, Plaintiffs' repeated comparisons between the FS Pipeline and the Keystone XL Pipeline are misguided.") (internal citations omitted). While Keystone remains an international project, Plaintiffs do not challenge the State Department's issuance of a presidential permit under the national interest standard. (*See* Doc. 107 at n.1.) Plaintiffs cannot use this Court's prior determination of an entirely separate issue to claim that the Corps has a "distinct obligation to asses oil spill risks . . . ." (Doc. 107 at 56.)

In *Standing Rock Sioux Tribe*, the Dakota Access Pipeline requested the Corps to grant it an easement to build its pipeline under Lake Oahe. 255 F. Supp. 3d at 114. At the urging of other federal agencies, the Corps provided additional review of the risk of oil spills due to the proximity of the proposed pipeline to tribal lands and water resources. *Id.* at 115–119. In providing comments, the U.S. Department of Interior specifically invoked its trust obligations to tribal lands and water resources in asserting the concerns should be addressed. *Id.* at 115. While the court evaluated the adequacy of the Corps' oil spill analysis under these narrow circumstances, the court flatly rejected the argument—which Plaintiffs also raise here—that the Corps must "consider the impacts from the whole pipeline" or "address the cumulative risk from the entire pipeline." *Id.* at 130 (citing *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 34 (D.C. Cir. 2015); *Sierra Club v. Bostick*, 787 F.3d 1043, 1051–54 (10th Cir. 2015); *Winnebago Tribe of Neb. v. Ray*, 621 F.2d 269, 272–73 (8th Cir. 1980)).

The present case does not concern an instance in which the Corps conducted additional environmental review attributable to permitting an easement on federal land or proximity to tribal resources. Instead, Plaintiffs raise the same argument that the Corps must evaluate the cumulative effects of a pipeline under NWP 12, which has been rejected many times over.

*Stop the Pipeline* concerned an individual permit issued under § 404 of the

CWA. 233 F. Supp. 2d at 963. Various public commenters had raised concerns

about the risk of oil spills and the Corps responded to these comments. *Id.* at 967.

In subsequent judicial review, environmental plaintiffs argued that the Corps'

environmental assessment of the pipeline "inappropriately deferred to the Office of

Pipeline Safety ('OPS')[1] report on all [oil spill] safety issues" and "did not actually

assess the significance of leaks and spills in its nine page report." *Id.*, at 967. The

court rejected these arguments: "The Corps did not, as Plaintiffs would seem to

suggest, completely abdicate its independent obligation under NEPA to assess

whether the project significantly impacted the human environment. It relied on the

expertise of another federal agency with superior expertise on a single issue."

*Id.* at 968.

The Corps has done the same here by deferring to other federal agencies'—

including PHMSA and OPS—expertise on oil spill safety. *Issuance and*

*Reissuance of Nationwide Permits*, 82 Fed. Reg. 1,860, 1,883–84 (Jan. 6, 2017).

The mere fact the issue was raised by virtue of public comment in *Stop the*

*Pipeline*, and the Corps responded by pointing to another agency's expertise, does

---

[1] The Office of Pipeline Safety is located within the Pipeline and Hazardous Material Safety Administration ("PHMSA") of the U.S. Department of Transportation. *See* Office of Pipeline Safety, https://www.phmsa.dot.gov/about-phmsa/offices/office-pipeline-safety (last visited Feb. 14, 2020).

not mean that the Corps has a general obligation to evaluate the risk of oil spills at pipeline stream crossings.

These three cases represent unique situations in which the federal government, based on specific circumstances unlike those at issue here, opted to conduct environmental review of the risk of spills from oil pipelines. Merely because the federal government has, under different circumstances, evaluated the risk of spills from pipelines does not mean that the federal government must do so in every instance. Said differently, these few examples do not mean the Corps had an affirmative duty to evaluate oil spills here.

