Brian P. Thompson
BROWNING, KALECZYC, BERRY & HOVEN, P.C.
800 North Last Chance Gulch, Ste. 101
PO Box 1697
Helena, MT 59824
(406) 443-6820
(406) 443-6883 - Facsimile
brian@bkbh.com

Attorneys for Montana Petroleum Association, Treasure State Resources
Association, Montana Association of Oil Gas and Coal Counties, and Montana
Contractors Association

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, et al., | Case No. CV 19-44-GF-BMM |
| Plaintiffs, | **MONTANA PETROLEUM ASSOCIATION, TREASURE STATE RESOURCES ASSOCIATION, MONTANA ASSOCIATION OF OIL GAS AND COAL COUNTIES, AND MONTANA CONTRACTORS ASSOCIATION AMICUS BRIEF** |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, et al., Defendants, | |
| TC ENERGY CORPORATOIN, et al. | |
| Intervenor/Defendants, | |
| STATE OF MONTANA, | |
| Intervenor/Defendant, | |
| AMERICAN GAS ASSOCIATION, et al., | |
| Intervenor/Defendants. | |

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION OF AMICI ...............................................................1

BACKGROUND ..................................................................................4

    I.    The Corps' reissuance NWP 12 does not violate NEPA. ....................6

        A.    The limited scope of the Corps' environmental analysis in regards to NWP 12 is appropriate..............................................7

        B.    Nothing in the CWA nor NEPA requires the Corps to evaluate global environmental concerns or an entire project under a 404 permit. .......................................................11

    II.    NWP 12 does not violate the ESA. ....................................................12

    III.    CWA ....................................................................................................15

CONCLUSION ..................................................................................16

CERTIFICATE OF COMPLIANCE ………………………………………..19

CERTIFICATE OF SERVICE……………………………………………20

# TABLE OF AUTHORITIES

Page

**Cases**

*California Trout v. Schaefer*,
   58 F.3d 469 (9th Cir. 1995) ........................................................ 6, 7, 8, 9, 10

*Kentuckians for the Cmmw. v. U.S. Army Corps of Engineers*,
   746 F.3d 698 (6th Cir. 2014) ................................................................ 11, 12

*North Carolina v. City of Virginia Beach*,
   951 F.2d 596 (4th Cir. 1991) ................................................................. 8, 9, 10

*Utah Envtl. Cong. v. Richmond*,
   483 F.3d 1127 (10th Cir. 2007) ...................................................................16

*Wyoming Outdoor Council Powder River Basin Resources Council
("WOC") v. U.S. Army Corps of Engineers*,
   351 F. Supp. 2d 1232 (D. Wyo. 2005) ........................................... 13, 14, 15

**Statutes**

16 U.S.C. § 1536(a)(2) .......................................................................................13

33 U.S.C. § 1344 (a) ...........................................................................................6

33 U.S.C. § 1344 (e) ...........................................................................................6

33 U.S.C. § 1344(e)(1) .................................................................................... 4, 16

42 U.S.C. § 4331 ................................................................................................6

**Other Authorities**

33 C.F.R. § 330.1(b) ...........................................................................................17

The Montana Petroleum Association ("MPA"), the Treasure State Resources Association ("TSRA"), the Montana Association of Oil, Gas, and Coal Counties ("MAOGCC"), and the Montana Contractors Association ("MCA") (hereinafter collectively referred to as the "MT Trade Groups"), having obtained leave from the Court, hereby submit their Amicus Curiae Brief.

## INTRODUCTION OF AMICI

The MPA is a statewide non-profit voluntary trade association with its offices located in Helena, Montana. The MPA consists of more than 150 diverse members, including "upstream," "midstream," and "downstream" companies operating in the petroleum industry. "Upstream" refers to companies engaged in the activities of exploration, production, and capture of crude petroleum; "midstream" refers to companies engaged in the transportation of crude petroleum from point to point; and "downstream" refers to companies engaged in the refining, transportation, and distribution of petroleum products. The MPA's membership also includes other businesses that participate in the petroleum industry in some fashion. The MPA's mission is to maintain a positive business climate for Montana's petroleum industry, and to foster public awareness of its many economic and ecological contributions to the state and nation. The MPA aims to be the premier voice in Montana's oil and gas industry, particularly on land use and environmental policy.

