# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, et al., | |
| Plaintiffs, | |
| v. | **CV-19-44-GF-BMM** |
| U.S. ARMY CORPS OF ENGINEERS, et al., | |
| Defendants, | **ORDER** |
| TC ENERGY CORPORATION, et al., | |
| Intervenor-Defendants, | |
| STATE OF MONTANA, | |
| Intervenor-Defendant, | |
| AMERICAN GAS ASSOCIATION, et al., | |
| Intervenor-Defendants. | |

Northern Plains Resource Council, et al. ("Plaintiffs") filed this action to challenge the decision of the United States Army Corps of Engineers ("Corps") to reissue Nationwide Permit 12 ("NWP 12") in 2017. (Doc. 36.) Plaintiffs allege five claims in their Amended Complaint. (*Id.*) Claims Three and Five relate to the Corps' verification of the Keystone XL Pipeline crossings of the Yellowstone River and the Cheyenne River. (Doc. 36 at 78-81, 85-87.) The Court stayed

Plaintiffs' Claims Three and Five pending further action by the Corps. (Doc. 56 at 1.)

Plaintiffs' Claims One, Two, and Four relate to the Corps' reissuance of NWP 12 in 2017. Plaintiffs allege that the Corps' reissuance of NWP 12 violated the Endangered Species Act ("ESA"), the National Environmental Policy Act ("NEPA"), and the Clean Water Act ("CWA"). (Doc. 36 at 73-77, 81-84.) Plaintiffs, Defendants the Corps, et al. ("Federal Defendants"), and Intervenor-Defendants TC Energy Corporation, et al. ("TC Energy") filed cross-motions for partial summary judgment regarding Plaintiffs' Claims One, Two, and Four. (Docs. 72, 87, 90.) Intervenor-Defendants the State of Montana and American Gas Association, et al., filed briefs in support of Defendants. (Docs. 92 & 93.) Amici Curiae Edison Electric Institute, et al., and Montana Petroleum Association, et al., also filed briefs in support of Defendants. (Docs. 106 & 122.)

## BACKGROUND

Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To that end, the Corps regulates the discharge of any pollutant, including dredged or fill material, into jurisdictional waters. *See* 33 U.S.C. §§ 1311, 1362(6), (7), (12). Section 404 of the CWA requires any party seeking to construct a project that will

discharge dredged or fill material into jurisdictional waters to obtain a permit. *See* 33 U.S.C. § 1344(a), (e).

The Corps oversees the permitting process. The Corps issues individual permits on a case-by-case basis. 33 U.S.C. § 1344(a). The Corps also issues general nationwide permits to streamline the permitting process for certain categories of activities. 33 U.S.C. § 1344(e). The Corps issues nationwide permits for categories of activities that are "similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). Nationwide permits may last up to five years, at which point they must be reissued or left to expire. 33 U.S.C. § 1344(e)(2).

The Corps issued NWP 12 for the first time in 1977 and reissued it most recently in 2017. 82 Fed. Reg. 1860, 1860, 1985-86 (January 6, 2017). NWP 12 authorizes discharges of dredged or fill material into jurisdictional waters as required for the construction, maintenance, repair, and removal of utility lines and associated facilities. 82 Fed. Reg. at 1985-86. Utility lines include electric, telephone, internet, radio, and television cables, lines, and wires, as well as any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, including oil and gas pipelines. 82 Fed. Reg. at 1985. The discharge may not result in the loss of greater than one-half acre of jurisdictional waters for

3

each single and complete project. 82 Fed. Reg. at 1985. For linear projects like pipelines that cross a single waterbody several times at separate and distant locations, or cross multiple waterbodies several times, each crossing represents a single and complete project. 82 Fed. Reg. at 2007. Activities meeting NWP 12's conditions may proceed without further interaction with the Corps. *See Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 3 (D.D.C. 2005).

