IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| **Northern Plains Resource Council**, et al., <br><br> Plaintiffs, <br><br> v. <br><br> **U.S. Army Corps of Engineers**, et al., <br><br> Defendants, <br><br> and <br><br> **TransCanada Keystone Pipeline, LP**, et al., <br><br> Defendant-Intervenors. | Case No. 4:19-cv-44-BMM <br><br><br> **Declaration of Jennifer Moyer in Support of Federal Defendants' Motion for Partial Stay Pending Appeal** |

I, Jennifer Moyer, hereby declare as follows:

1. I am currently employed as the Chief of the Regulatory Program at the U.S. Army Corps of Engineers (Corps), Headquarters, Directorate of Civil Works, Operations Division in Washington, D.C. I have been employed by the Corps since 1994, and have served in this capacity since 2014. In this capacity, I am

responsible for providing leadership, direction and oversight for the Corps Regulatory Program including developing rules, guidance, and initiatives to enhance effective program implementation, taking necessary and appropriate actions to promote consistency, and providing authoritative advice on interpretation of regulations to Corps and Department of the Army senior leadership and regulatory staff across the country.

2. On January 6, 2017 the Corps issued the final rule that reissued 50 existing Nationwide Permits (NWP), their general conditions, and definitions in the Federal Register, 82 Fed. Reg. 1,860. That final rule reissued NWP 12 for utility line activities. Covered utility line activities could include construction, maintenance or repair of water intake structures for drinking water, aerial transmission lines for electric power, telephone and telegraph lines and cables, the infrastructure for internet, radio, and television communications such as optic cables, utility substations, utility line access roads, and oil and natural gas pipelines.

3. In the 2017 NWP 12 Decision Document, the Corps estimated that NWP 12 would be used approximately 14,000 times per year on a national basis, resulting in impacts to approximately 1,750 acres of waters of the United States, including jurisdictional wetlands. NWP005331. Of those 14,000, approximately 11,500 are submitted to the Corps as part of written requests for NWP 12 verifications. *Id.* Approximately 2,500 of non-reporting NWP 12 activities are authorized without

any additional Corps review, per year, because those activities fall below the reporting requirements in NWP 12. *Id.*

4. Since NWP 12 went into effect on March 19, 2017 and up until the April 15, 2020 Order, the Corps had verified more than 38,000 NWP 12 pre-construction notifications.

5. Since NWP 12 went into effect on March 19, 2017 and up until the April 15, 2020 Order, the total permanent and temporary impacts to waters of the United States from all utility line activities authorized in the State of Montana using NWP 12 was approximately 13.8 acres included in 107 verifications.  For example, as part of a Fiber optic cable upgrade project in Valley County, Montana, on March 19, 2020 the Corps verified that the project's crossing of the Missouri River met the terms and conditions of NWP 12.  Another example is the Corps' authorization of improvements to a wastewater system in Chouteau County, Montana, under NWP 12 on February 13, 2020.

6. Of the 38,000 verifications nationwide, 3,400 of the pre-construction notifications were triggered wholly, or in part by, General Condition 18.  This condition does not authorize any activity that might affect listed species or designated critical habitat until the Corps determines that the requirements of the Endangered Species Act have been satisfied.  82 Fed. Reg. 1999.  Of NWP 12 pre-construction notifications submitted to the Corps since March 19, 2017, 1,846

notifications complied with General Condition 18 through regional programmatic consultations, 1,436 activity-specific informal consultations, and 164 activity-specific formal consultations.  Moreover, this total may under-represent the number of consultations due to the fact that one ESA consultation may assess the impacts of multiple NWP verifications for separate and distant water crossings along the same project alignment, versus tracking one ESA consultation for each individual NWP verification.

7.   As of April 26, 2020, after a thorough survey of all Corps Districts, I estimate that the Corps has 5,500 pending NWP 12 pre-construction notifications awaiting a written verification determination.

8.  As the Corps reads the text of the court's order as it currently stands, thousands of routine utility line project activities that otherwise could proceed under NWP 12 (some without any advance notice to the Corps), will now only be able to proceed after receiving Clean Water Act and/or Rivers and Harbors Act of 1899 authorization through the time and labor intensive standard individual permit process.  Individual permits require a resource-intensive, case-by-case review, including extensive, site-specific documentation, public comment, and a formal determination on the permit application.

9.  Requiring routine utility line projects with minimal impacts to obtain individual permits will be a major change in how the full span of utility industries

operate. General permits for utility line activities have been approved in nearly the same form under NWP 12 since 1977. 47 Fed. Reg. 31,833; 65 Fed. Reg. 12,887. Industry has relied on having their routine utility projects that require Clean Water Act or Rivers and Harbors Act of 1899 authorization receiving permits with little delay or paperwork because the regulated activity associated with their projects have only minimal effect on the aquatic environment.

10. Given the longstanding availability of NWP 12, industry and state and local governments have factored in the faster processing times associated with NWP 12 into their project planning and timelines for critical infrastructure projects. Activities covered by NWP 12 are also used as links to connect other projects to the power grid, and without a streamlined tool, those other projects will slow down, too.

11. Projects authorized by NWP 12 also include internet communications infrastructure (e.g. broadband lines connecting rural areas to the larger national grid) and that infrastructure is necessary to adapt to increases in internet traffic. The sudden absence of NWP 12 as an expedient permitting tool with which to permit minimally impacting projects will introduce unanticipated uncertainty into these essential projects.

