Jeffery J. Oven
Mark L. Stermitz
Jeffrey M. Roth
CROWLEY FLECK PLLP
490 North 31st Street, Ste. 500
Billings, MT 59103-2529
Telephone: 406-252-3441
Email: joven@crowleyfleck.com
        mstermitz@crowleyfleck.com
        jroth@crowleyfleck.com

Peter C. Whitfield
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: 202-736-8000
Email:  pwhitfield@sidley.com

*Counsel for TransCanada Keystone Pipeline, LP and TC Energy Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, BOLD ALLIANCE, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, CENTER FOR BIOLOGICAL DIVERSITY, and FRIENDS OF THE EARTH, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES ARMY CORPS OF ENGINEERS and LT. GENERAL TODD T. SEMONITE (in his official capacity as U.S. Army Chief of Engineers and Commanding General of the U.S. Army Chief of Engineers), <br><br> Defendants. <br><br> TRANSCANADA KEYSTONE PIPELINE, LP, a Delaware limited partnership, and TC ENERGY CORPORATION, a Canadian Public company, THE STATE OF MONTANA, AMERICAN GAS | CV 19-44-GF-BMM <br><br> **MEMORANDUM IN SUPPORT OF MOTION FOR STAY PENDING APPEAL BY TRANSCANADA KEYSTONE PIPELINE, LP AND TC ENERGY CORPORATION** |

ASSOCIATION, AMERICAN PETROLEUM
INSTITUTE, ASSOCIATION OF OIL
PIPELINES, INTERSTATE NATURAL GAS
ASSOCIATION OF AMERICA, and
NATIONAL RURAL ELECTRIC
COOPERATIVE ASSOCIATION

                    Defendant-Intervenors.

# TABLE OF CONTENTS

Table of Authorities..................................................................................................ii

INTRODUCTION .........................................................................................................1

I.      BACKGROUND...............................................................................................3

        A.      Statutory and Regulatory Background ..................................................3

                1.      Section 404 of the Clean Water Act ...........................................3

                2.      Endangered Species Act .............................................................4

        B.      Nationwide Permit 12............................................................................5

        C.      Keystone XL Pipeline ...........................................................................9

II.     ARGUMENT.................................................................................................12

        A.      Keystone XL And All Other Utility Projects Are Entitled To A
                Stay ......................................................................................................13

        B.      Defendants Are Likely To Succeed On Appeal Because The
                Issuance Of NWP 12 Complied With The ESA. .................................18

        C.      There Is No Basis For Vacating NWP 12 and Enjoining Its Use .......23

III.    CONCLUSION .............................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Survival v. STB*,
   704 F.3d 615 (9th Cir. 2012) ..................................................................17

*Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987)...................................................................16, 27

*Cal. Communities Against Toxics v. EPA*,
   688 F.3d 989 (9th Cir. 2012) ..................................................................24

*Conner v. Burford*,
   848 F.2d 1441 (9th Cir. 1988) ................................................................22

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
   807 F.3d 1031 (9th Cir. 2015) ..................................................................5

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
   663 F.3d 470 (D.C. Cir. 2011).............................................................3, 4

*Nat'l Wildlife Fed'n v. Brownlee*,
   402 F. Supp. 2d 1 (D.D.C. 2005)...........................................................22

*Nken v. Holder*,
   556 U.S. 418 (2009)................................................................................12

*TVA v. Hill*,
   437 U.S. 153 (1978)................................................................................26

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 ...........................................................................23, 24, 26

**Statutes**

16 U.S.C. § 1536.............................................................................4, 5, 10, 19

16 U.S.C. § 1540......................................................................................27

33 U.S.C. § 1344......................................................................................3, 4

**Other Authorities**

33 C.F.R. pt. 325 ........................................................................................3

33 C.F.R. § 325.2 ......................................................................................4

33 C.F.R. pt. 330 ........................................................................................4

33 C.F.R. § 330.2 ......................................................................................7

50 C.F.R. § 402.02 ..................................................................................18

50 C.F.R. § 402.13 ................................................................................4, 5

50 C.F.R. § 402.14 ....................................................................................4

80 Fed. Reg 26,832 (May 11, 2015) ......................................................19

82 Fed. Reg. 1860 (Jan. 6, 2017) ...........................................5, 6, 7, 8, 27

U.S. Fish & Wildlife Serv., *American Burying Beetle: Fact Sheet*,
     https://www.fws.gov/Midwest/endangered/insects/ambb/abb_fact.
     html ...................................................................................................20

U.S. Fish & Wildlife Serv., *Fish Guide: Pallid sturgeon*,
     https://www.fws.gov/fisheries/freshwater-fish-of-
     america/pallid_sturgeon.html .........................................................20

## INTRODUCTION

TransCanada Keystone Pipeline, LP and TC Energy Corporation ("TC Energy") respectfully request that the Court stay its April 15, 2020 Order that vacated Nationwide Permit 12 ("NWP 12") and enjoined the Army Corps of Engineers ("Corps") from authorizing any dredge or fill activities under it. TC Energy intends to appeal the Order, and that appeal is likely to succeed. The Corps properly determined that it need not consult with the Fish and Wildlife Service ("FWS") or National Marine Fisheries Service ("NMFS") because NWP 12 does not authorize any activity that may affect species or habitat protected by the Endangered Species Act ("ESA"). Additionally, the vacatur of NWP 12 and injunction against the Corps are not warranted under Ninth Circuit and Supreme Court precedent.

