William W. Mercer
Brianne McClafferty
HOLLAND & HART LLP
401 North 31st Street, Suite 1500
Billings, MT  59101
(406) 252-2166
wwmercer@hollandhart.com
bcmcclafferty@hollandhart.com

Deidre G. Duncan (*Pro hac vice*)
Karma B. Brown (*Pro hac vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 955-1500
dduncan@HuntonAK.com
kbbrown@HuntonAK.com

*Counsel for Defendant-Intervenors American Gas Association, American Petroleum Institute, Association of Oil Pipe Lines, Interstate Natural Gas Association of America, and National Rural Electric Cooperative Association*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, et al.,<br>        Plaintiffs,<br><br>        v.<br><br>U.S. ARMY CORPS OF ENGINEERS, et al.,<br>        Defendants, and<br><br>THE STATE OF MONTANA, TRANSCANADA KEYSTONE PIPELINE, LP, TC ENERGY CORPORATION, AMERICAN GAS ASSOCIATION, AMERICAN PETROLEUM INSTITUTE, ASSOCIATION OF OIL PIPE LINES, INTERSATE NATURAL GAS ASSOCIATION OF AMERICA, and NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION,<br>        Defendant-Intervenors. | Case No. 4:19-cv-00044-GF-BMM<br><br>**NWP 12 COALITION'S MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' MOTION FOR PARTIAL STAY PENDING APPEAL** |

# Table of Contents

Table of Authorities.................................................................................ii

Exhibit Index ........................................................................................v

I.      Introduction. .................................................................................1

II.     A Stay Pending Appeal Is Warranted.............................................4

        A.      The NWP 12 Coalition, its Members, and the Public Will
                Suffer Irreparable Harm from Vacatur of NWP 12. ...........5

                1.      The Corps Has Halted Review of NWP 12 Coalition
                        Member Pre-Construction Notifications, Delaying
                        Important and Time-Sensitive Utility Line Activities. ..............5

                2.      If NWP 12 Is Not Available As a Result of the Order,
                        Routine Inspections, Upgrades, Repair, and
                        Maintenance Activities Will Be Impeded..................9

                3.      Transitioning to Alternative CWA Authorizations
                        Creates Significant Regulatory Uncertainty, Increases
                        Costs, and Creates Delays that Threaten the Delivery
                        of Secure and Reliable Energy to the Public. ..........14

                4.      The Order Impedes the Public's Interest in
                        Dependable, Safe, and Reliable Energy. .................16

        B.      The Federal Defendants Are Likely to Prevail on Appeal.................18

                1.      The Court Erred by Providing Relief Plaintiffs Did
                        Not Request. ...............................................18

                2.      There Is No Basis to Vacate NWP 12. ...................20

                3.      The Injunction Is Overbroad, Contrary to the Public
                        Interest, and Unwarranted........................................23

III.    Conclusion.....................................................................................26

Certificate of Compliance

Certificate of Service

## Table of Authorities

### Federal Cases

*Caballo Coal Co. v. Ind. Mich. Power Co.*, 305 F.3d 796 (8th Cir. 2002) ................................................................................18

*Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989 (9th Cir. 2012) ..............3, 17, 21

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ............................................................23

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) ....................................................25

*Cent. Me. Power Co. v. FERC*, 252 F.3d 34 (1st Cir. 2001) ....................................18

*City & Cty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).............3, 25

*Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993) ......................................................24

*E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026 (9th Cir. 2019) .....................25

*Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17 (1952)..............................20

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) .........................................20

*James River Flood Control Ass'n v. Watt*, 680 F.2d 543 (8th Cir. 1982) ................................................................................13

*Keener v. Convergys Corp.*, 342 F.3d 1264 (11th Cir. 2003) ..........................23, 24

*Kentuckians for Commonwealth Inc. v. Rivenburgh*, 317 F.3d 425 (4th Cir. 2003) ................................................................................20

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, No. 3:10-CV-01397-SI, 2012 WL 13042847 (D. Or. Dec. 10, 2012)....................................................................21

*Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644 (9th Cir. 2011) ................................................................................25

*McCormack v. Hiedeman*, 694 F.3d 1004 (9th Cir. 2012) ......................................24

*Michigan v. EPA*, 135 S. Ct. 2699 (2015) ...............................................................21

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ...............................23

*Nken v. Holder*, 556 U.S. 418 (2009) ..................................................................4, 5

*Rapanos v. United States*, 547 U.S. 715 (2006) ....................................................14

*Right to Life of Dutchess County, Inc. v. FEC*, 6 F. Supp. 2d 248
    (S.D.N.Y. 1998) ................................................................................................25

*Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80 (1943) ...............................20

*Sierra Club v. Ga. Power Co.*, 180 F.3d 1309 (11th Cir. 1999) ............................17

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016) ..........................................................17

*United States v. Glaser*, 14 F.3d 1213 (7th Cir. 1994) ..........................................25

*United States v. Mendoza*, 464 U.S. 154 (1984) ...............................................23, 25

*White Stallion Energy Ctr., LLC v. EPA*, No. 12-1100, 2015 WL
    11051103 (D.C. Cir. Dec. 15, 2015), *cert. denied*, *Michigan v.*
    *EPA*, 136 S. Ct. 2463 (2016) ..........................................................................21

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .................................3, 23

*Zepeda v. INS*, 753 F.2d 719 (9th Cir. 1983) .........................................................23

