


# INGAA Affidavit Joan Dreskin.pdf

| | |
|---|---|
| DocVerify ID: | 316991D1-7C80-4519-8F7C-1CD6278BAEBA |
| Created: | April 29, 2020 09:54:20 -8:00 |
| Pages: | 13 |
| Remote Notary: | Yes / State: VA |

This document is a DocVerify VeriVaulted protected version of the document named above. It was created by a notary or on the behalf of a notary, and it is also a DocVerify E-Sign document, which means this document was created for the purposes of Electronic Signatures and/or Electronic Notary. Tampered or altered documents can be easily verified and validated with the DocVerify veriCheck system. This remote online notarization involved the use of communication technology.

Go to www.docverify.com at any time to verify or validate the authenticity and integrity of this or any other DocVerify VeriVaulted document.

**E-Signature Summary**

**E-Signature 1: Joan Dreskin Jackson (JJ)**
April 29, 2020 10:15:05 -8:00 [0E9C0D7331DF] [96.241.232.6]
jdreskin@ingaa.org (Principal) (ID Verified)

**E-Signature Notary: Rhonda Jo Piper (rjp)**
April 29, 2020 10:15:05 -8:00 [10F5AB4CC15F] [74.217.93.166]
rpiper@hunton.com
I, Rhonda Jo Piper, did witness the participants named above electronically sign this document.



DocVerify documents cannot be altered or tampered with in any way once they are protected by the DocVerify VeriVault System. Best viewed with Adobe Reader or Adobe Acrobat. All visible electronic signatures contained in this document are symbolic representations of the persons signature, and not intended to be an accurate depiction of the persons actual signature as defined by various Acts and/or Laws.



# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ARMY CORPS OF ENGINEERS, et al., <br><br> Defendants, <br>and <br><br> THE STATE OF MONTANA, TRANSCANADA KEYSTONE PIPELINE, LP, TC ENERGY CORPORATION, AMERICAN GAS ASSOCIATION, AMERICAN PETROLEUM INSTITUTE, ASSOCIATION OF OIL PIPE LINES, INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA, and NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION, <br><br> Defendant-Intervenors. | Case No. 4:19-cv-00044-GF-BMM |

## AFFIDAVIT OF JOAN DRESKIN, FOR THE
## INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA

1. My name is Joan Dreskin. I am Senior Vice President and General Counsel of the Interstate Natural Gas Association of America ("INGAA"). My business address is 20 F Street, NW, Suite 450, Washington, DC 20001.



2. I am offering this affidavit in support of the NWP 12 Coalition's Memorandum in Support of Federal Defendants' Motion for Partial Stay Pending Appeal in the above captioned case. (Doc. 131).

3. INGAA is a non-profit trade association representing interstate natural gas transmission pipelines ("interstate pipelines") operating in the United States. INGAA is comprised of 26 members, representing the vast majority of the interstate pipeline companies in the U.S. INGAA members operate approximately 200,000 miles of pipelines throughout the U.S. Ensuring the safety, security, and reliability of this natural gas pipeline network is crucial to meeting the energy needs of the U.S. and contributes directly to the U.S. economy by powering domestic industry and providing jobs.

4. INGAA advocates regulatory and legislative positions of importance to the interstate pipeline industry in the U.S. As part of its regulatory advocacy, INGAA speaks for its members on a broad array of environmental issues. Within the environmental sphere, INGAA represents its members on matters affecting interstate pipeline siting and permitting under the Clean Water Act ("CWA"), the Clean Air Act, the Natural Gas Act, and other federal and state programs. Maintaining members' reasonable access to CWA nationwide permits ("NWPs") falls within this area of INGAA's responsibilities.

2

5. As documented by statistics compiled by the Federal Energy Regulatory Commission ("FERC"), which is responsible for regulating INGAA members' rates, services and facilities, INGAA members construct hundreds of miles of new interstate pipelines each year. In addition, maintenance, repair, and/or integrity-related activities require excavating and inspecting thousands of locations along the 200,000 mile network of interstate pipelines annually, as required by regulations under the Pipeline Safety Act.

