Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, Montana 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for all Plaintiffs*
(additional counsel listed on signature pages)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, et al., | |
| Plaintiffs, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, et al., | CV 19-44-GF-BMM |
| Defendants, | |
| TC ENERGY CORPORATION, et al., | **Plaintiffs' Opposition to Federal Defendants' Motion for Partial Stay Pending Appeal and to TC Energy's Motion for Stay Pending Appeal** |
| Intervenor-Defendants, | |
| STATE OF MONTANA, | |
| Intervenor-Defendant, | |
| AMERICAN GAS ASSOCIATION, et al., | |
| Intervenor-Defendants. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ................................................................................. 1

BACKGROUND ................................................................................... 3

ARGUMENT ........................................................................................ 3

I.      Defendants are unlikely to succeed on the merits of their appeal ................. 4

        A.      The Court correctly found that the Corps violated the ESA ............... 4

        B.      The relief ordered by the Court is consistent with law ....................... 8

        C.      Plaintiffs propose limiting the vacatur of NWP 12 to the
                construction of new oil and gas pipelines ........................................... 9

                1.      The Corps' error was serious .................................................. 11

                2.      Defendants' claimed distruptions do not counsel against
                        Plaintiffs' proposed partial vacatur .......................................... 13

                3.      Defendants' remaining arguments do not warrant further
                        narrowing of vacatur ............................................................... 20

        D.      Plaintiffs propose limiting the injunction to NWP 12's use for
                Keystone XL only .............................................................................. 28

II.     Defendants fail to show irreparable harm ................................................... 33

III.    The balance of harms and public interest tip in Plaintiffs' favor ................. 37

CONCLUSION ...................................................................................... 41

# TABLE OF AUTHORITIES

## Cases

*Alaska Survival v. Surface Transp. Bd.*,
  704 F.3d 615 (9th Cir. 2012) ..........................................................................37

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993)........................................................10, 14, 16

*Al Otro Lado v. Wolf*,
  952 F.3d 999 (9th Cir. 2020) ...............................................................4, 34, 37

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001)....................................................................24

*Am. Hosp. Ass'n v. Harris*,
  625 F.2d 1328 (7th Cir. 1980) ......................................................................36

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987)......................................................................................37

*Brown & Williamson Tobacco Corp. v. FDA*,
  153 F.3d 155 (4th Cir. 1998) ........................................................................23

*California v. BLM*,
  277 F. Supp. 3d 1106 (N.D. Cal. 2017).........................................................17

*Cal. Cmtys. Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012) ...........................................................11, 14, 15

*Chamber of Commerce of U.S. v. Dep't of Labor*,
  885 F.3d 360 (5th Cir. 2018) ........................................................................23

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988) ........................................................................7

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
  789 F.3d 1075 (9th Cir. 2015) .................................................24, 29, 30, 37

*Credit Suisse First Bos. Corp. v. Grunwald*,
  400 F.3d 1119 (9th Cir. 2005) ........................................................................1

*Ctr. for Biological Diversity v. BLM*,
  No. 06-cv-4884, 2011 WL 337364 (N.D. Cal. Jan. 29, 2011) .....................10

*Ctr. for Food Safety v. Vilsack*,
  10-cv-04038, 2010 WL 11484449 (N.D. Cal. Nov. 30, 2010) ....................34

*Ctr. for Food Safety v. Vilsack*,
  734 F. Supp. 2d 948 (N.D. Cal. 2010)..........................................................14

*Defs. of Wildlife v. EPA*,
  420 F.3d 946 (9th Cir. 2005) .......................................................................12

*Desert Survivors v. Dep't of Interior*,
  336 F. Supp. 3d 1131 (N.D. Cal. 2018).........................................................24

*Earth Island Inst. v. U.S. Forest Serv.*,
  442 F.3d 1147 (9th Cir. 2006) .....................................................................40

*E. Bay Sanctuary Covenant v. Trump*,
  950 F.3d 1242 (9th Cir. 2020) .....................................................................23

*Empire Health Found. v. Azar*,
  --F.3d--,  2020 WL 2123363 (9th Cir. May 5, 2020)..................................23

*Goldie's Bookstore, Inc. v. Super. Ct. of Cal.*,
  739 F.2d 466 (9th Cir. 1984) .......................................................................35

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  938 F.3d 985 (9th Cir. 2019) .......................................................................36

*Idaho Farm Bureau Fed'n v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) .......................................................................15

*Indigenous Envtl. Network v. Dep't of State*,
  347 F. Supp. 3d 561 (D. Mont. 2018) .........................................................31

*Indigenous Envtl. Network v. State Dep't*,
    369 F. Supp. 3d 1045 (D. Mont. 2018) ........................................................40

*Indigenous Envtl. Network v. Dep't of State*,
    No. 17-cv-29, 2019 WL 652416 (D. Mont. Feb. 15, 2019) ..........................31

*In re Bennett*,
    298 F.3d 1059 (9th Cir. 2002) ......................................................................21

*James River Flood Control Ass'n v. Watt*,
    680 F.2d 543 (8th Cir. 1982) ........................................................................37

*Kentuckians for the Commonwealth, Inc. v. Rivenburgh*,
    317 F.3d 425 (4th Cir. 2003) ........................................................................22

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*,
    109 F. Supp. 3d 1238 (N.D. Cal. 2015) ........................................................13

*Lane Cty. Audubon Soc'y v. Jamison*,
    958 F.2d 290 (9th Cir. 1992) ..........................................................................9

*League of Wilderness Defs./Blue Mountains Biodiversity Project*
    *v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ........................................................................36

*League of Wilderness Defs./Blue Mountains Biodiversity Project*
    *v. U.S. Forest Serv.*,
    No. 10-cv-1397, 2012 WL 13042847 (D. Or. Dec. 10, 2012) .......... 10-11, 14

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) .................................................................33, 37

*Miller v. Carlson*,
    768 F. Supp. 1341 (N.D. Cal. 1991)..............................................................35

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)......................................................................24, 28, 36

*Mont. Wilderness Ass'n v. Fry*,
    408 F. Supp. 2d 1032 (D. Mont. 2006) ........................................................40

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
      551 U.S. 644 (2007).............................................................................12

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
      241 F.3d 722 (9th Cir. 2001) .........................................................36

*Nat'l Wildlife Fed'n v. Brownlee,*
      402 F. Supp. 2d 1 (D.D.C. 2005).............................................6, 11

*Nat'l Wildlife Fed'n v. NMFS,*
      524 F.3d 917 (9th Cir. 2008) ...........................................................9

*Nat'l Wildlife Fed'n v. NMFS,*
      886 F.3d 803 (9th Cir. 2018) .........................................................29

*Native Fish Soc'y v. NMFS,*
      No. 12-cv-431, 2014 WL 1030479 (D. Or. Mar. 14, 2014) .........10

*Nken v. Holder,*
      556 U.S. 418 (2009)....................................................................3, 4

*NRDC v. EPA,*
      526 F.3d 591 (9th Cir. 2008) .........................................................23

*NRDC v. Evans,*
      No. 02-cv-3805, 2003 WL 22025005 (N.D. Cal. Aug. 26, 2003) ...............27

*NRDC v. Kempthorne,*
      No. 05-cv-1207, 2008 WL 5054115 (E.D. Cal. Nov. 19, 2008)................. 8-9

*O.A. v. Trump,*
      404 F. Supp. 3d 109 (D.D.C. 2019)..............................................23

*Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS,*
      482 F. Supp. 2d 1248 (W.D. Wash. 2007) .....................................8

*Pollinator Stewardship Council v. EPA,*
      806 F.3d 520 (9th Cir. 2015) ..........................................9, 14, 17

*Pub. Emps. for Envtl. Responsibility v. FWS*,
    189 F. Supp. 3d 1 (D.D.C. 2016)...........................................................17, 18

*Qureshi v. United States*,
    600 F.3d 523 (5th Cir. 2010) ......................................................................22

*Rapanos v. United States*,
    547 U.S. 715 (2006).....................................................................................19

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ....................................................................35

*Sierra Club v. Marsh*,
    816 F.2d 1376 (9th Cir. 1987) ....................................................................13

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    803 F.3d 31 (D.C. Cir. 2015)......................................................................32

*Sierra Club v. Van Antwerp*,
    719 F. Supp. 2d 77 (D.D.C. 2010)..............................................................10

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    282 F. Supp. 3d 91 (D.D.C. 2017)..............................................................18

