Leo Berry
Brian P. Thompson
BROWNING, KALECZYC,
BERRY & HOVEN, P.C.
800 North Last Chance
Gulch, Ste. 101
PO Box 1697
Helena, MT 59624
Tel. (406) 443-6820
Fax (406) 443-6883
leo@bkbh.com
brian@bkbh.com

Thomas C. Jackson (*pro hac vice*)
BAKER BOTTS L.L.P.
700 K Street, N.W.
Washington, DC 20001
Tel. (202) 639-7000
Fax (202) 639-7890
thomas.jackson@bakerbotts.com

*Counsel for Amicus Curiae Essential Infrastructure Coalition*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>U.S. ARMY CORPS OF ENGINEERS, *et al.*,<br>    Defendants,<br><br>TC ENERGY CORPORATION, *et al.*,<br><br>    Intervenor-Defendants. | Case No. CV 19-44-GF-BMM<br><br><br>**BRIEF OF<br>THE ESSENTIAL<br>INFRASTRUCTURE COALITION<br>AS AMICUS CURIAE** |

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION AND INTERESTS OF AMICI CURIAE .......................................1

BACKGROUND ...........................................................................................5

ARGUMENT ................................................................................................7

    A.   Broad readings of the Order have impaired EIC members' projects and will harm the public these members serve....................................................................9

    B.   The Order is causing harm at a national level and will continue to do so unless the Court grants the Corps' pending motion. ...........................................13

CONCLUSION ...........................................................................................17

CERTIFICATE OF SERVICE ...................................................................19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
    140 S. Ct. 1205 (2020) ............................................................................................16

*Sierra Club v. U.S. Army Corps of Eng'rs, et al.*,
    Case No. 1:20-cv-460 (W.D. Tex.) ..........................................................................16

*United States v. Sineneng-Smith*,
    No. 19-67, 2020 WL 2200834 (U.S. May 7, 2020) ...........................................16

STATUTES

Clean Water Act § 404, 33 U.S.C. § 1344 ...........................................................6, 9

Endangered Species Act Section 7(a)(2), 16 U.S.C. § 1536(a)(2) ..........................6

Rivers and Harbors Act of 1899 § 10, 33 U.S.C. § 403 ...........................................6

OTHER AUTHORITIES

82 Fed. Reg. 1860, 1985-86 (Jan. 6, 2017) .............................................................5

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

The Essential Infrastructure Coalition ("EIC" or "Amici") includes a broad array of businesses and state entities dedicated to providing the reliable energy, water, and wastewater infrastructure and services upon which the American public depends every day.  Beyond their common goal of providing these essential services, Amici are affected in common by this Court's recent decision ("Order").  The Order vacated Nationwide Permit 12 ("NWP 12") and enjoined the U.S. Army Corps of Engineers ("Corps") from using NWP 12 to authorize dredge and fill activities under the Clean Water Act ("CWA").  Application of the Order threatens each EIC member's efficient and economical provision of services.  To mitigate against further harm from the Order's improper impediment, Amici respectfully urge the Court to grant the Corps' motion to partially stay the Order.

Amici include the following entities.

1.     The **Dayton Power and Light Company's ("DP&L's")** mission is to improve the lives of the over 550,000 people it serves within a 6,000-square-mile area of West Central Ohio (including the Wright-Patterson Air Force Base) by accelerating a safer and greener energy future.  To accomplish this mission, DP&L applies its core values of safety, integrity, agility, and excellence in managing its assets for the public benefit.  DP&L owns and maintains 1,724 miles of transmission

lines, and regularly must repair, replace, and build new transmission lines and substations.

2.      The **Indianapolis Power & Light Company's ("IPL's")** mission is to improve the lives of the over 490,000 people it serves in Central Indiana by accelerating a safer and greener energy future.   IPL's commitment to the environment, reliability, and its community is widely recognized.   IPL owns and maintains 854 miles of transmission lines, and regularly must repair, replace, and build new transmission lines and substations.

