| | |
|---|---|
| Jeffery J. Oven | Peter C. Whitfield |
| Mark L. Stermitz | SIDLEY AUSTIN LLP |
| Jeffrey M. Roth | 1501 K Street, NW |
| CROWLEY FLECK PLLP | Washington, DC 20005 |
| 490 North 31st Street, Ste. 500 | Telephone: 202-736-8000 |
| Billings, MT 59103-2529 | Email:  pwhitfield@sidley.com |
| Telephone: 406-252-3441 | |
| Email: joven@crowleyfleck.com | |
|     mstermitz@crowleyfleck.com | |
|     jroth@crowleyfleck.com | |

*Counsel for TransCanada Keystone Pipeline, LP and TC Energy Corporation*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, BOLD ALLIANCE, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, CENTER FOR BIOLOGICAL DIVERSITY, and FRIENDS OF THE EARTH,<br><br>                          Plaintiffs,<br><br>    vs.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS and LT. GENERAL TODD T. SEMONITE (in his official capacity as U.S. Army Chief of Engineers and Commanding General of the U.S. Army Chief of Engineers),<br><br>                          Defendants.<br><br>TRANSCANADA KEYSTONE PIPELINE, LP, a Delaware limited partnership, and TC ENERGY CORPORATION, a Canadian Public company, THE STATE OF MONTANA, AMERICAN GAS | CV 19-44-GF-BMM<br><br>**REPLY IN SUPPORT OF MOTION FOR STAY PENDING APPEAL BY TRANSCANADA KEYSTONE PIPELINE, LP AND TC ENERGY CORPORATION** |

ASSOCIATION, AMERICAN PETROLEUM INSTITUTE, ASSOCIATION OF OIL PIPELINES, INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA, and NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION

        Defendant-Intervenors.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION .....................................................................................................1

ARGUMENT .............................................................................................................2

    A.    Keystone XL And All Other Utility Projects Are Entitled To A Stay ................................................................................................................2

    B.    There Is No Basis For Enjoining The Use Of NWP 12 For Keystone XL ..................................................................................................6

        1.    Plaintiffs Have Failed to Show That They Will Suffer Irreparable Harm Absent an Injunction ......................................6

        2.    The Balance of Harms Weighs Against an Injunction .............10

CONCLUSION ........................................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015) ................................................................................8

*Sierra Club v. Marsh*,
    816 F.2d 1376 (9th Cir. 1987) ................................................................................5

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ................................................................................................7

**Statutes**

16 U.S.C. § 1536 ..............................................................................................................8, 9

**Other Authorities**

50 C.F.R. § 402.02 ................................................................................................................5

50 C.F.R. § 402.14 ............................................................................................................4, 5

82 Fed. Reg. 1860 (Jan. 6, 2017) ......................................................................................2, 5

U.S. Fish and Wildlife Service Environmental Assessment for the
    Dakota Access Pipeline (May 2016),
    https://www.fws.gov/uploadedFiles/DAPL%20EA.pdf ......................................6

## INTRODUCTION

The stay papers filed by TC Energy, the Federal Defendants, the NWP 12 Coalition and the State of Montana have demonstrated that there is no basis for vacating Nationwide Permit 12 (NWP 12) and enjoining the U.S. Army Corps of Engineers (Corps) from authorizing any activity under it. The statutory violation identified in the April 15 Order (Order)—the Corps' failure to engage in programmatic consultation with U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) before issuing NWP 12—is remedied by a remand for consultation. By taking the additional steps of vacating NWP 12 and enjoining its use, the Order will delay critical infrastructure projects, causing substantial harm to State and local governments, businesses, and individuals throughout the country that rely on the projects and the economic activity they support.

Plaintiffs themselves recognize that the relief the Court has ordered is unjustified and unlikely to survive appellate review. They therefore ask the Court to narrow the scope of both the vacatur and injunctive relief. But the relief they seek—precluding the use of NWP 12 only for "the construction of new oil and gas pipelines," including the Keystone XL Pipeline (Keystone XL), Doc. 144 at 2—rests on no defensible legal standard or principle. The Court should reject the gerrymandered relief plaintiffs seek and stay its order *in toto*.

