IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

NORTHERN PLAINS RESOURCE
COUNCIL, et al.,

       Plaintiffs,

       v.

U.S. ARMY CORPS OF ENGINEERS,
et al.,

       Defendants,

TC ENERGY CORPORATION, et al.,

       Intervenor-Defendants,

STATE OF MONTANA,

       Intervenor-Defendant,

AMERICAN GAS ASSOCIATION,
et al.,

       Intervenor-Defendants.

**CV 19-44-GF-BMM**

**ORDER AMENDING
SUMMARY JUDGMENT
ORDER (DOC. 130)
AND
ORDER REGARDING
DEFENDANTS' MOTIONS
FOR STAY PENDING
APPEAL**

**INTRODUCTION**

The Court issued an order on the parties' motions for summary judgment on

April 15, 2020. (Doc. 130.) The Court concluded that the Army Corps of

Engineers ("Corps") violated the Endangered Species Act ("ESA") when it

reissued Nationwide Permit 12 ("NWP 12") in 2017. (*Id.* at 25.) The Court

1

remanded NWP 12 to the Corps for compliance with the ESA. (*Id.* at 26.) The Court also vacated NWP 12 and enjoined the Corps from authorizing any dredge or fill activities under NWP 12 pending completion of the consultation process and compliance with all environmental statutes and regulations. (*Id.*)

## DISCUSSION

Federal Defendants and TC Energy have filed motions for a partial stay pending appeal. (Docs. 131 & 136.) Federal Defendants also suggest that the Court could revise its remedy. (Doc. 131 at 7.) Plaintiffs propose a revised remedy that would narrow the scope of the vacatur and injunction. (Doc. 144 at 10.)

## I.   THE PLAINTIFFS' FACIAL CHALLENGE AND THE COURT'S DECISION

The Court focused its ESA analysis on Plaintiffs' facial challenge to NWP 12. (Doc. 130 at 7-21.)  Plaintiffs alleged that NWP 12 authorized activities that "cause immediate and irreparable impacts to ecosystem functions of streams and adjacent wetlands" and "adversely affect hundreds of listed species that rely on rivers, streams, and wetland habitats and other aquatic resources across the country." (Doc. 36 at 43.) Plaintiffs' challenge focused on the Corps' use of NWP 12 to approve pipeline projects like Keystone XL, but Plaintiffs did not suggest that their harms stemmed only from pipelines, let alone only from Keystone XL. (Doc. 144 at 33.)

2

Plaintiffs explained in seeking summary judgment that "regional conditions and project-level consultations" represented "inadequate substitutes for programmatic consultation" because they "fail to adequately analyze NWP 12's cumulative impacts to listed species, like migratory birds, that cross regions." (Doc. 73 at 42 (citing Keystone XL as "illustrative")). The Court agreed with Plaintiffs. The Court concluded that the Corps cannot circumvent the consultation requirements of ESA § 7 by relying on project-level review. (Doc. 130 at 16.) The Court recognized that "[p]rogrammatic review of NWP 12 in its entirety . . . provides the only way to avoid piecemeal destruction of species and habitat." (Doc. 130 at 18.) The Court vacated NWP 12 and enjoined the Corps from authorizing activities under NWP 12. (Doc. 130 at 26.)

The relief that the Court provided comports with law. A district court "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c); *see also In re Bennett*, 298 F.3d 1059, 1069 (9th Cir. 2002). The Court properly can grant the presumptive remedy of vacating the unlawful action, particularly where, as here, Plaintiffs requested "such other relief as the Court deems just and appropriate." (Doc. 36 at 88); s*ee Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2307 (2016).

The U.S. Supreme Court recently addressed a district court's authority in

3

determining the appropriate relief in the face of an unconstitutional statute in *Whole Woman's Health*. A group of doctors challenged Texas's law that required doctors to perform abortions in a surgical center and that required doctors who perform abortions to have admitting privileges at a local hospital, as applied to doctors at two separate abortion facilities. *Id.* at 2299, 2301. The district court enjoined enforcement of both provisions throughout Texas. *Id.* at 2303.

The Fifth Circuit reversed, in significant part, due to the fact that res judicata barred the district court from holding the admitting-privileges unconstitutional statewide when petitioners had challenged its application only to two separate facilities. *Id.* at 2300-301. The Supreme Court reversed. Petitioners had asked for as-applied relief and for "such other and further relief as the Court may deem just, proper, and equitable." *Id.* at 2307. The Supreme Court concluded that "[n]othing prevents . . . awarding facial relief as the appropriate remedy for petitioners' as applied [constitutional] claims" even when the facial relief exceeds the other relief requested. *Id.* at 2307. Plaintiffs here also asked for "other relief as the Court deems just and appropriate." (Doc. 36 at 88.)

The Ninth Circuit likewise has recognized that "the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed" when a reviewing court determines that agency regulations are unlawful. *Empire Health Found. v. Azar*, __ F.3d __, 2020 WL 2123363, *10 (9th

Cir. May 5, 2020) (citation omitted). The Ninth Circuit invalidated on substantive grounds a rule promulgated by the Secretary of Health and Human Services regarding Medicare reimbursement. *Id.* at *8-9. The Ninth Circuit saw no reason not to apply the "ordinary result" of vacating the invalid rule that it had deemed unlawful. *Id.* at *10.

Accordingly, a single plaintiff with a successful Administrative Procedure Act ("APA") claim may obtain broad programmatic relief. *See E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1283 (9th Cir. 2020); *O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019) (rejecting argument that vacatur "should be limited to the plaintiffs in this case"). The Ninth Circuit affirmed a nationwide injunction to ensure the implementation of a "uniform federal policy" and to avoid having important parts of federal immigration law being determined according to the law of a local forum rather than having a "uniform federal definition." *E. Bay Sanctuary Covenant*, 950 F.3d at 1283 (citations omitted). The ESA likewise has nationwide application and significance that should be interpreted and applied pursuant to a "uniform federal definition."