Plaintiffs also cite to a letter from Montana Governor to the State Department for the proposition that the federal government—not the states—have primary authority over assessing stream crossings for the likelihood of oil spills. (*See* Doc. 107 at 56.) The letter suggests the Governor has asked the Corps to conduct more tribal consultation and more analysis on water crossings. *See* Letter from Steve Bullock, Governor, State of Montana, to U.S. Dep't of State (Nov. 18, 2019).[2] Consistent with the objective of his requests, the Corps is now engaged in individualized review of the Yellowstone River. (Doc. 53.) The Governor's letter,

---

[2] *Available at* < http://governor.mt.gov/Portals/16/DSEIS%20Keystone%20 Comments%20MT%2011.18.2019.pdf?ver=2019-11-18-131000-473>.

however, was limited in context and scope, and does not stand for the proposition

that the Corps is precluded from using NWP 12 in permitting oil pipelines or that

the federal government should supplant state authority on siting oil pipelines over

river crossings. Further, the letter does nothing to diminish the Montana

Department of Environmental Quality's ("MDEQ")—an agency overseen by the

Governor—comprehensive and thorough review of Keystone under MFSA and

MEPA. (*See* Doc. 92 at 8–13.)

As recently as January 23, 2019, MDEQ took steps to allow Keystone to

maintain its Certificate of Compliance. (*See id.* at 14.) Accordingly, MDEQ retains

regulatory authority over the construction of Keystone. MDEQ's pending review

of Keystone's water quality certification pursuant to § 401 of the CWA is proof of

that ongoing regulatory authority. (*See* Doc. 107 at n.21.)

## II. In responding to Montana's arguments, Plaintiffs' conception of the Corps' jurisdiction has changed.

In its Opening Brief, Plaintiffs' central contention was that the Corps'

Environmental Assessment violates NEPA because it contains "absolutely no

analysis of the risk of oil spills" from pipelines permitted by NWP 12 or the

cumulative impacts of such spills. (Doc. 73 at 11.) Plaintiffs further elaborated that

agencies are required "to evaluate effects that are 'caused by the action and are

later in time or farther removed in distance, but are still *reasonably foreseeable*.'" (*Id.* (emphasis added).) Montana responded by stating that this "but for" argument under MEPA is not applicable because states already regulate oil pipeline siting. (Doc. 92 at 15–17 (citing *Ohio Valley Envtl. Coalition*, 556 F.3d at 195–96).)

Plaintiffs now assert that the Corps has a "distinct obligation to assess oil spill risks" and "state laws do not usurp the Corps' jurisdiction over U.S. waters." (Doc. 107 at 54, 56.) Plaintiffs cannot first claim that the Corps' obligation to assess the risk of oil spills is required as a reasonably foreseeable effect of reissuing NWP 12 (Doc. 73 at 11–15) and now claim that the Corps has a distinct obligation to perform this task (Doc. 107 at 56). These are two separate arguments.

Plaintiffs' initial argument entirely depends on what might happen after the Corps approves a pipeline. Through that lens, Plaintiffs cannot look at federal action in isolation without considering the states' role in authorizing Keystone's construction. *See Ohio Valley Envtl. Coalition*, 556 F.3d at 197 (noting that the state—not the federal government—had "'control and responsibility' over all aspects of the valley fill projects beyond the filling of jurisdictional waters."). In contrast, Plaintiffs' new argument depends on the alleged authority explicitly conferred to the Corps by Congress. (*See* Doc. 107 at 54, 56 (arguing the Corps has a "distinct obligation to assess oil spill risks" and "state laws do not usurp the Corps' jurisdiction over U.S. waters.").

The text of 33 U.S.C. § 1344 requiring the Corps to permit "the discharge of dredged or fill material into the navigable waters" cannot be read to require a distinct obligation to assess oil spill risks. The allegation that the Corps must evaluate the risk of oil spills is totally reliant on the Plaintiffs' arguments about what is reasonably foreseeable as a result of authorizing the project under NWP 12, which Plaintiffs have now distanced themselves from at least in responding to Montana's arguments. In any instance, Plaintiffs' arguments fail because they do not account for the well-defined responsibilities assigned to the states and the Corps in authorizing the construction of oil pipelines.