1

The MAOGCC is a Montana non-profit corporation comprised of 34 of Montana's 56 counties and a number of Montana municipalities, school districts, and natural resource industry representatives. Much of the tax revenue that supports the individual government entities comprising the MAOGCC is generated by natural resource and related industries that rely upon NWP 12 to construct and maintain energy-related infrastructure. Additionally, the individual members of the MAOGCC have a strong interest in seeing that the individuals, businesses, and schools within their jurisdictions have high-wage jobs, as well as reliable and affordable access to water and power. Companies regularly operating in the counties and municipalities constituting the membership of MAOGCC regularly use NWP 12 permits to install infrastructure, providing services to the people, businesses, and institutions located in the MAOGCC jurisdictions. MAOGCC is in a unique position to communicate to the Court about the importance of NWP 12 to local communities and jurisdictions constituting the membership of MAOGCC.

TSRA is a statewide, non-profit trade association with its office located in Helena, Montana.  TSRA was formally incorporated as a Montana non-profit corporation in 1976.  TSRA currently represents approximately 89 members, many of whom conduct or work for large industrial or agricultural operations in Montana.  TSRA's membership includes labor unions, small and large industrial operations, as well as mining, forest, and agricultural operations.  TSRA's mission

is to provide information about the potential impact of proposed legislative and regulatory changes to members, elected officials, and the public; to develop coalitions to engage in legislative or regulatory developments important to members; and to provide a vehicle to help members be informed and involved in regulatory developments. The TSRA, with its broad and varied membership including agriculture, unions, and industrial operations, offers a unique perspective of the importance of NWP 12 to the broader economy of Montana.

The MCA is a non-profit trade association formed under the laws of the State of Montana with its offices located in Helena, Montana. The MCA is the Montana chapter of the Associated General Contractors of America. MCA's members consist entirely of construction companies and contractors operating in the State of Montana. The MCA's mission is to advocate for the construction industry, to provide training and support to member contractors, and to work closely with government organizations on contractor issues. MCA members are regularly hired to construct the infrastructure and facilities that are installed pursuant to NWP 12. If NWP 12 is invalidated as is sought by the Plaintiffs, MCA members stand to lose significant revenue due to the cancellation or delay of infrastructure projects that would have otherwise been realized.

//

3

## BACKGROUND

The Clean Water Act ("CWA") authorizes the U.S. Army Corps of Engineers ("Corps") to "issue general permits . . . for any category of activities involving discharges of dredged or fill material . . . ." 33 U.S.C. § 1344(e)(1). The Corps issues Nationwide Permits ("NWP") for dozens of different categories of activities. At issue in this case is NWP 12, allowing for the discharge of dredge or fill materials into waters of the United States for utility lines. [U.S. Army Corps of Engineers, Decision Document Nationwide Permit 12, p 1, accessible at https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/6725]. For the purposes of NWP 12, "utility lines" is defined as "any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose, and any cable, line, or wire for the transmission for any purpose of electrical energy, telephone, and telegraph messages, and internet, radio, and television communication." [Id.].

Plaintiffs filed their complaint asking this Court to invalidate NWP 12 across the country, arguing the 2017 reissuance of NWP 12 is facially deficient under the CWA, the Endangered Species Act ("ESA"), and the National Environmental Policy Act ("NEPA"). Plaintiffs also make specific reference to the Keystone XL Pipeline in this facial challenge and argue use of NWP 12 for the Keystone XL Pipeline is violative of the CWA, ESA, and NEPA.

4

Plaintiffs' suit against the Corps argues the agency acted improperly. Plaintiffs have moved for partial summary judgment, contending the Corps' reissuance of NWP 12 (1) violated the National Environmental Quality Act by failing to examine the direct, indirect, and cumulative impacts of the project to be permitted under NWP 12; (2) violated the Endangered Species Act by failing to consult with federal wildlife agencies prior to reissuing NWP 12; and (3) violated section 404(e) of the Clean Water Act because it does not take cumulative effects into account. Plaintiffs also specifically challenged "the use of NWP 12 to authorize the construction of the proposed Keystone XL Pipeline across hundreds of rivers and wetlands." [Doc 73, p. 1].