A permittee must submit a preconstruction notification ("PCN") to the Corps' district engineer before beginning a proposed activity if the activity will result in the loss of greater than one-tenth acre of jurisdictional waters. 82 Fed. Reg. at 1986. Additional circumstances exist under which a permittee must submit a PCN to a district engineer. *See* 82 Fed. Reg. at 1986. The PCN for a linear utility line must address the water crossing that triggered the need for a PCN as well as the other separate and distant crossings that did not themselves require a PCN. 82 Fed. Reg. at 1986. The district engineer will evaluate the individual crossings to determine whether each crossing satisfies NWP 12. 82 Fed. Reg. at 2004-05. The district engineer also will evaluate the cumulative effects of the proposed activity caused by all of the crossings authorized by NWP 12. *Id.*

All nationwide permits, including NWP 12, remain subject to 32 General Conditions contained in the Federal Regulations. 82 Fed. Reg. 1998-2005. General Condition 18 prohibits the use of any nationwide permit for activities that are

4

likely to directly or indirectly jeopardize threatened or endangered species under the ESA or destroy or adversely modify designated critical habitat for such species. 82 Fed. Reg. at 1999-2000.

The ESA and NEPA require the Corps to consider the environmental impacts of its actions. Section 7(a)(2) of the ESA requires the Corps to determine "at the earliest possible time" whether any action it takes "may affect" listed species and critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). If the Corps' action "may affect" listed species or critical habitat, the Corps must consult with U.S. Fish and Wildlife Service ("FWS") and/or National Marine Fisheries Service ("NMFS") (collectively, "the Services"). 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). Under NEPA, the Corps must produce an environmental impact statement unless it issues a finding of no significant impact (FONSI). 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.9.

The Corps issued a final Decision Document explaining NWP 12's environmental impacts when it reissued NWP 12 in 2017. NWP005262-5349. The Corps determined that NWP 12 would result in "no more than minimal individual and cumulative adverse effects on the aquatic environment" under the CWA. NWP005340. The Corps also concluded that NWP 12 complied with both the ESA and NEPA. NWP005324, 5340. The Decision Document comprised a FONSI under NEPA. NWP005340.

The Corps explained that its 2017 reissuance of NWP 12 complied with the ESA because NWP 12 would not affect listed species or critical habitat. NWP005324. The Corps did not consult with the Services based on its "no effect" determination. NWP005324-25. A federal district court in 2005 concluded that the Corps should have consulted with FWS when it reissued NWP 12 in 2002. *Brownlee*, 402 F. Supp. 2d at 9-11. The Corps initiated formal programmatic consultation with the Services when it reissued NWP 12 in 2007. NWP031044. The Corps continued the programmatic consultation when it reissued NWP 12 in 2012. *Id.*

## LEGAL STANDARD

A court should grant summary judgment where the movant demonstrates that no genuine dispute exists "as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment remains appropriate for resolving a challenge to a federal agency's actions when review will be based primarily on the administrative record. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

The Administrative Procedure Act's ("APA") standard of review governs Plaintiffs' claims. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011). The APA instructs a reviewing court to "hold unlawful and set

6

aside" agency action deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## DISCUSSION

## I. ENDANGERED SPECIES ACT

### A. ESA Section 7(a)(2) Consultation

Section 7(a)(2) of the ESA requires the Corps to ensure any action that it authorizes, funds, or carries out is not likely to jeopardize the continued existence of any listed species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2). The Corps must review its actions "at the earliest possible time" to determine whether an action "may affect" listed species or critical habitat. 50 C.F.R. § 402.14(a). The Corps must initiate formal consultation with the Services if the Corps determines that an action "may affect" listed species or critical habitat. 50 C.F.R. § 402.14; 16 U.S.C. § 1536(a)(2). The ESA does not require Section 7(a)(2) consultation if the Corps determines that a proposed action is not likely to adversely affect any listed species or critical habitat. 50 C.F.R. § 402.14(b)(1).