12. One of the core economic benefits of NWP 12 is that it is less costly to obtain an NWP verification than a standard individual permit. Based on the

Regulatory Impact Analysis for the 2017 NWPs, the Corps estimates a project proponent's average cost of obtaining an NWP verification is approximately $9,000, whereas the average cost of obtaining a standard individual permit is approximately $26,000.  NWP001941.  A 2002 article in the Natural Resources Journal, found that once project costs were appropriately controlled for size, complexity, and other factors, permit preparation costs would double when switching from NWP to an individual permit.  *See* David Sunding & David Zilberman, *The Economics of Environmental Regulation by Licensing: An Assessment of Recent Changes to the Wetland Permitting Process*, 42 NATURAL RESOURCES J. 59, 75 (2002).  While we disagree with the figures and have not validated the data supporting them, one public comment to the docket on the 2017 NWPs stated that the median cost to obtain NWP authorization was $16,700 and median cost to obtain an individual permit was $220,000.  NWP042996.

13. An NWP verification can also be obtained in less time than obtaining a standard individual permit.  In 2018, the average time to receive an NWP verification from the Corps was 45 days, while the average time to receive a standard individual permit from the Corps was 264 days.

14. On average, the Corps receives 3,000 standard individual permit applications annually.  Requiring individual permit review for routine utility line activities with minimal impacts will reduce the Corps' ability to devote appropriate resources to

evaluating activities that have greater adverse environmental effects.  The Corps assigns its resources based on its decades-long experience in using the NWP program.  Inability to use that program, without additional budgetary resources and/or workforce augmentations will greatly affect the Corps' ability to process permit applications for utility-line work, or any other project.  Currently, there are approximately 1,250 regulatory project managers across the nation assigned to, and familiar with, processing NWP 12 verifications.  On average, the workload for Corps project managers embraces the need for each to carry a portfolio of around 60 in-process permitting and permit-related actions, covering all activities regulated by the Department of the Army nationwide.  This workload includes the review of other NWPs and Individual Permits.  The Corps could require additional Congressional appropriations to hire new personnel to process the necessary increase in individual permit applications if the estimated 14,000 annual uses of NWP 12 have to be processed as standard individual permits.  Whether the Corps could get those additional appropriated dollars is uncertain.

    15. As a result of the court's order, I estimate that the Corps will have to process around 2,800 additional standard individual permits per year to cover the 14,000 actions that could have be authorized by NWP 12.  Note that some of the 14,000 NWP actions would be part of the same individual permit review.  Assuming the number of Corps employees remains constant, it will take the current Corps

workforce one and half years to process all of these additional permits if they focused on only those permit applications and nothing else.

16. Impacts to government entities related to processing these routine utility activities are not limited to the Corps. Federal, Tribal, and state resource agencies will be required to review and comment on the large number of public notices for these activities. State agencies and tribal offices assigned responsibility to evaluate and provide decisions on Clean Water Act section 401 water quality certification requests will also experience a surge in workload associated with the increased number of individual permits. In coastal states, state coastal zone management programs will receive a surge in workload to process requests for Coastal Zone Management Act consistency concurrences for standard individual permits authorizing utility lines in coastal zones. In making these statements about increased workload on other government entities, I am relying on personal experience in interacting with those other government entities.

17. The activities authorized by NWP 12 have positive impacts to local and regional economies and to the national economy as a whole. During construction, these activities support jobs and generate revenue for employers. Also, these benefits extend to businesses that provide supplies to the projects and services to these employees. These economic benefits are especially critical now because of the economic impacts from COVID-19. *See e.g.* U.S. Department of Homeland

Security Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response Ver. 3.0 at 9 (April 17, 2020).  NWP 12 could authorize work for COVID-related infrastructure expansions.  Further, utility activities authorized by NWP 12 provide energy, drinking water, telecommunications, internet and radio communications and other services to the public, governments, hospitals, schools, and other business.  For example, a prior version of NWP 12 was relied upon for work associated with laying fiber-optic cable to serve the Butte, Montana, school district, and for work associated with removal of a tree from an exposed and leaking water line along the Tongue River.

18. As NWP 12 also provides authorization under Section 10 of the Rivers and Harbors Act of 1899, vacating the permit also introduces uncertainty for NWP 12-authorized utility lines in or over navigable waters, such as community-serving electric transmission lines, because owners of these structures require ongoing authorization to maintain these structures in navigable waters. Without NWP 12, maintaining these structures may be considered unauthorized activities in violation of law.  Owners, who currently may not have any notice, will likely now need to apply for individual Section 10 permits to maintain those structures.

19. Without NWP 12, the Corps also loses its ability to enforce what would otherwise be noncompliance with the environmental protections contained in

special conditions of the verification for a given activity, even for activities where the discharge of fill has been completed. NWP 12 verifications may include conditions concerning historic properties, water quality, safety, and even endangered species in particular. Without NWP 12, the Corps may not have the ability to ensure compliance with permit requirements which have been specially tailored to the particular activity.

    Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to best of my knowledge.

        Executed on April 27, 2020 at Baltimore County, Maryland.

        _____
        Jennifer Moyer