The balance of harms also favors a stay. The Order has and will delay critical utility infrastructure projects, causing substantial harm to State and local governments, businesses, and individuals throughout the country that rely on these utility projects and the economic activity they support. TC Energy agrees with the Federal Defendants that the Order's "vacatur and injunction should therefore be stayed in their entirety." Doc. 131 at 21.

A stay is particularly appropriate for Keystone XL. The Order addressed only a facial challenge to NWP 12, not any application to Keystone XL. It found

that the Corps failed to consult with the Services about the NWP program as a whole. It made no finding of any ESA violation with respect to Keystone XL. Moreover, the Order's general concern that NWP 12 could authorize a utility project that may affect listed species or critical habitat without any consultation with the Services, Order at 19, is a "failing" that does not apply to Keystone XL at all, much less uniquely to Keystone. The Corps and the other federal agencies with authority over aspects of Keystone XL have already consulted with FWS pursuant to section 7 of the ESA. These agencies prepared an 897-page Biological Assessment that addresses the effect of the Project on every threatened or endangered species identified as a concern in the declarations attached to Plaintiffs' summary judgment motion. FWS concurred with their assessment and issued a Biological Opinion that the Corps will use in deciding whether Keystone XL may rely upon NWP 12 to authorize dredge or fill activity, and whether any additional conditions need to be imposed on the Project. *See infra* at 9-12.

Consequently, it would be an abuse of the Court's discretion to treat Keystone XL differently from other utility projects whose dredge and fill activities could still be authorized by NWP 12. If the Corps authorizes Keystone XL under NWP 12 and Plaintiffs think that authorization violates the ESA, they can revive and amend claims three and five that have been stayed in this matter (*see* Doc. 56), and the Court can consider their challenge. The Court cannot short-circuit that due

process by deciding that it is not available to Keystone XL, and Keystone XL alone.

Accordingly, TC Energy does not support any suggestion that the Keystone XL Project could be exempted from the stay. To the extent Federal Defendants suggest such relief is appropriate, TC Energy opposes that portion of their motion. If Federal Defendants are requesting this alternative avenue of relief, they did not disclose this to TC Energy in the meet and confer process. If they had, TC Energy would have expressed its strong opposition. There is no basis for allowing other utility projects to be authorized under NWP 12 but not Keystone XL.

## I.   BACKGROUND

### A.   Statutory and Regulatory Background

#### 1.   Section 404 of the Clean Water Act

The CWA generally requires any party seeking to construct a project that will discharge dredged or fill material into "waters of the United States" to obtain approval from the Corps in one of two ways. *See* 33 U.S.C. § 1344(f)(2). The party may apply for an individual permit under Section 404(a), *id.* § 1344(a), which is "granted on a case-by-case basis and involve[s] a costly review process, often requiring extensive documentation regarding specific site, public notice and comment, and sometimes a public hearing." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 663 F.3d 470, 472 (D.C. Cir. 2011); *see also* 33 C.F.R. pt.

325. In some situations, however, the party may proceed under a general permit issued by the Corps under Section 404(e) for a "category of activities involving discharges of dredged or fill material." 33 U.S.C. § 1344(e)(1). General permits "allow parties to proceed with much less red tape" than is involved with individual permits. *Nat'l Ass'n of Home Builders*, 663 F.3d at 472; *see also* 33 C.F.R. § 325.2(e)(2); *id.* pt. 330.

### 2.  Endangered Species Act

Section 7(a)(2) of the ESA requires that federal agencies "shall, in consultation with and with the assistance of" the FWS or NMFS, ensure that actions they authorize are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). The regulations provide for both formal and informal consultation. Formal consultation is required when an agency determines that a proposed action "may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). Informal consultation is an optional process designed to assist the agency in determining whether formal consultation is required. 50 C.F.R. § 402.13(a). During informal consultation, FWS or NMFS ("the Services") may suggest modifications to the proposed action that could be implemented "to avoid the likelihood of adverse effects to listed species or critical

habitat." *Id.* § 402.13(b). As a result, the agency may be able to structure its proposed action in a way that avoids the need for formal consultation.

In cases where the agency determines that its proposed action "may affect" listed species or critical habitat and does request formal consultation, the Services will issue a Biological Opinion ("BO") reflecting its expert judgment regarding the effect of the proposed action on the species or its habitat. 16 U.S.C. § 1536(b)(3)(A). If the Services determines that an action will not jeopardize a listed species, it will issue an incidental take statement that sanctions the incidental taking of the protected species. *See* 16 U.S.C. § 1536(b)(4); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,* 807 F.3d 1031, 1037 (9th Cir. 2015).