## Federal Statutes

33 U.S.C. § 1344(e) .................................................................................................1

## Federal Regulations

49 C.F.R. Part 192 .................................................................................................16

**Federal Register**

77 Fed. Reg. 10,184 (Feb. 21, 2012) .........................................................9

**Docketed Material**

Opinion and Order (Doc. 102), *Mont. Envt'l Info. Ctr v. U.S. Office of Surface Mining*, CV 15-106-M-DWM (D. Mont. Nov. 3, 2017)..................24

**Miscellaneous**

Transcript of Motion Hearing, *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, No. 4:19-cv-00044-GF-BMM (D. Mont. Mar. 6, 2020) .........................................................................................3

U.S. Dep't of Homeland Security, *National Infrastructure Protection Plan (NIPP) 2013:  Partnering for Critical Infrastructure Security and Resilience* (undated), https://www.cisa.gov/sites/default/files/publications/national-infrastructure-protection-plan-2013-508.pdf .................................16

**Exhibit Index**

Exhibit 1     Affidavit of Andrew Black for the Association of Oil Pipe
              Lines (Apr. 29, 2020)

Exhibit 2     Affidavit of Michael L. Murray for the American Gas
              Association (Apr. 29, 2020)

Exhibit 3     Affidavit of Joan Dreskin for the Interstate Natural Gas
              Association of America (Apr. 29, 2020)

Exhibit 4     Affidavit of Dorothy Kellogg for the National Rural Electric
              Cooperative Association (Apr. 29, 2020)

Exhibit 5     Affidavit of Robin Rorick for the American Petroleum Institute
              (Apr. 29, 2020)

## I.    Introduction.

The Court has taken the extraordinary step of vacating Nationwide Permit 12 ("NWP 12") and enjoining the U.S. Army Corps of Engineers ("Corps") from authorizing minor utility line discharges of dredged or fill material pursuant to NWP 12 pending completion of programmatic consultation under the Endangered Species Act ("ESA").  (Doc. 130, ¶¶ 5, 6).  For over 40 years, consistent with Congress' direction, the Corps has issued a utility line general permit.  33 U.S.C. § 1344(e).  Absent this Court's Order vacating NWP 12, the 2017 NWP 12, by its terms, would remain in effect for five years, until March 18, 2022, as authorized by the Corps' regulations and the Clean Water Act ("CWA").

The Coalition's members design their projects to meet the protective terms and conditions of NWP 12 in order to proceed under its streamlined authorization.[1] Utility line activities authorized by NWP 12 include time-sensitive maintenance, repair, and construction projects across the country, which are critical to the safe, reliable, and affordable delivery of energy to U.S. consumers, including rural customers, schools, hospitals, and businesses nationwide.  The Court's Order disrupts this essential regulatory permit with far-reaching consequences for the

---

[1] The NWP 12 Coalition includes the American Gas Association ("AGA"), American Petroleum Institute ("API"), Association of Oil Pipe Lines ("AOPL"), Interstate Natural Gas Association of America ("INGAA"), and National Rural Electric Cooperative Association ("NRECA") (collectively, the "NWP 12 Coalition" or "Coalition").

Corps, the NWP 12 Coalition, and the public at large.  That is a fact even the Plaintiffs recognized, when telling this Court their case was "*not meant to affect other uses of NWP 12 that provide a public benefit and would have only minimal environmental impacts*."  (Doc. 107 at 56-57) (emphasis added).

The Federal Defendants seek a partial stay of the Court's Order pending appeal.  (Doc. 131).  The NWP 12 Coalition strongly supports this motion.  An immediate stay is warranted because the remedy is overbroad, contrary to the public interest, and exceeds Plaintiffs' request that the Court remand NWP 12 to the Corps should it find any of their facial claims to have merit.[2]  (Doc. 36 at 88, Doc. 50 at 3).  The Court acknowledged that "Plaintiffs do not ask the Court to vacate NWP 12," when granting the Coalition permissive intervention in this case.  (Doc. 59 at 4-5).  The Coalition's motion to intervene as of right was denied on the basis that, "even if Plaintiffs prevail on the merits," "[t]he action's disposition … proves unlikely to impair or impede … the Coalition's abilities to rely on NWP 12 … [*because*] *the Coalition could still prospectively rely on the permit until it expires on its own terms in March 2022*."  (*Id.*) (emphasis added).

The Court's Order threatens Coalition members' ability to rely on NWP 12 and thus has sweeping consequences not considered by the Court, despite multiple

---

[2] The Court also erred in ruling in Plaintiffs' favor on the ESA claim, as explained in the NWP 12 Coalition's briefing on summary judgment.  (Docs. 93 and 112).

requests by the NWP 12 Coalition for an opportunity to provide briefing on appropriate remedies should the Court find Plaintiffs' facial claims to have merit. (Doc. 93 at 31 n.7); Transcript of Motion Hearing at 65, *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, No. 4:19-cv-00044-GF-BMM (D. Mont. Mar. 6, 2020).

As a matter of law, the Order does not address whether remand of NWP 12 without vacatur, as requested by Plaintiffs, was appropriate, pursuant to *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012); whether injunctive relief was warranted, under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 30-33 (2008); and a district court's limited authority to issue a nationwide injunction. *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018). In addition, the Order is vastly overbroad because NWP 12 is structured to ensure site-specific consultation for activities that may affect listed species, there are additional protections to species imposed through regional conditions and regional consultations, and the majority of activities authorized by NWP 12 do not implicate species at all. (Doc. 131 at 12, 15).