6. Interstate natural gas pipeline projects must comply with FERC certification requirements, which are designed to ensure that pipeline crossings cause only temporary construction impacts, do not result in permanent fill of jurisdictional waters, are restored to pre-construction contours and elevations immediately after construction, and are mitigated to the greatest extent possible.

7. Many of INGAA members' construction, maintenance, and safety activities involve "utility line crossings," as defined under NWP 12. INGAA members rely on, and make regular use of NWPs, including NWP 12 for the timely authorization of activities that have only minimal and temporary environmental effects, but that are essential to the reliable, safe and affordable supply of energy to U.S. consumers.

8. INGAA members use NWP 12 for both large and small pipeline projects located across the country that will have minimal impacts on the

3

environment. For example, INGAA members use NWP 12 for large pipeline expansions, where applicable, and also for smaller projects, such as pipeline replacement projects driven by highway replacements, ingress and egress to project workspace, and valve replacements. NWP 12 is also used extensively for maintenance, inspection, and repair activities to comply with pipeline integrity requirements mandated by the Pipeline & Hazardous Materials Safety Administration ("PHMSA") pursuant to the Pipeline Safety Act. INGAA members often rely on NWP 12 authorizations to inspect, maintain, and repair existing pipelines to ensure the continued safety and reliability of the pipelines. NWP 12 is particularly important to INGAA members because it allows them to conduct critical pipeline safety and reliability activities in jurisdictional waters in a timely manner to comply with PHMSA timelines, which mandate the timing of inspections and the time to remediate any deficiencies found during such inspections.

9.   INGAA members also rely on NWP 12 for modernization projects, such as replacing pipeline facilities with newer, more efficient facilities, and installing alternative power sources to reduce greenhouse gas emissions from compressor stations. In addition to pipelines relying on NWP 12, upstream and downstream utilities also rely on NWP 12.

10. Collectively, INGAA members use NWP 12 thousands of times annually for their construction, maintenance, and repair activities.

11. INGAA's members schedule and design their projects and maintenance and repair activities to meet the terms and conditions of the NWPs, including NWP 12.  NWPs provide an efficient permitting mechanism that helps streamline the review and approval process for pipeline projects without precluding or compromising the consideration of any necessary project-specific conditions.  Construction and maintenance of natural gas pipelines typically occur on tight schedules designed to ensure the safety, security, and reliability of the natural gas pipeline network and to meet the growing demands of natural gas customers.  Obtaining coverage under a NWP takes considerably less time than an individual CWA section 404 permit, while still ensuring appropriate consideration of all applicable avoidance, minimization and mitigation measures through adherence to the applicable conditions listed therein.

12. The conditions associated with the NWPs are designed to ensure that authorized crossings have only minimal environmental effects.  NWPs are subject to 32 general conditions that protect a range of different environmental resources, including spawning areas, migratory bird breeding areas, shellfish beds, water supply intakes, wild and scenic rivers, endangered species, migratory birds, bald and golden eagles, historic properties, and designated critical resource waters.  In

DocVerify ID: 316991D1-7C80-4519-8F7C-1CD6278BAEBA
www.docverify.com
Page 5 of 13   51CD6278BAEBA

each case, these conditions prohibit activities that would have more than minimal impacts on these resources. Regional conditions further ensure that authorized crossings have only minimal environmental effects on state- or region-specific resources of concern, including special status wetlands, special status streams and rivers, and streams known to harbor protected species.

13. In reliance on the availability of NWP 12, the majority of INGAA members have plans or have already submitted Pre-Construction Notifications seeking Corps verification to construct interstate natural gas pipelines and complete necessary repair, maintenance and modernization work using NWP 12.