*Swan View Coal. v. Weber*,
    52 F. Supp. 3d 1160 (D. Mont. 2014) .........................................................35

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978)........................................................................29, 30, 40

*United Nat'l Ins. Co. v. R&D Latex Corp.*,
    242 F.3d 1102 (9th Cir. 2001) ......................................................................1

*United States v. Akers*,
    785 F.2d 814 (9th Cir. 1986) ......................................................................40

*UOP v. United States*,
    99 F.3d 344 (9th Cir. 1996) ..........................................................................8

*Va. Soc'y for Human Life, Inc. v. FEC*,
    263 F.3d 379 (4th Cir. 2001) .........................................................................23

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ..................................................................3, 33

*Whole Woman's Health v. Hellerstedt*,
    136 S. Ct. 2292 (2016).................................................................................21

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ....................................................................5, 9

*W. Watersheds Project v. Zinke*,
    No. 18-cv-187, 2020 WL 959242 (D. Idaho Feb. 27, 2020)..................10, 20

## Statutes and Regulations

5 U.S.C. § 706 ..................................................................................................8

50 C.F.R. § 402.14(c)(4) ...................................................................................8

## Other Authorities

55 Fed. Reg. 36,641 (Sept. 6, 1990) ................................................................7

Fed. R. App. P. 4..............................................................................................1

Fed. R. Civ. P. 54 .......................................................................................1, 21

*Survey Says: Army Corps No Scalian Despot*,
    37 Envtl. L. Rep. 10317 (2007)....................................................................19

# INTRODUCTION

This Court properly held that the Corps violated the Endangered Species Act ("ESA") when it failed to engage in programmatic consultation prior to issuing Nationwide Permit 12 ("NWP 12"), despite resounding evidence that NWP 12-authorized activities adversely affect listed species. Order 11-13, 18-20, ECF No. 130. The Court declared the Corps' failure to consult unlawful under the ESA and Administrative Procedure Act ("APA") and remanded NWP 12 to the Corps for further analysis. *Id.* at 21. The Court also vacated NWP 12 and enjoined the Corps from authorizing dredge or fill activities under NWP 12 pending the completion of consultation. *Id.*

Federal Defendants and Intervenors (collectively, "Defendants") now urge the Court to amend the scope of the relief ordered and to stay any such relief pending appeal.[1] Plaintiffs do not oppose a partial narrowing of the vacatur and

---

[1] Federal Defendants' request for the Court to "*sua sponte* revise" its remedy, Fed. Defs.' Br. Supp. Partial Stay ("Fed. Br.") 2, ECF No. 131 (citing Fed. R. Civ. P. 54(b)), "should be treated as a motion for reconsideration under Rule 59" because it requests modification of the Court's summary judgment disposition and "seeks to relitigate the issues underlying the original [permanent] injunction order," *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005). Their suggestion that the Court may lose jurisdiction to revise its order should it fail to meet their unilateral deadline, Fed. Br. 2, is therefore misplaced. A notice of appeal does not "divest the district court of jurisdiction at the time it [i]s filed" when there is a pending motion for reconsideration. *United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1109 (9th Cir. 2001) (citing Fed. R. App. P. 4(a)(4)(B)(i)). Regardless, any such appeal appears unnecessary given the Court's efforts to accommodate Defendants' timeline.

1

injunction. Specifically, Plaintiffs propose that the Court modify these remedies by: (1) narrowing the vacatur of NWP 12 to a partial vacatur that applies to the construction of new oil and gas pipelines, thereby keeping NWP 12 in place during remand insofar as it authorizes non-pipeline construction activities as well as routine maintenance, inspection, and repair activities on existing NWP 12 projects; and (2) narrowing the injunction to enjoin the Corps from authorizing any dredge or fill activities for Keystone XL under NWP 12. This relief would afford appropriate protection for endangered and threatened species and their critical habitats while minimizing any potential disruption claimed by Defendants.

Plaintiffs do, however, oppose any additional narrowing of the Court's relief. The Corps' ESA violation is serious; Defendants have not shown otherwise. Nor have they shown that the disruptive consequences of partial vacatur limited to NWP 12's use for the construction of new oil and gas pipelines warrant a remand-only remedy. Similarly, TC Energy offers no persuasive argument why an injunction as to Keystone XL's use of NWP 12 should be avoided. To the contrary, its repeated and flawed assertions that the project is untainted by the Corps' unlawful actions demonstrate the need to prohibit Keystone XL from proceeding under NWP 12.

In the event the Court adopts Plaintiffs' proposed modification to the relief ordered, then it should deny Defendants' request for a stay pending appeal.

Defendants cannot demonstrate that they are likely to succeed on the merits, and their claimed injuries absent a stay are outweighed by the harm to Plaintiffs and the public interest were a stay to issue. Alternatively, if the Court declines Plaintiffs' proposed modification, Plaintiffs do not oppose the issuance of a partial stay pending appeal of the vacatur as it relates to routine maintenance, inspection, and repair activities on existing projects and construction of non-pipeline projects, and of the injunction as it relates to non-Keystone XL uses of NWP 12.

## BACKGROUND

To avoid unnecessary duplication, Plaintiffs respectfully refer the Court to the factual background provided in Plaintiffs' briefs and in the Court's Order. *See* Pls.' Br. Supp. Partial Summ. J. ("Pls.' MSJ Br.") 3-10, ECF No. 73; Order 2-6.

## ARGUMENT

"A stay [pending appeal] is not a matter of right, even if irreparable injury might otherwise result." *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017) (per curiam) (quoting *Nken v. Holder*, 556 U.S. 418, 433 (2009)). Rather, it is an exercise of judicial discretion guided by four factors: (1) whether the movant is likely to succeed on the merits; (2) whether the movant will be irreparably injured absent a stay; (3) whether the stay will substantially injure the other parties; and (4) where the public interest lies. *Id.*

As indicated, to address the concerns raised by Defendants, Plaintiffs respectfully propose that the Court limit the scope of the vacatur to apply to the use of NWP 12 for the construction of new oil and gas pipelines, and limit the scope of the injunction to apply to Keystone XL's use of NWP 12. *Cf.* Fed. Br. 2 (inviting Court to "revise its remedy in light of the considerations set forth in this motion for a stay"). If the Court adopts those narrowed remedies, then it should deny Defendants' request for a stay pending appeal. Alternatively, if the Court declines to modify its underlying remedial order, then it should issue a partial stay pending appeal that mirrors the scope of Plaintiffs' proposed modification, i.e., stay the vacatur as it relates to routine maintenance, inspection, and repair activities on existing projects and non-pipeline construction activities, and stay the injunction as it relates to non-Keystone XL uses of NWP 12.

## I.   Defendants are unlikely to succeed on the merits of their appeal

"An applicant for a stay pending appeal must make 'a strong showing that he is likely to succeed on the merits.'" *Al Otro Lado v. Wolf*, 952 F.3d 999, 1010 (9th Cir. 2020) (quoting *Nken*, 556 U.S. at 434). Defendants fall far short here.

### A.   The Court correctly found that the Corps violated the ESA

Defendants' arguments that they are likely to succeed in appealing the merits of the Court's decision are unavailing. To begin, Defendants focus their attention on the scope of the relief ordered, largely ignoring the Court's decision on the

4

merits. Indeed, two of the four briefs omit any discussion of the merits at all, *see generally* Montana's Br. Supp. Partial Stay ("MT Br."), ECF No. 135; NWP 12 Coals.' Br. Supp. Partial Stay ("Coal. Br."), ECF No. 138, while Federal Defendants' brief devotes a mere paragraph to them, Fed. Br. 15.

In any event, NWP 12 clearly authorizes actions that "may affect" listed species and the Court thus correctly held—based in large part on the Corps' own statements about the environmental impacts of NWP 12-authorized activities—that programmatic consultation was required. Order 11-13; *see also* Pls.' Reply Supp. Partial Summ. J. & Opp'n Cross-Mot. Summ. J. ("Pls.' MSJ Reply") 34-37, ECF No. 107; *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) ("The minimum threshold for an agency action to trigger consultation . . . is low . . . ."). As the Court noted, the National Marine Fisheries Service ("NMFS") and U.S. Fish and Wildlife Service ("FWS") (together, the "Services") "specifically have listed" the NWP program "as an example of the type of federal program that provides a national-scale framework and that would be subject to programmatic consultation," and the Corps was "well aware" of the need for such consultation. Order 10, 20.