3.      **Dominion Energy, Inc.'s ("Dominion's")** mission is to build a clean and sustainable future and Dominion has committed to achieving net zero emissions by 2050.   Through its entities across the United States, Dominion supplies over seven million utility and retail customers with electricity and natural gas, and its service areas include parts of Virginia, North Carolina, South Carolina, Utah, Wyoming, West Virginia, Ohio, Pennsylvania, and Georgia.   Dominion owns and operates 10,400 miles of electric transmission lines, 85,000 miles of electric distribution lines, 14,600 miles of natural gas transmission, gathering and storage pipelines, and 103,400 miles of gas distribution pipelines that it regularly must repair, replace, and expand upon.

4.      The **Trinity River Authority of Texas ("TRA")** was formed in 1955 by the Texas Legislature to address public water-supply and water-conservation

2

concerns in the Trinity River Basin. TRA's jurisdiction extends over 17,965 square miles, including all or part of 17 Texas counties, and TRA provides services to more than 60 cities in the Trinity River Basin for the benefit of millions of residents. The majority of TRA's services are devoted to financing, constructing, and operating independent enterprise operations serving various cities and the general public within the Trinity River watershed. The TRA owns and operates five water-treatment and supply facilities, five wastewater-treatment facilities, one reservoir, and one recreation project.

5.      The **Lower Neches Valley Authority of Texas ("LNVA")** was established in 1933 by the Texas Legislature to conserve, store, control, preserve, utilize, and distribute the waters within Tyler, Hardin, Liberty, Chambers, and Jefferson Counties, which are located within the Neches River Basin and the Neches-Trinity Coastal Basin. The watersheds of the Neches River and its tributaries occupy an area of approximately 10,300 square miles. The LNVA provides for the present and long-term freshwater needs of municipal, agricultural, and industrial customers; protects water quality in the Neches River and Coastal Basin; ensures affordability of the water supply; and enhances economic development within its jurisdiction. Among other things, the LNVA operates the North Regional Treatment Plant for industrial waste treatment and the West

Regional Water Treatment System for the production and distribution of potable water.

6. **CenterPoint Energy, Inc.'s ("CenterPoint's")** mission is to safely and reliably deliver electricity and natural gas to its over seven million metered customers in Arkansas, Indiana, Louisiana, Minnesota, Mississippi, Ohio, Oklahoma, and Texas. CenterPoint has committed to reduce carbon emissions directly attributable to its operations by 70% from 2005 levels by 2035. CenterPoint owns, operates, and regularly must repair, replace, and build new electric-transmission lines and natural-gas pipelines.

7. **Idaho Power Company's ("IPC's")** mission is to provide clean, reliable, and affordable energy to its 570,000 customers across a 24,000-square-mile service area in southern Idaho and eastern Oregon. To that end, IPC purchases, sells, generates, transmits, and distributes electric energy. IPC owns and operates 17 hydroelectric dams and three natural-gas power plants and soon will be building an approximately 300-mile transmission line for its Boardman to Hemingway project.

\*   \*   \*

Amici, in short, are linked by overriding concerns. Each must ensure that it can meet public demand for the essential services it provides. Each must agilely respond to service interruptions (and threats of such interruptions) that can arise for reasons ranging from severe weather events and natural disasters to the need to

update or replace infrastructure. Each must comply with reliability mandates and compliance timetables. Amici therefore strongly support the Corps' request for a partial stay of the Order.

In this vein, and for the Court's—and ultimately the public's—benefit, the EIC respectfully submits this amicus brief. Its goal is to provide concrete examples of how a broad reading of the Order has harmed Amici and impaired their ability to fulfill their missions to provide safe, reliable, and sustainable energy, water, and wastewater services to the public. Given the Court's own statements during the pendency of the litigation about the litigation's scope, it is likely that the Court does not intend the reading that has been ascribed to it. The Corps' pending motion provides the Court with an important opportunity to ensure that the Order does not impair settled expectations and interrupt the provision of services, at least until the U.S. Court of Appeals for the Ninth Circuit has had an opportunity to weigh in, and Amici urge the Court grant that motion.