# ARGUMENT

## A.  Keystone XL And All Other Utility Projects Are Entitled To A Stay

It is clear from Plaintiffs' declarations that they oppose the construction of any new oil or gas pipelines in the United States. But Plaintiffs provide no valid reason for "narrowing the vacatur to the use of NWP 12 for the construction of new oil and gas pipelines," Doc. 144 at 14, and even less reason to "limit[] injunctive relief to the authorization of Keystone XL under NWP 12." *Id.* at 28.

First, there is no basis for singling out oil and gas pipelines and claiming that their use of NWP 12 poses a particularly "severe risk to species." Doc. 144 at 14. Plaintiffs cite the potential harm to listed species from "increased sedimentation, and from horizontal directional drilling used during pipeline construction." *Id.* at 16. But that same drilling method is used to construct other buried utility projects like water pipelines and broadband and fiber optic cables. *See* 82 Fed. Reg. 1860, 1883, 1887 (Jan. 6, 2017). Plaintiffs cite "NWP 12's cumulative impacts to listed species, like migratory birds, that cross regions." Doc. 144 at 25. But migratory birds could be harmed by other utility line projects that Plaintiffs concede should be permitted to use NWP 12. *Cf.* Biological Assessment for the Keystone XL Pipeline, Segal Decl., Ex. D at 50 (Doc. 144-14 at 121) (discussing "risk of collision with power lines" for birds).

2

Similarly, Plaintiffs claim that oil and natural gas pipelines "affect numerous waterbodies and thereby involve precisely the kinds of cumulative impacts that should be addressed through programmatic consultation." Doc. 144 at 13-14. But this does not distinguish oil and gas pipelines from "the construction of electric, internet, and cable lines." *Id.* at 15. These types of utility projects are also likely to cross "numerous waterways," and Plaintiffs have offered no evidence to suggest otherwise.

Citing other pipelines, Plaintiffs argue that, "[w]hile individually," Keystone XL, the Flanagan South pipeline, and the Dakota Access pipeline, "may not jeopardize species, together their cumulative impacts could. Thus, programmatic review is necessary." Doc. 144 at 32. But this contention does not demonstrate that oil and natural gas pipelines differ from other utility projects that might use NWP 12: the same abstract claim could be made about three linear electricity projects.

And Plaintiffs are simply wrong in claiming that "programmatic consultation is 'the only way to avoid piecemeal destruction of species and habitat' and that project-level review 'cannot ensure that the discharges authorized by NWP 12 will not jeopardize listed species or adversely modify critical habitat.'" *Id.* at 11 (citing Order at 18-19). Project-level consultation includes a cumulative effects analysis. *See* 50 C.F.R. § 402.14(c)(1)(iv), (g)(3). And the Services rely on this analysis in establishing an "environmental baseline" to inform their "opinion as to whether the

3

action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(g)(4).

Plaintiffs also cite the risk of fossil fuel spills, Doc. 144 at 30-32, but this purported distinction between oil pipelines and other utility infrastructure is also groundless. To begin with, the Corps authorizes only dredge and fill activity in waters of the United States under NWP 12. It does not authorize the operation of pipelines, *see* 82 Fed. Reg. at 1883-84, and Plaintiffs have made no showing that oil spills are cognizable "effects" of the Corps' action. "The regulations define 'effects of the action' as the project's immediate impacts on the species ('direct effects') and those impacts that are *reasonably certain to occur* in the future ('indirect effects')." *Sierra Club v. Marsh*, 816 F.2d 1376, 1387 (9th Cir. 1987) (citing 50 C.F.R. § 402.02) (emphasis added). Cumulative effects are likewise "effects of future State or private activities, not involving Federal activities, that are *reasonably certain to occur* within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02 (emphasis added). Unable to show that oil spills are "reasonably certain to occur," Plaintiffs badly mischaracterize the record: they claim that the 2019 Biological Assessment for Keystone XL found "that there is a high likelihood of several oil spills occurring in pallid sturgeon habitat over the 50-year life of the project." Doc. 144 at 31. In fact, the cited page describes an oil

4

spill from Keystone entering a river as an "*unlikely* event." *See* Segal Decl., Ex. D at 83 (Doc. 144-14 at 154) (emphasis added).