Other courts routinely have vacated invalid agency actions of broad applicability without requiring plaintiffs to show harms stemming from each unlawful application. The Ninth Circuit in *Natural Resources Defense Council v. U.S. Environmental Protection Agency*, 526 F.3d 591, 608 (9th Cir. 2008),

vacated a rule adopted by EPA that prevented EPA from requiring permits for storm water discharge comprised solely of sediment from oil and gas construction activities. *See also Chamber of Commerce of U.S. v. Dep't of Labor*, 885 F.3d 360, 388 (5th Cir. 2018) (vacating Department of Labor's application of the "fiduciary rule" to broker-dealer and insurance agents as conflicting with the Employee Retirement Income Security Act). The facts presented here, and the cases analyzed, indicate that the Court exercised appropriate discretion when it chose to vacate broadly and enjoin the Corps' authorizations under NWP 12 due to the Corps' program-level ESA violation. *See Empire Health Found.*, 2020 WL 2123363 at *10.

## II.   REMEDY

Federal Defendants now suggest that the Court has the authority to amend the scope of the relief ordered. (Doc. 131 at 7.) Plaintiffs do not oppose a partial narrowing of the vacatur and injunction. (Doc. 144 at 9-10.) Plaintiffs suggest that the Court narrow the vacatur of NWP 12 to a partial vacatur that applies to the construction of new oil and gas pipelines. (*Id.*) This proposed narrowing would keep NWP 12 in place during remand insofar as it authorizes non-pipeline construction activities and routine maintenance, inspection, and repair activities on existing NWP 12 projects. (*Id.* at 10.) Plaintiffs also recommend that the Court narrow the injunction to enjoin the Corps from authorizing any dredge or fill

activities for Keystone XL under NWP 12. (*Id.*) Plaintiffs contend that this narrowed relief would afford endangered and threatened species and their habitat appropriate protection while minimizing any potential disruption. (*Id.*)

Vacatur stands as the presumptively required remedy when an agency acts unlawfully. *See* 5 U.S.C. § 706(2)(A) (directing courts to "set aside agency action . . . found to be . . . not in accordance with law"). The Ninth Circuit in *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 530-31 (9th Cir. 2015), invalidated EPA's unconditional registration of an insecticide used in beekeeping as being in violation of its own regulations. The question of the appropriate remedy remained. The precariousness of bee populations led the Ninth Circuit to determine that "leaving EPA's registration . . . in place risks more potential environmental harm than vacating it." *Id.* at 532. As a result, the Ninth Circuit rejected EPA's request to leave the unconditional registration in place on remand. *Id.* Here, injunctive relief likewise furthers the core purposes of the ESA and reflects the potentially widespread harms caused by the Corps' violation. *See, e.g., W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 498-500 (9th Cir. 2011) (enjoining revisions to nationwide grazing regulations for federal lands); *Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 295 (9th Cir. 1992) (enjoining BLM from conducting any timber sales until it had consulted with Fish and Wildlife Service regarding potential endangered species issues).

### a. Vacatur

Vacatur remains the presumptive remedy when an agency violates the law. 5 U.S.C. § 706(2)(A). The Ninth Circuit remands agency actions without vacating that action only in "limited circumstances." *Pollinator*, 806 F.3d at 532 (quoting *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012)); *see Wood v. Burwell*, 837 F.3d 969, 975-76 (9th Cir. 2016) (recognizing that remand without vacatur is a remedy "used sparingly"). A district court possesses "broad latitude," however, in fashioning equitable relief "when necessary to remedy an established wrong." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008).

A district court may exercise that discretion where appropriate to order partial, rather than complete, vacatur. *See, e.g.*, *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 79-80 (D.D.C. 2010). The district court in *Van Antwerp* determined that the Corps had violated the National Environmental Policy Act ("NEPA") and the Clean Water Act ("CWA") in issuing permits. *Id.* at 78. The district court tailored its relief to reduce the harm caused by the violations. The fact that the developers already had completed work on some of the project prompted the district court to narrow the scope of its vacatur to allow the developer to continue with the construction of a partially-completed county road and to maintain a storm water maintenance program as the continuation of these activities would promote

8

the purposes of the CWA. *Id.* at 79-80.

Two factors guide the Court in deciding whether to depart from, or limit, the presumptive remedy of vacatur: (1) "the seriousness" of an agency's errors; and (2) "the disruptive consequences" that would result from vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993); *see Cal. Cmtys. Against Toxics*, 688 F.3d at 994 (applying *Allied-Signal*'s two-factor test). The Court will address each of these factors.

### i.     The Seriousness of the Corps' Error

The Corps committed serious error in failing to engage in programmatic consultation. The Corps should have engaged in programmatic consultation before it issued NWP 12 as required by § 7 of the ESA. (Doc. 130 at 18-19.) The Court determined that programmatic consultation represents "the only way to avoid piecemeal destruction of species and habitat" and that project-level review "cannot ensure that the discharges authorized by NWP 12 will not jeopardize listed species or adversely modify critical habitat." (*Id.* (citing *National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d 1, 9-10 (D.D.C. 2005); 50 C.F.R. § 402.14(c))). The Court further noted that the Corps' ESA violation may have repercussions under NEPA and the CWA. (*Id.* at 21-25.) The Court acknowledged that the Corps' ESA § 7 programmatic consultation could alter the Corps' assessment of NWP 12's environmental consequences under NEPA and the CWA.

9

(*Id.* at 22-25.)

Plaintiffs proffered evidence in their summary judgment brief that addressed Keystone XL as illustrative of potential injuries. (Docs. 73-2 & 73-7.) Plaintiffs also pointed to harms likely to arise from other projects. (*Id.*) Plaintiffs now have submitted additional declarations to underscore the harm that they and their members may suffer from NWP 12's unlawful use, particularly from construction of major oil and gas pipelines throughout the country. (*See, e.g.*, Docs. 144-1 to 144-15.)