## III.    Plaintiffs seek an unusual remedy.

Plaintiffs assert that they seek a remand without vacatur. (Doc. 107 at 56–57.) This is an unusual remedy. *See* Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 Colum. L. Rev. 253, 255 (2017) ("With rare exceptions, agency actions that contravene the APA are invalidated and returned to the agency."). Despite the lack of vacatur, Plaintiffs still seek equitable relief against Keystone. (Doc. 107 at 64–65.) It remains unclear how this limited relief will be available when Plaintiffs present essentially a facial challenge to NWP 12 as it pertains to oil pipelines. (Doc. 110 at 1–4.) Further broadening the impacts of this

litigation, Plaintiffs' claims specifically concerning Keystone (*i.e.*, the Yellowstone

and Cheyenne River crossings) are presently stayed. (Doc. 107 at 13). If this Court

finds that NWP 12 was unlawfully reissued as it pertains to oil pipelines, this Court

could become the gatekeeper for determining, on a case-by-case basis, which oil

pipelines may continue to use NWP 12. Without this case-by-case determination,

acceptance of Plaintiffs arguments will result in a broader impact than Plaintiffs

acknowledge.

## IV.    Plaintiffs do not respond to the other ways in which this litigation will impact linear infrastructure.

The broad impact of this case is not just limited to the remedy. As pointed

out in Montana's Response Brief, Plaintiffs argue Keystone's use of NWP 12 to

build electricity transmission lines is unlawful because of potential "avian power

line collisions." (Doc. 92 at 19 (quoting Doc. 73 at 28).) Montana argues this

argument would impact other electricity transmission lines that might rely on

NWP 12. (*Id.*) Plaintiffs have no response to this other than refraining from making

arguments about Keystone's electric transmission lines in their Reply Brief.

Similarly, Plaintiffs have no response to Montana's contention that their

arguments, if accepted, could be repurposed to oppose electric transmission lines in

future litigation. (*See* Doc. 92 at 19–22.) Electricity transmission lines face

continuous scrutiny. *See, e.g.*, *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1081 (D.C. Cir. 2019) (finding the Corps failed to conduct adequate NEPA review in authorizing a transmission line crossing the James River in Virginia under historic preservation laws); *Backcountry Against Dumps v. United States DOE*, Case No. 3:12-cv-03062-L-JLB, 2017 U.S. Dist. LEXIS 114496, *3 (S.D. Cal. Jan. 30, 2017) (finding the U.S. Department of Energy failed to provide adequate NEPA review in issuing a presidential permit for a transmission line connecting a wind facility in Mexico to a public utility in California).

If this Court were to accept Plaintiffs' arguments, it would signal that NWP 12 is vulnerable in all its applications. This would allow future litigants another opportunity to claim federal action must be subject to NEPA review. This uncertainty would have a negative impact on all users of linear infrastructure by increasing the financing costs for these projects. James W. Coleman, *Pipelines & Power-lines: Building the Energy Transport Future*, 80 Ohio St. L.J. 263, 268–72, 265–66 (2019) ("The larger the risk that a project will not be approved, or that policies will artificially lower its profits in coming years, the more money investors must be paid to compensate for this uncertainty."). This would disproportionately affect renewable energy developers who—unlike oil producers—are entirely dependent on linear infrastructure to deliver their product to market.

## CONCLUSION

For the foregoing reasons, Montana respectfully requests that the Court grant

Defendants' cross-motions for partial summary judgment and deny Plaintiffs'

motion for partial summary judgment.

Respectfully submitted this 18th day of February, 2020.

> TIMOTHY C. FOX
> Montana Attorney General
> 215 North Sanders
> P.O. Box 201401
> Helena, MT 59620-1401
>
> By: ___*/s/ Jeremiah Langston*_____
> JEREMIAH LANGSTON
> Assistant Attorney General
>
> Counsel for Defendant-Intervenor

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 2,551 words, excluding certificate of service and certificate of compliance.

/s/ *Jeremiah Langston*
JEREMIAH LANGSTON
Assistant Attorney General

Counsel for Defendant-Intervenor

## CERTIFICATE OF SERVICE

I hereby certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: __February 18, 2020__      /s/ *Jeremiah Langston*
JEREMIAH LANGSTON
Assistant Attorney General

Counsel for Defendant-Intervenor