Plaintiffs' assertions and arguments are conflicting and confusing and have no legal support. Plaintiffs facially challenge the reissuance of the entirety of NWP 12 on the basis that individual projects, such as the Keystone XL, will not receive comprehensive analysis under NEPA [Doc. 73, p. 2], while ignoring the fact the Keystone XL pipeline, the specific target of Plaintiffs' lawsuit, is currently subject to cumulative NEPA analysis by the U.S. Dept. of State.[1] Plaintiffs' arguments are meritless, and the Court should deny Plaintiff's motion for summary judgment.

//

---

[1] United States Dept. of State, *Draft Supplemental Environmental Impact Statement of the Keystone XL Project*, October 2019, available at https://www.state.gov/wp-content/uploads/2019/10/KeystoneXL-Draft-SEIS_Oct-2019.pdf

5

## I.     The Corps' reissuance NWP 12 does not violate NEPA.

Plaintiffs argue the Corps' NEPA analysis of NWP 12 is insufficient because (1) the NWP Environmental Assessment fails to analyze oil spills; (2) it fails to analyze "frac-outs;" (3) it fails to evaluate climate change; and (4) it fails to evaluate the cumulative effects. [Doc. 73, pp. 11-27].

Section 404 of the Clean Water Act provides that the Corps may issue permits for the "discharge of dredge or fill material into the navigable waters." 33 U.S.C. § 1344 (a) and (e).

"The purpose of NEPA is to assure that federal agencies are fully aware of the impact of their decisions on the environment." *California Trout v. Schaefer*, 58 F.3d 469, 472 (9th Cir. 1995); *see also* 42 U.S.C. § 4331. To fulfill that purpose, NEPA requires all federal agencies to prepare an Environmental Impact Statement ("EIS") for "major federal actions significantly affecting the quality of the human environment." *California Trout*, at 472. "When the federal action is merely a component of a larger nonfederal project, the process becomes more complicated, because NEPA does not specify the scope of an agency's EA analysis." *Id*.

All of Plaintiffs' arguments fail because the Corps in this case properly limited its review to its jurisdiction.

//

6

**A.    The limited scope of the Corps' environmental analysis in regards to NWP 12 is appropriate.**

Despite the requirement to perform NEPA analyses for all "major federal actions," the Ninth Circuit has recognized that a NEPA review may be limited to the extent of the federal agency's jurisdiction. *Id*.

In *California Trout*, environmental groups claimed the Corps failed to properly analyze the totality of the environmental effects (specifically, the downstream fishery impacts due to the amount of water diverted) when it granted a dredge-and-fill permit for a potable-water conveyance project. 58 F.3d at 471-472 (9th Cir. 1995). The Corps in *California Trout* argued that it only had authority over a single 4.18 acre dredge-and-fill activity and that NEPA did not require analysis of the entirety of the water conveyance system. *Id*. The Ninth Circuit held that the Corps' limiting of the environmental review to the solitary 4.18-acre discharge into wetlands was appropriate because "[t]he Corps [had] no jurisdiction over the amount of water, if any, [a separate entity] may decide to divert." *Id.*, 58 F.3d at 474.

The *California Trout* holding also noted that the Corps' limited environmental review was further acceptable because the entire project was privately funded and because a separate federal entity was already fulfilling the NEPA mandate. *Id*.

The *California Trout* court heavily relied upon the Fourth Circuit decision of *North Carolina v. City of Virginia Beach*, 951 F.2d 596 (4th Cir. 1991), in concluding that a limited environmental analysis was acceptable where jurisdiction of the federal entity was limited and another federal entity was performing a more thorough environmental review.

At issue in *North Carolina* was a water pipeline being constructed to convey water to a municipality. *Id*. Plaintiff in that case argued that because the lake from which the water was sourced was under FERC jurisdiction, FERC was required to perform a NEPA environmental review over the entirety of the project even though only a small portion of the project was under the jurisdiction of FERC. *Id*. The Fourth Circuit disagreed, holding that "[l]imiting the effect, but not the scope of FERC's NEPA review to only those portions of the pipeline that lie within FERC's jurisdiction is consistent with the authority exercised by the Corps, which has already performed an environmental assessment pursuant to NEPA." *Id.*, 951 F.2d at 605.  The Fourth Circuit further noted that "[a]lthough a review of environmental impact by FERC of areas outside of its required jurisdiction might be desirable, NEPA case law requires only that an agency comply with the 'statutory *minima.*'" *Id*.