Formal consultation is a process that occurs between the Services and the Corps. 50 C.F.R. § 402.02. The process begins with the Corps' written request for consultation under ESA Section 7(a)(2) and concludes with the Services' issuance of a biological opinion. 50 C.F.R. § 402.02. A biological opinion states the

Services' opinion as to whether the Corps' action likely would jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. *Id.*

Programmatic consultation involves a type of consultation that addresses multiple agency actions on a programmatic basis. 50 C.F.R. § 402.02. Programmatic consultations allow the Services to consult on the effects of a programmatic action such as a "proposed program, plan, policy, or regulation" that provides a framework for future proposed actions. *Id.*

### B. The Corps' Reissuance of NWP 12 in 2017

The Corps concluded that its reissuance of NWP 12 in 2017 would have no effect on listed species or critical habitat. 82 Fed. Reg. at 1873-74; *see also* 81 Fed. Reg. 35186, 35193 (June 1, 2016). General Condition 18 provides that a nationwide permit does not authorize an activity that is "likely to directly or indirectly jeopardize the continued existence of a" listed species or that "will directly or indirectly destroy or adversely modify the critical habitat of such species." 82 Fed. Reg. at 1999.

A non-federal permittee must submit a PCN to the district engineer if a proposed activity "might" affect any listed species or critical habitat. 82 Fed. Reg. at 1999. The permittee may not begin work on the proposed activity until the district engineer notifies the permittee that the activity complies with the ESA and

that the activity is authorized. *Id.* The Corps determined that General Condition 18 ensures that NWP 12 will have no effect on listed species or critical habitat. NWP005324-26. The Corps declined to initiate Section 7(a)(2) consultation based on that determination. *Id.*

### C. The Corps Acted Arbitrarily and Capriciously

Plaintiffs argue that the Corps' failure to initiate Section 7(a)(2) consultation violates the ESA. (Doc. 36 at 6.) Plaintiffs assert that the Corps should have initiated programmatic consultation when it reissued NWP 12 in 2017. (Doc. 36 at 6.) Defendants argue that the Corps properly assessed NWP 12's potential effects and did not need to initiate Section 7(a)(2) consultation. (Doc. 88 at 43.) Defendants assert that the Corps did not need to conduct programmatic consultation because project-level review and General Condition 18 ensure that NWP 12 will not affect listed species or critical habitat. (Doc. 88 at 46.)

To determine whether the Corps' "no effect" determination and resulting failure to initiate programmatic consultation proves arbitrary and capricious, the Court must decide whether the Corps "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983)). The Corps' decisions are entitled to deference. *See Kisor v. Wilkie,* 139 S.

9

Ct. 2400, 2417-18 (2019); *Chevron, U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837, 844 (1984).

Programmatic consultation proves appropriate when an agency's proposed action provides a framework for future proposed actions. 50 C.F.R. § 402.02. Federal actions subject to programmatic consultation include federal agency programs. *See* 80 Fed. Reg. 26832, 26835 (May 11, 2015); 50 C.F.R. 402.02. A federal agency may develop those programs at the national scale. *Id.* The Services specifically have listed the Corps' nationwide permit program as an example of the type of federal program that provides a national-scale framework and that would be subject to programmatic consultation. *See* 80 Fed. Reg. at 26835.

Programmatic consultation considers the effect of an agency's proposed activity as a whole. A biological opinion analyzes whether an agency action likely would jeopardize a listed species or adversely modify designated critical habitat. 50 C.F.R. §§ 402.02, 402.14(h). This type of analysis allows for a broad-scale examination of a nationwide program's potential impacts on listed species and critical habitat. *See* 80 Fed. Reg. at 26836. A biological opinion may rely on qualitative analysis to determine whether a nationwide program and the program's set of measures intended to minimize impacts or conserve listed species adequately protect listed species and critical habitat. *Id.* Programmatic-level biological opinions examine how the overall parameters of a nationwide program align with

the survival and recovery of listed species. *Id.* An agency should analyze those types of potential impacts in the context of the overall framework of a programmatic action. A broad examination may not be conducted as readily at a later date when the subsequent activity would occur. *Id.*