## B.    Nationwide Permit 12

This Court's Order addressed only Plaintiffs facial challenge to NWP 12, a general permit issued by the Corps under Clean Water Act ("CWA") section 404(e) that may be used by utility lines. *See* Order at 2. The Corps first promulgated NWP 12 and several other nationwide permits in 1977 and the Corps has revised and reissued NWP 12 multiple times, most recently in the 2017 rulemaking challenged here, *see* 82 Fed. Reg. 1860 (Jan. 6, 2017). In addition, the Omaha District of the Corps' Northwestern Division (which includes Montana, Nebraska, North Dakota, South Dakota, and Wyoming) conducted a separate notice-and-comment rulemaking procedure to adopt additional regional conditions

for the use of NWP 12 within its region. NWPRC000001-19; NWPRC000020-80. The regional conditions "were carefully developed to address potential cumulative effects within the Omaha District that could result in adverse cumulative effects over time." NWPRC000064.

NWP 12 "authorizes discharges of dredged or fill material into waters of the United States and structures or work in navigable waters for crossings of those waters associated with the construction, maintenance, or repair of utility lines," if they satisfy many conditions. 82 Fed. Reg. at 1985. Utility line projects may be authorized by a NWP because most of their water crossings "result in *temporary impacts*" to waters and wetlands. NWP005279 (emphasis added).

To use NWP 12, a utility line must be "designed and constructed to avoid and minimize adverse effects, both temporary and permanent, to the waters of the United States to the maximum extent practicable at the project site." 82 Fed. Reg. at 2001 (General Condition 23(a)). Appropriate soil erosion and sediment controls must be used; measures must be taken to minimize soil disturbance in wetlands; and temporary fills must be removed and the area revegetated and returned to pre-construction elevations. *Id*. at 1999 (General Conditions 11-13). Additional conditions are imposed by the Corps' regional offices to protect specific waters and address conditions unique to the region. *See, e.g*., NWPRC000003-07 (prohibiting use of NWP 12 in peatlands in Montana and imposing special

conditions for use of NWP 12 in the Special River Management Zone of the Upper

Yellowstone River in Montana).

To use NWP 12, a utility must obtain an "individual 401 Water Quality

Certification" from the relevant state under Section 401 of the CWA, unless the

state granted certification for all activities authorized by NWP 12. 82 Fed. Reg. at

2002 (General Condition 25). In addition, a utility may use NWP 12 only if "the

activity does not result in the loss of greater than 1/2 acre of waters" for each

"single and complete project." *Id.* at 1985. For a "linear project[]"—like a

pipeline—the Corps' regulations have long treated each crossing of a separate

water body or the "separate and distant" crossing of the same water body as a

"single and complete project." 33 C.F.R. § 330.2(i); *see* 82 Fed. Reg. at 1988

Another set of requirements—specified in General Condition 18—ensure

that use of NWP 12 complies with the ESA. "No activity is authorized" under

NWP 12 that is "likely to directly or indirectly jeopardize the continued existence

of a threatened or endangered species" (or one "proposed for such designation"), or

"which will directly or indirectly destroy or adversely modify the critical habitat

for such species." 82 Fed. Reg. at 1999. And "[n]o activity is authorized" that

"'may affect' a listed species or critical habitat, unless ESA section 7 consultation

addressing the effects of the proposed activity has been completed." *Id.*

To enable that consultation to occur, a utility "must submit a pre-construction notification" ("PCN") to the Army Corps district engineer "if any listed species or designated critical habitat might be affected or is in the vicinity of the activity, or if the activity is located in designated critical habitat." *Id.* The PCN must identify all a project's water crossings, regardless of whether those other crossings require a PCN. *Id.* at 1890. "When the district engineer receives the PCN, he or she will evaluate the information in the PCN, plus other available information, to determine whether the proposed activity may affect listed species or designated critical habitat and thus require ESA section 7 consultation." *Id.* at 1954. If the Corps makes a "may affect" determination, section 7 consultation must be completed "before the activity is authorized by NWP." NWP005326. The utility "shall not begin work on the activity until notified by the district engineer that the requirements of the ESA have been satisfied and that the activity is authorized." 82 Fed. Reg. at 1999. If a utility fails to submit a PCN that was required by general condition 18 or submits a PCN but takes action before its activity was authorized, "then the activity is not authorized by NWP. The district engineer will take appropriate action for the unauthorized activity." 82 Fed. Reg. at 1955; *see also id.* at 1954.

C.     **Keystone XL Pipeline**

As this Court is aware, the Keystone XL will cross the U.S. border near Morgan, Montana, and continue for approximately 882 miles to Steele City, Nebraska, where it will connect to the existing Keystone pipeline system. The "route has been selected and modified to minimize the potential for impacts to surface water resources, as well as other sensitive environments, by avoiding them whenever possible and shifting the route to limit the area affected." 2014 Final SEIS at 4.3-20. Only 19.7 miles will traverse U.S. waters, roughly 2.2 percent of the project, and TC Energy has a Construction, Mitigation and Reclamation Plan ("CMRP") to minimize impacts to waterbodies and wetlands, as well as upland impacts.