If the Coalition's members are unable to rely on NWP 12, they may be forced to engage in lengthy and expensive individual CWA permit processes that will significantly impede their ability to complete time-sensitive construction, maintenance, safety, and repair projects nationwide, including activities that are

subject to a set timeframe under federal pipeline safety regulations.  The delay and expense resulting from the unavailability of NWP 12 harm not only the Coalition's members, but the public at large and our nation's economy (including loss of construction jobs and local tax revenue and increased costs to consumers), energy security, and energy diversity.  These harms are even more pronounced and immediate due to construction time-of-year restrictions, designed to protect wildlife resources.  If the construction window is missed, activities will be postponed until the next construction season, threatening (among other things) the Coalition's members' ability to meet their public service obligations to deliver energy to their customers.

In short, the Order causes significant, immediate, and irreparable harm.  In contrast, Plaintiffs will suffer no cognizable harm if a stay is granted pending appeal.  In light of the urgent circumstances and critical interests at issue, the NWP 12 Coalition strongly urges the Court to stay its Order pending appeal.

## II.    A Stay Pending Appeal Is Warranted.

Four factors govern a request for a stay pending appeal:  (1) whether the movant is likely to succeed on the merits; (2) whether the movant will suffer irreparable harm absent a stay; (3) whether a stay will substantially harm the other parties; and (4) whether a stay serves the public interest.  *See Nken v. Holder*, 556

U.S. 418, 434 (2009).  Applying these standards, the Order is an extraordinary

overreach that should be stayed pending appeal.

    **A.**    **The NWP 12 Coalition, its Members, and the Public Will Suffer Irreparable Harm from Vacatur of NWP 12.**

The Court's Order causes severe and immediate consequences to the NWP

12 Coalition and its members, which include not-for-profit rural electric

cooperatives, local energy companies that deliver and distribute natural gas and

electricity, refiners, marine businesses, service and supply firms, owners and

operators of oil pipelines, and interstate natural gas transmission pipeline

companies.  Coalition members have historically relied, currently rely, and have

concrete plans to rely on NWP 12 to support their obligations to provide reliable

energy to U.S. consumers at a reasonable cost.  The real-world implications and

the significant and immediate harms and uncertainty created by the Order are well

demonstrated below and in the accompanying affidavits.

    **1.**    **The Corps Has Halted Review of NWP 12 Coalition Member Pre-Construction Notifications, Delaying Important and Time-Sensitive Utility Line Activities.**

Immediately following this Court's Order, Corps Headquarters instructed

Corps Districts to not verify any pending PCNs for compliance with NWP 12.  The

Corps estimates there are approximately 5,500 PCNs currently before its Districts

awaiting verification.  Moyer Decl. ¶ 7 (Doc. 131-1).  Coalition members have

projects immediately and directly impacted by this hold.  *See, e.g.,* Black Aff. ¶ 13
(Ex. 1); Murray Aff. ¶¶ 8, 10 (Ex. 2).

The majority of INGAA members, for example, plan to submit or have
already submitted preconstruction notifications ("PCNs") seeking Corps
verification to construct interstate natural gas pipelines and complete necessary
repair, maintenance, and modernization work under NWP 12.  Dreskin Aff. ¶ 13
(Ex. 3).  These projects are subject to tight timelines, designed to ensure the safety,
security, and reliability of the natural gas pipeline network and to meet the growing
demands of natural gas customers.  *Id.* ¶ 11.

NRECA cooperatives rely on NWP 12 to provide timely and reliable
installation of transmission and distribution lines to deliver essential electric
supplies to homes, public institutions, and businesses in rural parts of the country.
Kellogg Decl. ¶ 9 (Ex. 4).  Electric cooperatives have legal public service
obligations to provide reliable electric service to their customer members, *id.* ¶ 4,
and the availability of NWP 12 is critically important to NRECA's members, as
well as the rural consumers they serve.  *Id.* ¶ 11.

An NRECA member submitted a PCN approximately 10 months ago for use
of NWP 12 for an overhead double-circuit electrical transmission line.  *Id.* ¶ 18.
At the beginning of April, this member was told that its verification was nearly
complete, but shortly after the Court's Order, the member was informed that its

application was placed on hold.  *Id.*  This work is scheduled to commence in the latter part of 2020.  *Id.*  If the verification is not issued by then, the NRECA member and its member-owners will be harmed financially by project delays and contractor change orders regarding demobilization and remobilization costs.  *Id.*  Additionally, project delays will increase risks for reliability impacts to the distribution members served in the area.  *Id.*

In reliance on the continued availability of NWP 12, which does not expire by its own terms until March 2022, Coalition members have invested significant time and resources in planning capital-intensive linear projects that undergo detailed review by federal, state, and local authorities.  Rorick Aff. ¶ 9 (Ex. 5); Dreskin Aff. ¶ 29; Murray Aff. ¶ 12; Black Aff. ¶ 13.  API members have undertaken significant work in the planning, or pre-planning construction stages, and, if NWP 12 is not available as a result of this Court's Order, their projects are likely to incur significant delays and millions of dollars in added costs to obtain necessary Corps approvals in multiple Corps Districts.  Rorick Aff. ¶ 10.