14. As a result of this Court's decision issued April 15, 2020 (Doc. 130), INGAA members may no longer be able to rely on NWP 12 authorizations to undertake critical and time-sensitive construction and maintenance activities necessary to ensure the safety, integrity, security, and reliability of the natural gas pipeline network. If INGAA members are instead forced to apply for individual CWA permits for those activities, the additional time required to obtain individual permits could create unnecessary safety risks by delaying critical maintenance and repair work, threatening the safety and reliability of our nation's natural gas pipeline network, and restrict consumers' access to natural gas, potentially raising costs for consumers. Moreover, the delay and expense associated with requiring individual CWA permits for these activities will significantly harm INGAA's

members and impede their ability to continue serving as an indispensable link between natural gas producers and consumers, without any commensurate benefit to aquatic resources.

15.     If INGAA members cannot rely on NWP 12 as a result of this Court's order, they would face regulatory uncertainty, costs, and delays.  Without NWP 12, a pipeline company would need to assess whether the project meets the conditions for another NWP.  However, if another NWP is not available, an individual permit may be required, which is more costly and time consuming to obtain.  Obtaining an individual permit would extend the project timeline.  The impact to the project timeline would vary depending on the complexity of the project, the Corps regional office with jurisdiction, and the type of environmental review required.  The individual CWA permit process takes significantly longer to complete than the NWP process in part because it requires multiple state and federal agency coordination, as well as public involvement on each project.  In addition, project advocates would also need to obtain activity-specific CWA section 401 water quality certifications from each state where the project is located.

16.     One member of INGAA estimates that if an individual permit is required, instead of NWP 12, the project permitting schedule would be extended by approximately three to ten times, depending on the complexity of the project.

7

Other INGAA members estimate that it may take a year or longer to obtain an individual permit.

17.     If all projects that would otherwise utilize NWP 12 are required to obtain an individual permit, Corps staff could be overwhelmed with requests, extending even further the time required to obtain an individual permit.  Since NWP 12 is used to authorize all types of linear infrastructure utilities (e.g., pipelines transporting natural gas and other petroleum products, water and sewer lines, electric transmission and distribution lines, communications lines, etc.), the Corps could be asked to process tens of thousands of additional projects through individual permits annually.  This is precisely the type of inefficiency that Congress wanted to avoid when it amended the CWA to authorize the Corps to issue NWPs for routine projects with no more than minimal adverse environmental impacts.  33 U.S.C. § 1344(e).

18.     INGAA members have significant concerns regarding the availability of staff at the Corps and coordinating agencies to review and process these additional projects through the individual permit process.  The Corps' workload constraints are exacerbated by the current circumstances, where companies and agencies are dealing with working conditions caused by COVID-19.

19.     INGAA members have expressed concern that if the Corps' resources are overwhelmed with requests for individual permits, the uncertainty regarding

when they might receive an individual permit could put their projects at risk because without a predictable permitting and construction schedule, they may not be able to secure financing, construction contracts and supply deals for their projects.

20. If NWP 12 is unavailable, many of the expansion, pipeline replacement, pipeline integrity, and modernization plans that INGAA members anticipate undertaking either will be delayed or will have to be conducted in a less coordinated manner, possibly leading to longer or more frequent pipeline outages when such construction is undertaken. Additionally, some projects may be cancelled if the risk profile for an applicant's pre-investment becomes too great and the project applicant cannot commit to a project completion date due to permitting uncertainties.

21. Of particular concern to INGAA members are pipeline integrity projects that were planned for 2020. These pipeline integrity projects are necessary to reduce the likelihood of pipeline leaks and ruptures by inspecting, repairing and/or replacing pipelines with the highest risk profiles. In many cases, these actions follow inspection schedules mandated by the PHMSA. If INGAA members cannot rely on NWP 12 as a result of the Court's Order, some of these safety improvements will not be accomplished pursuant to the regulatory

9

timeframes, or PHMSA will need to extensively grant waivers, imposing an additional administrative burden on its staff.