Federal Defendants cite General Condition 18 as a cure-all for the Corps' failure to conduct programmatic consultation. Fed. Br. 15; *see also* TC Energy's Br. Supp. Stay ("TC Br.") 20-21, ECF No. 137. But as the Court determined,

project-level—and even regional-level—review does not encompass NWP 12's cumulative impacts and so cannot replace national-scale consultation. *See* Order 18; *infra* pp. 7-8. The Court further explained that General Condition 18 improperly delegates the initial effect determination to the permittee and so cannot fulfill *the Corps'* obligations under the ESA. Order 19-20. In sum, the Court correctly held that the Corps violated its ESA Section 7 duties when it reissued NWP 12, and supported its decision with well-settled caselaw.

TC Energy's attempts to distinguish that caselaw are unconvincing. As to *National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d 1, 9-10 (D.D.C. 2005), which held that the Corps was required to conduct programmatic consultation before reissuing NWP 12 in 2002, TC Energy maintains that the Corps has since engaged in voluntary consultation with the Services and incorporated the necessary mitigation measures into the current version of NWP 12. TC Br. 22-23. Yet that past consultation—which was conducted with NMFS only and, by its terms, does not apply to the current version of the NWPs, *see* Pls.' MSJ Reply 42 n.11— simply underscores the need for such consultation in 2017. Order 20. Indeed, the record shows that annual NWP 12 usage has increased by more than 45 percent, from an estimated 7,900 uses per year in 2012, Segal Decl. (filed herewith) Ex. A at 37, to an estimated 11,500 uses per year in 2017, NWP005331, rendering any prior consultation obsolete.

6

Additionally, NMFS in 2012 found that the NWP program *was* jeopardizing listed species and required the Corps to adopt additional protective measures. Pls.' MSJ Br. 31. Renewed consultation is necessary to determine whether those measures, to the extent the Corps continues to apply them, remain sufficient to prevent such jeopardy now. That is particularly true given that the Corps did not consult with FWS. Many NWP 12 projects, such as fossil fuel pipelines, are located well inland and thus cross rivers, streams, and wetlands providing habitat for species that come under FWS jurisdiction. Keystone XL provides a good example: it implicates species like the pallid sturgeon, American burying beetle, and whooping crane, which are all under FWS's, not NMFS's, purview. *See, e.g.*, 55 Fed. Reg. 36,641 (Sept. 6, 1990) (determination to list pallid sturgeon as endangered made by FWS). Such species could not have been considered during the Corps' prior consultation with NMFS.

As to *Conner v. Burford*, 848 F.2d 1441, 1453-58 (9th Cir. 1988), which concluded that biological opinions must be coextensive with an agency's action and rejected the Services' deferral of an impacts analysis to a project-specific stage, TC Energy contends that NWP 12 contains the necessary checks and balances to ensure that project-specific analyses will adequately protect listed species. TC Br. 22. But as Plaintiffs explained and the Court properly held, project-specific consultation, by its very nature, cannot substitute for the cumulative

7

impacts analysis that would be afforded by programmatic review. *See* Pls.' MSJ Reply 40 (citing 50 C.F.R. § 402.14(c)(4); *Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*, 482 F. Supp. 2d 1248, 1266-67 (W.D. Wash. 2007)); Order 16-19.

The Court's merits decision is well reasoned and fully supported by the record and law. The Court correctly held that the Corps failed to comply with the ESA, and Defendants provide no compelling argument that they are likely to prevail on an appeal of that ruling.

## B.    The relief ordered by the Court is consistent with law

The Court's determination that vacatur and injunctive relief are warranted in light of the ESA violation discussed above is consistent with law. Defendants are therefore unlikely to succeed in arguing on appeal that the Court should have limited relief to a declaratory judgment and remand only.[2]

Vacatur is the presumptively required remedy when an agency acts unlawfully. *See* 5 U.S.C. § 706(2)(A) (directing courts to "set aside agency action . . . found to be . . . not in accordance with law"); *NRDC v. Kempthorne*, No. 05-cv-1207, 2008 WL 5054115, at *8 n.4 (E.D. Cal. Nov. 19, 2008) (confirming APA's "'set aside' remedy applies in ESA cases" and collecting cases), *superseded*

---

[2] Declaratory relief and agency remand are entirely appropriate remedies given the Court's correct determination on the merits, *see* 5 U.S.C. § 706(2); *UOP v. United States*, 99 F.3d 344, 350-51 (9th Cir. 1996), and no party contests these forms of relief.

*in part on other grounds*, 621 F. Supp. 2d 954 (E.D. Cal. 2009); *see also Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (courts remand without vacatur "only in 'limited circumstances.'" (citation omitted)).

Likewise, injunctive relief furthers the core purposes of the ESA and reflects the widespread harms caused by the Corps' violation. *See Kraayenbrink*, 632 F.3d at 498, 500 (holding that BLM failed to engage in programmatic consultation when it issued grazing regulations and affirming injunction of BLM's implementation of the regulations until it completed consultation); *Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 295 (9th Cir. 1992) (similar); *see also infra* pp. 24-27, 29.

The Court thus properly ordered vacatur and injunctive relief. Consequently, the only issue at this juncture is whether the concerns raised by Defendants warrant the refinement of that order in some manner. As detailed in the following sections, Plaintiffs propose narrowing the scope of the vacatur and injunction to minimize any potential disruption claimed by Defendants while ensuring appropriate protection for endangered and threatened species and their critical habitats.

**C.      Plaintiffs propose limiting the vacatur of NWP 12 to the construction of new oil and gas pipelines**

Although vacatur is the presumptive remedy when an agency violates the law, *supra* pp. 8-9, district courts have "broad latitude in fashioning equitable relief when necessary to remedy an established wrong." *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 936 (9th Cir. 2008) (internal quotation marks omitted). One such

9

exercise of that broad discretion is partial rather than complete vacatur. *See., e.g.*, *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 79-80 (D.D.C. 2010) (partially vacating Corps permit by allowing some parts of project to proceed).[3]

Here, although Defendants have expressed concerns with the Court's vacatur of NWP 12 in its entirety, they have not established that a remand-only remedy is appropriate. *See W. Watersheds Project v. Zinke*, No. 18-cv-187, 2020 WL 959242, at *26 (D. Idaho Feb. 27, 2020) (burden is on agency "to show that compelling equities demand anything less than vacatur"), *appeal filed*, No. 20-35342 (9th Cir. Apr. 17, 2020). Rather, under the pertinent legal test, it is clear that the appropriate course is to narrow the vacatur of NWP 12 in certain respects.

Courts are guided by two factors when evaluating whether to depart from or limit the presumptive remedy of vacatur: (1) "the seriousness" of an agency's errors; and (2) "the disruptive consequences" that would result from vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993); *accord League of Wilderness Defs./Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, No. 10-cv-1397, 2012 WL 13042847, at

---

[3] *See also Native Fish Soc'y v. NMFS*, No. 12-cv-431, 2014 WL 1030479, at *4 (D. Or. Mar. 14, 2014) (partially vacating a hatchery genetic management plan by allowing a certain amount of fish to be released pursuant to the plan); *Ctr. for Biological Diversity v. BLM*, No. 06-cv-4884, 2011 WL 337364, at *2-3 (N.D. Cal. Jan. 29, 2011) (partially vacating a land management plan by leaving specific protective measures in place).

*5 (D. Or. Dec. 10, 2012). Application of the *Allied-Signal* test here supports a partial vacatur of NWP 12 limited to the construction of new oil and gas pipelines.

### 1.    The Corps' error was serious

First, the Corps' error was serious. As described above, the Court held that the Corps failed to engage in programmatic consultation before issuing NWP 12, as required by Section 7 of the ESA. *Supra* pp. 4-8; Order 18-19. The Court concluded that programmatic consultation is "the only way to avoid piecemeal destruction of species and habitat" and that project-level review "cannot ensure that the discharges authorized by NWP 12 will not jeopardize listed species or adversely modify critical habitat." *Id.* (citing *Brownlee*, 402 F. Supp. 2d at 10; 50 C.F.R. § 402.14(c)).

Additionally, the Court recognized that the Corps' violation may well have repercussions under the National Environmental Policy Act ("NEPA") and Clean Water Act ("CWA"). In declining to rule on Plaintiffs' claims under those statutes, the Court reasoned that programmatic consultation could alter the Corps' assessment of NWP 12's environmental consequences under NEPA and the CWA, which could in turn affect its determination whether it can issue NWP 12 at all. *See* Order 22-25; *see also* Pls.' MSJ Br. 38-43. Thus, the Corps' error is far more than a "harmless" procedural error, like failing to disclose documents on the rulemaking docket. *Cf. Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 993 (9th Cir. 2012).