## BACKGROUND

NWP 12 authorizes discharges of dredged or fill material into waters of the United States necessary for the construction, maintenance, repair, and removal of a wide variety of utility lines.[1]  NWP 12 covers not only oil pipelines of the type that

---

[1] 82 Fed. Reg. 1860, 1985-86 (Jan. 6, 2017).

have been the focus for the Court in this case, but also reaches water lines, wastewater pipelines, electrical power lines, gas lines, and telecommunications cables, among others, as well as associated facilities such as access roads and substations. The availability of NWP 12 allows providers of important public services to maintain and expand essential energy, water, and wastewater infrastructure in a way that minimizes delays and costs to customers associated with the lengthy individual permit process in those instances where a project would have minimal impacts on waters of the United States.

On April 15, 2020, in response to Plaintiffs' lawsuit challenging targeted agency actions related to the Keystone XL Pipeline, this Court concluded that the Corps unlawfully adopted NWP 12 by not complying with the Endangered Species Act ("ESA") and remanded the permit to the Corps. Although Plaintiffs did not request such relief and the parties did not separately brief issues concerning remedy, the Court's Order went further and (i) vacated NWP 12, and (ii) enjoined the Corps from authorizing any dredge or fill activities under the permit until such time as it completes a consultation with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service under Section 7(a)(2) of the ESA. The Corps has asked the Court to stay, pending appeal, these portions of the Order. In the meantime, the Order already has disrupted existing projects and project planning, thereby impairing the ability of providers of electricity, water, and other essential services

to maintain and repair essential infrastructure and jeopardizing the continued viability of pending projects by imposing regulatory uncertainty, unforeseen delays, and costs arising from the prospect of having to procure individual CWA Section 404 permits.[2]

## ARGUMENT

The EIC respectfully requests that the Court grant the Corps' motion to partially stay the Order so that EIC members may continue to provide essential services to the public without delay or interruption. As more fully described above, the EIC's members develop, own, operate, and maintain infrastructure that provides essential services to the public, including reliable electricity, natural gas, potable water, and wastewater collection and treatment for homes, businesses, courthouses, churches, and every other venue. To provide these services on demand and during every hour of every day of the year, EIC members must regularly develop new infrastructure and vigilantly maintain and repair existing infrastructure. As everyone who has suffered a power outage knows, this work must be timely and efficient. EIC members achieve these results by relying—often heavily—on the regulatory streamlining provided by NWP 12. That permit, with its attendant assurances of

---

[2] NWP 12 also authorizes work under Section 10 of the Rivers and Harbors Act of 1899 in appropriate circumstances.

respect for the environment,[3] is an invaluable and common-sense means for accomplishing many of these critically important ends without significant delay, cost, or public inconvenience.

This Court's Order, however, has been widely understood to threaten such reliance on NWP 12 by entities who, like Amici here, were not party to any proceedings in this case, because the Court and parties publicly stated that any relief would be cabined to the record before the Court. *See infra* Part B. If that broad understanding is correct—indeed, if it remains even *debatable*—massive consequences never previously considered by the Court will apply across the country. This brief's primary goal is to illustrate some of those consequences. Their sheer significance justifies, at the least, the partial stay requested by the Corps, which will provide this Court and, if necessary, the Ninth Circuit ample time to consider whether such consequences are indeed appropriate before such consequences take hold. The fact that the public at large will be adversely affected by instant implementation of the Order, combined with the case's previous omission of information about these consequences, justifies such relief.