Moreover, the risk of oil spills is a problem for an endangered species only if the pipeline is in an area where there are listed species or critical habitat, in which case a PCN is required and consultation will occur. That is exactly what happened with the Flanagan South and the Dakota Access pipelines. In each instance, there *was* consultation between the federal agencies and FWS, which found the projects *not likely* to jeopardize the continued existence of any listed species or cause the destruction or adverse modification of any critical habitat.[1]

Finally, Plaintiffs have given no valid reason to limit the vacatur to Keystone XL. Doc. 144 at 27, n.10. Keystone XL has been through the formal consultation process, which included a cumulative effects analysis. *See infra* at 8-9. In the resulting biological opinion, FWS concluded that Keystone XL was not likely, on its own or cumulatively with other actions, to jeopardize the continued existence of any species or destroy critical habitat. Segal Decl., Ex. E at 35-37 (Doc. 144-14 at

---

[1] *See* Doc. 144 at 32 (acknowledging consultation and Biological Opinion for Flanagan South pipeline); U.S. Fish and Wildlife Service Environmental Assessment for the Dakota Access Pipeline, at 21-28 (May 2016), https://www.fws.gov/uploadedFiles/DAPL%20EA.pdf (discussing consultations under ESA section 7).

5

299-301). Thus, Plaintiffs cannot show Keystone XL's reliance on NWP 12 would severely harm protected species.[2]

At bottom, Plaintiffs' effort to narrow the scope of the Court's vacatur rests on nothing more than their distaste for oil and gas pipeline projects, and their well-founded fear that, without some narrowing, the Court's remedy will not survive appellate review. Mere expediency, however, is not a justification for tailoring equitable relief. The proper response to the overbreadth of the remedy this Court ordered is to limit that remedy to a remand, and abandon vacatur of NWP 12.

### B. There Is No Basis For Enjoining The Use Of NWP 12 For Keystone XL

#### 1. Plaintiffs Have Failed to Show That They Will Suffer Irreparable Harm Absent an Injunction

To obtain an injunction, Plaintiffs must show that they will suffer irreparable harm if Keystone XL is permitted to use NWP 12 during a remand to the Corps for programmatic consultation. *See, e.g.*, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). The fact that the Order found a procedural violation of the ESA does not alter their burden. There "is no presumption of irreparable injury where there has been a procedural violation in ESA cases. A plaintiff must show

---

[2] Moreover, this analysis would be the same whether Keystone XL proceeds under NWP 12 using the preconstruction notification process or through the individual permit process that Plaintiffs contend is necessary.

irreparable injury to justify injunctive relief." *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015). Plaintiffs have wholly failed to make that showing.

First, Plaintiffs claim that an injunction is needed to ensure that TC Energy will not proceed under NWP 12 even if it remains vacated. There is absolutely no basis for suggesting that TC Energy and the Corps would flout an order of this Court. TC Energy has obeyed this Court's prior injunctions and indeed has repeatedly submitted status reports in related litigation apprising the Court of its construction plans and its pre-construction and construction activities for Keystone XL.

Second, Plaintiffs cite harm to species that they allege will be caused by Keystone XL. Doc. 144 at 30. But the very fact that the FWS has evaluated the potential impacts of Keystone XL makes an injunction limited to that project entirely inappropriate. The ESA does not prohibit take of protected species at all times. Instead, it requires federal agencies to ensure agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). Agencies comply with this requirement through the consultation process, and Keystone XL has been through a comprehensive consultation.

7

In the biological assessment (BA) presented to FWS for Keystone XL, a cumulative effects assessment was conducted that included "the effects of future state, tribal, local, or private actions that are reasonably certain to occur in the action area that could, when combined with the consequences of the Proposed Federal Decisions, contribute to effects on listed species." Segal Decl., Ex. D at 26 (Doc. 144-14 at 97). The methodology for this assessment was prepared in accordance with the ESA Consultation Handbook as well as applicable ESA regulations. *Id.* The BA included an analysis of the cumulative effects on each of the potentially affected species. *Id.* at 32 (black-footed ferrets), 49 (interior least tern), 75 (whooping crane), 84 (pallid sturgeon), 90 (Topeka shiner), 122 (American burying beetle), 131 (northern long-eared bat), 148 (piping plover), 156 (rufa red knot), 166 (western prairie fringed orchid). The BA concluded that Keystone XL was likely to adversely affect only the American burying beetle. *Id.* at 170. There was no finding that the cumulative impact of Keystone XL was "likely to jeopardize the continued existence" of the American burying beetle, or would "result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2).