A court should tip the scales in favor of the endangered species under the ESA's "institutionalized caution" mandate in applying the *Allied-Signal* test to ESA violations like this one. *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015) (quoting *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987)). The need for "institutionalized caution" led the district court in *Klamath-Siskiyou Wildlands Center* to vacate permits issued to a logging company that included an improperly issued 50-year incidental take permit that allowed the logging company to take two threatened species in violation of the ESA. *Id.* The district court declined to categorize the agency's errors as "mere technical or procedural formalities" when the errors included the agency's failure to conduct a cumulative impacts analysis under NEPA for the timber harvest projects. *Id.* at 1244. The agency's failure to

10

conduct a cumulative impacts analysis compares with the Corps' failure here to engage in programmatic consultation analysis as required by § 7 of the ESA. This same need for "institutionalized caution" in evaluating ESA violations supports vacatur until the Corps adequately analyzes NWP 12's impacts to listed species through programmatic ESA consultation. *See Klamath-Siskiyou Wildlands Ctr.*, 109 F. Supp. 3d at 1242.

### ii.  The Vacatur's Disruptive Consequences

A court largely should focus on potential environmental disruption, as opposed to economic disruption, under the second *Allied-Signal* factor. *Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 953 (N.D. Cal. 2010). As noted by the district court in *Center for Food Safety*, "the Ninth Circuit has only found remand without vacatur warranted by equity concerns in limited circumstances, namely serious irreparable environmental injury." *Id.* The district court invalidated an agency decision to deregulate a variety of genetically engineered sugar beets without having prepared an environmental impact statement. In vacating the rule, the district court declined to classify the NEPA violations as "not that serious or numerous." *Id.* at 953. The district court ultimately determined that the equities favored vacatur of the rule despite allegations of potential economic consequences. *Id.* at 954.

11

A few examples of decisions to remand without vacatur provide further context for the Court's analysis. For example, the Ninth Circuit's decision in *California Communities Against Toxics v. EPA*, 688 F.3d 989 (9th Cir. 2012), demonstrates the limited nature of remanding an invalid agency action without vacating the action. Environmental groups challenged the decision of the EPA to approve revisions to California's clean air plan. The groups contended that EPA had committed procedural errors during the rulemaking process and that the substance of the revised state plan violated the Clean Air Act. *Id.* at 991-92. The district court agreed. EPA had violated the notice-and-comment provisions of the APA when it failed to list all pertinent documents in the docket index. The district court deemed the error harmless because the environmental groups already had the documents in their possession from earlier proceedings. *Id.* at 992.

The Ninth Circuit affirmed on this harmless error point. *Id.* at 993. EPA may have violated the Clean Air Act in approving the revisions to California's plan. *Id.* The Ninth Circuit agreed with EPA, however, that remand without vacatur would be appropriate in light of the harmless nature of EPA's procedural error and the potential harm caused by the vacatur. Vacatur would delay the construction of a much-needed power plant that could result in power blackouts over the coming summer. *Id.* at 994. These blackouts, in turn, would require the use of diesel generators that would add to air pollution in contravention of the purpose of the

12

Clean Air Act. *Id.* This combination of economically *and* environmentally harmful

consequences led the Ninth Circuit to affirm the order of remand without vacatur.

*Id.*; s*ee also Pollinator*, 806 F.3d at 532 (confirming that the *Allied-Signal* inquiry

centers on "whether vacating a faulty rule could result in possible environmental

harm").

Finally, the Ninth Circuit's analysis in *Idaho Farm Bureau Federation v.

Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995), highlights the proper application of

vacatur as a remedy in environmental cases. The district court set aside the

decision of the Fish and Wildlife Service ("FWS") to list the Bruneau Hot Springs

snail due to several procedural errors committed by FWS during the period

between the initial proposal and final listing. The Ninth Circuit remanded without

vacatur of FWS's listing decision for two reasons: (1) the minor nature of the

agency's procedural error; and (2) concerns that immediately vacating the listing

decision threatened the potential extinction of a snail species that constituted an

irreparable environmental injury. *Id.* The procedural error arose from the agency's

failure to make available for public comment one study that the agency had relied

upon in making its decision. *Id.* at 1405. The Ninth Circuit discussed no potential

harm that would have occurred by leaving the listing of the endangered species *in

place* while the agency reconsidered its decision. *Id.*

Defendants here point to no potentially irreparable environmental injury

that could arise from the Court's failure to remand without vacatur. Defendants and Intervenor-Defendants focus on disruptions stemming from vacatur of NWP 12 as to the construction of electric, internet, and cable lines, and to routine maintenance, safety, and repair of projects that already have been built and that may pose less risk to species. For example, the NWP 12 Coalition discusses routine maintenance and repair of gas pipelines to ensure safety, vegetation removal along electric lines to prevent forest fires, placement of protective matting to prevent rutting from service vehicles, and ongoing maintenance of utility projects in navigable waters. (Doc. 138 at 9-12, 21-22.) The Corps raises similar concerns. The Corps cited a fiber optic cable upgrade project, an improvement to a wastewater management system, and work associated with removal of a tree from an exposed and leaking water line that would be halted by the vacatur. (Doc. 131 at 16.)

Plaintiffs' arguments on summary judgement centered on threats to listed species and critical habitats by the construction of major oil and gas pipelines such as Keystone XL. (Doc. 144 at 21.) Plaintiffs note that these major oil and gas pipelines potentially affect numerous waterbodies and thereby involve precisely the kinds of cumulative impacts that should be addressed through programmatic consultation. (*Id.* at 21-22.) On the other hand, other activities authorized by NWP 12, such as routine maintenance and repair, raise issues that the Corps must

consider on remand. (*Id.* at 22.) These routine maintenance and repair projects, however, do not necessarily involve the same level of potential severe risk to listed species and their habitat as pipelines. (*Id.*)

To allow the Corps to continue to authorize new oil and gas pipeline construction could seriously injure protected species and critical habitats—"the very danger" that the ESA "aims to prevent." *Cal. Cmtys. Against Toxics*, 688 F.3d at 994. Plaintiffs contend that the appropriate course would be for the Court to narrow the vacatur of NWP 12 to a partial vacatur that applies only to the construction of new oil and gas pipelines. (Doc. 144 at 10.) Plaintiffs' proposed partial vacatur would keep NWP 12 in place during remand insofar as it authorizes more routine and minor projects in order to avoid these claimed disruptions. (*Id.*)