The issue before this Court is whether the re-issuance of the NWP 12 permit complied with NEPA, and specifically, the use of NWP 12 for the Keystone XL

Pipeline, a multi-state and multi-national pipeline being constructed to transport crude oil. While the Plaintiffs repeatedly and variously claim some hypothetical future NWP 12 project may possibly not be subject to cumulative NEPA oversight from a federal authority, the Keystone XL, the target of Plaintiffs' lawsuit, is very much subject to additional federal oversight and NEPA analysis.

An EIS of the entirety of the Keystone XL has been conducted by the U.S. Department of State. In December of 2019, the State Department published its final 1,080 page Supplemental Environmental Impact Statement for the Keystone XL Project, supplementing the 2014 Keystone XL Final SEIS and considering "the direct, indirect and cumulative impacts related to changes in the proposed Project since 2014 and [incorporating] updated information and new studies." The December 2019 Final SEIS included "revised methodology for the greenhouse gas and climate change analysis" and "revised methodology for the accidental release analysis" [United States Dept. of State, *Supplemental Environmental Impact Statement*, October 2019, Cover Sheet, available at https://www.state.gov/wp-content/uploads/2019/12/Vol-I-Keystone-Final-SEIS-Cover-through-Chapter-11_508-December-2019.pdf; *See also* Notice of Availability, 84 FR 53215].

As in the projects discussed by *California Trout* and *North Carolina*, the Keystone XL is subject to cumulative oversight by a separate agency, it is funded by private money, and the jurisdiction of the Corps is strictly limited. It would be a

9

duplication of efforts, nonsensical, and antithetical to the holdings of *California Trout* and *North Carolina* to require the Corps to perform more stringent NEPA environmental review beyond the Corps' established jurisdiction of fill material discharged into waters of the US, where the State Department has already fully and completely performed a NEPA EIS on the Keystone XL as a whole.

The Corps' jurisdiction is statutorily limited to the discharge of dredge-and-fill material, not the entire pipeline project, and the Corps' limited environmental analysis is therefore appropriate. Additionally, as mentioned in the Corps' Memorandum in support of its cross motion, triggers are in place to conduct a more thorough environmental analysis in the case of larger discharges or special circumstances as determined on a case-by-case basis.

The cumulative effects of the Keystone XL have already been considered as required by NEPA, and Plaintiffs' arguments that the Corps must complete a more complete NEPA review are meritless. Appropriate regulations are in place and being adhered to. Plaintiff's lawsuit and motions will only accomplish nothing but significant harm to businesses trying to complete projects, employees trying to earn a paycheck, and individuals trying to supply their homes, businesses and schools with heat and water. Plaintiffs' claims should be dismissed.

//

10

**B.     Nothing in the CWA nor NEPA requires the Corps to evaluate global environmental concerns or an entire project under a 404 permit.**

Plaintiffs argue that potential projects utilizing NWP 12 may receive no federal regulatory oversight beyond the use of NWP 12 and that this lack of cumulative and global environmental analysis is a violation of NEPA. [Doc. 73, pp. 2, 17-20]. Specifically, Plaintiffs contend the Corps' EA violates NEPA by "failing to evaluate the indirect and/or cumulative effects of the lifecycle greenhouse gas emissions caused by projects authorized under NWP 12." [Doc. 73, p. 17].

Plaintiffs are grasping at straws. No part of NEPA or the CWA requires the Corps to undertake a complete review of all projects and impacts when the Corps issues a permit under section 404 of the Clean Water Act. This is supported in caselaw from other jurisdictions.

In a decision from the Sixth Circuit, environmental groups sued the Corps claiming, in part, that the Corps' failure to consider the broader human health impacts of coal mining was a violation of the CWA and NEPA. *Kentuckians for the Cmmw. v. U.S. Army Corps of Engineers*, 746 F.3d 698, 706 (6th Cir. 2014). The Sixth Circuit held "the Corps did not violate NEPA by deciding not to consider the evidence linking surface coal mining in general to public health problems." The Sixth Circuit went on to hold that "[t]he Corps reasonably limited

11

its scope of review to the effects proximately caused by the specific activities that were authorized by the permit" and "[t]he Corps acted without abusing its discretion when it determined that the scope of its NEPA analysis should be limited to the local, proximate effects of the dredging and filling activities that were specifically authorized by the [CWA section 404] permit." *Id.* at 706-707. In other words, the Corps reasonably limited its NEPA analysis to the waters under its jurisdiction.