The Ninth Circuit in *Western Watersheds Project v. Kraayenbrink*, 632 F.3d at 472, evaluated amendments that the Bureau of Land Management ("BLM") made to national grazing regulations. BLM viewed the amendments as purely administrative and determined that they had "no effect" on listed species or critical habitat. *Id.* at 496. The Ninth Circuit rejected BLM's position based on "resounding evidence" from experts that the amendments "'may affect' listed species and their habitat." *Id.* at 498. The amendments did not qualify as purely administrative. The amendments altered ownership rights to water on public lands, increased barriers to public involvement in grazing management, and substantially delayed enforcement of failing allotments. *Id.* The amendments would have a substantive effect on listed species. *Id.*

There similarly exists "resounding evidence" in this case that the Corps' reissuance of NWP 12 "may affect" listed species and their habitat. NWP 12 authorizes limited discharges of dredged or fill material into jurisdictional waters. 82 Fed. Reg. at 1985. The Corps itself acknowledged the many risks associated

with the discharges authorized by NWP 12 when it reissued NWP 12 in 2017. NWP005306.

The Corps noted that activities authorized by past versions of NWP 12 "have resulted in direct and indirect impacts to wetlands, streams, and other aquatic resources." NWP005306. Discharges of dredged or fill material can have both permanent and temporary consequences. *Id.* The discharges permanently may convert wetlands, streams, and other aquatic resources to upland areas, resulting in permanent losses of aquatic resource functions and services. The discharges also temporarily may fill certain areas, causing short-term or partial losses of aquatic resource functions and services. *Id.*

The Corps examined the effect of human activity on the Earth's ecosystems. NWP005307. Human activities affect all marine ecosystems. *Id.* Human activities alter ecosystem structure and function by changing the ecosystem's interaction with other ecosystems, the ecosystem's biogeochemical cycles, and the ecosystem's species composition. *Id.* "Changes in land use reduce the ability of ecosystems to produce ecosystem services, such as food production, reducing infectious diseases, and regulating climate and air quality." *Id.* Water flow changes, land use changes, and chemical additions alter freshwater ecosystems such as lakes, rivers, and streams. NWP005308. The construction of utility lines "*will* fragment terrestrial and aquatic ecosystems." *Id.* (emphasis added).

12

The Corps more specifically discussed that land use changes affect rivers and streams through increased sedimentation, larger inputs of nutrients and pollutants, altered stream hydrology, the alteration or removal of riparian vegetation, and the reduction or elimination of inputs of large woody debris. NWP005310. Increased inputs of sediments, nutrients, and pollutants adversely affect stream water quality. *Id.* Fill and excavation activities cause wetland degradation and losses. NWP005310-11. The Corps emphasized that, although "activities regulated by the Corps under Section 404 of the [CWA]" are "common causes of impairment for rivers and streams, habitat alterations and flow alterations," a wide variety of causes and sources impair the Nation's rivers and streams. NWP005311.

The ESA provides a low threshold for Section 7(a)(2) consultation: An agency must initiate formal consultation for any activity that "may affect" listed species and critical habitat. 50 C.F.R. § 402.14; 16 U.S.C. § 1536(a)(2). The Corps itself has stated that discharges authorized by NWP 12 "*will* result in a minor incremental contribution to the cumulative effects to wetlands, streams, and other aquatic resources in the United States." NWP005313. The types of discharges that NWP 12 authorizes "may affect" listed species and critical habitat, as evidenced in the Corps' own Decision Document. The Corps should have initiated Section 7(a)(2) consultation before it reissued NWP 12 in 2017.

13

Plaintiffs' experts' declarations further support the Court's conclusion that the Corps should have initiated Section 7(a)(2) consultation. These expert declarants state that the Corps' issuance of NWP 12 authorizes discharges that may affect endangered species and their habitats. The ESA's citizen suit provision allows the Court to consider evidence outside the administrative record in its review of Plaintiffs' ESA claim. *See* 16 U.S.C. § 1540(g); *W. Watersheds*, 632 F.3d at 497.