The environmental impacts of construction and operation of Keystone XL were analyzed in the Final Supplemental Environmental Impact Statement issued in 2014 and the supplemental analysis issued in December 2019 that addressed the revised route through Nebraska and the additional issues identified by this Court in the prior litigation brought by these Plaintiffs and others.[1] The Army Corps, Bureau of Land Management ("BLM") and other federal agencies with authority

---

[1] U.S. Dep't of State, *Final Supplemental Environmental Impact Statement for the Keystone XL Project* (Dec. 2019) (2019 Final SEIS), https://cdxnodengn.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=286595

over some aspect of the Keystone XL Project have also engaged in extensive analysis and consultations with FWS to ensure that actions they authorize are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). This analysis and consultation is documented in the new Biological Assessment ("BA") and Biological Opinion ("BO") for Keystone XL that were prepared following this Court's decision in the earlier litigation. *See* BA at 3-8 and Appendix A (describing consultations beginning in 2008); BO at 4 ("Since May 2019," FWS, BLM, the Army Corps, and other agencies "held twice weekly conference calls to discuss the consultation").[2]

The BA evaluates in detail six endangered species and five threatened species that may be affected by Keystone XL (*id.* at 26-170), including the pallid sturgeon and American burying beetle referenced in the Court's opinion (*see* Order at 14-15), and the interior least tern, whooping crane, and piping plover that were

_____

[2] The BA is available at https://eplanning.blm.gov/epl-front-office/projects/nepa/1503435/20011538/250015780/POD_Appendix_U-1_Biological_Assessment_-_Part_1_508.pdf. The BO is available at https://eplanning.blm.gov/epl-front-office/projects/nepa/1503435/20011541/250015783/POD_Appendix_U-2__Biological_Opinion_508.pdf

mentioned in the declarations submitted by Plaintiffs.[3] The analysis in the BA is

informed by an extensive bibliography of references and by "[b]iological field

surveys within the proposed Project footprint (e.g., pipeline ROW, pump stations,

access roads, pipe yards, contractor yards, extra workspace)" that were "conducted

each year from 2008 to 2019." *Id.* at 3; *see also id.* at 10-11 (Table 1.4-2 Summary

of Species and Habitat Surveys); *id.* at 171-90 (references).

For each species, the BA discusses (1) the species' natural history and

habitat; (2) its potential presence in the Keystone XL "action area;" (3)

conservation measures that TC Energy will take to avoid and minimize adverse

effects on the species and its habitat; (4) the effects of the project's construction,

operations, potential oil spills, and power infrastructure; and (5) the cumulative

effects of Keystone XL in combination with any other reasonably certain future

activities within the action area. *See, e.g.,* BA at 76-85 (analysis of pallid

sturgeon). It then concludes with the agencies' determination, *e.g.*, Keystone XL

"'may affect, but is not likely to adversely affect' the pallid sturgeon." *Id.* at 84.

Only the American burying beetle "is likely to [be] adversely affect[ed]" by

Keystone XL. *Id.* at 123.

---

[3] *See* Decl. of Dr. Jon Bedick (Doc. 73-1) ¶¶ 6-13; Decl. of David Noah Greenwald
(Doc. 73-3) ¶¶ 11-16; Decl. of Dr. Martin Hamel (Doc. 73-4) ¶¶ 13-16; Decl. of
Brett Hartl (Doc. 73-5) ¶¶ 10-11; Decl. of Kenneth Midkiff (Doc. 73-7) ¶¶ 6-9.

FWS concurred with the BA's assessment that other species were not likely to be adversely affected and issued the BO for the American burying beetle, concluding that Keystone XL "is not likely to jeopardize [its] continued existence." BO at 37. The BO also found that the impact to the American burying beetle is "on lands that are outside the jurisdiction of the Federal agencies, or is related to activities undertaken by the applicant not under the authority of a Federal agency," except for the impact at a Western Area Power Administration substation and some power infrastructure financed by the Rural Utilities Service. BO at 38. Therefore, the incidental take statement in the BO "does not extend the Federal agencies' take exemption to Keystone for the take caused by the Project's actions." *Id.* Instead, TC Energy is developing a habitat conservation plan and applying "for a section 10(a)(l)(B) incidental take permit for the ABB for their activities on non-federal lands." *Id.*

## II.   ARGUMENT

A stay is an equitable remedy that requires consideration of "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

As discussed below, each of those factors strongly favors the grant of a stay of the April 15 Order. Defendants are likely to succeed on appeal because the Corps properly determined that it did not have to undertake formal programmatic consultation. *See infra* § I.B. And even if programmatic consultation were required, it is remedied by a remand to the Corps. There is no basis for vacating NWP 12 and enjoining the Corps from authorizing any activity under it. *See infra* § I.C. Indeed, that is particularly clear for Keystone XL because the Corps has already engaged in extensive consultations with FWS about the potential effect of Keystone XL on every threatened or endangered species that Plaintiffs have alleged may be harmed by the Project. It would therefore be improper to single out Keystone XL for different treatment. Keystone XL should not be the only project that the Corps is enjoined from authorizing under NWP 12 when Keystone XL has already been through the section 7 consultation process and many others have not. *Cf*. Decl. of Jennifer Moyer (Doc. 131-1) ¶ 6 (of 38,000 verifications made by the Corps under NWP 12 since March 19, 2017, "1,436 [had] activity-specific informal consultations, and 164 [had] activity-specific formal consultations").