AGA members rely upon NWP 12 for hundreds of minor projects annually across several states.  Murray Aff. ¶ 12.  These interstate pipeline projects include facilities authorized by the Federal Energy Regulatory Commission's ("FERC") Blanket Certificate Program and smaller intrastate expansion and operations and maintenance projects.  *Id.*  If Coalition members are instead forced to apply for

7

individual CWA permits for those types of activities, the additional time required to obtain individual permits could create unnecessary safety risks by delaying critical maintenance and repair work, threatening the safety and reliability of our nation's natural gas pipeline network, and restricting consumers' access to natural gas, potentially raising costs for consumers.  *Id.*; Dreskin Aff. ¶ 14; Rorick Aff. ¶ 9.

Any delay in CWA authorization puts Coalition members' projects at risk because, without a predictable permitting and construction schedule, Coalition members may not be able to secure financing, construction contracts, and supply deals for their projects.  Black Aff. ¶ 12; Dreskin Aff. ¶ 19; Rorick Aff. ¶¶ 15, 16. If agreed upon contract terms cannot be met as a result of the Order, there is a risk that project developers will lose necessary funding and abandon the projects. Rorick Aff. ¶ 16.  Other projects may be cancelled if the risk profile for an applicant's pre-investment becomes too great, and the project applicant cannot commit to a project completion date due to permitting uncertainties.  Black Aff. ¶ 12 (noting that project delays and cancellations could affect pipeline customers' supply and costs of obtaining crude oil and refined petroleum products); Dreskin Aff. ¶ 20.

In addition, delays in receiving necessary CWA authorizations impact employment and local tax revenue.  An AOPL member was one month away from

receiving NWP 12 verification to commence a project designed to extend hundreds of miles across multiple states, which was expected to generate approximately 2,500 construction jobs and $25 million in local property tax revenue to local communities.  Black Aff. ¶ 13.

These harms are illustrative of the immediate impacts of the Order.

> **2.    If NWP 12 Is Not Available As a Result of the Order, Routine Inspections, Upgrades, Repair, and Maintenance Activities Will Be Impeded.**

Coalition members also routinely rely on NWP 12 for inspections, upgrades, repair, and maintenance, as required by federal and/or state regulatory requirements to ensure the continued safety and reliability of pipelines.  *See, e.g.,* Black Aff. ¶ 18; Murray Aff. ¶ 10; Dreskin Aff. ¶ 8; Rorick Aff. ¶ 17.  NWP 12 is particularly important in this regard because it is the primary permitting mechanism for time-sensitive pipeline repairs, such as gas leaks, pressure malfunctions, and natural disaster damage.[3]

For example, an AGA member is working diligently to replace vintage cast iron and unprotected steel pipe to improve safety and reliability and to reduce methane emissions to fulfill its commitments to the jurisdictional state utility

---

[3] Indeed, the Corps emphasized that companies should rely on NWPs 12 and 3 to authorize "emergency repair activities to fix natural gas pipeline leaks, pressure malfunctions, natural disaster damage, terrorist threats, or other events that pose a danger to public safety."  77 Fed. Reg. 10,184, 10,228 (Feb. 21, 2012).

commissions and the U.S. Environmental Protection Agency ("EPA") voluntary Methane Challenge program.  Murray Aff. ¶ 11.  An AGA member planned to submit NWP 12 PCNs within the next few months in Corps Districts located in Texas, Mississippi, and other states for:  (1) several projects to make existing lines "piggable" to allow pipeline safety integrity inspections and repairs using a robotic in-line inspection tool; and (2) projects to improve natural gas pipeline safety and reliability for customers by removing and replacing existing pipe.   Murray Aff. ¶ 12.  These projects will be delayed if they instead require individual permits or other CWA authorizations as a result of this Court's Order, jeopardizing safety, reliability, and planned greenhouse gas reductions.  Murray Aff. ¶¶ 11, 12. Increased costs due to construction delays will likely increase energy costs to residential and commercial customers, at a time when many of those customers have lost revenue or jobs and are struggling financially due to the COVID-19 pandemic stay-at-home orders.  *Id.* ¶ 11.

INGAA members must maintain, repair, and/or undertake integrity-related activities to comply with pipeline integrity requirements mandated by the Pipeline & Hazardous Materials Safety Administration ("PHMSA") pursuant to the Pipeline Safety Act.  Dreskin Aff. ¶¶ 5, 8.  NWP 12 is particularly important because it allows Coalition members to conduct these critical pipeline safety and reliability activities in a timely manner consistent with PHMSA's regulatory timelines, which

10

mandate the timing of inspections and the time to remediate any deficiencies. Dreskin Aff. ¶ 8.  For example, of immediate concern to INGAA members are pipeline integrity projects that were planned for 2020.  Dreskin Aff. ¶ 21.  These pipeline integrity projects are necessary to reduce the likelihood of pipeline leaks and ruptures by inspecting, repairing, and/or replacing pipelines with the highest risk profiles.  *Id.*  If repairs cannot be accomplished within required timeframes because of the Court's Order, some of these safety improvements will not be accomplished pursuant to the regulatory timeframes, or PHMSA will need to extensively grant waivers, imposing an additional administrative burden on its staff.  Dreskin Aff. ¶ 21.