22.     Similarly, the inability of INGAA members to rely on NWP 12 could interfere with an interstate pipeline's ability to transport gas efficiently to end users.  For example, without NWP 12, there may be delays with installing electric utility lines and other utilities servicing compressor stations and meter stations (upstream of the pipeline) and delays with connecting local natural gas distribution companies to interstate natural gas pipelines (taking gas off of the pipeline).

23.     The financial impacts to INGAA members if they are unable to rely on NWP 12 as a result of this Court's order will be significant.  One INGAA member that uses NWP 12 approximately 1,500 times per year estimates that it will cost several hundred thousand dollars to merely analyze and reassess the permitting options available for its projects if it cannot rely on NWP 12. Furthermore, this member company anticipates that some of its access agreements and other permits may expire, causing additional delays and expenses.  Overall, this member company foresees disruptions to its seasonally dependent work schedules and potential impacts to consumers, including shortages or increased costs, if it cannot rely on NWP 12 as a result of the Order.

24.     Another INGAA member presumes that the cost to obtain an individual permit would at least double the permitting expenses that would have

10

been incurred under NWP 12.  Another member has reported that the cost of one of its projects will increase from $100 million to $125 million, if NWP 12 is unavailable and it must avoid all wetlands and waterbodies.

25.     Some INGAA member companies estimate that they use NWP 12 thousands of times per year.  Others may use it a dozen times a year, while some use it 200 times a year.  One INGAA member that uses NWP 12 an average of 50 times per year indicated that it has at a minimum, approximately $1 billion dollars of project work scheduled for calendar year 2020 in reliance on the use of NWP 12.

26.     If INGAA member companies need to secure individual permits for projects that would normally qualify for NWP 12, they may face even further delays if their individual permits are not issued in time for their pipeline projects to commence construction during the limited construction windows imposed by FERC, the U.S. Fish and Wildlife Service, state agencies and others.  Delaying or cancelling such projects may increase the risk of reliability issues, while also failing to meet the needs of customers who have a need for natural gas that may be unfulfilled in the interim.

27.     According to one INGAA member, due to specific state-mandated restrictions, certain work can only be completed between August 1 and March 31.  However, the actual project-specific construction window is extremely limited for

11

this project, which is necessary to remediate low depth of cover of transmission pipelines in a river.  The ideal time to do this work is when water levels are low and currents are slow.  Therefore, the construction must occur in August and/or September.  If NWP 12 is not available, and this INGAA member cannot operate under another NWP and must instead resort to an individual permit, it could miss this extremely limited construction window, and will be unable to remediate the depth of cover requirements.  If this project needs to be postponed until the next year, the member will suffer significant harms, delay and costs.

28.   INGAA members have ongoing projects planned in reliance on the continued availability of NWP 12 through its expiration in March 2022.  If NWP 12 is not available, these members will have expended significant costs for preliminary work activities, such as staging, mobilizing contractors, ordering and delivery supplies.

29.   Any requirements to stop work would result in additional expenses associated with demobilizing and storing supplies.  For example, one INGAA member estimates that stopping work on a current project, if required by this Court's Order, would have a financial impact of about $350,000 per day due to mobilization and demobilization costs, as well as lost productivity.  This per day expense translates to a financial impact of $52.5 million if the project is delayed for 150 days (not accounting for any potential lost revenue).

12

## CERTIFICATION

I certify that the foregoing statements made by me are true. I am aware that, if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Executed this 29th day of April, 2020.

*Joan Dreskin Jackson*
Signed on 2020/04/29 10:15:05 -8:00

Joan Dreskin

STATE OF <u>VIRGINIA COUNTY OF CHESTERFIELD</u>

Subscribed and sworn to before me this <u>29th</u> day of <u>April</u>, 2020.

*Rhonda Jo Piper*
Signed on 2020/04/29 10:15:05 -8:00

Notary Public

My Commission Expires: <u>July 31, 2020</u>

Rhonda Jo Piper
Registration # 223328
Electronic Notary Public
Commonwealth of Virginia
My commission expires the 31 day of Jul 2020
Notary Stamp 2020/04/29 10:15:05 PST    10F5AB4CC15F

13