Defendants nevertheless argue that the lack of programmatic consultation was "not serious" because the Corps consulted on the 2012 version of NWP 12 and continues to implement *some* of the recommended mitigation and monitoring measures derived through that process. *See, e.g.*, Fed. Br. 11. However, as the Court observed, the 2012 consultation shows the Corps was "well aware" of its obligation to consult and of the impacts of NWP 12-authorized activities on listed species. Order 20.

Defendants similarly downplay the seriousness of the Corps' error by pointing to regional conditions and the possibility of project-level consultation pursuant to General Condition 18. *See, e.g.*, TC Br. 22. But those are no substitute for the Corps' overarching Section 7 obligation, which is designed to ensure against jeopardy to imperiled species and destruction of their critical habitats. *Supra* pp. 7-8; Order 19-20; *see also Defs. of Wildlife v. EPA*, 420 F.3d 946, 978 (9th Cir. 2005) (explaining that ESA's mandate to protect species "weigh[ed] heavily" in favor of vacatur pending adequate consultation, where thousands of pollution permits would otherwise issue), *rev'd and remanded on other grounds sub nom. Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007).

The Corps' Chief of the Regulatory Program, Jennifer Moyer, admits facts that further illustrate the seriousness of the Corps' error. She attests that, since 2017, at least 164 NWP 12-authorized projects have undergone formal ESA

consultation (i.e., were likely to "adversely affect" listed species), without any programmatic consultation in place to evaluate and protect against the cumulative impacts of the program as a whole. *See* Moyer Decl. ¶ 6, ECF No. 131-1. She also states that 3,400 uses of NWP 12 triggered General Condition 18 due to potential impacts on listed species and 1,436 projects underwent informal consultations, *id.*, which suggests an even wider impact (assuming permittees properly applied General Condition 18 to begin with).

In applying the *Allied-Signal* test to ESA violations like this one, "courts will tip the scales in favor of the endangered species under that statute's 'institutionalized caution' mandate." *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015) (quoting *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987)). This factor therefore supports vacatur until the Corps adequately analyzes NWP 12's impacts to listed species through programmatic ESA consultation.

### 2. Defendants' claimed disruptions do not counsel against Plaintiffs' proposed partial vacatur

While the ESA violation found by the Court is serious, Plaintiffs' arguments in summary judgment briefing centered on threats posed to listed species and critical habitats by the construction of major oil and gas pipelines like Keystone XL—which not only pose a grave risk of oil spills but also affect numerous waterbodies and thereby involve precisely the kinds of cumulative impacts that

13

should be addressed through programmatic consultation. Other activities authorized by NWP 12 such as routine maintenance and repair, which are the focus of the practical concerns raised by Defendants, may raise issues that warrant consideration on remand without involving the same level of severe risk to species as pipelines. Accordingly, given the particular circumstances of this case, narrowing the vacatur to the use of NWP 12 for the construction of new oil and gas pipelines would be a reasonable exercise of the Court's discretion. *See League of Wilderness Defs.*, 2012 WL 13042847, at *5 ("The second factor of *Allied-Signal* can help inform the appropriate scope of vacatur . . . .").

In arguing against any form of vacatur, Defendants cite the alleged delays and costs associated with seeking individual permits. *See, e.g.*, Fed. Br. 17-18. But under the second *Allied-Signal* factor, courts largely focus on potential environmental, as opposed to economic, disruption. *Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010) ("[T]he Ninth Circuit has only found remand without vacatur warranted by equity concerns in limited circumstances, namely serious irreparable environmental injury.").

The main case on which Defendants rely, *California Communities Against Toxics*, is consistent with that premise. There, the court remanded without vacatur because vacatur threatened both economically *and* environmentally harmful consequences. 688 F.3d at 994; *id.* (finding first *Allied-Signal* factor also weighed

14

against vacatur); *see also Pollinator*, 806 F.3d at 532 (confirming that inquiry centers on "whether vacating a faulty rule could result in possible environmental harm" and citing *California Communities Against Toxics* for that proposition); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995) (leaving in place regulation listing type of snail as endangered where vacatur could have led to snail's extinction). Here, leaving NWP 12 in place during remand for the use of new oil and gas pipeline construction would seriously injure protected species and critical habitats, "the very danger" the ESA "aims to prevent." *Cal. Cmtys. Against Toxics*, 688 F.3d at 993; *infra* pp. 16-17, 24-27.

In any event, Defendants primarily focus on disruptions stemming from vacatur of NWP 12 as to the construction of electric, internet, and cable lines, and to routine maintenance, safety, and repair of projects that have already been built—which, as discussed above, may pose less risk to species. For example, the NWP 12 Coalition discusses routine maintenance and repair of gas pipelines to ensure safety, vegetation removal along electric lines to prevent forest fires, placement of protective matting to prevent rutting from service vehicles, and ongoing maintenance of utility projects in navigable waters. Coal. Br. 9-12, 21-22. The Corps raises similar concerns, citing a fiber optic cable upgrade project, an improvement to a wastewater management system, and work associated with removal of a tree from an exposed and leaking water line. Fed. Br. 16. Plaintiffs'

15

proposed partial vacatur would keep NWP 12 in place during remand insofar as it authorizes more routine and minor projects, avoiding these claimed disruptions.

Limiting partial vacatur of NWP 12 in this way strikes a reasonable balance under the *Allied-Signal* factors while redressing the particular harms to listed species set forth in Plaintiffs' summary judgment briefs and referenced in the Court's order. For example, the Court discussed adverse effects to threatened and endangered species from NWP 12-authorized construction activities, including increased sedimentation, and from horizontal directional drilling used during pipeline construction. Order 14-15. These impacts are likely to be particularly severe when constructing large-scale oil and gas pipelines, which extend many hundreds of miles across dozens or even hundreds of waterways and require the creation of permanent rights of way, usually over 100 feet wide, as well as a network of access roads, pump stations, and other associated facilities. In contrast, such impacts are likely to be less severe for routine maintenance, repair, and inspection activities on *existing* NWP 12 projects and for the installation of non-pipeline projects like broadband and fiber optic cables. *See* Pls.' MSJ Reply 56-57 (seeking to tailor remedy to exclude those NWP 12-authorized activities that would provide a public benefit and cause only minimal environmental effects). Thus, while all such impacts must be addressed on remand, narrowing the vacatur portion of the remedy to the more severe threats posed by NWP 12 is justified.

Defendants do not specify how many, or what percentage of, NWP 12-authorized activities might be categorized as "routine" (i.e., maintenance and repair activities) as compared to major pipeline construction projects. However, Federal Defendants indicate it is at least in the "thousands," Moyer Decl. ¶ 8, and the NWP 12 Coalition's brief focuses primarily on these routine projects, *see* Coal. Br. 9-14. The Court can therefore assume that allowing such routine maintenance and repair projects to proceed under NWP 12 during remand would go a long way to alleviating any disruption stemming from the partial vacatur.[4]

Plaintiffs' proposed partial vacatur would, however, apply to the use of NWP 12 for the construction of new fossil fuel pipelines during the remand. As detailed throughout this brief, any disruption or permitting delays resulting from this vacatur is outweighed by the need to protect endangered species and critical habitat from harm until consultation is completed. *See also California v. BLM*, 277 F. Supp. 3d 1106, 1125-27 (N.D. Cal. 2017) (rejecting compliance cost argument as insufficient to avoid vacatur); *Pub. Emps. for Envtl. Responsibility v. FWS*, 189 F. Supp. 3d 1, 3 (D.D.C. 2016) ("Absent a strong showing by [the agency] that

---

[4] Limiting vacatur to new oil and gas pipeline construction would also address Defendants' concern that the Corps may not be able to enforce post-construction special conditions contained in previously issued verifications for projects that have already been completed, which are designed to protect the environment. *Cf.* Fed. Br. 18-19; Moyer Decl. ¶ 19; *see also Pollinator*, 806 F.3d at 532 (in deciding on vacatur, court considers whether it would risk greater environmental harm).

17

vacatur will unduly harm economic interests . . . , the Court is reluctant to rely on economic disruption" to deny relief); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 104 (D.D.C. 2017) (allegations of financial harm will not necessarily have a "determinative effect" on remedy, because claims of "lost profits and industrial inconvenience" are "the nature of doing business, especially in an area fraught with bureaucracy and litigation").