---

[3] Like other NWPs, NWP 12 is subject to multiple conditions that provide assurance that discharges of dredged or fill material will have, at most, a minimal impact on waters of the United States. For instance, there are limitations on the types and areas of waters of the United States that can be impacted by a project (and local Corps districts and states can add further limitations to address local conditions). Other conditions include requirements for mitigation and provisions for Corps review of proposed discharges in appropriate cases.

A.     **Broad readings of the Order have impaired EIC members' projects and will harm the public these members serve.**

The Order has had immediate impacts on EIC members and has the potential to further disrupt their ability to provide essential services in a timely fashion. The following are just some of the examples that illustrate how significantly the Court's order would intrude into the provision of essential services if the broad reading is correct and if the Court does not grant the partial stay. Undersigned counsel believe that the level of detail provided here will be more than ample for the Court to see with clarity the consequences of NWP 12's elimination. Amici are prepared to provide any further information for the Court's review if it would like to learn more about any or all examples listed at whatever degree of detail it deems suitable.

1. One EIC member has a 50-mile electric transmission line project that is in the permitting stage; construction was slated to begin later this year. The project has already received approval from the state public utility commission as being necessary to respond to growing demand in the project area. This EIC member was one week away from submitting preconstruction notifications ("PCNs") for the project to the local Corps district office pursuant to NWP 12 when the Order issued. As a result, the member has been forced to convert its PCN to an application for an individual CWA Section 404 permit. Given the anticipated period of 12 to 18 months (or possibly more) for processing of an application for an individual permit, the Order will impact the timeline for construction of this important project that will

9

supply additional power to meet growing demand in the area.  This member has identified 15 other transmission projects and 11 pipeline projects for which it anticipated using NWP 12 to authorize impacts to waters of the United States that could also be affected by the Court's Order.

2.  Another EIC member is in the planning stages for an approximately 300-mile electric transmission line in the Northwest that will allow the member to provide renewable power to help meet customer demand, especially during periods of peak usage during the summer months.  Project planning to date has been predicated on the availability of NWP 12 to authorize several crossings of waters of the United States associated with access roads and potentially with foundations for transmission structures.  The member now faces the prospect of needing an individual CWA Section 404 permit for the project, threatening significant delays and cost increases to this important regional project.

3.  A separate EIC member has identified over 200 projects at various stages of completion that will be harmed by the Order prohibiting reliance on NWP 12 if understood broadly.  These projects include numerous electric-transmission and distribution projects and renewable-energy projects, as well as a variety of gas-pipeline projects, ranging from small service lines to interstate pipelines.  In a number of cases, these projects were already under construction when the Order was issued.  In other cases, the Corps had verified that the projects qualified for NWP 12

10

but construction had not yet begun.  In still other cases, permitting for the projects was underway, with PCNs having either been submitted but not yet verified or in preparation.  Due to the Order, many of these projects now may be delayed with attendant increases in cost and inconvenience to the public; for others, the projects may be abandoned altogether because the lack of NWP 12 will render them wholly infeasible or unduly costly.

4. Delays arising from the Order create particular concerns with respect to solar projects in light of state mandates requiring utilities to obtain 100% of their energy from non-carbon-emitting sources by 2045.  To meet this and related requirements, the member must put a significant amount of solar generation in service to comply with the mandate, the equivalent of approximately 1,000 megawatts of solar power going into service every year.  Without NWP 12, this member's ability to meet this goal is, to put it mildly, cast in serious doubt.  Similarly, delays in transmission projects will affect the member's ability to meet grid reliability standards established by the North American Electric Reliability Corporation ("NERC").