The FWS reviewed the BA during formal consultation on Keystone XL. In FWS's biological opinion (BO), the agency also discussed potential cumulative effects of Keystone XL, including potential effects of oil spills and climate change.

FWS agreed with the conclusions in the BA and determined that Keystone XL was not likely to jeopardize the continued existence of any species. Segal Decl., Ex. E at 35-37 (Doc. 144-14 at 299-301). Thus, Plaintiffs' claims that impacts from the construction of pipelines and Keystone XL "are likely to be particularly severe," Doc. 144 at 14-17, and that there is "ample evidence of irreparable injury from Keystone XL's threatened harms to protected species," *id.* at 29-30, are not true. And the cumulative effects analysis employed by the Corps and FWS in the BA and BO is the same that would be done if Keystone XL had to apply for an individual permit, as Plaintiffs contend.

Plaintiffs attempt to dismiss the foregoing by claiming that it "ignores the Court's key holding that '[t]he Corps cannot circumvent ESA Section 7(a)(2) consultation requirements by relying on project-level review,'" and asserting that "project-specific consultation cannot adequately consider the cumulative impacts of NWP 12-authorized activities." Doc. 144 at 31. But this is an impermissible attempt to shift the burden of proving irreparable harm. To obtain an injunction, Plaintiffs must demonstrate that the alleged inadequacies in project-specific consultation threatens them with *imminent* and *irreparable* harm. Abstract arguments about the inadequacy of project-specific consultation—which is all Plaintiffs have offered—cannot suffice.

## 2.     The Balance of Harms Weighs Against an Injunction

Because there is no basis for concluding that Plaintiffs will suffer an irreparable harm absent an injunction, the Court can and should consider the harms to defendants and the public in deciding whether to grant a stay. And those factors weigh heavily in favor of such relief.

Plaintiffs say that the costs and delays that will occur if Keystone XL cannot use NWP 12 are "exaggerated." Doc. 144 at 35. But in the article Plaintiffs cite, TC Energy declined to provide a comment. Doc. 144-14 (Segal Decl., Ex. F). That is not an admission that TC Energy will not suffer significant harms absent a stay. The other article Plaintiffs cite acknowledged that the Order put Keystone XL's summer construction schedule "in jeopardy," and noted only that TC Energy is "reviewing options to address the impact" of the ruling and "to secure the necessary authorizations to continue with planned Keystone XL construction." *Id.* at (Segal Decl., Ex. C). That in no way contradicts the sworn declaration establishing that each option will impose substantial costs on the company, will threaten hundreds of jobs and the significant tax revenue that Keystone XL will provide, and could delay the pipeline's operational date. *See* Stay Br., Doc. 137, at 16-18.

## CONCLUSION

For the reasons stated above and in its opening brief, TC Energy requests the Court stay its Order in full pending resolution of an appeal to the Ninth Circuit.

Dated: May 8, 2020                              Respectfully submitted,

*/s/ Peter C. Whitfield.*
Peter C. Whitfield
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000 (telephone)
(202) 736-8711 (fax)
Email: pwhitfield@sidley.com


*/s/ Jeffery J. Oven*
Jeffery J. Oven
Mark L. Stermitz
Jeffrey M. Roth
CROWLEY FLECK PLLP
490 North 31st Street, Ste. 500
P.O. Box 2529
Billings, MT 59103-2529
Telephone: 406-252-3441
Email: joven@crowleyfleck.com
       mstermitz@crowleyfleck.com
       jroth@crowleyfleck.com

*Counsel for TransCanada Keystone Pipeline LP and TC Energy Corporation*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), I certify that this brief is printed in 14-point font, double spaced, and contains 2,329 words, excluding tables, caption, signatures, and certificates of service and compliance.

*/s/ Jeffery J. Oven*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served today via the Court's CM/ECF system on all counsel of record.

*/s/ Jeffery J. Oven*