To narrow the vacatur of NWP 12 to a partial vacatur that applies to the construction of new oil and gas pipelines strikes a reasonable balance under the *Allied-Signal* factors while still redressing the potential harms to listed species and habitat that those projects pose. For example, the Court discussed adverse effects to threatened and endangered species from NWP 12-authorized construction activities, including increased sedimentation, and from horizontal directional drilling used during pipeline construction. (Doc. 130 at 14-15.) These impacts likely would be particularly severe when constructing large-scale oil and gas pipelines. (Doc. 144 at 24.) These large-scale oil and gas pipelines may extend

many hundreds of miles across dozens, or even hundreds, of waterways and require the creation of permanent rights-of-way. (*See* Doc. 138-5 at 4 (asserting that several developers "have relied on NWP 12 authorizations to construct hundreds of miles" of oil and gas pipelines within the past five years).) These large-scale oil and gas pipelines often require a network of access roads, pump stations, pipe yards, contractor yards, and extra workspace. (*See* Doc. 137 at 16 (describing Keystone XL's proposed Project footprint); Doc. 144-14 (Keystone XL's Biological Assessment).)

Plaintiffs acknowledge that the potential impacts arising from NWP 12, by contrast, likely would be less severe for routine maintenance, repair, and inspection activities on *existing* NWP 12 projects, and for the installation of non-pipeline projects like broadband and fiber optic cables. (Doc. 107 at 64-65.) The Corps must address all such impacts on remand. To narrow the vacatur portion of the remedy to the more severe threats posed by NWP 12 proves justified in this instance. *See Idaho Farm Bureau Fed'n*, 58 F.3d at 1405-06; *see also Van Antwerp*, 719 F. Supp. 2d at 79-80 (noting that a district court may exercise discretion where appropriate to order partial, rather than complete, vacatur).

The continued availability of the ordinary individual permit process under CWA § 404(a) tempers any disruption caused by this partial vacatur. Partial vacatur does not block any projects. It vacates only the Corps' categorical approval

of new oil and gas pipeline construction under NWP 12. Defendants acknowledge that the individual permit process remains available. Defendants simply complain that the individual permit process proves too expensive and time-consuming.

The need to protect endangered species and critical habitat from harm until the Corps completes programmatic consultation outweighs any disruption or permitting delays that would result from this partial vacatur. Numerous other courts have agreed. For example, state and tribal groups brought an action against BLM in *California v. BLM*, 277 F. Supp. 3d 1106, 1125-27 (N.D. Cal. 2017). The groups alleged that BLM had violated the APA in adopting its decision to postpone compliance dates in a rule governing natural gas waste and royalties without following the notice-and-comment period after the rule's effective date had passed. *Id.* at 1110-11. The magistrate judge agreed.

The magistrate judge rejected BLM's argument that the cost of compliance warranted remand without vacatur, and, instead, concluded that "the general rule in favor of vacatur" would be appropriate. *Id.* at 1127; s*ee also Pub. Emps. for Envtl. Responsibility v. FWS*, 189 F. Supp. 3d 1, 3 (D.D.C. 2016) (reasoning that "[a]bsent a strong showing by [the agency] that vacatur will unduly harm economic interests . . . , the Court is reluctant to rely on economic disruption" to deny relief of vacatur of rules adopted in violation of NEPA); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 104 (D.D.C. 2017)

17

(noting that allegations of financial harm to pipeline developer will not necessarily have a "determinative effect" on remedy, because claims of "lost profits and industrial inconvenience" are "the nature of doing business, especially in an area fraught with bureaucracy and litigation").

The Ninth Circuit approved of this type of limited vacatur in *Northern Cheyenne Tribe v. Norton*, 503 F.3d 836 (9th Cir. 2007). BLM had taken a "hard look" at the environmental consequences caused by coal bed methane development. *Id.* at 844. This "hard look" had found evidence to suggest that coal bed methane development would cause less environmental damage than BLM anticipated. *Id.* BLM failed to analyze, however, a phased development alternative in addition to the five proposals. Under these circumstances, the district court properly found that the limited injunction proposed by BLM would minimize potential damage to the environment. *Id.* at 846.

Partial vacatur proves appropriate under the circumstances. To vacate NWP 12 only as it relates to new oil and gas pipeline construction will prohibit the Corps from relying on NWP 12 for those projects that likely pose the greatest threat to listed species. The Corps may not approve the discharge of dredged or fill material under NWP 12 for projects constructing new oil and gas pipelines. NWP 12 will remain in place during remand insofar as it authorizes non-pipeline construction activities and routine maintenance, inspection, and repair activities on

18

existing NWP 12 projects. The "less drastic remedy" of partial vacatur adequately will prevent harm to listed species and critical habitat at this point. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). The continued availability of the ordinary permitting process further supports partial vacatur as it represents the "nature of doing business" in this area. *Standing Rock Sioux Tribe*, 282 F. Supp. 3d at 104.

### b.  Injunctive Relief

A plaintiff seeking injunctive relief must satisfy a four-factor test by showing the following:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006). The Ninth Circuit long has recognized an exception to the traditional test for injunctive relief when addressing procedural violations under the ESA. *Cottonwood Env. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015). No question exists that the ESA strips courts of at least some of their equitable discretion in determining whether injunctive relief proves warranted. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 543 n.9 (1987) (explaining that the ESA "foreclose[s] the traditional discretion possessed by an equity court").

19

The Ninth Circuit also has recognized that the ESA "removes the latter three factors in the four-factor injunctive relief test from [courts'] equitable discretion." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Service*, 886 F.3d 803, 817 (9th Cir. 2018). This analysis requires a court to "presume that remedies at law are inadequate, that the balance of interests weighs in favor of protecting endangered species, and that the public interest would not be disserved by an injunction." *Id.* This approach comports with the "fundamental principle" that Congress has "afford[ed] endangered species the highest of priorities." *National Wildlife Fed'n v. Nat'l Marine Fisheries Service*, 422 F.3d 782, 794 (9th Cir. 2005) (citing *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978)).