The same is true with the NWP 12 program and the Keystone XL Pipeline. The Corps has properly limited its NEPA environmental analysis to its jurisdiction and has not violated the CWA or NEPA by "failing to evaluate the indirect and/or cumulative effects of the lifecycle greenhouse gas emissions caused by projects authorized under NWP 12." The Corps' regulation of any facility in the context of this case begins and ends with the crossing of a jurisdictional water of the United States, and no federal law extends the Corps' regulation of dredge or fill material to global climate considerations as is argued by the Plaintiffs.

## II.     NWP 12 does not violate the ESA.

The ESA requires federal agencies, in consultation with the Services, to "insure that any action authorized, funded, or carried out by such agency [. . .] is not likely to jeopardize the continued existence of any endangered species or

12

threatened species or result in the destruction or adverse modification of habitat of such species" 16 U.S.C. § 1536(a)(2).

As discussed more thoroughly in the Federal Defendants' and TC Energy's briefs, the Corps satisfied the consultation requirement of the section 7 of the ESA.

Plaintiffs' brief in support of their motion for partial summary judgment asserts that the Corps cannot issue NWP 12 nationwide without first consulting with the National Marine Fisheries Service and the U.S. Fish and Wildlife Service (the "Services") on the complete and cumulative scale of the NWP 12 program. Plaintiffs further argue that project-specific consultations with the Services do not comply with the requirements of the ESA. [Doc. 73, pp. 27-33]. Neither argument passes muster.

Plaintiffs' argument regarding general permits under section 404(e) and the ESA is not novel in the mountain west states. In a U.S. District Court for the District of Wyoming case, the Corps issued a general discharge permit under section 404(e) of the CWA allowing the discharge of dredge-and-fill material for the formation of reservoirs to contain released coalbed methane water. *Wyoming Outdoor Council Powder River Basin Resources Council ("WOC") v. U.S. Army Corps of Engineers*, 351 F. Supp. 2d 1232, 1237 (D. Wyo. 2005). The environmental groups argued the Corps failed to assess the impact of 404(e) permit on endangered species and that the Corps' assurance that it may undertake Section

13

7 consultations pursuant to the Endangered Species Act ("ESA") on an individual basis were legally deficient. *Id.*, 351 F. Supp. 2d at 1247.

While the *WOC* court ruled in favor of the environmental groups in some aspects of that case, it held that the Corps' actions regarding individual project review for the section 404(e) permit did not violate the ESA. *Id.* In so holding, the *WOC* court emphasized that the Corps (1) did discuss "if only briefly, the reasonably foreseeable impacts to fish and wildlife;" (2) acknowledged "that '[a]uthorized activities could have adverse effects on terrestrial and aquatic wildlife,' including threatened and endangered species;" (3) described impacts to wildlife "during drilling operations and road and pipeline construction;" (4) recognized "the danger posed by waste pits that attract migratory birds;" and (5) discussed "the impact that loss of wetlands could have on fish and wildlife. *Id.*, 351 F. Supp. 2d at 1247. Furthermore, the *WOC* court noted that conditions on the issued section 404(e) permit ameliorated the potential impact to threatened and endangered species by containing the following condition:

> Activities that are likely to jeopardize the continued existence of threatened or endangered species would not be authorized. Therefore, the Corps must evaluate all regulated activities that "may effect" [sic] listed species in areas where the Corps is the lead federal agency (i.e. non-federal lands with non-federal minerals) and consult with the U.S. Fish and Wildlife Service when necessary. In order to accomplish that requirement, prospective permittees would be required to notify the Corps prior to undertaking any activities on non-federal lands with non-federal minerals [in specific] geographic areas ....

14

*Id.*, 351 F. Supp. 2d at 1247.

The *WOC* court held that these provisions and analyses were satisfactory, that the Corps had "laid out a definite plan for individual review of projects taking place within designated areas," and that the Corps "acknowledged the potential impacts to fish and wildlife absent permit conditions." *Id.*, 351 F. Supp. 2d at 1248.