Martin J. Hamel, Ph.D., an assistant professor at the University of Georgia who studies anthropogenic and invasive species' impacts on native riverine species, submitted a declaration stating that the discharges authorized by NWP 12 may affect adversely pallid sturgeon, an endangered species. (Doc. 73-4 at 2, 4, 6.) Pallid sturgeon remain susceptible to harm from pollution and sedimentation in rivers and streams because pollution and sedimentation can bury the substrates on which sturgeon rely for feeding and breeding. (*Id.* at 4.) Fine sentiments can lodge between coarse grains of substrate to form a hardpan layer, thereby reducing interstitial flow rates and ultimately reducing available food sources. Construction activities that increase sediment loading pose a significant threat to the pallid sturgeon populations in Nebraska and Montana. (*Id.*)

Dr. Hamel also stated his understanding that the horizontal directional drilling method ("HDD") for crossing waterways may result in less sedimentation

14

of the waterway than other construction methods, such as open trench cuts. (Doc. 73-4 at 5.) HDD can result, however, in an inadvertent return of drilling fluid. An inadvertent return of drilling fluid would result in increased sedimentation and turbidity, which would affect aquatic biota such as pallid sturgeon and the species sturgeon rely on as food sources. (*Id.*)

Jon C. Bedick, Ph.D., a professor of biology at Shawnee State University who has worked extensively with the endangered American burying beetle, submitted a declaration detailing his concerns regarding the Corps' failure to analyze NWP 12's threat to the American burying beetle. (Doc. 73-1 at 2-3, 5.) Certain construction activities, including those approved by NWP 12, can cause harm to species such as the American burying beetle. (*Id.* at 5.) Dr. Bedick relayed his concern that the Corps failed to undertake a programmatic consultation with FWS regarding its reissuance of NWP 12. (*Id.*)

NWP 12 authorizes actual discharges of dredged or fill material into jurisdictional waters. 82 Fed. Reg. at 1985. Two experts have declared that the discharges authorized by NWP 12 will affect endangered species. (Docs. 71-1 & 71-3.) The Corps itself has acknowledged that the discharges *will* contribute to the cumulative effects to wetlands, streams, and other aquatic resources. NWP005313. There exists "resounding evidence" from experts and from the Corps that the

discharges authorized by NWP 12 may affect listed species and critical habitat. *See W. Watersheds*, 632 F.3d at 498.

The Corps cannot circumvent ESA Section 7(a)(2) consultation requirements by relying on project-level review or General Condition 18. *See* 82 Fed. Reg. 1999; *Conner v. Burford*, 848 F.2d 1441, 1457-58 (9th Cir. 1988). Project-level review does not relieve the Corps of its duty to consult on the issuance of nationwide permits at the programmatic level. The Corps must consider the effect of the entire agency action. *See Conner*, 848 F.2d at 1453-58 (concluding that biological opinions must be coextensive with an agency's action and rejecting the Services' deferral of an impacts analysis to a project-specific stage). The Federal Regulations make clear that "[a]ny request for formal consultation may encompass . . . a number of similar individual actions within a given geographical area, a programmatic consultation, or a segment of a comprehensive plan." 50 C.F.R. § 402.14(c)(4). The regulations do "not relieve the Federal agency of the requirements for considering the effects of the action or actions as a whole." *Id.*; *see also Cottonwood Envtl. Law Center v. U.S. Forest Serv.*, 789 F.3d 1075, 1085 (9th Cir. 2015) (concluding that the Forest Service needed to reinitiate consultation at programmatic level); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 482 F. Supp. 2d 1248, 1266-

67 (W.D. Wash. 2007) (holding that deferral of analysis to the project level "improperly curtails the discussion of cumulative effects").