## A. Keystone XL And All Other Utility Projects Are Entitled To A Stay

The Order should be stayed for Keystone XL as well as for all other utility projects. In the summary judgment briefing, Plaintiffs alleged that they will be harmed by application of NWP 12 to Keystone XL because there will be

13

inadequate review of the effect of Keystone XL on several threatened and endangered species that their members study or enjoy. *See supra* at 11 & n. 3. That speculation is unfounded, and it certainly presents no immediate irreparable harm that could justify an injunction prohibiting the Corps from acting on the PCNs that have been submitted for Keystone XL.

TC Energy cannot conduct any dredge or fill activity in any water of the United States until it has permission from the Corps under the Clean Water Act. TC Energy intended to use NWP 12 to obtain that authorization, and it submitted PCNs to the Corps as required by NWP 12. *See* Declaration of Gary Salsman ¶ 4 (attached as Exhibit 1). Unless and until the Corps issues verification letters on the PCNs, Plaintiffs will not suffer any harm—much less any irreparable harm—from NWP 12. When and if the Corps does issue verifications on the PCNs, Plaintiffs can request to the lift the stay of claims three and five in order to challenge the application of NWP 12 to Keystone XL if they think it violates the ESA.

At this point, however, Plaintiffs have no ripe challenge to the application of NWP 12 to Keystone XL. The Order addressed only their facial challenge to NWP 12. It found that the Corps failed to consult with the Services about the NWP program as a whole. There was no finding of any ESA violation that is unique to Keystone XL. The Order thus properly did not apply more onerous restrictions on Keystone XL than it applied to other utility projects that seek to use NWP 12.

14

A primary "failing" of NWP 12 identified in the Order was that the Corps violated "*its* obligation under ESA Section 7(a)(2) because it delegates the Corps' initial effect determination to non-federal permittees" who may decide their projects will not affect endangered species and will not submit a PCN to the Corps. (Order at 19). This "failing" simply does not apply to Keystone XL. As explained above, the Corps and other federal agencies with jurisdiction over Keystone XL have already engaged in consultation with FWS. They issued a BA that addresses the effect of Keystone XL on every threatened and endangered species that may be harmed, including the species Plaintiffs identified. *See supra* at 11 & n.3. FWS has concurred with the agencies' assessment and issued a BO that the Corps will consider in deciding whether to issue verification letters on the PCNs for Keystone XL. *See supra* at 9-12. Because the section 7 consultation is complete for Keystone XL, Plaintiffs' interests are adequately protected without vacatur of NWP 12 and an injunction barring the Corps from authorizing any activity under NWP 12. Moreover, because section 7 consultation for Keystone XL is complete, there is even less reason to arbitrarily single out Keystone XL by enjoining the Corps from authorizing its activity under NWP 12 while allowing the Corps to authorize activity of other projects that have not had such project-specific consultation.

Enjoining Keystone XL from using NWP 12 would also cause substantial harm to TC Energy, its employees and its customers, as well as the State of

Montana, and all the local governments, businesses and individuals that will benefit from the economic activity generated by construction of the Project. TC Energy has spent over a decade and approximately $3.2 billion to develop the Project. Salsman Decl. ¶ 8. Additionally, the Government of Alberta has agreed to invest up to $1.06 billion towards construction in 2020, in addition to further investment by TC Energy. *Id*. If TC Energy does not receive authorization from the Army Corps by early July, it would have to (i) delay construction or alter its construction plans to avoid dredge or fill activities in waters of the United States, which is estimated to increase the construction costs at the impacted locations by over $100 million (40% higher) and delay completion of the planned 2020 construction; or (ii) forego construction in 2020 altogether. *Id.* ¶ 6.

Each option will impose substantial costs on the company, will threaten hundreds of jobs and significant tax revenue that the Project would provide, and could delay the operational date of a service that shippers have already contracted to use. This counsels strongly in favor of a stay that allows TC Energy to use NWP 12. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) (that "the oil company petitioners had committed approximately $70 million to exploration" that "would have lost without chance of recovery had exploration been enjoined" was substantial harm that justified denial of injunction); *Alaska Survival v. STB*, 704 F.3d 615, 616 (9th Cir. 2012) (lifting injunction because "[f]urther delay of

16

this project will prevent the award of construction contracts, postpone the hiring of construction employees, and significantly increase costs").

Specifically, TC Energy had planned to enter construction contracts for approximately 1,800 construction workers to construct the pipeline segments scheduled to be built in 2020. Salsman Decl. ¶ 7. If that planned pipeline construction cannot be completed this year, some or all of those construction jobs may be lost along with significant investment and economic opportunities in the communities the pipeline traverses. *Id*.