AOPL and API members rely on NWP 12 to ensure the integrity and safety of their pipelines through maintenance and repair projects, and authorization for that work is now uncertain due to the Court's Order.  Black Aff. ¶ 18; Rorick Aff. ¶ 17.  For example, an AOPL member expected to receive NWP 12 authorization shortly to replace an approximately 1,800-foot section of pipeline to address pipeline wall loss that was discovered in an inspection.  Black Aff. ¶ 20.  This work was expected to begin this summer, and any delay in NWP 12 authorization would impede safety improvements and increase project costs, as well as impact pipeline operations.  *Id.*  If regulatory deadlines are not met, then the pipeline must be de-rated, thus likely impacting the ability to serve customers.  *Id.*  If the project

11

is delayed further, into 2021, the pipeline may need to be shut down, with potentially severe environmental and economic consequences.  *Id.*

NRECA members rely upon NWP 12 for a range of routine maintenance activities that are minimal in nature.  Kellogg Aff. ¶ 14.  For example, an NRECA member utilizes NWP 12 to permit vegetation management in wetlands or by surface waterways, such as necessary vegetation removal from the wetland or waterway.  *Id.*; *see also* Murray Aff. ¶ 13 (describing AGA members' reliance on NWP 12 for access to pipeline and utility rights of way for maintaining vegetation as required by PHMSA regulations).  Vegetation along electric utility rights of way must be maintained to prevent trees or other vegetation from bringing down power lines and, during dry conditions, preventing power lines from contributing to wildfires. Kellogg Aff. ¶14.  The NRECA member serves an area of the country with abundant rainfall, and, as a result, abundant vegetation must be cleared continually.  *Id.*  The integrity of the power lines in its service area could be severely compromised if vegetation management must be stopped due to the unavailability of NWP 12 while the cooperative obtains an individual permit for this necessary and routine activity.  *Id.*

Other uses of NWP 12 by NRECA members include the placement of temporary protective matting for vehicles and other equipment to prevent rutting during work on utility poles and lines.  *Id.* ¶ 15.  This work involves very minor

and temporary impacts to jurisdictional waters, but a delay in necessary pole and line work, if an individual permit is required for this type of activity as a result of the Court's Order, could compromise the reliability of the line and threaten the availability of electric power to a service area, with no commensurate benefit to the environment.  *Id.* ¶ 15.

Utility line activities are planned and scheduled well in advance in order to commence construction during the limited construction windows imposed by FERC, the U.S. Fish and Wildlife Service, state agencies, and others, which are designed to protect species.  Dreskin Aff. ¶ 26; Rorick Aff. ¶ 18.  As a result, there is already a narrow window for pipeline construction to ensure minimal effects to the environment.  Dreskin Aff. ¶ 27.  If activities cannot occur during this window, they will have to be postponed until the next construction season, resulting in significant harms, delay, and costs.  Dreskin Aff. ¶ 27; Rorick Aff. ¶¶ 18, 19. Harms from delay of a project are cognizable harms that counsel against an injunction.  *See James River Flood Control Ass'n v. Watt*, 680 F.2d 543, 544 (8th Cir. 1982) (per curiam) (finding irreparable injury unless court granted a stay because of lost "opportunity to begin the project [construction] this season").

In addition, Coalition members are facing field restrictions and associated construction delays as a result of the COVID-19 pandemic.  Murray Aff. ¶ 8; Rorick Aff. ¶ 14.  The ability to reliably provide energy is even more important

now during this sensitive and challenging time brought on by COVID-19, and the

Court's Order could threaten Coalition members' ability to continue numerous

energy and infrastructure projects, including time-sensitive maintenance and repair

activities, resulting in serious consequences to the public at large.  Murray Aff. ¶ 8;

Rorick Aff. ¶ 14.

> **3.     Transitioning to Alternative CWA Authorizations Creates Significant Regulatory Uncertainty, Increases Costs, and Creates Delays that Threaten the Delivery of Secure and Reliable Energy to the Public.**

If NWP 12 is not available for the Coalition members' utility line activities,

alternative CWA authorizations will be required.  Subjecting each of these routine

activities to the individual permit process creates additional regulatory delays and

costs, which impedes time-sensitive projects.[4]  Dreskin Aff. ¶¶ 16-17; Rorick Aff.

¶ 13; Murray Aff. ¶ 8.

NRECA members, for example, could face years of additional delays and

substantial additional costs.  Kellogg Aff. ¶ 13.  The process of applying for and

obtaining an individual permit is time consuming, expensive, and subject to

---

[4] Without taking into account any additional costs and delay that will result from the Court's Order and increased regulatory burdens on the Corps, and relying on older data not updated for purposes of inflation, one study estimated that "[t]he average applicant for an individual permit spends 788 days and $271,596 in completing the process, and the average applicant for a nationwide permit spends 313 days and $28,915 – not counting costs of mitigation or design changes." *Rapanos v. United States*, 547 U.S. 715, 721 (2006).

regulatory uncertainty. *Id.* The increased costs and burdens that result from the individual permitting process can affect not only the cooperative members of NRECA, but the amount of costs that are passed on to consumers and indirectly borne by the rural public. *Id.* In addition, CWA-related burdens, costs, and delays can impede NRECA members' ability to fulfill their public service obligations to ensure a reliable supply of electricity to rural consumers. *Id.*

The Corps estimates that it would take its 1,250 regulatory project managers 1.5 years to process pending PCNs and those expected during the remainder of 2020. Moyer Decl. ¶¶ 14, 15. The Corps has calculated that there could be 2,800 individual permit applications per year, until the Permit's expiration in March 2022, to cover the 14,000 actions that could have been authorized by NWP 12. Moyer Decl. ¶ 15. Indeed, even absent the thousands of additional individual permit applications that may now be before the Corps as a result of the Court's Order, Coalition members estimate that the time for review and processing of an individual permit ranges from 9 to 24 months. Rorick Aff. ¶ 13; Murray Aff. ¶ 9; *see also* Moyer Decl. ¶ 13 (estimating that the average time to receive an individual permit from the Corps was 264 days versus an NWP verification in 45 days). Coalition members have significant concerns regarding the availability of staff at the Corps and coordinating agencies to marshal these additional projects through the individual permit process, concerns which are echoed directly by the

Corps.  Rorick Aff. ¶ 13; Murray Aff. ¶ 9; Moyer Decl. ¶ 14; Dreskin Aff. ¶¶ 18-19.