Any disruption caused by this partial vacatur would be further tempered by the continued availability of the ordinary individual permit process under CWA Section 404(a). Partial vacatur would not block any projects; it would vacate only the categorical approval of major utility projects nationwide under NWP 12, which, as Plaintiffs have pointed out, applicants began (improperly) using for major pipeline projects only in 2012. Pls.' MSJ Reply 7-9, 47-54.

Defendants acknowledge the individual permit process is still available; they simply complain that it is too expensive and time-consuming. *See, e.g.*, Coal. Br. 14-15. But their claim that costs will increase is far from clear. *See Pub. Emps. for Envtl. Responsibility*, 189 F. Supp. 3d at 3-4 (rejecting claims of disruption where the party's alleged economic harm "rests on very little substance or certainty"). For example, the Corps estimates that an individual permit costs an applicant an average of $26,000, compared to $9,000 for a NWP verification. Moyer Decl.

18

¶ 12.[5] Yet there is no evidence that these costs would be prohibitive, especially since major projects often require dozens, if not hundreds, of verifications and cost billions of dollars.

Intervenors suggest permitting costs could be even higher. *See, e.g.*, Coal. Br. 14 n.4 (citing estimates from *Rapanos v. United States*, 547 U.S. 715 (2006)). However, a subsequent article examined empirical data and found the permitting delays and burdens described in *Rapanos* were inaccurate and that nearly all individual permit applications are granted. *See* Kim Diana Connolly, *Survey Says: Army Corps No Scalian Despot*, 37 Envtl. L. Rep. 10317, 10317, 10334 (2007).

Defendants' claims of delay do not undermine the partial vacatur remedy proposed by Plaintiffs, either. The Corps states that the average time to process a standard individual permit is 264 days. Moyer Decl. ¶ 13. The NWP 12 Coalition claims a range of 9 to 24 months. Coal. Br. 15. The Corps' website, however, states that "three to four months is normally required to process a routine application." Segal Decl. Ex. B. Regardless, the partial vacatur Plaintiffs propose would mean more minor and routine activities could proceed under NWP 12 during the remand without facing such delays. *Supra* pp. 15-17. And, even as to oil and gas pipelines, Defendants have failed to demonstrate that either the time it

---

[5] Ms. Moyer also inexplicably cites wildly inflated cost estimates made by a public commenter in the 2017 docket, but then states that even the Corps disagrees with the figures and has not validated the data. Moyer Decl. ¶ 12.

would take for the Corps to complete consultation or the time it would take to

pursue an individual permit would jeopardize the construction of any major

pipeline projects or otherwise cause undue disruption *See infra* p. 35.

Finally, the Corps suggests private entities may not be aware of the Court's

Order or the Corps' subsequent suspension of NWP 12, and may commence work

under NWP 12 and/or assume that the Corps' failure to respond to a

preconstruction notification ("PCN") means a project is verified. Fed. Br. 19. But

as Defendants and this Court have stated, it is presumed that the Corps and

regulated entities, many of which are represented in these proceedings, will follow

the law. To the extent the Corps is suggesting it has limited ability to control or

monitor private entities' use of NWP 12 for a wide range of projects nationwide,

that highlights the central flaws in issuing such a broad NWP and supports

Plaintiffs' theory of the case. In any event—and particularly if the Court narrows

the vacatur as Plaintiffs propose—there is no basis for Defendants' contention that

a potential increase in individual permit applications for major pipeline projects

would overwhelm Corps staff or impact the agency's regulatory responsibilities.

### 3. Defendants' remaining arguments do not warrant further narrowing of vacatur

As just described, Defendants have failed "to show that compelling equities

demand anything less than vacatur" of NWP 12 for construction of new oil and gas

pipelines. *Zinke*, 2020 WL 959242, at *26. They nonetheless claim that further

20

departure from the presumptive remedy is required because: (1) Plaintiffs did not specifically request vacatur beyond Keystone XL; and (2) Plaintiffs' harms do not support that remedy. Fed. Br. 9-10, 14-15; Coal. Br. 18-20. They are wrong on both counts.

First, courts "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c); *see also In re Bennett*, 298 F.3d 1059, 1069 (9th Cir. 2002). Particularly where, as here, Plaintiffs requested "such other relief as the Court deems just and appropriate," First Am. Compl. 88, ECF No. 36, the Court can properly grant the presumptive remedy of vacating the unlawful action. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2307 (2016) (explaining that "[n]othing prevents . . . awarding facial relief as the appropriate remedy for petitioners' as-applied [constitutional] claims," even if it exceeds the relief requested). Whether further tailoring is appropriate turns on the seriousness of the agency's errors and vacatur's disruptive impacts, which Plaintiffs agree support partial vacatur here.

Federal Defendants complain about a purported lack of notice, Fed. Br. 9-12, but those criticisms are moot now that they and Intervenors have presented further arguments and evidence on the remedy issue.[6] Regardless, Federal Defendants'

---

[6] In ruling on these motions, the Court has an opportunity to likewise address Defendants' concerns regarding the extent of its findings regarding remedy. *See, e.g.*, Fed. Br. 12-14.

contention that no party could have expected a broader remedy than one directed at Keystone XL alone, *id.* at 10, is belied by the summary judgment briefing, in which Defendants insisted that the Court should ignore Keystone XL entirely in resolving Plaintiffs' "facial" claims, *see* Fed. Defs.' Reply Supp. Cross-Mot. Summ. J. ("Fed. MSJ Reply") 1-2, ECF No. 110; TC Energy's Reply Supp. Cross-Mot. Summ. J. 1, ECF No. 113, while simultaneously objecting to broader remedies, *see, e.g.*, Fed. MSJ Reply 20 ("Given the multitude of other activities for which NWP 12 can authorize work . . . vacatur would be inappropriate, over-broad, and extremely disruptive."); NWP 12 Coals.' Br. Supp. Cross-Mot. Summ. J. 2, ECF No. 93 ("invalidating NWP 12 would have significant ramifications" for the Corps, the NWP 12 Coalition's members, and other entities).[7]

Defendants' cited authorities regarding notice are also off point. *See, e.g.*, *Qureshi v. United States*, 600 F.3d 523, 526 (5th Cir. 2010) (*sua sponte* pre-filing injunction against vexatious litigant); *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 432-33, 438 (4th Cir. 2003) (in challenge solely to individual project authorization, district court "reached beyond the issues presented to it" by declaring unlawful regulation promulgated post-authorization—against which no party sought *any* relief—and enjoining issuance of permits under it).

---

[7] While some Intervenors complain that the Court limited their permissive intervention by not allowing them to file their own motions, *see* MT Br. 3; Coal. Br. 19, they identify no prejudice suffered as a result.

Second, Plaintiffs' harms do not provide a basis to further limit the scope of vacatur. "[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Empire Health Found. v. Azar*, --F.3d--,  2020 WL 2123363, *10 (9th Cir. May 5, 2020) (citation omitted). Accordingly, a single plaintiff with a successful APA claim can obtain broad programmatic relief. *See E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1283 (9th Cir. 2020); *O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019) (rejecting argument that vacatur "should be limited to the plaintiffs in this case"). Courts thus routinely vacate invalid agency actions of broad applicability without requiring (or even mentioning a need for) plaintiffs to show harms stemming from each unlawful application. *See, e.g.*, *Chamber of Commerce of U.S. v. Dep't of Labor*, 885 F.3d 360, 388 (5th Cir. 2018) (financial service regulations); *NRDC v. EPA*, 526 F.3d 591, 608 (9th Cir. 2008) (storm water discharge rule); *Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 176 (4th Cir. 1998) (tobacco regulations), *aff'd,* 529 U.S. 120 (2000).