5. One EIC member frequently relies on NWP 12 in connection with the construction and maintenance of its wastewater-collection system, which includes over 200 miles of interceptor pipes and many miles of collector pipes.  This is a gravity-based collection system that requires the siting of most pipes in low-lying

areas, which frequently results in the need to cross wetlands, streams, or other water bodies that qualify as waters of the United States. This member also regularly undertakes projects to repair existing pipes and to add new capacity to serve a growing metropolitan area. Due to the Order and the unavailability of NWP 12, this member will be forced to consider redesigns of some projects and will face not only project delays, but also significant cost increases. Notably, some of these projects are driven by the need to address sanitary sewer overflows, and delays in these projects could subject this member to enforcement actions by state regulatory authorities.

6. Another EIC member routinely relies on NWP 12 for transmission projects necessary to comply with NERC reliability standards. This member currently has three PCNs pending before the Corps for projects for new transmission lines, reconductoring (upgrading) existing transmission lines, and expanding an existing substation. Before the Order issued, this member was preparing to submit two additional PCNs for a substation expansion and for reconductoring of existing transmission lines. Some of these projects are subject to mandatory timelines, and this member's failure to meet those timelines could make this member subject to enforcement actions or breach of Regional Transmission Organization agreements. Due to the Order, and this member's need to pursue other avenues to comply with the CWA, this poses potential compliance risks to the member. Other impacts

observed by this member include field construction contractors for these planned projects being out of work and a delay in this member's ability to recover the capital costs already expended for these projects.

In addition, the Order has created regulatory uncertainty related to the validity of the Corps' approvals under NWP 12 that were issued just before the Order, but where construction had not yet occurred.  In one such case, construction crews were already on site and preparing to begin work shortly after the Court's April 15th Order. Despite already having paid for required mitigation and receiving all necessary approvals before the Order was issued, this member now is unsure how its recent approval may be impacted.

7. Relatedly, another member has two planned projects for converting overhead primary conductors to underground primary cable on its distribution system and for rebuilding a 3-Phase overhead mainline on its distribution system that now face delays.  Delaying this member's ability to obtain authorizations to proceed with these important projects unnecessarily postpones the associated benefits to reliability they will bring.

**B.    The Order is causing harm at a national level and will continue to do so unless the Court grants the Corps' pending motion.**

These few examples of harm that EIC members are experiencing offer a mere glimpse of the disruption and injury that will flow from a broad reading of the Order. They are not limited to Montana or any project; they will affect everyone throughout

the country and will reverberate for years to come as essential infrastructure projects and necessary upgrades and repairs are delayed, potentially by years.  This massive scope is part of the reason why a stay is warranted—if the Court of Appeals or Supreme Court concludes that NWP 12 is permissible for the kind of projects described above, there will be no way to restore the lost time and money that will be gone forever.  There will be no way to replace the days or weeks of lost productivity because of inadequate electricity or other essential services, much less retroactively make comfortable someone subjected to misery, as often happens when essential services are cut.  Costs imposed now, even if ultimately deemed based on an error of law, will nonetheless force rate increases felt by a public that is ill equipped to accept further expense given the pandemic and the economic havoc it has imposed.

Plaintiffs' recent brief itself illustrates why a stay ought to be granted.  The one thing made clear by the menu of options put forth by the Plaintiffs is that the Order, as understood, should not be effective without major modifications.  *See* ECF No. 144 at 1-3.  Amici fully agree, of course, and welcome Plaintiffs' step in that direction.  But the solution, for the time being at the very least, is to grant the stay as the Corps has requested, which will allow time for full and fair consideration by this Court (including of the many ramifications that have not yet been fully addressed, such as those in this brief) or, if necessary, by the Court of Appeals.

A stay does not mean that the Court necessarily abandons its judgment; it simply means that its consequences will be held in abeyance pending further review. Given that many of these consequences are only now being presented to the Court, and no party thought that this litigation would lead to the examples described above, there can be little argument that pushing the pause button here is unjustifiable.