The court must exercise its discretion to determine whether a plaintiff has suffered irreparable injury. *Cottonwood*, 789 F.3d at 1090. "[T]here is no presumption of irreparable injury where there has been a procedural violation in ESA cases." *Id.* at 1091. Plaintiffs must demonstrate that irreparable injury "is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). A "possibility" of irreparable harm cannot support an injunction. *Id.* The Ninth Circuit has recognized that "establishing irreparable injury"—the remaining factor— should not "be an onerous task" given "the stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them." *Cottonwood*, 789 F.3d at 1091.

20

A court determines irreparable harm by reference to the purposes of the statute being enforced. *Nat'l Wildlife Fed'n*, 886 F.3d at 818 (citing *Garcia v. Google*, 786 F.3d 733, 744-45 (9th Cir. 2015)). The types of harms that may be irreparable "will be different according to each statute's structure and purpose." *Sierra Club v. Marsh*, 872 F.2d 497, 502-03 (1st Cir. 1989). The Court determined that the Corps violated § 7 of the ESA. (Doc. 130.)

One of the ESA's central purposes is to conserve species. *See* 16 U.S.C. § 1531(b) (a purpose of the ESA is to provide "a program for the conservation of . . . endangered species and threatened species"). The "plain intent" of Congress in enacting the ESA was "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth.*, 437 U.S. at 184. To fulfill this important purpose, the ESA requires the Corps to determine "at the earliest possible time" whether any action it takes "may affect" listed species and critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). If the Corps' action "may affect" listed species or critical habitat, the Corps must consult with FWS and/or National Marine Fisheries Service ("NMFS"). 16 U.S.C. § 1536(a)(2).

The Court explained in its Order how the Corps' reissuance of NWP 12 in 2017 failed to comply with the ESA. (Doc. 130 at 7-21.) The Corps failed to initiate § 7(a)(2) consultation to ensure that discharge activities authorized under NWP 12 comply with the ESA. *See* 16 U.S.C. § 1536(a)(2). Plaintiffs assert that

21

the Court must enjoin Keystone XL to avoid irreparable harm. (Doc. 144 at 36.) TC Energy asserts that it would be improper to single out Keystone XL from the new construction of other oil and gas pipelines for different treatment. (Doc. 137 at 18.)

The Court agrees that it would be improper to single out Keystone XL. The Court's ESA analysis focused on Plaintiffs' facial attack to NWP 12. (Doc. 130 at 7-21.) Plaintiffs now have argued and demonstrated that certain activities authorized under NWP 12 pose more of a threat to listed species and critical habitat than other activities authorized under NWP 12. *See supra* at 11-18. Large-scale oil and gas pipelines, including Keystone XL, repeatedly utilize NWP 12 to approve dredge and fill activities for a pipeline that extends hundreds of miles across many waterways. (*See* Doc. 138-5 at 4.)

The Court discussed at length in its Order that the Corps needed to consider NWP 12's entire effect when it reissued the permit in 2017. (*See, e.g.*, Doc. 130 at 16.) The Court concluded that "[p]rogrammatic review of NWP 12 in its entirety, as required by the ESA for any project that 'may effect' listed species or critical habitat, provides the only way to avoid piecemeal destruction of species and habitat." The Corps failed to ensure that its reissuance of NWP 12 in 2017 was not likely to jeopardize the continued existence of any listed species or destroy or adversely modify designated critical habitat. (Doc. 130 at 21); *see* 16 U.S.C. §

22

1536(a)(2). The Court noted that the types of discharges that NWP 12 authorizes "may affect" listed species and critical habitat. (Doc. 130 at 13.) The Corps should have initiated § 7 ESA consultation before it reissued NWP 12 in 2017, and irreparable injury "is *likely*" if developers continue to build new, large-scale oil and gas pipeline projects. *See Nat'l Wildlife Fed'n*, 886 F.3d at 819 (citation omitted).

Although case law instructs the Court to presume that the remaining factors favor injunctive relief, the Court addresses these factors briefly below out of an abundance of caution. *See Nat'l Wildlife Fed'n*, 886 F.3d at 817. The second factor—whether remedies available at law are inadequate to compensate for the injury—plainly favors injunctive relief. *Amoco*, 480 U.S. at 545 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages"). This need for injunctive relief proves especially true considering that the Court identified a violation of the ESA. *Cottonwood Envtl. Law Ctr.*, 789 F.3d at 1090 (noting that it is the "incalculability" of an ESA injury that "renders the remedies available at law . . . inadequate" (citation omitted)); *Nat'l Wildlife Fed'n*, 886 F.3d at 817 (noting Congress's "plain intent" in enacting the ESA was to "halt and reverse the trend toward species extinction, whatever the cost").

The Court addresses the third and fourth factors together. *See Padilla v. Immigration and Customs Enforcement*, 953 F.3d 1134, 1141 (9th Cir. 2020)

(noting where the government is a party is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge). Preserving endangered species is of "incalculable" value to the public interest. *Cottonwood*, 789 F.3d at 1090. The public also has an interest in the repair, maintenance, and construction of vital infrastructure.  (*See e.g.*, Doc. 131 at 16). The Court's order strikes a balance between these important interests by narrowing the relief to allow for certain of these vital projects to continue while the Corps completes the consultation and compliance process pursuant to the ESA.

Routine maintenance, inspection, and repair activities on existing NWP 12 projects pose less of a risk. *See supra* p. 16. No evidence exists, however, that the construction of Keystone XL pipeline necessarily poses a greater risk under the ESA than the construction of other new oil and gas pipelines. The Court will amend its order to narrow its injunctive relief to the same scope that it narrowed its vacatur relief. *See supra* pp. 17-18.