The Corps has done the same with the re-issuance of the NWP 12 permit. Plaintiffs acknowledge that the NWP 12 decision documents and the NWP 12 EA (1) discuss the impacts of pipeline spills, fragmentation and loss of habitat, oil spills, loss of wetland habitat, and adverse effects on water quality all in the context of harm to wildlife [Doc. 73, p. 29] and (2) require applicants to submit PCNs if listed species might be affected by the project. [Doc. 73, p. 36]. These factors raised by the Plaintiffs track identically with the wildlife review and project specific analysis requirements that were held to not violate the ESA in *WOC*. The individual project conditions and requirements satisfy the requirements of the ESA, and satisfy the requirement for consultation.

**III.   CWA**

The Corps may "issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately,

and will have only minimal cumulative adverse effect on the environment." 33

U.S.C. § 1344(e)(1).

Plaintiffs argue that the re-issuance of NWP 12 exceeds the "minimal

adverse environmental effect" threshold for both separate instances and the

cumulative environment. [Doc. 73, pp. 38-43]. However, Plaintiffs have put forth

no facts nor sufficient argument showing the Corps has arbitrarily determined only

minimal adverse effects for the reissuance of NWP 12. This being a determination

requiring the Corps' technical, or scientific expertise, the reviewing court must

defer to the Corps. *Utah Envtl. Cong. v. Richmond*, 483 F.3d 1127, 1140 (10th Cir.

2007). The Court should look to and adopt the arguments of the Federal

Defendants on this topic.

## **CONCLUSION**

The Corps acted within its authority and within the bounds of the law when

it reissued NWP 12. The Corps undertook the proper environmental review under

NEPA and properly limited review to its jurisdiction in accordance with the CWA.

Additionally, the Corps acted in accordance with the ESA.

The MT Trade Groups, and their customers and clients, will be significantly

harmed if the Plaintiffs' sought-after relief is granted. As mentioned, Plaintiffs do

not seek relief only in regards to the Keystone XL. Instead, Plaintiffs seek to

invalidate the entire NWP 12 program. This would impact thousands of people and

projects nationwide that rely on NWP 12 to construct or upgrade critical

infrastructure. NWP 12 is used not only for pipelines containing crude or refined

petroleum, but also for electrical power lines, natural gas utility lines, potable

water lines, and sewer lines providing necessary services to homes, schools,

hospitals, and businesses across the nation. In their briefing, Plaintiffs repeatedly

remind the court of the thousands of uses of NWP 12 expected by the Corps.

Despite citing the thousands of expected uses of NWP 12, Plaintiffs never consider

the impacts to individual people relying upon the infrastructure installed pursuant

to NWP 12. NWP 12 is used to install infrastructure people depend upon to supply

light, heat, and resources. Plaintiffs' lawsuit asks this Court to put the availability

of those necessities at risk.

Plaintiffs want each and every utility line crossing a body of water to go

through a stringent environmental review, meaning every school waiting on a

shovel-ready water line project, every homeowner waiting for natural gas, and

every business waiting for electricity to turn the lights on will have to endure

additional wait times and incur additional expense while a more stringent

permitting process is undertaken. Plaintiffs seek this result in the face of the

explicit provision in the CWA providing for NWPs and Congress's goal "to

regulate with little, if any, delay or paperwork certain activities having minimal

impacts." 33 C.F.R. § 330.1(b).

17

Accordingly, Plaintiffs' motion should be denied and the motions of the

Defendants and Intervenors should be granted.

DATED this 23rd day of March, 2020.

BROWNING, KALECZYC, BERRY & HOVEN, P.C.

By /s/ *Brian P. Thompson*
     Brian P. Thompson

Attorneys for Montana Petroleum Association, Treasure
State Resources Association, Montana Association of
Oil Gas and Coal Counties, and Montana Contractors
Association

18

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(d)(2)(E), I certify that **MONTANA PETROLEUM ASSOCIATION, TREASURE STATE RESOURCES ASSOCIATION, MONTANA ASSOCIATION OF OIL GAS AND COAL COUNTIES, AND MONTANA CONTRACTORS ASSOCIATION AMICUS BRIEF**, is double spaced, is a proportionately spaced 14 point typeface, and contains 3,839 words.

 /s/ *Brian P. Thompson*
Brian P. Thompson

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of March, 2020, I filed the above pleading with the Court's electronic case management system, which caused notice to be sent to counsel of all parties.

 /s/ *Brian P. Thompson*
BROWNING, KALECZYC, BERRY & HOVEN, P.C.