The Ninth Circuit in *Lane County Audubon Soc'y v. Jamison*, 958 F.2d 290 (9th Cir. 1992), analyzed what had become commonly known as the "Jamison Strategy." Under the Jamison Strategy, BLM would select land for logging consistent with the protection of the spotted owl. *Id.* at 291. BLM would submit individual timber sales for ESA consultation with FWS, but would not submit the overall logging strategy itself. *Id.* at 292. The Ninth Circuit determined that the Jamison Strategy constituted an action that may affect the spotted owl, because the strategy set forth criteria for harvesting owl habitat. *Id.* at 294. BLM needed to submit the Jamison Strategy to FWS for consultation before BLM implemented the strategy through the adoption of individual sale programs. BLM violated the ESA by not consulting with FWS before it implemented the Jamison Strategy. *Id.*

The district court in *National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d at 10, relied, in part, on the Ninth Circuit's holding in *Lane County* when it determined that the Corps' reissuance of NWP 12 in 2002 violated the ESA. In *Brownlee*, the Corps had failed to consult with FWS when it reissued NWP 12 and three other nationwide permits in 2002. *Id.* at 2, 10. Two environmental groups challenged the Corps' failure to consult. *Id.* at 2. The environmental groups argued

that the nationwide permits, including NWP 12, authorized development that
threatened the endangered Florida panther. *Id.*

The Corps asserted that NWP 12 complied with the ESA because project-
level review would ensure that no harm befell Florida panthers and their habitats.
*Id.* at 10. The court disagreed. *Id.* NWP 12 and the other nationwide permits
authorized development projects that posed a potential threat to the panther. *Id.* at
3. Large portions of panther habitat existed on lands that could not be developed
without a permit from the Corps. *Id.* at 3. Project-level review did not relieve the
Corps from considering the effects of NWP 12 as a whole. *Id.* at 10 (citing 50
C.F.R. § 402.14(c)). The Corps needed to initiate overall consultation for the
nationwide permits "to avoid piece-meal destruction of panther habitat through
failure to make a cumulative analysis of the program as a whole." *Id.*

The same holds true here. Programmatic review of NWP 12 in its entirety, as
required by the ESA for any project that "may affect" listed species or critical
habitat, provides the only way to avoid piecemeal destruction of species and
habitat. *See Brownlee*, 402 F. Supp. 2d at 10; 50 C.F.R. § 402.14(c). Project-level
review, by itself, cannot ensure that the discharges authorized by NWP 12 will not
jeopardize listed species or adversely modify critical habitat. The Corps has an
ongoing duty under ESA Section 7(a)(2) to ensure that its actions are not likely to
jeopardize the continued existence of endangered and threatened species or result

in the destruction or adverse modification of critical habitat. 16 U.S.C.

§ 1536(a)(2). The Corps failed to fulfill that duty when it reissued NWP 12 in

2017.

The Court certainly presumes that the Corps, the Services, and permittees

will comply with all applicable statutes and regulations. *See, e.g.*, *United States v.*

*Norton*, 97 U.S. 164, 168 (1887) ("It is a presumption of law that officials and

citizens obey the law and do their duty."); *Brownlee*, 402 F. Supp. 2d at 5 n.7

(presuming that permittees will comply with the law and seek the Corps' approval

before proceeding with activities affecting endangered species). That presumption

does not allow the Corps to delegate its duties under the ESA to permittees.

General Condition 18 fails to ensure that the Corps fulfills *its* obligations

under ESA Section 7(a)(2) because it delegates the Corps' initial effect

determination to non-federal permittees. The Corps must determine "at the earliest

possible time" whether its actions "may affect listed species or critical habitat." *See*

50 C.F.R. § 402.14(a). The Corps decided that NWP 12 does not affect listed

species or critical habitat because General Condition 18 ensures adequate

protection.  NWP005324-26. General Condition 18 instructs a non-federal

permittee to submit a PCN to the district engineer if the permittee believes that its

activity "might" affect listed species or critical habitat. 82 Fed. Reg. at 1999-2000.

In that sense, General Condition 18 turns the ESA's initial effect determination

over to non-federal permittees, even though the Corps must make that initial determination. *See* 50 C.F.R. § 402.14(a). The Corps' attempt to delegate its duty to determine whether NWP 12-authorized activities will affect listed species or critical habitat fails.