A delay in construction would also threaten significant tax revenue that the Project would provide. The State of Montana has estimated that Keystone XL "will generate approximately $63 million in annual property tax revenues in Montana, or about 151 percent of the property taxes collected in 2006 in the six counties crossed." Montana Intervention Br. (Doc. 43) at 3. And the Project will generate tax revenue and economic activity in South Dakota and Nebraska as well. *See* Salsman Decl. ¶ 10 (describing hundreds of millions of dollars in estimated payment for wages and services and taxes to state, county and municipal governments during the first year of operation); 2019 Final SEIS at 4-63, 4-65 (describing beneficial impacts to economic base and tax revenue).

Finally, a delay in construction that impacts the date the Project can be placed into service will cost TC Energy even more money and deprive its

customers of a service they have contracted to use. Salsman Decl. ¶ 10. It will also harm the public interest by delaying a Project that the State Department said will promote the nation's energy security and bilateral relations with Canada. For these reasons, and those discussed below, TC Energy is entitled to a stay of sections 5 and 6 of the Order.

### B.   Defendants Are Likely To Succeed On Appeal Because The Issuance Of NWP 12 Complied With The ESA.

Defendants are likely to succeed on appeal because the Corps properly determined that it did not have to undertake formal programmatic consultation with FWS and NMFS because NWP 12 will not affect threatened or endangered species or critical habitat. *See* NWP005324-25. The Order's contrary conclusion rests on a faulty legal conclusion, ignores the protections built into NWP 12 to protect listed species and their habitat, and erroneously dismisses the protection provided by General Condition 18 as an unlawful delegation of the Corps' statutory duties to permittees.

First, the Order erroneously concluded that programmatic consultation is required by 50 C.F.R. § 402.02 "when an agency's proposed action provides a framework for future proposed action." Order at 10. It does not. Section 7 requires consultation when an agency's proposed action "may affect" critical species or listed habitat. 16 U.S.C. § 1536(a)(2). As the Services recognized in the rulemaking cited in the Order, "framework programmatic actions," such as "the

U.S. Army Corps of Engineers' Nationwide Permit Program" are agency actions that may require programmatic consultation with the Corps. But section 7 nowhere requires the Corps to engage in programmatic consultation before it issues nationwide permits. Instead, the Services disavowed their previous position that programmatic framework actions necessarily result in take of protected species. 80 Fed. Reg 26,832, 26,833 (May 11, 2015) ("the Services have altered their view and now affirm that a framework programmatic action in and of itself does not result in incidental take of listed species"). And they specifically stated that "this regulatory change *does not imply* that section 7 consultation is required for a framework programmatic action that has no effect on listed species or critical habitat." *Id.* at 26,835 (emphasis added).

Second, programmatic consultation was not required because the Corps reasonably concluded that the reissuance of NWP 12 has no effect on listed species or habitat. There is no "resounding evidence" that the reissuance of NWP 12 "may affect" listed species and their habitat. Order at 11. The Corps did say that "discharges authorized by NWP 12 'will result in a *minor incremental contribution* to the cumulative effects to wetlands, streams, and other aquatic resources in the United States.'" Order at 13 (citing NWP005313 (emphasis added)). The Corps did not state, however, that these minor incremental contributions to the cumulative effects from all other activities may affect listed species or critical habitat.

Nonetheless, the Order improperly makes such an assumption. *Id.* This is unreasonable.

ESA-protected species are not ubiquitous in waters of the United States. They are confined to certain areas of the country. Pallid sturgeon, for example, "move throughout the Missouri and Mississippi River systems and are built for migrating through swift flowing muddy water."[4] American burying beetles "are known to occur in only four states: Rhode Island, Oklahoma, Arkansas, and Nebraska."[5] Thus, the minor incremental impacts of nationwide activity outside these areas cannot be presumed to affect listed species or critical habit.

Third, NWP 12 has protections to ensure that the dredge and fill activity it authorizes does not affect listed species or critical habitat unless there has been consultation with the Services under Section 7.[6] If an activity would occur where any listed species or designated critical habitat might be affected, the permittee

---

[4] *See* U.S. Fish & Wildlife Serv., *Fish Guide: Pallid sturgeon*, https://www.fws.gov/fisheries/freshwater-fish-of-america/pallid_sturgeon.html.

[5] *See* U.S. Fish & Wildlife Serv., *American Burying Beetle: Fact Sheet*, https://www.fws.gov/Midwest/endangered/insects/ambb/abb_fact.html.