### 4.   The Order Impedes the Public's Interest in Dependable, Safe, and Reliable Energy.

If NWP 12 is no longer available, the loss of streamlined CWA authorization will impair the Coalition's members' ability to provide safe and reliable energy, which is essential to our nation's security, public health and safety, economic viability, and way of life.[5]

AGA members rely on NWP 12 for projects necessary to meet PHMSA's TIMP requirements under 49 C.F.R. Part 192.  Murray Aff. ¶ 15.  The TIMP regulations require that if such pipeline integrity projects cannot be completed by specific deadlines, then the operator is required by the PHMSA TIMP regulations to reduce line pressures or remove pipelines from service altogether until the integrity testing requirements can be met.  *Id.*  If NWP 12 is unavailable for these projects as a result of the Court's Order, thousands of pipeline integrity testing projects will be subject to potential delays, triggering PHMSA requirements to reduce pressure or shut down service, and thereby reducing energy service to

---

[5] *See* U.S. Dep't of Homeland Sec., *National Infrastructure Protection Plan (NIPP) 2013:  Partnering for Critical Infrastructure Security and Resilience* (undated), https://www.cisa.gov/sites/default/files/publications/national-infrastructure-protection-plan-2013-508.pdf.

electric generating plants and residential, commercial and industrial customers across the country who rely on natural gas.  *Id.*

AGA members also rely on NWP 12 for System Infrastructure Projects necessary to meet customer demands in growing markets.  Murray Aff. ¶ 16.  As areas expand with new residential, commercial, and industrial developments, including hospitals and COVID-19 essential businesses, the demand for natural gas has increased.  *Id.*  Existing pipelines need to be replaced with larger diameter pipelines or new pipelines need to be installed to increase capacity to serve customers who rely on natural gas.  *Id.*  Several AGA member companies also have U.S. military bases within their service territories that require natural gas system infrastructure upgrades to serve their mission readiness.  *Id.*  If NWP 12 is unavailable, these System Infrastructure Projects will be subject to potential delays—where individual permits are required—and energy service to these civilian and military customers across the country may be undermined.  *Id.*

Courts have consistently recognized the public's interest in dependable access to electricity and power.  *See, e.g., Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016); *Sierra Club v. Ga. Power Co.*, 180 F.3d 1309, 1311 (11th Cir. 1999) (per curiam) ("[A] steady supply of electricity during the summer months, especially in the form of air conditioning to the elderly, hospitals and day care centers, is critical."); *Cal. Cmtys. Against Toxics*, 688 F.3d at 993-94 (9th Cir.

2012) (per curiam) (declining to vacate approval of an electric power plant in part due to public interest in steady power supply); *Caballo Coal Co. v. Ind. Mich. Power Co.*, 305 F.3d 796, 801-02 (8th Cir. 2002); *Cent. Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001) (declining to vacate because "the public interest in assuring power is decisive."). The Court's Order directly and immediately impedes that access, and, thus, is contrary to the public interest.

**B.     The Federal Defendants Are Likely to Prevail on Appeal.**

**1.     The Court Erred by Providing Relief Plaintiffs Did Not Request.**

Plaintiffs did not seek vacatur of NWP 12. From the outset, Plaintiffs repeatedly confirmed that their requested relief, should the Court find any of their facial claims to have merit, was remand of NWP 12 to the Corps for compliance. During summary judgment briefing, Plaintiffs stated they did not seek to "have NWP 12 broadly enjoined [because] … this case focuses on the Corps' use of NWP 12 to approve massive oil pipelines like Keystone XL, and is *not meant to affect other uses of NWP 12 that provide a public benefit and would have only minimal environmental impacts*." (Doc. 107 at 56-57) (emphasis added). Plaintiffs thus have acknowledged there are a whole host of projects with public benefit, such as those undertaken by the Coalition's members, which should remain authorized and were never the targets of their challenge.

In opposing the NWP 12 Coalition's motion to intervene, Plaintiffs took the position that the Coalition was not harmed because they sought "declaratory relief and a remand as to NWP 12 itself," (Doc. 52 at 2), and Plaintiffs did not seek to vacate NWP 12, but rather sought vacatur and injunctive relief only as to Keystone XL approvals (*id.* at 3); *see also* (Doc. 50 at 3).  This position is confirmed by Plaintiffs' prayer for relief, which asked the Court to "[d]eclare the Corps' issuance of NWP 12 in violation of" the Administrative Procedure Act ("APA"), CWA, National Environmental Policy Act ("NEPA"), or ESA, and to "[r]emand NWP 12 to the Corps for compliance." (Doc. 36 at 87-88).