 Defendants' lone out-of-circuit case suggesting otherwise, *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001), *overruled on other grounds by Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012), contradicts binding precedent. Nor is it persuasive even on a blank slate, as it

collapses the distinction between a permanent injunction and "a less drastic remedy (such as partial or complete vacatur)." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010); *see also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (vacatur is appropriate "whether or not appellant has suffered irreparable injury"). Defendants' suggestion that vacatur requires this broad showing as to every application of NWP 12, Fed. Br. 14, is especially inappropriate given that the Corps' failure to consult has prevented Plaintiffs from learning the full scope of NWP 12's impacts on their interests, *cf. Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1082 (9th Cir. 2015) (plaintiffs are "not required to establish what a Section 7 consultation would reveal, or what standards would be set"), and NWP 12 itself does not require public notice of many of the harmful activities it authorizes.[8]

Even assuming the validity of Defendants' erroneous legal premise, Plaintiffs have shown that NWP 12 harms their interests in ways that extend beyond Keystone XL. Defendants' assertion to the contrary, Fed. Br. 14,

---

[8] Federal Defendants also err by conflating the need to show Article III standing for each *form* of relief with the need to show standing for the *scope* of relief. No party contested Plaintiffs' standing to seek their requested forms of relief, and if a party "has standing . . . and prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur." *Am. Bioscience*, 269 F.3d at 1084; *see also Desert Survivors v. Dep't of Interior*, 336 F. Supp. 3d 1131, 1136 (N.D. Cal. 2018) (rejecting argument to limit vacatur's geographic scope "on the basis of Article III standing").

mischaracterizes the record. In challenging the Corps' failure to undertake programmatic consultation, Plaintiffs alleged that their interests were implicated by NWP 12's authorization of activities that "cause immediate and irreparable impacts to ecosystem functions of streams and adjacent wetlands" and "adversely affect hundreds of listed species that rely on rivers, streams, and wetland habitats and other aquatic resources across the country." First Am. Compl. ¶ 105; *see also id.* ¶¶ 25, 27, 221-22. Indeed, that Plaintiffs' injuries stem from a multitude of projects is inherent in their challenge because—as the Court recognized— "[p]rogrammatic review of NWP 12 in its entirety . . . provides the only way to avoid piecemeal destruction of species and habitat." Order 18.

Thus, in seeking summary judgment, Plaintiffs explained that "regional conditions and project-level consultations are inadequate substitutes for programmatic consultation" because they "fail to adequately analyze NWP 12's cumulative impacts to listed species, like migratory birds, that cross regions." Pls.' MSJ Br. 35 (citing Keystone XL as "illustrative"). While Plaintiffs agree that their challenge *focused* on the Corps' use of NWP 12 "to approve massive oil pipelines like Keystone XL" as particularly harmful, Pls.' MSJ Reply 57, they did not suggest that those harms stemmed *only* from pipelines, let alone only from Keystone XL.

Plaintiffs' summary judgment declarations likewise invoked Keystone XL as illustrative while also pointing to harms stemming from other projects. *See, e.g.*, Collentine Decl. ¶¶ 8-9, ECF No. 73-2 (citing uses of NWP 12 "to approve several major oil and gas pipeline project[s]," and explaining that "[i]n each of these cases, the Corps' use of NWP 12 meant that Sierra Club members who were impacted by . . . these major projects were deprived of the opportunity for public comment"); Midkiff Decl. ¶ 10, ECF No. 73-7 (detailing "professional, aesthetic, and recreational interests in the preservation of the Missouri River system and the habitat it provides"). And, as noted throughout the litigation, some Plaintiffs are nationwide organizations that have long opposed NWP 12 and its impacts on their members. *See* First Am. Compl. ¶¶ 19-22; Collentine Decl. ¶¶ 7, 10; Greenwald Decl. ¶¶ 9, 11, ECF No. 73-3; Templeton Decl. ¶ 7, ECF No. 73-12; *see also* NWP043770-72 (comment letter submitted by several Plaintiffs opposing use of NWP 12 for major fossil fuel pipelines). Based on the evidence that Plaintiffs proffered in summary judgment briefing, the Court found "resounding evidence" that the continued use of NWP 12 would adversely impact listed species. Order 11.

Though they need not show harm to justify vacatur and, in any event, have already done so, Plaintiffs are nonetheless submitting additional declarations along with this brief to further underscore the harm that they and their members suffer from NWP 12's unlawful use, particularly for construction of major oil and gas

26

pipelines, throughout the country. *See, e.g.*, Collentine Suppl. Decl. ¶¶ 3-17 (impacts from pipelines across the country); Greenwald Suppl. Decl. ¶¶ 7-11 (same); Devine Decl. ¶¶ 7-8 (same); Feibelman Decl. ¶¶ 7-12 (impacts to waters and species in New Mexico and West Texas); Reed Decl. ¶¶ 7-8, 11-12 (impacts to waters and species in Texas); Dreher Decl. ¶¶ 2-5 (impacts from Permian Highway pipeline in Texas); Adams Decl. ¶¶ 3-6 (same); Gunnarson Decl. ¶¶ 4-7 (same); Ravina Decl. ¶¶ 4-11 (impacts from Atlantic Coast pipeline in Virginia); Kassam-Adams Decl. ¶¶ 4-8 (same); Shaunesey Decl. ¶¶ 6-9 (same); Bowers Decl. ¶¶ 9-24 (impacts from Atlantic Coast and Mountain Valley pipelines in Virginia); Leech Decl. ¶¶ 3-9 (same); Harer Decl. ¶¶ 5-8 (impacts from Mountain Valley Southgate pipeline in North Carolina).[9]

In sum, Plaintiffs' proposed partial vacatur is appropriate under the circumstances of this case and none of Defendants' additional arguments warrant further narrowing.[10]

---

[9] *Cf. NRDC v. Evans*, No. 02-cv-3805, 2003 WL 22025005, at *1 (N.D. Cal. Aug. 26, 2003) (court can consider declarations to assess harm to public interest).

[10] Should the Court nevertheless conclude that further narrowing is required, remand without vacatur *still* would not be appropriate as to Keystone XL. *See infra* pp. 28-32; *see also* Fed. Br. 1 ("At the very least, the Court should stay its vacatur and injunction as they relate to anything *other than* the Keystone XL pipeline." (emphasis added)).

**D.      Plaintiffs propose limiting the injunction to NWP 12's use for Keystone XL only**

As with partial vacatur, Plaintiffs believe an injunction is warranted but propose narrowed relief given the particular circumstances of this case. Specifically, Plaintiffs propose limiting injunctive relief to the authorization of Keystone XL under NWP 12.

Plaintiffs explain above how their proposed narrowing of the court-ordered vacatur will preclude the Corps and permittees from relying on NWP 12 for those projects that pose the greatest threat to listed species. *Supra* pp. 16-17. Thus, although the Court determined that the Corps committed a serious violation of Section 7 of the ESA and properly enjoined the Corps from authorizing dredge or fill activities under NWP 12, the "less drastic remedy" of partial vacatur should suffice at this juncture to prevent new oil and gas pipelines from being built in reliance on NWP 12. *Monsanto*, 561 U.S. at 165; *see also* Fed. Br. 17 ("[T]he Court's vacatur of Nationwide Permit 12 prevents private parties from relying on the permit. . . .").

Injunctive relief (in addition to vacatur) is still warranted as to Keystone XL, however. TC Energy's repeated assertions that the Court's reasoning regarding the unlawfulness of NWP 12 does not apply to Keystone XL, TC Br. 1-3, 15, suggest that TC Energy may still attempt to proceed under NWP 12. Indeed, the company's recent public statements indicate that it is still "reviewing options to address the

28

impact of [the Court's] ruling and to secure the necessary authorizations to continue with planned Keystone XL construction." Segal Decl. Ex. C. Consequently, injunctive relief is needed to provide additional assurance that Keystone XL will not proceed under NWP 12.

Plaintiffs satisfy the test for that relief, as they have previously explained. *See* Pls.' MSJ Reply 58. Where a procedural violation of the ESA occurs, it is usually appropriate to enjoin further activities that risk harm to listed species, consistent with the "fundamental principle" that Congress has "afford[ed] endangered species the highest of priorities." *Cottonwood*, 789 F.3d at 1091 (citing *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978)). The ESA thus "removes the latter three factors in the four-factor injunctive relief test from [courts'] equitable discretion," requiring them to "presume that remedies at law are inadequate, that the balance of interests weighs in favor of protecting endangered species, and that the public interest would not be disserved by an injunction." *Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d 803, 817 (9th Cir. 2018). Nor should "establishing irreparable injury"—the remaining factor—"be an onerous task" given "the stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them." *Cottonwood*, 789 F.3d at 1091.