To the contrary, and as reflected in their recent brief, Plaintiffs never even sought the relief that is now attributed to this Court's order.  From the very beginning, they disclaimed any intent to go beyond the activities directly at issue.[4] When parties who were strangers to those specific activities sought to intervene out of concern for the potential for broader ramifications, the intervention was opposed on the ground that any relief could not affect them,[5] and this Court agreed.[6] Whatever the ultimate result, there can be no good reason not to *stay* the vacatur and

---

[4] *See* ECF Nos. 1, Prayer for Relief (requesting narrow, project-specific relief with respect to vacatur and injunctions); 36, Prayer for Relief (same).

[5] *See* ECF No. 50 at 3 (confirming Plaintiffs were not seeking to have NWP vacated or "broadly enjoined," but only "narrowly tailored relief to ensure adequate environmental review of oil pipelines, especially Keystone XL"); *see also* ECF No. 107 at 57 ("Plaintiffs have not sought to have NWP 12 broadly enjoined for the very reason Montana is concerned about—this case . . . is not meant to affect other uses of NWP 12 that provide a public benefit and would have only minimal environmental impacts.").

[6] ECF No. 59 at 4-5 (finding that "[t]he action's disposition as currently pled by Plaintiffs proves unlikely to impede or impair [interested person's] abilities to rely on NWP 12," as "Plaintiffs do not ask the Court to vacate NWP 12 . . . . [and they] could still prospectively rely on the permit until it expires on its own terms in March 2022, even if Plaintiffs prevail on the merits").

injunction under these circumstances.  Indeed, barely a month ago, the U.S. Supreme Court itself stayed an injunction that would have changed the rules of a state primary election close to voting day—and it reiterated multiple times that staying that injunction was appropriate in part because the district court granted relief that the plaintiff had not even sought.  *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (reprimanding district court for, among other things, "affording relief that the plaintiffs themselves did not ask for in their preliminary injunction motions," which the Court described as a "critical point in the case").  Indeed, just *this morning*, the Supreme Court unanimously reversed the Ninth Circuit because a court's departure from "the principle of party presentation" constitutes an abuse of discretion.  *United States v. Sineneng-Smith*, No. 19-67, 2020 WL 2200834, at *3 (U.S. May 7, 2020).

In short, a sudden change in NWP 12 permitting across the country— especially when such a result was previously disavowed—surely warrants additional consideration before taking effect.  To be sure, the Court's Order may well have been misunderstood, given the Court's own statements about the potential scope of any injunction.  ECF No. 59 at 4-5.  But it is in fact being understood that way across the country, including in at least one notable lawsuit challenging another project, *Sierra Club v. U.S. Army Corps of Eng'rs, et al.*, Case No. 1:20-cv-460 (W.D. Tex.).  The immediate solution is to simply grant the partial stay altogether, which will then

allow the Court to undertake whatever further analysis or clarification may be warranted.

## CONCLUSION

Based on the foregoing, the EIC respectfully urges the Court to grant the Corps' motion to partially stay the Order.  Granting that motion will ensure that entities like EIC members and, more importantly, the public they serve will not experience further harm due to the Order until this Court and, if necessary, the Ninth Circuit has the opportunity to review the Order.

DATED this 7th day of May, 2020.

BROWNING, KALECZYC, BERRY & HOVEN, P.C.


By _/s/Brian P. Thompson_____
        Brian P. Thompson

                -AND-

    Thomas Jackson (*pro hac vice*)
    BAKER BOTTS L.L.P.

*Counsel for Amicus Curiae Essential Infrastructure Coalition*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(d)(2)(E), I certify that **BRIEF OF THE ESSENTIAL INFRASTRUCTURE COALITION AS AMICUS CURIAE**, is double spaced, is a proportionately spaced 14 point typeface, and contains 3,940 words.


      /s/ *Brian P. Thompson*
Brian P. Thompson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the 7th day of May, 2020, I filed the above pleading with the Court's electronic case management system, which caused notice to be sent to counsel of all parties.


 /s/ *Brian P. Thompson*
BROWNING, KALECZYC, BERRY & HOVEN, P.C.

19