## III.   STAY PENDING APPEAL

Federal Defendants and TC Energy have filed separate motions for partial stays pending appeal. (Docs. 131 & 136.) Federal Defendants ask the Court to stay the portions of the Order that vacate NWP 12 and enjoin the Corps from authorizing any dredge or fill activities under NWP 12. (Doc. 131 at 6.) Federal Defendants ask the Court, at the very least, to stay the vacatur and injunction as

24

they relate to anything other than the Keystone XL pipeline. (*Id.*) TC Energy asks the Court to stay the order for Keystone XL and all other utility projects. (Doc. 137 at 18.)

"A stay [pending appeal] is not a matter of right, even if irreparable injury might otherwise result." *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017) (per curiam) (quoting *Nken v. Holder*, 556 U.S. 418, 433 (2009)). The U.S. Supreme Court has set forth a four-factor test to evaluate a request for a stay pending appeal:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 434. A party requesting a stay pending appeal bears the burden of showing that the circumstances justify an exercise of the court's discretion. *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012).

### a. Federal Defendants' and TC Energy's Likelihood of Success on the Merits of Their Appeal

"An applicant for a stay pending appeal must make 'a strong showing that he is likely to succeed on the merits.'" *Al Otro Lado v. Wolf*, 952 F.3d 999, 1010 (9th Cir. 2020) (quoting *Nken*, 556 U.S. at 434). The Court determined that the Corps' reissuance of NWP 12 in 2017 violated the ESA. (Doc. 130 at 25.) Well-settled case law indicates that Defendants likely would be unable to succeed on appeal.

25

*See, e.g.*, *Brownlee*, 402 F. Supp. 2d at 9-10. The district court in *Brownlee* reached the same conclusion regarding NWP in 2002 as did the Court regarding NWP 12—the Corps needed to engage in programmatic consultation to comply with the ESA. *Id.* The Ninth Circuit similarly determined in *Lane County Audubon Society*, 958 F.2d at 295, that BLM's failure to consult with FWS before implementing management guidelines for conservation of northern spotted owl violated § 7 of the ESA.

These circumstances differ greatly from those faced by the Ninth Circuit in *Alaska Survival v. Surface Transportation Board*, 704 F.3d 615 (9th Cir. 2012). The Surface Transportation Board ("STB") issued a decision to allow a construction project to move forward that plaintiffs sought to challenge as violating the board's statutory authority and NEPA. *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1079, 1084 (9th Cir. 2013). The Ninth Circuit originally granted plaintiffs a stay of the STB's decision. *Id.* at 1077 n.2. The Ninth Circuit then received merits briefing and heard oral argument on the claims. *Alaska Survival*, 704 F.3d at 616. The Ninth Circuit issued a brief opinion after oral arguments to lift the stay with notice that "[a]n opinion on the merits of denial of the petition for review will follow in due course." *Id.* The brief opinion explained that it had decided to lift the stay because "the balance of hardships no longer tips sharply in the [plaintiffs'] favor." *Id.* To leave the stay in place would result in hardships

because it would "prevent the award of construction contracts, postpone the hiring of construction employees, and significantly increase costs." *Id.* Plaintiffs, on the other hand, would suffer almost no hardships because the court had determined on the merits that STB had complied fully with the law. *Id.* No reason existed to leave a stay in place during a time in which the Ninth Circuit completed work on an opinion in favor of the STB.

### b. Irreparable Injury

Defendants' claims of irreparable injury fail to support a stay. Irreparable harm stands as the "bedrock requirement" of a stay pending appeal. *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011) (per curiam). Federal Defendants complain that, absent a stay, the Corps will be burdened by having to process an increased number of individual permit applications under § 404(a). (Doc. 131 at 19-20.) Those burdens prove to be a fault of the Corps' own making. Federal Defendants' claimed harms appear "less than convincing" in light of the Corps' knowledge that its reauthorization of NWP 12 required § 7(a)(2) consultation given its prior consultation on the reissuance of NWP 12 in 2007. (Doc. 130 at 20); *Ctr. for Food Safety v. Vilsack*, 10-cv-04038, 2010 WL 11484449, at *6 (N.D. Cal. Nov. 30, 2010) (citation omitted); *see also Al Otro Lado*, 952 F.3d at 1008 (noting that the fact that the government's asserted harm was largely self-inflicted severely undermined the government's claim for equitable relief).

Indeed, the Corps' own regulatory manager acknowledged the Corps' consultation obligations before recommending that the Corps simply make a "national 'no effect' determination for each NWP reissuance until it is challenged in federal court and a judge rules against the Corps." NWP036481. Plaintiffs challenged the Corps' no effect determination in federal court. The Court ruled against the Corps, just as the Corps anticipated. (Doc. 130 at 7-21.) This type of "largely self-inflicted" harm undermines the Corps' claim for equitable relief. *See Al Otro Lado*, 952 F.3d at 1008.

The Corps' alleged burden fails to support a stay where, as here, "the troubles complained of resulted from [the agency's] failure to follow the law in the first instance." *Swan View Coal. v. Weber*, 52 F. Supp. 3d 1160, 1161-62 (D. Mont. 2014) (enjoining Forest Service from authorizing or accepting harvest plans for site-specific timber projects due to failure to comply with NEPA and ESA); *accord Miller v. Carlson*, 768 F. Supp. 1341, 1343 (N.D. Cal. 1991) (denying stay based on rejection of fiscal constraints as justification for a state's failure to comply with its legal obligations). The Ninth Circuit affirmed a preliminary injunction that required the federal government to hold bond hearings before an immigration judge. *Rodriguez v. Robbins*, 715 F.3d 1127, 1146 (9th Cir. 2013). The Ninth Circuit, in rejecting the government's cost concerns in complying with the terms of preliminary injunction, noted that even the likelihood of the

28

government facing "severe logistical difficulties in implementing [the injunction]" would not warrant a stay as these difficulties "would merely represent the burdens of complying with the applicable statutes." *Id.* The Corps similarly faces the burdens of complying with the ESA. Moreover, any burdens that the Corps will face represent largely a fault of its own making. *See Swan View Coal.*, 52 F. Supp. 3d at 1161-62.