The Corps remains well aware that its reauthorization of NWP 12 required Section 7(a)(2) consultation given the fact that it initiated formal consultation when it reissued NWP 12 in 2007 and continued that consultation during the 2012 reissuance. NWP031044. NMFS released a biological opinion, which concluded that the Corps' implementation of the nationwide permit program has had "more than minimal adverse environmental effects on the aquatic environment when performed separately or cumulatively." (Doc. 75-9 at 222-23.) The Corps reinitiated consultation to address NMFS's concerns, and NMFS issued a new biological opinion in 2014. NWP030590. The Corps' prior consultations underscore the need for programmatic consultation when the Corps reissued NWP 12 in 2017.

Substantial evidence exists that the Corps' reissuance of NWP 12 "may affect" listed species and critical habitat. This substantial evidence requires the Corps to initiate consultation under ESA Section 7(a)(2) to ensure that the discharge activities authorized under NWP 12 comply with the ESA. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.02, 402.14. The Corps failed to consider relevant

expert analysis and failed to articulate a rational connection between the facts it found and the choice it made. *See W. Watersheds*, 632 F.3d at 498. The Corps' "no effect" determination and resulting decision to forego programmatic consultation proves arbitrary and capricious in violation of the Corps' obligations under the ESA. The Corps should have initiated ESA Section 7(a)(2) consultation before it reissued NWP 12 in 2017. The Corps' failure to do so violated the ESA.

These failures by the Corps entitle the Plaintiffs to summary judgment regarding their ESA Claim. The Court will remand NWP 12 to the Corps for compliance with the ESA. The Court vacates NWP 12 pending completion of the consultation process. The Court further enjoins the Corps from authorizing any dredge or fill activities under NWP 12.

## II.   PLAINTIFFS' REMAINING CLAIMS

Plaintiffs further allege that NWP 12 violates both NEPA and the CWA. (Doc. 36 at 73-77, 81-84.) Plaintiffs, the Corps, and TC Energy each have moved for summary judgment regarding Plaintiffs' NEPA and CWA Claims. (Doc. 72 at 2; Doc. 87 at 2; Doc. 90 at 2.) The Court already has determined that the Corps' reissuance of NWP 12 violated the ESA, remanded NWP 12 to the Corps for compliance with the ESA, and vacated NWP 12 pending completion of the consultation process.

The Court anticipates that the Corps may need to modify its NEPA and CWA determinations based on the Corps' ESA Section 7(a)(2) consultation with the Services, as briefly discussed below. The Court will deny without prejudice all parties' motions for summary judgment regarding Plaintiffs' NEPA and CWA claims pending ESA Section 7(a)(2) consultation and any further action by the Corps.

## A. The National Environmental Policy Act

Plaintiffs allege that NWP 12 violates NEPA because the Corps failed to evaluate adequately NWP 12's environmental impacts. (Doc. 36 at 4.) Congress enacted NEPA to ensure that the federal government considers the environmental consequences of its actions. *See* 42 U.S.C. 4331(b)(1). NEPA proves, in essence, to be a procedural statute designed to ensure that federal agencies make fully informed and well-considered decisions. *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 18 (D.D.C. 2013). NEPA does not mandate particular results, but instead prescribes a process to ensure that agencies consider, and that the public is informed about, potential environmental consequences. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

NEPA requires a federal agency to evaluate the environmental consequences of any major federal action "significantly affecting the quality of the human environment" before undertaking the proposed action. 42 U.S.C. § 4332(C). A

22

federal agency evaluates the environmental consequences of a major federal action through the preparation of a detailed environmental impact statement ("EIS"). 40 C.F.R. § 1501.4. An agency may opt first to prepare a less-detailed environmental assessment ("EA") to determine whether a proposed action qualifies as a "major federal action significantly affecting the quality of the human environment" that requires an EIS. *Id.* The agency need not provide any further environmental report if the EA shows that the proposed action will not have a significant effect on the quality of the human environment. 40 C.F.R. § 1501.4(e); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757-58 (2004).

The Corps conducted an EA in the process of reissuing NWP 12. NWP005289. The Corps determined that the issuance of NWP 12 would not have a significant impact on the quality of the human environment. NWP005340. The Corps accordingly concluded that it did not need to prepare an EIS. *Id.* Plaintiffs argue that the EA proves insufficient under NEPA for various reasons. (Doc. 73 at 17-34.)