[6] While Plaintiffs submitted declarations alleging that the Corps will not review Keystone XL's potential to affect Pallid Sturgeon and American burying beetles, *see supra* n.3, those claims are directly contradicted by the environmental analyses in the BA and BO issued for the Project. Plaintiffs have not challenged those analyses in this case. Accordingly, it was error for the Order to rely on the allegations other than to assess Plaintiffs' standing.

must submit a PCN notifying the Corps, NWP000141, and cannot begin

construction until the Corps provides a "no effect" determination or until "any

consultation required under Section 7 of the Endangered Species Act . . . has been

completed." NWP000145; *see also* NWPRC000055. As the Corps explained, the

"might affect" standard for requiring a PCN is broader than the "may affect"

standard required for formal consultation. NWP000015 ("The word 'might' is

defined as having 'less probability or possibility' than the word 'may'"). This

ensures that a regional office is afforded the opportunity to perform a review of a

potential use of NWP 12 to determine whether regulated activity would trigger an

obligation to consult under ESA section 7.[7]

  This process is not an improper delegation of the Corps' duties. Order at 19.

It is the Corps, not the permittee, that decides whether a proposed activity "may

affect" listed species or critical habitat, and thus whether consultation is required.

The permittee's duty is to notify the Corps of its proposed activity. If it fails to do

so, its activity is not unauthorized.  NWP000141-42.

---

[7] Regional offices are well equipped to perform such reviews. *See* NWPRC00055
("To ensure compliance with the Endangered Species Act (ESA), Omaha District
regulatory offices are familiar with Federal Threatened or Endangered (T&E)
Species and habitats in their area of responsibility. Based on experience and their
knowledge of USFWS T & E site specific resources and information each office is
able to ensure compliance with the ESA.").

Finally, the cases relied on in the Order are not applicable here. The Corps did not engage in the same incremental-step consultation disfavored in *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988). In *Conner*, the FWS failed to prepare a comprehensive biological opinion contemporaneously with the sale of oil and gas leases pursuant to the Mineral Leasing Act (MLA) in two national forests despite acknowledging that the sale could affect listed species living the area. *Id.* at 1452. The court faulted the agency for failing to assess all aspects of post-sale development, noting that the MLA had no "checks and balances" to ensure that a comprehensive review and a meaningful biological opinion was prepared. *Id.* at 1455-56. General Condition 18, and the regional conditions, provide checks and balances to ensure the Corps does not authorize dredge or fill activity without performing the required ESA review.

The Order's reliance on *National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d 1 (D.D.C. 2005), is also misplaced. It involved a version of the nationwide permits issued in 2002, and the Corps has modified NWP 12 since *Brownlee* was decided. The Corps engaged in voluntary consultation with FWS and NMFS when it issued NWP 12 in 2007 and in 2012, and measures from that consultation are included in the current version of NWP 12. *See* Doc. 88 at 32-35. Nothing in *Brownlee* establishes that the current version of NWP 12, with those

22

protections, may affect listed species or critical habitat that requires further programmatic consultation under section 7.

Thus, the Corps did not violate the ESA in issuing NWP 12.

## C. There Is No Basis For Vacating NWP 12 and Enjoining Its Use

The Order appears to assume that once it found that the Corps failed to engage in the programmatic consultations it found were required by section 7 of the ESA, it had to vacate NWP 12 and enjoin the Corps "from authorizing any dredge or fill activities under NWP 12 pending completion of the consultation process and compliance with all environmental statutes and regulations." Order ¶¶ 5, 6. The Order nowhere explains why that remedy was chosen. *See id*. at 21 (announcing remedy with no explanation beyond that the Corps "violated the ESA"). That was a fundamental error that is likely to be reversed on appeal.

The Supreme Court has long held that an injunction "is not a remedy which issues as of course." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311(1982) (quoting *Harrisonville v. W. S. Dickey Clay Mfg. Co*., 289 U.S. 334, 337-38 (1933)). "The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Romero-Barcelo*, 456 U.S. at 312-13.

The same is true for the remedy of vacatur. "A flawed rule need not be vacated." *Cal. Communities Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). "[W]hen equity demands, the regulation can be left in place while the agency follows the necessary procedures to correct its action." *Id.* (quoting *Idaho Farm Bureau Fed'n v. Babbit,* 58 F.3d 1392, 1405 (9th Cir. 1995)).

"Where plaintiff and defendant present competing claims of injury, the traditional function of equity has been to arrive at a 'nice adjustment and reconciliation' between the competing claims," and to "mould [the] decree to the necessities of the particular case." *Romero-Barcelo*, 456 U.S. at 312 (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)). The Order did no balancing. It vacated NWP 12 even though Plaintiffs made no showing that such relief was necessary to avoid irreparable harm to them. Indeed, as an earlier order acknowledged, Plaintiffs did not even ask to have NPW 12 vacated; they requested a remand to the Corps. *See* Mot. for Summary Judgment (Doc. 72) at 2; Doc. 59 at 4-5 (granting limited intervention to Montana and the NWP 12 Coalition because "Plaintiffs do not ask the Court to vacate NWP 12" so intervenors "could still prospectively rely on the permit until it expires on its own terms in March 2022, even if Plaintiffs prevail on the merits").