In reliance on Plaintiffs' requested remedy, the Court granted the NWP 12 Coalition's motion to intervene permissively, and held that intervention as of right was not appropriate because:

> [t]he action's disposition as currently pled by Plaintiffs proves unlikely to impair or impede … the Coalition's abilities to rely on NWP 12.  *Plaintiffs do not ask the Court to vacate NWP 12.  Plaintiffs seek instead declaratory relief as to NWP 12's legality.*  Montana and the *Coalition could still prospectively rely on the permit until it expires on its terms in March 2022, even if Plaintiffs prevail on the merits*.

(Doc. 59 at 4-5) (emphasis added; internal citations omitted).  Thus, the NWP 12 Coalition's participation in this case was premised on NWP 12 remaining in place, even if Plaintiffs prevailed on the merits, through its expiration in 2022.

19

But that is no longer the case.  Notwithstanding its acknowledgement that Plaintiffs sought a declaratory judgment and remand (*id.*), paragraphs 5 and 6 of the Court's Order vacate NWP 12 and enjoin the Corps from authorizing discharges of dredged or fill material under NWP 12.  (Doc. 130 at 26).  This goes too far.  *See, e.g., Kentuckians for Commonwealth Inc. v. Rivenburgh,* 317 F.3d 425, 434, & 449 (Luttig, J., concurring in part) (4th Cir. 2003) (vacating district court injunction, enjoining the Corps' Huntington District from approving any new authorizations under NWP 21, as "overbroad" because it granted relief no party requested and thus "none of the injunction was legitimate.").

### 2.    There Is No Basis to Vacate NWP 12.

The Court abused its discretion in vacating NWP 12.  If a court finds an agency action unlawful, it should remand the matter to the agency for further action.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 88 (1943) ("[J]udicial judgment cannot be made to do service for an administrative judgment.").  "[T]he function of the reviewing court ends when an error of law is laid bare.  At that point the matter once more goes to the [agency] for reconsideration." *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952).  Indeed, this is the approach the D.C. Circuit followed when remanding the

20

Mercury Air Toxics Standards rule to EPA for necessary findings under the Clean

Air Act.  *See Michigan v. EPA*, 135 S. Ct. 2699, 2712 (2015); *White Stallion*

*Energy Ctr., LLC v. EPA*, No. 12-1100, 2015 WL 11051103, at *1 (D.C. Cir. Dec.

15, 2015) (per curiam) (remanding rule without vacatur), *cert. denied*, *Michigan v.*

*EPA*, 136 S. Ct. 2463 (2016).

Although the NWP 12 Coalition does not agree with the Court's

determination that programmatic consultation is required, vacatur was not

warranted.  "Whether agency action should be vacated depends on how serious the

agency's errors are 'and the disruptive consequences….'"  *Cal. Cmtys. Against*

*Toxics*, 688 F.3d at 992.  "[C]ourts may decline to vacate agency decisions when

vacatur would cause serious and irremediable harms that significantly outweigh the

magnitude of the agency's error."  *League of Wilderness Defs./Blue Mountains*

*Biodiversity Project v. U.S. Forest Serv.*, No. 3:10-CV-01397-SI, 2012 WL

13042847, at *2 (D. Or. Dec. 10, 2012).

Vacatur of NWP 12 is extremely disruptive and will cause serious and

irremediable harms.  *Supra at* II.A.  The Order impacts the use of NWP 12 for any

utility line project across the country, including those that have nothing to do with

the ESA. For example, vacatur of NWP 12 creates uncertainty for authorized

projects relying on NWP 12 for crossings over or under Section 10 Rivers and

Harbors Act navigable waters.  These types of projects, which include electric

transmission lines that have been in place for many years, require ongoing
authorization to maintain the structures in navigable waters.  There are no
discharges associated with this ongoing activity; however, without NWP 12, the
Corps may consider maintaining these structures to be unauthorized and require
individual permits.  Moyer Decl. ¶ 18.

Even assuming, *arguendo*, that the Corps had a duty to engage in
programmatic consultation, the error identified by the Court is not serious enough
to require vacatur of NWP 12 for the reasons identified in the Federal Defendants'
Motion.  (Doc. 131 at 11-12).  Moreover, the vast majority of utility line activities
authorized by NWP 12 do not involve impacts to species.  Moyer Decl. ¶ 6 (of
38,000 verifications made by the Corps under NWP 12 since March 2017, 1,436
underwent activity-specific informal consultations, and just 164 had activity-
specific formal consultations).  NWP 12's structure provides for site-specific ESA
consultation for any utility line activities that may affect listed species or
designated critical habitat.  General Condition 18 ensures that the Corps is
informed of any project that "might affect" a species in the vicinity of planned
work.  Corps Districts adopt regional conditions and undergo regional
consultations in their respective jurisdictions, which provide additional protections
to species.

Under the circumstances, vacatur of NWP 12 is extremely disruptive, contrary to the public interest, and an abuse of discretion.

### 3.     The Injunction Is Overbroad, Contrary to the Public Interest, and Unwarranted.

The Court undertook no analysis to support its nationwide injunction, or any other form of injunctive relief.  The Supreme Court has repeatedly admonished that an injunction is a "drastic and extraordinary" remedy that is only to be granted in exceptional circumstances, if the traditional legal standard is strictly satisfied. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *see also Winter*, 555 U.S. at 22.  The Supreme Court has further confirmed that the finding of a statutory violation by a government agency does not necessarily justify the entry of an injunction.  *Monsanto*, 561 U.S. at 157-58 (finding district court erred to the extent it considered an injunction to apply automatically in the case of violations of NEPA).  There has been no such showing here.

An injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also United States v. Mendoza*, 464 U.S. 154, 160 (1984).  In other words, such relief must be "narrowly tailored to remedy the specific harms shown by plaintiffs, rather than to enjoin all possible breaches of the law."  *Zepeda v. INS*, 753 F.2d 719, 728 n.1 (9th Cir. 1983) (internal quotation marks and citation omitted); *see also Keener v. Convergys Corp.*, 342 F.3d 1264,

1269 (11th Cir. 2003) ("An injunction 'should be tailored to restrain no more than what is reasonably required to accomplish its ends.'" (citation omitted)).  "A district court abuses its discretion by issuing an 'overbroad' injunction." *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) (citation omitted); *Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993) (staying nationwide injunction insofar as it "grants relief to persons other than" named plaintiff).

The Court did not evaluate (nor could it, as the relief was not requested or briefed) any of the necessary factors to award broad injunctive relief, and in particular the balance of the equities and the public interest, as it was required to do pursuant to *Monsanto*.  *See* Opinion and Order (Doc. 102), *Mont. Envt'l Info. Ctr. v. U.S. Office of Surface Mining*, CV 15-106-M-DWM, (D. Mont. Nov. 3, 2017) (order modifying scope of the injunctive relief where court first issued injunctive relief without considering evidence on the equitable factors as set forth in *Monsanto*).  Plaintiffs did not seek an injunction as to NWP 12 in its entirety. To the contrary, they sought only to "enjoin activities in furtherance of Keystone XL's construction."  (Doc. 107 at 57).  There are no verifications for construction of Keystone XL (Doc. 36 at 87), and the claims pertaining to Keystone XL's verifications were stayed and not before the Court.  (Doc. 56 at 1).  If Keystone XL's verifications are approved in the future, Plaintiffs can renew their as-applied claims to Keystone XL.  Because Keystone XL does not have authorization to rely

24

on NWP 12, Plaintiffs are not suffering any harm, much less any harm that bears upon the broader uses of NWP 12 for which Plaintiffs sought no injunction.  *Id.*

Finally, Plaintiffs did not allege any injury that would have entitled them to nationwide relief.  Nationwide injunctions are "exceptional cases."[6]  *City & Cty. of San Francisco*, 897 F.3d at 1244.  The Ninth Circuit has frequently limited injunctions to the specific harm allegedly caused by a facially invalid agency action.  *See, e.g.*, *id.* at 1244-45 (vacating nationwide injunction barring enforcement of an executive order and limiting injunctive relief to California because the record contained no evidence of harm outside the state); *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1028 (9th Cir. 2019) (same); *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (vacating portion of nationwide injunction barring enforcement of interim final rules outside the plaintiff states); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 665 (9th Cir. 2011) (vacating the nationwide portion of an injunction barring the enforcement of a facially invalid regulation).

---

[6] A nationwide injunction runs counter to the principle that even a federal court of appeals' decision is only binding within its circuit.  *See United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994); *Right to Life of Dutchess County, Inc. v. FEC*, 6 F. Supp. 2d 248, 252 (S.D.N.Y. 1998); and *Mendoza*, 464 U.S. at 160.

A nationwide injunction is manifestly excessive given the significant harms to the NWP Coalition and its members, the public, and the Federal Defendants, and in light of the complete lack of irreparable harm to Plaintiffs.

## III.   Conclusion.

The NWP 12 Coalition respectfully requests the Court grant the Federal Defendants' Motion for Partial Stay Pending Appeal.

Date:  April 29, 2020                    Respectfully submitted,

                                         */s/ Karma B. Brown*
                                         Deidre G. Duncan (*Pro hac vice*)
                                         Karma B. Brown (*Pro hac vice*)
                                         HUNTON ANDREWS KURTH LLP
                                         2200 Pennsylvania Avenue, NW
                                         Washington, DC  20037
                                         (202) 955-1500
                                         dduncan@HuntonAK.com
                                         kbbrown@HuntonAK.com

                                         */s/ Brianne C. McClafferty*
                                         William W. Mercer
                                         Brianne McClafferty
                                         HOLLAND & HART LLP
                                         401 North 31st Street, Suite 1500
                                         Billings, MT  59101
                                         (406) 252-2166
                                         wwmercer@hollandhart.com
                                         bcmcclafferty@hollandhart.com

                                         *Counsel for Defendant-Intervenors*
                                         *American Gas Association, American*
                                         *Petroleum Institute, Association of Oil*
                                         *Pipe Lines, Interstate Natural Gas*
                                         *Association of America, and National*
                                         *Rural Electric Cooperative Association*

**Certificate of Compliance**

I certify that this NWP 12 Coalition Memorandum's in Support of Federal Defendants' Motion for Partial Stay Pending Appeal complies with the requirements of Local Rule 7.1(d)(2)(B) and contains 5,981 words, excluding the parts exempted by Local Rule 7.1(d)(2)(E), according to the word count calculated by Microsoft Word 2016.

*/s/ Karma B. Brown*

**Certificate of Service**

I hereby certify that on April 29, 2020, I filed the above pleading with the Court's electronic case management system, which caused notice to be sent to counsel for all parties.

*/s/ Karma B. Brown*