Here, there is ample evidence of irreparable injury from Keystone XL's threatened harms to protected species. For example, the Court found that "[p]allid

sturgeon remain susceptible to harm from pollution and sedimentation in rivers and streams because pollution and sedimentation can bury the substrates on which sturgeon rely for feeding and breeding," and that NWP 12 activities "pose a significant threat to the pallid sturgeon populations in Nebraska and Montana." Order 14-15. The Court likewise found that activities approved by NWP 12 "can cause harm to species such as the American burying beetle." *Id*. at 15. As Plaintiffs' underlying declarations explain, Keystone XL is a potent example of those risks. *See* Hamel Decl. ¶ 10, ECF No. 73-4 (concluding that construction activities authorized by NWP 12, and Keystone XL in particular, "pose a significant threat to the imperiled pallid sturgeon populations"); Bedick Decl. ¶ 12, ECF No. 73-1 ("Pipelines carrying tar sands, such as Keystone XL, pose significant risks to the [American burying beetle].").

TC Energy's contrary arguments are both ill-founded and illogical. TC Energy primarily focuses on the Court's failure to consider economic harms from construction delays in crafting an injunction, TC Br. 25-26, but binding precedent forecloses courts from weighing those economic impacts against the "unparalleled public interest in the 'incalculable' value of preserving endangered species" established in the ESA, *Cottonwood*, 789 F.3d at 1090 (quoting *Hill*, 437 U.S. at 187-88). Even if the Court could account for those alleged harms, Plaintiffs' irreparable environmental injuries outweigh any temporary delays and economic

harms TC Energy faces. *See infra* pp. 37-40. Indeed, TC Energy made similar arguments when seeking a stay of this Court's prior ruling that the State Department's analysis of Keystone XL violated the ESA and other core environmental statutes, which both this Court and the Ninth Circuit rejected. *See Indigenous Envtl. Network v. Dep't of State*, No. 17-cv-29, 2019 WL 652416, at *10-11 (D. Mont. Feb. 15, 2019), *aff'd*, No. 18-36068 (9th Cir. Mar. 15, 2019).

TC Energy's remaining assertion—that there is no threat of irreparable harm because Keystone XL has undergone project-specific consultation, TC Br. 15—ignores the Court's key holding that "[t]he Corps cannot circumvent ESA Section 7(a)(2) consultation requirements by relying on project-level review," Order 16.[11] As the Court correctly found, project-specific consultation cannot adequately consider the cumulative impacts of NWP 12-authorized activities.

For example, the 2019 Biological Assessment for Keystone XL finds that there is a high likelihood of several oil spills occurring in pallid sturgeon habitat over the 50-year life of the project, which may have "toxicological effects on pallid sturgeon." Segal Decl. Ex. D at 83. Similarly, the 2019 Biological Opinion finds that Keystone XL will result in take of American burying beetles. Segal Decl. Ex.

---

[11] Even if it were relevant, this Court found the initial consultation for the project inadequate. *Indigenous Envtl. Network v. Dep't of State*, 347 F. Supp. 3d 561, 587, 591 (D. Mont. 2018). Plaintiffs have since served notice of their claim to the federal government that the 2019 consultation for Keystone XL continues to violate the ESA.

31

E at 39. Other projects that rely on NWP 12 may cause similar impacts to these species. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36 (D.C. Cir. 2015) (Biological Opinion for Flanagan South pipeline found project would result in take of beetle); Collentine Suppl. Decl. ¶¶ 10-11 (citing impact of Flanagan South pipeline to beetle and of Dakota Access pipeline to pallid sturgeon). While individually these projects may not jeopardize species, together their cumulative impacts could. Thus, programmatic review is necessary. *See* Order 18; Pls.' MSJ Br. 35-36.

If TC Energy no longer needs NWP 12—e.g., because it believes that it can rely on its project-specific consultation to obtain an *individual* permit under the CWA—then it can attempt to pursue that avenue. But it cannot rely on NWP 12 to move forward, as the injunction must make clear. TC Energy's apparent belief that Keystone XL is uniquely exempt from the Court's Order, coupled with the irreparable harm to Plaintiffs if that were the case, justifies a continued injunction against the use of NWP 12 for Keystone XL.

*        *        *

For the reasons described above, Plaintiffs' proposed narrowing of the vacatur to the use of NWP 12 for the construction of new oil and gas pipelines is a reasonable exercise of the Court's discretion: it would resolve many of the concerns raised by Defendants while protecting listed species from those projects

that pose the greatest harm. Plaintiffs' proposed narrowing of the injunction to the use of NWP 12 for Keystone XL is similarly appropriate in light of both the irreparable harm to Plaintiffs were the project to proceed and TC Energy's assertions that Keystone XL should be exempt from any court-ordered relief.

If the Court adopts Plaintiffs' proposal for narrowing the vacatur and injunctive relief ordered, then it should deny Defendants' request for a stay pending appeal. As detailed below, Defendants cannot demonstrate that they are likely to succeed on the merits, and their claimed injuries absent a stay are outweighed by the harm to Plaintiffs and the public interest were a stay to issue. *See Washington*, 847 F.3d at 1164 (movant bears burden of justifying stay).

Alternatively, if the Court declines Plaintiffs' proposed modification, Plaintiffs do not oppose the issuance of a partial stay pending appeal of the vacatur as it relates to routine maintenance, inspection, and repair activities on existing projects and non-pipeline construction activities, and of the injunction as it relates to non-Keystone XL uses of NWP 12.

## II.   Defendants fail to show irreparable harm

Defendants' allegations of irreparable injury do not justify a stay. *See Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011) (per curiam) (irreparable harm is the "bedrock requirement" of a stay).

Federal Defendants complain that, absent a stay, the Corps will be burdened by having to process an increased number of individual Section 404(a) permit applications. Fed. Br. 19-20. To begin, those purported burdens are lessened by Plaintiffs' proposed partial vacatur. *Supra* pp. 15-17. And they are a fault of the Corps' own making. The agency was "well aware that its reauthorization of NWP 12 required Section 7(a)(2) consultation" given its prior consultation on the reissuance of NWP 12 in 2007, Order 20, as well as public comments submitted by several Plaintiffs in 2016 citing the need for programmatic consultation, NWP043807-08.

Indeed, the Corps' regulatory manager is on record acknowledging the Corps' consultation obligations before recommending the Corps simply make a "national 'no effect' determination for each NWP reissuance until it is challenged in federal court and a judge rules against the Corps." NWP036481. That is exactly what has occurred, rendering Federal Defendants' claimed harms "less than convincing." *Ctr. for Food Safety v. Vilsack*, 10-cv-04038, 2010 WL 11484449, at *6 (N.D. Cal. Nov. 30, 2010) (citation omitted); *see also Al Otro Lado*, 952 F.3d at 1008 ("That the government's asserted harm is largely self-inflicted severely undermines its claim for equitable relief." (citation and quotation marks omitted)).

In any event, the Corps' alleged burden is overstated, *see supra* pp. 18-20, and cannot support a stay where, as here, "the troubles complained of resulted from

34

[the agency's] failure to follow the law in the first instance." *Swan View Coal. v. Weber*, 52 F. Supp. 3d 1160, 1161-62 (D. Mont. 2014); *accord Miller v. Carlson*, 768 F. Supp. 1341, 1343 (N.D. Cal. 1991); *cf. Rodriguez v. Robbins*, 715 F.3d 1127, 1146 (9th Cir. 2013) ("[E]ven if the government faced severe logistical difficulties in implementing [the injunction] . . . they would merely represent the burdens of complying with the applicable statutes.").

Intervenors, meanwhile, claim that their inability to rely on NWP 12 will cause additional costs and delays. TC Br. 15-18; Coal. Br. 14-16. These purported harms are exaggerated; developers can pursue alternative means of getting their projects built. *See supra* p. 18 (individual permitting process is available); Dreskin Decl. ¶ 15, ECF No. 138-3 (suggesting some pipeline projects could proceed under another NWP); Rorick Decl. ¶ 11, ECF No. 138-5 (similar). In fact, the companies behind several major pipelines, including Keystone XL, Mountain Valley, Atlantic Coast, and Permian Highway, have publicly represented that they should be able to complete their projects on schedule notwithstanding the Court's ruling. *See* Segal Decl. Exs. C, F. And while Intervenors assert that they could be forced to abandon projects altogether, their speculative assertions "do[] not constitute irreparable injury." *Goldie's Bookstore, Inc. v. Super. Ct. of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984); *see also, e.g.*, Rorick Decl. ¶ 15 (projects "*may*" be "*at risk*" for securing

financing (emphasis added)); Dreskin Decl. ¶ 20 ("*some* projects *may* be cancelled *if* the risk profile . . . becomes too great" (emphasis added)).