Intervenors claim that their inability to rely on NWP 12 will cause additional costs and delays. (Doc. 137 at 15-18 & Doc. 138 at 14-16.) The Court's amended remedy to partial vacatur and partial injunction lessens the burdens suggested by Intervenors. The Court narrowed the scope of the vacatur and injunction to minimize potential disruption to existing projects and smaller-scale projects while ensuring appropriate protection for endangered and threatened species and their critical habitats. *See supra* pp. 17-18, 20. NWP 12 does not stand as Intervenors' only option. Developers remain able to pursue individual permits for their new oil and gas pipeline construction. *See Pub. Emps. for Envtl. Responsibility*, 189 F. Supp. 3d at 3.

TC Energy states that enjoining Keystone XL from using NWP 12 would cause substantial harm to TC Energy, TC Energy's employees and its customers, the State of Montana, and all the local governments, businesses, and individuals that will benefit from the economic activity generated by construction of Keystone

XL. (Doc. 137 at 20-21.) TC Energy relies largely upon the U.S. Supreme Court's decision in *Amoco Production Company*, 480 U.S. at 545, to support its claim that courts should not necessarily presume irreparable harm in environmental cases.

Two Alaska Native villages and a Native organization sought to enjoin exploratory drilling off the Alaska coast under leases that the Secretary of the Interior had granted to oil companies. *Amoco*, 480 U.S. at 535. Plaintiffs alleged that the leases violated the Alaska National Interest Lands Conservation Act ("ANILCA") because it restricted their use of subsistence resources. *Id.* The U.S. Supreme Court reversed the Ninth Circuit's grant of injunctive relief based on it use of a presumption of irreparable harm in the context of ANILCA. *Id.* at 545.

The presumption of irreparable injury when an agency fails to evaluate thoroughly the environmental impact of a proposed action runs contrary to traditional equitable principles involved in determining the appropriateness of granting injunctive relief. *Id.* To permit oil exploration to continue pending administrative review did not violate ANILCA where "injury to subsistence resources from exploration was not at all probable." *Id.* The Supreme Court understood, however, that in most instances "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Id.* The balance of harms usually will favor the issuance of an injunction to protect the environment when "such injury is

30

sufficiently likely." *Id.*

*Amoco* looked with disfavor upon the presumption of irreparable harm in the context of ANILCA. *Id.* The Ninth Circuit and other circuits have questioned the applicability of *Amoco* to NEPA cases. *See, e.g.*, *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190 (9th Cir. 1988); *Marsh*, 872 F.2d at 502–03 (holding *Amoco* should not routinely control the decision of whether to enjoin agency action in NEPA cases). The First Circuit has outlined why harm may not prove irreparable under ANILCA even when irreparable under other statutes. Under NEPA, for example, if "the decisionmaker has fully considered the environmental impacts of the proposed action, NEPA does not stop him from deciding to cause environmental damage." *Marsh*, 872 F.2d at 502. ANILCA, on the other hand, allows a court to make the decisionmaker choose a different option entirely. *Id.* at 503. This distinction, according to the First Circuit, proves important because agency decisions in general face "every-growing bureaucratic commitment" as interest groups, workers, suppliers, potential customers and local officials "become ever more committed to the action initially chosen." *Id.* at 503. Under ANILCA, environmental harm proves "reparable" because the court can require the decisionmaker to make a new choice, regardless of the level bureaucratic commitment. Under NEPA, however, the court's limited ability to review actions means that any later litigation "effort to bring about a new choice, simply by

asking the agency administrator to read some new document, will prove an exercise in futility" due to bureaucratic commitment. *Id.* This futility means "that ever-growing bureaucratic commitment to a project . . . may prove to be 'irreparable harm' in a NEPA case in a sense not present in an ANILCA case." *Id.*

These decisions, and their reasoning, appear to support the presumption of irreparable damage employed by the Ninth Circuit in evaluating alleged NEPA violations. Here, we face a violation of the ESA and its programmatic consultation requirement. This programmatic consultation requirement compares to the procedural requirements of NEPA that serve to apprise the agency of environmental consequences. The Court nevertheless will follow *Amoco* and not presume that irreparable injury would arise from the Corps' failure to engage in programmatic consultation as required by the ESA. *See, e.g.*, *Cottonwood Envtl. Law Ctr*, 789 F.3d at 1089–91; *Pub. Serv. Co. of Colorado v. Andrus*, 825 F. Supp. 1483, 1504–08 (D. Idaho 1993), *modified*, No. CIV. 91-0035-S-HLR, 1993 WL 388312 (D. Idaho Sept. 21, 1993).

The district court in *Andrus* found that Idaho had shown several irreparable injuries that would result from the decisions of the Department of Energy ("DOE") regarding the shipment, receipt, processing, and storage of spent nuclear fuel at the national engineering laboratory in Idaho. The number and volume of shipments of spent nuclear fuel to the laboratory would increase dramatically under DOE's

current proposals and it was undisputed that the total amount of radiation exposure increases as the number of shipments increases. *Andrus*, 825 F. Supp. at 1505. The risk of an accident in transit also increases as the number of shipments increase. *Id.* at 1505-06. The environmental consequences of even a single accident could be devastating. *Id.* at 1504-08. These factors easily satisfied the irreparable injury requirement. Spent nuclear fuel admittedly poses a risk of a kind different than the construction and development of oil and gas pipelines. Nevertheless, an increase in the number and size of pipelines increases the risk of an accident or harm to the environment in the construction and development of these pipelines. *See Sierra Club v. U.S. Fish & Wildlife Serv.*, 235 F. Supp. 2d 1109, 1139–40 (D. Or. 2002) (determining that the potential over-harvesting of cougars satisfied the likelihood of irreparable harm requirement to support injunction until completion of EIS).