The Decision Document detailed NWP 12's environmental consequences. NWP005303-5317. The Court anticipates that the ESA Section 7(a)(2) consultation will further inform the Corps' NEPA assessment of NWP 12's environmental consequences. Armed with more information, the Corps may decide to prepare an EIS because NWP 12 represents a major federal action that

23

significantly affects the quality of the human environment. *See* 42 U.S.C.

§ 4332(C); 40 C.F.R. § 1501.4.

**B. The Clean Water Act**

Section 404(e) of the CWA allows the Corps to issue nationwide permits for

categories of activities that "will cause only minimal adverse environmental effects

when performed separately, and will have only minimal cumulative adverse effect

on the environment." 33 U.S.C. § 1344(e)(1). The Decision Document evaluated

NWP 12's compliance with CWA Section 404 permitting guidelines. NWP005340.

The Corps concluded that the discharges authorized by NWP 12 comply with the

CWA. *Id.* The Corps specifically noted that the activities authorized by NWP 12

"will result in no more than minimal individual and cumulative adverse effects on

the aquatic environment." *Id.*

Plaintiffs allege that NWP 12 violates the CWA because NWP 12 authorizes

activities that will cause more than minimal adverse environmental effects. (Doc.

36 at 5.) Plaintiffs note that, although NWP 12 authorizes projects that would result

in no more than one-half acre of water loss, linear utility lines may use NWP 12

repeatedly for many water crossings along a project's length. Plaintiffs argue that

this repeated use causes more than minimal adverse environmental effects. (*Id.*)

The Court similarly anticipates that the ESA Section 7(a)(2) consultation

will inform the Corps' CWA assessment of NWP 12's environmental effects. The

Corps' adverse effects analyses and resulting CWA compliance determination may change after ESA Section 7(a)(2) consultation brings more information to light.

At this point in the litigation, the Court does not need to determine whether the Corps made a fully informed and well-considered decision under NEPA and the CWA when it reissued NWP 12 in 2017. The Court has remanded NWP 12 to the Corps for ESA Section 7(a)(2) consultation. The Court anticipates that the Corps will conduct additional environmental analyzes based on the findings of the consultation.

## ORDER

It is hereby **ORDERED** that:

1. Plaintiffs' Motion for Partial Summary Judgment (Doc. 72) is **GRANTED, IN PART, and DENIED WITHOUT PREJUDICE, IN PART**. The Court grants Plaintiffs' motion for summary judgment regarding Plaintiffs' ESA Claim, Claim Four. The Court denies without prejudice Plaintiffs' motions for summary judgment regarding Plaintiffs' NEPA and CWA Claims, Claims One and Two.

2. Federal Defendants' Motion for Partial Summary Judgment (Doc. 87) is **DENIED, IN PART, and DENIED WITHOUT PREJUDICE, IN PART**. The Court denies Federal Defendants' motion for summary judgment regarding Plaintiffs' ESA Claim, Claim Four. The Court denies without prejudice Federal

Defendants' motions for summary judgment regarding Plaintiffs' NEPA and CWA Claims, Claims One and Two.

3.  TC Energy's Motion for Partial Summary Judgment (Doc. 90) is **DENIED, IN PART, and DENIED WITHOUT PREJUDICE, IN PART**. The Court denies TC Energy's motion for summary judgment regarding Plaintiffs' ESA Claim, Claim Four. The Court denies without prejudice TC Energy's motions for summary judgment regarding Plaintiffs' NEPA and CWA Claims, Claims One and Two.

4.  NWP 12 is remanded to the Corps for compliance with the ESA.

5.  NWP 12 is vacated pending completion of the consultation process and compliance with all environmental statutes and regulations.

6.  The Corps is enjoined from authoring any dredge or fill activities under NWP 12 pending completion of the consultation process and compliance with all environmental statutes and regulations.

DATED this 15th day of April, 2020.

Brian Morris, Chief District Judge
United States District Court

26