The Order also failed to consider the harm to Defendants, Intervenor-Defendants, and the customers they serve, even though Montana and the NWP

24

Coalition sought to intervene in this case precisely because of the harm that would be caused if NWP 12 were vacated or enjoined. As the intervention motions explained, NWP 12 is essential to rural electric cooperatives and other electric utilities, natural gas pipelines, telecommunications providers, and oil pipelines that construct and repair utility lines that cross waters of the United States to deliver power, telecommunications services, natural gas and petroleum products to businesses and individuals throughout Montana and the nation. *See* Montana Intervention Br. at 8-10; NWP Coalition Intervention Br. (Doc. 49) at 17-23. Without NWP 12, companies must use the lengthier, more expensive individual permit process, which will overwhelm the Corps with thousands of permit applications that it does not have the resources to process through the individual process. *See* Moyer Decl. ¶¶ 14-15. Indeed, Congress established the nationwide permitting process to avoid that very result. Companies caught up in this delay will be unable to construct, expand, or even to repair essential infrastructure projects in a timely and cost-effective manner. *See* Montana Intervention Br. at 8-10; NWP Coalition Intervention Br. at 17-23; Amicus Br. of Edison Elec. Inst., *et al.* (Doc. 106) at 1-4.

Finally, the Order failed to consider the economic costs incurred by local communities when these infrastructure projects take longer and become more expensive to build. Increased costs make it more difficult to expand broadband

service or upgrade aging electrical infrastructure. Montana Intervention Br. at 9.

Workers lose jobs when construction projects are delayed or cancelled, and local

governments lose an important source of tax revenue. *Id.* at 3. "[C]ourts of equity

should pay particular regard for the public consequences in employing the

extraordinary remedy of injunction." *Romero-Barcelo*, 456 U.S. at 312. The

Order's failure to do so is reversible error.

Plaintiffs may respond that even though they did not request this relief, it

was appropriate for the Order to vacate and enjoin the use of NWP 12 to remedy

the Corps' violation of the ESA. But even if one assumes that the Corps had a duty

to engage in programmatic consultation (which it did not), that argument would

fail. An injunction that causes substantial harm to defendants and the public should

not be issued when it "is not the only means of ensuring compliance" with the

statute. *Romero-Barcelo*, 456 U.S. at 314. Here, the injunction is unnecessary

because the portion of the Order remanding NWP 12 for the Corps to engage in

programmatic consultation with the Services ensures compliance with the

consultation requirement in section 7(a)(2).

This is not a case in which an injunction is needed to prevent "the

eradication of an endangered species." *TVA v. Hill*, 437 U.S. 153, 174 (1978). The

Order made no finding that NWP 12 will cause the destruction of any threatened or

endangered species or critical habitat. Nor could such a finding be made. As

previously explained, there are regional conditions that preclude the use of NWP 12 in specific areas where dredge and fill activity is likely to jeopardize listed species or adversely modify critical habitat. And to ensure that NWP 12 does not authorize activity that is likely to cause such harm in other areas, a permittee must submit a PCN "if any listed species or designated critical habitat might be affected or is in the vicinity of the activity, or if the activity is located in designated critical habitat, and shall not begin work on the activity until notified by the district engineer that the requirements of the ESA have been satisfied and that the activity is authorized." 82 Fed. Reg. at 1999.

The Order correctly presumes that "the Corps, the Services, and permittees" will obey the regulations. Order at 19. Plaintiffs have cited no evidence to the contrary. And in the unlikely event that some company does violate the regulations and engages in activity that effects an unauthorized taking of an endangered species or critical habitat, the ESA provides a remedy: the government may bring a criminal or civil enforcement action, or any person may bring a citizens suit. 16 U.S.C. § 1540. As a result, harm to endangered species or critical habitat from the use of NWP 12 is "not at all probable," and is vastly outweighed by the substantial harm that vacatur and the injunction are causing defendants, intervenor-defendants, and the public. *See Vill. of Gambell*, 480 U.S. at 545 (reversing injunction). The

vacatur of NWP 12 and injunction are likely to be reversed on appeal and should be stayed now.

## III.   CONCLUSION

For the reasons stated above, TC Energy requests the Court stay its Order in full pending resolution of an appeal to the Ninth Circuit.

 Dated: April 29, 2020                          Respectfully submitted,

*/s/ Peter C. Whitfield.*
Peter C. Whitfield
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000 (telephone)
(202) 736-8711 (fax)
Email: pwhitfield@sidley.com


*/s/ Jeffery J. Oven*
Jeffery J. Oven
Mark L. Stermitz
Jeffrey M. Roth
CROWLEY FLECK PLLP
490 North 31st Street, Ste. 500
P.O. Box 2529
Billings, MT 59103-2529
Telephone: 406-252-3441
Email: joven@crowleyfleck.com
       mstermitz@crowleyfleck.com
       jroth@crowleyfleck.com

*Counsel for TransCanada Keystone Pipeline LP and TC Energy Corporation*

28

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), I certify that this brief is printed in 14-point font, double spaced, and contains 6,477 words, excluding tables, caption, signatures, and certificates of service and compliance.

*/s/ Jeffery J. Oven*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served today via the Court's

CM/ECF system on all counsel of record.

*/s/ Jeffery J. Oven*