Even taken at face value, Intervenors' alleged harm stems from the requirement that Intervenors and their members follow the law and obtain permits for their projects. Such ordinary compliance costs do not constitute irreparable harm. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019) (absent threat of going out of business, "monetary injury is not normally considered irreparable" (citation and alteration omitted)); *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) ("[I]njury resulting from attempted compliance with government regulation ordinarily is not irreparable harm."). Indeed, Intervenors have no right to maximize revenues by using a cheaper, quicker permitting process—particularly when their preferred process poses significant harm to protected species, as is the case with major oil and gas pipelines. *See supra* pp. 24-27; *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) ("[L]oss of anticipated revenues . . . does not outweigh the potential irreparable damage to the environment."), *abrogated on other grounds by Monsanto*, 561 U.S. 139; *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (irreparable environmental injuries outweigh temporary economic harms).

The contrary cases on which Intervenors rely, TC Br. 16-17; Coal. Br. 13, are distinguishable. In *Amoco Production Co. v. Village of Gambell*, the Supreme Court found that the financial harm to the oil company from an injunction was truly irreparable, while the environmental harm absent the injunction "was not at all probable." 480 U.S. 531, 545 (1987). In *James River Flood Control Association v. Watt*, the court similarly found that a preliminary injunction posed irreparable harm to the movant and no immediate harm to the other parties. 680 F.2d 543, 544 (8th Cir. 1982) (per curiam). And in *Alaska Survival v. Surface Transportation Board*, the court granted a request to allow a project to move forward because the corporation had already won its appeal and would soon be able to proceed with the project anyway. 704 F.3d 615, 616 (9th Cir. 2012). None of those circumstances are present here. In short, Defendants cannot establish irreparable harm.

## III.   The balance of harms and public interest tip in Plaintiffs' favor

Because Defendants have not satisfied the irreparable harm requirement, the Court need not reach these final two factors. *See Leiva-Perez*, 640 F.3d at 965. Regardless, "the balance of equities and public interest tip sharply" in Plaintiffs' favor. *Al Otro Lado*, 952 F.3d at 1015; *cf. Cottonwood*, 789 F.3d at 1091 ("[W]hen evaluating a request for injunctive relief to remedy an ESA procedural violation, the equities and public interest factors always tip in favor of the protected species.").

As detailed above, Plaintiffs would suffer substantial harm if Keystone XL and other oil and gas pipelines were allowed to be constructed using NWP 12 during the remand. *See supra* pp. 24-27; *see also, e.g.*, Black Decl. ¶ 13, ECF No. 138-1 (stating that developer was one month away from receiving verification for a pipeline "designed to extend hundreds of miles across multiple states"); Rorick Decl. ¶ 9 (stating that developers have plans to construct pipelines in 17 states). This harm is compounded by the fact that the Corps has *already* issued more than 38,000 verifications under NWP 12. *See* Fed. Br. 19; *see also, e.g.*, Rorick Decl. ¶ 7 (asserting that several developers "have relied on NWP 12 authorizations to construct hundreds of miles" of oil and gas pipelines within the past five years).

Federal Defendants claim that Plaintiffs will suffer no such harm because, of the 5,500 pending PCNs, few are expected to relate to oil and gas pipelines or implicate listed species. Fed. Br. 16 (citing Moyer Decl. ¶¶ 6-7, 17). That argument fails. First, that there are many *other* PCNs pending does not mean that the oil and gas pipelines waiting on verifications will not harm Plaintiffs if allowed to proceed. Second, even assuming that permittees are correctly determining whether their NWP 12-authorized activities trigger General Condition 18, *see* Order 19-20, the ensuing project-level review for those activities cannot cure the Corps' violation, *see id.* at 18. Programmatic consultation is needed to ensure that oil and

gas pipelines—combined with the thousands of other PCN and non-PCN uses of NWP 12—will not cause cumulative adverse effects to listed species. *Id.* at 20.

The public interest further weighs against the issuance of a stay. In arguing otherwise, Defendants cite the need to use NWP 12 for the maintenance and repair of electric, internet, and cable lines and wires. *See, e.g.*, Fed. Br. 16; MT Br. 4-5. Plaintiffs' proposed narrowing of the vacatur and injunction would allow such uses to continue, thereby avoiding any associated harms to the public. Similarly, a stay is unnecessary to redress Defendants' overstated fears of regulatory uncertainty. *See* Fed. Br. 18-19. As explained above, Plaintiffs do not oppose narrowing vacatur so that the Corps can enforce special conditions in existing verifications for projects that have already been built. *Supra* p. 17 n.4. And no confusion should result from the Corps' regulation deeming PCNs presumptively authorized after 45 days, *contra* Fed. Br. 19—the Corps should deny verifications to address any uncertainty, but the scope of the Court's vacatur will dictate whether those activities are authorized regardless. *See supra* p. 20.

There is no public interest, however, in allowing the construction of new oil and gas pipelines to proceed before programmatic consultation is completed. As this Court held, that consultation "allows for a broad-scale examination" of NWP 12's potential impacts and safeguards against the "piecemeal destruction" of listed species and critical habitat. Order 10, 18. The threat of such destruction from oil

and gas pipelines is substantial. *Supra* pp. 24-27. And while Defendants tout the

purported tax and energy security benefits of new pipelines, *see* TC Br. 17-18; MT

Br. 6; Coal. Br. 8-9, any such benefits are trumped by the public's interest in

ensuring that the ESA is followed and its core purposes vindicated. *See Mont.*

*Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006) (The "most

basic premise of Congress' environmental laws" is that "the public interest is best

served when the law is followed."); *Hill*, 437 U.S. at 174 (it is "beyond doubt that

Congress intended endangered species to be afforded the highest of priorities");

*Indigenous Envtl. Network v. State Dep't*, 369 F. Supp. 3d 1045, 1051-52 (D.

Mont. 2018) (concluding potential environmental damage to the public outweighed

any energy security and economic benefits provided by Keystone XL).[12]

Thus, the balance of equities and public interest counsel against a stay

pending appeal.

---

[12] That public interest is only heightened given the Court's reasoning that programmatic consultation could, in turn, inform the agency's analyses of NWP 12 under NEPA and the CWA. Order 22-25. Allowing new oil and gas pipelines to go forward before the Corps completes those analyses would undermine the interests protected by those laws. *See Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1177 (9th Cir. 2006) ("The preservation of our environment, as required by NEPA . . . is clearly in the public interest."), *abrogated on other grounds by Winter v. NRDC*, 555 U.S. 7 (2008); *United States v. Akers*, 785 F.2d 814, 823 (9th Cir. 1986) (similar as to CWA).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) grant in part and deny in part Defendants' request to amend the relief ordered in the Court's Order by (a) narrowing the vacatur of NWP 12 to those dredge or fill activities associated with the construction of new oil and gas pipelines, (b) narrowing the injunction of NWP 12 to those dredge or fill activities associated with the construction of Keystone XL, and (c) rejecting Defendants' request for any further narrowing of the vacatur or injunction; and (2) deny Defendants' request for a stay pending appeal.

Dated: May 6, 2020                    Respectfully submitted,

                                      /s/ Doug Hayes
                                      Doug Hayes (*pro hac vice*)
                                      /s/ Eric Huber
                                      Eric Huber (*pro hac vice*)
                                      Sierra Club Environmental Law Program
                                      1650 38th Street, Suite 102W
                                      Boulder, CO 80301
                                      (303) 449-5595
                                      doug.hayes@sierraclub.org
                                      eric.huber@sierraclub.org
                                      *Attorneys for Sierra Club and Northern*
                                      *Plains Resource Council*

/s/ Cecilia D. Segal
Cecilia D. Segal (*pro hac vice*)
Natural Resources Defense Council
111 Sutter Street, Floor 21
San Francisco, CA 94104
(415) 875-6100
csegal@nrdc.org
*Attorney for Bold Alliance and Natural
Resources Defense Council*

/s/ Jared Margolis
Jared Margolis (*pro hac vice*)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
(503) 283-5474
jmargolis@biologicaldiversity.org
*Attorney for Center for Biological Diversity
and Friends of the Earth*

/s/ Timothy M. Bechtold
Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for all Plaintiffs*

## WORD COUNT CERTIFICATION

I certify that the foregoing response contains 9,897 words, as counted with Microsoft Word's "word count" tool, and excluding material Local Civil Rule 7.1(d)(2)(E) omits from the word-count requirement.

/s/ Cecilia D. Segal

## CERTIFICATE OF SERVICE

I certify that I served the foregoing response on all counsel of record via the

Court's CM/ECF system.

/s/ Cecilia D. Segal