Intervenors' alleged harm stems from the requirement that Intervenors and their members follow the law and obtain permits for their projects. These type of ordinary compliance costs likewise do not rise to the level of irreparable harm. In fact, "monetary injury is not normally considered irreparable" absent a threat of being driven out of business. *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019) (citation and alteration omitted)); *see also Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) (determining that "injury resulting from attempted compliance with government regulation ordinarily is not

33

irreparable harm"). Intervenors possess no inherent right to maximize revenues by using a cheaper, quicker permitting process, particularly when their preferred process does not comply with the ESA. *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) (determining that the "loss of anticipated revenues . . . does not outweigh the potential irreparable damage to the environment"), *abrogated on other grounds by Monsanto*, 561 U.S. 139; *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (irreparable environmental injuries outweigh temporary economic harms).

### c. The Balance of the Equities and Public Interest

Defendants' failure to satisfy the irreparable harm requirement relieves the Court from needing to address the final two factors. *See Leiva-Perez*, 640 F.3d at 965. Out of an abundance of caution, however, the Court will address the balance of equities and the public interest. The balance of equities and public interest "tip sharply" in Plaintiffs' favor in this case. *See Al Otro Lado*, 952 F.3d at 1015. The equities and public interest factors always tip in favor of the protected species "when evaluating a request for injunctive relief to remedy an ESA procedural violation." *Cottonwood Envtl. Law Ctr.*, 789 F.3d at 1091.

As detailed above, Plaintiffs would suffer substantial harm if the Court allowed Keystone XL and other oil and gas pipelines to be constructed using

NWP 12 during the remand. (*See* Doc. 138-1 at 6-7 (stating that developer was one month away from receiving verification for a pipeline "designed to extend hundreds of miles across multiple states"); Doc. 138-5 at 5 (stating that developers have plans to construct pipelines in 17 states)). The fact that the Corps *already* has issued more than 38,000 preconstruction notification ("PCN") verifications under NWP 12 since March 19, 2017, up and until the April 15, 2020 Order, compounds this harm. (*See* Doc. 131-1 at 3.)

Federal Defendants claim that Plaintiffs will suffer no such harm. Federal Defendants note that very few of the 5,500 pending PCNs relate to oil and gas pipelines or implicate listed species. (Doc. 131 at 16.) This argument fails. The mere fact that many *other* PCNs remain pending does not mean that the oil and gas pipelines waiting on verifications will not harm Plaintiffs if allowed to proceed. Further, even if the Court were to assume that permittees correctly determine whether their NWP 12-authorized activities trigger General Condition 18, the ensuing project-level review for those activities cannot cure the Corps' violation of a failure to engage in programmatic consultation pursuant to § 7 of the ESA. (*See* Doc. 130 at 18-20.) NWP 12 requires programmatic consultation to ensure that the cumulative impacts of oil and gas pipelines, combined with the thousands of other PCN and non-PCN uses of NWP 12, will not cause adverse effects to listed species. (*Id.* at 20.)

The public interest further weighs against the issuance of a stay. In arguing otherwise, Defendants cite the need to use NWP 12 for the maintenance and repair of electric, internet, and cable lines and wires. (*See, e.g.*, Doc. 131 at 16; Doc. 135 at 4-5.) The Court's narrowing of the vacatur and injunction will allow these uses to continue. This narrowing of the vacatur and injunction thereby avoids many associated harms to the public.

The Court's narrowing of the vacatur ensures that the Corps can enforce special conditions in existing verifications for projects that already have been built. The Ninth Circuit considered whether vacatur would risk greater environmental harm to vulnerable bee populations in rejecting the agency's request to leave the unlawful registration decision in place on remand. *Pollinator*, 806 F.3d at 532. The Court similarly declines to risk potential environmental harm to endangered species by leaving NWP 12 in place on remand. And no confusion should result from the Corps' regulation deeming PCNs presumptively authorized after 45 days. The Corps should deny verifications to address any uncertainty, but the narrowed scope of the Court's vacatur dictates that non-pipeline construction activities and routine maintenance, inspection, and repair activities on existing NWP 12 projects remain authorized.

No public interest exists in allowing the construction of new oil and gas pipelines to proceed before the Corps has completed the legally required

programmatic consultation under § 7 of the ESA. This programmatic consultation "allows for a broad-scale examination" of NWP 12's potential impacts and safeguards against the "piecemeal destruction" of listed species and critical habitat. (Doc. 130 at 10, 18.) The threat of such destruction from oil and gas pipelines proves substantial.

The public's interest in ensuring that the Corps follows the ESA trumps any purported tax and energy security benefits of new oil and gas pipelines. (*See* Doc. 137 at 17-18; Doc. 135 at 6; Doc. 138 at 8-9). The district court in *Montana Wilderness Association v. Fry*, 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006), understood that the "most basic premise of Congress' environmental laws" is that "the public interest is best served when the law is followed." The U.S. Supreme Court likewise opined that it remains "beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Hill*, 437 U.S. at 174; *see also Indigenous Envtl. Network v. State Dep't*, 369 F. Supp. 3d 1045, 1051-52 (D. Mont. 2018) (concluding potential environmental damage to the public outweighed any energy security and economic benefits provided by Keystone XL). The Court agrees.

**ORDER**

Accordingly, it is **HEREBY ORDERED** that the relief in the Court's April 15, 2020 Order (Doc. 130 at 26) is **AMENDED AS FOLLOWS**:

37

5. NWP 12 is vacated as it relates to the construction of new oil and gas pipelines pending completion of the consultation process and compliance with all environmental statutes and regulations. NWP 12 remains in place during remand insofar as it authorizes non-pipeline construction activities and routine maintenance, inspection, and repair activities on existing NWP 12 projects.

6. The Corps is enjoined from authoring any dredge or fill activities for the construction of new oil and gas pipelines under NWP 12 pending completion of the consultation process and compliance with all environmental statutes and regulations. The Corps remains able to authorize dredge or fill activities for non-pipeline construction activities and routine maintenance, inspection, and repair activities on existing NWP 12 projects.

It is further **ORDERED** that Federal Defendants' and TC Energy's Motions for Partial Stay Pending Appeal (Docs. 131 & 136) are **DENIED**.

DATED this 11th day of May, 2020.

Brian Morris, Chief District Judge
United States District Court